STATE OF TEXAS VS. RUBEN GUTIERREZ  1

REPORTER'S RECORD

VOLUME 4 OF 32 VOLUMES

TRIAL COURT CAUSE NO. 98-CR-1391-A

- - - - - - - - - - - - - - - - - x
                            :

THE STATE OF TEXAS         : IN THE DISTRICT COURT
                           :

VS.                      : 107TH JUDICIAL DISTRICT
                           :

RUBEN GUTIERREZ          : CAMERON COUNTY, TEXAS
                           :

- - - - - - - - - - - - - - - - - x

PRETRIAL MOTIONS

On the 22nd day of March, 1999, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Benjamin Euresti, Jr., Judge Presiding, held in Brownsville, Cameron County, Texas.

Proceedings reported by machine shorthand.

A P P E A R A N C E S

APPEARING FOR THE STATE OF TEXAS:

        HON. JOHN T. BLAYLOCK
        State Bar No. 00784302
        HON. KAREN L. FISCHER
        State Bar No. 00790685
        Assistant District Attorneys
        Cameron County Courthouse
        974 East Harrison
        Brownsville, Texas  78520
        (956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS

DEC 8  1999

Troy C. Bennett, Jr., Clerk

ORIGINAL

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                               2

1    APPEARANCES CONTINUED:

2    APPEARING FOR THE DEFENDANT:

3         HON. SANTIAGO GALARZA
          State Bar No. 00787508
4         Law Offices of Santiago Galarza
          3100 East 14th Street
5         Brownsville, Texas  78521
          (956) 541-4157
6
          AND
7
          HON. DANIEL R. REYES
8         State Bar No. 16794290
          Perez & Reyes
9         316 Nolana Loop
          McAllen, Texas  78504
10        (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                                   i

**VOLUME 4**

**PRETRIAL MOTIONS**

MARCH 22, 1999                                    PAGE    VOL

Pretrial Motions.................................3      4

Defendant's Motion to Transfer Venue............15      4

DEFENDANT'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Adriana Sanchez | 15 | 25 | 28 | --- | --- | 4 |
| Anna San Miguel | 30 | 36 | 38 | --- | --- | 4 |

|  |  |  |  |  | PAGE | VOL |
|--|--|--|--|--|------|-----|

Court's ruling..................................40      4

Motion to Suppress..............................43      4

STATE'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Antonio Flores | 43 | 68 | 109 | 112 | 115 | 4 |
| Gilbert Garcia Jr. | 117 | 136 | 114<br>--- | --- | --- | 4 |

|  |  |  |  |  | PAGE | VOL |
|--|--|--|--|--|------|-----|

State rested...................................151      4

DEFENDANT'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Ruben Gutierrez | 152 | 176 | --- | --- | --- | 4 |
| Anna San Miguel | 209 | 215 | --- | --- | --- | 4 |

|  |  |  |  |  | PAGE | VOL |
|--|--|--|--|--|------|-----|

Defendant rested...............................218      4

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    ii

**STATE'S REBUTTAL WITNESSES:**

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Sandra Galvan | 219 | 222 | --- | --- | --- | 4 |
| Rey Pineda | 230 | 234 | --- | --- | --- | 4 |

|  |  | PAGE | VOL |
|--|--|------|-----|
| Both sides closed.............................241 | | | 4 |
| Court's ruling................................241 | | | 4 |
| Adjournment...................................243 | | | 4 |
| Court Reporter's Certificate..................244 | | | 4 |

### ALPHABETICAL WITNESS INDEX

#### PRETRIAL MOTIONS

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Flores, Antonio | 43 | 68 | 109 114 | 112 | 115 | 4 |
| Galvan, Sandra | 219 | 222 | --- | --- | --- | 4 |
| Garcia, Gilbert Jr. | 117 | 136 | --- | --- | --- | 4 |
| Gutierrez, Ruben | 152 | 176 | --- | --- | --- | 4 |
| Pineda, Rey | 230 | 234 | --- | --- | --- | 4 |
| San Miguel, Anna | 30 | 36 | 38 | --- | --- | 4 |
| San Miguel, Anna | 209 | 215 | --- | --- | --- | 4 |
| Sanchez, Adriana | 15 | 25 | 28 | --- | --- | 4 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                    iii

1                    INDEX OF EXHIBITS

2                   PRETRIAL MOTIONS

3     STATE'S EXHIBITS:

4     NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

5     1     Waiver of Rights            49         49         4
      2     Waiver of Rights            63         63         4
6     3     Confession                  63         63         4
      4     Confession                  63         63         4
7     5     Waiver of Rights           125        125         4
      6     Confession                 134        135         4
8     7     Photograph                 115        117         4
      8     Polygraph Warnings         204        ---         4

9

10

11    DEFENDANT'S EXHIBITS:

12    N/A

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2                  **(Open court, defendant present)**

3              THE COURT:  All right.  You may be seated.

4    All right.  Let's continue with the hearing on the motion

5    for change of venue; is that correct?

6              MS. FISCHER:  Yes, Your Honor, that's

7    correct.  That's where we were.  The defense had put one

8    witness on.

9              MR. REYES:  We had just one more witness

10   we're going to call, Your Honor.  Mr. Galarza went to get

11   him.  He just walked outside the courtroom.  We had told

12   him to be here at 10:00 in the morning.

13             THE COURT:  Okay.  Just one matter before

14   I begin that, for the record, I have a list of witnesses

15   that were subpoenaed from the Brownsville Police

16   Department that was submitted to the Court with the names

17   of the witnesses, their driver's license, Social Security

18   numbers, for purposes of discovery the defense was asking

19   for.

20             I'm going to submit this list to the

21   defense on the condition that it be under strict Court

22   orders to be -- to not be distributed to anyone else or

23   any other person not involved with the case, strictly for

24   purposes of discovery of this case.  It will be

25   confidential.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    4

```
 1              MR. GALARZA:  We can go ahead and submit
 2   it to our investigator if we need to do that, Your Honor.
 3   That's correct.
 4              THE COURT:  And, Ms. Fischer, do you want
 5   the original?
 6              MS. FISCHER:  Yes, Your Honor.
 7              THE COURT:  All right.  Then you can call
 8   your next witness, counsel.
 9              MR. GALARZA:  Your Honor, they're on their
10   way.  They should be here in probably two or three
11   minutes.  I already called the office.  They had already
12   left.
13              THE COURT:  They're not here yet?
14              MR. GALARZA:  No, Your Honor.
15              THE COURT:  Then let me -- while we
16   wait --
17              MR. GALARZA:  I don't know if you want to
18   go over the jury questionnaire.  There's only a couple of
19   objections that we need to put on there as to the
20   second -- the one that was submitted by the State.
21              THE COURT:  Oh, the supplemental one?
22              MR. GALARZA:  That's correct, Your Honor.
23              MS. FISCHER:  Yes, Your Honor.  I filed
24   some proposed questions from the State.
25              THE COURT:  Are you talking about those
```

```
 1   five?
 2              MS. FISCHER:  I think there were -- yeah,
 3   there were four --
 4              THE COURT:  Okay.  Here they are.
 5              MS. FISCHER:  The State requested four
 6   separate questions to be added to the jury questionnaire.
 7              THE COURT:  Okay.  What I did with that --
 8   let's see.  There's -- there was three questions and the
 9   third one with a second subpart; am I correct?
10              MS. FISCHER:  Yeah.  There was question
11   number A that had one, two and three below it, and then
12   question number B.
13              THE COURT:  Oh, okay.  I see what
14   you're -- I reviewed this already; and what the Court is
15   going to do on part A, I will not submit part A because
16   that is -- we're going to be voir diring a lot on that on
17   the individual jurors.  And the Court will give
18   instructions also in regards to those issues of law, but
19   on B, I will submit B -- or include B as part of the
20   questionnaire.
21              And then your objection was to what,
22   counsel?
23              MR. REYES:  Our objection, Your Honor, was
24   to the questionnaire being submitted on page -- on
25   question number 44 which is on page 14.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    6

1                  MS. FISCHER:  Now, Judge, that's the

2      Court's questionnaire, Mr. Reyes.  That was what I was

3      provided by the Court.

4                  THE COURT:  Right.  Okay.  On question

5      number 44.

6                  MR. REYES:  Forty-four, Your Honor, "Have

7      you ever had an unpleasant experience involving law

8      enforcement?"  We believe that --

9                  THE COURT:  That's 43.

10                 MR. REYES:  I'm sorry.  Forty-four, "Have

11     you, your spouse, or any family member -- or any member

12     of your family or a friend ever worked in a prison, a

13     jail, or detention center as a security guard or for a

14     detective service or polygraph agency?"

15                 The objection to that is the last part

16     which says, "Have you worked for a polygraph agency?"  We

17     believe that's totally irrelevant; and we don't believe

18     that it should be asked of any prospective jury member.

19                 THE COURT:  Any objection to including

20     that or not including that?

21                 MS. FISCHER:  Judge, I think it can be

22     included.  I think it's a proper question; and it's been

23     approved before by this Court.

24                 MR. REYES:  It's not admissible in court,

25     Your Honor, the results or whether or not an individual

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    7

1   took it.  So I don't see what the purpose of asking them

2   that question would be.

3                I think what it tends to show is maybe

4   that -- whether or not a polygraph was given, and then

5   maybe they might expect it at the time of trial.  So I

6   believe it's prejudicial.  It's not admissible in court;

7   and it would be totally irrelevant to voir dire on that.

8                THE COURT:  Okay.  I'll deny -- or

9   overrule the objection to that.

10               MR. REYES:  The next objection that we had

11  was on question number 56 which is on page 17, "Have you

12  ever filed a complaint with a police -- with the police

13  against anyone?"  And also question 57, "Have you ever

14  filed a complaint against a police officer or anyone in

15  law enforcement?"

16               We believe those are irrelevant questions,

17  Your Honor, and we don't believe that they should be

18  included to any -- in the questionnaire submitted to any

19  prospective jury member.

20               THE COURT:  I'll overrule that

21  objection -- those objections.

22               MR. REYES:  The next objection is on

23  question number 62 which is on page 18, "What is the

24  first thing that comes to mind -- to your mind when you

25  think of the defense counsel and also the prosecution?"

STATE OF TEXAS VS. RUBEN GUTIERREZ                          8

1  We would object to those two questions being submitted as
2  part of the questionnaire.
3              THE COURT:  I'll overrule that.
4              MR. REYES:  The next one is on page 19
5  which is question number 64, "What purpose do you think
6  the death penalty serves in our society?"  We believe
7  that that question is asking for a commitment from the
8  jury -- prospective jury members; and we believe this
9  should not be included in the questionnaire.
10             THE COURT:  I'll overrule that.
11             MR. REYES:  The next one is on page 20
12  which is question number 70, "Would you hold the State to
13  a higher standard on a capital murder case?"  We believe
14  that what they should be allowed to ask is whether they
15  could hold the State to its burden of proof which is that
16  beyond a reasonable doubt and not get a jury member
17  committed.  We believe that it's an improper question;
18  and we would object to that being included.
19             THE COURT:  I'll overrule that.
20             MR. REYES:  The next is page 22, question
21  number 76, "Assume you're -- you are on a jury to
22  determine the sentence for a defendant who has already
23  been convicted of a very serious crime.  If the law gives
24  you a choice of death or life imprisonment or other
25  penalty, circle one."

1      We would object, first of all, Judge, to
2  where it says, "very serious crime."  It's equating
3  capital murder to a very serious crime.  So we believe
4  that it's a prejudicial question; and it's setting that
5  out to each prospective juror.  We would object to that
6  phrase being included in there.  If they were to just
7  write "crime," that would be sufficient, but not "very
8  serious crime."
9              THE COURT:  I'll overrule that.
10             MR. REYES:  And then also, we would object
11 to subparts 1 through 5 in that it's asking for a
12 commitment from the jurors.
13             THE COURT:  That'll be overruled.
14             MR. REYES:  And then on question number 78
15 on pages 24 and 25 --
16             MS. FISCHER:  Judge, I'll agree with them.
17 I think starting at 78, that has to do with child
18 testimony.  That was specific to that case.  I think
19 question 78 also and all of its subparts are irrelevant
20 to this case.
21             THE COURT:  Okay.  That was for the prior
22 case.  Okay.  Seventy-eight, I'll sustain the objection
23 and delete number 78 and all its subparts.
24             MR. REYES:  Judge, just to back up, I'm
25 sorry, I apologize to the Court, on page 22 again, we

STATE OF TEXAS VS. RUBEN GUTIERREZ                          10

1    would also object to question 77 in that some of the

2    questions being asked in subparts 1 through 26 are

3    cumulative.  Some of them are asking for a commitment

4    from the jurors; and especially on page 23 where it's

5    number 11, "I think the return of the whipping post would

6    be the most effective in capital punishment."

7                    THE COURT:  That'll be overruled.

8                    MR. REYES:  We also would object to

9    question number 80 which is on page number 26.  It's

10   asking, "If a person kills two or more people at the same

11   time, he should always receive the death penalty."

12   That's an irrelevant question.  It doesn't apply to the

13   facts in this case.

14                    MS. FISCHER:  Judge, I would --

15   (sneezing).

16                    THE COURT:  Bless you.

17                    MS. FISCHER:  Excuse me.  Thank you.  I

18   would agree with him on that, but I would suggest that

19   perhaps we should put the facts of this case into

20   question number 80, basically, "If a person kills someone

21   during the course of committing a felony, they should

22   also receive the death penalty."  That would be the case

23   specific question in lieu of question number 80 there.

24                    THE COURT:  Well, I think the other

25   questions I've already ruled on.  Seventy-six can include

1  that situation.  So I'll go ahead and sustain the

2  objection on number 80.

3               MR. REYES:  And then the last objection

4  with respect to the motion we submitted was question

5  number 82 which is on page 27.

6               THE COURT:  Okay.  Well, 81 does not --

7  we're going to have to change -- let's see.

8               MR. REYES:  That was with respect to

9  question number 81, Your Honor, not 82.

10              THE COURT:  Eighty-one we have to change

11 the names and submit the ones that are involved in this

12 case.

13              MR. REYES:  The objection would be that --

14 or we would request that the relevant facts and names be

15 included in question 81.

16              THE COURT:  I'll sustain.  We'll change

17 that.

18              Eighty-two you were saying what?

19              MR. REYES:  No.  Eighty-two we don't have

20 an objection to, Your Honor.  It's basically asking the

21 prospective jurors if they want to be a juror --

22              THE COURT:  Okay.

23              MR. REYES:  -- in this case; and we have

24 no objection to that at this time.

25              THE COURT:  Anything else?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              12

```
 1                    MS. FISCHER:  Nothing from the State, Your

 2    Honor.

 3                    MR. REYES:  They did submit to us, Your

 4    Honor, a set of some other questions that they wanted to

 5    include.  I think those the Court had already ruled on

 6    them; is that correct?

 7                    THE COURT:  Yes.  From the State?

 8                    MR. REYES:  Yes.

 9                    THE COURT:  Yes.

10                    MS. FISCHER:  Question B will be included;

11    the others are not.

