STATE OF TEXAS VS. RUBEN GUTIERREZ  73462   1



1              REPORTER'S RECORD

2           VOLUME 9 OF 32 VOLUMES

3       TRIAL COURT CAUSE NO. 98-CR-1391-A

4   - - - - - - - - - - - - - - - x
                                   :
5   THE STATE OF TEXAS             : IN THE DISTRICT COURT
                                   :
6   VS.                            : 107TH JUDICIAL DISTRICT
                                   :
7   RUBEN GUTIERREZ                : CAMERON COUNTY, TEXAS
                                   :
8   - - - - - - - - - - - - - - - x

9

10            INDIVIDUAL VOIR DIRE

11

12      On the 29th day of March, 1999, the following

13  proceedings came on to be heard in the above-entitled and

14  numbered cause before the Honorable Benjamin Euresti,

15  Jr., Judge Presiding, held in Brownsville, Cameron

16  County, Texas.

17      Proceedings reported by machine shorthand.

18

19            A P P E A R A N C E S

20  APPEARING FOR THE STATE OF TEXAS:

21      HON. JOHN T. BLAYLOCK
        State Bar No. 00784302
22      HON. KAREN L. FISCHER
        State Bar No. 00790685
23      Assistant District Attorneys
        Cameron County Courthouse
24      974 East Harrison
        Brownsville, Texas  78520
25      (956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS
DEC 8 1999
Troy C. Bennett, Jr., Clerk

ORIGINAL

STATE OF TEXAS VS. RUBEN GUTIERREZ                    2

1    APPEARANCES CONTINUED:

2    APPEARING FOR THE DEFENDANT:

3         HON. SANTIAGO GALARZA
          State Bar No. 00787508
4         Law Offices of Santiago Galarza
          3100 East 14th Street
5         Brownsville, Texas  78521
          (956) 541-4157
6
          AND
7
          HON. DANIEL R. REYES
8         State Bar No. 16794290
          Perez & Reyes
9         316 Nolana Loop
          McAllen, Texas  78504
10        (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    i

VOLUME 9

CHRONOLOGICAL INDEX

MARCH 29, 1999

INDIVIDUAL VOIR DIRE:

| NAME | STATE | DEFENSE | VOL |
|------|-------|---------|-----|
| Anita Anaya | 5 | 18 | 9 |
| Lydia Caldera | 50 | 63 | 9 |
| Eric Escobedo | 79 | 94 | 9 |
| Monica Rivera | 131 | 163 | 9 |
| Ricardo Santana | --- | --- | 9 |
| America Barrera Lopez | 197 | --- | 9 |
| Velma Lazo Peralez | 203 | 231 | 9 |

| | PAGE | VOL |
|------|------|-----|
| Adjournment.................................264 | | 9 |
| Court Reporter's Certificate....................265 | | 9 |

ALPHABETICAL INDEX

| NAME | STATE | DEFENSE | VOL |
|------|-------|---------|-----|
| Anaya, Anita | 5 | 18 | 9 |
| Caldera, Lydia | 50 | 63 | 9 |
| Escobedo, Eric | 79 | 94 | 9 |
| Lopez, America Barrera | 197 | --- | 9 |
| Peralez, Velma Lazo | 203 | 231 | 9 |
| Rivera, Monica | 131 | 163 | 9 |
| Santana, Ricardo | --- | --- | 9 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    3

1               **P R O C E E D I N G S**

2            **(Open court, defendant not present)**

3               THE COURT:  All right.  You may be seated.

4    Where is the note?

5               THE BAILIFF:  The note, Your Honor,

6    Mr. Santiago Galarza has it.

7               MR. GALARZA:  We have it, Your Honor.

8               THE COURT:  Okay.  For the record, we have

9    a report from the Cameron County Sheriff's Office in

10   reference to this defendant, Ruben Gutierrez.  And it

11   states that -- the incident report is that the defendant

12   refused to go to court.  It's dated March the 29th.  The

13   time is 7:44 a.m.  And it states that the defendant

14   stated he did not want to go to court due to feeling

15   sick.  No medical request form was found, and he advises

16   of sending one to see the medical staff about illness.

17              Okay.  Do you want to put anything on the

18   record, counsel?

19              MR. GALARZA:  Your Honor, just for the

20   record, we want to go ahead and object to proceeding with

21   the matter at this time since he is sick and he's not

22   here right now.  This is something that probably just

23   happened to him either this weekend or -- because the

24   last time we spoke to him was on Friday.

25              THE COURT:  All right.  Do you want to put

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    4

1    anything on the record, counsel?

2                    MR. BLAYLOCK:  The State's perfectly

3    willing to have him sit here next to his attorneys while

4    he's sick.

5                    THE COURT:  All right.  Then let's

6    proceed.

7                    Bring her in.

8                    All right.  Good morning, Ms. Anaya.

9                    MS. ANAYA:  Good morning.

10                   THE COURT:  How are you?

11                   MS. ANAYA:  Fine.

12                   THE COURT:  Okay.  Sorry we had to

13   reschedule you, but things took longer than we thought,

14   but we're ready to proceed at this time.  If you could,

15   please speak into the microphone so everybody can hear

16   you.

17                   MS. ANAYA:  Okay.

18                   THE COURT:  Thank you.

19                   All right.  You may proceed.

20                   MS. FISCHER:  Thank you, Judge.

21

22

23

24

25

1                       **ANITA ANAYA,**

2        having been called as a prospective juror and, upon

3        her oath, was examined and testified as follows:

4                    **VOIR DIRE EXAMINATION**

5    BY MS. FISCHER:

6        Q.   Good morning, ma'am.

7        A.   Good morning.

8        Q.   My name is Karen Fischer.  This is John

9    Blaylock.

10       A.   Uh-huh.

11       Q.   We work for the District Attorney's Office.

12   That means we present the people of Cameron County here

13   today.

14               I have had an opportunity to read your

15   questionnaire.  And I appreciate you filling that out for

16   us because it helps me know a little bit more about how

17   you feel about things regarding this particular case.

18               But there's a couple of questions I want

19   to ask you about the questionnaire; and the first of

20   which is when we asked you if you took medicine

21   regularly, you said that you did take regular medication.

22       A.   Uh-huh.

23       Q.   Is there anything about that that would cause

24   you to have a problem being a juror in this case knowing

25   you may have to sit still for long periods of time and

STATE OF TEXAS VS. RUBEN GUTIERREZ                           6

1   that you pretty much stay in this courtroom from 9:00
2   'til 5:00 every day?
3        A.   No.
4        Q.   Okay.  And there was another question that I
5   want to ask you about; and this is where we start to get
6   to kind of the personal issues and I need to know your
7   feelings.  You said that you have known people, or maybe
8   even yourself, that have been a victim of a crime.  Can
9   you tell me who it is that you know that was a victim of
10  a crime?
11       A.   Well, just like -- not victims, just like when
12  they're drunk, you know, driving, D.W.I., that's all.
13       Q.   Is that someone in your family?
14       A.   Yes.
15       Q.   Okay.  Did they have to go to court and be
16  punished and all that for what they did?
17       A.   Well, no.  They just got, you know, the penalty
18  that they have to pay.
19       Q.   Okay.
20       A.   And right now, well, I have a cousin that's in
21  prison because -- about that, you know.  He had more than
22  one.  So I rarely talk to him.  So --
23       Q.   Do you think these people were treated fairly
24  by the system, by the criminal justice system?
25       A.   Well, I think so because I don't think they

STATE OF TEXAS VS. RUBEN GUTIERREZ                    7

1   should be driving drunk.

2       Q.    Okay.   Anything about that going to cause to

3   you to be prejudiced in this case?   Are you going to hold

4   it against anyone because of what you know about what

5   happened to them?

6       A.    No.

7       Q.    Okay.   Now, of course, the reason why you're

8   here today talking to us one-on-one, you know that this

9   case involves the defendant being charged with the

10  offense of capital murder.

11      A.    Uh-huh.

12      Q.    That means the death penalty could be an

13  appropriate punishment in this case if after answering

14  some questions the jury decided that it was.

15                  How a criminal trial works, it's in two

16  parts.

17      A.    Uh-huh.

18      Q.    Now, the first part is the part where you have

19  to make a decision as a juror as to whether or not you

20  think the defendant is guilty or innocent, whether or not

21  you think he committed the crime.

22      A.    Uh-huh.

23      Q.    That's the first part.   The second part, then,

24  is if you do find beyond a reasonable doubt that he did

25  commit the crime, he is guilty, then you as the jury will

STATE OF TEXAS VS. RUBEN GUTIERREZ                              8

```
 1   be asked to assess punishment.
 2        A.    Uh-huh.
 3        Q.    And it's during the punishment phase that you
 4   will be asked some questions.  And based on your answers
 5   to those questions, the death penalty may or may not be
 6   imposed by the Judge.
 7             So now, let's talk about the
 8   guilt/innocence phase for just a minute.  What happens is
 9   the State brings you witnesses.  They tell you the facts
10   about the case.  They tell you what happened.  And you
11   make your decision based on that.
12        A.    Uh-huh.
13        Q.    The burden of proof, the standard that you have
14   to use is beyond a reasonable doubt.  That is the
15   standard.  I think Mr. Blaylock or somebody read that
16   definition last week when you were here.  And basically
17   it's a real, long, legal definition, but basically it
18   asks you to use your reason and your common sense as to
19   whether or not the person's guilty.  That's the standard.
20   The standard is the same for all cases, whether it be a
21   D.W.I. or a capital murder case.
22             But when you answered one of your
23   questions, when we asked you, "Would you hold the State
24   to a higher standard in a capital murder case?"  You
25   answered, "Yes."
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           9

```
 1              Tell me why you think the State should be
 2    held to a higher standard.
 3         A.   Well, because I think some of the criminal
 4    things should be punished, you know, to the higher,
 5    but --
 6         Q.   Okay.  Punishment is different, yeah.
 7    Punishment is more severe.  The worse the crime, the more
 8    severe the punishment.
 9         A.   Yes.
10         Q.   Okay.  Is that how you feel?
11         A.   Uh-huh.
12         Q.   Okay.  But as far as having to prove it, when
13    you come into court and you're a juror, I don't have to
14    prove it to you beyond all doubt or beyond a shadow of a
15    doubt.  Sometimes you hear that on television --
16         A.   Yeah.
17         Q.   -- beyond a shadow of a doubt.  That's not what
18    the legal standard is.  In Texas the legal standard is
19    beyond a reasonable doubt, okay?  So you can have a
20    doubt, but it has to be proved to you beyond a reasonable
21    doubt.  That's the standard, okay?  That's what the law
22    is.
23         A.   Yes.
24         Q.   Can you follow that law?
25         A.   I think I can.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          10

1      Q.    Okay.  And so that -- and you understand, then,
2   that for D.W.I. and capital murder, killing somebody and
3   driving while intoxicated, same burden?
4      A.    Yes.
5      Q.    Okay.  Not any different.  The law stays the
6   same --
7      A.    Uh-huh.
8      Q.    -- okay?  So, then, the law says I do not have
9   to prove the case to you beyond a shadow of a doubt.  Do
10  you understand that?  That's what the law is.
11     A.    Uh-huh.
12     Q.    Can you follow that law?
13     A.    I think so.
14     Q.    Okay.  That's what I need you to do because you
15  need to understand that we need people, we need 12 folks
16  who can be fair and impartial and not -- you know, if you
17  have like a hidden prejudice that says, "Well, I think it
18  has to be 100 percent --"
19     A.    Uh-huh.
20     Q.    -- you may not be a good juror, you know.  If
21  you can't follow the law, then you're not going to be a
22  good juror.  Can you follow the law?
23     A.    Yes.
24     Q.    Okay.  Then we need to -- the next thing I want
25  to ask you when we asked -- when you said -- well, we

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    11

```
 1    asked you, "Do you know any of the lawyers?"  And you
 2    said that you knew Mr. Blaylock.  How do you know
 3    Mr. Blaylock?
 4         A.   No.  I did not say that, did I?
 5         Q.   Okay.  It says --
 6         A.   Well, yes, well, just from here.  I'm sorry.
 7    Just from here.
 8         Q.   Okay.  From when you saw him --
 9         A.   Yeah.
10         Q.   -- talking on Tuesday?
11         A.   Yeah.
12         Q.   Mr. Reyes, the same way?
13         A.   Yeah, the same way.
14         Q.   All right.  Now I need to ask you some very
15    specific questions about your feelings about the death
16    penalty, capital punishment.  When we asked you the
17    question, "How do you feel about it?"  You said, "I'm
18    neither generally opposed nor generally in favor of
19    capital punishment."
20                   Tell me how you feel about the death
21    penalty.
22         A.   Well, I really -- on the death penalty, I say
23    that -- I mean, I don't really -- I say that the death
24    penalty is for people that, you know, that are not
25    supposed to be in the streets, you know, that they do
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    12

1    think they're going to commit the same thing over again.

2              Like sometimes like, you know, people that

3    do the same thing over again and keep on doing it, you

4    know, it's the people that I think that they deserve the

5    death penalty.  They're a threat, you know.

6         Q.    You tell me what type of crimes, then.  People

7    who have killed before?

8         A.    Yeah, people that kill and keep killing, you

9    know.

10        Q.    Okay.  What other types of people deserve the

11   death penalty?

12        A.    Well, I'm going to say people that kill, you

13   know.

14        Q.    Okay.  Only people that kill?

15        A.    Uh-huh.

16        Q.    Okay.  Now, the law in Texas is exactly like

17   how you feel.  Only -- you can only get the death penalty

18   if you commit murder with something else.  Like if you

19   commit murder on a child younger than six --

20        A.    Uh-huh.

21        Q.    -- the law says that you get the -- you can be

22   subject to the death penalty for that.

23              Or if you kill a police officer, the law

24   says that's more serious to kill a cop who's performing

25   his duties.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          13

```
 1                    The law also says if you're robbing
 2      somebody and you kill them, you can get the death penalty
 3      for that.
 4          A.    Uh-huh.
 5          Q.    How do you feel about that?  Do you think
 6      that's a good law?
 7          A.    Well, probably so because, I mean, maybe he
 8      didn't have intentions, but if he had -- well, because if
 9      the person went to, you know, steal something from
10      somebody, I mean, he knew that something might -- that
11      that could happen, you know.  He could kill somebody.  So
12      I think probably so, yeah.
13          Q.    What if that person had never killed anyone
14      before?  This was the first time that they did it.  The
15      law says that they can receive the death penalty.  Do you
16      think that's a good idea?
17          A.    Well, sometimes I think that person like --
18      maybe he could just get life in prison, you know.
19          Q.    But the law -- and this is something that you
20      and I need to talk about because it's very important.
21      The law says you can be a first time killer --
22          A.    Uh-huh.
23          Q.    -- and get the death penalty.
24          A.    Yeah.
25          Q.    Do you think that's a good idea?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          14

```
 1        A.   Well, I don't really know how to say it.  Well,
 2   I guess it all depends on how -- what the killing was or
 3   how he did the killing.
 4        Q.   Okay.  Yeah.  And that's what -- and I'm going
 5   to come up here and ask you about a couple of questions
 6   because this is real important.
 7                 If -- in a particular case, what happens
 8   is that you are not asked a question that says, "Do you
 9   think this defendant should receive the death penalty?"
10        A.   Uh-huh.
11        Q.   Instead, you are asked some questions.
12        A.   Uh-huh.
13        Q.   And based on your answers to those questions,
14   like if you think the defendant's going to hurt again and
15   if you think that he actually intended the killing to
16   happen, then he can receive the death penalty.
17        A.   Uh-huh.
18        Q.   Okay?  And so if you have some ideas that you
19   only think the death penalty should be for somebody who
20   has killed before --
21        A.   Uh-huh.
22        Q.   -- then you may not want to answer those
23   questions the way that you feel because you may not want
24   the person to receive the death penalty.  Like you said a
25   minute ago, maybe they should get a life sentence
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    15

1   instead.

2        A.    Uh-huh.

3        Q.    Okay.  So now, you tell me.  If I told you the

4   law says that you can receive the death penalty for

5   killing someone while robbing them --

6        A.    Uh-huh.

7        Q.    -- and in your past you had never killed

8   anybody before, can you follow that law?

9        A.    Well, I guess I can.  Uh-huh.  Because if

10  that's the law and -- I guess I can follow it.

11       Q.    Okay.  But if you can't, that's okay, too.  I

12  mean, if you have -- you know, in here, if you have a

13  feeling that, "The only time I could give someone the

14  death penalty is if he had killed before," that's okay.

15  I mean, I'm not telling you that it's wrong to feel like

16  that.

17       A.    Yeah.  I understand.

18       Q.    You know, it's okay.  But it's kind of like --

19  and we use this example all the time with people who are

20  accused of breaking into houses.  We have a lot of

21  burglaries here in Cameron County.  You probably know

22  that.  I mean, you probably know people who have had

23  their house getting broken in to.

24       A.    Uh-huh.

25       Q.    You know, usually when your house gets broken

STATE OF TEXAS VS. RUBEN GUTIERREZ                    16