12                    MR. REYES:  We have no other objections,

13    Your Honor.  The only other thing is if we can include

14    the names of the prospective witnesses which we had

15    included in our proposed questionnaire to the Court just

16    so we can have attached to the questionnaire and submit

17    it to the jury or to the panel the list of witnesses just

18    to expedite as to whether or not they know any of the

19    parties or any of the witnesses that might be called to

20    testify in this case.  The very last page --

21                    THE COURT:  Yes.  I see it.

22                    MS. FISCHER:  Judge --

23                    THE COURT:  What?

24                    MS. FISCHER:  -- I don't know if we should

25    have their addresses on it.  That makes me feel a little
```

1   uncomfortable about -- well, I don't know.  And also, I'm

2   not sure if his list has everybody on it.  If we are

3   going to do that, I'd like the Court to allow the State's

4   subpoena list perhaps as the appropriate one.

5                    MR. REYES:  That's where we took the names

6   from, Your Honor.

7                    THE COURT:  Okay.  We'll cover that

8   tomorrow at the general voir dire on whether or not they

9   are familiar with any of these witnesses.  And when you

10  name the witnesses, make sure you at least know where

11  they're from, what city they're from so they can relate a

12  name with a town.

13                   MS. FISCHER:  Judge, tomorrow when the

14  panel comes, are we going to conduct a general type --

15  you will, of course, instruct them about some issues of

16  law that are going to be important in this case and some

17  general type issues.  Are we going to -- the State and

18  the defense conduct like a general voir dire with them

19  also or is only the Court going to do that?

20                   THE COURT:  No.  You're all going to

21  participate in general voir dire to eliminate some of

22  these questions about knowing witnesses, about the facts

23  in this case and so forth.  So, at that stage we may be

24  able to excuse some jurors at that point before we start

25  with individual voir dire.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    14

```
1                    MS. FISCHER:  Okay.
2                    MR. BLAYLOCK:  That'll be downstairs?
3                    THE COURT:  Yes.
4                    Now, is this the defense copy?
5                    MR. REYES:  Yes.  That was our proposed
6    questionnaire to the jury, Your Honor.  That was what we
7    were requesting that the Court submit to the prospective
8    panel.
9                    MS. FISCHER:  I've reviewed it, Judge, and
10   I feel that the copy provided by the Court is the more
11   appropriate charge and we would ask the Court to use
12   that.
13                   THE COURT:  And does it include questions
14   in the Court's questionnaire already?
15                   MR. REYES:  Yes.  It basically covers the
16   same thing.  It doesn't get into as much detail as the
17   Court's questionnaire, but it does cover the majority of
18   the questions that the Court has on its questionnaire.
19                   THE COURT:  Okay.
20                   MR. BLAYLOCK:  We object to their whole
21   proposed questionnaire, Judge.  If we need to make
22   specific objections, we're prepared to do that.
23                   THE COURT:  All right.  I'll go into that
24   later.  Are your witnesses here, counsel?
25                   MR. REYES:  Yes, sir.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          15

```
 1                    MR. GALARZA:  Yes, Your Honor.
 2                    THE COURT:  Let's proceed with this
 3    hearing on the motion to change venue and -- which we
 4    started --
 5                    MR. REYES:  On Thursday.
 6                    THE COURT:  -- on Thursday.  You can call
 7    your second witness now.
 8                    MR. REYES:  The State -- I mean, the
 9    defense calls Adriana Sanchez.
10                    THE COURT:  Adriana Sanchez?
11                    MR. REYES:  Yes, Your Honor.
12                    THE COURT:  Would you raise your right
13    hand, please?
14                    (The witness was sworn in by the Court)
15                    THE WITNESS:  Yes, sir.
16                    THE COURT:  All right.  You may be seated.
17                    MR. REYES:  May I proceed, Your Honor?
18                    THE COURT:  You may.
19                    ADRIANA SANCHEZ,
20      having been first duly sworn, testified as follows:
21                    DIRECT EXAMINATION
22    BY MR. REYES:
23         Q.    Ms. Sanchez, good morning.
24         A.    Good morning.
25         Q.    Can you please state your full name for the
```

1   record?

2        A.    Yes.  Adriana Lee Sanchez.

3        Q.    Okay.  I'm going to go ahead and ask you to

4   speak up a little bit.  I know that the microphone is in

5   front of you so you can speak into it.

6        A.    Okay.

7        Q.    When I do ask you for a name, Ms. Sanchez, can

8   you go ahead and make sure that you give me the full

9   name, their first name and their last name?  And if I do

10  ask you for a date, can you give me the month, the day,

11  and the year?  Can we have that understanding?

12       A.    Yes.

13       Q.    Now, can you go ahead and tell us if you are a

14  resident of Cameron County?

15       A.    Yes.

16       Q.    And how long have you been a resident of this

17  county?

18       A.    For over 18 years.

19       Q.    And in what city within Cameron County do you

20  reside?

21       A.    Brownsville, Texas.

22       Q.    Now, are you aware of the case titled the State

23  of Texas versus Ruben Gutierrez?

24       A.    Yes.

25       Q.    And are you aware that that case is pending in

STATE OF TEXAS VS. RUBEN GUTIERREZ                              17

```
 1   this county?
 2        A.   Yes.
 3        Q.   And are you aware that that case is pending in
 4   this court?
 5        A.   Yes.
 6        Q.   Now, you executed an affidavit which was to
 7   become a part of a motion to change venue; is that
 8   correct?
 9        A.   That's correct.
10        Q.   And were you aware that the affidavit that you
11   executed was made -- was done under oath?
12        A.   Yes.
13        Q.   Are you aware of the contents of the motion to
14   change venue?
15        A.   Yes.
16        Q.   Can you go ahead and let us know how it is that
17   you came about to sign that affidavit?
18        A.   By Mr. Santiago Galarza.
19        Q.   And do you know Mr. Galarza?
20        A.   Yes, for the past two years.
21        Q.   Okay.  How many years more or less have you
22   known him?
23        A.   Close to three years.
24        Q.   I'm sorry?
25        A.   Close to three years.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    18

```
 1          Q.   Okay.  Does the fact that you know him, did
 2     that in any way influence you signing that affidavit?
 3          A.   No.
 4          Q.   Everything that you stated in that affidavit is
 5     true and correct?
 6          A.   Yes.
 7          Q.   Now, before you talked to Mr. Galarza about
 8     signing this affidavit, had you heard about this case?
 9          A.   Yes.
10          Q.   And do you personally know Ruben Gutierrez?
11          A.   No.
12          Q.   Do you personally know anybody in his family?
13          A.   No.
14          Q.   And do you know me by any chance?
15          A.   No, sir.
16          Q.   How is it specifically that you came to hear
17     about this case?
18          A.   Through the newspaper and TV.
19          Q.   Okay.  When you talk about newspapers, which
20     newspaper specifically did you read about regarding this
21     case?
22          A.   The Brownsville Herald.
23          Q.   Do you recall when you read about this case?
24          A.   Right after the incident happened.
25          Q.   And after that, had you had an opportunity to
```

1  read some more about this case?

2      A.   Yes.

3      Q.   Can you tell us if you recall when it is that

4  you read about this case?

5      A.   Days after it happened.

6      Q.   Okay.  So, is it safe for us to say that you

7  had heard about this case from after it allegedly

8  happened to up until today?

9      A.   Yes.

10     Q.   Have you heard anything else about this case

11  through any other source; TV, radio?

12     A.   Just the TV and the newspaper.

13     Q.   Okay.  When you say TV, what stations do you

14  normally watch?

15     A.   Channel 4 and Channel 5.

16     Q.   And do you recall around what -- when you heard

17  about this case through those two television channels?

18     A.   When the incident happened at the 10:00 news.

19     Q.   Okay.  And have you heard about this case after

20  that through the TV stations?

21     A.   Not at this moment.

22     Q.   Have you had an opportunity to hear -- or to

23  listen regarding this case through any radio stations?

24  Have you heard anything about this case through radio

25  stations?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          20

1        A.    Yes.

2        Q.    Can you go ahead and tell us which radio

3   stations?

4        A.    They were a Mexican station, like 96 Tejano

5   music.

6        Q.    And do you recall when specifically you heard

7   about this case on that -- through that radio station?

8        A.    The following day when the incident happened.

9        Q.    And have you heard about this case in between

10  that alleged date of offense up to today?  Have you heard

11  about this case?

12       A.    Not through the radio.

13       Q.    Okay.  But you have through other sources?

14       A.    Yes.

15       Q.    Okay.  Now, when you were either reading about

16  this case or listening to facts about this case through

17  Channel 5, Channel 4, or the radio stations, was the

18  information that was being broadcast through those --

19  through that -- those forms of media, was it prejudicial?

20       A.    Yes.

21       Q.    And was it prejudicial towards Ruben Gutierrez?

22       A.    Yes.

23       Q.    And in your opinion, was that information that

24  was being broadcast, was that also inflammatory?

25       A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    21

1       Q.   And in your opinion, did that lead or would
2  that lead to Ruben Gutierrez not being able to receive a
3  fair and impartial trial at least in this county?
4       A.   Yes.
5       Q.   And in your opinion, would it be better to have
6  this case tried somewhere outside of this county?
7       A.   Yes.
8       Q.   And that would be to ensure that he receives a
9  fair and impartial trial?
10      A.   Correct.
11      Q.   After listening to Channel 4 and Channel 5 and
12  the radio station as well as reading the Brownsville
13  Herald, have you formed an opinion as to Ruben Gutierrez'
14  guilt?
15      A.   Yes.
16      Q.   And that opinion that you have of him, was that
17  based on what you have heard and read?
18      A.   Yes.
19      Q.   And if the Court was to instruct you that you
20  set that opinion aside, would you be able to do that?
21      A.   No.
22      Q.   And that's because you've heard and read
23  everything through the TV stations, radio stations and
24  newspaper; is that correct?
25      A.   That's correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          22

1        Q.    Have you talked to any people regarding this
2   case?
3        A.    My husband.
4        Q.    Okay.  And have you talked to any other family
5   members?
6        A.    Yes.
7        Q.    And who are they?
8        A.    Well, my husband, Luis Sanchez.
9        Q.    Who else?
10       A.    My mother and my sister.
11       Q.    Have you talked to friends regarding this case?
12       A.    Yes.
13       Q.    Okay.  Can you tell us who it is that you
14   talked to?
15       A.    Yes.  Mary Lou.
16       Q.    Can you give me her last name?
17       A.    Farias.
18       Q.    Okay.  Anybody else?
19       A.    No.
20       Q.    Now, are these -- I would assume that your
21   husband is a resident of this county?
22       A.    That's correct.
23       Q.    Okay.  And what about your mother, what is her
24   name?
25       A.    Beatrice Longoria.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    23

1        Q.    Is she a resident of Cameron County?

2        A.    Yes.

3        Q.    And your sister, what is her name?

4        A.    Lorena Salas.

5        Q.    And is she a resident of this county?

6        A.    Yes.

7        Q.    Your friend, Mary Lou Farias, is she a resident

8    of Cameron County?

9        A.    Yes.

10       Q.    Now, in discussing this case or in talking

11   about this case with your family members and your friend,

12   were they of the same opinion as you were that the

13   information that was being put out there by the media was

14   prejudicial and inflammatory?

15       A.    Yes.

16       Q.    And had they, in your opinion, formed -- in

17   their minds, had they formed an opinion regarding the

18   guilt of Ruben Cardenas -- Ruben Gutierrez?

19       A.    Yes.

20             MS. FISCHER:  Objection.  That calls for

21   speculation.  She can't know what they're thinking.

22             MR. REYES:  It's asking for her opinion,

23   Your Honor.

24             THE COURT:  It's overruled.  Go ahead.

25       Q.    (BY MR. REYES)  Ma'am, in your opinion, they

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    24

1   have formed an opinion as to Ruben Gutierrez' guilt; is
2   that correct?
3        A.   That's correct.
4        Q.   Did you have an opportunity to talk to them
5   about whether this case should be tried in this county or
6   not?
7        A.   Yes.
8        Q.   And were you able to form an opinion as to
9   whether they believed that this case should be tried
10  outside of this county also?
11                  MS. FISCHER:   Your Honor --
12       A.   Yes.
13                  MS. FISCHER:   -- I have to object again.
14  He keeps asking what everybody else thinks.  He should
15  bring them in if he'd like to know what they think.  She
16  is basing her answers here on hearsay.  She would have
17  had to have talked to these folks and asked them their
18  opinion; and those answers are hearsay.
19                  MR. REYES:   It's asking for an opinion,
20  Your Honor.
21                  THE COURT:   Restate your question,
22  counsel.
23       Q.   (BY MR. REYES)   In discussing this case with
24  your relatives and your friend, were you able to form an
25  opinion as to what they believed --

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    25

1              MS. FISCHER:  Your Honor, I object.  She

2    cannot give an opinion to the ultimate issue in question

3    here.  It's up to the Court to decide whether or not this

4    case needs to be tried.  And she's asking this lay

5    witness to give an opinion as to the ultimate issue that

6    is before the trier of the fact.

7              THE COURT:  That's overruled.  I'll permit

8    her to answer.

9         Q.   (BY MR. REYES)  Were you able to determine

10   whether or not they have formed an opinion as to whether

11   or not this case should be tried in this county?

12        A.   Yes.

13        Q.   And was that opinion the same as yours?

14        A.   Yes.

15        Q.   And your opinion was that this case should be

16   tried outside of this county; is that correct?

17        A.   That's correct.

18              MR. REYES:  I'll pass the witness, Your

19   Honor.

20                    **CROSS-EXAMINATION**

21   BY MS. FISCHER:

22        Q.   Ma'am, can you remember when it is the last

23   time you heard anything about this case on the

24   television?

25        A.   A few days after the incident happened.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          26

1        Q.    And was that the last time that you had heard
2   anything about this particular case?
3        A.    Through the television and newspaper, yes.
4        Q.    Okay.  And if I told you that this case
5   happened on the -- Ms. Harrison was killed on September
6   the 5th of 1998 and you say a few days after that, can we
7   be safe to say that September of '98 is the last time you
8   heard anything about this case here in Cameron County
9   through the television?
10       A.    Yes.
11       Q.    And that's the same thing for the newspaper,
12  when it is the last time that you heard anything about
13  this case or read anything about this particular case in
14  the newspaper.
15       A.    The same, a few days after.
16       Q.    So you've not heard anything about or read
17  anything about this case since September of 1998?
18       A.    Correct.
19       Q.    Is that the same for the radio; you haven't
20  heard anything on the radio since September of 1998?
21       A.    Correct.
22       Q.    Okay.  Now, that's been October, November,
23  December, January, February, March.  It's almost six
24  months ago.  We've had several other murders here in
25  Cameron County.  Have you heard about those on the

1    television?

2         A.    Yes.

3         Q.    And do you have the same opinion, that anybody

4    you see on the TV accused of murder is pretty much

5    guilty?

6         A.    Yes.

7         Q.    Okay.  And so, any time somebody puts their

8    picture up on the TV, you pretty much think that that

9    must be the end of it; they must be guilty?

10        A.    Yes.

11        Q.    And so, it really doesn't matter how much

12   publicity this would have been, if it would have been ten

13   days or it would have been for six months, you would have

14   had the same opinion because no matter what you see on

15   the TV, you believe what they're telling you?

16        A.    Well, it all depends on the, you know, facts,

17   you know.

18        Q.    What do you know about the facts about this

19   particular case?

20        A.    You know, how things happened.

21        Q.    Okay.

22        A.    It's how you come out, you know, with --

23        Q.    Okay.  Now, do you understand that the law says

24   that someone is innocent until proven guilty?

25        A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    28

1      Q.   Okay.  And what if I told you that the law is
2  you can't take into consideration what you hear in the TV
3  and what you talk to your friends about, that you have to
4  be fair and impartial, could you do that if I told you
5  the law said you had to?
6      A.   I don't have an answer.
7      Q.   If I told you that you were going to be
8  considered as a potential juror here in this case today
9  and that you could only consider the facts that came from
10 that witness stand, could you base your decision on what
11 happens in the courtroom and not what you heard on the
12 television?
13              MR. REYES:  I'm going to object, Your
14 Honor.  She's already answered that question.
15              THE COURT:  That's overruled.
16     Q.   (BY MS. FISCHER)  Could you follow the law?
17     A.   Yes.
18              MS. FISCHER:  Pass the witness.
19                   **REDIRECT EXAMINATION**
20 **BY MR. REYES:**
21     Q.   Ms. Sanchez, even though that this -- what you
22 heard about regarding this case happened about six months
23 ago, you still remember everything; is that correct?
24     A.   That's correct.
25     Q.   And was it based on what you heard that you had

STATE OF TEXAS VS. RUBEN GUTIERREZ                    29

1    formed an opinion as to Ruben Gutierrez' guilt?

2         A.    Yes.

3         Q.    And earlier you testified and you said that

4    you -- based on that, you could not set your opinion as

5    to his guilt aside; is that correct?

6         A.    That's correct.

7         Q.    And is that still your belief today?

8         A.    Yes.

9         Q.    And if you were to be instructed by the Court,

10   do you believe that you still could not set your opinion

11   aside?

12        A.    Correct.

13               MR. REYES:  I'll pass the witness, Your

14   Honor.

15               MS. FISCHER:  I don't have anything

16   further, Your Honor.

17               THE COURT:  All right.  You may step down.

18               You may call your next witness.

19               MR. REYES:  Anna San Miguel, Your Honor.

20               THE COURT:  Would you raise your right

21   hand, please?

22               **(The witness was sworn in by the Court)**

23               THE WITNESS:  I do.

24               THE COURT:  All right.  You may be seated.

25               MR. REYES:  May I proceed, Your Honor?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    30

1                    THE COURT:  You may.

2                    **ANNA SAN MIGUEL,**

3      having been first duly sworn, testified as follows:

4                    **DIRECT EXAMINATION**

5   BY MR. REYES:

6          Q.   Ms. San Miguel, can you please state your full

7   name for the record?

8          A.   Anna San Miguel.

9          Q.   And are you a resident of Cameron County?

10         A.   Yes, I am.

11         Q.   And how long have you been a resident of this

12  county?

13         A.   All my life.

14         Q.   And how old are you?

15         A.   I'm 22.

16         Q.   Are you aware of the case titled the State of

17  Texas versus Ruben Gutierrez?

18         A.   Yes, I am.

19         Q.   And are you aware that that case is pending in

20  this county?

21         A.   Yes, I am.

22         Q.   Are you aware that that case is pending in this

23  court?

24         A.   Yes, I am.

25         Q.   Now, you executed an affidavit which was to

PAM L. ESQUIVEL, CSR, RPR

1    become a part of a motion to change venue.  Were you

2    aware of that?

3         A.   Yes.

4         Q.   And were you aware that the affidavit that you

5    executed was -- you executed it under oath?

6         A.   Right.  Yes.

7         Q.   Was everything that you stated in that

8    affidavit, was that true and correct?

9         A.   Yes.

10        Q.   The motion to change venue which your affidavit

11   was attached to, were you familiar with the contents of

12   that affidavit?

13        A.   Yes.

14        Q.   Now, before you were contacted with respect --

15   with regard to executing or signing that affidavit, were

16   you -- had you heard about this case?

17        A.   Yes.

18        Q.   And can you tell us whether -- how it is that

19   you came to hear about this case?

20        A.   Through the news.

21        Q.   Can you tell us specifically which form of

22   media you heard about this case?

23        A.   Channel 5 news.

24        Q.   Did you have an opportunity to read about this

25   case through any newspaper?

STATE OF TEXAS VS. RUBEN GUTIERREZ                           32

1      A.   Yes, I did.

2      Q.   Which newspaper was that?

3      A.   The Brownsville Herald.

4      Q.   Any other newspaper?

5      A.   No.

6      Q.   Did you have an opportunity to listen about

7  this case through any radio station?

8      A.   Yes.

9      Q.   Okay.  Which radio station specifically?

10     A.   I believe it was one of the Tejano stations.

11     Q.   Can you tell us specifically what it is that

12  you heard about this case?

13     A.   It was the -- when the incident occurred.  I

14  don't really remember when.

15     Q.   Okay.  And do you -- have you heard anything

16  about this case after that?

17     A.   Yes.  People talk about it.

18     Q.   So, have you -- you've heard or talked about

19  this case from the alleged date of offense up to today;

20  is that what you're saying?

21     A.   Yes.

22     Q.   Now, with respect to what you heard about this

23  case, was the information that you heard through Channel

24  5, the Brownsville Herald, or through the Tejano station,

25  was the information that you heard prejudicial?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          33