```
 1    in to, you just -- I mean, it makes you very angry.
 2         A.    Yeah.
 3         Q.    And if you were here today and this was a
 4    burglary of a habitation case, you would probably say, "I
 5    don't care what happens.  I'm going to find him guilty
 6    because I just don't like people who break into houses."
 7         A.    Uh-huh.
 8         Q.    And see how sometimes because how you feel --
 9         A.    Yeah.
10         Q.    -- about things, it may cause you to be unfair.
11         A.    Uh-huh.
12         Q.    Okay?  And so that's what I need to know is if
13    your feeling about why people should get the death
14    penalty is so strong that you couldn't be fair in this
15    case.
16         A.    Well, I think I could do my best, you know.  I
17    think I could try to be very fair.
18         Q.    Okay.  And then when we ask you these
19    questions, we ask you if there is a probability that the
20    defendant would be a continuing threat to society,
21    basically would he hurt again --
22         A.    Uh-huh.
23         Q.    -- we're going to ask you that question.  We're
24    going to -- during the punishment phase of the trial
25    we'll put on evidence and then we'll ask you, "Do you
```

1   think he will hurt again?"

2        A.    Uh-huh.

3        Q.    What you have to do is you have to be able to

4   answer that question honestly.  You have to say either,

5   "Yes," or "No, I don't think that he'll hurt again," or

6   "I do think that he'll hurt again."

7        A.    Uh-huh.

8        Q.    The thing is is that if you have a hidden

9   belief about what you think ought to happen, that may

10  change your answer to this question.  Do you see what I'm

11  saying?

12       A.    Yes, I understand what you're saying.

13       Q.    Okay.  So now, my question to you is can you

14  answer the question honestly knowing that if you answer

15  this question "yes," the defendant may receive the death

16  penalty?

17       A.    Yes.

18       Q.    Okay.  Even though you may not think that

19  because he didn't kill two people, that's not going to

20  make you change your answer?

21       A.    No, I don't think so.

22       Q.    Okay.  That's the same for all the questions,

23  then.  That's what I just need to know is to make sure

24  that you can be fair and not have anything that's going

25  to not make it so that your feelings about how many times

1   a person killed would change your answers.  You're

2   telling me you can follow the law?

3        A.   Yeah, I think so.

4              MS. FISCHER:  I don't have any further

5   questions, Judge.

6              MR. REYES:  May I proceed, Your Honor?

7              THE COURT:  You may.

8                   **VOIR DIRE EXAMINATION**

9   BY MR. REYES:

10       Q.   Good morning, Ms. Anaya.

11       A.   Good morning.

12       Q.   How are you doing?

13       A.   Okay.

14       Q.   I'm going to go ahead and be asking you some

15   more questions about your questionnaire --

16       A.   Uh-huh.

17       Q.   -- and also some other principles of law that

18   we talked about last week and just to get an individual

19   answer from you and go into more detail from your

20   questionnaire.

21       A.   Uh-huh.

22       Q.   If you don't understand one of my questions,

23   just let me know and I'll go ahead and rephrase it.

24       A.   Okay.

25       Q.   On your questionnaire you had marked that you

STATE OF TEXAS VS. RUBEN GUTIERREZ                    19

1    knew Mr. Blaylock and myself; and that was just from us
2    having spoken to you --
3         A.    Yes.
4         Q.    -- last week?
5         A.    Uh-huh.
6         Q.    And you didn't recognize any names of the
7    witnesses that were called that were listed last week?
8         A.    No.
9         Q.    What about -- let me go ahead and list four
10   additional names; and then let me know if you know or
11   recognize any of those names.
12        A.    Okay.
13        Q.    Roberto Gonzalez from Brownsville; Tina Hauff
14   from Brownsville; Claudia Leyva who works for the
15   Brownsville Police Department; and Tino Ortiz.
16        A.    No.
17        Q.    Okay.  If it did turn out that you recognized
18   anybody, would you be able to listen to their testimony
19   and judge them just as you would judge any other witness?
20        A.    Yes, sir.
21        Q.    And the fact that you knew them, would that
22   affect you in any way?
23        A.    No.
24        Q.    We talked to you last week about the
25   indictment.  And remember that I told you that an

STATE OF TEXAS VS. RUBEN GUTIERREZ                              20

 1    indictment is simply the means whereby a person who's
 2    charged with a felony crime in this State is brought to
 3    court?  Do you recall that?
 4         A.    Yes.
 5         Q.    And I told you that that indictment is
 6    absolutely no evidence of a person's guilt, and that all
 7    it serves is to let the State know what it is that it
 8    must prove to you beyond a reasonable doubt, and it also
 9    tells the person that's charged what it is exactly that
10    they're being charged with.
11         A.    Uh-huh.
12         Q.    Did you understand that?
13         A.    Yes, sir.
14         Q.    Are those principles that you agree with?
15         A.    Uh-huh.
16         Q.    Do you agree with that?
17         A.    Yes.
18         Q.    And would you be able to follow the
19    instructions of the Court if the Judge were to instruct
20    you that that is the law in this State?
21         A.    Yes.
22         Q.    You would be able to follow it?
23         A.    (Nods head).
24         Q.    We talked about the presumption of innocence.
25    Remember that I told you that every person who's charged

STATE OF TEXAS VS. RUBEN GUTIERREZ                    21

1   with a crime in this State or anywhere in the United
2   States is presumed to be innocent until the very end; and
3   then it can only be overcome if the State presents enough
4   evidence to the jury to -- for them to come back with a
5   verdict of guilty.  Do you recall that?
6       A.   Uh-huh.
7       Q.   And do you agree with that law?
8       A.   Yeah.
9       Q.   Okay.  Everybody is presumed innocent --
10      A.   Until found guilty.  Yeah.
11      Q.   Okay.  And you agree with that?
12      A.   Uh-huh.
13      Q.   And if the Judge were to instruct you that that
14  is the law, would you be able to follow it?
15      A.   Yes.
16      Q.   Now, the State of Texas has the burden of
17  proof, and it stays with them from start to finish.  It
18  never shifts to us.  Remember that we don't have to
19  present any evidence whatsoever.
20      A.   Uh-huh.
21      Q.   And we don't have to, you know, present any
22  witnesses or anything like that.  Mr. Gutierrez doesn't
23  have to testify.  Do you remember that?
24      A.   Yes.
25      Q.   Are those things that you agree with?

1    A.    I guess so.  If that's the way it is, yes.

2    Q.    Okay.  Well, do you understand how we would

3  need a more definite answer from you, a yes or a no?

4    A.    Oh, okay.

5    Q.    Okay.  Are those --

6    A.    Yes, I think so.  I mean, sorry.  Yes.

7    Q.    And would you be able to follow those

8  instructions of the Court?

9    A.    Yes.

10    Q.    Now, we talked to you about the definition of

11  beyond a reasonable doubt.  It's right in front of you.

12  Can you see it?

13    A.    Uh-huh.

14    Q.    It says, "A reasonable doubt is a doubt based

15  on reason and common sense after a careful and impartial

16  consideration of all the evidence in the case.  It is the

17  kind of doubt that would make a reasonable person

18  hesitate to act in the most important of his own

19  affairs."

20              All it's asking you is for you to use your

21  reason and your common sense and carefully and

22  impartially consider all the evidence.

23    A.    Uh-huh.

24    Q.    Can you do that?

25    A.    Yes.

1       Q.   The second part it's saying, "Reasonable doubt
2   therefore must be proof of such a convincing character
3   that you would be willing to rely and act upon it without
4   hesitation in the most important of your own affairs."
5                 For example, would you agree with me that
6   the purchase of a home or a house is something that's
7   very important in a person's life?
8       A.   Uh-huh.
9       Q.   So you would take a lot of careful thought,
10  consideration before you decided to buy a house, wouldn't
11  you?
12      A.   Yes, sir.
13      Q.   It's simply asking you to go ahead and take
14  that reasoning, all that care and consideration that you
15  would give in the purchase of a home, something that's
16  very important in your own life, and bring it in and
17  apply it to this case.  Can you do that?
18      A.   Yes.
19      Q.   Okay.  And the first part is asked -- is
20  telling you that the proof -- that the evidence that is
21  presented to you must be of such a convincing character
22  that you must be willing to rely and also act upon it
23  without hesitation.  Can you do that?
24      A.   Yes.
25      Q.   Okay.  And if you were to be selected as a

STATE OF TEXAS VS. RUBEN GUTIERREZ                           24

1    juror, would you be able to apply this definition to the
2    evidence that is presented to you in making a decision?
3         A.    Yes.
4         Q.    We talked about also what are called the
5    elements.  Do you remember I told you that every crime is
6    made up of what are called elements; and those are the
7    things that the State of Texas has to prove to you with
8    evidence beyond a reasonable doubt?  Do you remember
9    that?
10        A.    Uh-huh.
11        Q.    And I pointed that there was six of them.  I
12   don't know if you recall it, but if you don't, they're
13   right here.  They're right to my left.
14              Remember that I told you that the
15   elements, the first one, was Ruben Gutierrez, the
16   defendant.
17        A.    Uh-huh.
18        Q.    Element number two, that it occurred on or
19   about September the 5th of 1998.
20        A.    Yes.
21        Q.    And element number three, Cameron County; four,
22   intentionally; five, the manner and means; and number
23   six, the said defendant was then and there in the course
24   of committing or attempting to commit the offense of
25   robbery.  Do you see that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    25

1        A.    Uh-huh.

2        Q.    And do you remember that I told you that each

3   one of these elements has to be proven to you with

4   evidence beyond a reasonable doubt?

5        A.    Yes.

6        Q.    And do you remember that, for example, number

7   one, the State of Texas has to bring enough evidence,

8   either witnesses, documents, whatever, to prove to you

9   and to convince you beyond a reasonable doubt and prove

10  element number one, that it was Ruben Gutierrez, the

11  defendant?

12       A.    Uh-huh.

13       Q.    And also that it happened on or about September

14  the 5th of 1998.  Do you see that?

15       A.    Yes.

16       Q.    And do you remember that I told you that if

17  they failed to prove even one of those elements, you must

18  say not guilty by your verdict?

19       A.    Yes.

20       Q.    Do you remember that?

21       A.    Uh-huh.  I remember.

22       Q.    Let's say, for example, they -- in number six,

23  do you see how it says, "In the course of committing or

24  attempting to commit robbery"?  Do you see that?

25       A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    26

1      Q.   Okay.  And let's say, for example, that they

2  introduced evidence maybe through witnesses that proved

3  up a burglary of a habitation, a burglary of a house.

4      A.   Uh-huh.

5      Q.   Do you see how burglary of a house is different

6  from a robbery?  There's two different --

7      A.   Yeah, because --

8      Q.   -- they're two different crimes?

9      A.   Uh-huh.

10     Q.   Do you understand that?

11     A.   Yeah, because in the house, that means they get

12 into the house, right, and --

13     Q.   Exactly.

14     A.   -- the other is outside the house.

15     Q.   Okay.  Let's say, for example, that they prove

16 to you beyond a reasonable doubt that there was a

17 burglary of a house and not a robbery, do you see how

18 they failed to prove element number six because they

19 didn't prove robbery, they proved something else?

20     A.   Uh-huh.

21     Q.   Do you understand that?

22     A.   Yes.

23     Q.   Okay.  So based on what we talked about

24 earlier, because they failed to prove element number six,

25 they've only proved five, if the Judge were then to ask

1    you, "How do you vote, guilty or not guilty?"  What would

2    your verdict have to be?

3        A.    Not guilty.

4        Q.    And do you understand why?

5        A.    Yes, because they didn't prove the six

6    elements.

7        Q.    Okay.  And is that something that you agree

8    with?  Since the State --

9        A.    Yeah.

10       Q.    Since the State brought the charges, they have

11   to prove them to you?

12       A.    Yeah, I understand that.

13       Q.    And if they don't prove them to you, you can't

14   just give them the case?

15       A.    Yes.

16       Q.    I know it's one element out of six, but still

17   the law says that that's enough.

18       A.    Uh-huh.

19       Q.    Okay?  Would you agree with that?

20       A.    Yes.

21       Q.    And if the Judge were to instruct you that that

22   is the law, would you be able to follow it?

23       A.    Yes.

24       Q.    In Texas we also have what's called a

25   bifurcated trial system.  And I told you on Tuesday of

STATE OF TEXAS VS. RUBEN GUTIERREZ                    28

1    last week that it's a two-part trial system; the

2    guilt/innocence phase and the punishment phase.

3                 And obviously if you find somebody not

4    guilty, then you don't even go to the second part.  If

5    you find somebody guilty, then you go to the second part.

6                 We talked about lesser included offenses

7    also, remember that?

8         A.    Uh-huh.

9         Q.    Where it's capital murder, from -- lesser

10   crimes from that are murder and then also robbery.  Do

11   you remember those?

12        A.    (Nods head).

13        Q.    And the question is in a hypothetical case if

14   you were to find somebody guilty of murder, the range of

15   punishment in that -- for murder is five years in prison

16   up to 99 years or life.  Would you be able to consider

17   the full range of punishment and then make a decision?

18                 I'm not asking what number of years you

19   would give because you don't know anything about any of

20   the facts, but just if you could keep an open mind as to

21   the whole number of years, consider five, consider 99 or

22   life in prison, anything in between, and then make a

23   decision based on what's presented to you.

24        A.    I think so.

25        Q.    Do you see how we would need a definite answer,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    29

```
 1    if you would --
 2         A.    Yes.
 3         Q.    -- or not?
 4         A.    Yes, sir.
 5         Q.    Okay.  I don't mean to badger you on that, but,
 6    you know, we do need definite answers because if you're
 7    seated as a juror, we need to know exactly what it is
 8    that you're --
 9         A.    Okay.  Yes.
10         Q.    For robbery, the range of punishment in this
11    State is two years in prison up to 20 years.  And all I'm
12    asking is whether you really -- you would be able to look
13    at the full range of punishment, two years, 20 years or
14    everything in between, and then make a decision based on
15    the evidence that's presented to you.
16         A.    Yes.
17         Q.    If you find somebody guilty of capital murder,
18    then that's when you would go ahead and come to those
19    special issues --
20         A.    Uh-huh.
21         Q.    -- and only in that circumstance, okay?
22         A.    Yes.
23         Q.    Basically Special Issue Number 1 is asking you,
24    "Is there a probability that the defendant would commit
25    criminal acts of violence that would constitute a
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    30

1   continuing threat to society?"

2                    And then Special Issue Number 2, "Do you

3   find from the evidence beyond a reasonable doubt that the

4   defendant either himself actually caused the death of the

5   victim; if he didn't, did he intend to kill the person;

6   if he didn't, did he anticipate that a human life would

7   be taken?"

8                    Do you understand?  And I'll go over them

9   in a little bit, but do you understand basically what

10  it's asking you?

11       A.    Yes.

12       Q.    Now, the State of Texas still has its burden of

13  proof.  They have to prove Number 1 and Number 2 to you

14  beyond a reasonable doubt.

15       A.    Yes.

16       Q.    Do you understand?

17       A.    I understand.

18       Q.    And would you be willing to hold the State to

19  their burden with respect to those two special issues; in

20  other words, require that they prove those two to you

21  beyond a reasonable doubt?

22       A.    Yes.

23       Q.    Now, Special Issue Number 2 is asking, "Is

24  there a probability."  In other words, is it more likely

25  than not, would you agree with me?  Is it more likely

 1   than not that the defendant would commit criminal acts of

 2   violence; and, therefore, he would be a continuing threat

 3   to society.  Would you agree with me?

 4        A.   Could you answer -- ask the question again?

 5        Q.   It's asking you -- when you look at the word

 6   "probability" --

 7        A.   Uh-huh.

 8        Q.   -- would you agree with me, Ms. Anaya, that

 9   that actually means more likely than not?

10        A.   Oh, yes.

11        Q.   Right?

12        A.   Uh-huh.

13        Q.   Okay.  And it's asking you to kind of look into

14   the future and make a prediction, right?

15        A.   Yes.

16        Q.   Because you don't know what's going to happen

17   or not --

18        A.   Yes.

19        Q.   -- is that correct?

20        A.   That's true.

21        Q.   None of us can look into the future and then

22   see what's going to happen --

23        A.   No.

24        Q.   -- is that correct?

25        A.   Uh-huh.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          32

1      Q.   It's just kind of asking you to go ahead and
2    make a guess as to what's going to happen in the future
3    or what might not happen.  Do you see that?
4      A.   Yes, I see that.
5      Q.   And do you see how it's basically asking you to
6    punish an individual in this case for something that
7    might not even happen in the future?  Because it's asking
8    you to answer the question --
9      A.   Yes.
10     Q.   -- for this case based on something that might
11   not even happen in the future.  Do you see that?
12     A.   Yeah, I have to consider that, too, that if he
13   was a threat or not and --
14     Q.   So you would look into everything and then make
15   a decision?
16     A.   Yes, I think so.  Yes.
17     Q.   And it's also -- do you see how it's limiting
18   to what you can look at, where it says, "Criminal acts of
19   violence"?  Do you see that?  Whether he would commit
20   other criminal acts of violence.
21     A.   Yes.
22     Q.   Okay.  Do you see how it's limiting you to
23   those acts only?  Do you see that?
24     A.   Yes.
25     Q.   Okay.  So do you see how the only thing that is

1    relevant to this special issue would be whether or not he

2    would commit other acts of violence; for example, maybe

3    an assault on a person, maybe a murder or something like

4    that?  But, for example, burglary of a house or burglary

5    of a vehicle, those aren't criminal acts of violence.

6    They're not violence on a person.

7         A.    Yeah, I know.

8         Q.    They're more against property.  Do you see the

9    difference there?

10        A.    Yes.

11        Q.    Now, Number 2, it's asking you to look at all

12   the facts and all the evidence that's presented to you,

13   and based on that can you tell beyond a reasonable doubt

14   whether that individual actually caused the death of the

15   victim.  Do you see that?

16        A.    Uh-huh.

17        Q.    Where actually -- for example, I go -- I go

18   into a Circle K.  I turn to the victim and I kill him and

19   then I run out with the money.  Do you see where in that

20   situation I killed him myself?

21        A.    Yes.

22        Q.    So based on that scenario, you'd be able to

23   answer "yes" to Question Number 2?  Are you with me?