```
 1        A.   Yes, it was.

 2        Q.   Was it inflammatory?

 3        A.   Yes, it was.

 4        Q.   Was it prejudicial and inflammatory against

 5   Ruben Gutierrez?

 6        A.   Yes, it was.

 7        Q.   Based on what you heard, is it your opinion

 8   that Ruben Gutierrez cannot receive a fair and impartial

 9   trial in this county?

10        A.   Yes, I believe that he can't.

11        Q.   And is it your opinion that this case should be

12   transferred or moved to another county?

13        A.   Yes, it should.

14        Q.   Now, have you heard -- I'm sorry.  Let me back

15   up here.

16             Have you formed an opinion as to Ruben

17   Gutierrez' guilt because of what you heard through the

18   media?

19        A.   Yes.

20        Q.   And if the Court was to instruct you that -- if

21   you were to be asked or instructed to set that opinion

22   aside, would you be able to do that?

23        A.   Yes, I would.

24        Q.   You stated earlier that the information that

25   you heard was prejudicial and inflammatory --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              34

```
 1          A.    Right.
 2          Q.    -- and that you had been able to form an
 3     opinion.  Do you still have that opinion today?
 4          A.    Yes.
 5          Q.    And was that opinion formed based on what it is
 6     that you heard before?
 7          A.    Yes.
 8          Q.    And do you believe that -- would it be
 9     difficult for you to be able to set that opinion aside --
10          A.    No.
11          Q.    -- based on what you've heard?
12          A.    No.
13          Q.    Have you talked to other people with respect to
14     this case?
15          A.    Yes, I have.
16          Q.    And can you tell us who it is that you talked
17     to?
18          A.    To my sister.  Her name --
19          Q.    What is her name?
20          A.    Martha San Miguel.
21          Q.    And is she a resident of Cameron County?
22          A.    Yes, she is.
23          Q.    And who else have you talked to?
24          A.    My husband.
25          Q.    And I assume that he is a resident of this
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    35

1    county also?

2         A.    Yes, he is.

3         Q.    And who else?

4         A.    Well, I've talked to a lot of people.  I have a

5    lot of friends and they've heard about the case and --

6    there's a lot of them.

7         Q.    How many people have you heard -- have you

8    talked to about regarding this case?  How many have you

9    talked to?

10        A.    Well, I would say about maybe more than ten

11   people --

12        Q.    And those people --

13        A.    -- maybe more than 20.

14        Q.    -- that you talked to, did they express to

15   you -- are you of the opinion that they believe that the

16   information that they heard or talked about was

17   prejudicial and inflammatory also against Ruben

18   Gutierrez?

19        A.    Yes.

20        Q.    And in their -- were you able to reach or make

21   an -- or form an opinion as to what it is that they

22   believed with respect to Ruben Gutierrez being tried in

23   this county?

24        A.    Yes.

25        Q.    And were they of the same opinion that you

STATE OF TEXAS VS. RUBEN GUTIERREZ                          36

```
 1   were --
 2        A.    Yes.
 3        Q.    -- that this -- were they of the opinion that
 4   this case should be tried outside of this county?
 5        A.    Yes.
 6              MR. REYES:  I'll pass the witness, Your
 7   Honor.
 8                    CROSS-EXAMINATION
 9   BY MS. FISCHER:
10        Q.    Ma'am, do you know the defendant, Mr. Ruben
11   Gutierrez?
12        A.    No, I don't.
13        Q.    Do you know his attorneys, Mr. Galarza and
14   Mr. Reyes?
15        A.    Yes, I do.
16        Q.    Do you know Mr. Galarza?
17        A.    Yes, I do.
18        Q.    How do you know him?
19        A.    I know that he's an attorney and I also work
20   for him.
21        Q.    I'm sorry.  You work for him?
22        A.    Yes, I do.
23        Q.    Wouldn't that mean that you would take an
24   interest in the cases that he's retained on?
25        A.    No.  Well, no.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    37

1      Q.   So, when a case comes in to the office and it's
2   a big case, you don't get excited about that?  I mean,
3   it's not important to you and --
4      A.   Well, I work for them and basically whatever
5   they ask for me to do, I do it for them.
6      Q.   Okay.  And that means that if the name Ruben
7   Gutierrez came up at the office and then you heard it on
8   the TV at the same time, that would be important to you
9   and you would say, "Oh, my case -- you know, my boss'
10  case is on the TV," right?
11     A.   Well, actually, I heard about the case before
12  they even called to the office.
13     Q.   Okay.  And have you heard about the case since
14  then?  This case happened back in September of 1998.
15  Have you heard anything about this case on the TV, radio,
16  or newspaper since September of '98?
17     A.   No.
18     Q.   Okay.  And we've had a lot of murders here in
19  Cameron County this year.  And in fact, we've had a few
20  since September of 1998.  Have you heard about those on
21  the television?
22     A.   Yes, I have.
23     Q.   Okay.  Have you made up your mind about whether
24  those folks are guilty or innocent?
25     A.   Yes, I have.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          38

1      Q.   Okay.  Is that just because you believe
2   everything that's on the television?
3      A.   Well, I watch the news every once in awhile and
4   basically what they say, yes.
5      Q.   Okay.  But now, I noticed when you were talking
6   to Mr. Reyes, you understand the law and the law is you
7   have to put those opinions aside.  And you told him, "I
8   could do that and put those opinions aside if the law
9   told me I had to."  Isn't that right?
10     A.   Right.
11               MS. FISCHER:   I pass the witness, Judge.
12                    **REDIRECT EXAMINATION**
13  **BY MR. REYES:**
14     Q.   You signed that affidavit, which was to become
15  a part of that motion to change venue, of your own free
16  will; is that correct?
17     A.   Correct.
18     Q.   Nobody forced you to sign it?
19     A.   No.
20     Q.   And the information that you gave in that
21  affidavit was true?
22     A.   True.  Yes.
23     Q.   And did you hear about this case even before
24  Mr. Gutierrez became a client of Mr. Galarza's?
25     A.   Yes, I did.

1             MR. REYES:  I'll pass the witness, Your

2    Honor.

3             MS. FISCHER:  I have nothing further, Your

4    Honor.

5             THE COURT:  You may step down.  Thank you.

6             You may call your next witness.

7             MR. REYES:  We don't have any other

8    witnesses, Your Honor.

9             THE COURT:  Okay.

10             MS. FISCHER:  Your Honor, I -- I tried to

11   talk about this hearing coming up on Friday, but I was

12   not able to get everybody together.  The State is going

13   to rely on its controverting affidavits that are in the

14   file.

15             If the Court wishes to hear some further

16   testimony from the State, I have a Dr. Norman Binder from

17   the U.T.B. political science department who is teaching

18   class right now and cannot be here until 3:30 this

19   afternoon, is willing to come before the Court if the

20   Court feels it needs further testimony on this issue.  If

21   not, we rely on the affidavits and ask the motion to be

22   denied.

23             MR. REYES:  We would object, Your Honor,

24   to the State just offering its affidavits.  We would

25   request that these witnesses be brought to court and that

1    we be able to cross-examine these witnesses.

2                    MS. FISCHER:  Judge, I think the statute

3    is very clear.  The State doesn't have to put on any

4    evidence.  It's the defendant's burden.  It's a very high

5    burden.

6                    And I think from the defendant's own

7    witnesses, the first witness they put on said she didn't

8    even have an opinion about the case.  And the last

9    witness they put on said, "I could put all that aside and

10   be fair and impartial."

11                   I think by their own witnesses -- and

12   there's ample evidence that their own witnesses say they

13   can be fair and impartial.  There's no need for a change

14   of venue.

15                   THE COURT:  Okay.  Based on the testimony

16   presented by the witnesses and all the documents in the

17   file, the Court will deny the defendant's motion to

18   change venue.

19                   What else do we have?

20                   MR. REYES:  I think that's it, Judge.  I

21   think the Court had set the motion to suppress for 1:30

22   this afternoon.  That's what we were advised on on

23   Thursday.

24                   THE COURT:  Right.  How many witnesses do

25   you have?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    41

1              MS. FISCHER:  Judge, we will have five

2    people here.

3              THE COURT:  And --

4              MR. REYES:  We'll probably maybe have two

5    at the most.

6              THE COURT:  Additional?

7              MR. REYES:  Yes.

8              THE COURT:  All right.  Let's recess until

9    1:30.

10             **(Lunch recess)**

11             THE COURT:  Okay.  You may be seated.  I

12   believe that the State's next motion is the motion to

13   suppress?

14             MS. FISCHER:  Judge, I'm going to make

15   sure that I have everything clear before we get started.

16   It's my understanding that they are suppressing -- they

17   have filed a motion to suppress the confessions and that

18   we need to have *Jackson vs. Denno* hearing.

19             The State's prepared to go forward on the

20   issue of the voluntariness of the confession and I've got

21   my witnesses here, Judge.  They can be sworn in.  They

22   were not here this morning.

23             And it's my understanding of what we're

24   doing right now.  If that's not the understanding of

25   defense counsel, I need to know that.

1               THE COURT:  Are you ready to proceed,

2    counsel?

3               MR. REYES:  We're ready to proceed, Your

4    Honor, on the motion to suppress statements.

5               THE COURT:  Okay.  Call your first witness

6    then.

7               MS. FISCHER:  Judge, I'm going to go ahead

8    and invoke the rule.  I want to have them sworn in; and I

9    don't want them listening to one another.  So, my first

10   officer is going to be Tony Flores, but if we can swear

11   all three of them in and I can send them outside.

12              THE COURT:  All three officers please rise

13   at this time.  Raise your right hand.

14              **(The prospective witnesses were sworn in**

15              **by the Court)**

16              PROSPECTIVE WITNESSES:  (Answered in the

17   affirmative).

18              THE COURT:  Okay.  The rule has been

19   invoked; and that means you are not to converse with each

20   other about the case, about the hearing, or anything

21   relevant with the case.  So just wait outside until

22   you're called to come in and testify.

23              And your first is going to be who?

24              MS. FISCHER:  Detective Flores.

25              THE COURT:  Detective Flores, you can stay

STATE OF TEXAS VS. RUBEN GUTIERREZ                          43

1   behind.  You may be seated.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  You may proceed.

4                    MS. FISCHER:  Thank you, Judge.

5                         ANTONIO FLORES,

6     having been first duly sworn, testified as follows:

7                      DIRECT EXAMINATION

8   BY MS. FISCHER:

9         Q.   Detective, would you please state your name for

10  the record?

11        A.   Antonio Flores.

12        Q.   And what do you do you for a living?

13        A.   I'm a detective with the Brownsville Police

14  Department.

15        Q.   Are you a certified peace officer in the State

16  of Texas?

17        A.   Yes, I am.

18        Q.   How long have you been a certified peace

19  officer?

20        A.   Approximately seven years.

21        Q.   And how long have you been with the Brownsville

22  Police Department?

23        A.   Seven years.

24        Q.   And what are your duties there as a detective

25  with the Brownsville Police Department?  What is your

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    44

1   assignment?

2       A.    My assignment is to investigate various crimes

3   dealing anywhere from theft all the way to murder all the

4   way up.

5       Q.    And how long have you been a detective?

6       A.    Approximately four and a half years.

7       Q.    And in connection with the case of the State of

8   Texas versus Ruben Gutierrez in which a woman by the name

9   of Ms. Harrison was killed, did you do an investigation

10  to that case?

11      A.    Yes, I did.

12      Q.    And as part of your investigation, did you have

13  an opportunity to take a statement from one of the

14  defendants named Ruben Gutierrez?

15      A.    Yes, I did.

16      Q.    And do you see the person that you took a

17  statement from here in the courtroom today?

18      A.    Yes, I do.

19      Q.    Can you please point to him and tell me

20  something he's wearing?

21      A.    Sitting over here in the corner wearing a gray

22  colored long-sleeve shirt (pointing).