24        A.    Yeah.  With the facts presented, you want to

25   know if I could be able to answer --

STATE OF TEXAS VS. RUBEN GUTIERREZ                           34

1       Q.    Based on what's presented to you.

2       A.    Yeah, I think so.  Yes.

3       Q.    Okay.  And do you see how that question is

4   asking you whether or not that person actually killed the

5   victim?

6       A.    Yes.

7       Q.    Okay.  So in that example that I gave you where

8   I go -- where I go and I actually shoot the individual

9   myself, do you see how in that example you can answer

10  "yes" because I actually killed that person?

11      A.    Yes.

12      Q.    Do you follow me?

13      A.    Uh-huh.

14      Q.    Okay.  And it's asking you if he didn't -- if I

15  didn't actually kill the person, then did the person

16  intend to kill somebody else or that victim.  Do you see

17  the difference?

18      A.    Uh-huh.

19      Q.    And let me give you another example.  Let's say

20  Mr. Galarza and I go to a Circle K, okay?  I have a gun.

21  I intend to kill somebody.  I have it in my mind that if

22  somebody crosses me, I'm going to turn around and shoot

23  them.

24                I never tell him that I have a gun.  I

25  never tell him what it is that I'm thinking.  All we're

STATE OF TEXAS VS. RUBEN GUTIERREZ                          35

1    going to do is we're going to go in there.  We make a

2    plan that one of us is going to distract the clerk, and

3    the other one is going to go ahead and grab the

4    cigarettes and run out.  That's all he knows, okay?

5         A.    Uh-huh.

6         Q.    Do you see how in that scenario there's no way

7    that he could have intended or anticipated that a human

8    life would be taken because in his mind all we're going

9    to do is run in there, take cigarettes, and then run out?

10   Do you follow me?

11        A.    Uh-huh.

12        Q.    Okay.  And do you think that you'd be able

13   to -- if the Court was to instruct you that that is the

14   law, would you be able to follow it?  In other words,

15   look at all the evidence that's presented and then decide

16   whether or not how you're going to answer that question.

17   Did you understand?

18        A.    Yeah, I understand what you're asking me.

19   Yeah, about the other person, that if he knew or not,

20   right?

21        Q.    I'm sorry?

22        A.    Like he didn't know that all this was going to

23   happen.

24        Q.    And that's basically where it goes to the law

25   of parties.  Because let's say, for example, two people

STATE OF TEXAS VS. RUBEN GUTIERREZ                    36

 1    go into a Circle K.  One kills another person.  That

 2    doesn't automatically mean the other person is guilty of

 3    murder because I shoot that person.  They're required to

 4    prove more than me just having gone in there.  You might

 5    find the other person guilty of robbery, but not

 6    necessarily of the murder.  Do you see that?

 7          A.    Yes.

 8          Q.    Okay.  Do you see where that is requiring that

 9    they prove more than Mr. Galarza just having gone in

10    there with me to the store to rob?

11          A.    Yes, I see that.

12          Q.    Okay.  I mean, you can find him guilty of

13    robbery maybe, going in there and stealing something or

14    theft, but not necessarily the murder unless they prove

15    that he actually killed the person, the clerk --

16          A.    Uh-huh.

17          Q.    -- unless they proved that he intended to kill

18    the person, or unless they prove that he anticipated that

19    the clerk would be killed.  Do you see that?

20          A.    Uh-huh.

21          Q.    Do you follow me?

22          A.    Yes.

23          Q.    Okay.  And could you follow that instruction

24    and then make a decision as to --

25          A.    Yes, I think so.  I mean, yes, because I think

STATE OF TEXAS VS. RUBEN GUTIERREZ                    37

1    I would look at all the evidence and then decide.

2         Q.   And then make a decision?

3         A.   Yes.

4         Q.   And do you understand how they're required to

5    prove more than he and I just going in there, one of us

6    kills, and then we're both guilty of murder?

7         A.   Yes.

8         Q.   You have to take it one step further and then

9    look at all those things.

10        A.   Uh-huh.

11        Q.   Would you be able to do that?

12        A.   I think, yeah.

13        Q.   Yes?

14        A.   Uh-huh.

15        Q.   Special Issue Number 3, it's asking you to take

16   into consideration all the evidence, the circumstances of

17   the offense, the defendant's character and background,

18   and the personal moral culpability of the defendant,

19   okay, and then decide whether or not that's sufficient --

20   any of those things, is it sufficient evidence to give

21   them a life sentence and not the death sentence.  Do you

22   understand that?

23        A.   Uh-huh.

24        Q.   If you answer "yes" to 1 and 2, the death

25   penalty would be assessed.  So you go to Number 3 to find

STATE OF TEXAS VS. RUBEN GUTIERREZ                    38

1   out whether or not there's anything that's there that

2   would give them a life sentence rather than the death

3   penalty.  Do you see that?

4        A.   Yes.

5        Q.   Do you follow me?

6        A.   Uh-huh.

7        Q.   And basically it's asking you to look at all

8   the evidence that's presented, how it is that the crime

9   was committed, his character, his background; for

10  example, you know, whether he went to school, whether

11  he's a dropout, if he had psychological problems or

12  not --

13       A.   Uh-huh.

14       Q.   -- that he came from a broken home, was he from

15  a poor family, a rich family.  All those things, do you

16  see how they go to Number 3, his character and his

17  background?

18       A.   His character, yeah, and background.

19       Q.   And then the personal moral culpability of the

20  defendant, whether or not he's shown remorse, accepted

21  responsibility, things like that.  Do you see?

22       A.   Uh-huh.

23       Q.   Could you take all those things into

24  consideration as you're being asked right here and then

25  make a decision?

STATE OF TEXAS VS. RUBEN GUTIERREZ                     39

1        A.    Yes.
2        Q.    You would be able to do that?  And do you see
3    how it's asking you right there whether there's a
4    sufficient mitigating circumstance or circumstances?  Do
5    you see that?
6        A.    Uh-huh.
7        Q.    Okay.  So what it's basically asking you is
8    whether there is one reason that's sufficient to you to
9    mitigate his punishment from the death penalty to life
10   imprisonment.  Do you see that?
11       A.    Uh-huh.
12       Q.    So it's not asking you that you have to have
13   more -- or it's not telling you that you have to have
14   more than one reason.  One reason, if it's sufficient or
15   mitigating -- if it's a sufficient mitigating
16   circumstance or reason, that's enough for you to be able
17   to answer "yes" to this question.  Do you see that?
18       A.    Yes.
19       Q.    Okay.  And do you agree with that?
20       A.    Yes.
21       Q.    Would you be able to follow that instruction?
22       A.    Yes.
23       Q.    In Texas we also have -- I'm sorry.  Every
24   person who is accused of a crime has a right to remain
25   silent; and they don't have to talk to the police.  They

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          40

1    don't have to present evidence in court or they don't

2    have to go ahead and testify at their own trial.

3         A.   Uh-huh.

4         Q.   Do you agree with those?  Those are

5    constitutional rights that every individual is given in

6    this country when they're charged with a crime.

7         A.   Yes.

8         Q.   Okay.  And if the Judge were to instruct you

9    that that is the law in this State, would you be able to

10   follow that law?

11        A.   Yes.

12        Q.   Also in this State they have -- we have what's

13   called a spousal privilege where the spouse, either the

14   husband or the wife, cannot be forced to come and testify

15   in court whether or not they know anything about the

16   crime.  Do you understand that?

17        A.   Yes.

18        Q.   And would you hold it against the State or

19   Mr. Gutierrez in this case if the spouse did not come and

20   testify or would you be able to follow that instruction?

21        A.   I think I would be able to follow the

22   instruction.

23        Q.   Do you think you would be able to or would you

24   be able to definitely follow that instruction?

25        A.   Definitely I would follow the instruction, yes.

1       Q.   In Texas, also, sometimes the State -- the
2   police take statements that are allegedly made by the
3   person who's on trial.  And they usually call them
4   statements of accused or confessions.  Do you see where
5   that could happen?
6       A.   Could you repeat that again?
7       Q.   Yes.  Where they arrest somebody or they bring
8   you in for questioning and they take a statement from
9   you --
10      A.   Yes.
11      Q.   -- and they call them confessions or statements
12  of accused.
13      A.   Uh-huh.
14      Q.   And my question is just whether you'd be able
15  to take all the circumstances surrounding the taking of
16  that statement; for example, if they read him his rights
17  or not, if that person actually said, "I want an
18  attorney," and they never provided one to him --
19      A.   Uh-huh.
20      Q.   -- if that person maybe was threatened, if they
21  threatened maybe his mother or his father if he didn't
22  talk to them?  Do you see --
23      A.   Yes.
24      Q.   -- how that statement in those situations might
25  not be given voluntarily?  Do you see that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    42

1        A.    Yes, I see that.

2        Q.    And my question to you, Ms. Anaya, is whether

3   you would be able to take that into consideration in

4   deciding whether or not that statement was given

5   voluntarily, look at those things, and then decide,

6   "Well, was it given voluntarily or not?"

7        A.    The statement you mean?

8        Q.    Yes, the statement.

9        A.    Yeah, I think I could -- yes, I would like at

10  that.

11       Q.    Okay.  And if you in your mind and the Judge

12  were to instruct you that if that statement was not given

13  voluntarily, that you must set it aside and not consider

14  it as any evidence whatsoever, could you do that?

15       A.    Yes.

16       Q.    Now, in Texas in situations where there's more

17  than one person who's charged with a crime, there's like

18  maybe two or three or more, they're called co-defendants.

19  Do you understand?

20       A.    Yes.

21       Q.    And in those situations if a person -- if one

22  of those defendants is on trial, they might -- the State

23  of Texas might make a deal with one of the other persons,

24  one of the other defendants for them to come and testify.

25                   Now, in exchange for their testimony, they

STATE OF TEXAS VS. RUBEN GUTIERREZ                    43

1   might get a lesser sentence, they might get probation, or

2   their cases in some situations might be dismissed.  Do

3   you see where that could happen?

4        A.    Yes.

5        Q.    For example, if an individual is facing maybe

6   life in prison or 99 years in prison and they get maybe

7   20 or ten years or 15 years in exchange for their

8   testimony in court, do you see how that person would have

9   a motive, a reason to come testify in court, meaning he

10  wants his ten, 20 years?

11       A.    Yes.

12       Q.    Okay.  Because he doesn't want to risk getting

13  99 years or life in prison.

14       A.    Yes.

15       Q.    Okay?  So he would have a reason to come and

16  testify, would you agree?

17       A.    Yes.

18       Q.    Okay.  And would you agree with me that that

19  individual might not completely tell the truth because he

20  wants to go ahead and keep his deal with the State?  So

21  he might want to go ahead and say what it is that they

22  want to hear and not necessarily the truth.  Do you see

23  where that might happen?

24       A.    Yes, I know that might happen, too.

25       Q.    Okay.  So would you be willing to take into

STATE OF TEXAS VS. RUBEN GUTIERREZ                    44

1   consideration that fact in making a decision as to
2   whether or not to believe that codefendant?  In other
3   words, listen to them, you know, see whether or not they
4   have a deal with them, watch how it is that their -- what
5   their demeanor is, what they're saying, and then make a
6   decision as to whether or not to believe them.  That is
7   all we're asking.
8       A.   Yes.
9       Q.   Can you do that?
10      A.   (Nods head).
11      Q.   I know that you work at the Valley Baptist
12  Medical Center; is that correct?
13      A.   Yes.
14      Q.   So you work with doctors, maybe nurses?
15      A.   No.  I work as a housekeeper, but I do run into
16  them, you know.
17      Q.   Okay.  Do you understand that if you were to be
18  selected as a juror in this case, you would have to sit
19  in the jury box, listen to all the witnesses --
20      A.   Yes.
21      Q.   -- and then decide whether or not to believe
22  them?
23      A.   Yes.
24      Q.   Okay.  Now, would you agree with me that police
25  officers sometimes may make mistakes?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          45

1          A.    Yes.

2          Q.    Okay.  And because they make mistakes, they

3    want to go ahead and cover those mistakes up.  So when

4    they come to court, they might not be willing to tell the

5    whole truth.  Do you see where that could happen?

6          A.    Yes.

7          Q.    Okay.  Or even if they don't make a mistake,

8    they may not be willing to tell the whole truth.  Even

9    though they're wearing a badge, that doesn't necessarily

10   mean that they're telling the truth 100 percent of the

11   time?

12         A.    Yeah, I know that.

13         Q.    Do you believe that?

14         A.    Yes.

15         Q.    So would you be willing to listen to that

16   police officer, and after you listened to his testimony,

17   how it is that he's behaving in court, would you be

18   willing to listen and then make a decision as to whether

19   or not to believe him?

20         A.    Yes.

21         Q.    Okay.  The same thing with doctors or nurses.

22   Just because maybe you see them and you work with them,

23   would you be willing to keep an open mind, listen to

24   them, and not automatically believe everything they're

25   saying?  Would you be willing to do that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                46

1        A.    Like you mean like when --

2        Q.    Let's say a doctor would come testify --

3        A.    Uh-huh.

4        Q.    -- and you're sitting as a juror, would you

5   automatically believe them or would you want to listen to

6   them --

7        A.    Well, I would listen and consider what he said.

8        Q.    Okay.  Because the same thing with doctors,

9   they might have made a mistake and they might be wanting

10  to cover it up.  Anything could happen.  Would you agree

11  with me?

12       A.    Yeah.  Anybody could want to cover up a

13  mistake, yes.

14       Q.    Okay.  So, the same thing, would you listen to

15  them and then decide whether or not to believe them?

16       A.    Yes.

17       Q.    And you don't have any -- do you have any

18  relatives in law enforcement?

19       A.    I have cousins in Houston, they're police

20  officers.

21       Q.    Would the fact that they're police officers and

22  they're relatives of you -- of yours, would that affect

23  you in any way?

24       A.    No.

25       Q.    You wouldn't feel compelled to say "guilty"

1    because you have relatives that are police officers?

2         A.    No.

3         Q.    Would you be able to make a decision just based

4    on the facts and the evidence that are presented to you?

5         A.    Yes.

6         Q.    And you yourself have not been a victim of any

7    crime; is that correct?

8         A.    No.

9         Q.    Just your relatives that have been arrested for

10   D.W.I.?

11        A.    Yes.

12        Q.    And have you heard anything about this case in

13   the media?

14        A.    No.

15        Q.    Through friends, talking about it or anything

16   like that?

17        A.    No.

18        Q.    So have you formed an opinion as to the guilt

19   or innocence of Mr. Gutierrez?

20        A.    No.

21        Q.    Would you be willing to keep an open mind until

22   all the evidence has been presented to you?

23        A.    Yes.

24        Q.    Let me just look through your questionnaire and

25   see if I have any other questions.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    48

```
1               It says that you were interested in the
2    outcome of a criminal case in question number 26.  Which
3    case in particular?
4         A.   Well, not really any particular case, but like,
5    you know, like somebody -- like sometimes you find, you
6    know, people that -- friends or maybe family members that
7    could be like that, in trouble; and then you would want
8    to find out, you know, what was the outcome of it.  But I
9    don't have anything in particular right now --
10        Q.   So --
11        A.   -- a case in particular.
12        Q.   Nothing that would affect you in this case?
13        A.   No.
14        Q.   You have, in fact, served on a civil jury; is
15   that correct?
16        A.   Yes.
17        Q.   Anything in that jury service that would lead
18   you not to want to be a juror in this case?
19        A.   No.
20        Q.   Sometimes people have bad experiences and they
21   swear they never want to be on a jury after that.
22   Nothing like that?
23        A.   No.
24               MR. REYES:  I'll pass the witness, Your
25   Honor.  Nothing further.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          49

```
 1                    THE COURT:  All right.  Ms. Anaya, let me
 2   ask you to step down for a few minutes.  I need to take
 3   up a legal matter with the lawyers, and then I'll bring
 4   you back in.
 5                    MS. ANAYA:  Okay.
 6                    THE COURT:  Step outside, please.
 7                    (Prospective juror left the courtroom)
 8                    THE COURT:  Is this juror acceptable to
 9   the State?
10                    MS. FISCHER:  The State would exercise a
11   peremptory strike at this time, Your Honor.
12                    THE COURT:  Bring her in.
13                    Ms. Anaya, that's all the questions we
14   have for you today.  You're excused to go.  Thank you
15   very much.
16                    MS. ANAYA:  Okay.  I was wondering, could
17   I get an excuse for my job?
18                    THE COURT:  Yes.
19                    THE BAILIFF:  At the District Clerk's
20   Office.  I will advise her.
21                    THE COURT:  He'll tell you where to go.
22                    MS. ANAYA:  Thank you.
23                    THE COURT:  Bring in Ms. Caldera.
24                    THE BAILIFF:  Yes, Your Honor.
25                    THE COURT:  Good morning, Ms. Caldera.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    50

```
 1                    MS. CALDERA:  Good morning.

 2                    THE COURT:  How are you?

 3                    MS. CALDERA:  Pretty good, thank you.

 4                    THE COURT:  Okay.  I think the lawyers

 5    have a few more questions to ask you.  And if you would

 6    do me a favor, just talk into the microphone so everybody

 7    can hear you.  Thank you.

 8                    MS. CALDERA:  Okay.

 9                    MR. BLAYLOCK:  May I proceed, Judge?

10                    THE COURT:  You may.

11                    MR. BLAYLOCK:  Thank you, Judge.

12                         LYDIA CALDERA,

13       having been called as a prospective juror and, upon

14       her oath, was examined and testified as follows:

15                    VOIR DIRE EXAMINATION

16    BY MR. BLAYLOCK:

17       Q.   Good morning, Ms. Caldera.

18       A.   Good morning.

19       Q.   And how are you this morning?

20       A.   Fine, thank you.

21       Q.   All right.  You can tell by now we're running a

22    little bit late, right?

23       A.   I know.  I thought I was lost.

24       Q.   You came in a while ago, right?

25       A.   Yes.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           51

1       Q.    How does it feel to know that we're running a
2   little bit late?  How does that make you feel?
3       A.    Well, I guess you all are real busy, you know.
4       Q.    We try hard.
5       A.    Trying to figure out everything.
6       Q.    Now, ma'am, you say you don't have any feelings
7   towards defense attorneys or prosecutors in your
8   questionnaire.  And you filled this questionnaire out
9   last -- not last Tuesday but the Tuesday before --
10      A.    Yes.
11      Q.    -- correct?  Or was it --
12      A.    No.  It was last Tuesday.
13      Q.    Yeah.  One week from tomorrow.  How do you feel
14  about defense attorneys and prosecutors?  I notice you
15  didn't put anything down for us.  Do you have any
16  feelings about that at all?
17      A.    No.  I don't --
18      Q.    How would you say -- what would you say my job
19  is as the prosecutor?
20      A.    Your job?
21      Q.    Uh-huh.
22      A.    Well, your job is to find the -- you know, all
23  the reasons and everything, you know, to find out if
24  it's, you know, the right thing to do or not, you know,
25  what you're going to do.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        52