23              MS. FISCHER:  Your Honor, may the record

24  reflect he's identified the defendant, Ruben Gutierrez?

25              THE COURT:  It shall reflect.

1       Q.   (BY MS. FISCHER)  Okay.  Now, when is it that

2   you first came in contact with this defendant?

3       A.   Back in September the 8th we were investigating

4   the death of Ms. Harrison; and through several witnesses

5   that we had already spoken to regarding the

6   investigation, Ruben Gutierrez' name came up.  And myself

7   and Detective Ramon Ortiz proceeded to go to his

8   residence, which was the Waterside apartments, and we

9   attempted to make contact with him there.

10      Q.   And were you able to do that?

11      A.   He wasn't there.

12      Q.   Okay.  So what did you do instead?

13      A.   Myself and Detective Ramon Ortiz conducted a

14  consent to search there at the residence.  Ruben's wife,

15  Ms. Gutierrez, was there at the residence and she signed

16  the consent to search form and we entered the residence.

17      Q.   Okay.  Did you -- let's not focus on that right

18  now, Detective Flores.  We're going to focus on the

19  confessions rights here in this hearing.  After obtaining

20  a consent to search, did Mr. Gutierrez ever show up?

21      A.   He didn't show up while we were there on this

22  date.

23      Q.   Okay.  But did anyone in that household

24  indicate to you that it was okay for you to talk to Ruben

25  Gutierrez?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              46

1          A.    Yes.  While --

2          Q.    Who was that?

3          A.    While we were there with Ms. Gutierrez, his

4    wife, Ruben's mother showed up and she's some sort of --

5    has something to do with the management of the apartment

6    complex.  And we advised her that we were there

7    conducting an investigation.  And she said that she would

8    have --

9                MR. REYES:  I'm going to object, Your

10   Honor.  It calls for hearsay.

11               THE COURT:  You cannot testify as to what

12   someone else told you.

13               THE WITNESS:  I'm sorry.

14               THE COURT:  Go ahead.  Ask a question.

15         Q.    (BY MS. FISCHER)  Did you inform the family

16   that you were conducting an investigation?

17         A.    Yes, I did.

18         Q.    And in response to that, did they make

19   arrangements for Mr. Gutierrez to talk to you?

20         A.    Yes.

21         Q.    And what were those arrangements?

22         A.    The following day at 3 p.m.

23         Q.    And who made those arrangements?

24         A.    His mother.

25         Q.    Okay.  And the following day would have been

STATE OF TEXAS VS. RUBEN GUTIERREZ                           47

1    the 9th of September at 3 p.m.  Did Mr. Gutierrez show up
2    at the police department?
3            A.   Yes, he did.
4            Q.   Tell me how that came about.
5            A.   I was expecting Mr. Gutierrez to show up as he
6    said around 3 p.m.  He didn't show up 'til approximately
7    3:45 p.m.
8            Q.   Okay.  Was he with anyone?
9            A.   Yes, he was.
10           Q.   Who was he with?
11           A.   He was with his mother and with his wife.
12           Q.   Did he have any lawyer with him?
13           A.   No, he didn't.
14           Q.   Okay.  Was he under arrest at this time?
15           A.   No, he wasn't.
16           Q.   Okay.  Did you talk to him?
17           A.   Yes, I did.
18           Q.   Where did you talk to him?
19           A.   I met all three of them downstairs in the
20   lobby.  I brought Mr. Gutierrez upstairs.
21           Q.   That's the lobby of the police department?
22           A.   Yes, ma'am.
23           Q.   Uh-huh.
24           A.   And I brought him upstairs to the criminal
25   investigations division.

1      Q.   And that was Mr. Gutierrez alone?

2      A.   Yes, ma'am.

3      Q.   Okay.  Tell me what happens when you bring him

4  upstairs to -- to your office; is that right?

5      A.   Right.  While he was there at my cubicle, I

6  proceeded to read Mr. Gutierrez' Miranda rights.

7      Q.   Okay.  And when you say you read him his

8  Miranda rights, tell me how you do that.

9      A.   Well, we have a sheet of his Miranda rights.

10  It's written on a piece of paper.  What we do is we read

11  it to him.  Then he has an opportunity to read the rights

12  himself.  Then once he understands his rights, we have

13  him initial each right as he reads it to make sure that

14  he understands his rights.  Then he signs his rights and

15  signs the waiver that's included on the bottom portion.

16  He dates them and times them.

17             MS. FISCHER:  Your Honor, may I approach

18  the witness?

19             THE COURT:  You may.

20      Q.   (BY MS. FISCHER)  Detective Flores, I'm going

21  to show you what's been marked as State's Exhibit

22  Number 1.  I'm going to ask you to take a look at this

23  and tell me if this is the waiver of rights that you went

24  over with Mr. Gutierrez.

25      A.   Yes, it is.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          49

1      Q.   Okay.  And I noticed that there are a number of

2   RG's here along the side where the rights are.  Are those

3   his initials?

4      A.   That's correct.

5      Q.   Okay.

6           MS. FISCHER:  Your Honor, at this time I

7   would offer into evidence what's been marked as State's

8   Exhibit Number 1.  I'll tender this to opposing counsel.

9           MR. REYES:  Judge, we would ask the Court

10  to defer any ruling as to the admissibility until we have

11  a chance to cross-examine.

12          THE COURT:  Well, do you have an objection

13  to it?

14          MR. REYES:  An objection to it?  Well, we

15  are objecting, Your Honor, that it was not voluntarily

16  taken.  That's the whole purpose of the hearing.

17          MS. FISCHER:  Judge, I'm offering this for

18  the motion to suppress hearing only.  I assume at the end

19  of this trial we'll have a determination from the Court

20  as to what is and is not admissible.

21          THE COURT:  For purposes of this hearing

22  it'll be admitted.

23          **(State's Exhibit Number 1 admitted)**

24      Q.   (BY MS. FISCHER)  Now, after you read

25  Mr. Gutierrez this right -- his rights, did you, in fact,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          50

1    take a statement from him?

2         A.    No, I didn't.  I interviewed him.

3         Q.    Okay.  And when you -- why didn't you take a

4    statement from him?

5         A.    Well, we were interviewing him and he

6    started -- we asked him questions regarding his

7    whereabouts.  And we wanted to make sure exactly what he

8    was saying on the dates that we had in question.  And he

9    was getting sort of mixed up on the dates and times of

10   who he was with.

11                   And he said he had the right to terminate

12   the interview that he was doing with us, the interview,

13   the verbal interview; and at that time he terminated the

14   interview.

15        Q.    Okay.  Now, I want to make sure I understood

16   you right.  You said that Mr. Gutierrez said, "I know I

17   have the right to terminate the interview and I'm

18   terminating the interview"?

19        A.    That's correct.

20        Q.    And he did that?

21        A.    That's correct.

22        Q.    What did you do?

23        A.    After that, what we did is we walked him back

24   downstairs and I brought up his wife, Ms. Gutierrez,

25   Ms. Angie Gutierrez.

1      Q.   Uh-huh.  And what happened then?

2      A.   I proceeded to interview her and I took a

3  statement from her.

4      Q.   Okay.  But as far as Ruben went, did you place

5  him under arrest?

6      A.   No.

7      Q.   Did he stay at the police department?

8      A.   No.

9      Q.   You let him go?

10     A.   That's correct.

11     Q.   Okay.  At a later date, did you once again come

12  in contact with Ruben Gutierrez?

13     A.   Yes, I did.

14     Q.   And when was that?

15     A.   I believe that was the 13th of September.

16     Q.   Okay.  And why did you come in contact with

17  Mr. Gutierrez on that date?

18     A.   On the 13th of September, we had already had a

19  capital murder warrant issued for the arrest of Ruben

20  Gutierrez.

21     Q.   Okay.  And what was the capital murder warrant

22  based upon?  What information, what probable cause did

23  you base your warrant for Mr. Gutierrez on?

24     A.   We had statements from several witnesses that

25  they had seen Ruben Gutierrez at and around the location

STATE OF TEXAS VS. RUBEN GUTIERREZ                        52

1    of the death of where Ms. Harrison resided at, and also
2    that we had already detained and arrested one suspect and
3    he had already given a confession as well.
4         Q.   Okay.  And when you say you had already
5    arranged -- arrested one subject on the case, who was
6    that?
7         A.   Rene Garcia.
8         Q.   And Rene Garcia gave you a confession.  And in
9    that confession, who did he name as his codefendant?
10             MR. REYES:  I'm going to object, Your
11   Honor.  It calls for hearsay.
12             MS. FISCHER:  Your Honor --
13             THE COURT:  He may answer.  Go ahead.
14        Q.   (BY MS. FISCHER)  Who did he name as his
15   codefendant?
16        A.   Ruben Gutierrez.
17        Q.   After you got your warrant, what did you do
18   with it?
19        A.   When we got the warrant, I went out to his
20   residence once again.  I already knew where he lived.
21   And I knocked on the door and Ruben Gutierrez answered
22   the door.
23        Q.   What did you do at that point?
24        A.   Once he answered the door, I advised him he was
25   under arrest for capital murder.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          53

1      Q.   And after placing him under arrest, where did
2   you take him?
3      A.   We had to pause there for a few minute while we
4   waited for his wife to come back.  She was at the
5   laundromat.  And then from there, we went straight -- he
6   was taken directly to the police station while we waited
7   for his wife to secure the residence.
8      Q.   Okay.  And why is it that you had -- was it so
9   that she could secure the residence; is that why you
10  had --
11     A.   That's correct.
12     Q.   -- to wait?  Okay.  What about any children,
13  were there any children --
14     A.   Yes, there was.
15     Q.   -- there at the --
16               THE COURT:  Just a minute.  We're getting
17  a little mixed up here.  Let her finish asking the
18  question before you start answering, okay?
19               THE WITNESS:  Yes, sir.
20               THE COURT:  We're getting to the point
21  where both of you are talking at the same time; and it's
22  hard to understand where the question is and where the
23  answer starts, okay?
24               THE WITNESS:  Yes, sir.
25               THE COURT:  Did you finish your question?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    54

1       Q.    (BY MS. FISCHER)   Were there any children
2   there at the home of Mr. Gutierrez?
3       A.    Yes.
4       Q.    Okay.  And did you have to wait for his wife to
5   come back so that she could help take care of those
6   children?
7       A.    That is correct.
8       Q.    And you did that?
9       A.    Yes, ma'am.
10      Q.    After you take him to the police department,
11  where did he go -- from the police car, where was the
12  next place he went?
13      A.    I had a patrol officer transport him to the
14  station; and I had him wait for him -- wait for me
15  upstairs in the C.I.D. lobby.
16      Q.    Okay.  And what was your purpose for doing
17  that?
18      A.    I -- I wanted to get an interview with
19  Mr. Gutierrez once more.
20      Q.    Okay.  And did you, in fact, do that?
21      A.    Yes, I did.
22      Q.    Okay.  Now, let's talk about that second
23  interview you had with Mr. Gutierrez.  Now, you
24  understand that he had already told you he didn't want to
25  talk the first time.  What made you want to try and talk

STATE OF TEXAS VS. RUBEN GUTIERREZ                     55

1  to him a second time?

2       A.   He was already under arrest.  And I told him

3  that, you know, he was there.  And I read him his rights

4  again and I told him why he was being arrested.

5       Q.   Okay.  And did he indicate that he wanted to

6  talk to you at that point?

7       A.   That is correct.

8       Q.   Okay.  Let's go through that a little more

9  slowly now.  While you were at the police station with

10  Mr. Gutierrez in your office, was he handcuffed or

11  unhandcuffed?

12      A.   He was handcuffed.

13      Q.   Okay.  When you were reading him his rights --

14  while this is all going on, did you take his cuffs off at

15  any point in time?

16      A.   No.

17      Q.   Okay.  Did you tell him that he had the right

18  to have an attorney?

19      A.   That is correct.

20      Q.   Did you tell him he had the right to remain

21  silent?

22      A.   Yes.

23      Q.   Did you tell him that anything he said could be

24  used against him?

25      A.   Yes.

1      Q.   Did you tell him he had the right to have an
2  attorney present prior to and during any questioning?
3      A.   Yes.
4      Q.   Did you tell him that he had the right to have
5  an attorney appointed to him prior to any questioning?
6      A.   Yes.
7      Q.   Did you tell him, once again, that he could
8  terminate the interview if he wanted to at any time?
9      A.   Yes.
10     Q.   Did he say anything about wanting to terminate
11 the interview?
12     A.   No.
13     Q.   Did he indicate he wanted to talk to you?
14     A.   Yes.
15     Q.   How did he do that?
16     A.   Ruben indicated that he had been involved in
17 the robbery of Ms. Harrison.
18     Q.   Okay.
19     A.   And then I started interviewing him; and then
20 he proceeded to give me a confession of his involvement.
21     Q.   Okay.  But did you understand -- did you feel
22 that he understood those rights that you had just read
23 him?
24     A.   Yes.
25     Q.   How did you know that he understood?

1      A.   He once again initialed his rights by the side
2  of every number.
3      Q.   Okay.
4      A.   He signed his rights.  He dated and timed them
5  once again.
6      Q.   Okay.  And after you talked to him and read him
7  his rights, did he agree to give you a written statement?
8      A.   That is correct.
9      Q.   Okay.  And how was this written statement
10 taken?
11     A.   It was taken on a confession form.
12     Q.   Okay.  And does that confession form include
13 those same warnings?
14     A.   Yes, they do.
15     Q.   Who does the -- tell me how it works.  Who does
16 the writing, who -- or typing or -- you know, I assume
17 the defendant does the talking.
18     A.   And I take the statement.
19     Q.   Okay.  On what?
20     A.   On the computer.
21     Q.   Okay.  And do you type in what he's saying?
22     A.   Yes, ma'am.
23     Q.   Okay.  And then after you're done typing, what
24 do you do with it?
25     A.   What we do is we print it out.  The printout

STATE OF TEXAS VS. RUBEN GUTIERREZ                          58

1  has his rights at the top of the page.  Once again I had

2  him initial every right of his at the top of the page.  I

3  allowed him to read it.  He read it.  Once he read it, he

4  initial every paragraph, at the end of every paragraph at

5  the end of the paragraph.  He once again signed it.  And

6  I believe I signed it as a witness myself.

7       Q.   Okay.  While he was talking to you, at any time

8  did he ask for a lawyer?

9       A.   No, he didn't.

10      Q.   Did he at any time ask for the interview to

11 stop?

12      A.   No.

13      Q.   Did you ever have to make any threats to get

14 him to give you this statement?

15      A.   None.

16      Q.   Did you have to make any coercive statements in

17 order for him -- to get him to talk?

18      A.   None.

19      Q.   Did you promise anything to him?

20      A.   No, I didn't.

21      Q.   Did you ever talk to him about the fact that he

22 may be exposed to the death penalty?