```
 1        Q.    Right.  If he did it --
 2        A.    What is it going to -- you know, going to be
 3   done.
 4        Q.    Would you say my job is to seek justice?
 5        A.    Yes.
 6        Q.    What would you say the defense attorney's job
 7   is?
 8        A.    Well, I guess it's -- he's trying to see, you
 9   know, the other side, too.
10        Q.    Okay.  Let me ask you this, ma'am.  This is the
11   hard question.  How do you feel about the death penalty?
12        A.    Well, that's the thing, you know, that I feel,
13   you know, they should be -- but then I feel bad, you
14   know, for the death, you know, because I think that's
15   God's -- you know, the one that's got to do that, you
16   know.  But like I say, I mean, everybody deserves what
17   they do, too.  So there's two ways, you know, to look on
18   it, you know.
19        Q.    Yeah.  There's definitely at least two ways to
20   look at it, right?
21        A.    Uh-huh.
22        Q.    But because you feel -- I mean, this is your
23   opinion.  I'm not trying to talk you out of it.
24        A.    Yes.
25        Q.    In fact, in many ways I agree with it, that
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    53

```
 1   it's God's job to sort this out.
 2        A.    Yes.
 3        Q.    Because you feel that way, would it keep you
 4   from being a fair juror on this kind of case?
 5        A.    Well, I don't know.  I would have to go through
 6   all the --
 7        Q.    The evidence?
 8        A.    I think so.
 9        Q.    And after -- let's say hypothetically after you
10   saw all the evidence, you were satisfied beyond a
11   reasonable doubt that the person did it, whatever we said
12   he did, he did it, he killed a person in the commission
13   of a robbery, you're satisfied that he did that, now
14   would you -- because of your feelings, would you want him
15   to get the death penalty?
16                  THE COURT:  Would you consider it?
17                  MR. BLAYLOCK:  Yes, sir.
18        Q.    (BY MR. BLAYLOCK)  Would you -- I mean,
19   because of your feelings, you know, you think that's
20   God's job, would you consider that?
21        A.    I wouldn't like to do it myself, you know.
22   Anybody else can do it, but I think me --
23        Q.    Okay.  So, you don't want to --
24        A.    That's one thing, you know.
25        Q.    Do you want to be a juror in this kind of case?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    54

1     A.    Well, I would be a juror.  I don't say no --
2     Q.    Okay.
3     A.    -- but -- you know.
4     Q.    What I'm asking you is would you --
5     A.    That's the thing.
6     Q.    -- would you want to be a juror in this kind of
7  case?
8     A.    Not for the death penalty.
9     Q.    No?
10    A.    Not for the death penalty.
11    Q.    And because of your feelings about that -- I
12  mean, really, we're just trying to get a fair trial for
13  everybody involved.  Do you think you would be a fair
14  juror for this kind of case, for a death penalty?
15    A.    I would be fair.  I mean, I'm straight, you
16  know, but that's just the only thing, you know.
17    Q.    All right.  So, if you were selected, you would
18  sit on this kind of case and if it came down to it,
19  knowing that the death penalty would be assessed, you
20  would still be true and fair?
21    A.    I guess so.  I should.
22    Q.    Okay.  And if it came down to assessing the
23  death penalty, could you do that?
24    A.    I guess so.
25    Q.    Okay.  I'm going to ask you some questions

STATE OF TEXAS VS. RUBEN GUTIERREZ                          55

1   about some of the answers you made on your questionnaire.

2   You said that -- and this is your opinion.  So there's no

3   wrong answers here, all right?

4        A.   Uh-huh.

5        Q.   That you would hold the State to a higher

6   standard in a capital murder case.  Tell me why you would

7   do that.

8        A.   Well, since there's so much, you know -- and so

9   many crimes and killings and all that --

10       Q.   Uh-huh.

11       A.   -- so that's why I think that it -- we should,

12  you know, do the right thing, you know, try to work, you

13  know, with all these together.  In other words --

14       Q.   I think I understand what you're saying.  But

15  what I'm asking you is why would you want the State to

16  have a higher burden than in a usual kind of case?  You

17  say that you would hold the State to a higher standard in

18  a capital murder kind of case as opposed to another kind

19  of case.  Just tell me why you think that we would have a

20  higher burden.

21       A.   Well, to get rid of all these crimes.

22       Q.   Okay.  So I think you're saying that it's more

23  important, that this kind of case is more important than

24  others --

25       A.   It is.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    56

1    Q.    -- because it can get rid of these kinds of
2  crimes?
3    A.    Uh-huh.
4    Q.    All right.  Now, do you understand that we have
5  to prove this to you as a juror beyond a reasonable
6  doubt?  That's the kind of doubt based on your reason and
7  your common sense.
8    A.    Yes.
9    Q.    Remember I talked to you about that last
10 Tuesday?
11   A.    Uh-huh.
12   Q.    Okay.  Now, would you want -- would you want me
13 to prove it beyond a shadow of a doubt in a capital case?
14   A.    Well, I think so in the court I think they
15 should prove it, you know, prove -- have the proofs.
16   Q.    Sure.  You should have the proof beyond a
17 reasonable doubt or beyond all doubt?
18   A.    I guess beyond all doubt.
19   Q.    Beyond all doubt?
20   A.    Yes.
21   Q.    Okay.  And would you agree that beyond all
22 doubt is higher than beyond a reasonable doubt, right?
23   A.    Uh-huh.
24   Q.    Okay.  You agree with that?
25   A.    Yeah.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           57

1      Q.   Okay.  Now, why would you want us to prove it
2   beyond all doubt in a capital murder case?
3      A.   Well, I think this is -- since it's going
4   through a court and all that, you've got to know exactly,
5   you know, all the -- and it's got to be clear, you know,
6   so that we all can, you know, decide.
7      Q.   Okay.  And so if you had any kind of doubt at
8   all, you would say not guilty?
9      A.   I wouldn't say not guilty.  I would just try
10  to, you know, find out, you know, to get it clear.
11     Q.   All right.  And you say you have relief --
12  religious considerations that might prevent you from
13  being a juror in this case.
14     A.   Yes.
15     Q.   Tell the Judge what about your religion that
16  would keep you from being a juror on this case.
17     A.   Well, I'm a Catholic and I'm very close to the
18  religion, you know.  I -- and so that's why, you know --
19  and that's the way, you know, we believe, you know, that
20  it's like killing, you know, this other person.  I
21  mean --
22     Q.   The death penalty is like killing that person?
23     A.   Yes.
24     Q.   And that goes against your religion?
25     A.   There's already been one and then -- you know,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    58

```
 1   but --
 2        Q.   All right.  So your religion tells you that you
 3   can't be a juror on a death penalty case; is that what
 4   you're saying?
 5        A.   Well, the religion is not telling me, but
 6   that's the way they, you know, preach.
 7        Q.   Okay.
 8        A.   And it depends on you how you feel, too.
 9        Q.   That's what I'm saying.
10        A.   Yes.
11        Q.   By tells you, I mean that's in your heart?
12        A.   Yes.
13        Q.   Your heart because of your religion is telling
14   you that --
15        A.   Yes.
16        Q.   -- you wouldn't be --
17        A.   Because it all depends how you understand it,
18   too, you know.
19        Q.   Okay.  And how do you understand it?
20        A.   Well, to me, it's hard, you know, to decide --
21        Q.   Sure.
22        A.   -- which, you know, which way.  Because I know
23   that there should be rules and there should be
24   restrictions, you know, about those -- all these crimes
25   and all this.  But then on the other side, I say, "Okay.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          59

1   Life in prison, okay," but then I say killing the person,

2   you know.

3       Q.   That's too --

4       A.   That's the only thing.

5       Q.   Killing a person is too hard for you?

6       A.   Yes.

7       Q.   Okay.  You couldn't do that?

8       A.   I don't think so.

9       Q.   All right.  And if you were feeling mixed up or

10  confused about that if you were in the jury room, would

11  you like fall back on your religion to help you answer

12  that question?

13      A.   That's the only thing.  I don't know.

14      Q.   You would then?  You would or wouldn't?  Are

15  you the kind of woman that would fall back on your

16  religion to help you answer the question, death penalty

17  or not?

18      A.   I think I would feel bad.  I would feel bad,

19  you know, doing that decision.

20      Q.   Okay.  And that's based on your religious

21  beliefs?

22      A.   Yes.

23      Q.   Now, do you know what beyond a reasonable doubt

24  means?  Remember we talked about it on Tuesday a little

25  bit?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              60

```
 1        A.    Uh-huh.
 2        Q.    We talked about the kind of doubt based on your
 3   reason and your common sense --
 4        A.    Yes.
 5        Q.    -- that would make you simply hesitate to act
 6   in the most important matters of your own affairs, right?
 7        A.    Yes.
 8        Q.    Okay.  And you've told us and the Judge that
 9   you would want the State to prove it higher than beyond a
10   reasonable doubt, beyond all doubt.  Are you firm on
11   that?  You want it proved absolutely beyond all doubt?
12        A.    Well, if I'm going to be in the, you know,
13   court with that, I would.
14        Q.    Okay.  And you do acknowledge, as we've already
15   discussed, that that is a higher burden of proof --
16        A.    Uh-huh.
17        Q.    -- right?
18        A.    Yes.
19        Q.    What project do you have in progress that would
20   affect your ability to concentrate on this case?  You
21   said in your questionnaire that you have a project in
22   progress that would affect your ability to concentrate if
23   you were to have to serve as a juror.
24        A.    Okay.  There's a whole bunch.
25        Q.    Well, tell me.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    61

1    A.   There's a whole bunch.  My mother for one
2  thing.
3    Q.   Your mother?
4    A.   I always have to be, you know, checking on her,
5  being with her, you know, because she's -- she's sick --
6    Q.   How --
7    A.   -- for one thing.
8    Q.   How sick is she?
9    A.   Well, she's under medication.  Her mind is not
10  right.  You know, we have a lady there, of course, but
11  just four hours.
12    Q.   How old is your mother?
13    A.   She's 86.
14    Q.   Eighty-six?
15    A.   Yes.  She's 86.
16    Q.   And do you know anything about this case?  Did
17  you know Ms. Harrison or her name was Ms. Cuellar before
18  she --
19    A.   I do not know her.
20    Q.   Okay.  Well, let me ask you this before we go
21  on to the rest of your reasons.  If the victim in this
22  case was over 80, say 84, 85 years old, because of your
23  mother being right in that age group, would you be more
24  sensitive in this kind of case, maybe not be as fair?
25    A.   Well, I guess I would.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          62

```
 1        Q.    So you would be --
 2        A.    I guess I would.
 3        Q.    -- a little more sensitive --
 4        A.    Uh-huh.
 5        Q.    -- because of the health of your mother?
 6        A.    Yes.
 7        Q.    Now, do you need to be there to take care of
 8   your mother?
 9        A.    Well, most of the time.  I'm not saying that
10   I'm there all the time, but I have to be on the lookout
11   for her.
12        Q.    Okay.  So, are you -- I mean, are you asking
13   the Judge to give you some kind of a medical excuse not
14   to have to be a juror because you want to help your
15   mother?
16        A.    Well, if I could, that would be perfect --
17        Q.    You can ask him.
18        A.    -- but if I -- that would be perfect.  But if I
19   can't, I mean like I say, I don't like to say no.  I'm
20   always, you know, willing.
21        Q.    I understand.
22        A.    I'm always willing.  But that would be -- I
23   would feel better, you know, because I don't think -- to
24   be here with this, you know, I would have to concentrate,
25   too.  It needs a lot of -- you know.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                         63

1        Q.   Uh-huh.  And your mother's health would keep
2   you from concentrating?
3        A.   I think so.
4        Q.   What else would keep you from concentrating?
5        A.   Well, for one thing, I'm 67 years old.
6        Q.   Uh-huh.
7        A.   And this is my last year of working because I'm
8   already very tired.  I've worked all my life.  I'm having
9   problems with my eye vision.  This eye.  I have to have a
10  checkup because the doctor is afraid that it would be --
11  that glaucoma.  And so, that's why I have to have a
12  checkup, you know.
13       Q.   Okay.
14       A.   And I'm having problems, but that's about --
15       Q.   What other kind of thing would keep you from
16  concentrating?  You said there were lots of things.  Your
17  mother, your eyes, what else?
18       A.   Well, there's a lot of things, you know --
19       Q.   Okay.
20       A.   -- that I can't mention them.
21            MR. BLAYLOCK:  Can we approach, Judge?
22            **(Off the record discussion at the bench)**
23            **VOIR DIRE EXAMINATION**
24  **BY MR. GALARZA:**
25       Q.   Ms. Caldera, good morning.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              64

1        A.    Good morning.

2        Q.    My name is Santiago Galarza; and to my right is

3   Daniel Reyes.  We both represent Mr. Gutierrez in this

4   case.

5               I'm just going to be asking you some

6   questions to go ahead and clarify what you're talking

7   about at this time.  And if you don't understand the

8   questions, just go ahead and ask me to repeat them and

9   I'll go ahead and repeat them.

10              You stated earlier that -- well, let me go

11  back a little bit.  Here in Texas we have what's called a

12  bifurcated trial.  What that is is it's a two-part trial,

13  okay?

14              The very first part is the guilt/innocence

15  stage.  What we have at that point is whether he's going

16  to found guilty or not guilty.  So what we do is we try

17  to go ahead and show you all the evidence.  The State

18  goes ahead and brings any statements, any pictures or

19  anything they have.  And then we go ahead and also

20  question as to that.  Do you understand that?

21       A.    Yes.

22       Q.    And then at that point, once we introduce to

23  you all the evidence that's in the case, then the 12

24  jurors will go to the jury room; and they'll go ahead and

25  decide whether this person is guilty or not guilty.  Do

STATE OF TEXAS VS. RUBEN GUTIERREZ                              65

1    you understand that?

2         A.    Uh-huh.

3         Q.    Okay.   In order for a person to be found

4    guilty, the -- beyond a reasonable doubt, that's what the

5    standard is in all cases.   Do you understand that?

6         A.    Yes.

7         Q.    The standard whether it's a D.W.I., which is a

8    low case, a misdemeanor, or whether it's a capital murder

9    like this kind of case.   Do you understand that?

10        A.    (Nods head).

11        Q.    If the Court were to tell you that the proof

12   that the State needs to show you is beyond a reasonable

13   doubt, would you be willing to follow that procedure?

14        A.    (No response).

15        Q.    Beyond a reasonable doubt, what it means is

16   like using your common sense.

17        A.    Yes.

18        Q.    Like an example, if you're going to purchase a

19   house, you're going to go, you're going to look at the

20   house, you're going to check the price out, and you're

21   going to check to see if the house has any damages, okay?

22              If the price on the house is 100,000 and

23   once you see that house you feel that it's not worth it,

24   you're not going to go ahead and purchase that house; is

25   that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                        66

1          A.     Uh-huh.

2          Q.     Okay.  You're using your common sense, you're

3     using your every day reasoning to make a decision --

4          A.     Yes.

5          Q.     -- is that correct?

6          A.     Right.

7          Q.     Okay.  That's the same thing that we're going

8     to be asking you to use in this kind of case, for you to

9     listen to all the statements --

10         A.     Yes.

11         Q.     -- for you to listen to the police officers, to

12    the doctors, and to the laymen which is the individual

13    people.  And at that point you're the one that decides

14    who's telling the truth and who's lying.

15         A.     Uh-huh.

16         Q.     Okay?  You use your common sense by looking at

17    the individual, looking at their -- how they're

18    responding to the questions, looking to see if they're

19    telling the truth or not.  Do you understand that?

20         A.     Right.

21         Q.     Okay.  In order for a case to be proved beyond

22    a reasonable doubt, you need to go ahead and follow six

23    elements or you need to follow some elements.  In this

24    kind of case, the elements is the ones that are right

25    here; and I'll go ahead and read them to you.

1          The very first thing -- the very first

2   element is that Ruben Gutierrez, the defendant; on or

3   about the 5th day of September, 1998; in Cameron County,

4   Texas; number four is intentionally; number five is cause

5   the death of an individual, namely Escolastica Harrison,

6   by stabbing Escolastica Harrison with a screwdriver or

7   object unknown to the grand jury, or by striking

8   Escolastica Harrison with an object unknown to the grand

9   jury, or causing Escolastica Harrison to impact with an

10  object unknown to the grand jury; and number six, that

11  the said Defendant was then and there in the course of

12  committing or attempting to commit the offense of robbery

13  of Escolastica Harrison, okay?