23      A.   No, I didn't.

24      Q.   Did you ever deny him anything that he asked

25 for, perhaps going to the bathroom?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          59

```
 1         A.    No.
 2         Q.    Or getting a drink of water?
 3         A.    No.
 4         Q.    Or having a cigarette?
 5         A.    No.
 6         Q.    Did -- were you able to observe him and make a
 7   determination about whether or not you thought he was
 8   under the influence of any alcohol?
 9         A.    Was I able to observe if he was?
10         Q.    Were you able to observe him to make that
11   determination?
12         A.    It didn't appear that he was.
13         Q.    Okay.  So you saw him, and he didn't appear to
14   be under the --
15         A.    That's correct.
16         Q.    -- influence of alcohol?  What about drugs, did
17   you get a good enough observation of him to make a
18   determination about whether or not he was under the
19   influence of any drugs?
20         A.    Yes.
21         Q.    Okay.  Was he under the influence of any drugs?
22         A.    It didn't appear to me that he was.
23         Q.    After it was all said and done, did you allow
24   him to read the statement?
25         A.    Yes, I did.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          60

1        Q.   Okay.  Did he indicate to you that he could
2    read and write in the English language?
3        A.   Yes, he did.
4        Q.   What about talking to you one-on-one,
5    Officer Flores, did he speak to you in English or in
6    Spanish?
7        A.   In English mostly.
8        Q.   Okay.  Did he speak to you some in Spanish?
9        A.   I believe some times he made references in
10   Spanish as to --
11       Q.   Okay.  Now, are you influent in the Spanish
12   language?
13       A.   Yes, I am.
14       Q.   And were you able to understand what he was
15   saying?
16       A.   Yes, I was.
17       Q.   Okay.  But he indicated to you he could read in
18   English?
19       A.   That is correct.
20       Q.   And you let him read the statement in English?
21       A.   Yes, I did.
22       Q.   Actually -- okay.  After you took his complete
23   confession and he read it, did you ever take, at that
24   time while you're in the room with him, a second
25   confession?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          61

1    A.    Yes, I did.

2    Q.    And why did you do that?

3    A.    The reason why we took that confession is that

4  we wanted to include if we had left any information out

5  that we wanted -- while we were interviewing him.

6              After he had already initialed his rights

7  at the top, initialed each paragraph, and signed his name

8  on the statement, what we did is we added more

9  information once again to his original statement.

10             And after we took that statement, we

11  printed it out as well; and then he initialed every right

12  at the top of the page.  He initialed every paragraph

13  indicating that there was nothing to be added at the end

14  of the paragraphs.  He signed -- and he signed it as

15  well.

16    Q.    Okay.  So by the time you all were done, he had

17  been read his rights once on the warning form, and then

18  once on the first statement, and then once on the second

19  statement for a total of at least three times?

20    A.    That is correct.

21    Q.    And he never said, "I don't want to sign it"?

22    A.    That is correct.

23    Q.    Never said, "I want to stop"?  Never said, "I

24  want to do anything but give you this voluntary

25  confession"?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              62

1        A.    That is correct.

2                    MS. FISCHER:  Your Honor, may I approach

3    the witness?

4                    THE COURT:  You may.

5        Q.    (BY MS. FISCHER)  I'm going to show you what's

6    been marked as State's Exhibit Numbers 2, 3 and 4,

7    Detective Flores.  And I'm going to ask you to take a

8    look at each and every one of these and ask if you

9    recognize what those are.

10        A.    Yes.  This is a warning and waiver of rights.

11        Q.    Okay.  That's exhibit -- State's Exhibit

12    Number 2.  What has been marked as State's Exhibit

13    Number 3, what is that?

14        A.    Exhibit 3 is a written confession of Ruben

15    Gutierrez.

16        Q.    And what is State's Exhibit Number 4?

17        A.    Also a written confession of Ruben Gutierrez.

18        Q.    Okay.  And I see a number of RG's on both

19    State's Exhibits Numbers 3 and 4.  What are those?

20        A.    Those are his initials to where he read his --

21    read and understand his rights.

22        Q.    Okay.  And at the end of what has been marked

23    as State's Exhibit Number 3, does it contain a signature?

24        A.    Yes, it does.

25        Q.    And whose signature is that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                        63

1        A.    Ruben Gutierrez'.

2        Q.    And on the end of State's Exhibit Number 4,

3   does it contain a signature?

4        A.    Yes, it does.

5        Q.    And whose signature is that?

6        A.    Ruben Gutierrez.

7              MS. FISCHER:   Your Honor, at this time

8   we'd offer into evidence what has been marked as State's

9   Exhibits Numbers 2, 3 and 4.  I will tender them to

10  opposing counsel.

11             MR. REYES:   Judge, we would object that

12  those are copies; and the proper predicate for the

13  introduction of a copy as opposed to the original has not

14  been established.

15             MS. FISCHER:   Judge, I think a copy is

16  always sufficient in place of an original.  I can ask

17  Detective Flores.

18       Q.    (BY MS. FISCHER)   Upon reviewing State's

19  Exhibits Numbers 2, 3 and 4, are those exact copies of

20  the original confessions --

21       A.    Yes, they are.

22       Q.    -- of Ruben Gutierrez?

23             THE COURT:   Okay.  For purposes of this

24  hearing, they'll be admitted.

25             (State's Exhibit Numbers 2, 3 and 4

STATE OF TEXAS VS. RUBEN GUTIERREZ                          64

1              admitted)

2       Q.    (BY MS. FISCHER)  Now, Detective Flores, did

3    you ever have the opportunity to talk to Ruben Gutierrez

4    again after taking the confessions of State's Exhibit

5    Numbers 3 and 4?

6       A.    Yes, I did.

7       Q.    And when was that?

8       A.    After we took the statements, he wanted to show

9    us where exactly some of the evidence of the robbery was

10   at.

11      Q.    Okay.  And what did you do so that he could

12   do -- so that he was able to show you where some of the

13   evidence was?

14      A.    Detective Pineda, Rey Pineda and myself

15   proceeded to go with Ruben as per his directions exactly

16   where a blue suitcase was located at.

17      Q.    Okay.  And what did you do?

18      A.    Well, we transported Ruben in the back seat of

19   our -- of my unit; and we headed out as per his

20   directions where the blue suitcase was located at.

21      Q.    Okay.  And what was happening?  Who -- what was

22   going on while you all are doing this?  Was Mr. Gutierrez

23   talking?

24      A.    Yes, he was.

25      Q.    Was he telling you where to go?

1     A.    Yes, ma'am.

2     Q.    What did he tell you?

3     A.    He was leading us to exactly the exact location

4  of where the suitcase could be found.

5     Q.    Okay.  And when you got to the exact location

6  where he said the suitcase would be found, was the

7  suitcase there?

8     A.    Yes, it was.

9     Q.    Tell me how you found the suitcase.

10    A.    We were driving down California Road, which is

11  a caliche road.  We were going towards South Indiana

12  Road.  And as we were approaching the resaca close to

13  that intersection, we were driving up to a wooded area

14  and Ruben Gutierrez told us to slow down because the

15  location of the suitcase was coming up.

16              Once we were coming up to the location

17  where the wooded area was at, Ruben told us to stop.  I

18  stopped.  I was driving.  I stopped the unit.  And then

19  he gave Detective Rey Pineda more or less an idea of

20  where the suitcase was located in the wooden area.

21              Detective Pineda got out of the unit, out

22  of the front passenger seat.  He went and he was going

23  into the wooded area.  Ruben Gutierrez at that time told

24  me, "It's not where he's at."  And he told me -- he said

25  he was going to show me exactly where the suitcase was

STATE OF TEXAS VS. RUBEN GUTIERREZ                    66

1    at.

2              So then I go around --

3              MR. REYES:  I'm going to object to the

4    narrative form of the answer.

5              MS. FISCHER:  I'm sorry, Judge.  I can do

6    it in question and answer.

7              THE COURT:  Go ahead.

8         Q.   (BY MS. FISCHER)  Okay.  When Mr. Gutierrez

9    says, "No, that's not where the suitcase is," what

10   happens next?

11        A.   He says to me that he can tell me exactly where

12   the suitcase is at.

13        Q.   And did he do that?

14        A.   Yes, he did.

15        Q.   Okay.  And what did you see Ruben Gutierrez do?

16        A.   He walked up to this wooded area that was with

17   a barbed wire fence; and with his hands in front of him,

18   he went, "It's right there."  And he pointed at the

19   suitcase where you could actually see it from where he

20   was standing at.

21        Q.   And that was the blue suitcase?

22        A.   That is correct.

23        Q.   Okay.  Did -- after you found the blue

24   suitcase, I assume everybody got back in the car.  Did

25   you go anywhere else?

STATE OF TEXAS VS. RUBEN GUTIERREZ                         67

1      A.    We went back to the police station.

2      Q.    Okay.  There is mentioned in the statement of

3  Mr. Gutierrez that a screwdriver was used as the weapon

4  to kill Ms. Harrison.  Did Mr. Gutierrez ever tell you

5  where the screwdriver might be found?

6      A.    Yes, he did.

7      Q.    Where did he tell you the screwdriver might be

8  found?

9      A.    He led us to this open field located close to

10  Norton Road and Morningside Road.

11     Q.    Okay.  And did he indicate to you that that --

12  that was an area where the screwdriver had been found?

13     A.    That is correct.

14     Q.    Okay.  Did you find a screwdriver there?

15     A.    No, we didn't.

16     Q.    Okay.  Now, there was also a toolbox that was

17  taken from Ms. Harrison's house did.  Mr. Gutierrez ever

18  indicate to you that he knew where the toolbox was?

19     A.    No, he didn't.

20     Q.    There was also a substantial amount of money,

21  somewhere between 200 and $500,000 taken from

22  Ms. Harrison.  Did Mr. Gutierrez ever indicate to you he

23  knew where the money was?

24     A.    No, he didn't.

25            MS. FISCHER:  I pass the witness.

STATE OF TEXAS VS. RUBEN GUTIERREZ                     68

1                      MR. REYES:  May I proceed, Your Honor?

2                      THE COURT:  You may.

3                          **CROSS-EXAMINATION**

4    BY MR. REYES:

5         Q.    Detective Flores, you stated that you had been

6    with the Brownsville Police Department for how many

7    years?

8         A.    Approximately seven years.

9         Q.    And before working with the police, did you

10   work anywhere else before that?

11        A.    No, I didn't.  I was in the United States Army.

12        Q.    And out of those seven years with the

13   Brownsville Police Department, how many of those years

14   have you been a detective?

15        A.    Approximately four and a half.

16        Q.    And part of being a detective, have you had an

17   opportunity to investigate murders before?

18        A.    Yes, I have.

19        Q.    Approximately how many occasions?

20        A.    Maybe -- estimating maybe 12 times, 12, 13

21   times.

22        Q.    So you're familiar with the procedures that

23   need to be followed with respect to the Brownsville

24   Police Department; is that correct?

25        A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          69

1       Q.   Now, you stated that the first time that you

2  had gone over to Ruben Gutierrez' residence was on

3  September the 8th of 1998; is that correct?

4       A.   That is correct.

5       Q.   Now, when you went over there to his residence,

6  was Mr. Gutierrez present?

7       A.   No, he wasn't.

8       Q.   Okay.  And to your knowledge, is Mr. Ruben

9  Gutierrez an adult?

10      A.   Yes, he is.

11      Q.   To your knowledge, how old is he?

12      A.   About 22, 21, 20.

13      Q.   So he's not a juvenile, is he?

14      A.   That is correct.

15      Q.   Because earlier you had stated that when you

16 went to his residence on September the 8th of 1998, you

17 spoke to his mother; is that correct?

18      A.   That is correct.

19      Q.   And that you had made arrangements with his

20 mother to take him to the police department at 3:00 the

21 next day; is that correct?

22      A.   His mother volunteered to bring him in.  That

23 is correct.

24      Q.   But since he is an adult, you didn't take that

25 to mean that Ruben Gutierrez was wanting to talk to you,

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          70

1    did you?

2         A.    Excuse me?

3         Q.    The fact that the mother had volunteered to

4    take him on September the 9th of 1998 to the Brownsville

5    Police Department, did that indicate to you that Ruben

6    Gutierrez wanted to talk to you about this case?

7         A.    Yes, it would -- yes, it did.

8         Q.    Even though it was his mother that was telling

9    you that she was going to take him?

10        A.    That is correct.

11        Q.    Okay.  And you had no knowledge as to whether

12   or not his mother had even discussed being -- taking

13   Ruben Gutierrez to the Brownsville Police Department, did

14   you?

15        A.    No, I didn't.

16        Q.    Okay.  And you -- up to that point in

17   discussing with the mother taking Ruben Gutierrez to the

18   Brownsville Police Department, you had not talked to

19   Ruben Gutierrez; is that correct?

20        A.    That is correct.

21        Q.    So at that point, you didn't know whether or

22   not Ruben Gutierrez wanted to discuss anything with

23   you --

24        A.    That is correct.

25        Q.    -- is that correct?  And you did not have an

STATE OF TEXAS VS. RUBEN GUTIERREZ                           71

```
 1    opportunity to talk to Ruben Gutierrez at all on
 2    September the 8th of 1998; is that correct?
 3         A.   I did have an opportunity.
 4         Q.   On September the 8th of 1998?
 5         A.   The 8th?  No, I didn't.
 6         Q.   The only persons that you talked to were Angie
 7    Gutierrez and Norma Gutierrez; is that correct?
 8         A.   That is correct.
 9         Q.   Ruben Gutierrez showed up on September the 9th
10    of 1998; is that correct?
11         A.   That is correct.
12         Q.   He was approximately 45 minutes late?
13         A.   Approximately.
14         Q.   Okay.  And he showed up with his mother and
15    also with his wife; is that correct?
16         A.   That is correct.
17         Q.   Did he show up with any children?
18         A.   I didn't see any children.
19         Q.   You stated that you had gone downstairs to pick
20    him up; is that true?
21         A.   That is correct.
22         Q.   And that you took him up to the C.I.D.?
23         A.   That is correct.
24         Q.   Do you recall at about -- how long of a period
25    of time Ruben Gutierrez was at the Brownsville Police
```

1   Department?

2       A.   I can't recall.

3       Q.   You stated he got there about 3:45.  You don't

4   remember what time he left?

5       A.   No, I didn't.

6       Q.   Okay.  You stated that you took a statement

7   from Angie Gutierrez, his wife; is that correct?

8       A.   From Angie Gutierrez herself.

9       Q.   Yes.  And that you took that statement from her

10  after you talked to Ruben Gutierrez; is that correct?

11      A.   That is correct.

12      Q.   The statements that you take from individuals,

13  does the time that you write on there, does it reflect

14  the time that you start taking the statement or the time

15  that you finish taking it?

16      A.   The time I start taking the statement.

17      Q.   Okay.  And how long did it take you

18  approximately on September the 9th of 1998 to take a

19  statement from Angie Gutierrez?

20      A.   I don't recall.  We were talking.  We were --

21  then I took the statement.  Then she read it.  She signed

22  it.  I don't have an approximate time.

23      Q.   But if we look her statement, we would at least

24  know the time that you began taking the statement from

25  her; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                     73

1      A.    That's correct.

2      Q.    Okay.  Now, you stated that on September the

3  9th of 1998, Ruben Gutierrez went up to your office; is

4  that true?

5      A.    That is correct.

6      Q.    Can you describe how it is that your offices

7  are set up?

8      A.    Our office is on the second floor of the

9  Brownsville Police Department.  It's divided up into two

10  sections, sections divided against -- crimes against

11  persons and crimes against property.  Inside the crimes

12  against persons where I work, there's eight cubicles.

13  There's no walls all the way up to -- there's eight

14  cubicles and I'm in one of the cubicles.

15      Q.    Now, when you took him up to the second floor,

16  was he handcuffed?

17      A.    Yes, he was.  I'm sorry.  On the 9th?

18      Q.    We're talking about September the 9th of 1998.

19      A.    No, he wasn't.

20      Q.    Okay.  Was he handcuffed at all during the time

21  that he was there?

22      A.    No, he wasn't.

23      Q.    Okay.  Now, when you walk into the Brownsville

24  Police Department, you can't get in unless somebody lets

25  you in; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          74

1      A.   That is correct.

2      Q.   And can you get out unless somebody lets you

3  out?

4      A.   Yes, you can.

5      Q.   You can just walk out?

6      A.   If someone lets you out?

7      Q.   Well, can you get out of the Brownsville Police

8  Department from the C.I.D. division without somebody

9  letting you out?

10     A.   You could if you wanted to.

11     Q.   But you would need to go ahead and walk all the

12  way downstairs?

13     A.   That is correct.

14     Q.   Okay.  What about the door in front as you walk

15  into the Brownsville Police Department, can an individual

16  just walk out?

17     A.   Yes.

18     Q.   How many police officers were present when you

19  were questioning Ruben Gutierrez?

20     A.   One.

21     Q.   And was that you or somebody --

22     A.   Myself and Detective Pineda.

23     Q.   And were you both in uniform?

24     A.   No.  Plain clothes.

25     Q.   And were you all wearing your side weapons?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                75

1        A.    I don't recall if we were.

2        Q.    Is it customary for you to wear them?

3        A.    If we're in the building, it's -- I can have it

4   on.  I don't have to have it on all the time.

5        Q.    But you don't recall whether or not you were

6   wearing it on that day?

7        A.    That's correct.  I don't recall.

8        Q.    Do you recall whether or not Detective Pineda

9   was wearing his sidearm on that day?

10       A.    I don't recall.

11       Q.    Now, you stated that on that day, September the

12  9th of 1998, you started talking to Ruben Gutierrez; is

13  that correct?

14       A.    That is correct.

15       Q.    Did he give you any information regarding that

16  alleged offense of September the 5th of 1998?

17       A.    No.

18       Q.    Not at all?

19       A.    None.

20       Q.    After he -- after you had read his Miranda

21  warnings, he advised you that he no longer wanted to

22  discuss the case with you; is that correct?

23       A.    That is correct.

24       Q.    And he stopped the interview; is that true?

25       A.    Yes.  That's correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          76

1        Q.   Now, you have before you what was marked and
2    admitted as State's Exhibit Number 1.
3        A.   I don't have it with me.
4                  MR. REYES:   May I approach the witness,
5    Your Honor?
6                  THE COURT:   You may.
7        Q.   (BY MR. REYES)   That was the waiver of the
8    Miranda warnings; is that correct?
9        A.   That is correct.
10       Q.   Okay.   Now, was this the document that you used
11   on September the 9th of 1998?
12       A.   That is correct.
13       Q.   And you would agree with me that this document
14   is divided into two sections, the warnings section where
15   you basically read it to the individual and see whether
16   or not they understand their rights; is that correct?
17       A.   That is correct.
18       Q.   And then the second part is the actual waiver;
19   is that correct?
20       A.   That is correct.
21       Q.   Where they're saying basically that they
22   understand their rights; is that correct?
23       A.   That is correct.
24       Q.   And they're willing to waive them; is that
25   true?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          77

1        A.    That is correct.

2        Q.    Now, on the second part here where it says, "I

3    have read the statement of my rights; the statement of my

4    rights has been read to me," isn't it correct that

5    neither of those phrases is marked; is that correct?

6        A.    That is correct.

7        Q.    Okay.  So we don't know just from based on this

8    document whether Ruben Gutierrez read this document

9    himself or whether you read it to him; is that correct?

10       A.    That is correct.

11       Q.    Now, on this day on September the 9th of 1998,

12   did you do anything to ensure or for you to make sure

13   that Ruben Gutierrez was not under the influence of any

14   drugs?

15       A.    No, I didn't.

16       Q.    Did you give him a blood test?

17       A.    No, I didn't.

18       Q.    Did you do anything to ensure that he was not

19   under the influence of any alcohol?

20       A.    No.

21       Q.    You didn't give him an intoxilyzer test, did

22   you?

23       A.    No, I didn't.

24       Q.    So you don't know whether or not he was under

25   the influence of any drugs or alcohol --

STATE OF TEXAS VS. RUBEN GUTIERREZ                          78