14          That's what the State needs to go ahead

15  and prove beyond a reasonable doubt, okay?  Do you ever

16  play the lottery on Wednesdays and on Saturdays?

17       A.   Very little.

18       Q.   Okay.  When you play it, if you get -- usually

19  you have to get six numbers; is that correct?

20       A.   Uh-huh.

21       Q.   Okay.  If you only get five of the six numbers,

22  do you still get the lottery?

23       A.   No.

24       Q.   Why not?

25       A.   If you get what?

STATE OF TEXAS VS. RUBEN GUTIERREZ                68

1      Q.    If you get five of the numbers?

2      A.    Five of the numbers?  Yes.

3      Q.    Do you still get the 18 million which is --

4      A.    No.

5      Q.    Why not?

6      A.    Because it's not the complete -- you need one

7    more.

8      Q.    Okay.  Do you understand that the same thing

9    has to happen in this case?

10     A.    Uh-huh.

11     Q.    If they prove only five out of the six elements

12   beyond a reasonable doubt, then what would your verdict

13   be at that time, guilty or not guilty?

14     A.    Well, the way you planned it, they're going to

15   have to -- no, because it's not -- you didn't get all

16   the --

17     Q.    Okay.  So you understand that they have to

18   prove all six elements beyond a reasonable doubt?

19     A.    Uh-huh.

20     Q.    Okay.  What happens is once you find the person

21   not guilty, then everything stops there, okay?  You get

22   to go home and the person is found not guilty.  Do you

23   understand that?

24     A.    I guess so.

25     Q.    Okay.  But if you find a person guilty, then

STATE OF TEXAS VS. RUBEN GUTIERREZ                    69

1   you have to go through the sentencing stage which is the

2   second part of the bifurcated trial, okay?

3        A.   Uh-huh.

4        Q.   At the sentencing stage, what happens is that

5   if you find the person guilty of capital murder, then you

6   have to go ahead and answer three questions or three

7   special issues which are the ones that are up there.

8   Those three questions right there, those are the ones

9   that need to be answered, okay?

10            What happens in a capital murder case, you

11  automatically don't come out and you say, "Look, this

12  person will receive the death penalty."  You're not the

13  one that says that, okay?  What you have to do is you

14  have to answer all three questions that are up there.

15       A.   Uh-huh.

16       Q.   Once you answer those three questions, if you

17  answer "yes" to Number 1 and Number 2 and "no" to Number

18  3, then the Judge is the one that will impose the death

19  penalty.  You do not come out and say, "No, I vote for

20  the death."  You just go ahead and answer those three

21  questions right there.  Do you understand that?

22       A.   Yes.

23       Q.   Okay.  Question number 1, "Is there a

24  probability that the defendant, Ruben Gutierrez, would

25  commit criminal acts of violence that would constitute a

STATE OF TEXAS VS. RUBEN GUTIERREZ                    70

1   continuing threat to society?"
2              Okay.  What this means is will Ruben
3   Gutierrez come back and commit criminal acts of violence
4   again?  Criminal acts of violence are acts against
5   another person.  Will he commit murder again, will he
6   commit assault against another person, will he commit
7   something like that?
8              And this is what you're going to answer.
9   If 12 of you answer "yes," then you all come back with a
10  "yes" as to Number 1, okay?
11       A.    Uh-huh.
12       Q.    If ten of you answer "no," then you can still
13  come back with a "no" answer, okay?  We only need ten of
14  you for you to give us a "no" answer, okay?  If two of
15  you answer "yes" and ten of you answer "no," then you can
16  still come back.  Do you understand that?
17       A.    Right.
18       Q.    Okay.  If ten of you answer "no," then it stops
19  right there.  But if 12 of you answer "yes," you all
20  bring us back a "yes" answer, then you go to Number 2.
21  Do you follow me?
22       A.    Yes.
23       Q.    Okay.  In Number 2, what you all have to show
24  or what you all need is, "Do you find from the evidence
25  beyond a reasonable doubt that Ruben Gutierrez, the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    71

1    defendant, actually caused the death of Escolastica

2    Harrison, or he intended to kill the deceased, or he

3    anticipated that a human life would be taken?"

4              So, let me give you a hypothetical.  If

5    Mr. Reyes and I go into the Circle K and we both go with

6    a gun.  We go in to commit robbery.  At that point they

7    don't want to go ahead and give us the money.  So one of

8    us -- I take the gun and I shoot the clerk.  And then we

9    take the money and we leave.  Do you understand that?

10        A.    Uh-huh.

11        Q.    Okay.  In my hypothetical, to answer question

12   number one or -- actually, did I actually cause the death

13   of Escolastica Harrison?  Did I kill the clerk?

14        A.    You had the gun?

15        Q.    Yes.  I had the gun.

16        A.    I think you did.

17        Q.    Okay.  And to answer question number two, did

18   Mr. Reyes intend for the clerk to be killed?

19        A.    No, but he was there with the one that -- you

20   know --

21        Q.    And he knew --

22        A.    -- that was doing the crime and he knew that he

23   had the gun, too.  So there he was.

24        Q.    Okay.  So at that point your --

25        A.    They're both together there.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    72

1      Q.   Okay.  So let's go to question number three,
2   did he anticipate that a human life would be taken?
3      A.   It all depends on the person --
4      Q.   Okay.  So if both of us --
5      A.   -- you know, if he's thinking --
6      Q.   In our hypothetical, both of us went with a
7   gun.  I killed the clerk.  And we intended to rob the
8   clerk.  Did he anticipate that a human life would be
9   taken?
10     A.   I think he should have.
11     Q.   Okay.  So you're able to answer depending on
12  the facts --
13     A.   Yes.
14     Q.   -- is that correct?
15          Okay.  Let me change it a little bit.  If
16  we both went in to commit robbery, neither one of us as
17  far as we knew had a gun.  We were just going to go in to
18  try and commit the robbery and leave, okay?
19          Mr. Reyes and I both go in.  As we take
20  the money, we leave.  Mr. Reyes gets out.  As soon as he
21  gets out, I take out a gun and shoot the clerk.  He did
22  not know about that, that I had a gun.  Did he intend to
23  kill the clerk, Mr. Reyes?
24     A.   There, I don't think so.
25     Q.   Okay.  Would you say yes or no?  Did he

STATE OF TEXAS VS. RUBEN GUTIERREZ                    73

1   intend -- he didn't know about the gun.  I was the only

2   one --

3       A.   If he didn't know, but why are they doing that?

4   Still I say they're in there.  They're doing the same

5   thing.

6       Q.   Which is the robbery?

7       A.   Yes.

8       Q.   Okay.  But would you agree with me that he

9   could be found guilty of robbery, but not of capital

10  murder?

11              MR. BLAYLOCK:  I object.  Attempting to

12  confine the witness to a certain set of facts.

13              THE COURT:  It's overruled.

14      Q.   (BY MR. GALARZA)  Okay.  You can answer the

15  question.  Or do you want me to repeat it?

16      A.   (No response).

17      Q.   Okay.  Did he intend for the clerk to be

18  killed?

19      A.   The other person?

20      Q.   Yes.

21      A.   The other one?

22      Q.   Mr. Reyes.  I killed the clerk.  He did not

23  know I had a gun.

24      A.   Well, he didn't intend, but he was there.

25  Still I say he was there, you know.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    74

1     Q.   Okay.  Did he anticipate that a person would be
2   killed?
3     A.   No, I guess not.
4     Q.   Okay.  Let's go back.  So if you answer to
5   Number 2, Number 2 is "yes" if all the jurors bring us a
6   "yes" answer?  Do you follow me so far?
7     A.   Yes.
8     Q.   We're still -- let me go back.  In the first
9   hypothetical we both had a gun.  We both went in to
10   commit robbery and I killed the clerk.  So at that point
11   your answer to Number 2 would be "yes;" is that correct?
12     A.   Yes.
13     Q.   Okay.  To both of us?  Because we both had a
14   gun?
15     A.   Right.
16     Q.   Okay.  Now then you answer "yes," now we jump
17   to Question Number 3, okay?  And Question Number 3,
18   "Would you take into consideration all the evidence, the
19   circumstances of the offense, the defendant's character
20   and background, and the personal moral culpability of the
21   defendant?"
22             Okay.  What it's asking you at this time
23   is does this person deserve a life or a death sentence?
24   And what it's asking you, will you take into
25   consideration the evidence, okay?  All the facts that

STATE OF TEXAS VS. RUBEN GUTIERREZ                    75

```
 1   were introduced to you.
 2         A.    I would take it into consideration.
 3         Q.    Will you take into consideration the
 4   circumstances of the offense, how the offense happened,
 5   who is the one that actually killed the clerk?  Would you
 6   take that into consideration?
 7         A.    I guess so.
 8         Q.    Okay.  Would you take into consideration the
 9   defendant's character and background, the education maybe
10   of the person?
11         A.    Uh-huh.
12         Q.    If he was -- if he had a psychological problem.
13   Would you take different things into consideration?
14         A.    Yes.
15         Q.    Would you take into consideration the moral
16   culpability?  Is he remorseful for what happened?  Is he
17   sorry for what happened?
18         A.    Well, that's too late --
19         Q.    Okay.
20         A.    -- for that.
21         Q.    But would you take it into consideration?
22         A.    I don't think so.
23         Q.    You don't think so?
24         A.    I don't think so.
25                    MR. BLAYLOCK:  Approach again, Judge?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                     76

1              **(Off the record discussion at the bench)**

2         Q.   (BY MR. GALARZA)  Ms. Caldera, would you be

3    able to set your feelings aside once the Court gives you

4    the definition of beyond a reasonable doubt, if they tell

5    you, "Look, this is what you're supposed to follow,"

6    would you be able to set your feelings aside about the

7    death penalty and just answer the questions that are

8    proposed to you?

9         A.   I don't know.  It all depends at that moment.

10   Right now, you know -- I would have to hear all the --

11        Q.   Evidence?

12        A.   -- evidence.

13        Q.   Okay.  Would you be able to set your feelings

14   aside as to your religion?  I believe you stated awhile

15   ago because of your religion, because of church and

16   everything else, you do not believe that you would be

17   able to sit in a death penalty case; is that correct?

18        A.   That's correct.

19        Q.   Okay.  Would you be able to set those feelings

20   aside and just answer all the questions and return a yes

21   or no depending on what your answer was?

22        A.   I don't know.  I don't know.  I don't think so.

23        Q.   You don't think so?

24        A.   I don't think so.

25        Q.   You stated that I believe you had some projects

STATE OF TEXAS VS. RUBEN GUTIERREZ                    77

1    or because of your mom, she's older.  And I believe you
2    have a grandmother also; is that correct?
3         A.    My great grandmother just passed away two
4    months ago.
5         Q.    Oh, okay.  I'm sorry about that.
6         A.    She was 100 years; and I was always taking care
7    of her.
8         Q.    I'm sorry about that.  Would you be able to set
9    your feelings aside as to your mom that she's at home and
10   just listen to the evidence?
11        A.    I'm trying.  I'm trying.
12        Q.    You work as a teacher aide; is that correct?
13        A.    Yes.
14        Q.    And what hours do you usually work?
15        A.    I work eight hours.
16        Q.    Eight hours?
17        A.    From --
18        Q.    What time to what time?
19        A.    -- 7:30 to 4:00.
20                   MR. GALARZA:  May we approach, Your Honor?
21                   (Off the record discussion at the bench)
22                   MR. BLAYLOCK:  Judge, due to the juror's
23   religion; she has an opposition to the death penalty that
24   she wouldn't be able to set aside; she also stated that
25   she would hold the State to a higher burden, beyond all

STATE OF TEXAS VS. RUBEN GUTIERREZ                          78

1    doubt; and she stated that she needs to take care of her
2    mother, and the State would move that she be allowed to
3    go take care of her mother at this time.
4                    MR. GALARZA:  There's no objection, Your
5    Honor.
6                    THE COURT:  Okay.  Thank you, Ms. Caldera.
7    I appreciate you coming by.  At this time you're excused
8    to go.
9                    MS. CALDERA:  Thank you.  I appreciate it.
10                   THE COURT:  Thank you.
11                   MR. BLAYLOCK:  Take care, ma'am.  Good
12   luck with your mom.
13                   MS. CALDERA:  Thank you very much.
14                   THE COURT:  See if Mr. Escobedo is there.
15                   THE BAILIFF:  He's already here.
16                   THE COURT:  Bring him in.
17                   When they pass them like that, go right to
18   the specific points that they're challenging.
19                   Good morning, Mr. Escobedo.
20                   MR. ESCOBEDO:  Good morning, sir.
21                   THE COURT:  How are you?
22                   MR. ESCOBEDO:  Fine.
23                   THE COURT:  You may be seated.  The
24   lawyers have a few more questions to ask you.  And I'll
25   just ask you to please speak into the microphone so

1    everybody can hear you.

2                    MR. ESCOBEDO:   Okay.

3                    THE COURT:   Thank you.

4                    You may proceed.

5                         ERIC ESCOBEDO,

6       having been called as a prospective juror and, upon

7       his oath, was examined and testified as follows:

8                    VOIR DIRE EXAMINATION

9    BY MS. FISCHER:

10        Q.    Good morning, Mr. Escobedo.

11        A.    Good morning.

12        Q.    How are you doing this morning?

13        A.    Good.

14        Q.    My name is Karen Fischer.   This is John

15   Blaylock.   I think you met him on Tuesday.   We work for

16   the Cameron County District Attorney's Office.   That

17   means we represent the people of Cameron County here

18   today.

19                    Obviously you know why you're here.   The

20   defendant in this case is being charged with a capital

21   offense which means that the death penalty could be an

22   ultimate punishment for him.

23                    I need to ask you some questions about

24   that, but before we get there, there's a few things that

25   I wanted to talk to you about on your questionnaire.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    80

1    First of all, I noticed that you work for Cash Pawn or I

2    think it's called Cash American Pawn.

3         A.   Uh-huh.

4         Q.   Now, you know the District Attorney's Office

5    deals with a lot of cases involving pawn shops.  And you

6    may have spoken to us in the past or you may have spoken

7    to some of our colleagues.  Is there anything about your

8    job or what you do that would cause you to be unfair in

9    this case?

10        A.   No.

11        Q.   Okay.  Have you ever had any particular

12   dealings with our office involving your job?

13        A.   No, I haven't.

14        Q.   Okay.  Well, you may some day.  So don't hold

15   it against us is what I'm saying.  In this trial I need

16   you to be fair and impartial.

17        A.   Okay.

18        Q.   Okay.  Now, one of the questions that we asked

19   you -- and of course, these are very personal questions,

20   but I think you understand the severity of this crime is

21   such that we need to know how you feel about a lot of

22   issues because it's only right that Mr. Gutierrez get a

23   fair trial.  It's only right that the people of Cameron

24   County get a fair trial.

25                  We asked you, "Do you know anyone who's

STATE OF TEXAS VS. RUBEN GUTIERREZ                    81

1   been to the penitentiary?"  Can you tell me who you know
2   who's been to the penitentiary?
3        A.   I believe it was my brother-in-law.
4        Q.   Okay.  And what did he go to prison for?
5        A.   He had been in prison for robbery, I believe.
6   Yes.
7        Q.   Okay.
8        A.   I'm not really too familiar with the situation,
9   but something like that.
10       Q.   Okay.  Do you think he was treated fairly by
11  the system?
12       A.   Yes.
13       Q.   Okay.  Now, this case, one of the elements in
14  the very case that Mr. Gutierrez is accused of committing
15  is robbery, that while in the course of robbing
16  Ms. Harrison that she was murdered.  They murdered her.
17  Knowing that now, do you think that you can be fair?
18       A.   I think I can be fair.
19       Q.   Okay.  Can you put aside what you know about
20  your brother-in-law's case?
21       A.   Yes.
22       Q.   And that's what -- basically that's kind of
23  what the law says.  You have to come in here with a clean
24  slate.  That's what I'm asking you to do.
25       A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    82

1        Q.   Okay.  The next thing I want to talk to you
2   about, in Texas we have a two-part trial system.  The
3   first part of that is you, as a juror, you sit here in
4   the jury box and you listen to the evidence in the case.
5   And you make a decision about whether or not the
6   defendant is guilty or innocent of the crime that he's
7   being accused of.
8              If you find him guilty, then you move on
9   into the punishment phase.  And because this is a special
10  case, the punishment will be a little bit differently
11  than in another case.  You'll be asked a series of
12  questions.  And based on your answers to those questions,
13  then the Judge will make a decision about whether or not
14  the death penalty should be imposed.
15             Let's talk about the guilt/innocence phase
16  for a minute.  We talked a little bit about it on
17  Tuesday.  The law in the State of Texas is such that the
18  State has the burden of proof.  It's my job, it's our job
19  to prove to you the defendant committed the crime.  We
20  know that, and we accept that, and that is our job.
21             We have to do that -- we have a burden of
22  proof.  We have a standard; and that is beyond a
23  reasonable doubt.  We have to prove the case to you
24  beyond a reasonable doubt.
25             It's not like Perry Mason or Matlock or

STATE OF TEXAS VS. RUBEN GUTIERREZ                    83

1   shows like that where beyond a shadow of a doubt or

2   beyond all doubt or everything, you know -- 110 percent

3   sure, because there's no way you could be 100 percent

4   sure unless you were there.

5                And I read your questionnaire.  You don't

6   know anything about this case, right?

7        A.   No.

8        Q.   Okay.  So that's the burden.  And this may

9   surprise you -- I don't know if you even noticed, but you

10  can be charged with a capital murder offense, like

11  Mr. Gutierrez is here, and the burden is the same as if

12  you have been charged with driving while intoxicated.

13  The law is always the same.  The burden is always the

14  same.

15                So that's basically -- and what I'm

16  telling you is the law says you can't hold me to any

17  higher standard because it's a capital murder case.

18                And the law also says -- we asked you the

19  question, "Should the State be required to prove their

20  case beyond all doubt in a capital murder?"  That's not

21  the law.  The law is the standard is beyond a reasonable

22  doubt.  Can you do that?

23        A.   Yes.

24        Q.   Can you follow the law?

25        A.   (Nods head).

STATE OF TEXAS VS. RUBEN GUTIERREZ                        84

1       Q.   Okay.  Now we've got all those issues aside,

2   let's talk about your feelings about the death penalty.

3   Tell me how you feel about the death penalty.

4       A.   Well, I really don't have -- I'm really not

5   against it.  There are some crimes that I believe should

6   be taken to that extent of the death penalty.

7       Q.   What type of crimes are those that you think?

8       A.   I'd say once an individual takes it into his

9   own hands and is not -- doesn't -- somebody who's a

10  threat when put back in public; and there's no reason for

11  him to be in jail all his life, I mean, and -- and he

12  gets paroled and he's back on the streets and he does

13  that again, it takes you right back to step one.  So,

14  I --

15      Q.   And you seem to have a pretty good grasp of the

16  law because that's one of the very questions that the law

17  is going to ask you about whether or not you think the

18  death penalty should be imposed, okay?

19              Before we get to these, though, I just

20  want to clarify with you, the law in Texas -- and in this

21  particular case in general, Mr. Gutierrez is accused of,

22  while in the course of robbing someone, committing

23  murder.  And in Texas the law says that punishment -- or

24  that crime can be punished by the death penalty.

25              There are other crimes also.  Like if you

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                           85

1    kill a child under the age of six, the law says that you

2    can get the death penalty.  Or if you kill a police

3    officer, the law says you can get a death penalty -- you

4    can get the death penalty.

5              So if we had -- like in the hypothetical

6    situation Mr. Blaylock used on Tuesday, if you go into

7    the Circle K and rob someone, rob a store clerk -- they

8    go into the pawn shop and rob the clerk -- I noticed your

9    wife works there also.  They rob your wife.  And while in

10   the course of taking the money, they kill her.  The law

11   says you can be subjected to the death penalty.  Do you

12   think that's a good law?

13       A.   Yes, I think it is.

14       Q.   Okay.  Do you think that's a fair punishment?

15       A.   I think it is a fair punishment.

16       Q.   Okay.  Now, let's talk about that because you

17   understand the law.  The first question -- if you find

18   the defendant guilty, the first question you're going to

19   be asked -- and based on your answers to these three

20   questions, that will tell the Judge whether or not the

21   death penalty should be imposed.  It's not -- there's not

22   a big box that says yes or no for the death penalty.

23   Instead you're asked some questions.

24              And the first question is, "Do you think

25   he'd be a continuing threat to society?"  And I think

STATE OF TEXAS VS. RUBEN GUTIERREZ                                86

1   that you already said -- you said that that's something
2   you would take into consideration.
3        A.    (Nods head).
4        Q.    All I need you to do is answer these questions
5   honestly.
6                    And so what kind of things would you take
7   into consideration when you're looking at whether or not
8   a person would be a continuing threat?
9        A.    I believe how many times he's been in and out
10  of rehabilitation, prison --
11       Q.    Okay.
12       A.    -- things like that.
13       Q.    Now, that's the first question.  I think you
14  understand that.  And you know that you'll have to give
15  an honest answer to that.  And if you find that he is a
16  continuing threat, then the death penalty could be the
17  appropriate solution.
18                   The next question, then, has to do with
19  something that Mr. Blaylock talked about on Tuesday.
20  That was the law of parties.  Do you understand what the
21  law of parties in the State of Texas is?
22       A.    I believe that if everybody takes part in a
23  crime, they're all guilty in the same extent.
24       Q.    That's exactly right.  That's exactly right.
25  The get-away driver in the bank robbery hypothetical, the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    87

1    one that's driving the car is just as guilty as the one

2    who goes in when they plan to go and rob the bank.

3    That's exactly right.

4                Now, this is another part of the law.

5    This may surprise you, but I'm going to tell you what the

6    law is.  In the State of Texas you don't have to be the

7    actual triggerman in order to have the death penalty as

8    the end result.  How do you feel about that?

9        A.   I believe it's a fair law because the reason is

10   if they do have a gun for that crime, they are intending

11   of using that gun.

12       Q.   Okay.  Once again, I think you've got a good

13   grasp on the law because that's exactly what this

14   question asks you.  It says, "Not only you have to find,

15   number one, if the defendant actually committed the

16   crime --" and that is in the situation where you actually

17   are the triggerman.  You are the one that kills the store

18   clerk.

19               But if you didn't cause the death, but you

20   intended to cause the death, then the law says you can be

21   subjected to the death penalty.

22               And the hypothetical that Mr. Blaylock and

23   I have been using it's kind of like when he and I go into

24   the store together, let's say we go into the pawn shop

25   together, and his job is to go get the money and it's my

STATE OF TEXAS VS. RUBEN GUTIERREZ                          88