```
 1          A.    That is correct.
 2          Q.    -- when he was being read this document; is
 3    that correct?
 4          A.    That is correct.
 5          Q.    So you don't know whether or not he was in his
 6    full senses when he was being read this document and
 7    asked to sign it; is that correct?
 8          A.    That is correct.
 9          Q.    Now, are you aware that Ruben Gutierrez wears
10    glasses?
11          A.    No, I wasn't.
12          Q.    Okay.  Did he -- was he wearing his glasses on
13    that day?
14          A.    I don't believe he was.
15          Q.    And do you -- do you know whether or not he
16    wears contact lenses?
17          A.    No, I don't.
18          Q.    So you don't know whether or not he was wearing
19    his contact lenses on that day; is that true?
20          A.    That is correct.
21          Q.    Now, you had stated earlier that when you were
22    talking to Ruben Gutierrez, that he spoke to you in
23    English but he also spoke to you in Spanish; is that
24    correct?
25          A.    That is correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    79

1       Q.   Okay.   Now, you don't know how fluent he is in
2   English; is that correct?
3       A.   That is correct.
4       Q.   And you don't know how fluent he is in Spanish;
5   is that correct?
6       A.   That is correct.
7       Q.   So if you were reading this document, which is
8   marked as State's Exhibit Number 1, to him in English,
9   you don't -- you cannot tell this Court whether or not he
10  understood what he was being read; is that correct?
11      A.   That is correct.
12      Q.   Did you at any time throughout the
13  investigation of this case take Mr. Gutierrez before a
14  magistrate?
15      A.   No, I didn't.
16      Q.   Do you know who took him to a magistrate?
17      A.   No, I don't.
18      Q.   Were you the investigator in charge of this
19  case?
20      A.   No, I wasn't.
21      Q.   Who was the investigator in charge of this
22  case?
23      A.   Detective Gilbert Garcia.
24      Q.   So he would be the individual, the officer who
25  would know who took him to a magistrate?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          80

1        A.    I wouldn't know if he would know or not.

2        Q.    Have you ever been a lead investigator in a

3   case?

4        A.    Yes, I have.

5        Q.    And isn't it your responsibility to make sure

6   that everything gets done with respect to that

7   investigation?

8        A.    That is correct.

9        Q.    So if you were in charge of this investigation,

10  then you would know as the chief investigator who took

11  him to a magistrate; is that correct?

12       A.    That would be correct.

13       Q.    Now, you had an opportunity to talk to Angie

14  Gutierrez on September the 8th of 1998; is that correct?

15       A.    That is correct.

16       Q.    You actually went to her house and you

17  conducted a search --

18       A.    That is correct.

19       Q.    -- of her home; is that correct?

20       A.    Yes, it is.

21       Q.    So on that day, the day before you were talking

22  to Ruben Gutierrez, you could have sat down with Angie

23  Gutierrez and you could have discussed what it is that

24  she knew or did not know about this case; is that

25  correct?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                           81

1        A.    That's correct.

2        Q.    Okay.  But you didn't talk to her until

3   September the 9th of 1998; is that correct?

4        A.    That's incorrect.  I did talk to her on the

5   8th.

6        Q.    Okay.  But in reference to taking a statement

7   from her --

8        A.    No, I didn't.

9        Q.    -- you didn't do that until September the 9th

10  of 1998 --

11       A.    That is correct.

12       Q.    -- is that true?

13       A.    That's correct.

14       Q.    And you chose to do that, you chose to talk to

15  her and take a statement from her only after Ruben

16  Gutierrez told you, "I no longer want to talk to you;" is

17  that correct?

18       A.    I was going to talk to her anyway regardless of

19  whether he gave me a statement or not.

20       Q.    Well, you said there were two police officers,

21  is that correct, you and Detective Pineda?

22       A.    That's correct.

23       Q.    Detective Pineda could have been talking to her

24  at the same time you were talking to Ruben Gutierrez; is

25  that true?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          82

```
 1        A.    That's correct.
 2        Q.    Okay.  But you didn't talk to her until after
 3   you -- until you talked to Ruben Gutierrez and he told
 4   you that he no longer wanted to talk to you; is that
 5   true?
 6        A.    That's correct.
 7        Q.    Ruben Gutierrez stayed at the Brownsville
 8   Police Department until after you talked to Angie
 9   Gutierrez; is that correct?
10        A.    Downstairs with his mother, yes.
11        Q.    So, right after he told you, "I'm going to go
12   ahead and no longer want to talk to you," you let him go
13   back downstairs?
14        A.    Yes, with his mother.
15        Q.    Did you escort him downstairs?
16        A.    Yes.  I didn't personally escort him, but
17   somebody did.
18        Q.    But nonetheless, he was at the Brownsville
19   Police Department --
20        A.    That's correct.
21        Q.    -- until after you talked to Angie --
22        A.    That's correct.
23        Q.    -- is that correct?
24        A.    That's correct.
25        Q.    And isn't it correct that you made threats to
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           83

1    Ruben Gutierrez with respect to his children?

2        A.   No, I didn't.

3        Q.   In other words, if Ruben Gutierrez didn't talk

4    to you, that you were going to do everything in your

5    power to take his children away from him?

6        A.   That's not correct.

7        Q.   Isn't it correct that you threatened his wife

8    also, that you were going to take away her children if

9    she did not give you a statement or talk to you?  Isn't

10   that correct?

11       A.   No.

12       Q.   And isn't it correct that you also threatened

13   Ruben Gutierrez with prosecuting or arresting his wife if

14   she did not talk to you -- or if he did not talk to you,

15   rather?

16       A.   That's not correct.

17       Q.   So, nothing was said to you by Ruben Gutierrez

18   on September the 9th of 1998?

19       A.   Yes, he did.

20       Q.   Okay.  Earlier you testified that he didn't.

21       A.   No.  He did.  It got to the point to where we

22   were interviewing him, and then he started getting

23   confused on the dates, and the places, times, who he was

24   with.  And then that's when he decided, "Do you know

25   what?  I want to terminate the interview."

STATE OF TEXAS VS. RUBEN GUTIERREZ                              84

1      Q.    Okay.  And did you prepare a separate document

2  with respect to what was said by him on September the

3  9th --

4      A.    Yes.  On my --

5      Q.    -- of 1998?

6      A.    -- supplemental report.

7      Q.    I'm sorry?

8      A.    On my supplemental report I did indicate that.

9      Q.    Okay.  But when you took a statement from him

10 or allegedly from him on September the 13th, you have

11 everything that he said written down; is that correct?

12     A.    That's correct.

13     Q.    And when you took one on the 14th, you also

14 have everything written down in a statement as to what he

15 allegedly said on that day; is that true?

16     A.    I didn't take the one on the 14th.

17     Q.    Okay.  But is there one that was taken on the

18 14th?

19     A.    I believe so.

20     Q.    And is there a separate statement, written

21 statement from what was allegedly said on that date?

22     A.    Correct.

23     Q.    But you don't have one for September the 9th of

24 1998; is that correct?

25     A.    It's included all in the same one.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          85

1        Q.    My question to you, Officer Flores, is whether
2    you have a separate document, a statement from him from
3    what was said or done on September the 9th of 1998?
4        A.    No.
5        Q.    Now, what you have before you is State's
6    Exhibit Number 1; is that true?
7        A.    That is correct.
8        Q.    And that is read to the individual beforehand?
9        A.    That is correct.
10       Q.    Now, you stated that you're the individual that
11   types out what's being said; is that true?
12       A.    That is correct.
13       Q.    And you stated that after you type out what was
14   allegedly told you, that you have the individual also
15   again initial that he understood his rights; is that
16   true?
17       A.    Is this for the 9th?
18       Q.    We're talking about the 13th.
19       A.    The 13th?
20       Q.    Yes.
21       A.    Can you repeat the question?
22       Q.    Yes.  You stated earlier that what you do is
23   you take care of what was marked as State's Exhibit
24   Number 1 first, true?
25       A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          86

1    Q.   Okay.  And then after that in the process of
2   taking the statement, what you do is you go ahead and
3   type out what's allegedly being told to you and then you
4   print it out --
5    A.   That is correct.
6    Q.   -- is that correct?  And then you read the
7   individual the rights that are printed on that statement;
8   is that correct?
9    A.   That's correct.
10    Q.   And then you also get that individual to waive
11   his rights; is that correct?
12    A.   That is correct.
13    Q.   Do you have what's been marked as State's
14   Exhibit Number 3 and admitted as evidence with you?
15    A.   No, I don't.
16         MS. FISCHER:  The Judge has it, Mr. Reyes.
17         MR. REYES:  He just needs State's Exhibit
18   Number 3, Your Honor.  May I approach the witness?
19         THE COURT:  You may.
20         MR. REYES:  Do you have the other
21   statement?
22    Q.   (BY MR. REYES)  I'm going to show you what has
23   been marked as State's Exhibit Number 3 and State's
24   Exhibit Number 4, okay?  Do you recognize those?
25    A.   Yes, I do.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        87

1        Q.    Okay.   Now, these two statements were taken on
2   the same day, September 13th of 1998; is that correct?
3        A.    That is correct.
4        Q.    And these two statements were also taken at
5   exactly the same time on September 13th of 1998 at
6   12:21 p.m.; is that correct?
7        A.    This is the first statement that was taken.
8        Q.    Which is State's Exhibit Number 3?
9        A.    That is correct.
10        Q.    Okay.   Now, if we look at the last page of
11   State's Exhibit Number 3 and if we look at the last page
12   of State's Exhibit Number 4, they're different; isn't
13   that correct?
14        A.    That is correct.
15        Q.    And these two statements were taken at exactly
16   the same time; is that true?
17        A.    Not exactly the same time, no.
18        Q.    Well, let me back up here.   The time that's
19   noted as to when the statement was taken is 12:21 p.m. on
20   State's Exhibit 3 and State's Exhibit Number 4?
21        A.    This is the time that his rights were read.
22        Q.    Okay.   So his rights were read for State's
23   Exhibit Number 3 at 12:21 p.m.; is that correct?
24        A.    That is correct.
25        Q.    For this statement?

1       A.    That's correct.

2       Q.    And his rights were read at 12:21 p.m.?

3       A.    It's the same rights, sir.  It's the same

4   waiver of rights that was read.

5       Q.    So, what you're saying is that you didn't read

6   him his rights for State's Exhibit Number 4?

7       A.    No.

8       Q.    You did not?

9       A.    He was allowed to read them.

10      Q.    Okay.  So you did not -- you don't know whether

11  or not he had an opportunity to read them; is that

12  correct?

13      A.    He initialed each -- I told him to read each

14  initial -- read each number and to put his initial as he

15  had read each one; and he had initialed each and every

16  right.

17      Q.    So you didn't read these to him?

18      A.    That is correct.

19      Q.    And you earlier stated that you didn't know

20  whether -- how well he speaks English; is that correct?

21      A.    That's correct.

22      Q.    So you don't know how well he reads English

23  also?

24      A.    Oh, I do because I ask him before I read him

25  his rights.  We have them in the Spanish version and the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          89

1   English version; and he chose the English version.  So --

2        Q.   But you don't know how well he reads --

3        A.   That is correct.

4        Q.   -- is that correct?

5        A.   That's correct.

6        Q.   So you don't know whether or not when he read

7   this statement he actually understood the rights; is that

8   correct?

9        A.   He did understand them because they were the

10  same rights that I had read to him.

11       Q.   Okay.  You didn't read them to him; is that

12  correct?

13       A.   Not on this page I didn't, no.

14       Q.   Okay.  And isn't it correct that the waiver

15  here where it says, "I understand all my rights as stated

16  above; and now that I know all my rights, it is my choice

17  to voluntarily give them up and to freely, intelligently

18  and knowingly make this statement"?

19       A.   That is correct.

20       Q.   Okay.  Now, if you notice on State's Exhibit

21  Number 3, there's some initials that appear after that

22  statement; is that correct?

23       A.   That is correct.

24       Q.   And they do not appear on State's Exhibit

25  Number 4; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          90

```
 1         A.    That is correct.
 2         Q.    And that -- those initials signify or indicate
 3  that that individual is willing to give up his rights and
 4  give you this statement; is that correct?
 5         A.    No, that's not correct.
 6         Q.    Well --
 7         A.    The initials here -- once he had the
 8  opportunity to read his statement, I told him to initial
 9  each paragraph at the end so there wouldn't be anything
10  added on to the paragraph.  And he initialed it at the
11  end of the paragraph which states his rights where his
12  rights are at.
13         Q.    So basically what you get him to initial is his
14  rights?
15         A.    That is correct.
16         Q.    And you stated earlier that there's a
17  difference between a person understanding his rights and
18  a person waiving his rights; is that correct?
19         A.    I never stated that.
20         Q.    Okay.  Well, isn't there a difference between
21  the warnings and the actual waiver?
22         A.    There is a difference.
23         Q.    In other words, somebody might understand his
24  rights, but they might not be willing to waive them; is
25  that correct?  Is that correct?
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    91

1       A.    Correct.

2       Q.    Okay.  And isn't it correct that this last

3    sentence on the very first paragraph of State's Exhibit

4    Number 4, that is what constitutes the waiver?

5       A.    That's his rights.

6       Q.    Okay.  "I understand all of my rights as stated

7    above; and now that I know all of my rights, it is my

8    choice to voluntarily give them up and freely,

9    intelligently and knowingly make the following

10   statement."