```
 1    job to go, you know, pick up extra stuff.
 2                 If I tell him -- if the store clerk is
 3    giving him a hard time and I say, "John, shoot him.
 4    Let's get rid of this and let's go," not only is
 5    Mr. Blaylock -- he caused the death.  He's the
 6    triggerman.  He could be subjected to the death penalty,
 7    but I could too because I intended that that person die.
 8    That's the law.  Can you follow the law?
 9         A.   Okay.
10         Q.   Okay.  And you can answer this question
11    honestly, then, knowing that the law of parties says even
12    if you aren't the shooter, then you could get the death
13    penalty if the circumstances were right?
14         A.   (Nods head).
15         Q.   And I think you already talked about the last
16    one, "Anticipated that a human life would be taken."  One
17    of the things you said was if they went in armed.  If
18    they went in armed, then wouldn't you agree with me that
19    they anticipated that a human life would be taken?
20         A.   Yes.
21         Q.   The law says if you anticipated that a human
22    life would be taken, if you believe that a human life
23    could be taken and you anticipated that, then you could
24    be subjected to the death penalty.  Can you follow that
25    law?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          89

```
 1        A.    Yes, ma'am.
 2        Q.    Okay.   The last thing I want to talk to you
 3   about -- okay.   So that's these two questions.   If you
 4   answer "yes" and "yes," then the end result could be the
 5   death penalty.
 6               But you're asked a third question.   And
 7   there you have to consider what we call mitigation.   Do
 8   you understand what that word means?
 9        A.    Not really, ma'am.
10        Q.    Let me tell you what the legal definition is.
11   And I don't know if this will make it any clearer or not,
12   but we'll try.   The legal definition says mitigation is
13   something that makes you less morally blameworthy.
14   Basically it makes you less to blame.
15        A.    Okay.
16        Q.    And the law says that you have to consider
17   everything that comes in about the case, including
18   whether or not they were or were not the triggerman
19   maybe, and their character and their background.   The law
20   says you have to take those things into consideration.
21               And then you're asked the final question,
22   "Is there something there that would make you think that
23   life was a more appropriate sentence than death?"   You
24   have to be able to do that and keep your mind open.   Can
25   you do that?   Can you take those things into
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              90

```
 1   consideration?
 2        A.   Yes, I can.
 3        Q.   Okay.  I'm going to talk to you about two other
 4   real quick issues of law, and then I'm going to let the
 5   other side visit with you.
 6             First of all, you're married.  You have a
 7   wife.  Let's say you and she went on a crime spree.  I'm
 8   not saying that's what's going to happen, but let's say
 9   you did.  And let's say you were on trial.
10             The law says she does not have to testify
11   against you.  You and she -- she has a spousal privilege
12   from having to say anything bad about you at all, even if
13   she saw you committing all these crimes.  How do you feel
14   about that?
15        A.   Well, that's kind of a tough one because you
16   know that person is holding very important evidence, but
17   yet then again, you have to respect the law and you
18   you've got to respect that person whether it's -- how can
19   I explain?  Her safety, too.  So, there's a lot of
20   factors into that --
21        Q.   Okay.
22        A.   -- into that law.
23        Q.   And so you understand there may be situations
24   and -- this is what's important.  The law says I can't
25   force her to testify, okay?  I can't force her to get up
```

1    there and testify against you.

2              Would you hold -- let's take you out of

3    the scenario now.  Now you're not on trial, but you're a

4    juror.  Would you hold that against the State if they

5    couldn't bring you all the evidence?

6         A.   No, I wouldn't.

7         Q.   Okay.  The same thing goes with codefendants.

8    A codefendant is someone who goes and commits a crime

9    with another person.  Like if you and your wife would go

10   on a crime spree, you would be codefendants.  If

11   Mr. Blaylock and I went into the Circle K together, we

12   would be codefendants.

13              No one can force him to testify against

14   me.  No one can do it.  The State can't do it.  I can't

15   make him get up there and say anything bad about his

16   codefendant because he has the right to remain silent.

17   He has the right not to incriminate himself.  How do you

18   feel about that?

19        A.   I think that's a -- it's a fair law about it.

20        Q.   Okay.  You can't hold it against the State if

21   they don't get up there, even though they may have some

22   important evidence to tell you.  You understand that?

23        A.   Yes.

24        Q.   Now, sometimes the State will make a deal with

25   Mr. Blaylock, cut him a deal and say, "Okay.  Instead of

STATE OF TEXAS VS. RUBEN GUTIERREZ                          92

1   life in prison, we'll give you 20 in prison if you tell

2   the truth and come and tell the jury what you saw and

3   what happened."  How do you feel about the State cutting

4   deals with folks?

5        A.   Well, in a way, it's a good tool because you

6   will get more evidence out of it.  You get more facts

7   about it because of that second person being there.  But

8   at the same time, why is that person getting lesser time

9   than the other person?

10       Q.   Could you think maybe it's because he accepts

11  responsibility; he says, "What I did was wrong," pleads

12  guilty and takes his punishment?

13       A.   That, too, but you would have to take a look at

14  his history.

15       Q.   Well -- and I think that -- and you're probably

16  thinking exactly what I'm thinking -- is he might have a

17  reason to lie if he's getting a shorter sentence or

18  getting a better deal, but you would have to judge his

19  credibility.  You would have to take a look at it.  Is

20  that --

21       A.   Yeah.

22       Q.   You'd have to listen to what he's saying and

23  judge his credibility based on what you hear.

24       A.   Exactly.

25       Q.   Okay.  That's exactly right.  There's nothing

STATE OF TEXAS VS. RUBEN GUTIERREZ                    93

```
 1    else that I need to talk to you about regarding the law.
 2              There are a couple of other witnesses that
 3    we didn't talk about on Tuesday.  One of them is a
 4    gentlemen working for EMS.  His name Mr. Tino Ortiz.  Do
 5    you know Mr. Ortiz by any chance?
 6         A.   No.
 7         Q.   Okay.  Tina Hauff, she lives here in
 8    Brownsville.
 9         A.   No.
10         Q.   And Claudia Leyva, she works for the
11    Brownsville Police Department.
12         A.   No, I don't.
13         Q.   Is there anything that you want to tell me --
14    this is the last time you and I get to visit one-on-one.
15    Is there something about being a juror or something that
16    you think I need to know because this is the last -- if
17    there's anything bothering you or anything you think I
18    need to know, this is the last time you can tell me.
19         A.   No.  I just have to keep in mind that -- well,
20    I just want to say that I don't think anything would
21    cause me to not be a fair juror in this.  I really don't
22    have any problems.  I don't know the accused.  I don't
23    rush into things.  I have to take things one at a time.
24    So I think I would be a fair juror in the trial.
25         Q.   Thank you, Mr. Escobedo.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    94

1              MS. FISCHER:  I don't have any further
2   questions, Your Honor.
3              MR. REYES:  May I proceed?
4              THE COURT:  You may.
5                  **VOIR DIRE EXAMINATION**
6   **BY MR. REYES:**
7        Q.   Mr. Escobedo, good morning.
8        A.   Good morning, sir.
9        Q.   My name is Daniel Reyes.  I'm one of the
10  attorneys that represents Ruben Gutierrez.  To my left is
11  the other attorney Mr. Galarza, Santiago Galarza.
12              One question before we start on something
13  that we covered on Tuesday, do you know anybody from the
14  District Attorney's Office, secretaries, investigators,
15  attorneys?
16       A.   No, I don't.
17       Q.   On Tuesday I talked to you a little bit about
18  the indictment.  And do you remember that I told you that
19  a grand jury indictment is simply the means whereby a
20  person in a felony prosecution is brought to trial?  Do
21  you recall that?
22       A.   I do.
23       Q.   And I also told you that a grand jury
24  indictment under our law is absolutely no evidence of a
25  person's guilt.  Do you remember that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              95

1        A.    Yes, I do.

2        Q.    And I told you that the indictment, all it is

3   is a document, a piece of paper that tells the State of

4   Texas what it is they have to prove to you, to the jury,

5   with evidence beyond a reasonable doubt.

6               And I also told you that that piece of

7   paper tells that person who's accused of that crime

8   specifically what it is that they're being charged with.

9   That's all it is.

10       A.    (Nods head).

11       Q.    Did you understand all those principles of law?

12       A.    Yes, sir.

13       Q.    And do you agree with all those principles of

14  law?

15       A.    Yes, I do.

16       Q.    I also talked to you about a person's right --

17  or a constitutional right which is called the presumption

18  of innocence.  Do you remember that?

19       A.    Yes.

20       Q.    I told you that every individual who is charged

21  with a crime in this State, whether it be a class C

22  misdemeanor, the lowest crime you can be charged with, or

23  whether it's a murder or capital murder, you're presumed

24  to be innocent; and that presumption stays with them from

25  start to finish.  Do you remember that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          96

```
 1        A.    Yes, I do.

 2        Q.    Is that something that you agree with?

 3        A.    Yes, I do.

 4        Q.    Yes?

 5        A.    Yes.

 6        Q.    Okay.  Now, that presumption can only be

 7   overcome if at the very end the State of Texas presents

 8   enough evidence to you to convince all 12 jurors, all 12

 9   members of the jury that that person committed the crime

10   beyond a reasonable doubt.  Do you understand that?

11        A.    Yes.

12        Q.    And if you were to be selected as a juror in

13   this case, would you be willing to abide and follow that

14   instruction of the Court?

15        A.    Yes, I would.

16        Q.    So by that are you meaning that you would give

17   Mr. Gutierrez that presumption of innocence, and wait

18   until the very end, and then decide whether or not he's

19   guilty?

20        A.    Yes, sir.

21        Q.    I talked to you also about the definition of

22   beyond a reasonable doubt.  Do you remember that?

23        A.    Yes, sir.

24        Q.    And that's the -- the State of Texas has the

25   burden of proof.  They're the ones that are required to
```

1  bring evidence to you to convince you beyond a reasonable

2  doubt that a person committed a crime.  Do you understand

3  that?

4       A.   Yes.

5       Q.   And the definition is right in front of you

6  here.  Let me go ahead and read it to you and then point

7  out some things on there.

8       A.   (Nods head).

9       Q.   It says, "A reasonable doubt is a doubt based

10 on reason and common sense after a careful and impartial

11 consideration of all the evidence in the case.  It is the

12 kind of doubt that would make a reasonable person

13 hesitate to act in the most important of his own

14 affairs."

15            First of all, it's asking you to just use

16 your reason and common sense and carefully and

17 impartially consider everything that's presented to you

18 in court.  Can you could do that?

19      A.   Yes, sir.

20      Q.   The second part is basically asking you to take

21 all the care and all the consideration that you would

22 give something in your own personal life, for example the

23 purchase of a house, or the purchase of a car, bring that

24 care and consideration that you would give to that matter

25 and apply it and use it here in this case.  Can you do

STATE OF TEXAS VS. RUBEN GUTIERREZ                          98

1  that?

2        A.    Yes, sir, I could.

3        Q.    "Reasonable doubt therefore must be proof of

4  such a convincing character that you would be willing to

5  rely and act upon it without hesitation in the most

6  important of your own affairs."  Do you see that?

7        A.    Yes, sir.

8        Q.    That the evidence as presented to you must be

9  of such a convincing character that you would not only be

10  willing to rely on it, but you would be willing to act

11  without hesitation.  Could you do that?

12        A.    Yes, sir.

13        Q.    Now, you understand that the State of Texas is

14  required to prove the case beyond a reasonable doubt.

15  They're the ones that brought the charges, they're the

16  ones that must prove them.

17              Now, the reason that I bring that up is

18  because on your questionnaire on question number 81,

19  which is on page number 21, it says, "Do you want to be a

20  juror in this case?"  And you answered, "Yes."  "Why or

21  why not?"  "I'm very interested in the case and to hear

22  both sides of the story."

23              Okay.  Now, do you understand that we

24  under our law are not required to present any evidence.

25  And by we, I'm talking about Mr. Gutierrez through his

1    attorneys.  Do you understand that?

2         A.    Yes, sir.

3         Q.    And do you understand that we are not required

4    to have Mr. Gutierrez testify?

5         A.    Yes, sir.

6         Q.    Okay.  And that is a right that's given to

7    every person that's accused.  Do you understand that?

8         A.    Uh-huh.

9         Q.    Now, the reason I ask that is because here I

10   guess what -- your answer is leading me to believe that

11   you would want to hear both sides of the story.