11      A.    That is correct.

12      Q.    Doesn't that indicate that he's waiving his

13   rights?

14      A.    Yes.

15      Q.    And he wants to give you that statement?

16      A.    Yes, it does.

17      Q.    But it doesn't have the initials on there; is

18   that correct?

19      A.    That's correct.

20      Q.    You stated that on September the 13th of 1998

21   you already had an arrest warrant for capital murder; is

22   that correct?

23      A.    That is correct.

24      Q.    Do you recall what magistrate issued that

25   warrant?

STATE OF TEXAS VS. RUBEN GUTIERREZ                           92

```
 1        A.    I don't recall.
 2        Q.    Do you recall what time of the day on September
 3   13th that warrant was issued?
 4        A.    No, I don't.
 5        Q.    Who in the Brownsville Police Department
 6   obtained that warrant?
 7        A.    I can't recall.
 8        Q.    And you participated in the arrest of Ruben
 9   Cardenas; is that correct?
10        A.    Ruben Gutierrez?
11        Q.    Ruben Gutierrez.  I'm sorry.
12        A.    Yes, I did.
13        Q.    And that was on September 13th of 1998?
14        A.    That is correct.
15        Q.    Do you recall at what time?
16        A.    No, I don't.
17        Q.    So you don't recall at what time of day on the
18   13th of September of 1998 you went to execute that
19   warrant?
20        A.    That is correct.
21        Q.    Do you recall what time of day on that same day
22   you arrived at the Brownsville Police Department?
23        A.    No, I don't.
24        Q.    Do you have a report with you, Officer?
25        A.    No, I don't.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        93

1        Q.   Would you have -- if you had that report with
2    you, would that refresh your memory?
3        A.   It would.
4              MR. REYES:  Your Honor, I'd ask that the
5    witness be provided with his whole report and if he can
6    have an opportunity to review it?
7              MS. FISCHER:  Judge, I have his report.
8    I'll allow him to take a look at it right here.
9              THE COURT:  Go ahead, counsel.
10             MR. REYES:  I'm sorry, Your Honor?
11             THE COURT:  Go ahead.
12       Q.   (BY MR. REYES)  Do you recall -- does your
13   report at all state as to what time the arrest warrant
14   was obtained for Ruben Gutierrez?
15       A.   No, I don't.
16       Q.   It doesn't?
17       A.   No, it doesn't.
18       Q.   Okay.  Does -- your report then should state at
19   what time you went to execute that arrest warrant; is
20   that correct?
21       A.   That's correct.
22       Q.   At what time was that?
23       A.   I don't have it here in my supplement.
24       Q.   Were there any more reports that you might have
25   written?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    94

1      A.    That information would be on the arrest report
2   itself.
3      Q.    Okay.  And do you have that with you?
4      A.    No, I don't.
5                  MR. REYES:  We'd also ask that he be
6   provided with the arrest report, Your Honor.
7                  MS. FISCHER:  Judge, if he wrote the
8   arrest report, I'll let him take a look at it.  This is
9   under the Gaskin rule.  He's allowed to look at
10  everything he wrote.
11                 THE COURT:  Well, did you prepare the
12  arrest report?
13                 THE WITNESS:  I don't recall, Your Honor.
14                 MS. FISCHER:  Judge, all I have in my file
15  is a report on Pedro Gracia and on Rene Garcia.  I do not
16  have an arrest report on Mr. Gutierrez.
17     Q.    (BY MR. REYES)  After you arrested Ruben
18  Gutierrez on the 13th of September, Detective Flores, you
19  stated that you waited around for his wife to arrive; is
20  that correct?
21     A.    That is correct.
22     Q.    And the reason that you waited for her to
23  arrive is because there was children at the residence; is
24  that correct?
25     A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    95

1      Q.   And do you recall how long of a period of time
2  you were at Ruben Gutierrez' residence before the wife
3  arrived?
4      A.   Before the wife arrived?  About ten minutes.
5      Q.   How many police officers went with you to
6  execute that arrest warrant?
7      A.   I believe it was two officers and an S.I.U.
8  agent.
9      Q.   So there was a total of four officers from the
10  Brownsville Police Department?
11      A.   That is correct.
12      Q.   And I would assume that these officers in
13  executing an arrest warrant would have their weapons with
14  them; is that correct?
15      A.   That is correct.
16      Q.   And some of the officers would also have their
17  uniforms; is that correct?
18      A.   That is correct.
19      Q.   Do you recall how many out of the four officers
20  were actually wearing their uniforms on that day?
21      A.   Two.
22      Q.   Now, isn't it correct that before you took
23  Ruben Gutierrez out of his home, that he asked you to
24  give him some time to put on his contact lenses?
25      A.   That is correct.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              96

1      Q.   Okay.  And isn't it correct that you did not
2  allow him to put on his contact lenses?
3      A.   I don't recall.  I believe he did put them on.
4      Q.   Okay.  Isn't it correct that you didn't
5  actually give him his contact lenses until September the
6  14th of 1998?
7      A.   I don't recall.
8      Q.   Do you have your report with you?
9      A.   Yes, I do.
10     Q.   Would you have made any kind of notes regarding
11 that on that day?
12     A.   No, I didn't.
13     Q.   You would agree with me that if an individual
14 wears glasses or contact lenses, that that's very
15 important for them to have especially if they're going to
16 be questioned later on?
17     A.   Correct.
18     Q.   And if you're asking an individual to read
19 something and sign it, that it would be very important
20 for them to have their contact lenses or their glasses?
21     A.   Correct.
22     Q.   And you don't recall whether or not, first of
23 all, he put them on; is that correct?
24     A.   I think I recall that he did put them on, that
25 he did ask for some time to put them on; and he was

STATE OF TEXAS VS. RUBEN GUTIERREZ                          97

1   observed by another patrol officer putting them on.

2        Q.    Do you recall what patrol officer that was?

3        A.    I don't recall.

4        Q.    So you're saying -- are you saying that you're

5   absolutely sure that he did or are you saying that he

6   might have put them on?

7        A.    That he might have put them on.

8        Q.    So you're not sure, then?

9        A.    That is correct.

10       Q.    And you're not sure whether or not he put them

11  on on that day or whether he put them on the next day on

12  the 14th of September; is that correct?

13       A.    That is correct.

14       Q.    At that point when you went to his house to

15  execute that arrest warrant, Ruben Gutierrez was under

16  arrest; is that correct?

17       A.    That is correct.

18       Q.    He was not free to leave?

19       A.    That is correct.

20       Q.    And if he wanted to walk away from you, you

21  would not have let them -- let him; is that correct?

22       A.    That is correct.

23       Q.    And once he was at the police department, if he

24  wanted to walk out of the police department, you would

25  not have let him; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          98

1       A.    That is correct.

2       Q.    So he was in your care, your custody and your

3    control?

4       A.    That's correct.

5       Q.    On September the 9th -- let me back up.  On

6    September the 8th of 1998, you wanted to talk to him

7    about the death or the murder of Escolastica Harrison; is

8    that correct?

9       A.    That is correct.

10      Q.    The murder that occurred on September the 5th

11   of 1998?

12      A.    That is correct.

13      Q.    And also on September the 9th of 1998, you

14   wanted to talk to him about Escolastica Harrison, the

15   murder that occurred on September the 5th of 1998 --

16      A.    That is correct.

17      Q.    -- is that correct?  And then on September the

18   13th of 1998 when you arrested him, you again wanted to

19   talk to him about the murder of Escolastica Harrison on

20   September the 9th of 1998; is that correct?  On September

21   the 5th of 1998.

22      A.    That's correct.

23      Q.    Okay.  So every time that you wanted to talk to

24   him was regarding the same matter?

25      A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                         99

1     Q.   You stated that when you were talking to Ruben
2   Gutierrez on September the 13th of 1998, he was, in fact,
3   handcuffed?
4     A.   That is correct.
5     Q.   And do you recall where it is that you were
6   holding Ruben Gutierrez?
7     A.   In my cubicle sitting down in my chair.  Not in
8   my chair, but at the chair that we have there.
9     Q.   Okay.  And how many police officers were
10  present?
11    A.   Myself and Sergeant Galvan.
12    Q.   Anybody else?
13    A.   No.
14    Q.   So when you were talking to Ruben Gutierrez for
15  the purpose of taking that statement on September 13th of
16  1998, the only persons that were there were you and
17  Sergeant Galvan?
18    A.   That is correct.
19    Q.   Was Sergeant Galvan present with you from the
20  time that Ruben Gutierrez -- you started questioning him
21  to the time that he actually signed?
22    A.   That is correct.
23    Q.   And she was present throughout the whole
24  procedure?
25    A.   Yes, she was.

1        Q.    And is that normal procedure with the

2   Brownsville Police Department to have somebody that

3   witnesses the statement be present from start to finish?

4        A.    Most of the time, yes, it is.

5        Q.    That individual, basically what they're doing

6   is they're signing as witnesses that what was said and

7   what was done did actually occur; is that correct?

8        A.    That is correct.

9        Q.    So if somebody comes in towards the end and

10   witnesses a statement, then that individual might not

11   know everything that occurred from start to finish; is

12   that correct?

13        A.    Yes.

14                MR. REYES:    May I approach the witness

15   again, Your Honor?

16                THE COURT:    You may.

17        Q.    (BY MR. REYES)  When you're talking about

18   Sergeant Galvan, you're talking about Sandra Galvan; is

19   that correct?

20        A.    That is correct.

21        Q.    In looking at State's Exhibit Number 3, is she

22   the individual that signed as a witness?

23        A.    That is correct.

24        Q.    Okay.  And where it says, "witness number two,"

25   is that your signature?

1        A.   That is correct.

2        Q.   So basically what you're witnessing is that you

3   followed the procedure that you testified about?

4        A.   That's correct.

5        Q.   And your testimony was that Sergeant Sandra

6   Galvan was present from start to finish with respect to

7   this statement?

8        A.   That's correct.

9        Q.   Let's look at State's Exhibit Number 4.  Is

10  Sandra Galvan also the individual that signs as a

11  witness?

12       A.   That is correct.

13       Q.   And the signature for witness number two, is

14  that your signature?

15       A.   That is correct.

16       Q.   Let's look at State's Exhibit Number 1.  Who is

17  this document witnessed by?

18       A.   This is on the 9th and it's witnessed by

19  Santiago Manrique.

20       Q.   Okay.  And whose signature is down here?

21       A.   That is mine.

22       Q.   Okay.  Was Sergeant Manrique present from start

23  to finish with respect to the procedure followed with

24  this statement?

25       A.   Yes, he was.

STATE OF TEXAS VS. RUBEN GUTIERREZ                            102

1        Q.    Now, with respect to Exhibit Number 3 and also
2   Exhibit Number 4 which you have with you, the last page
3   of those statements is absolutely different; is that
4   correct?
5        A.    That is correct.
6        Q.    And the dates on those two statements are the
7   same; is that correct?
8        A.    That is correct.
9        Q.    They were both given on September the 13th of
10  1998?
11       A.    That is correct.
12       Q.    And they're both timed at 12:21 p.m.; is that
13  correct?
14       A.    That is correct.
15       Q.    Now, did you on any -- at any time on September
16  the 13th or September the 14th have an opportunity -- I'm
17  sorry.  Let me back up.  On September the 8th or
18  September the 9th have an opportunity to call a probation
19  officer by the name of Nidia Quintanilla?
20       A.    If I did?
21       Q.    Yes.
22       A.    No, I didn't.
23       Q.    To your knowledge, did any individual from the
24  Brownsville Police Department call a probation officer by
25  the name of Nidia Quintanilla?