12        A.    Well, I would, but if it came down to only one

13   side giving me the evidence, I would then study that --

14   all the facts that they're giving me.

15        Q.    And would you -- for example, let's say that we

16   didn't present any evidence.  And we can just go ahead

17   and let the State close its case.  And we don't present

18   any witnesses, any photographs, any documents, nobody

19   testifies for us.

20              Would you maybe -- when you're back in the

21   jury room deliberating, would you be thinking, "Well, I

22   wish I would have heard from Mr. Gutierrez and his

23   attorneys"?

24        A.    I guess I would have that consideration.  I

25   wish I would have heard his side of the story, but I

STATE OF TEXAS VS. RUBEN GUTIERREZ                    100

1    wouldn't hold it against that person.

2         Q.   So the question then becomes would it affect

3    you --

4         A.   No, it wouldn't.

5         Q.   What about if Mr. Gutierrez didn't testify,

6    would you be thinking about that if you were back in the

7    jury room deliberating?

8         A.   No, sir.  I wouldn't, sir.

9         Q.   It wouldn't affect you in any way with respect

10   to your verdict?

11        A.   I don't think it would.  No, sir.

12        Q.   Do you understand that once we have you as a

13   jury member, we're not allowed to ask you any more

14   questions?  And we need to know right now how it is that

15   you're thinking because if you're sitting in the jury box

16   and we're presenting evidence, we don't know how it is

17   that you're going to be thinking and what's going through

18   your mind.  So we need definite answers at this point.

19        A.   Yes, sir.

20        Q.   And with respect to my question if

21   Mr. Gutierrez didn't testify, would that affect your

22   verdict in any way?

23        A.   I don't think it would, sir.  No, sir.  I --

24        Q.   Okay.  You used the words, "I don't think it

25   would."

STATE OF TEXAS VS. RUBEN GUTIERREZ                          101

```
 1        A.    No.
 2        Q.    It might or it might not?
 3        A.    It wouldn't.
 4        Q.    It would not?
 5        A.    It would not.
 6        Q.    And you honestly feel that way?
 7        A.    I honestly do.
 8        Q.    I talked to you about the elements also on
 9   Tuesday; and they're right here on the charts just to my
10   left.  Remember I told you that every crime in this State
11   is made up of elements; and those are the things that the
12   State of Texas has to prove in particular to you with
13   evidence beyond a reasonable doubt.
14              For example, if you look at number one, it
15   says, "The defendant, Ruben Gutierrez."  They have to
16   present enough evidence through witnesses, testimony,
17   documents, whatever, pictures, to convince you that it
18   was Ruben Gutierrez that committed the crime beyond a
19   reasonable doubt.  Do you understand that?
20        A.    Yes, sir.
21        Q.    They have to go ahead and present enough
22   evidence to convince you beyond a reasonable doubt that
23   this crime occurred on or about September the 5th of
24   1998.  And they have to prove all the elements, three,
25   four, five as well as number six before you can say
```

1    guilty.  Do you understand that?

2         A.    Yes, sir.

3         Q.    Okay.  Now, the law also states that if they

4    fail to prove even one of those elements, let's say they

5    only prove five elements and not six, that you have to

6    say by your verdict not guilty because they brought the

7    charges, they have to prove each and every one of those

8    things on that indictment.

9         A.    Okay.

10        Q.    Do you agree with that?

11        A.    Yes, sir.

12        Q.    Let me give you an example.  Let's say number

13   six, that they -- do you see where it says, "A murder was

14   committing while in the course of committing or

15   attempting to commit robbery"?

16        A.    Right.

17        Q.    Do you see that?

18        A.    Yes.

19        Q.    Now, robbery, would you agree with me, is

20   different from a burglary?  You have burglary of a

21   habitation, a burglary of a building or a house where you

22   go into somebody's property and steal something; whereas

23   robbery is maybe from a person who you threaten with harm

24   of violence or threat of violence.  Do you see the

25   difference?

1        A.    Yes, sir.

2        Q.    So let's say in a hypothetical situation they

3   prove that a burglary of a house happened and not a

4   robbery.  Do you see how they failed to prove that

5   element number six?

6        A.    (Nods head).

7        Q.    How many elements did they prove to you?

8        A.    Five.

9        Q.    Okay.  So based on our law, what would your

10  verdict have to be?

11       A.    Not guilty because they didn't put the sixth

12  one there.

13       Q.    Do you agree with that?

14       A.    Yes.

15       Q.    Is that something that you feel that you would

16  be able to do if selected as a juror in this case?

17       A.    Yes, sir.

18       Q.    Now, you understand that this is a capital

19  murder case.

20       A.    Yes, sir.

21       Q.    Do you understand that?

22       A.    Yes, sir.

23       Q.    And do you feel that -- if you were put in that

24  situation, do you feel that you would be able to do

25  that --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    104

1       A.   Yes.

2       Q.   -- knowing this is a capital murder?

3       A.   Yes, sir.

4       Q.   In Texas we also have what is called a

5   bifurcated trial system.  That's just a fancy phrase or

6   term that means a two-part trial; the guilt/innocence

7   phase and then the punishment phase.

8            Obviously if you find somebody not guilty,

9   you don't need a second phase.  That forever ends that

10  case, okay?

11      A.   Okay.

12      Q.   If you find somebody guilty, then you go to the

13  second part which is called, again, the punishment phase

14  or sentencing phase.

15           In Texas we also have what are called

16  lesser included offenses.  For example, capital murder,

17  some crimes that fall under that would be murder or

18  robbery.  Do you understand that?

19      A.   Okay.

20      Q.   Those are lesser crimes.  In Texas, the range

21  of punishment for a murder is anywhere from five years in

22  prison to 99 years or life.  Do you understand the whole

23  range?

24      A.   Yes, sir.

25      Q.   Okay.  Now, do you understand that you would be

STATE OF TEXAS VS. RUBEN GUTIERREZ                105

1   asked to make a decision as to what number of years you

2   would sentence an individual to prison after you would go

3   ahead and have evidence presented to you?  Do you

4   understand that?

5        A.   Yes, sir.

6        Q.   The only question that I can ask right now is

7   whether you could keep an open mind and consider the full

8   range of punishment anywhere from five years to 99 years

9   or life and any number of years in between, and then hear

10  the evidence and then make a decision?

11       A.   Yes, sir.

12       Q.   Could you do that?

13       A.   I could.

14       Q.   With robbery, the range of punishment is two

15  years in prison to 20 years in prison.  The same

16  question, can you keep an open mind, consider two years,

17  consider 20 years and any number of years in between, and

18  then make a decision after evidence has been presented?

19       A.   Yes, sir.

20       Q.   Those questions that are in front of you that

21  are called special issues, those you only get to if you

22  find a person guilty of capital murder.  Do you

23  understand that?

24       A.   Yes, sir.

25       Q.   And basically with respect to 1 and 2, the

STATE OF TEXAS VS. RUBEN GUTIERREZ                        106

1   State of Texas still has its burden of proof.  In other
2   words, they have to prove those two questions to you or
3   issues, special issues, with evidence beyond a reasonable
4   doubt.  This definition here still applies to those two.
5   Do you understand that?
6        A.   Yes, sir.
7        Q.   Okay.  Would you be willing to, if selected as
8   a juror, hold the State to that burden?
9        A.   Yes, sir.
10        Q.   Now, with respect to Number 1 and Number 2, in
11   order for the jury to say "yes" to Number 1 and "yes" to
12   Number 2, all 12 jurors have to answer "yes."  Do you
13   understand?
14        A.   Yes, sir.
15        Q.   And if they want to answer "no," only ten
16   jurors have to say "no" to Number 1 and only ten jurors
17   have to say "no" to Number 2.  Do you understand?
18        A.   Yes, sir.
19        Q.   Okay.  Now, with respect to Number 3, if all
20   12 -- if the jury wants to answer, "yes," "Yes, there are
21   some sufficient mitigating circumstance or
22   circumstances," if they want to answer "yes," only ten
23   jurors have to say "no" -- I mean, I'm sorry, "yes."
24        A.   Yes.
25        Q.   Do you understand that?

1       A.    Yes.

2       Q.    But if they want to answer "No, there's nothing

3  that mitigates that person's blameworthiness, their

4  culpability.  That person should get the death penalty,"

5  all 12 jurors have to agree.  Do you follow me?

6       A.    Yes, sir.

7       Q.    Do you agree with those requirements?

8       A.    Yes, sir.

9       Q.    Now, with respect to Special Issue Number 1,

10  it's asking you, "Is there a probability that the

11  defendant would commit criminal acts of violence that

12  would constitute a continuing threat to society?"

13            If you look at the word "probability,"

14  would you agree with me that that's basically asking you

15  whether it's more likely than not?

16       A.    (Nods head).

17       Q.    Is that a definition you would give to that

18  word?

19       A.    Yes.

20       Q.    Is it more likely than not that he would commit

21  criminal acts of violence; and because he would do so, he

22  would continue to be a threat to society?

23       A.    Yes, sir.

24       Q.    And would you agree with me that that question

25  is basically asking you to make a determination as to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    108

1    something that might or might not even happen some time

2    in the future?

3        A.   Yes.

4        Q.   It's basically asking you to punish an

5    individual in this particular case for something that

6    might not even happen in the future.  Would you agree

7    with me?

8        A.   Yes, sir.

9        Q.   And is that something that you would take into

10   consideration in answering that question?

11       A.   Yes.

12       Q.   Now, if you look -- the fourth line, do you see

13   where it's asking about criminal acts of violence?  The

14   first question --

15       A.   Okay.

16       Q.   -- the fourth line, criminal acts of violence.

17       A.   Yes, sir.

18       Q.   Do you see how it's narrowing the scope of the

19   things that you're supposed to look at?  You would agree

20   with me that there's crimes against a person and also

21   crimes again property?

22       A.   Yes.

23       Q.   Criminal acts of violence would be something

24   that would be committed against a person.  An assault for

25   example, a murder, something like that would be an act of

STATE OF TEXAS VS. RUBEN GUTIERREZ                    109

1    violence.

2        A.    Uh-huh.

3        Q.    Okay.  Do you see how it's limiting what it is

4    that you need to look at; for example, whether that

5    person would commit other murders, whether that person

6    would commit other assaults, okay?

7        A.    (Nods head).

8        Q.    It's not asking about burglaries or, you know,

9    thefts, things like that.  Do you see that?

10       A.    Yes, sir.

11       Q.    Is that something you agree with?

12       A.    Yes.

13       Q.    That's basically what the question is asking

14   you.  And if you were to be selected as a juror and you

15   got to that point, to this point, would you be able to

16   follow that instruction?

17       A.    Yes.

18       Q.    Now, Question Number 2, it's asking you, "Do

19   you find from the evidence --" and what that poster board

20   is missing where it's supposed to say, "Beyond a

21   reasonable doubt."

22               "Do you find from the evidence beyond a

23   reasonable doubt that Ruben Gutierrez, the defendant,

24   either himself caused the death of the victim; if he

25   didn't, did he intend to kill the deceased or another; or

1   if he did not, did he anticipate that a human life would

2   be taken?"

3                    This is basically talking about law of

4   parties; and Ms. Fischer talked to you about that

5   earlier.  Now, do you understand that in our State, just

6   because two individuals go in to a Circle K, for example,

7   and one of them shoots the clerk and kills them, they're

8   not automatically both guilty of murder?  Do you

9   understand that?

10       A.   Yes, sir.

11       Q.   There has to be something more proven by the

12  State before you can say, "Yes, they're both guilty of

13  murder."  Now, both of them might be guilty of the

14  robbery, but with respect to the murder, there's

15  something more that they need to prove.  Do you

16  understand that?

17       A.   Okay.  Yes.

18       Q.   Now -- and this is where this comes into play,

19  "Whether the person actually killed the victim; if he

20  didn't, did he anticipate or did he intend that somebody

21  be killed," okay?

22                    Let me give you some examples.  Let's say

23  Mr. Galarza and I go into a Circle K.  We both arm

24  ourselves -- or let me back up here.  Let's say that I

25  put a gun in my pocket and he sees me.  And I tell him,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    111

1    "If anybody crosses me, you know, keeps us from going in

2    there and stealing, you know, the cigarettes that we're

3    going to take, I'm going to kill them."

4                Now, do you see where in that situation if

5    you are to be -- if I was the person on trial after

6    having gone in there and taken the cigarettes and

7    shooting the clerk myself, with respect to whether or not

8    I actually myself killed that person, that victim, what

9    would your answer have to be?  Did I actually kill that

10   clerk?

11        A.   Yes.

12        Q.   Because I went in there, I shot him, right?

13   Now, did I -- where it's asking did I intend to kill the

14   clerk?

15        A.   They were your intentions.

16        Q.   Right.  And what about did I anticipate?  In

17   thinking, "Well, if anybody crosses me, I'm going to kill

18   them," so I could have anticipated that a human life was

19   going to be taken, right?

20        A.   Yes.

21        Q.   If Mr. Galarza, if he was there, he knew about

22   the gun, he knew that if anybody crossed me I was going

23   to kill them, now with respect to him, did he actually

24   kill that clerk?

25        A.   No, he didn't, but --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    112

1      Q.   So with respect to that, what would your answer

2   have to be with respect to Mr. Galarza if they're asking,

3   "Did he actually kill that clerk?"

4      A.   He didn't do the action, but he was there

5   taking part in the action.

6      Q.   Okay.  But my question was did he actually kill

7   that clerk?

8      A.   No, he didn't.

9      Q.   Okay.  So your answer to number two would have

10  to be what?

11     A.   No.

12     Q.   Okay.  Now, did he intend to kill somebody?

13  When we went in there, did he himself say, "Well, I'm

14  also going to kill somebody"?  Did he do that or was it

15  only me?

16     A.   It was only you.

17     Q.   Okay.  So when they're asking you did he intend

18  to kill somebody, your answer would have to be what?

19     A.   No.

20     Q.   Okay.  Now, with respect to number three, did

21  he anticipate that a human life would be taken?  Now, did

22  he know that I had a gun?

23     A.   Yes.

24     Q.   Did he know that I might kill somebody?

25     A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        113

```
 1        Q.    So could he have anticipated that a human life
 2   would be taken?
 3        A.    Yes.
 4        Q.    All right.  So if you're being asked to answer
 5   that question, your answer would be what?
 6        A.    Yes.
 7        Q.    Okay.  Let me give you another scenario.  Let's
 8   say that he and I go into a Circle K.  I, in my mind,
 9   think I'm going to kill somebody if they get in my way of
10   taking those cigarettes, okay?  I put a gun in my pocket.
11             Mr. Galarza has no idea what I'm thinking
12   about.  He has no idea that I have a gun with me.  All he
13   and I plan to do is go into that Circle K.  One of us is
14   going to distract the clerk, you know, try and get him to
15   go somewhere else to the store.  We're going to grab
16   cigarettes, put them in our pocket, and run out, okay?
17             We go in there.  And as I'm distracting
18   the clerk, I shoot him and I kill him.  Then we run out.
19   Do you see how I actually killed that clerk --
20        A.    Yes.
21        Q.    -- how I could have intended -- I intended
22   actually to kill that clerk and I anticipated that a
23   human life would be taken?
24             But with respect to Mr. Galarza, he didn't
25   actually kill that clerk.  And since he didn't know I had
```

1    a gun and he didn't know that I intended to kill

2    somebody, and all we had planned was to grab the

3    cigarettes and run out, that's it, that he could not have

4    intended to kill anybody.  Then it comes to the last

5    part, could he have anticipated?

6         A.    No.

7         Q.    No, right?  Because there's no way he could

8    have done that.  Do you see how it requires something

9    more, not just because you go in there you're

10   automatically guilty?

11        A.    Yeah.

12        Q.    Now, you can find him guilty of the theft

13   maybe, would you agree with me?

14        A.    Yes.

15        Q.    But not necessarily of the murder of the clerk.

16   Do you see that?

17        A.    Yes, sir.

18        Q.    Okay.  Now Question Number 3, do you understand

19   that you only get to this question if you answer "yes" to

20   Number 1 and Number 2, okay?  "Yes, he will be a threat,"

21   or "Yes, he actually killed somebody or he intended or

22   anticipated."  Do you see that?

23        A.    Yes.

24        Q.    And you only get to Number 3 because basically

25   by answering "yes" to 1 and 2, the death penalty would be

1   imposed.

2              So Number 3 is asking you, "Is there any

3   sufficient mitigating circumstance, reason or reasons,

4   why that person should get a life sentence and not the

5   death penalty?"  Do you see that?

6        A.   Yes, sir.

7        Q.   Do you see how it's basically asking you if you

8   find that one reason is a sufficient mitigating reason,

9   then that's enough for you to answer "yes" to this

10  question, okay?  You don't need like five or six reasons.

11  One is sufficient if that in your mind is a sufficient

12  mitigating reason.  Do you understand that?

13       A.   Yes, sir.

14       Q.   And it's basically asking you to take into

15  consideration all the evidence, okay?  Now, we're not

16  required to present any evidence to you.  We can just sit

17  back and do nothing, say nothing.  But if we present

18  witnesses to you, evidence to you, would you take that

19  into consideration?

20       A.   Yes, sir.

21       Q.   Circumstances of the offense, you know, how it

22  is that the person was killed, whether or not the person

23  actually killed that victim, whether or not the person

24  intended or anticipated that a human life would be taken,

25  all those things would you take those into consideration

1    in answering that third question?