```
1        A.    I don't recall.  I'm not sure.
2        Q.    Did you on September the 13th or the 14th have
3   an opportunity to call that probation officer by the name
4   of Nidia Quintanilla?
5        A.    If I had the opportunity?
6        Q.    Yes.  Did you call?
7        A.    I might have had.  I didn't call.
8        Q.    Do you have any personal knowledge as to
9   whether any other individual from the Brownsville Police
10  Department called that probation officer?
11       A.    I'm not aware.
12       Q.    You stated that the second statement that was
13  given to you on September the 13th of 1998, that the
14  reason you took that second statement is because you
15  wanted additional information; is that correct?
16       A.    That is correct.
17       Q.    But you stated that with respect to that second
18  statement, you did not read Ruben Gutierrez' rights?
19       A.    That is correct.
20       Q.    But yet, his initials appear next to those
21  rights; is that correct?
22       A.    That is correct.
23       Q.    And also with respect to the last page which is
24  different between three -- State's Exhibit 3 and 4, his
25  initials also appear on there; is that correct?
```

1     A.    That is correct.

2     Q.    Now, you also had an opportunity to talk to

3     Ruben Gutierrez on September the 14th of 1998; is that

4     correct?

5     A.    If I had the opportunity?

6     Q.    Yes.

7     A.    I might have had.

8     Q.    Okay.  Did you talk to him?

9     A.    I don't recall if I did.

10    Q.    Do you recall or do you know, have any personal

11    knowledge as to whether anybody from the Brownsville

12    Police Department talked to him on September the 14th?

13    A.    Yes.

14    Q.    And who was that?

15    A.    I believe it was Detective Gilbert Garcia.

16    Q.    And was there a statement taken from Ruben

17    Gutierrez on September the 14th?

18    A.    I believe so.

19    Q.    But you had no involvement whatsoever with

20    respect to that statement?

21    A.    I don't -- I don't believe I did.

22    Q.    Did you have any involvement whatsoever in the

23    reading of the Miranda warnings to Ruben Gutierrez on

24    September 14th of 1998?

25    A.    I don't believe so.

1     Q.    Other than those days, September the 9th,

2   September the 13th, did you have any other occasion to

3   talk to Ruben Gutierrez?

4     A.    No.

5     Q.    You had stated that on September the 14th you

6   took Ruben Gutierrez out to the scene of the -- where

7   some of property was located; is that correct?

8     A.    I don't recall which date it was.

9     Q.    But did you have an opportunity to take him out

10   there?

11     A.    I didn't take him out there.

12     Q.    Do you know who was responsible for taking him

13   out there?

14     A.    I don't recall.  I believe it was

15   Detective Garcia.

16     Q.    But you had no involvement whatsoever with

17   respect to that?

18     A.    That is correct.

19     Q.    Did you take him at all throughout your

20   investigation of this case out to the scene?

21     A.    To the scene?

22     Q.    Yes.  To locate the suitcase, things like that.

23     A.    Yes.

24     Q.    And what day was that?

25     A.    On the 13th.

1      Q.    Did you prepare anything with respect to having

2   taken Ruben Gutierrez out there to the scene in a

3   statement form --

4      A.    No.

5      Q.    -- like the one you took on the 13th?

6      A.    No, I didn't.

7      Q.    All you did was write things in your report; is

8   that correct?

9      A.    That is correct.

10     Q.    Okay.  So there's nothing to indicate to us

11  that Ruben Gutierrez freely and voluntarily wanted to

12  take you out there; is that correct?

13     A.    That's correct.

14     Q.    All we have is your word on it?

15     A.    That's correct.

16     Q.    Is it customary with the Brownsville Police

17  Department that when you arrest an individual, to attempt

18  to get a statement from him?

19     A.    Yes.

20     Q.    And isn't it correct that you -- on September

21  the 13th of 1998 when we have those two different

22  statements that were signed at the same time or have the

23  same time, isn't it correct that you told Ruben Gutierrez

24  just to re-sign that document and you never gave him the

25  opportunity to read it?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    107

1      A.    He was allowed to read it.

2      Q.    Isn't it correct that you told him to re-sign

3  it?

4      A.    That is correct.

5      Q.    And isn't it correct that you told him that all

6  you needed -- that you had lost the first one and that

7  you just needed for him to re-sign that one?

8      A.    That's not correct.

9      Q.    Isn't it correct that you told him that you

10 needed for him to re-sign that second statement, which is

11 State's Exhibit Number 4, because you just needed that

12 for your records?

13     A.    That's not correct.

14     Q.    And isn't it correct that you are the

15 individual that initiated the statement or the taking of

16 the statement on September the 13th of 1998?

17     A.    That's correct.

18     Q.    Backing up to September the 9th of 1998, isn't

19 it correct that Ruben Gutierrez also had requested that

20 you allow him to have an attorney with him?

21     A.    That's not correct.

22     Q.    Isn't it correct that he told you on September

23 the 9th that he did not want to talk to you?

24     A.    That he did not want to talk to me?

25     Q.    Yes.

1     A.    That is correct.

2     Q.    And isn't it correct that on September the 13th

3  of 1998, that he told you that he did not want to talk to

4  you?

5     A.    That's incorrect.

6     Q.    And isn't it correct that he told you on

7  September the 13th that he wanted an attorney?

8     A.    No.

9     Q.    And that you still questioned him even after he

10  asked for an attorney?

11     A.    No.

12     Q.    Isn't it correct that on September the 13th,

13  there was somebody from Mr. Galarza's office at the

14  Brownsville Police Department attempting to stop that

15  interview?

16     A.    No.

17     Q.    And isn't it correct that on September the 14th

18  of 1998, there was somebody from Mr. Galarza's office

19  attempting to stop the interview process with respect to

20  Mr. Ruben Gutierrez?

21     A.    No.

22     Q.    And isn't it correct that even though they were

23  there attempting to stop it, that you continued

24  questioning Ruben Gutierrez?

25     A.    That's incorrect.

1          MR. REYES:  I'll pass the witness, Your

2    Honor.

3                    **REDIRECT EXAMINATION**

4    **BY MS. FISCHER:**

5         Q.   Detective Flores, how did you know that

6    Mr. Gutierrez understood what he was reading?

7         A.   He was allowed to place his initials next to

8    each and every one of his warnings, of his rights.

9         Q.   Okay.  Now, I want to talk about not only the

10   warnings or the rights, but also the actual body of the

11   statement.  How does a defendant indicate to you, "I

12   understand what I've read and I agree with what I've

13   read"?

14        A.   He signs it.

15        Q.   Okay.  What about the actual body of the

16   statement, did Ruben Gutierrez make any markings on the

17   statement that indicated to you he understood what he

18   read?

19        A.   Yes, he did.

20        Q.   What did he do?

21        A.   He initialed the paragraph at the end of the

22   paragraph where he stated that he understood.

23        Q.   And is that on each and every paragraph?

24        A.   That is correct.

25        Q.   In both statements?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    110

1        A.    That is correct.

2        Q.    And you took that to mean that he understood

3   what he was reading?

4        A.    That is correct.

5        Q.    Did he ever indicate to you he didn't

6   understand what he was reading?

7        A.    No.

8        Q.    Ever indicate to you he couldn't read in

9   English?

10       A.    No.

11       Q.    Did he ever even by his demeanor give you any

12   indication that he wasn't reading what you had wrote?

13       A.    No.

14       Q.    What about his ability to read as far as

15   whether or not he needed to have contacts or glasses on,

16   tell me about when the subject of contacts first came up

17   with Mr. Gutierrez.

18       A.    I believe it might have been at his residence.

19       Q.    Okay.  Was that on the 9th -- well, you didn't

20   actually go and see him on the 9th.  When he came to see

21   you on the 8th, did he ever -- I mean, on the 9th, did he

22   ever indicate to you he had any trouble reading as far as

23   needing glasses or contacts?

24       A.    No.

25       Q.    Okay.  When you get to the house on the 13th

STATE OF TEXAS VS. RUBEN GUTIERREZ                    111

```
 1   with your arrest warrant, what happens that indicates to
 2   you that he needs his contacts?
 3        A.   I believe he mentions that he needed his
 4   contacts.
 5        Q.   Okay.  So, then, what happened after he said,
 6   "I need my contacts"?
 7        A.   I believe he was allowed to place -- put on his
 8   contacts.
 9        Q.   Okay.  When he came back, did he ever indicate
10   to you, "Man, they didn't let me have my contacts"?
11        A.   No.
12        Q.   "They won't let me have my glasses"?
13        A.   No.
14        Q.   When you got him up in the room at C.I.D., did
15   he ever indicate to you, "I can't see"?
16        A.   No.
17        Q.   Did he ever indicate to you, "They didn't let
18   me have my contacts back at the house"?
19        A.   No.
20        Q.   So by the defendant's own demeanor, you took
21   that to mean they let him have his contacts and he didn't
22   have any trouble reading?
23        A.   That is correct.
24        Q.   When you handed him his statement and allowed
25   him to look at it, did he hold it at an appropriate
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    112

```
 1   distance like someone who was able to see just fine?
 2       A.    That is correct.
 3       Q.    Did he ever indicate to you that he had to hold
 4   it up close so he could see what was happening?
 5       A.    No.
 6       Q.    Did he ever indicate to you he had to hold it
 7   far away so he could see what was happening?
 8       A.    No, he didn't.
 9       Q.    Did he act like a normal person who could read
10   and write and could see what he was doing?
11       A.    Yes.
12       Q.    Do you have any reason to believe they didn't
13   let him have his contacts?
14       A.    No.
15                   MS. FISCHER:  I pass the witness.
16                   RECROSS-EXAMINATION
17   BY MR. REYES:
18       Q.    You -- on September the 13th of 1998 when you
19   went to arrest Ruben Gutierrez at his residence, isn't it
20   correct that you did not allow him to put clothing, other
21   than what he was wearing, and take him to the police
22   department?
23       A.    He was already dressed.
24       Q.    Okay.  Isn't it correct that all he was wearing
25   was some boxer shorts and a T-shirt maybe?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    113

1        A.   I don't recall.

2        Q.   And isn't it correct that later on that day on

3   September the 13th, Angie Gutierrez actually had to go to

4   the Brownsville Police Department and actually take him

5   clothing?

6        A.   I don't recall.

7        Q.   Do you have your report with you, Officer?

8        A.   Yes, I do.

9        Q.   Do you anywhere on there indicate that?

10       A.   No.

11       Q.   You stated earlier that four police officers

12  from the Brownsville Police Department were present; is

13  that correct?

14       A.   That is correct.

15       Q.   And those were you and one officer from the

16  S.I.U.?

17       A.   That is correct.

18       Q.   What was his name or her name?

19       A.   Johnson.

20       Q.   And two other officers, what were their names?

21       A.   I'm trying to remember his name.  Frank

22  Cardenas, and I can't recall who the other officer was.

23       Q.   Was it a female or male?

24       A.   Male officer.

25                 MR. REYES:  I'll pass the witness, Your

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          114

```
 1    Honor.
 2                        REDIRECT EXAMINATION
 3    BY MS. FISCHER:
 4         Q.    Detective Flores, did you take a picture of
 5    Mr. Gutierrez when he came in to give you a confession?
 6         A.    Yes.
 7         Q.    Okay.  And would that have been on the 8th or
 8    on -- I mean, on the 9th or on the 13th?
 9         A.    On the 13th.
10              MS. FISCHER:  Your Honor, may I approach
11    the witness?
12              THE COURT:  You may.
13         Q.    (BY MS. FISCHER)  Detective Flores, I'm going
14    to show you what's been marked as State's Exhibit
15    Number 7 and I'm going to ask if you recognize what this
16    is.
17         A.    A picture of Ruben Gutierrez.
18         Q.    And does that picture fairly and accurately
19    represent what Ruben Gutierrez looked like when you
20    talked to him on the 13th of September?
21         A.    That is correct.
22         Q.    Is that the clothing he was wearing when you
23    talked to him?
24         A.    Yes.
25              MS. FISCHER:  Your Honor, at this time
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          115

1    we'd offer into evidence what has been marked as State's

2    Exhibit Number 7.  I'll tender it to opposing counsel.

3                    MR. REYES:  May I take this witness on

4    voir dire, Your Honor?

5                    THE COURT:  You may.

6                    **VOIR DIRE EXAMINATION**

7    **BY MR. REYES:**

8        Q.  You stated that you took this photograph on

9    September 13th of 1998?

10       A.  I'm not -- yes.  On the photograph on the 13th,

11   yes, that's correct.

12       Q.  Okay.  Were you the individual that took this

13   photograph?

14       A.  I -- yes.

15       Q.  You took it yourself personally?

16       A.  I believe so.

17       Q.  So you're not sure whether or not you took it,

18   then?

19       A.  I remember taking a photograph of him and I

20   believe it's that photograph that you have in your hands.

21       Q.  So you're not sure whether or not the

22   photograph that you took was this one?

23       A.  That's correct.

24       Q.  So you don't know what the time of day this

25   photograph was taken, if it was taken on September 13th

STATE OF TEXAS VS. RUBEN GUTIERREZ                    116

1   of 1998 at all --

2        A.    That's correct.

3        Q.    -- is that correct?  So, for all you know, this

4   photograph might have been taken on September 14th of

5   1998; is that correct?

6        A.    Correct.

7        Q.    Or it might have been taken some time after

8   that day; is that true?

9        A.    That's correct.

10             MR. REYES:  We would object, Your Honor.

11  I think the reason that she's attempting to introduce it

12  is to show that Ruben Gutierrez did have his clothing on

13  September 13th of 1998, but this officer cannot testify

14  that this photograph was taken even on that day or what

15  day at all.  So we would object to that photograph being

16  admitted.

17             MS. FISCHER:  Your Honor, that does not go

18  to the admissibility of a piece of a evidence.  A

19  photograph only has to reasonably and accurately depict

20  what it purports to depict.  It has nothing to do with

21  who took it, when they took it, or where they took it.

22             If he can say, "This is what Ruben

23  Gutierrez looked like when I talked to him," then it's

24  admissible if he can say it fairly and accurately

25  represents that.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          117

```
 1                 He can argue it's not the right picture,
 2    but as far as the admissibility of it, as long as he can
 3    say it fairly and accurate depicts, that is the predicate
 4    that I have to meet.
 5                        THE COURT:  You're talking when?
 6                        THE WITNESS:  On the 13th, sir.
 7                        THE COURT:  The objection is overruled.
 8                        MS. FISCHER:  Your Honor, State's Exhibit
 9    Number 7 is admitted?
10                        THE COURT:  It'll be admitted.
11                        (State's Exhibit Number 7 admitted)
12                        MS. FISCHER:  I pass the witness.
13                        MR. REYES:  We have nothing further, Your
14    Honor.
15                        MS. FISCHER:  I have nothing further, Your
16    Honor.  May he be excused?
17                        THE COURT:  You may step down.
18                        THE WITNESS:  Thank you, Your Honor.
19                        THE COURT:  Call your next witness.
20                        MS. FISCHER:  Officer Gilbert Garcia.
21                        GILBERT GARCIA JR.,
22        having been previously duly sworn, testified as
23        follows:
24                        DIRECT EXAMINATION
25    BY MS. FISCHER:
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    118

```
 1       Q.   Detective Garcia, will you please state your
 2   full name?
 3       A.   Gilbert Garcia, Jr.
 4       Q.   And what do you do for a living?
 5                THE COURT:  Hold on.  You were sworn in
 6   earlier?
 7                THE WITNESS:  Yes, sir, I was.
 8                THE COURT:  You're a detective?
 9                THE WITNESS:  Yes, sir.
10                THE COURT:  All right.
11       Q.   (BY MS. FISCHER)  Detective, tell me who you
12   work for.
13       A.   I work for the Brownsville Police Department.
14       Q.   Are you certified peace officer in the State of
15   Texas?
16       A.   Yes, ma'am.
17       Q.   How long have you been a certified peace
18   officer in the State of Texas?
19       A.   Approximately seven and a half years.
20       Q.   And how long have you been with the Brownsville
21   Police Department?
22       A.   About the same amount of time.
23       Q.   Tell me what your duties are as a detective in
24   the Brownsville Police Department.
25       A.   Investigate crimes, follow up investigative
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    119

1    leads, work on different cases assigned.

2         Q.    Okay.  Now, are you assigned -- if I

3    understand, there's a property division and a persons

4    division of crimes at B.P.D.  When one are you assigned

5    to?

6         A.    The persons division.

7         Q.    Does that mean you work homicides?

8         A.    Yes, ma'am.

9         Q.    Do you have any experience in taking

10   confessions from defendants?

11        A.    Yes, ma'am.

12        Q.    Okay.  Let's talk about a case in particular,

13   the State of Texas versus Ruben Gutierrez in which the

14   State alleges a woman by the name of Ms. Harrison was

15   murdered and robbed in her home.  Are you familiar with

16   that case?

17        A.    Yes, ma'am.

18        Q.    Did you have an opportunity to take a statement

19   from a defendant by the name of Ruben Gutierrez?

20        A.    Yes, I did.

21        Q.    Do you see Ruben Gutierrez here in the

22   courtroom today?

23        A.    Yes, I do.

24        Q.    Will you please point to him and tell me

25   something he's wearing?

1        A.   Okay.  He's sitting right over there wearing a

2   gray shirt (pointing).

3                MS. FISCHER:  Your Honor, will the record

4   reflect he's identified the defendant, Ruben Gutierrez?

5                THE COURT:  It shall reflect.

6        Q.   (BY MS. FISCHER)  Detective Garcia, when is

7   the first time that you had an opportunity to talk to

8   Mr. Gutierrez?

9        A.   It's rather difficult to recall the exact date.

10  I know it was September.

11       Q.   Okay.  Would having your report perhaps help

12  you refresh your memory?

13       A.   Yes, it would.

14               MS. FISCHER:  Your Honor, I'm going to

15  tender a copy of his report to Detective Garcia so that

16  he can refresh his memory.

17               THE COURT:  You may.

18               MS. FISCHER:  Thank you.

19       Q.   (BY MS. FISCHER)  Detective Garcia, if I told

20  you that the warnings and waivers that you signed of

21  Mr. Gutierrez are dated the 14th of September, would that

22  sound about right?

23               MR. REYES:  I'm going to object, Your

24  Honor, to counsel leading her own witness.

25               THE COURT:  Don't lead your witness,

1    counsel.  Rephrase your question.

2         Q.    (BY MS. FISCHER)  Detective, let's get into

3    you talking to Mr. Gutierrez.  We can worry about the

4    date in a little while.

5         A.    I found it.

6         Q.    Okay.

7         A.    The first time I met Mr. Gutierrez was on

8    September 14th.  It's right here in my supplement.

9         Q.    So, we're --

10        A.    It's just that there's a lot of supplements.

11        Q.    That's all right, Detective.  So on

12   September 14th, tell me about when you first came in

13   contact with this defendant.

14        A.    I don't recall if I spoke to him that day or

15   not, but I did see him.

16        Q.    Okay.  What did you do with the defendant?

17   What was your reason for coming in contact with him?

18        A.    Okay.  When I came in contact with him was at

19   Cameron County jail.

20        Q.    Okay.  And why did you go to the Cameron County

21   jail to talk to the defendant?

22        A.    To ask him if he was willing to take a

23   polygraph test.

24        Q.    Okay.

25                   MR. REYES:  I'm going to object, Your

                PAM L. ESQUIVEL, CSR, RPR