2         A.    Yes, sir.

3         Q.    It's asking you to take into consideration the

4    person's character and background, whether or not he came

5    from a broken home, whether or not he was abused as a

6    child, whether or not he had psychological or psychiatric

7    problems when he was growing up, whether or not he came

8    from a rich or poor family, you know, how he did in

9    school, was he a good student or was he bad student.  Do

10   you see how all those go as to his character and

11   background?

12        A.    Yes, sir.

13        Q.    Would you take those into consideration?

14        A.    Yes, sir.

15        Q.    The personal moral culpability of the

16   defendant, whether or not a person has shown remorse,

17   whether or not a person has shown that he's sorry for

18   what happened, would you take that into consideration as

19   it's asking you there?

20        A.    Yes, sir.

21        Q.    You talked earlier about parole, remember how a

22   person might get parole --

23        A.    Uh-huh.

24        Q.    -- and that individual might be back out on the

25   street.  And you stated earlier that the punishment

1    should be greater for -- if the crime that they committed

2    was more serious.  Do you remember that?

3         A.   Yes, sir.

4         Q.   Now, in Texas we have what's called an

5    escalating parole system which means that the more

6    serious the crime that you commit, the more time you have

7    to spend in prison before you become eligible for parole.

8    Do you follow me?

9         A.   Yes, sir.

10        Q.    And in Texas, not necessarily because you

11   become eligible for parole does it necessarily mean that

12   you're going to be automatically released.  They might

13   deny your application for parole.  Do you see where that

14   could happen?

15        A.   Yes, sir.

16        Q.    And you understand that in this State, victims

17   of the family -- or I'm sorry.  Family members of the

18   victim can come to the parole hearings and object to that

19   person's release.  Do you understand that?

20        A.   Yes, sir.

21        Q.    So they have a say-so.

22             Now, let me just give you examples of as

23   to how our parole system works in this State.  Let's say

24   an individual is charged -- or charged and then convicted

25   and then sentenced to -- for a burglary where there was

STATE OF TEXAS VS. RUBEN GUTIERREZ                      118

1   no weapon or violence used.  Let's say that individual
2   was sentenced to ten years in prison.
3                Under our law, that person would have to
4   serve 25 percent or one-fourth of the time in prison or
5   two and a half years before they would become eligible
6   for parole.  Do you follow me?
7        A.   Yes, sir.
8                MS. FISCHER:  Your Honor, I'm going to
9   object.  That's a misstatement of the law.  There is no
10  one-fourth time on burglary.
11               MR. REYES:  I'm talking about whether
12  there is no weapon or no violence used, Judge.
13               MS. FISCHER:  Judge, that's an improper
14  statement of the law.  Going into parole, these type of
15  details is improper.  The time for parole is not the
16  appropriate issue.
17               MR. REYES:  It shows the escalating parole
18  system that we have.
19               THE COURT:  It's overruled.  Go ahead.
20       Q.   (BY MR. REYES)  Do you understand, for
21  example, if an individual is convicted and sentenced for
22  an aggravated offense where a weapon was used, they have
23  to serve half of the time of that ten-year sentence.
24  They would have to serve five years before they even
25  become eligible for parole.

1                    And in a murder case, an individual would

2     have to serve 35 calendar years before they would be

3     eligible for parole.  So do you see how it keeps

4     escalating?

5            A.    Yes, sir.

6            Q.    And do you understand that in Texas the highest

7     crime you can be convicted of is capital murder?

8            A.    Yes, sir.

9            Q.    Do you understand how the parole system works?

10           A.    Yes, sir.

11           Q.    You talked about also the spousal privilege

12    that we have here in the State of Texas.  You stated that

13    you would not hold it against the State if that were the

14    case; is that correct?

15           A.    Yes, sir.

16           Q.    Now, the question then that I'm asking you is

17    whether you would hold it against Mr. Gutierrez.

18           A.    No, sir.

19           Q.    Do you understand that that's the right that a

20    spouse has?

21           A.    Uh-huh.

22           Q.    And that spouse can go ahead and themselves

23    assert that right and nobody can take it away from them.

24           A.    Yes, sir.

25           Q.    So basically, there's nothing we can do to

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    120

```
 1    force that individual to come and testify.  Do you

 2    understand that?

 3         A.   Yes, sir.

 4         Q.   In some cases the State attempts to introduce

 5    statements that are allegedly made by the person who's on

 6    trial.  And they're usually called confessions or

 7    statements of accused.  Do you see where that could

 8    happen?

 9         A.   Yes, sir.

10         Q.   My question to you, Mr. Escobedo, is whether

11    you would be willing to keep an open mind, listen to all

12    the evidence, and then decide whether or not that

13    statement was given voluntarily.

14         A.   Yes, sir.

15         Q.   For example, would you be willing to listen to

16    evidence maybe that an individual might have asserted his

17    Miranda rights, maybe wanted an attorney, and the police

18    officers kept questioning that individual, okay?

19         A.   (Nods head).

20         Q.   Or maybe where threats were being made against

21    that person, or maybe against his mother or his father,

22    that they would probably arrest them if he didn't give

23    them a statement.  Do you see that?

24         A.   Yes, sir.

25         Q.   And do you see if those are the circumstances
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    121

1    or the facts of a particular case, that statement might

2    not have been given voluntarily?

3         A.    Yes, sir.

4         Q.    Do you understand that?  And if the Judge were

5    to instruct you that if a statement was not given

6    voluntarily or freely or in violation of the law, that

7    you are not to consider it for any reason whatsoever --

8         A.    Yes, sir.

9         Q.    -- could you set it aside and not consider that

10   statement for any reason whatsoever?

11        A.    Yes, sir.

12        Q.    You would be able to do that?

13        A.    (Nods head).

14        Q.    In some cases the State of Texas also makes

15   deals with codefendants.  And in cases where there's

16   maybe more than one person accused of a crime, they're

17   called codefendants.  And in some cases they make deals

18   with one of those defendants for them to come and testify

19   in court against the individual who's on trial.  Do you

20   see where that could happen?

21        A.    Yes, sir.

22        Q.    And for example, if they're facing a life

23   sentence or 99 year sentence, they might make a deal

24   where they might get 20 years.  Do you see how they're

25   saving themselves all that time in prison?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    122

```
 1        A.    Uh-huh.
 2        Q.    And my question is just whether you would be
 3   able to keep in mind the fact that this person might have
 4   some reason to come to court and lie, to keep the deal.
 5        A.    Yes.
 6        Q.    Okay.  And even if the condition of their
 7   testimony is that the testimony that they give in court
 8   be truthful, do you agree with me that there's no way you
 9   can know whether or not that person is telling the truth?
10   Do you understand?
11        A.    Yes.
12        Q.    So do you see where that person might want to
13   go ahead and come to court and lie to be able to get his
14   deal?
15        A.    Yes, sir.
16        Q.    You as a juror would have to sit and listen to
17   all the witnesses that come before you.  And you're
18   supposed to judge, you know, their credibility, their
19   believability.
20              And in some cases some jurors might think,
21   "Well, that person's a doctor.  Because he has a medical
22   degree, I'm going to believe 100 percent of what they
23   say."
24              Or another juror might say, "Well, that
25   person is a law enforcement official.  He's a police
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    123

1    officer.  I'm going to believe everything of what he

2    says."  Do you see where that could happen?

3         A.   Yes, sir.

4         Q.   And would you agree with me, Mr. Escobedo, that

5    some of these individuals might have a reason to lie?

6         A.   Yes.

7         Q.   Okay.  Or maybe a doctor might not have a

8    reason to lie, but maybe if evidence wasn't given to him

9    properly, his diagnosis or, you know, whatever he might

10   have done might be in error.

11        A.   Yes.

12        Q.   Do you see that?

13             So my question is just whether you'd be

14   able to keep an open mind, listen to the witnesses, look

15   at their demeanor, how is it that they're behaving in

16   court, and then decide whether you're going to believe

17   them or not.

18        A.   Yes, sir.

19        Q.   Can you do that?

20        A.   (Nods head).

21        Q.   Do you have any relatives in law enforcement?

22        A.   No, I don't.

23        Q.   And have you been a victim of a crime?

24        A.   No, I haven't.

25        Q.   Have you heard anything about this case in

STATE OF TEXAS VS. RUBEN GUTIERREZ                    124

1   particular?

2        A.   No, sir, I haven't.

3        Q.   Have you formed any opinion whatsoever?

4        A.   No.

5        Q.   And are you willing as a juror to keep an open

6   mind?

7        A.   Yes, I am.

8        Q.   Have you served on a jury before?

9        A.   No, I haven't.

10       Q.   Let me just look through your questionnaire one

11  last time.  On question number 53 it's asking what you

12  think about our laws.  And you basically state that you

13  believe that they are too lenient.

14            Do you think that because you believe that

15  they're too lenient, you might sit as a juror on this

16  case and make sure that the harshest punishment that's

17  available to you, that that's what you would give?

18       A.   No, sir, I wouldn't.  I would have to -- I

19  would have to take into consideration all the evidence

20  and the laws.

21       Q.   So with respect to that question about laws

22  being too lenient, would you set that opinion aside --

23       A.   Oh, yes.

24       Q.   -- and just listen to the evidence and make --

25       A.   Yes, sir.

1       Q.    -- a decision based on what you hear?

2       A.    Yes, sir.

3       Q.    And you're absolutely sure that that opinion of

4  yours, that our laws are too lenient, would not affect

5  you at all?

6       A.    No, sir.  I would have to put them aside.

7       Q.    Number 63, "What are your feelings about the

8  death penalty?"  "I am for it.  Why have somebody in

9  prison for the rest of their lives living off of taxes

10  for a crime that was to that extent."

11            Okay.  Do you see how if you were selected

12  as a juror, the fact that you -- one of the options that

13  would happen or be available as a result of your answers

14  would be a life sentence.

15       A.    Uh-huh.

16       Q.    Okay?  And that goes exactly opposite to what

17  you're saying here.  Basically you're saying, "Well, why

18  keep him in prison for life if they're spending our tax

19  dollars," okay?

20       A.    (Nods head).

21       Q.    And do you see how that would lead me to

22  believe that once you get on a jury, you might be willing

23  to give him the death penalty because you don't want our

24  tax dollars to be spent on him.

25       A.    Yes, sir.

1      Q.   Do you see that?

2      A.   Yeah.

3      Q.   My question is whether you'd be able to set

4  that feeling aside and make a decision just based on the

5  evidence.

6      A.   Oh, yeah.  Yes.  That's just my opinion.

7  That's -- I don't make those laws.

8      Q.   And do you think it would affect you at all?

9      A.   No, sir, I wouldn't.

10     Q.   And you're sure?

11     A.   I could honestly say I couldn't -- I wouldn't

12 because this is a -- I believe this is another person's

13 life; and I would have to take a lot of things into

14 consideration besides my personal opinions on certain

15 laws.

16     Q.   And the same thing with question number 66,

17 "What is the best argument for the death penalty?"  "Do

18 you want murderers on our streets?"  Okay.  You know you

19 talked about a person being paroled.  Do you think that

20 you having that opinion, would that affect you in any

21 way?

22     A.   No, sir.  What I would -- what I was trying to

23 come forward with that question is, well, there is

24 different kinds of murders, too.  There's -- I would have

25 to keep in consideration the type of murder it was, was

STATE OF TEXAS VS. RUBEN GUTIERREZ                    127

1   it done just out of -- premeditated or was it done out of
2   self-defense.
3        Q.   The question then would become if you're
4   sitting as a juror and then you're at the punishment
5   phase of either a capital murder, murder or robbery, the
6   fact that you would have in your mind that that
7   individual might be paroled, would you tend to give him
8   the highest punishment or answer those questions in a way
9   that would lead to the death penalty because you don't
10  want that person out on our streets?
11       A.   No.   Well, I would have to answer the questions
12  just to be fair with Mr. Gutierrez.
13       Q.   And do you honestly feel that you would be able
14  to set that feeling aside?
15       A.   Yes, sir.
16       Q.   And you wouldn't have any difficulty doing
17  that?
18       A.   No, sir.
19       Q.   You honestly feel that way?
20       A.   I honestly do feel that way.
21       Q.   Anything else you wanted to ask?   This is the
22  last time we can talk to you if you're selected as a
23  juror in this case.
24       A.   No, sir.
25       Q.   Just one last thing before I finish.   On

 1  question 79, page 20, "In a group situation once you have
 2  formed an opinion, do you usually," and you answered B,
 3  "Stand by your original opinion despite what others
 4  believe."
 5      A.   Uh-huh.
 6      Q.   Do you understand that you as a member of the
 7  jury would have to go ahead and listen to the evidence,
 8  go back to the jury room, deliberate with the rest of the
 9  jurors, and then you would vote, first of all, on
10  guilt/innocence and then special issues or punishment?
11  Do you understand that?
12      A.   Yes, sir.
13      Q.   And basically what this leads me to believe is
14  that once you've made a decision, you're going to stick
15  by that decision and not even deliberate with the rest of
16  the jurors.
17      A.   No.  I would deliberate, but if I would -- it
18  would lead me to believe that he was -- that he was
19  guilty and all the rest of them keep telling me, "No,
20  he's innocent," I'm not going to go with the crowd just
21  because they're telling me he's innocent.  I'm going to
22  go with what they say.  I'm going with what I think and
23  because of the facts that they give me.
24      Q.   But would you be willing as a juror to
25  deliberate, to talk --

STATE OF TEXAS VS. RUBEN GUTIERREZ                          129

```
 1        A.    Oh, yeah.

 2        Q.    -- and discuss it with them?

 3        A.    Yes, sir.

 4        Q.    And if you felt that way, that's fine, but you

 5   wouldn't just sit back and say, "No more talking"?

 6        A.    No, sir.

 7        Q.    Anything else?

 8        A.    No, sir.

 9        Q.    Thank you, Mr. Escobedo.

10             MR. REYES:  We have nothing further, Your

11   Honor.

12             THE COURT:  Okay, Mr. Escobedo.  Let me

13   ask you to step down for a few minutes.  We'll take up

14   some legal matters, and then I'll bring you right back.

15             (Prospective juror left the courtroom)

16             THE COURT:  Is this juror acceptable to

17   the State?

18             MS. FISCHER:  Yes, Your Honor.

19             THE COURT:  Is he acceptable to the

20   defense?

21             MR. REYES:  May we have a minute, Your

22   Honor?

23             THE COURT:  Yes.

24             (Brief pause in proceedings)

25             MR. REYES:  We don't have a challenge,
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    130

```
 1   Your Honor, however we do exercise a peremptory strike.
 2                    THE COURT:  That would be number five?
 3                    MR. GALARZA:  Five.
 4                    THE COURT:  Bring him in.
 5                    THE BAILIFF:  Yes, Your Honor.
 6                    THE COURT:  Okay.  Mr. Escobedo, that's
 7   all the questions we have for you today.  You're excused
 8   to go at this time.
 9                    MR. ESCOBEDO:  Thank you.
10                    THE COURT:  Thank you very much.
11                    Let's take a break.  Ms. Rivera was having
12   car problems.  Let me go check and see if she made it to
13   the courthouse or not.
14                    (Recess taken from 10:47 a.m. to
15                    10:57 a.m.)
16                    THE COURT:  You may be seated.  Bring in
17   Ms. Rivera.
18                    THE BAILIFF:  Yes, Your Honor.
19                    THE COURT:  Good morning, Ms. Rivera.
20                    MS. RIVERA:  Hello.  I'm sorry.  My car
21   was like -- I had problems.  I had to go house to house
22   and make phone calls and nobody could give me a ride.
23   So --
24                    THE COURT:  Are you okay?
25                    MS. RIVERA:  Yes.  I'm out of breath.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    131

```
 1                    THE COURT:  Okay.
 2                    MS. RIVERA:  I'm okay.
 3                    THE COURT:  All right.  I think we're
 4  ready to begin.  The attorneys have a few questions to
 5  ask of you.
 6                    MS. RIVERA:  Okay.
 7                    THE COURT:  If you'll just speak into the
 8  microphone.
 9                    MS. RIVERA:  Okay.
10                    THE COURT:  You may proceed.
11                    MONICA RIVERA,
12     having been called as a prospective juror and, upon
13     her oath, was examined and testified as follows:
14                    VOIR DIRE EXAMINATION
15  BY MR. BLAYLOCK:
16     Q.   Good morning, Ms. Rivera.
17     A.   Good morning.
18     Q.   I'm John Blaylock.  I met you on Tuesday,
19  remember?
20     A.   Yes.  Uh-huh.
21     Q.   And this is Karen Fischer.
22                    MS. RIVERA:  Hi.
23     Q.   (BY MR. BLAYLOCK)  And we represent, as I told
24  you on Tuesday, the people of Cameron County and
25  prosecute crimes, right?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    132

```
 1        A.    Yes.

 2        Q.    I understand you've had a difficult morning

 3   already.

 4        A.    Uh-huh.

 5        Q.    We'll start off slow.

 6        A.    Okay.

 7        Q.    First of all, tell me how you feel about

 8   prosecutors.

 9        A.    Prosecutors.  I feel okay about it.  I have no

10   emotional feelings or -- I just have to hear what's

11   happening and then I'll go on from there.

12        Q.    Okay.  And how do you feel about defense

13   attorneys?  Remember that question on your questionnaire?

14        A.    Yes.  I have no problems whatsoever.  Just

15   normal.

16        Q.    Okay.  We're just normal people, right?

17        A.    Yeah.

18        Q.    My job is to bring you the facts of the case,

19   right?

20        A.    Uh-huh.

21        Q.    Would you also say my job is to do justice?

22        A.    Yes.

23        Q.    Okay.  And how do you feel about justice?

24        A.    I feel it should be allowed, you know.  If

25   somebody committed a crime or -- yes, you do have to hear
```