STATE OF TEXAS VS. RUBEN GUTIERREZ                    148

1    you're going to be truthful.  I'm not saying that you're

2    going to lie, but have you already made your mind up so

3    that the truth is always going to be life?  Is the answer

4    to this question always going to be "yes"?  No matter

5    what you hear, life is always better than death?

6         A.   To my belief, it is.

7         Q.   But that's different from what you told the

8    Judge, Ms. Trevino.  You told the Judge that you could

9    consider death.

10        A.   Yes.  What I feel about life, I'm answering it

11   honestly.  Life is better than death, but --

12        Q.   Exactly.  And --

13                  THE COURT:  Let her finish answering.

14        A.   But he asked me if I would answer it honestly

15   and I said yes, I would.

16        Q.   (BY MS. FISCHER)  Exactly.  And that's what

17   I'm saying.  Is your honest belief that life is always

18   better than death?  So you're not lying.  You just have

19   what we call a bias --

20        A.   Uh-huh.

21        Q.   -- or a prejudice against the death penalty so

22   that you're always going to say life is better than

23   death.

24        A.   Uh-huh.

25        Q.   Am I right?  Maybe not.  I don't want to make

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    149

1   it seem too simple, but you know how some people just
2   like the color red so they always pick the color red over
3   any other color even though the blue suit's nicer?
4        A.   Uh-huh.
5        Q.   It's kind of simple or kind of trivial, but
6   it's kind of how you're telling me you feel, that the
7   honest answer is always going to be life because that's
8   what your honest belief is.  So you're not lying here,
9   but you've already made your mind up.  That's the real
10  question.  You've already made your mind up that life is
11  better than death.  Is that what you're saying?
12       A.   Uh-huh.
13       Q.   I mean, I'm -- I don't want to put words in
14  your mouth.  And if it sounds like I am, I'm a lawyer and
15  that's what we get paid to do.
16       A.   Yes.
17       Q.   You need to tell me, not that you're lying, but
18  that you honestly believe that life is always better than
19  death.  Have you already made your mind up as to that?
20            THE COURT:  She's already answered that
21  question, counsel.  Ask her how she would answer that
22  third question based on the evidence.
23       Q.   (BY MS. FISCHER)  Well -- you're going to hear
24  evidence about this question.
25       A.   Uh-huh.

1       Q.   You're going to hear about the offense, the

2   evidence, the circumstances, his role.  You're going to

3   hear all of those things.  And then you're going to have

4   to answer this question, do I think life in prison is

5   better than death?

6                 THE COURT:  That's not the question,

7   counsel.  Is there sufficient mitigating circumstances to

8   warrant a sentence of life.  The question is not life

9   better than death.  Is there sufficient mitigating

10  circumstances to warrant a sentence of imprisonment of

11  life rather than death?

12      Q.   (BY MS. FISCHER)  But, Ms. Trevino, you always

13  think that someone should receive a life sentence; is

14  that right?

15      A.   Well, why take another life?

16      Q.   Okay.  But this question is going to ask you if

17  there's something about his background that should make

18  him receive life versus death, okay?  If there's

19  something about his background that makes you think that

20  life is better than death.  But you haven't even

21  considered any of these things yet and you're already

22  telling me you know how you're going to answer that

23  question because you always say that life is better than

24  death.

25      A.   I didn't say I was ready to answer the

1   question.  I only said that I would take everything under

2   consideration.

3        Q.   Okay.

4        A.   I didn't say I was going to say "yes" to

5   everything.

6        Q.   Okay.  But you told me a minute ago that you

7   were always going to vote for the life sentence.

8        A.   Well, you're confusing me.

9        Q.   Okay.  And I don't mean to confuse you,

10  Ms. Trevino.  I don't mean to confuse you.  I just want

11  to know if you've already made your mind up about how you

12  feel about the death penalty.  And you keep telling me

13  over and over again that you could never, you know, vote

14  for the death penalty, that you could never make that

15  your final assessment after answering these questions

16  because of what you feel in your heart.

17            But if you answer this question such that

18  you don't find that there is anything good about the

19  person to receive a life sentence, then the defendant

20  will receive the death penalty.  Can you do that?

21       A.   Well, it's not going to be up to me.  There's

22  going to be more jurors, aren't there?

23       Q.   Uh-huh.  But, Ms. Trevino, you can't have

24  already made your mind up.  And that's what I'm concerned

25  about.  You keep telling me over and over again that you

STATE OF TEXAS VS. RUBEN GUTIERREZ                           152

1    have this feeling in here and that it's a truthful,
2    honest feeling.  And I'm not trying to get you to change
3    your feeling, okay?  I'm not.  I'm not trying to do that.
4                    But I am very concerned because I sit
5    right here in this chair, and it's my job to represent
6    the people of Cameron County.  And I have to make sure
7    that the -- and the people of Cameron County follow these
8    laws, okay?  And then these laws, they tell me as an
9    assistant district attorney, "You go out there and you
10   follow the law."
11                   And the law says if someone deserves a
12   death sentence, that it's my job to advocate for it,
13   okay?  And so, I'm trying to do my job and you keep
14   telling me that you've already made your mind up.  And
15   so, you can't be fair to me if you've already made your
16   mind up.  And it's not just me you're not being fair to.
17   It's the people of this county.
18                   And so, if you can't be fair, that's okay.
19   I'm not trying to get you to change your mind, but I need
20   for you to tell me.  And you've been telling everybody a
21   lot of different things, but when I come back to asking
22   you if you've already made your mind up, you keep saying
23   that you have.
24        A.   Well, what do you want me to say?
25        Q.   I want you to tell me -- just tell me the

1    truth.  Okay.  And what the question is going to ask

2    you -- let's start up here at the top again.  Yes, I

3    think he's going to hurt again.  Yes, he caused the

4    death, okay?  So we already know he's a bad guy at this

5    point.

6          A.    Uh-huh.

7          Q.    So, then you get to this question.  The law

8    says I have to consider everything I hear.  I have to

9    consider the evidence.  I have to consider what I hear

10   about the case.  I have to consider his background, and I

11   have to consider his role.  And then is there something

12   about what I hear -- is there something about what I hear

13   that means a life sentence should be imposed rather than

14   a death sentence?

15                Okay.  So your job's not over.  Yes, he's

16   going to hurt again.  Yes, he caused the death.  And then

17   you're going to hear about him.  You're going to hear

18   about what kind of person he is, and you're going to hear

19   about what type of crime he committed.

20         A.    Uh-huh.

21         Q.    And then you're going to be asked, is there

22   something about that that makes him less morally

23   blameworthy for that offense so that we should give him

24   life rather than death, okay?

25                Now, when you're asked that question, no

STATE OF TEXAS VS. RUBEN GUTIERREZ                    154

1   matter what you hear about a person, even if he was a

2   horrible person, even if he did kill his own mother, are

3   you always going to be answering, "No matter what I hear,

4   even if there isn't anything mitigating, there's nothing

5   good about him to make him less to blame, I think that he

6   should receive life"?

7        A.   What if I said that I need to be -- I need to

8   hear about his background?

9        Q.   Uh-huh.

10            THE COURT:  She needs a hypothetical.

11       A.   I just can't be sitting here and I don't even

12  know the person.

13       Q.   (BY MS. FISCHER)  Exactly.

14            THE COURT:  Let me put it this way.  On

15  the hypothetical that Mr. Galarza gave you, remember?

16            MS. TREVINO:  Yes, sir.

17            THE COURT:  About all the robberies and

18  murders?

19            MS. TREVINO:  Yes, sir.

20            THE COURT:  In that hypothetical, would

21  you say, "Yes, he deserves life because I don't believe

22  in the death penalty"?  Would you automatically answer

23  life on that even though all the evidence shows there's

24  nothing good about him?  That's what the evidence shows.

25            MS. TREVINO:  How can I answer this?

1           THE COURT:  The question is, are you going
2   to answer the question based on the evidence, if the
3   evidence shows he's not a good person and that answer
4   should be "no" --
5           MS. TREVINO:  Okay.
6           THE COURT:  -- or are you always going to
7   answer "yes" because you don't want anybody to get the
8   death penalty regardless of what the evidence shows?
9           MS. TREVINO:  Would I be wrong in saying
10  that?
11          THE COURT:  In saying what?
12          MS. TREVINO:  In saying that, yes, I want
13  everybody to get life instead of the death penalty.
14          MS. FISCHER:  No, Ms. Trevino, that's not
15  wrong.
16          THE COURT:  There's nothing wrong with
17  saying that.  The question is, once -- if you are a
18  juror, okay?  If you are a juror and the evidence shows
19  that the answer to the last question should be "no"
20  because there's nothing good about him and that's -- the
21  evidence shows that, would you answer "yes" going against
22  the evidence because you're against the death penalty?
23          MS. TREVINO:  Oh, my.
24          THE COURT:  In other words -- let me try
25  to put it this way.  Before you're selected as a juror,

STATE OF TEXAS VS. RUBEN GUTIERREZ                               156

1   you have to consider both --
2                   MS. TREVINO:  Uh-huh.
3                   THE COURT:  -- life imprisonment or the
4   death penalty --
5                   MS. TREVINO:  Uh-huh.
6                   THE COURT:  -- to sit on a jury, on this
7   jury, okay?  If you can never consider the death penalty,
8   then you cannot sit on this jury, because a juror in this
9   case has to consider both, okay?
10                   MS. TREVINO:  Uh-huh.
11                   THE COURT:  Now, there's people that have
12   feelings against the death penalty.  But some people say,
13   "If I'm a juror in this case, I can put those feelings
14   aside, listen to the evidence and make a determination
15   based on the law and the evidence.  And if the law and
16   the evidence shows this person should receive the death
17   penalty, then that's the way I have to go because I'm
18   going to follow the law and the evidence."
19                   Or some people say, "I'm sorry.  My
20   feelings about the death penalty are so strong I cannot
21   follow the law and the evidence because I feel strongly
22   about the death penalty and I'm always going to give life
23   rather than death, no matter what the law and the
24   evidence say."
25                   Which one are you going to fall into?  And

STATE OF TEXAS VS. RUBEN GUTIERREZ                        157

1    it's just your true feelings.  That's all we're asking

2    for.

3                    MS. TREVINO:  Okay.  Even if I was opposed

4    to the death penalty, I will sit in a jury and I would

5    take everything into consideration, even if I was opposed

6    to the death penalty.

7                    THE COURT:  And answer those questions --

8                    MS. TREVINO:  And answer those questions

9    truthfully.

10                   THE COURT:  Truthfully, based on the law

11   and the evidence, even though it may mean that -- a

12   defendant may get the death penalty?

13                   MS. TREVINO:  Yes, sir.

14                   THE COURT:  That's all we're asking you.

15                   MS. TREVINO:  Yes, sir.

16        Q.   (BY MS. FISCHER)  Okay.  There's two other

17   things I want to talk to you very briefly about because

18   you brought them up in the beginning and I think it's

19   real important that you tell the Judge what your feeling

20   about that is, and that's the age of your sons.

21        A.   Uh-huh.

22        Q.   Okay.  Your sons are right about the same age

23   the defendant is.  Is that going to make a decision -- is

24   that going to play a role in your decision-making process

25   on this question?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          158

```
 1              THE COURT:  Is that going to affect you,
 2   in other words?
 3        A.   Would it affect me because of their age
 4   because --
 5        Q.   (BY MS. FISCHER)  You mentioned that your own
 6   sons are close in age.  You said that.
 7        A.   Right.
 8        Q.   You said, "I know and I understand because my
 9   own sons could be in this situation," okay?
10        A.   Uh-huh.
11        Q.   That's another one of those personal feelings
12   that you have.  Is it going to affect your answer to this
13   question?
14        A.   (No response).
15        Q.   Once again, there are no wrong answers, okay?
16   I think you feel like we're giving you a test and we're
17   trying to make you give the wrong answers or give the
18   right answers.  We're not.  If it's going to affect you,
19   that's fine.  I just want you to tell me.  If it's not,
20   then I just want you to tell me.
21        A.   No, I don't think it would affect me.
22        Q.   Okay.  All right.  You're going to have to set
23   those personal feelings aside.  Can you do that?
24        A.   Yes, I would set my feelings aside.
25        Q.   Okay.  Next part, personal culpability of the
```

1   defendant.  You're going to be asked to consider under

2   like this law of parties question -- and you brought this

3   up before again, also.  I'm just going to ask you again

4   one more time about the person who just anticipated, the

5   person who wasn't the triggerman, the person who didn't

6   pull the trigger, okay?  You're going to be asked to

7   consider that down here.  You're going to be asked to

8   consider that person's role.

9        A.    Uh-huh.

10       Q.    Knowing that the person who didn't do the

11  shooting, knowing that he can be eligible for the death

12  penalty, is that always going to affect your decision?

13       A.    No, it wouldn't.

14       Q.    Okay.  All right.  The bottom line, then,

15  Ms. Trevino, is what -- after talking to you -- we've

16  been talking to you for a long time now.

17       A.    Yes.

18       Q.    It's not over.  He gets to talk to you, too.

19  Sorry.  The bottom line is you have not made your mind up

20  about whether or not you think someone should receive

21  life in prison versus the death penalty?

22       A.    Yes, I have.  I've made my mind up.

23       Q.    Ms. Trevino, that's what I'm concerned about.

24  Tell me -- if you've made your mind up, tell me what your

25  mind is made up to.

STATE OF TEXAS VS. RUBEN GUTIERREZ                      160

```
1                    THE COURT:  In this case or --
2                    MS. TREVINO:  No, not in this case.
3                    THE COURT:  Okay.  Well --
4        Q.   (BY MS. FISCHER)  In any case have you already
5   made your mind up where the death penalty is an option?
6        A.   I said that I would make -- that I would
7   consider the death penalty after looking at the --
8                    THE COURT:  Evidence?
9        A.   -- evidence.
10       Q.   (BY MS. FISCHER)  Okay.  But then that means
11  that you haven't made your mind up.
12       A.   Well, how can I make up my mind if I'm not -- I
13  don't even -- like I said --
14       Q.   Well, exactly --
15                   THE COURT:  Let her finish.
16       A.   I have -- I mean, I haven't even been in the
17  jury.  I don't even know the person.
18       Q.   (BY MS. FISCHER)  Right.
19       A.   I don't know the evidence.  I don't know
20  anything.
21       Q.   Uh-huh.  But that's like what the Judge was
22  telling you just a minute ago.  He gave you a very good
23  hypothetical.  There are some people who fit in this
24  category over here, life.
25       A.   Uh-huh.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           161

1      Q.   "No matter what happens, I cannot do the death
2  penalty and I'm always going to say life."
3            And then there are people on this side who
4  say, "Do you know what?  I don't like the death penalty,
5  but I'm going to follow the law and I'm going to listen
6  to what I see.  And if I see the death penalty's
7  appropriate, then I'm going to do that."
8      A.   Uh-huh.
9      Q.   Or, "If I see life is appropriate, I'm going to
10  do that."  These people haven't made their mind up yet.
11  They're keeping both options open.  These people over
12  here, life.  It has to be that way.
13      A.   Uh-huh.
14      Q.   Now, which group are you going to fit in?
15      A.   Okay.  I said that -- the second one, you said
16  that how can I say the death penalty when I said life.
17  But I had already told the Judge that I would look at the
18  circumstances.
19      Q.   So you're going to keep those options open?
20      A.   Yes.
21      Q.   So then you haven't made your mind up?
22      A.   No, I haven't made up my mind.
23      Q.   So you can be open to the death penalty as a
24  consideration?
25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              162

1      Q.   You can do that?

2      A.   Yes.

3      Q.   Okay.  That's all I want, Ms. Trevino.  Okay.

4           MS. FISCHER:  I don't have any further

5   questions, Judge.  Oh, actually, I'm sorry.  I'm sorry.

6   I forgot to ask her one other thing.

7           THE COURT:  Go ahead.

8      Q.   (BY MS. FISCHER)  Your son-in-law is a police

9   officer.  Does that sound right?

10     A.   No, he's not a police officer.

11     Q.   Okay.

12     A.   He serves warrants in La Feria.  He's -- he

13  just went to Edinburg this morning to apply for a

14  position --

15     Q.   Okay.

16     A.   -- as police offer.

17     Q.   We're going to have a lot of policemen coming

18  in this courtroom, okay?  The law says you have to treat

19  them the same even just because --

20     A.   Right.

21     Q.   You know, you can't just believe what they say

22  because they're cops.  Can you do that?

23     A.   I think I --

24     Q.   You understand how that works?

25     A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                         163

1      Q.   I mean, you know, some people like their
2   son-in-law so much that they would believe anything they
3   said, you know?
4      A.   Yes.  Yeah, yeah.
5      Q.   Okay.
6      A.   I would take that into consideration, also.
7      Q.   Okay.  And then you also said that you know
8   someone who's been to the penitentiary before.  Who is
9   that?
10      A.   Oh, I know a few.
11      Q.   Okay.
12      A.   Should I mention their names?
13      Q.   Well, I just want to make sure that you don't
14   have any -- do you know anyone who's been to prison for
15   murder before?
16      A.   Oh, no, no, not for murder.
17      Q.   Okay.  Nothing about what you know about them
18   is going to cause you to be unfair in this case?
19      A.   No, no.  Huh-uh.
20      Q.   Okay.  All right.  And then the last thing is
21   you said that at one point in time you had to file a
22   complaint against your husband?
23      A.   Uh-huh.
24      Q.   Okay.  When was that?
25      A.   I think it was 1989.

STATE OF TEXAS VS. RUBEN GUTIERREZ                            164

1      Q.   Okay.  Did you have to come to court and did

2   they file charges against him or anything official like

3   that?

4      A.   They put him in jail.

5      Q.   All right.  Do you feel that the system handled

6   everything fairly?  Did they -- did the system handle

7   things for you?

8      A.   Yes.  Uh-huh.

9      Q.   Okay.  Is there anything that you want to ask

10  me that I haven't talked to you about?

11     A.   No.  I'm just scared.

12     Q.   It's okay, Ms. Trevino.

13     A.   I've never been here before.

14     Q.   That's okay.  You did a great job up to now.

15     A.   I'm nervous.

16     Q.   There's no problem.  This is the last time we

17  get to talk.  So if there's anything that you want to ask

18  me, this is the time to do it, okay?

19     A.   No, I don't think I have any questions.

20     Q.   Thank you, ma'am.

21     A.   You're welcome.

22              MR. GALARZA:  May I proceed, Judge?

23              THE COURT:  Mr. Galarza, go ahead.

24

25

1          **VOIR DIRE EXAMINATION**

2     **BY MR. GALARZA:**

3          Q.   Ms. Trevino, let me just ask you some

4     questions; and if you don't understand, just go ahead and

5     tell me to repeat them and I'll go ahead and do that.

6          A.   Yes, sir.

7          Q.   And we just -- like Ms. Fischer said, we're

8     just trying to get a fair and impartial jury so we can go

9     ahead and proceed with the case later on.

10              Okay.  I believe you stated you don't know

11    any of the parties, is that correct, any of the attorneys

12    or accused people?

13         A.   No, I don't.

14         Q.   And you didn't know any of the witnesses, the

15    names that were called up?

16         A.   I didn't.

17         Q.   Okay.  Let me tell you a couple of names, also,

18    and just let me know if you know them or not.  Claudia

19    Leyva, she's a dispatcher with the Brownsville Police

20    Department?

21         A.   I don't know her.

22         Q.   Tina Hauff, she lives here in Brownsville?

23         A.   No, sir.

24         Q.   Roberto Gonzalez, he's an inmate at the Cameron

25    County Jail here in Brownsville?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          166

```
 1        A.    No.
 2        Q.    Tino Ortiz?
 3        A.    No.
 4        Q.    Escolastica Harrison, also known as Escolastica
 5   Cuellar?
 6        A.    No.  I didn't know her.
 7        Q.    Okay.  If it happens that you do know one of
 8   them, one of the witnesses, because maybe they're a
 9   friend and they have a different last name now, would
10   that affect you in any way?  Their testimony, would you
11   automatically believe that they're more credible just
12   because you know them?
13        A.    I don't think so.
14        Q.    So you would just listen to their testimony and
15   give it the weight it deserves?
16        A.    Yes.
17        Q.    Let me go ahead and explain to you a procedure
18   that usually happens.  When a person is arrested for an
19   offense, like for a burglary, do you believe that that
20   person is already guilty for the offense?
21        A.    No, I don't think so.
22        Q.    Why not?
23        A.    Because you have to look at the circumstances.
24        Q.    Okay.  Because he hasn't gone through the
25   court --
```

1        A.    Right.

2        Q.    -- procedure and they haven't presented all the

3   evidence; is that correct?

4        A.    Right.

5        Q.    So what usually happens when a person is

6   arrested, a law enforcement agency goes ahead and

7   prepares the files, which means they go ahead and get all

8   the statements that they need, pictures or anything else

9   they might need.  Once their file is complete, then

10  they'll go ahead and turn it over to the District

11  Attorney's office.

12              If it's a felony, then at that point the

13  D.A.'s office will go ahead and present it to the grand

14  jury.  And if the grand jury believes that there's

15  sufficient evidence to proceed with the case, then at

16  that point what the grand jury foreman does is he'll sign

17  what we call an indictment, okay?

18       A.    Uh-huh.

19       Q.    An indictment is just what tells you what a

20  person is being charged with, okay?

21       A.    Okay.

22       Q.    At that point, then the indictment is filed

23  with one of the district courts; and this one, of course,

24  was filed here in the 107th.  That's when we go through

25  the procedure of picking a jury and trying to present the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          168

1    evidence and do everything else.

2                Just because the grand jury has signed an

3    indictment and it's been filed here in the district

4    court, would you agree with me that the person is still

5    innocent?  He's still not guilty of the offense?

6        A.   I would agree he's still innocent.

7        Q.   Because the jury still has not heard all the

8    evidence --

9        A.   Right.

10       Q.   -- and they haven't determined guilt or

11   innocence --

12       A.   Right.

13       Q.   -- is that correct?

14       A.   Uh-huh.

15       Q.   Okay.  So you would agree with me that all

16   persons are presumed innocent until proven guilty?

17       A.   Until proven guilty.

18       Q.   In order for the State to prove their case,

19   they need to prove it beyond a reasonable doubt.  And

20   that's the definition that you see in the left-hand side.

21       A.   Uh-huh.

22       Q.   And let me read it to you, "A reasonable doubt

23   is a doubt based on reason and common sense after a

24   careful and impartial consideration of all the evidence

25   in this case.  It is the kind of doubt that would make a

STATE OF TEXAS VS. RUBEN GUTIERREZ                          169

1  reasonable person hesitate to act in the most important
2  of his own affairs."
3              Okay.   The second part reads, "Reasonable
4  doubt, therefore, must be proof of such a convincing
5  character that you would be willing to rely and act upon
6  it without hesitation in the most important of your own
7  affairs."
8              What mainly they're asking you to do at
9  this point, they're asking you to use your everyday
10 reasoning, everyday common sense to determine or to
11 believe the testimony of one witness over the other
12 witness or to determine who's telling the truth and who's
13 not telling the truth, okay?
14             You look at their demeanor, you look at
15 the way they testify to see who's telling the truth and
16 who's lying, okay?  Have you -- what usually is done,
17 like an example, have you ever bought a home?  Have you
18 purchased a home before, a residence, a house?
19     A.    No, sir.
20     Q.    Have you purchased a car?
21     A.    Yes, sir.
22     Q.    Okay.  When you first went to buy the car, if
23 the car was selling for 12,000, and then once you saw it,
24 it was only worth 8,000, would you automatically pay the
25 $12,000 for it?  If it was -- if it was selling for

1    12,000 and once you saw it, it was only worth $8,000.

2    Once you went through the bank or through the blue book,

3    you saw that it was only worth $8,000, you would not pay

4    the $12,000; is that correct?

5        A.    I wouldn't pay the 12,000.

6        Q.    Okay.  Because your common sense would tell you

7    after you looked at everything that this car is not worth

8    the $12,000.

9        A.    Right.

10       Q.    Okay.  That's the same thing that we're asking

11   you to do in this type of case, just use your common

12   sense to determine if they have proved every single

13   element beyond a reasonable doubt.

14       A.    Uh-huh.

15       Q.    The elements, I think I already kind of went

16   through them with you a little while ago.  There are six

17   elements in this case, and what we're talking about is a

18   capital murder case.

19               Element number one would be the defendant;

20   number two, on or about the 5th day of September, 1998;

21   number three, in Cameron County, Texas; number four,

22   intentionally; number five, caused the death of an

23   individual by stabbing the individual with a screwdriver

24   or object unknown to the grand jury, or by striking the

25   individual with an object unknown to the grand jury, or

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    171

1    causing the individual to impact with an object unknown

2    to the grand jury; and number six, and the said defendant

3    was then and there in the course of committing and/or

4    attempting to commit the offense of robbery of an

5    individual.  Okay.

6                    In order for you to find a person guilty

7    of capital murder with these elements, the State needs to

8    prove every single element beyond a reasonable doubt,

9    okay?

10                   So have you ever played the lottery on

11   Wednesdays and Saturdays, the one with six numbers?

12        A.    No.  I've never played it.

13        Q.    Have you ever heard of it?

14        A.    Yes, I have.

15        Q.    So if you played that lottery, if you only get

16   five out of the six numbers, do you automatically get the

17   whole jackpot?

18        A.    No.

19        Q.    Because in order for you to get the whole

20   jackpot, you need to get all six numbers; is that

21   correct?

22        A.    All six numbers.

23        Q.    That's the same thing we're asking you to do in

24   this type of case.  That's the same thing you need to do.

25   In order for you to find the person guilty of capital

STATE OF TEXAS VS. RUBEN GUTIERREZ                    172

1    murder, they need to prove every single element, all six

2    elements beyond a reasonable doubt, okay?

3        A.    Uh-huh.

4        Q.    Like an example, robbery, that's -- would you

5    agree with me that that's a crime that's done against a

6    person?  For an example, like if I go up to a clerk -- or

7    I go to a person walking down the street and I tell them,

8    "Give me your watch," and I have a gun, okay, I'm

9    committing robbery because I'm threatening them, okay,

10   with a gun.

11           Or as I'm trying to take the watch away, I

12   hurt him, I commit bodily injury, I'm committing robbery

13   at that instance, okay?  That's one type of felony.

14       A.    Uh-huh.

15       Q.    Okay.  Another type of felony is like burglary.

16   If they go into a building, if they come into the

17   courthouse and take some of the chairs, they're

18   committing burglary of a building?  Okay.

19           It could also happen in the residence.  If

20   they go into your house and take jewelry or something,

21   then they're committing burglary of habitation.  Okay.

22   That's another type of felony.  Okay.

23           So, looking back at element number six

24   where it says, "And the said defendant was then and there

25   in the course of committing or attempting to commit the

1    offense of robbery of an individual," okay, if after you
2    heard all the evidence, okay, and you went through all
3    the first five elements, and as to your thinking they had
4    proved every single element beyond a reasonable doubt,
5    number one through number five, okay, but in element
6    number six what they're saying that they're going to
7    prove to you is robbery -- is that correct?  They're
8    saying that they're going to prove to you that the
9    individual is attempting to commit the offense of
10   robbery.
11        A.    Uh-huh.
12        Q.    Okay.  If once you heard all the evidence and
13   once you were going through that element, okay, and then
14   you realized, "Well, they did not prove to me robbery.
15   They proved to me burglary of a building or burglary of
16   habitation," okay, if they did not prove robbery, they
17   proved burglary, what would your verdict be at that
18   point?
19        A.    Would it --
20        Q.    As to capital murder, what would it be?
21        A.    Wouldn't robbery and burglary be the same
22   thing?
23        Q.    Because there's two different felonies.  And
24   remember the lottery, in order for you to win --
25        A.    Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              174

```
 1        Q.    -- you would have to have all six numbers.
 2        A.    Okay.
 3        Q.    So it's like saying if your sixth number was a
 4   four, and number five came up, okay, just because you're
 5   real close you still don't win the lottery; is that
 6   correct?
 7        A.    Uh-huh.
 8        Q.    Because you need to have four.
 9        A.    Right.
10        Q.    Okay.  So, it's the same thing as element
11   number six.
12        A.    Uh-huh.
13        Q.    What they're saying that they're going to prove
14   to you is that he was attempting to commit the offense of
15   robbery.  That's what they're telling you that they're
16   going to prove to you.
17        A.    Uh-huh.
18        Q.    But if they prove to you -- after you went
19   through all the evidence that you had and you talked
20   about it and you realized they did not prove robbery,
21   they proved burglary, okay, at that point what would your
22   verdict be of capital murder?  Would it be guilty or not
23   guilty?  Remember they need to prove every single
24   element.
25        A.    Not guilty.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    175

```
 1        Q.   Okay.  Because they did not prove --
 2        A.   Right.
 3        Q.   -- element number six; is that correct?
 4        A.   Right.  Uh-huh.
 5        Q.   Okay.  So it could be -- if they did not prove
 6   element number six, you could find him guilty of murder
 7   because the other five were proved.
 8        A.   Uh-huh.
 9        Q.   Okay?
10        A.   Uh-huh.
11        Q.   Would you agree with me on that?
12        A.   I would agree.
13        Q.   Okay.  So you would agree with that if they did
14   not prove element number six, if they proved burglary,
15   and on there it actually says robbery, then you would
16   find him not guilty of capital murder?
17        A.   (Nods head).
18        Q.   Okay.  Here in Texas we have what's called a
19   bifurcated trial.  What that is is just a two-part trial.
20   The very first part is when we go through the evidence,
21   when we present the evidence to you, we -- the witnesses
22   testify, if there's any pictures, you go ahead and see
23   the pictures.
24             And then once we go ahead and close, when
25   we finish presenting everything to you, all the 12 jurors
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              176

1    will go back to the jury room.  You all will deliberate,

2    which means you all will talk about the case.  And then

3    at that point you all will decide if this person is

4    guilty or this person is not guilty.

5                     Okay.  Do you understand that if you all

6    find the person not guilty, then it stops right there?

7         A.    Uh-huh.

8         Q.    Okay.  So you all do not have to go into the

9    second part which is the sentencing.

10        A.    Right.

11        Q.    Okay.  But if you find the person guilty, then

12   at that point you have to go into the second part --

13        A.    Okay.

14        Q.    -- which is the sentencing.  How much will this

15   person get because of the offense that he committed,

16   okay?

17        A.    Uh-huh.

18        Q.    If you find him guilty of capital murder, we go

19   through the three questions that are up there --

20        A.    Uh-huh.

21        Q.    -- which is the ones that we've gone through

22   with you for a long time already.

23        A.    Right.

24        Q.    Okay.  If you find him not guilty of capital

25   murder but if you find him guilty of murder because they

STATE OF TEXAS VS. RUBEN GUTIERREZ                            177

1   did not prove element number six, then the sentencing
2   range for that offense is five to 99 or life which means
3   you can give him five, you can give him 99 or life, or
4   anything in between, okay?
5                    Would you be willing to follow that
6   procedure?
7        A.   I would.
8        Q.   Okay.  If you find him not guilty of capital
9   murder and not guilty of murder, but you find him guilty
10  of robbery which is a lesser included offense, okay, then
11  the sentencing range in that offense is from two to 20,
12  which means you can give him two, you can give him 20, or
13  you can give him anything in between, okay?
14                   Would you follow that procedure?
15       A.   I would.
16       Q.   Okay.  But if you find him guilty of capital
17  murder, then we go into the three issues that we went
18  through, okay?  You already stated you would follow --
19  take into consideration Number 1, answer yes or no, take
20  into consideration Number 2, answer yes or no, and then
21  take into consideration Number 3 and answer yes or no to
22  that one --
23       A.   Yes, sir.
24       Q.   -- is that correct?
25       A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                178

```
 1        Q.   Okay.  In order for you to answer "yes," for
 2   all the jury to answer "yes" to Question Number 1, all 12
 3   of you have to agree to "yes."
 4        A.   Right.
 5        Q.   And then you all bring us a "yes" answer, okay?
 6        A.   Uh-huh.
 7        Q.   In order for you all to answer "no" to Question
 8   Number 1, then only ten of you have to answer "no."  So
 9   ten of you can say "no," two of you can say "yes," and
10   you all can still come back with a "no" answer, okay?
11        A.   Okay.
12        Q.   And then if you all come back with a "no"
13   answer to Question Number 1, then it stops right there.
14        A.   Okay.
15        Q.   But if you all come back with a "yes," all 12
16   of you come back with "yes," then we go to Issue
17   Number 2.
18        A.   Okay.
19        Q.   Okay.  Then again evidence is presented to you.
20   Then you go into that question again.  If all 12 of you
21   answered "yes," then you bring us back a "yes" answer.
22        A.   Right.
23        Q.   Okay.  If ten of you answer "no" and two of you
24   answer "yes," then you can bring us back a "no" answer.
25        A.   Uh-huh.
```

1      Q.   Okay.  So if you bring us back a "no" answer,
2  then it stops right there.  But if you bring us back a
3  "yes" answer, then we go into Question Number 3.
4      A.   Okay.
5      Q.   And in Question Number 3, then at that point in
6  order -- that is the reverse of the other two, okay?  In
7  order for you all to say "no" to Question Number 3, all
8  12 of you have to agree to "no."
9      A.   Okay.
10     Q.   Do you understand that?
11     A.   Uh-huh.
12     Q.   Okay.  But in order for you all to say "yes,"
13  then only ten of you have to "yes," okay?  Ten of you can
14  say "yes" and two of you can say "no," okay?
15              You're willing to follow that?
16     A.   I'm willing to follow that.
17     Q.   Okay.  And in all three of them, in order for
18  all to come back -- like in the third one, in order for
19  you all to come back with a "no" like I spoke to you a
20  little while ago, maybe your feeling might be, "Well,
21  he's 17.  I believe that because he's 17 he deserves life
22  rather than death."  So you can give us a "yes" answer.
23              And then the next juror can say, well --
24  like Mr. Reyes and I in the hypothetical.  If he's the
25  one that's in trial, well, that juror can say, "Well, I

1   believe that he deserves life because he did not actually

2   shoot the clerk." So, therefore, that juror might say

3   "yes," okay? You all don't have to agree as to why it's

4   "yes."

5       A.   Uh-huh.

6       Q.   All you all have to do is just say "yes,"

7   whatever reason you all have, and then come back with a

8   "yes" answer, and then only ten of you have to say "yes."

9       A.   Okay.

10      Q.   The same thing as to Number 1 and Number 2,

11  okay? In order for you all to come back with a "no"

12  answer, all ten of you don't have to agree to why you all

13  are saying "no." The only thing is that you all have to

14  say "no," and then come back with a "no" answer, and only

15  ten of you have to agree. Do you understand that?

16      A.   I understand.

17      Q.   So the only thing you're doing as to these

18  three questions is bringing us back a yes or no answer.

19      A.   Okay.

20      Q.   Okay. You're willing to follow that?

21      A.   I am willing to follow that.

22      Q.   Okay. You understand that a person that's

23  being accused -- like if I was in trial, I have the right

24  to remain silent. I have the right not to give any

25  statement to the police officer. I have the right not to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    181

1    testify here in court.

2         A.   Uh-huh.

3         Q.   Okay.  Would you hold that against me if I

4    didn't testify or I did not talk to the police officer?

5         A.   No, I wouldn't.

6         Q.   Okay.  You would just listen to the evidence

7    and give it the weight that it deserves?

8         A.   Uh-huh.

9         Q.   Okay.  You understand that the -- a spouse,

10   like if me and my spouse went to Circle K.  And at that

11   point when we went in, we both agreed to commit robbery.

12   And as we went in, the clerk gave me a hard time and I

13   shot the clerk, okay?  All three of us were the only ones

14   that were there.  The clerk is dead.  So the only two

15   that know exactly what happened is my spouse and I, okay?

16        A.   Uh-huh.

17        Q.   You understand that my spouse does not have to

18   testify against me here in Texas, that that's the law

19   here in Texas that she does not have to testify?

20        A.   I understand.

21        Q.   Okay.  Would you hold it against me if my

22   spouse did not testify against me?

23        A.   No.

24        Q.   Okay.  You would just listen to the evidence

25   and not hold that against me?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          182

```
1        A.    (Nods head).
2        Q.    You understand that codefendants -- like an
3   example, Mr. Reyes and I, we both went into Circle K.  I
4   killed the clerk.  Mr. Reyes would be a codefendant,
5   okay?  We both would be defendants, but he would be a
6   codefendant if I was in trial.
7        A.    Uh-huh.
8        Q.    Okay.  So would you agree with me that
9   sometimes there's a plea bargain.  Like if I was in
10  trial, Mr. Reyes can agree with the State to get instead
11  of life or instead of death, he can say -- they can tell
12  him, "Well, we'll give you 30 years if you testify
13  against Mr. Galarza."
14       A.    Uh-huh.
15       Q.    Would you agree with me that that sometimes
16  happens?
17       A.    Yes.
18       Q.    Okay.  And he might get probation, he might get
19  his case dismissed if he agrees to testify against me.
20       A.    Uh-huh.
21       Q.    So would you agree with me that he has a reason
22  to testify if he's getting something in return?
23       A.    Yes.  Yes, I agree.
24       Q.    So he has a reason to testify against me?
25       A.    I agree.
```

1      Q.   Okay.  Would you agree with me that -- like in

2  the hypothetical, if it was only the clerk, and Mr. Reyes

3  and I that went into the Circle K, okay, only all three

4  of us know exactly what happened, okay?  So we really

5  don't know exactly what happened.  Mr. Reyes might be

6  lying.  Even if he would come here and testify, he might

7  be lying, but he has a reason to lie because he's getting

8  something in return.

9      A.   Do I agree with that?

10              THE COURT:  Do you believe it might

11 happen?

12     Q.   (BY MR. GALARZA)  Do you believe it might

13 happen?

14     A.   Oh, it might happen.  Uh-huh.

15     Q.   Okay.  And would you take this into

16 consideration that this might happen, that he might be

17 lying?

18     A.   I would take it into consideration.

19     Q.   You will agree with me that police officers and

20 doctors are human?

21     A.   Right.

22     Q.   Okay.  And since they're human, that they might

23 also make mistakes?

24     A.   Yes.

25     Q.   Okay.  And like all of us, in order to cover

STATE OF TEXAS VS. RUBEN GUTIERREZ                           184

1    our mistakes, they might lie in order to cover that

2    mistake.  Okay.  Would you take that into consideration?

3        A.   I would.

4        Q.   Okay.  You stated that you have a son-in-law

5    that's in law enforcement; is that correct?

6        A.   Right.

7        Q.   Nothing -- you don't automatically believe all

8    police officers just because he's in law enforcement; is

9    that correct?  You don't automatically believe that all

10   police officers say the truth?

11       A.   I don't believe that?

12       Q.   No.  Do you believe that police officers might

13   lie?

14       A.   Yes, I believe that they lie.

15       Q.   Okay.  So just because your son-in-law is in

16   law enforcement, that automatically doesn't make you

17   believe officers a lot more than other people?

18       A.   No, sir.

19       Q.   Have you heard anything about this case?

20       A.   No, sir.

21       Q.   Have you already formed an opinion about this

22   case?

23       A.   No, sir.

24       Q.   I believe you stated -- have you ever served in

25   prior jury service?  I believe -- have you ever been a

1    juror before?

2        A.   No.  No, no, no.

3        Q.   Like Mrs. Fischer said, this is the last time

4    we'll be able to talk to you and -- or you'll be able to

5    ask us any questions.  At this point do you have any

6    questions?

7        A.   No, sir.

8            MR. GALARZA:  That's all I have at this

9    time, Your Honor.

10           THE COURT:  All right.  Ms. Trevino, let

11   me ask you to step down for just one minute.  I need to

12   take up a legal matter and then I'll bring you back.

13           MS. TREVINO:  Okay.

14           THE COURT:  Just follow the bailiff.

15           MS. TREVINO:  Okay.

16           **(Prospective juror left the courtroom)**

17           THE COURT:  Is this venireperson

18   acceptable to the State?

19           MS. FISCHER:  Your Honor, at this time the

20   State's going to challenge her for cause.  She said time

21   and time again she's already made her mind up, that she

22   feels life is more appropriate than death, and that that

23   was her opinion, and she had already made her mind up

24   because her personal beliefs guide her in that decision.

25           THE COURT:  That'll be denied.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    186

```
1              MS. FISCHER:  We'll take her, Judge.
2              THE COURT:  She's acceptable?
3              MR. GALARZA:  Yes, she is.
4              THE COURT:  That's what you mean, you'll
5    take her?
6              MS. FISCHER:  Yes.
7              THE COURT:  I wasn't sure.
8              MR. GALARZA:  She's acceptable to us, Your
9    Honor.
10             THE COURT:  Okay.  Bring her in.
11             All right.  Ms. Trevino, you've been
12   chosen as an alternate juror which means that we have 12
13   jurors already.  You're an alternate which means you have
14   to come in like the jurors do, sit throughout the trial
15   like the jurors do.  But in case something happens to one
16   of the jurors, if they get sick or they can't come to
17   court because of their illness, then you would be the
18   first one to take their place.  Do you follow me?
19             MS. TREVINO:  Right.  I understand.
20             THE COURT:  Now, this case is going to
21   last about two weeks which means we're going to start
22   Friday.  It may go through next week and then the
23   following week for a couple of days.  Do you have any
24   problem with that schedule?
25             MS. TREVINO:  No, sir, except that I work
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              187

1    and I need to ask, you know, at work.

2                    THE COURT:  You'll be excused from your

3    employment.  We'll give you excuses here because you're

4    on jury service.

5                    MS. TREVINO:  Okay, sir.

6                    THE COURT:  Ask the bailiff where to get

7    the excuses.

8                    MS. TREVINO:  Okay.

9                    THE COURT:  Let me give you the oath.

10   Would you raise your right hand, please?  Do you swear

11   that in the case of the State of Texas against the

12   defendant you will a true verdict render according to the

13   law and the evidence, so help you God?

14                   MS. TREVINO:  I do.

15                   THE COURT:  All right.  I'll ask you to

16   follow the bailiff at this time --

17                   MS. TREVINO:  Okay.

18                   THE COURT:  -- and ask you to report to

19   the jury room at 9 a.m. Friday morning.

20                   MS. TREVINO:  Friday morning.

21                   THE COURT:  Friday morning at 9 a.m.

22                   MS. TREVINO:  Okay.

23                   THE COURT:  You're excused to go at this

24   time.

25                   MS. TREVINO:  Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           188

```
 1                    THE COURT:  Follow the bailiff.
 2                    MS. TREVINO:  Okay.
 3                    THE COURT:  Okay.  We'll be in recess for
 4    lunch.
 5                    MR. GALARZA:  1:30, Judge?
 6                    THE COURT:  1:30, yes.
 7                    (Lunch recess taken from 11:56 a.m. to
 8                    1:32 p.m.)
 9                    THE COURT:  Okay.  You may be seated.
10    Bring in -- is it Mr.?
11                    THE BAILIFF:  Yes, Your Honor.
12                    THE COURT:  Is it Gerdes?
13                    THE BAILIFF:  Yes, sir.
14                    THE COURT:  Good afternoon, sir.
15                    MR. GERDES:  Good afternoon.
16                    THE COURT:  How are you?
17                    MR. GERDES:  Great, sir.
18                    THE COURT:  Is it Gerdes?
19                    MR. GERDES:  Gerdes.
20                    THE COURT:  Gerdes.
21                    MR. GERDES:  Correct.
22                    THE COURT:  Please be seated.
23                    MR. GERDES:  Thank you.
24                    THE COURT:  First of all, let me apologize
25    for making you wait around in the morning and
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    189

1    rescheduling you for this afternoon.  Some of the

2    questioning takes longer than other times; and I never

3    can tell how long it's going to take.  But I appreciate

4    your patience in this matter.

5              MR. GERDES:  I understand.  I wish you had

6    cushions on that bench out there.  That's rough.

7              THE COURT:  I think the attorneys want to

8    ask you a few more questions.  And if you'll just do me

9    the favor of speaking into the microphone --

10             MR. GERDES:  Sure.

11             THE COURT:  -- we'll get ready to start.

12   You can adjust it if you'd like.

13                   **JACKIE GERDES,**

14      having been called as a prospective juror and, upon

15      his oath, was examined and testified as follows:

16                   **VOIR DIRE EXAMINATION**

17   **BY MS. FISCHER:**

18        Q.   Good afternoon, sir.

19        A.   Hi.

20        Q.   My name is Karen Fischer.  And Mr. Blaylock,

21   the one that you met last -- or a couple of Tuesdays ago

22   when you were here, he and I, we work for the Cameron

23   County District Attorney's Office.  That means we

24   represent the people of Cameron County here today.

25                   Now, I noticed -- and Mr. Blaylock is

STATE OF TEXAS VS. RUBEN GUTIERREZ                          190

1    downstairs taking care of some stuff.  He'll be back and

2    forth.  I noticed that you said you knew Mr. Blaylock.

3    Do you know Mr. Blaylock from any past dealings?

4         A.    No, no.  Absolutely not.  Strictly from name in

5    the newspaper.

6         Q.    Okay.  Yeah, his name has been in the paper a

7    couple of times.

8         A.    Right.  And that was my only reference to it.

9         Q.    Okay.  Anything about that, have any bad

10   feelings, any negative feelings toward anything about

11   Mr. Blaylock?

12        A.    Absolutely not.

13        Q.    Okay.  Anything about that going to cause you

14   to be unfair in this case?

15        A.    No.  Absolutely not.

16        Q.    What we're looking for is people who can be

17   fair, people who have not made up their minds one way or

18   another, people who can consider all the evidence in the

19   case which is why, you know, if you had any personal

20   biased feelings, that's what I'd want to know, okay?

21        A.    Sure.

22        Q.    Now, I know that this is not the first time

23   that you've ever had to come to jury duty.  You've been

24   in -- served on a jury before.

25        A.    Yes, that is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                               191

1      Q.   Okay.  Was that in Federal Court or in State
2   court?
3      A.   I've been in both.
4      Q.   Oh, okay.
5      A.   The last jury I exactly served on was in a
6   Federal case.
7      Q.   Okay.
8      A.   And I'm sorry.  I have not served on a civil
9   case.  I have gone through this process but have never
10  been selected.
11     Q.   Okay.  But now what about a criminal case here
12  in the district courts here like in this courthouse, have
13  you ever had a criminal case here?
14     A.   Criminal, no.  No.
15     Q.   Okay.  And you've gone through the process
16  before, but never -- no one has ever selected you?
17     A.   That's correct.
18     Q.   Okay.  I've noticed that you said you've been
19  interested before in the outcome of a criminal case.  Has
20  there ever been any particular case that you followed,
21  either in the papers or through Court TV or anything like
22  that?
23     A.   No, not really.  And I reference that mainly
24  to, you know, if there's some high level case going on in
25  the country, sure, you want to know the outcome.  But as

STATE OF TEXAS VS. RUBEN GUTIERREZ                       192

1   a general rule, I do not follow that sort of stuff.

2        Q.   Right.

3        A.   I do very little reading of it in the paper

4   because -- just because.

5        Q.   I understand.  When we asked you if you wanted

6   to be a juror in this case, you said not necessarily.

7   And you mentioned that you may have some work products or

8   work problems that may cause you some problems if this

9   case were to last more than two weeks.

10       A.   Correct.

11       Q.   We're expecting the case to last for about two

12  weeks, probably, you know, maybe five to eight working

13  days, something like that.

14       A.   Uh-huh.

15       Q.   Tell me what it is that would cause you to have

16  a problem concentrating on this case because of your

17  work.

18       A.   Well, I own an electrical contracting firm.

19  I'm an electrical contractor.  I employ something like

20  215 people.  I don't have too many idle moments.  And I'm

21  very easily distracted when it affects my business.

22            We're presently in the middle of about

23  three major contracts which amounts to probably four to

24  $5 million worth of work that if I don't get it, it will

25  go to an out-of-town contractor.  I'm very selfish.  I

STATE OF TEXAS VS. RUBEN GUTIERREZ                          193

1   want the work in town, and I want to do it.

2            Yes, I would be upset if I were selected

3   for that reason, but I would do the job that you chose me

4   to do.  I'm not going to do backflips quite honestly,

5   but --

6        Q.   I understand.

7        A.   -- I have that responsibility to do; and that's

8   really about it.

9        Q.   Well, on the one hand, that's a great thing

10  about our constitution.  It allows us to have a jury of

11  our peers, you know.  If the only people we could get to

12  come on jury service were people who couldn't find work,

13  you know, that wouldn't be very fair.

14       A.   That's correct.  I understand that.  Mainly

15  relaying my feelings that I would do what I have to do,

16  but --

17       Q.   And I know you are the president of the

18  company.

19       A.   Yes, that's correct.

20       Q.   Who's running the company today while you're

21  here?

22       A.   My newly-hired office manager.

23       Q.   Okay.  How newly hired is that?

24       A.   He's been there less than a year.

25       Q.   Okay.  All right.  The question is, can you

STATE OF TEXAS VS. RUBEN GUTIERREZ                           194

1   put -- we need your full attention.  And you understand
2   that.  This is a very important case.  This is a very
3   serious case.  And we need your full attention and we
4   need you to be able to concentrate for the time that
5   you're here.
6                   We work -- or Judge Euresti works very
7   hard.  He works every day from nine to five.  And we keep
8   a real tight trial schedule so that we can move things
9   along rather quickly.
10                  Would you be able to give us your
11  attention every day from nine to five or is there
12  something about work that would cause you to not be able
13  to concentrate on what's going on here in this courtroom?
14      A.   No.  I could concentrate on that.  After the
15  initial shock, I can settle down and do it.
16      Q.   Okay.  That's we need and that's what we
17  appreciate.
18                  Now, the State system is a lot different
19  from the Federal system.  So let me kind of explain to
20  you how the State criminal justice system works.  We have
21  a two-part trial system in the State of Texas.
22                  And the first half -- if you are a juror,
23  the first half of your job is to decide whether or not
24  the guilt -- the defendant is guilty of what he has been
25  accused of.  Such as in this particular -- in this

STATE OF TEXAS VS. RUBEN GUTIERREZ                         195

1    particular case, he has been accused of committing the

2    murder of Ms. Harrison while in the course of committing

3    robbery.

4            If you were to find a defendant guilty of

5    capital murder, find the defendant guilty as charged,

6    then you would move into the punishment phase, which is a

7    little bit different from the Federal system because

8    there the Judge does the punishment.  In the State court,

9    the jury will set the punishment.

10           And in this particular case, because it is

11   a capital murder case and the death penalty is an option

12   for punishment, then you will not be asked the question,

13   "Do you think this particular defendant should receive

14   the death penalty?"  That will not be the question.

15           Instead, you are asked to look at three

16   special issues; and that's these three questions right

17   here.  And based on your answers to these three

18   questions, that then tells the Judge whether or not the

19   death penalty should be imposed, okay?

20      A.    Uh-huh.

21      Q.    But let's step back then for a minute and talk,

22   first of all, about your feelings about the death

23   penalty.  I've read through your questionnaire; and I

24   know that you are generally in favor and feel that it is

25   an appropriate punishment.  Tell me why you think that it

1    is an appropriate punishment.

2        A.    Well, I think there must be some deterrent to a

3    malicious type of crime of such a nature of murder.

4              I also think that it's necessary because

5    there's perhaps some people in life that do hideous

6    things, should probably be put away.  And that's really

7    my two main thoughts.

8              And I think I put in my answers there sort

9    of like a necessary evil.  You really don't want to see

10   someone killed, but on the other hand it's necessary for

11   our society.

12       Q.    Exactly.  In the State of Texas, you have to do

13   something more than just commit murder in order to even

14   be eligible for capital punishment.

15             The law gives us some examples -- or the

16   law gives us a set number of cases or a set number of

17   situations that warrant the death penalty, one of which

18   is if you kill a police officer while he's on duty.  The

19   law says that's more serious than just regular murder and

20   that's a capital offense.

21             So is killing a child under the age of

22   six.  That is a capital offense.  So is murder for hire.

23   You hire somebody to kill your parents, they say that's

24   more serious than just going out and committing murder.

25             The law also says if while in the course

1    of committing another felony crime, like robbery, you

2    kill someone, that is capital murder.

3                      And the hypothetical I think Mr. Blaylock

4    used last week or a couple of weeks ago was like when

5    somebody goes into the Circle K to rob the Circle K and

6    while they're robbing the Circle K, they kill the store

7    clerk, that is a capital offense.  How do you feel about

8    that law?

9         A.    I have nothing -- I think it's right.

10        Q.    Okay.

11        A.    I don't have a problem with that.

12        Q.    Okay.  Now, like I said before, if you get to

13   that point where you do find the defendant guilty of a

14   capital offense, then in the punishment phase of a

15   capital murder trial you'll have to consider these three

16   issues.

17                      The first question is going to ask you

18   whether there is a probability the defendant would commit

19   criminal acts of violence that would constitute a

20   continuing threat to society.  Basically, is he going to

21   be a danger in the future?  You're going to be asked to

22   answer that question.

23                      Do you think you could answer that

24   question?

25        A.    I think if there was proper evidence put

STATE OF TEXAS VS. RUBEN GUTIERREZ                    198

1   forward for you to analyze and -- you know, to make that

2   determination.

3        Q.   Like what?  What would you look at when you

4   were trying to make a decision about whether someone

5   would be a continuing threat?

6        A.   Past --

7        Q.   Okay.  Exactly.

8        A.   -- his past.  How he acts perhaps in court.

9        Q.   Uh-huh.  And you're going to be asked to make a

10  judgment call about whether he's going to hurt society

11  again.  When you think of the word "society," who do you

12  think of?

13       A.   Everyone, the general public.

14       Q.   Okay.  What about people who are incarcerated,

15  would you consider them part of society?

16       A.   I never thought about that.

17       Q.   Let's think about that for a minute.  You

18  have -- let's say you put someone in prison or you put

19  someone in the county jail just right down a block away

20  from us.  In any one given day, they, of course, come in

21  contact with other inmates, but they also come in contact

22  with the people like the bailiffs here who have to go

23  over and get them and bring them to court, the people

24  that work in the infirmary, the jailers that work there.

25                 Wouldn't you think that that is part --

STATE OF TEXAS VS. RUBEN GUTIERREZ                                199

1    it's a jail society, but a society nonetheless?

2        A.   But I was -- I would not consider it the same

3    as the free society, the people who are out here walking

4    the streets that have not committed a crime.

5        Q.   Exactly.  But do you think that even if they

6    were in jail they could continue to be a threat?

7        A.   To the jail society, yes.  Perhaps.

8        Q.   Exactly.  Which is just one segment.  I notice

9    that you live out on the Island.

10       A.   Yes.

11       Q.   That's -- you know, you have that society there

12   that is different from the society we have here in

13   Brownsville which once again, you know, is different from

14   the one in Harlingen.

15            Sometimes, you know, society can mean the

16   world as a whole and sometimes it's just the people in

17   this room.

18       A.   Uh-huh.

19       Q.   So you're going to be asked that question based

20   on would he hurt again in his society.

21       A.   Uh-huh.

22       Q.   Now, the next question that we go through, this

23   question has to do with the law of parties; and I think

24   Mr. Blaylock kind of explained that a little bit last

25   week.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    200

1      Basically where you have like the bank
2  robber situation where two people decide they're going to
3  rob a bank, and one of them goes in and actually does the
4  robbing, the other one is the get-away car driver.  Under
5  the law, they're equally guilty of robbery.  How do you
6  feel about that law?
7      A.   I agree with that.
8      Q.   Okay.  The law says that you can consider the
9  law of parties in being eligible for the death penalty.
10  So not only if you cause the death of the person -- let's
11  say in the Circle K hypothetical, not only if you go in
12  and cause the store clerk to die, actually do the
13  killing, shoot the clerk while robbing her, you, of
14  course, can be considered for the death penalty.  That's
15  kind of the first step.  That's the easy question.
16          The law says if you didn't actually cause
17  the death but you intended to kill the person, then you,
18  too, can be considered eligible for the death penalty.
19          And in a hypothetical situation, let's say
20  two people go in the store.  Let's say Mr. Blaylock and
21  I -- he's not here, so I can pick on him.  Mr. Blaylock
22  and I decide we're going to go into the Circle K and rob
23  it.  So while I'm over here getting beer and he's over
24  there getting the money, the store clerk won't give him
25  the money.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           201

1          Well, we both went in with knives.  We
2    were prepared to intimidate and scare if we had to.  So
3    we took our weapons with us.  And so since the store
4    clerk won't give him the money, I tell John, "Well, just
5    stab her.  Get the money and let's go."  So he does.
6          Do you think that I intended for that
7    store clerk to die?
8       A.   Yes.
9       Q.   Okay.  Do you think that I should be considered
10   eligible for the death penalty?
11      A.   Sure.
12      Q.   Okay.  Now, the last part of the law says if
13   you anticipated that a human life would be taken, then
14   you, too, can be considered eligible for the death
15   penalty.
16          In a situation where let's say we both go
17   into the Circle K, we both go in armed.  And we go into
18   our local neighborhood Circle K.  The clerk knows me.  I
19   go in there to buy cigarettes and beer.  I know her.  She
20   can pick me out of a lineup.
21          But we both go in with our knives.  We
22   both go in with the thought of, "We're going to get the
23   money no matter what."  We talk about it.  While I'm over
24   here getting the beer, Mr. Blaylock's over here getting
25   the money.  She won't give him the money, so he stabs

1    her.
2              Do you think I should have anticipated
3    that someone may have had to die in that robbery?
4         A.    What you just said, yes.
5         Q.    Okay.  Now, the law says if you anticipated
6    that a human life would be taken, then you could be
7    considered eligible for the death penalty, even if you're
8    not what we would call like the triggerman.  How do you
9    feel about that law?
10        A.    I would agree with that.
11        Q.    Okay.  Now, the last question -- so, you know,
12   if you do believe they're going to be a threat to society
13   and you do believe that they actually caused or intended
14   or anticipated the death, you go down to the last
15   question.
16             And here, the law says you must take into
17   consideration the evidence you hear in the -- about the
18   case in this courtroom, the circumstances surrounding the
19   offense, the defendant's character and background, and
20   then the personal moral culpability of the defendant.
21             You have to take those four things into
22   consideration.  And then you are asked the question, "Is
23   there something about one of those four things that is
24   mitigating that would warrant a life sentence versus a
25   death sentence?"  Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              203

```
1              And mitigating, I'm going to tell what you
2   the legal definition is.  The legal definition of
3   mitigation is something that makes you less morally
4   blameworthy for the particular offense, less to blame for
5   causing the death of that person.
6              You may find something that makes -- that
7   is mitigating and makes them less morally blameworthy.
8   You may find something.  You may not find anything, but
9   you're asked to consider and then make the decision.
10             Can you consider both options?  Can you
11  consider those four things and answer this question based
12  on what you hear about the defendant and his background
13  and the offense?
14       A.   Yes.
15       Q.   And basically the reason why I'm asking you
16  this question is some people come sit into this courtroom
17  with their mind set that, "If I think the defendant's
18  guilty of capital murder, I'm going to give him the death
19  penalty no matter what."
20       A.   Uh-huh.
21       Q.   The law says you can't do that, you know.  And
22  some folks kind of have the reverse psychology.  They go,
23  "No matter what I hear about how bad the crime is, I
24  think life is always better than death."  You kind of
25  have people on both sides of that.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           204

1           What the law says is as a juror, you have
2    to be able to consider all of this evidence and consider
3    both options.  Can you do that?
4         A.   Yes.
5         Q.   Okay.  The -- this is the last time that you
6    and I get to visit because if you become a juror in the
7    case, we all take an oath that we will not communicate
8    with one another in a personal way because that would be
9    improper.
10          Is there anything that you want to ask me
11   or any questions that you have about either the system or
12   about this case in particular that would affect your jury
13   service?
14        A.   No, I don't believe so.  I really prior to
15   being called to jury duty had never -- or remember
16   reading anything about the case.  And the only time that
17   it did happen was after the jury was already served and
18   there was an article in the paper; and that's just about
19   as much as I know about it.
20        Q.   Now, from that article in the paper, is there
21   anything about that that has caused you to already make a
22   decision in this case?
23        A.   Not really, no.
24        Q.   Okay.  The -- Ms. Harrison was from
25   Brownsville.  She lived here all of her life.  I know

1    that you live out on the Island now.  Before you all

2    moved out to the Island, where did you all live?

3         A.   We lived on Cowen Terrace West.  We lived there

4    for about 23 or 24 years.

5         Q.   I'm sorry.  Where is that?

6         A.   Cowen Terrace.  It's near the airport in

7    Brownsville.

8         Q.   Oh, okay.  Okay.  This offense happened on the

9    north side, not really close to the airport, but kind of

10   down --

11        A.   Uh-huh.

12        Q.   -- from the airport.  Have you heard anything

13   about it or anything that would cause you -- already have

14   an opinion about the case?

15        A.   No, not at all.

16        Q.   Okay.  All right.  Then I don't have any other

17   questions.  Thank you.

18        A.   Thank you.

19                  MR. REYES:  May I proceed, Your Honor?

20                  THE COURT:  You may.

21                  **VOIR DIRE EXAMINATION**

22   BY MR. REYES:

23        Q.   Good afternoon, Mr. Gerdes.

24        A.   Good afternoon.

25        Q.   How are you?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    206

1        A.    Fine, sir.

2        Q.    My name is Daniel Reyes.  I'm one of the

3   attorneys that represents Mr. Gutierrez in this case.

4   I'm just going to go ahead and be asking you some more

5   questions from the answers that you gave --

6        A.    Sure.

7        Q.    -- in your questionnaire and just cover some

8   basic principles of law.  If you don't understand one of

9   my questions, just let me know and I'll rephrase it,

10  okay?

11       A.    Okay, sir.

12       Q.    You said you're the owner of Metro Electric?

13       A.    Yes, that's correct.

14       Q.    You all have businesses in McAllen also; is

15  that correct?

16       A.    Yes, that's correct.

17       Q.    You all have those white pick-ups with the blue

18  sign?

19       A.    Yes.

20       Q.    Is that your business?

21       A.    Absolutely.  Uh-huh.  There are numerous other

22  businesses with the same white trucks and blue signs.

23  Mine say Metro.

24       Q.    Metro Electric?

25       A.    Yes.

1    Q.    Okay.  I'm just curious because I've seen those

2    trucks before and I was just wondering if that was the

3    same business.

4    A.    Yes.  Yes, they are.

5    Q.    We talked to you two weeks ago about grand jury

6    indictments; do you remember that?

7    A.    Yes.  Uh-huh.  I sure do.

8    Q.    Remember we told you that a grand jury

9    indictment is simply the means whereby a person in a

10   felony prosecution is brought to trial and that

11   indictment cannot be used as any evidence as to guilt?

12   A.    That's correct.  I remember that.

13   Q.    And we told you that all the indictment is is a

14   piece of paper that tells the prosecution what it is that

15   they have to prove to a jury beyond a reasonable doubt,

16   and it tells the person who is being charged exactly what

17   he's being charged with.  Did you understand that?

18   A.    Yes.  Uh-huh.

19   Q.    Are all those principles that you agree when?

20   A.    Yes.  I have no problem with that.

21   Q.    And if the Judge were to instruct you that that

22   is the law in this State, would you be able to follow the

23   law?

24   A.    Yes.  That's correct.

25   Q.    We also talked to you about what's called the

1    presumption of innocence.  We told you that every person

2    that is charged with a crime in this country is presumed

3    to be innocent and that presumption stays with them until

4    the very end.  Do you agree with that?

5        A.    Yes.  That's correct.

6        Q.    And that presumption can only be overcome if

7    and only if the prosecution convinces the jury with

8    evidence beyond a reasonable doubt.

9        A.    Correct.

10       Q.    Do you understand that?

11       A.    Yes.  Uh-huh.

12       Q.    Is that something that you agree with?

13       A.    Yes, sir.

14       Q.    And if the Judge were to instruct you that that

15   is the law in this country, would you be able to follow

16   it?

17       A.    Yes.  Correct.

18       Q.    We also talked to you about the burden of

19   proof.  We told you that it's the prosecution's burden.

20   They brought the charges and now they're required by law

21   to prove them.  Did you understand that?

22       A.    Yes.

23       Q.    And they're required to prove their case beyond

24   a reasonable doubt.  Did you understand that?

25       A.    Yes.  Correct.

1      Q.   Basically what it's asking you to do is just to

2  use your reason and your common sense and carefully and

3  impartially consider all the evidence in the case.  Would

4  you do that?

5      A.   Sure.

6      Q.   And the evidence that they present to you must

7  be of such a convincing character, that you would not

8  only be willing to rely upon it, but you would be willing

9  to act upon it without hesitation.

10     A.   Yes, sir.

11     Q.   Do you understand that?

12     A.   Yes.  Uh-huh.

13     Q.   Would you be able to do that?

14     A.   Certainly.

15     Q.   The indictment is made up of what are called

16 elements.  And if you look at that chart right there

17 which is right next to the definition of a reasonable

18 doubt, those are the things that the State of Texas, the

19 six elements that they're required to prove to you

20 reasonable doubt.  Do you see that?

21     A.   Yes.  Uh-huh.

22     Q.   It's one through six.  For example, the first

23 element is Ruben Gutierrez, the defendant.  They have to

24 present enough evidence to you to convince you that that

25 person is the one that committed that crime beyond a

STATE OF TEXAS VS. RUBEN GUTIERREZ                                210

1    reasonable doubt.  Do you see that?

2        A.   Yes, sir.

3        Q.   And then you take element number two and then

4    you look at the evidence and then think to yourself, "Did

5    they convince me beyond a reasonable doubt?"  Do you see

6    that?

7        A.   Yes.

8        Q.   And then you go down to three, four, five and

9    six.  Do you understand that?

10       A.   Yes.  Uh-huh.

11       Q.   And let's say that -- for example, let's look

12   at element number six where it's talking about robbery.

13   Let's say that you're selected as a juror in a

14   hypothetical case and you're being asked to decide

15   whether a person is guilty or not guilty of capital

16   murder, of committing a murder while attempting to commit

17   or committing robbery.  But in your mind, for example, a

18   burglary of a habitation, a burglary of a home happened

19   and not a robbery.

20            And in this State they are two different

21   and distinct crimes.  Robbery is where you use some force

22   or a threat of force to take something from a person.  A

23   burglary is where you go into a home or a building and

24   take something from them.  Do you understand that?

25       A.   Yes.  Uh-huh.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          211

1    Q.   Let's say in a hypothetical case in your mind

2    they proved a burglary happened and not robbery as

3    they're alleging.  What would your verdict have to be

4    under our law?

5    A.   Well, from what you just said -- and I didn't

6    realize there was a difference --

7    Q.   There is a difference.

8    A.   -- between robbery and burglary.

9    Q.   Yes.

10   A.   Robbery would be by force?

11   Q.   When you use force or threat of force against a

12   person to take something from them.

13   A.   Okay.

14   Q.   Burglary is when you go into a building, for

15   example, a home or a building and just take something

16   from them.

17   A.   Okay.  Then I'm sorry.  Would you repeat your

18   question?

19   Q.   Yes.  If in that hypothetical case you were

20   being asked to reach a verdict, okay, and the

21   hypothetical case is where they're alleging robbery --

22   A.   Uh-huh.

23   Q.   -- while in the course of committing -- I mean,

24   murder while in the course of committing or attempting to

25   commit robbery, then what would your verdict have to be

1   under our law?

2       A.    Based on it being a burglary.

3       Q.    Yes.

4       A.    That's the way I would have to act.

5       Q.    Would you say guilty or not guilty?

6       A.    If he were -- if all the evidence pointed that

7   way, I'd say he was guilty.

8       Q.    If they prove a robbery; is that correct?

9       A.    Yes.

10      Q.    But if they proved a burglary and not a

11  robbery, under our law what would your verdict have to

12  be?

13      A.    I don't understand the difference that you're

14  trying to get across to me.  I don't know --

15      Q.    It's different because they're alleging that a

16  murder occurred while in the course of attempting to

17  commit or committing robbery.  Do you see that?

18      A.    Yes, sir.

19      Q.    What they charged is what they have to prove.

20      A.    Okay.

21      Q.    Okay?

22      A.    Okay.

23      Q.    But if they bring you evidence to show it was a

24  burglary of a habitation, do you see how burglary is not

25  robbery?  It's a different crime.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          213

1      A.   Yes, but I'm trying to distinguish between the

2   two to answer your question.

3      Q.   Okay.  Well, my question is if they prove

4   another crime instead of robbery, what would your answer

5   have to be?

6      A.   It would have to be not guilty.

7      Q.   Okay.  Burglary of a habitation would be some

8   other crime, not robbery.

9      A.   Yes.

10      Q.   Do you understand that?

11      A.   Yes.

12      Q.   Under that hypothetical situation, what would

13   your verdict have to be?

14      A.   Not guilty.

15      Q.   Okay.  Do you understand now?

16      A.   Well, yeah.  Yes.  Uh-huh.

17      Q.   Okay.  And some people might think, "Well, this

18   is a capital murder case.  They didn't prove robbery to

19   me, but they proved some other felony.  So I'm still

20   going to give it to them."  Do you see how that would be

21   wrong?

22      A.   If there was another felony proven, well, you

23   would have to go with that --

24      Q.   But does it say anywhere on there burglary of a

25   habitation?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    214

1        A.    What are you trying to prove?  Burglary,

2   murder, or what are we trying to do?

3        Q.    They have to prove robbery because we're using

4   that indictment there in the hypothetical situation,

5   okay?

6        A.    Okay.

7        Q.    Do you follow me?

8        A.    Yes.  So again, if it's proven something else

9   besides robbery, it would have to be a not guilty

10  verdict.  Yes.

11       Q.    Okay.  And the reason I'm asking is because

12  some people might think, "Well, they didn't prove

13  robbery, which is what they're supposed to prove, but

14  they proved some other felony, like burglary or, you

15  know, arson, for example.  So I'm still going to give it

16  to them because even though they didn't prove that, they

17  proved something else."  Do you see where that could

18  happen?

19       A.    Yes, yes.  I can see where that would happen,

20  but again, depending upon the evidence that you put

21  forth, if it was strong enough to do that, I --

22       Q.    But my question was --

23       A.    -- but if you didn't prove the charge, then I

24  would say yeah, that would be a not guilty verdict.

25       Q.    And you would be able to do that?

1        A.    Yes, sir.

2        Q.    We also talked to you about a person's right to

3   remain silent; do you remember that?

4        A.    Yes.   Uh-huh.

5        Q.    That a person does not have to present any

6   evidence?

7        A.    Yes, I remember that.

8        Q.    And that a person on trial does not have to

9   testify in court; do you remember that?

10       A.    Yes.   That's right.

11       Q.    Would you require -- in a hypothetical case,

12  would you require the person in the case you're sitting

13  on as a juror to testify?

14       A.    Will I have that right?

15       Q.    Well, our law defines --

16       A.    I don't mean to --

17       Q.    -- that the person has a right to remain silent

18  and that would extend to them not having to testify in

19  court.

20       A.    Right.

21       Q.    Would you require that person to testify --

22       A.    No, sir.

23       Q.    -- at their trial?

24       A.    I don't see how I could.   If that's his right

25  to remain silent, I would have no say in that matter the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    216

1    way I see it.

2         Q.    But would you hold it against him if he does

3    not?

4         A.    I don't think so.

5         Q.    That's not --

6         A.    I don't think -- that's not a positive answer,

7    but I don't know without being in that situation.    I

8    would try not to let that affect me.

9         Q.    Do you understand that this is the last time

10   that we're allowed to talk to you?

11        A.    Yes.

12        Q.    After today you're going to sit in the jury box

13   if you're selected as a juror and there's no way that

14   we're going to know what you're thinking.  So, knowing

15   that a person has a right not to testify and if we're

16   presenting evidence and then we close our case and we

17   don't have the person on trial testify, then you might

18   hold it against us.  Do you see that?

19        A.    I see what you're saying, yes.

20        Q.    That's why it's important that we know at this

21   point.

22        A.    I would hope that would not happen.  That's not

23   my intention.  And I know he has that right, so I'm not

24   going to hold that against him.

25        Q.    But would it affect your verdict, though?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    217

1      A.    No.

2      Q.    And you're absolutely sure about that?

3      A.    Sure as I can be right now.

4      Q.    What about if we didn't present any evidence?

5      A.    What would I think?

6      Q.    Yes.

7      A.    Truthfully, you'd have a very poor case if you

8  didn't have any evidence.

9      Q.    But do you understand that we're not required

10  to present any evidence?  We can just sit here and

11  absolutely do nothing.

12     A.    I did not understand that previously.  I do

13  now.  And --

14     Q.    And if, for example, in a hypothetical case we

15  did not present any evidence and you were seated as a

16  juror, would you -- would that affect your verdict?

17     A.    I would think not.  No.  Uh-uh.  If you sit

18  there and say absolutely nothing, it would all depend

19  upon the prosecution what they presented as far as

20  evidence whether I believed it or not.

21     Q.    So after the State presented its case and you

22  in your mind thought, "Well, they didn't convince me

23  beyond a reasonable doubt," and we didn't present any

24  evidence whatsoever, would you still be able to say not

25  guilty if they didn't convince you beyond a reasonable

STATE OF TEXAS VS. RUBEN GUTIERREZ                          218

1   doubt?

2        A.   Well, if they didn't convince me, right.

3        Q.   You would be able to do that?

4        A.   Yes.

5        Q.   In Texas we have also what's called a

6   bifurcated trial system, a two-part trial system.  If you

7   find somebody guilty, for example, of capital murder,

8   then you answer those three special issues.  And the only

9   options you have are life in prison or the death penalty.

10  Do you understand that?

11       A.   Yes.  Correct.

12       Q.   And if you find somebody guilty of a lesser

13  included offense or a lesser crime of capital murder,

14  which would be, for example, murder, the range of

15  punishment is five years confinement in the State

16  penitentiary up to 99 years or life or any number of

17  years in between.  Do you understand that?

18       A.   Yes, sir.

19       Q.   If you find somebody guilty of robbery, which

20  is a lesser included offense, then you would -- the range

21  of punishment would be two years in prison up to 20 years

22  or any number of years in between.

23       A.   Two to 20 or five to 99 and the others?

24       Q.   Yes, for murder.

25       A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        219

1        Q.    Would you be able to consider the full ranges

2   of punishment if selected as a juror?

3        A.    Yes.   Uh-huh.

4        Q.    Special Issue Number 1, do you see where it's

5   asking you kind of to predict the future because it's

6   asking, "Is there a probability, is it more likely than

7   not that the defendant would commit criminal acts of

8   violence that would constitute a continuing threat to

9   society?"

10             You don't know whether or not that person

11   is going to commit any future acts of violence; is that

12   correct?

13        A.    You're absolutely correct.

14        Q.    We don't have a crystal ball, so we don't know.

15   We'll probably know -- he can go 50 years, 60 years and

16   pass away and never ever commit any act of violence,

17   right?

18        A.    That's correct.

19        Q.    So it's kind of basically asking you to look

20   into the future and punish somebody or sentence somebody

21   in this case for something that might not even happen in

22   the future.   Do you see where that --

23        A.    That's correct.

24        Q.    And do you see where it's asking you to focus

25   on criminal acts of violence; for example, an assault,

STATE OF TEXAS VS. RUBEN GUTIERREZ                                220

1    murder?  Do you see that?

2         A.    Yes, sir.  Uh-huh.

3         Q.    Could you do that?  Could you focus just on

4    those kinds of acts?

5         A.    I think I could, yes.

6         Q.    Special Issue Number 2, this goes as to the law

7    of parties.  Basically it's asking, "Did that person

8    who's on trial in a hypothetical case cause the death of

9    the deceased?  If he didn't, did he intend to kill

10   somebody?  If he didn't, did he anticipate that a human

11   life would be taken?"

12              In this State you're not automatically

13   guilty.  For example, if you go into a Circle K with a

14   friend and that person winds up killing the clerk, you're

15   not automatically guilty of the murder.  Something more

16   has to be proven before the jury can say that you're

17   culpable of that murder.  Do you understand that?

18        A.    Yes.

19        Q.    For example, let's say Mr. Galarza, the other

20   attorney, and I go into a Circle K.  We decide and we

21   discuss going in there to take cigarettes.  He's going to

22   take cigarettes from the counter while I'm distracting

23   the clerk at some other part of the store.

24              We meet there in an hour, but he doesn't

25   know that within that hour I go home, I pick up a gun,

STATE OF TEXAS VS. RUBEN GUTIERREZ                              221

1    and I'm thinking in my mind, "If I'm distracting that

2    clerk and he gives me trouble, I'm going to go ahead and

3    shoot that clerk." He doesn't know any of that and I

4    never tell him.

5                    We go into that Circle K.  He takes the

6    cigarettes.  He walks out.  And he doesn't know that as

7    I'm walking out, I turn around, I shoot the clerk and I

8    kill him.

9                    Now, he might be guilty of the theft;

10   would you agree?

11        A.    That's correct.

12        Q.    But we would have to look at whether or not

13   he's guilty of the murder as well.  Do you understand?

14        A.    Yes.

15        Q.    Now, looking at that Question Number 2, the

16   first part, if you take that first part of that question,

17   it says did I myself kill that clerk?  When you're

18   looking at me.

19        A.    Uh-huh.

20        Q.    Did Mr. Galarza actually kill that clerk?

21        A.    Under the scenario you just laid out?

22        Q.    Yes, sir.  We're just basing it on what I told

23   you.

24        A.    No.  No, he didn't.

25        Q.    Did I intend to kill that clerk?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    222

```
 1        A.    From what you've said, yes.
 2        Q.    Did Mr. Galarza intend to kill that clerk?
 3        A.    Not from what you said.
 4        Q.    Did I anticipate that a human life would be
 5   taken?
 6        A.    I'm sorry?
 7        Q.    Did I anticipate that a human life would be
 8   taken?
 9        A.    Yes.
10        Q.    What about Mr. Galarza?
11        A.    No.
12        Q.    Okay.  Do you see how there's a difference
13   there?
14        A.    Yes.
15        Q.    It takes more than you just being there before
16   you can find somebody culpable of that crime.
17        A.    Uh-huh.
18        Q.    Do you understand that?
19        A.    Yes.  Uh-huh.
20        Q.    Do you agree with that?
21        A.    Yes.  Again, wait upon the evidence to prove
22   that this guy -- to prove your scenario.
23        Q.    I'm sorry?
24        A.    If you can prove that scenario where the guy
25   didn't know all the things you just told me about, yes.
```

1       Q.   But you would have to base it on evidence.

2       A.   Sure.

3       Q.   Okay.  And we're just going based on what I'm

4   telling you right now.

5       A.   Yes.

6       Q.   Do you understand that?

7       A.   Yes.

8       Q.   But you understand also that the law requires

9   that that person at least at the very minimum anticipate

10  that a human life would be taken before you can hold him

11  culpable for that murder.

12      A.   Yes.  Correct.

13      Q.   Do you understand that?

14      A.   Uh-huh.

15      Q.   Now, look at Special Issue Number 3.  This is

16  basically asking you, "Looking at all these four things,

17  is there any reason why that person should get a life

18  sentence and not the death penalty?"  Do you understand

19  that?

20      A.   Say that again.  I didn't quite --

21      Q.   Let me back up here a little bit.  If you

22  answer "yes" to Number 1 and "yes" to Number 2, you go to

23  Question Number 3.

24      A.   Okay.

25      Q.   And the reason you're at Question Number 3 is

STATE OF TEXAS VS. RUBEN GUTIERREZ                          224

1    because the death penalty would be assessed unless you

2    answer "yes" to this question.

3          A.   Uh-huh.

4          Q.   Do you understand that?

5          A.   Okay.  Yes, sir.

6          Q.   It's asking you to take into consideration all

7    the evidence in the case, the circumstances of the crime,

8    the character and background of the person accused, and

9    the person's moral culpability.  Is there any one reason

10   or set of reasons why -- which in your mind are

11   sufficiently mitigating to give him a life sentence and

12   not the death penalty?  Do you follow me?

13         A.   Yes.  I see what you're saying.  Yeah.  I have

14   no problem with that.

15         Q.   You would be able to consider -- would you be

16   able to consider everything that's presented to you --

17         A.   Sure.

18         Q.   -- before answering that question?

19         A.   Yeah, because you would have to go "yes" on all

20   four in order to do that, correct?  And I could weigh all

21   those whether they were all proven or not if that's what

22   you're asking.

23         Q.   Okay.  Well, look at the last paragraph on

24   Question Number 3.  Do you see where it says "sufficient

25   mitigating circumstance --"

1      A.    Yes.

2      Q.    "-- or circumstances"?  Do you see that?

3      A.    Yes.  Correct.

4      Q.    Do you see how it's asking you if there is in

5  your mind one reason and one reason only why this -- why

6  this person should get a life sentence and not the death

7  penalty, then that's sufficient for you to answer "yes"

8  to this question.

9      A.    That's correct.

10     Q.    In other words, they don't have to prove all

11  four.

12     A.    Correct.

13     Q.    All right.  For example, if you think, well,

14  you know, the person whose case you're sitting on as a

15  juror is 17 years old, he's very young.  And if you in

16  your mind think that's a sufficient mitigating reason and

17  for that reason I think he should get a life sentence,

18  you can answer "yes" to this question.

19     A.    Yes.  That's correct.

20     Q.    And it's only one reason.  You're not required

21  to have two, three, four.

22     A.    Just one.

23     Q.    Just one is enough.

24     A.    I understand it.

25     Q.    Do you agree with that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    226

1        A.    Yes.   Uh-huh.

2        Q.    Could you do that?

3        A.    Sure.

4        Q.    We also talked to you about codefendants;

5   remember that?  If there's more than one person that's

6   accused of a crime, they're called codefendants.

7        A.    Yes.  Okay.  I remember that vaguely.

8        Q.    Okay.  And we talked to you about how one of

9   those persons might be given a deal in exchange for them

10  coming to court and testifying.  Do you recall that?

11       A.    No, I don't.

12       Q.    Okay.  Well, in some situations and in some

13  cases, the State of Texas might offer that codefendant a

14  deal.  For example, if he's facing 99 years or life in

15  prison, they might give him ten years or 20 years in

16  prison in exchange for him to come to court and testify.

17  Do you understand that?

18       A.    Yes.

19       Q.    And do you see where that person might have

20  some kind of motive or motives or some kind of reason to

21  lie?

22       A.    I can see that, yes.

23       Q.    And even if the plea bargain or if their

24  agreement was that that person come testify truthfully,

25  you don't really know whether or not that person is

1    testifying truthfully, would you?

2         A.   No, you wouldn't.

3         Q.   My question just, Mr. Gerdes, is whether you

4    would be able to take into consideration the fact that

5    that person might have a plea bargain before deciding

6    whether to believe him or not.

7         A.   Yes, I could consider that.

8         Q.   I wanted to go ahead and ask you some questions

9    from your questionnaire.  Question 75 you state that you

10   are very strongly -- you are very strongly in favor of

11   the death penalty.  The fact that you believe that, do

12   you think that that would affect your decision-making in

13   any way?

14        A.   No.  That was a pretty strong statement and

15   I --

16        Q.   Is that the way you feel?

17        A.   I'm not up on the table beating for the death

18   penalty, no.

19        Q.   But is that the way you feel?  I mean, you're

20   very strongly in support of it?

21        A.   I believe that "strong," I think it's a little

22   bit strong word.  I probably didn't intend to write it

23   that strongly, but I do believe in it, yes.  I think that

24   question comes up several times in the 17 pages and I

25   pretty well answered it hopefully the same way.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          228

1      Q.   Uh-huh.  So would you be willing -- I mean,
2   able to keep an open mind in answering those three
3   special issues?  Because you realize that the way those
4   questions are answered would depend on whether or not
5   that person gets the life sentence or the death penalty.
6      A.   Absolutely.
7      Q.   And the fact that you feel and the way you
8   worded it here, "I'm strongly in favor of capital
9   punishment as an appropriate penalty," would that
10  influence your answers?
11     A.   No.  No.  Uh-uh.  It would be strictly upon the
12  evidence.  I wouldn't be voting for the death penalty
13  just because I'm strongly in favor of it.
14     Q.   So would you be able to set your feelings aside
15  and just make a decision based on what is presented to
16  you?
17     A.   Oh, absolutely.  Yes.  If I didn't, that would
18  make me as guilty as him.  I didn't intend to put it that
19  strongly in that questionnaire.
20     Q.   When you say that would make you as guilty as
21  him, what do you mean?
22     A.   Well, if I went and voted for the death
23  penalty, whether -- disregarding the evidence, that's
24  what you're asking and that's what I'm saying.  No.  I
25  could deal favorably with what the evidence is no matter

STATE OF TEXAS VS. RUBEN GUTIERREZ                    229

1  what my feeling is about the death penalty.

2      Q.  But when you were talking about it would make

3  you just as guilty as him, who were you referring to?

4      A.  Well, go back to what you asked me.  If I went

5  in there with a closed mind which we -- you know, we

6  can't go and say, "Well, I'm going to vote for the death

7  penalty no matter what this guy did just because I like

8  it," well, that would make me just as guilty as anybody

9  going in with that kind of attitude is what I'm saying.

10 That's not what I believe.

11     Q.  But the statement that you made is it's going

12 to make you just as guilty as him.

13     A.  I thought I just explained that.

14     Q.  Well, then, you've changed it to them.  I'm

15 just trying to see who you were referring to when you

16 talked about as guilty as who?

17     A.  Oh, the -- I see what you're trying to do.  As

18 whoever is being convicted of a crime or whether they are

19 convicted or not.  I'm referring to the other person on

20 trial.

21     Q.  So have you in your mind already made up --

22 decided, you know, because that person is on trial they

23 would be guilty?

24     A.  No.  As I mentioned earlier, I don't know

25 anything about the case other than a brief newspaper

STATE OF TEXAS VS. RUBEN GUTIERREZ                    230

1   article that came out in the paper the day after this
2   trial started.
3        Q.   So have you formed any kind of opinion though?
4        A.   Absolutely not.
5        Q.   Have you been a victim of any kind of crime
6   before?
7        A.   I don't know how you mean that.  I think I
8   wrote on that questionnaire we've had our home broken
9   into.  I would consider that as a crime.  That's the only
10  thing.
11       Q.   Would that affect you in any way though?
12       A.   No.
13       Q.   You would be able to set that aside and just
14  make a decision?
15       A.   Yeah.
16       Q.   Thank you so much, sir.
17       A.   Sure.
18       Q.   I appreciate your time.
19            THE COURT:  All right, Mr. Gerdes.  I need
20  to take up a legal issue.  I'll ask you to please step
21  outside with the bailiff --
22            MR. GERDES:  Oh, okay.
23            THE COURT:  -- and I'll call you back in
24  just about one minute.
25            MR. GERDES:  Sure.

PAM L. ESQUIVEL, CSR, RPR

1          **(Prospective juror left the courtroom)**

2          THE COURT:  Is this venireperson

3   acceptable to the State?

4          MS. FISCHER:  Yes, Your Honor.

5          MR. REYES:  May I have a second, Your

6   Honor?

7          THE COURT:  Go ahead.

8          **(Brief pause in proceedings)**

9          MR. REYES:  We don't have a challenge,

10  Your Honor.  We do exercise our peremptory strike.

11         THE COURT:  Bring him in.

12         Mr. Gerdes, that's all the questions we

13  have for you today.  I appreciate you waiting around and

14  coming back and answering the questions.  You're excused

15  to go at this time.

16         MR. GERDES:  Thank you very much.

17         THE COURT:  Thank you, sir.

18         MS. FISCHER:  Thank you, sir.

19         THE COURT:  Okay.  Ms. Rosas.

20         Good afternoon, Ms. Rosas.

21         MS. ROSAS:  Good afternoon.

22         THE COURT:  How are you?

23         MS. ROSAS:  Fine.

24         THE COURT:  First of all, let me apologize

25  for rescheduling you this afternoon, but some questioning

STATE OF TEXAS VS. RUBEN GUTIERREZ                    232

1   take longer than others and I never know how long it's

2   going to take --

3                    MS. ROSAS:  Oh, okay.

4                    THE COURT:  -- per person, but I

5   appreciate your patience, first of all.

6                    MS. ROSAS:  You're welcome.

7                    THE COURT:  I think we're ready to begin.

8   If you'll just talk into the microphone, we'll get

9   started.

10                   Go ahead.

11                   MS. FISCHER:  Thank you, Judge.

12                   **HERLINDA ROSAS,**

13     having been called as a prospective juror and, upon

14     her oath, was examined and testified as follows:

15                   **VOIR DIRE EXAMINATION**

16  **BY MS. FISCHER:**

17     Q.    Good afternoon, Ms. Rosas.

18     A.    Good afternoon.

19     Q.    My name is Karen Fischer.  Along with

20  Mr. Blaylock, the one who was here a couple of Tuesdays

21  ago, we work for the Cameron County District Attorney's

22  Office.  That means we represent the people of Cameron

23  County here today.

24                   Now, you know the reason why you're here

25  is because this is a case involving capital murder in

STATE OF TEXAS VS. RUBEN GUTIERREZ                               233

1   which the death penalty could be the punishment assessed

2   against the defendant.

3             Now, I know from reading your

4   questionnaire that you have some very, very strong

5   feelings against the death penalty.

6        A.   Yes.

7        Q.   Tell me why it is that you do not think we

8   should have the death penalty.

9        A.   Well, I think that like, well, I believe in

10  God.  So I think that only He should be the one that

11  takes our lives.

12       Q.   Okay.  Do you have a religious hindrance from

13  being able to sit in judgment for someone because of your

14  religious beliefs?

15       A.   Yes.

16       Q.   Okay.  Now, you understand that in this case,

17  if you were selected as a juror, you would be asked to

18  not only sit in judgment and decide whether or not this

19  defendant was guilty, but then you would be asked to

20  consider some questions.  And based on your answers to

21  those questions, the death penalty could be imposed.

22  Could you do that?

23       A.   No, I couldn't.

24       Q.   Why not?

25       A.   Because of my religious beliefs.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          234

1      Q.   Okay.  Now, just so that you understand, if the

2  defendant is found guilty of capital murder, you're not

3  going to be asked a question that says, "Do I think the

4  defendant should receive the death penalty?"

5           Instead, you're asked to look at three

6  special questions.  And based on your answers to these

7  questions, then that tells the Judge whether or not the

8  death penalty should be imposed, okay?

9           But my question to you is no matter what

10  these questions ask you to do and no matter what these

11  questions ask you to consider, would you make the answer

12  as such so that you would ensure the defendant would get

13  a life sentence?

14      A.   I don't know.

15      Q.   Okay.  The first question here, it's going to

16  ask you to make a decision about whether or not the

17  defendant will be a future danger, whether or not the

18  defendant will hurt again in society.

19      A.   Uh-huh.

20      Q.   You're going to have to answer that question

21  based on the evidence you hear.  You may hear evidence

22  about his past, crimes he may have committed in the past.

23  You may hear evidence from other people who say that he

24  has a bad reputation.  And you're going to be asked to

25  decide whether or not he will hurt again in the future.

STATE OF TEXAS VS. RUBEN GUTIERREZ                      235

1              I'm going to tell you this:  If you answer
2    this question "yes," then there is a possibility the
3    defendant may receive the death penalty.
4              Would you always answer this question "no"
5    no matter what you heard so that you would be sure the
6    defendant would not get the death penalty?
7         A.   Can I read the question?
8         Q.   Yeah.  Okay.  The question is whether there is
9    a probability that the defendant would commit criminal
10   acts of violence that would constitute a continuing
11   threat to society.  You're going to be asked to decide
12   whether or not you think a defendant will be a danger to
13   someone in the future.  Do you think you could do that?
14        A.   Well, I don't believe in the death penalty.  I
15   think maybe life or -- but not --
16        Q.   Okay.  But these are the questions that you're
17   going to be asked, okay?
18        A.   Uh-huh.
19        Q.   Are you going to answer these questions so that
20   you can make sure that the defendant gets life in prison
21   to keep him from getting the death penalty because of
22   your beliefs?
23        A.   I don't know.
24        Q.   But that's --
25        A.   I would have to hear the --

STATE OF TEXAS VS. RUBEN GUTIERREZ                     236

1      Q.   Yes.  And that's what I want to talk to you
2  about.  I want you to tell me how you do believe because
3  when we get to this last question down here on the
4  bottom, you're going to be asked to take into
5  consideration everything you hear about the defendant.
6      A.   Uh-huh.
7      Q.   And then you're going to be asked do you think
8  there's something about him, something that you've heard,
9  that would make life in prison a better option than
10 death, okay?  You're going to be asked that question,
11 okay?
12           Have you already made your mind up about
13 how you're going to answer that question without even
14 hearing any evidence in the case?
15     A.   No.
16     Q.   Okay.  So then you could consider the death
17 penalty?
18     A.   Well, I guess if I was to hear everything.
19     Q.   Okay.  And that the -- I mean, I just want you
20 to be honest and tell me because sometimes people come
21 into the courtroom and we have a -- we've seen a lot of
22 different folks.  We've talked to about 70 folks here in
23 the three weeks we've been doing this.
24           And some folks come in and they may not
25 like the death penalty, but they know that the law says

STATE OF TEXAS VS. RUBEN GUTIERREZ                    237

1    that if certain things are proved, then the defendant

2    will receive the death penalty.  And they could do that.

3    They could put their personal feelings aside and they

4    could decide the death penalty was appropriate based on

5    the evidence they heard in that particular case.

6        A.    Right.

7        Q.    Some folks just think honest to God in their

8    heart that, "No matter what I hear in this courtroom, no

9    matter what you tell me the law is, and no matter what

10   you tell me the evidence is, no matter how bad the

11   defendant is, he may have killed two or three people, his

12   own mother may not have anything good to say about him,

13   you know.  He's hurt his own family.  No matter what I

14   hear, I would never vote for the death penalty and I

15   would always answer those questions to make sure that he

16   got life just because that's my personal feeling."

17               Which group do you fit in; the one that

18   can follow the law or the one that, "No matter what the

19   law says, I'm going to give a life sentence"?

20       A.    Well, the one that can follow the law.

21       Q.    Okay.  And that's what I need to know from you,

22   if you can follow that law and put those personal

23   feelings aside.

24       A.    Uh-huh.

25       Q.    Okay.  Are you going to be able to do that?  In

STATE OF TEXAS VS. RUBEN GUTIERREZ                                238

```
 1   order to be a juror in the case, you're going to have to,
 2   okay?  And I just want you to be --
 3        A.   Well, I don't have a choice.
 4        Q.   That's exactly right.  You don't have any
 5   choice.  If you take the oath that says, "I promise to
 6   follow the law," then you have to follow the law.
 7        A.   Right.
 8        Q.   You know, and sometime we do have feelings in
 9   our hearts that would make it just impossible for us to
10   sit as a juror.
11             We had an elderly woman come in and talk
12   about the fact that her sister had been killed.  And that
13   was very hard on her and she had personal feelings that
14   were so strong in her heart.  No matter what she said,
15   she couldn't follow the law.  No matter what we said, she
16   couldn't follow the law.
17        A.   Right.
18        Q.   If you have feelings that are like that about
19   the death penalty that no matter what I say to you the
20   law is, you're going to know in your heart that death is
21   wrong, I need to know that.
22        A.   Well --
23        Q.   If you can't set those feelings aside.
24        A.   Well, if I was to be picked, I would just have
25   to follow the law.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    239

1      Q.   Okay.  Follow the law, even knowing if you

2   answered these questions "Yes, he's going to hurt again",

3   "Yes, he caused the death," and "No, I didn't hear

4   anything good about him, nothing to warrant an excuse for

5   him committing this crime," that he will receive the

6   death penalty?

7              Knowing all of that, now that I've told

8   you how the process works, knowing that, can you put

9   those personal feeling you have aside and follow the law

10  and answer these questions honestly?

11     A.   Yes, I can.

12     Q.   Okay.  The --

13              MS. FISCHER:  Judge, may we approach?

14              THE COURT:  Yes.

15              **(Off the record discussion at the bench)**

16              THE COURT:  Ms. Rosas, I need to take up a

17  legal matter.  Would you follow the bailiff outside and

18  I'll call you back in in just one minute.  Thank you.

19              **(Prospective juror left the courtroom)**

20              THE COURT:  Okay.  Counsel?

21              MS. FISCHER:  Your Honor, at this time the

22  State would exercise its peremptory strike.

23              THE COURT:  Each side has exercised their

24  peremptory strike.  There are no more peremptory strikes

25  on the table.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    240

1                    Bring her in.

2                    THE BAILIFF:  Yes, sir.

3                    THE COURT:  Okay.  Ms. Rosas, that's all

4    the questions we have for you today.  I appreciate you

5    waiting around and coming back in the afternoon.  You're

6    excused to go at this time.

7                    MS. ROSAS:  Okay.

8                    THE COURT:  Thank you very much for your

9    patience.

10                    MS. ROSAS:  Thank you.

11                    THE COURT:  Good afternoon, Mr. Fernandez.

12                    MR. FERNANDEZ:  Okay.

13                    THE COURT:  How are you?

14                    MR. FERNANDEZ:  Okay.

15                    THE COURT:  Let's see.  You were scheduled

16    for 1:30.  It's almost an hour later.

17                    MR. FERNANDEZ:  That's okay.

18                    THE COURT:  First of all, let me apologize

19    for you waiting around.

20                    MR. FERNANDEZ:  That's okay.

21                    THE COURT:  Sometimes the questioning

22    takes longer than others.

23                    MR. FERNANDEZ:  Okay.

24                    THE COURT:  I really can't control that,

25    but I appreciate your patience.

STATE OF TEXAS VS. RUBEN GUTIERREZ                            241

1              MR. FERNANDEZ:  Okay.

2              THE COURT:  And first of all, I notice

3   that your favorite subject is golf?

4              MR. FERNANDEZ:  Yes.

5              THE COURT:  As a matter of fact, you put

6   golf, golf, golf, three times.

7              MR. FERNANDEZ:  That's what it is.

8              THE COURT:  So I guess you enjoy golf.

9              MR. FERNANDEZ:  Yes, I do.

10             THE COURT:  All right.  So do I.  Okay.

11  The lawyers have a few more questions to ask you.  If you

12  could just adjust the microphone so you can speak into

13  it, we'll get ready to start.  You can pick it up if

14  you'd like.

15             MR. FERNANDEZ:  That's fine.

16             THE COURT:  Okay.  Go ahead.

17                 **FREDRICO FERNANDEZ,**

18      having been called as a prospective juror and, upon

19      his oath, was examined and testified as follows:

20                  **VOIR DIRE EXAMINATION**

21  BY MS. FISCHER:

22      Q.   Good afternoon, Mr. Fernandez.

23      A.   Uh-huh.

24      Q.   My name is Karen Fischer.  And along with

25  Mr. Blaylock, the gentleman that was here a couple of

STATE OF TEXAS VS. RUBEN GUTIERREZ                          242

1    weeks ago talking to you all when you were on the
2    panel --
3         A.   Right.
4         Q.   -- we work for the Cameron County District
5    Attorney's Office.  That means we represent the people of
6    Cameron County here today.
7         A.   Uh-huh.
8         Q.   And, Mr. Fernandez, I'm going to be real honest
9    with you.  I'm not going to ask you a lot of questions
10   because you seem to have a pretty good understanding of
11   why you're here today.  When we asked you if you wanted
12   to be a juror, you said yes.
13        A.   Uh-huh.
14        Q.   And then you said you want to make sure that
15   Ruben Gutierrez gets a fair trial.
16        A.   Right.
17        Q.   That's why we're here.  We're talking to you
18   one-on-one because -- we've asked you a lot of tough
19   questions in this questionnaire.
20        A.   Right.
21        Q.   I think you know that.
22        A.   Yes.
23        Q.   And, you know, there are a lot of folks that
24   have particular feelings one way or another about the
25   death penalty or one way or another about how they feel

STATE OF TEXAS VS. RUBEN GUTIERREZ                         243

1    about defendants and can't be fair.

2              From your questionnaire it seems like you

3    understand that you have to be fair.

4         A.    Right.

5         Q.    And any personal feelings you may have one way

6    or the other, you have to put those aside and come here

7    in this courtroom and listen to the evidence in the case

8    and make a decision on what you hear in the courtroom.

9         A.    Uh-huh.

10        Q.    Okay.  Have you ever been a juror on a case

11   before?

12        A.    I was about three years ago, I think so.

13        Q.    Okay.  What kind of case was that?

14        A.    It was a criminal.  I guess it was a possession

15   of cocaine.

16        Q.    Okay.

17        A.    If that's criminal or not --

18        Q.    Yes, that's a criminal case.

19        A.    Okay.

20        Q.    And was that over at the old courthouse or was

21   it here in this courthouse?

22        A.    I think it started here and then we moved over

23   there.  Yes.

24        Q.    Okay.  Now, did you all reach a verdict in that

25   case?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    244

1        A.    Yes, ma'am.  Uh-huh.

2        Q.    Okay.  Did you as the jury assess punishment?

3        A.    He was found not guilty.

4        Q.    Okay.

5        A.    So there was no punishment.

6        Q.    Okay.  Is there anything about your past jury

7   experience that would cause you to be biased or unfair in

8   this case?

9        A.    No.

10       Q.    Okay.  Now, if -- then you understand how the

11   trial works.

12       A.    Yes.

13       Q.    The first half of your job is whether or not

14   the defendant's guilty.

15       A.    Uh-huh.

16       Q.    If you find him guilty, the second half of your

17   job then is to assess punishment.

18       A.    Uh-huh.

19       Q.    In this particular case because the death

20   penalty is an option, you are not asked the question, "Do

21   I think the defendant should receive the death penalty?"

22            Instead, you're asked the question -- or

23   you're asked these three special questions.  We call them

24   special issues.  And based on your answer to those

25   questions, that then tells the Judge whether or not the

1    death penalty should be imposed.

2         A.    Uh-huh.

3         Q.    Okay?  Now, the first question you're going to

4    be asked is whether there's a probability that the

5    defendant would commit criminal acts of violence that

6    would constitute a continuing threat to society.

7         A.    Okay.

8         Q.    You're going to be asked as a juror to make a

9    judgment call about whether or not there's a probability

10   the defendant will be a future danger.

11        A.    Uh-huh.

12        Q.    Do you think that you would be able to do that

13   if you hear evidence in the case about the defendant?

14        A.    Probably.  Yes, ma'am.  Uh-huh.

15        Q.    What kind of things would you look at?

16        A.    His past -- his past history.

17        Q.    Okay.  Now, the next question that you have to

18   go on to, then, is if you find, "Yes, I think he will be

19   a continuing threat," then you're going to be asked what

20   we call the law of parties question.

21              In Texas, we have a law where -- you know,

22   like say you have two people who rob a bank.  The person

23   that goes in to take the money, he's just as guilty as

24   the get-away car -- I'm sorry.  The person that goes into

25   the bank to get the money and then you have the person

STATE OF TEXAS VS. RUBEN GUTIERREZ                          246

1    that's the get-away car driver.

2         A.   Right.

3         Q.   The person who drives the get-away car, even if

4    he never stepped foot in that bank, he's guilty of

5    robbery.  How do you feel about that law?

6         A.   I would -- I don't think it's fair.

7         Q.   Why don't you think it's fair?

8         A.   Well, could I say something before I go on?

9         Q.   Yes.  Uh-huh.

10        A.   A couple of days ago, one of my co-workers

11   learned that, you know, they had this on.  And it was a

12   relative of hers.  And I think that would affect me in

13   being a fair juror because she was real close.  I've

14   known her for the past 18 years, you know.  And she was

15   like her niece or something like that.  So it probably

16   would affect me in the decision because she was real

17   close to me.

18        Q.   Okay.  When you say a relative, a relative of

19   whom?  Ms. Harrison --

20        A.   Yes.  Uh-huh.

21        Q.   -- the deceased?

22        A.   Right.  Uh-huh.

23        Q.   Okay.  And someone that you work with is her

24   niece?

25        A.   Well, she said that -- somebody said that she

PAM L. ESQUIVEL, CSR, RPR

1    might be related to her because I know when the

2    accident -- well, when it happened, that she was -- you

3    know, she was very hurt about it.

4         Q.    Okay.

5         A.    And I found out this a couple of days ago, but

6    she found out that, you know, the jury was going on.  So,

7    you know, I don't think I would -- I feel sorry for her.

8    So I don't think I'll be fair, you know, because she's a

9    real close person.

10        Q.    Can you tell me what that co-worker's name is?

11        A.    Do I have to?

12        Q.    Well, only because I don't know -- I've talked

13   to a lot of the Harrison and Cuellar family; and it may

14   be someone that I may have talked to.

15        A.    Well, her mother's name is Cuellar.

16        Q.    Okay.

17        A.    So --

18        Q.    Well, because they might be a witness in the

19   case which is why I'm asking.  And so, that may make you

20   feel --

21        A.    Probably.

22        Q.    -- even more pressured about the situation.

23        A.    Right.

24        Q.    What -- do you know what her mother's name is?

25        A.    No.  I sure don't.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           248

1        Q.    Okay.  Because of your connection and because

2   you know this person, do you think that maybe that may

3   make you feel pressured to make a decision?

4        A.    Yes.  Uh-huh.  Right.  Because I feel sorry for

5   her.

6        Q.    If I asked you do you already have your mind

7   made up about how you would vote --

8        A.    Probably with the way she was hurt and all

9   that, yes.  You know, I would feel sorry for her.  Like I

10  said, she's a real close friend of mine, you know, like

11  family.  So, you know, I don't think I'll be fair.

12       Q.    Okay.  Have you already made your mind up then

13  if we asked you to vote?

14       A.    At first when I was answering the

15  questionnaire, you know, I was -- I assumed I would be

16  fair.  But a couple of days ago, you know, after finding

17  out, you know, that it was, you know, her -- I didn't

18  know at the beginning about -- what was her last name?

19  Harrelson or --

20       Q.    Yes.

21       A.    -- Harrison?

22       Q.    Her maiden name was Cuellar.

23       A.    Right.  Cuellar.  Right.

24       Q.    And she married a Harrison.

25       A.    Right.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    249

1      Q.   Yes.

2      A.   So by finding this out, you know, I feel sorry

3    for her.  So I don't think I would be fair, you know.

4      Q.   Are you --

5      A.   I've already made up my mind, you know, knowing

6    her.

7      Q.   Okay.  You made up your mind what?

8      A.   Guilty.

9      Q.   Okay.  Even though you haven't heard --

10     A.   Even though I haven't heard anything.  Yeah.

11     Q.   Okay.

12              MR. REYES:  May we approach, Your Honor?

13              THE COURT:  All right.  Mr. Fernandez,

14   thank you.  I appreciate you bringing that up and being

15   honest.

16              MR. FERNANDEZ:  I'm sorry I didn't bring

17   it up earlier.  I just heard it a couple of days ago.

18              THE COURT:  That's okay.  You don't have

19   to apologize.  You're excused to go at this time.

20              MR. FERNANDEZ:  Okay.

21              MS. FISCHER:  May I go to the restroom

22   real quick?

23              THE COURT:  Quick, yeah.

24              **(Brief pause in proceedings)**

25              THE COURT:  Good afternoon, Ms. Perez.

STATE OF TEXAS VS. RUBEN GUTIERREZ                         250

1          MS. PEREZ:  Hello.

2          THE COURT:  We'll get ready to start in

3  just a few minutes.  One of the lawyers stepped out.

4          MS. PEREZ:  Okay.

5          THE COURT:  Before she comes in, on your

6  application, what is your job duty at B.I.S.D.?

7          MS. PEREZ:  Teacher assistant.

8          THE COURT:  Teacher assistant.  Okay.

9          **(Brief pause in proceedings)**

10         THE COURT:  I think we're ready to start.

11  Good afternoon, Ms. Perez, again.

12         MS. PEREZ:  Good afternoon.

13         THE COURT:  The lawyers have a few more

14  questions to ask of you.  And if you could just speak

15  into the microphone, I think we'll get ready to start.

16  You can adjust it if you like.

17         MS. PEREZ:  Okay.

18         THE COURT:  And for the record,

19  Ms. Fischer, I asked her about her application.  Her job

20  duty is teacher assistant.  She told me that --

21         MS. FISCHER:  Okay.

22         THE COURT:  -- for your information.

23         MS. FISCHER:  Thank you, Judge.

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                            251

**ISIDRA RAFAELA PEREZ,**

having been called as a prospective juror and, upon

her oath, was examined and testified as follows:

**VOIR DIRE EXAMINATION**

BY MS. FISCHER:

Q.    Good afternoon, ma'am.

A.    Good afternoon.

Q.    My name is Karen Fischer.  Myself and

Mr. Blaylock, the one that spoke with you last -- or a

couple of weeks ago when you came here, we both work for

the Cameron County District Attorney's Office.

A.    Yes, ma'am.

Q.    That means that we represent the people of

Cameron County here today.

A.    Yes, ma'am.

Q.    Now, I noticed that you said that your daughter

works for an attorney in Port Isabel.  Who is that lawyer

that she works for?

A.    His name is Sitcleve?

Q.    Sitgreaves?

THE COURT:  Sitgreaves.

Q.    Right.

Q.    (BY MS. FISCHER)  Mr. Sitgreaves.  Yes. Okay.

Is there anything about your daughter working for an

attorney that may cause you to be unfair in this case?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              252

1        A.    I don't think so.

2        Q.    Does she ever talk to you about the work that

3    she does?

4        A.    Not really.

5        Q.    Okay.   Now, have you ever had to sit as a juror

6    before in a case?

7        A.    No, ma'am.

8        Q.    Okay.   When -- in the State of Texas when you

9    have a trial, you have what we call a two-part trial

10   system.   And the first part of that trial is for you as a

11   juror to decide whether or not the defendant is guilty of

12   what he is accused of.

13              And then if you do decide that he is

14   guilty, you find him guilty, then you move into what we

15   call the punishment phase.   And it's during the

16   punishment phase that you're going to be asked -- in this

17   particular case because the defendant is facing a capital

18   murder charge, you're going to be asked to consider some

19   issues that may cause the death penalty to be imposed

20   upon the defendant.

21              Now, I know from reading your

22   questionnaire that you are opposed to the death penalty.

23       A.    How -- I mean, how did you get that?

24       Q.    Well, when we asked you the question what your

25   view was about capital punishment, you said, "I'm opposed

STATE OF TEXAS VS. RUBEN GUTIERREZ                    253

1    to capital punishment except in a few cases where it may

2    be appropriate."  Is that how you feel?

3         A.   Yes.

4         Q.   Okay.

5         A.   Because --

6         Q.   Tell me --

7         A.   I'm sorry, but if the society or the community

8    is in danger of that particular habits of that person,

9    well, then, I'm for it.

10        Q.   Okay.

11        A.   But, of course, morally and my spiritual habits

12   or my spiritual activities, we don't go around killing

13   anybody.

14        Q.   Right.

15        A.   Do you know what I mean?

16        Q.   Exactly.  I know what you -- I know what you're

17   telling me; and I also need to ask you, then, this

18   question.

19        A.   Yes, ma'am.

20        Q.   Is there something about your religious beliefs

21   that would cause you to be unfair in this case or can you

22   put them aside?

23        A.   Oh, yes.  I can put them aside because my

24   religion does not prohibit me to serve as whatever --

25        Q.   As a juror?

1    A.    -- in a court.  Uh-huh.

2    Q.    Does your religion prohibit you from

3 considering the death penalty as an appropriate

4 punishment?

5    A.    No, ma'am.

6    Q.    Okay.  And that's kind of what being a juror is

7 all about.  People have a lot of personal feelings about

8 different issues.

9    A.    Right.

10    Q.    We all have life experiences.

11    A.    Right.

12    Q.    To be a juror, you have to put all that aside.

13    A.    Right.

14    Q.    And you can't let what's in your heart dictate

15 what the law is and what your mind is.

16    A.    I understand.

17    Q.    Okay.  Then you tell me what type of crimes do

18 you think are appropriate and what types of situations do

19 you think someone should perhaps face capital punishment.

20    A.    I guess when they are sick of their mind

21 because of drugs or any other chemical that they use or

22 any other habit; for instance, just going crazy and

23 shooting at anybody, or because of stealing also.

24    Q.    Okay.  Now, before we -- before we get to that

25 part about where we're going to talk about the death

STATE OF TEXAS VS. RUBEN GUTIERREZ                    255

1   penalty, I want to kind of -- the first part -- or all

2   throughout the trial, your job is to listen to the

3   evidence and decide certain issues.  The first issue

4   you'll have to decide is whether or not the defendant's

5   guilty.

6                    It's my job to prove that to you, okay?

7   He's presumed innocent as he sits here.  He's been

8   accused of a crime.  It's my job to prove that crime to

9   you beyond a reasonable doubt.

10                   It's real important that you understand

11  that concept because it's not like we hear on television

12  where they say, you know, beyond a shadow of a doubt or

13  beyond all doubt.  It's not like that.

14       A.    Uh-huh.

15       Q.    The law gives us a definition that we have to

16  follow; and that definition basically -- and it's written

17  up here and we talked about it.  It asks you to use your

18  reason and your common sense; and after a careful and

19  impartial consideration of all the evidence, to make a

20  decision, okay?

21       A.    Yes, ma'am.

22       Q.    Now, when we asked you -- and that's the

23  standard throughout the whole trial.  That's for any

24  trial.  When we asked you if you would hold us, the

25  State, to a higher burden because this was a capital

1    murder case, you said, "Yes."  Okay?

2         A.    Maybe I just didn't understand the whole thing.

3         Q.    Okay.  And that's what I want to clear up.

4         A.    Okay.

5         Q.    That's not the burden.  Just because this is a

6    capital murder, the burden isn't raised any.  It's the

7    same as if this were a D.W.I. case or if this were a drug

8    case.  And that's basically -- because it's a pretty

9    stringent standard; and it is.  It asks you to use your

10   reason and your common sense and be, you know, careful

11   and make a decision.

12              But it doesn't require me to prove the

13   case beyond all doubt because there's no way I could do

14   that unless you were there.

15        A.    Right.

16        Q.    And if you were there, then you could not be a

17   juror because you would have to be a witness.

18        A.    Right.

19        Q.    So there may be some things that you may have

20   doubts about, but they may not be reasonable doubts.  And

21   so, can you put those aside, follow the definition, and

22   if the evidence is proven to you beyond a reasonable

23   doubt, find the defendant guilty?

24        A.    Yes.

25        Q.    Okay.  Now, then let's talk for a few minutes

STATE OF TEXAS VS. RUBEN GUTIERREZ                        257

1    about how the assessment of the death penalty works,

2    okay?  Let's say you do find the defendant guilty.

3                    In this particular case, the defendant is

4    accused of capital murder and basically while in the

5    course of committing robbery caused the death of

6    Ms. Harrison.

7                    That is a capital offense in the State of

8    Texas.  Okay?  You have to do something a little bit more

9    than just commit murder.  Murder while committing

10   robbery, okay, is one of the ways that you can have a

11   capital offense.

12                   Kind of like the hypothetical situation

13   where somebody goes in, like you had said before, to

14   steal.  Goes in to the Circle K to steal the money from

15   the clerk; and while he's stealing the money from the

16   clerk, he kills her.

17        A.   Right.

18        Q.   That's capital murder.  Do you feel that's a

19   good law?

20        A.   Yes.

21        Q.   Okay.  And the death penalty should be

22   appropriately considered in that case?

23        A.   Yes.

24        Q.   Okay.  If you find the defendant guilty then in

25   a case of capital murder, you have to consider these

1    three special questions.  And then based on your answers

2    to these three questions, that tells the Judge whether or

3    not to consider the death penalty as an appropriate

4    punishment, okay?

5         A.   Okay.

6         Q.   The first question is going to ask you whether

7    there is a probability that the defendant would commit

8    criminal acts of violence that would constitute a

9    continuing threat to society.

10                  Do you know what that question is asking

11   you?

12        A.   Yes.

13        Q.   It's like you had said before, "Is he going to

14   hurt again?"  That's the exact question that you have

15   to --

16        A.   Another human being or several other ones.

17        Q.   Exactly.  Do you think you can do that?

18        A.   Yes.

19        Q.   How would you do that?  What would you look at?

20        A.   First of all, if -- I mean, what substance did

21   he take before or what was in him that -- or that caused

22   the urge to do that, first to have the guts -- I'm sorry

23   to use that word.

24        Q.   No, that's fine.

25        A.   Or the courage to do such a thing.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          259

1        Q.    So you kind of have to look at the past.

2        A.    Right.   Investigate or -- I mean, I don't know

3   that person --

4        Q.    Right.

5        A.    -- of course.

6        Q.    But it's our job to bring you evidence.

7        A.    Right.

8        Q.    And you understand I'm not asking you to make a

9   decision about anyone or commit to any decision --

10       A.    No.

11       Q.    -- because you don't know anything; and we

12   can't talk about the facts.

13       A.    Uh-huh.

14       Q.    What I need you to do is just consider.

15       A.    Right.   Consider what he had done to his --

16   well, intake, you know, either alcohol or drugs, because

17   you really need to be with something in order to do

18   something like that.

19       Q.    Okay.   Well, but do you think that only people

20   who are --

21       A.    No.

22       Q.    -- drug addicts --

23       A.    No.

24       Q.    -- or alcoholics --

25       A.    No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          260

1          THE COURT:  Just a minute.  Just a minute.

2          MS. PEREZ:  Sorry.

3          THE COURT:  Let her finish asking the

4    questions before you answer because she's taking

5    everything down and she can't take both people talking at

6    the same time.

7          MS. PEREZ:  Okay.

8          THE COURT:  Thank you.

9          MS. PEREZ:  Sorry.

10         THE COURT:  Go ahead.  Ask your question.

11    Q.    (BY MS. FISCHER)  And I think that you know

12    that you already started answering, do you think only

13    people who are drug addicts commit crimes?

14    A.    No, ma'am.

15    Q.    Or people who are on alcohol?

16    A.    No.

17    Q.    Sometimes people who are sober are just evil in

18    here --

19    A.    Right.

20    Q.    -- and commit crimes?

21    A.    Yes.

22    Q.    Okay.  But you have to take into consideration

23    whether they will be a continuing threat.  That's the

24    first question, okay?

25    A.    Yes, ma'am.

1    Q.    The next question then becomes what we call the
2 law of parties question.  And what that basically says
3 is -- like in the hypothetical we use with the bank
4 robbers, when two people decide they're going to rob a
5 bank, one will go -- let's say hypothetically one goes in
6 and robs the bank; the other one is the get-away car
7 driver.
8              In the State of Texas, the person that all
9 he did was drive the car, he is just as guilty --
10    A.    As the other.
11    Q.    -- as the other one under the law of parties.
12 How do you feel about that?
13    A.    Yes.
14    Q.    Okay.  The law says you can consider the same
15 type of thing, the law of parties, and be eligible for
16 the death penalty, okay?
17    A.    Uh-huh.
18    Q.    And so, that means not only if they actually
19 caused the death, they actually did the killing.  Let's
20 say they were the ones that went into the Circle K and
21 killed the store clerk while stealing.  They can be
22 considered eligible for the death penalty.
23    A.    Yes.
24    Q.    But if they intended that that person be
25 killed, not actually caused the death, but intended to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    262

1    kill the person, then they too --

2         A.   Yes.

3         Q.   -- can be eligible for the death penalty.

4              And let's say two people go into the

5    Circle K.  And one is over there getting the money from

6    the store clerk; the other one is over here getting beer.

7    What if the store clerk won't give the money up?  So the

8    one that's over here by the beer cooler, he says, "Well,

9    just stab the lady and let's get out of here."

10             Now, he actually stabbed the lady, the

11   person that was stealing, okay?  So he actually caused

12   the death.  He's eligible for the death penalty.

13             How do you feel about the one that said,

14   "Well, just stab her"?

15        A.   The same thing.

16        Q.   Okay.  The law says you treat them the same.

17        A.   Yes.

18        Q.   Can you do that?

19        A.   He helped him do the -- whatever.

20        Q.   And he can be considered for the death penalty.

21        A.   Right.

22        Q.   Do you feel that's right?

23        A.   Yes.

24        Q.   Do you feel that's fair?  Not only that, but if

25   you anticipated that a human life would be taken, then

STATE OF TEXAS VS. RUBEN GUTIERREZ                    263

1    you can be considered eligible for the death penalty.

2                   Let's say they have a plan.  The plan is

3    we're both going to take in our knives.  We're going to

4    have our weapons in case we have to threaten somebody.

5    We're going to get the money no matter what.  And my job

6    is to go to the clerk; your job is to get the beer.

7                   And remember, this is our local Circle K.

8    And so, the lady knows us.  So we need to get in and out

9    real fast so she doesn't know who we are so that she

10   can't pick us out of a lineup.  That's the plan.

11                  So they go in, but the lady won't give up

12   the money.  So, one of them kills her.  How do you feel

13   about the other one, the one that went in the store?

14        A.    Yes.

15        Q.    The same way, should have anticipated, can be

16   treated the same way?

17        A.    Right.

18        Q.    Okay.  Those are the first two things you have

19   to consider.  If you answer "yes" to both of these

20   questions, "Yes, I think he's going to hurt again," "Yes,

21   he should have known someone was going to have to die,"

22   the defendant can be eligible for the death penalty.

23        A.    Okay.

24        Q.    But then you have to ask yourself and take into

25   consideration everything you hear in this courtroom, all

1    the evidence, all the circumstances about the case, the

2    defendant's character and background, and the personal

3    culpability of the defendant, his personal role.

4              And then you are asked this question, "Is

5    there something about one of these four things that

6    mitigates --" and mitigate is basically something that

7    makes you less morally blameworthy, something that makes

8    you less to blame, an excuse for that particular crime,

9    for committing that crime.

10             "Is there something that would warrant

11   life in prison versus death?"  Okay.  So then you have to

12   answer that question based on what you hear.

13        A.   Uh-huh.

14        Q.   My question to you at this point is do you have

15   any personal feelings that would always want you to say,

16   "I think life in prison is better than death"?

17        A.   No.

18        Q.   Okay.  Do you have any other personal feelings

19   the other way where, "No matter what I hear, he may be a

20   good person or he may love his mother very much, if he

21   killed, then he ought to get the death penalty"?

22        A.   Yes.

23        Q.   You feel that way --

24        A.   Yes.

25        Q.   -- that he should always get the death penalty?

STATE OF TEXAS VS. RUBEN GUTIERREZ                           265

1      A.   Not always, of course.

2      Q.   Okay.

3      A.   But the law is the one that weighs the

4   circumstances or the whatever.

5      Q.   You're going to be asked to do that.

6      A.   Right.

7      Q.   Okay.  And the law says you have to take them

8   into consideration and then decide if there's something

9   there that warrants saving his life.  There may not be.

10  You know, he may be a horrible person and have killed two

11  or three people.

12           But let's say there is something good

13  about him.  Let's say he does come in here and there's

14  something about his background that you hear that may

15  make him less to blame.  Could you consider a life

16  imprisonment versus death?

17     A.   One good does not erase the bad part.

18     Q.   That's exactly right, but the law says you have

19  to consider it.

20     A.   Well --

21     Q.   Could you consider it?  I'm not saying you have

22  to do it.

23     A.   Yeah.  But you need to consider it.

24     Q.   Exactly.  You have to consider it.  We've

25  had -- we've talked to a lot of folks, ma'am, and some of

STATE OF TEXAS VS. RUBEN GUTIERREZ                    266

1    them come in the courtroom and they have a feeling that

2    no matter what, they're going to give the death penalty.

3              Some have a feeling that no matter what,

4    they're going to give a life sentence.

5              And then a lot of folks say, "Look, you

6    know, I don't know one way or the other what I'm going to

7    do, but I'm going to keep my options open."

8              Which group do you fit in?

9    A.    I'll keep my options open.

10   Q.    Okay.  So you wouldn't always say the death

11   penalty --

12   A.    No.

13   Q.    -- because you don't know anything about the

14   case?

15   A.    No.

16   Q.    And you wouldn't always say life because you

17   don't know anything about the case?

18   A.    That's right.

19   Q.    Keep your options open?

20   A.    Yes, ma'am.

21   Q.    Okay.  There are a lot of different rights that

22   the defendant has.  He has the right to remain silent.

23   He doesn't have to take the stand.  He doesn't have to

24   tell you his side of the story.  He doesn't have to tell

25   you anything.  The law says you can't hold it against

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                           267

1    him.  Can you follow that law?

2        A.   Yes, ma'am.

3        Q.   He doesn't have to present any evidence.  He

4    doesn't have to do anything in his own defense.  It's my

5    job to make sure he's proven guilty.  Can you follow that

6    law?

7        A.   I understand that.

8        Q.   Okay.  The law says I have to prove to you that

9    he committed the crime.  If I don't do it, then the law

10   says that you have to find him not guilty.

11       A.   Yes, ma'am.

12       Q.   Can you do that, too?

13       A.   Yes, ma'am.

14       Q.   Okay.  Now, this is the last time that you and

15   I get to visit one-on-one like this.  If you become a

16   juror, you can't ask me questions and you can't ask me

17   things and you can't tell me things.  All I can do is

18   present the case to you.

19            Is there anything that you think I need to

20   know about you being a possible juror in this case?

21       A.   Other than what I already said, no.

22       Q.   Okay.  And when we asked you if you wanted to

23   be a juror in this case, you said, "Yes."  Is there

24   anything that you think that might cause you to be

25   unfair?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    268

```
 1          A.   No.
 2          Q.   Okay.  Thank you for your time, ma'am.
 3          A.   You're welcome.
 4                    MR. GALARZA:  Can I proceed, Judge?
 5                    THE COURT:  You may.
 6                    VOIR DIRE EXAMINATION
 7  BY MR. GALARZA:
 8          Q.   Ms. Perez --
 9          A.   Yes.
10          Q.   -- good afternoon.
11          A.   Good afternoon.
12          Q.   I'm just going to be asking you some questions.
13  If you don't understand them, just ask me to repeat them
14  and I'll go ahead and repeat them or rephrase them --
15          A.   Yes, sir.
16          Q.   -- so you can go ahead and understand them.
17                    I believe in your questionnaire you stated
18  that -- or you don't state.  It says, "Do you feel that
19  you would be unable to serve as a juror for the estimated
20  two weeks or more of this trial?"  And you checked,
21  "Don't know" or "No opinion."  I'm just trying to go
22  ahead and make sure --
23          A.   Yes.
24          Q.   -- that you would be able to serve as a juror.
25  There's no conflict that you would have, going out of
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          269

```
1    town or anything else?
2         A.   No.
3         Q.   Okay.  That's what I wanted make sure of.
4         A.   Uh-huh.
5         Q.   Okay.  You stated I believe at the time that
6    they questioned you during the voir dire that you did not
7    know any of the parties, is that correct, any of the
8    attorneys involved?
9         A.   No.
10        Q.   And you don't know any of the witnesses?  There
11   was a long list of names --
12        A.   Yes.
13        Q.   -- that were called out --
14        A.   But I don't -- I don't know anybody.
15        Q.   Okay.  I'm also going to call out some other
16   names and just let me know if you know them or not.
17   Claudia Leyva, she's a dispatcher at the Brownsville
18   Police Department?
19        A.   No.
20        Q.   Tina Hauff, she lives here in Brownsville?
21        A.   Tina Hauff?
22        Q.   Hauff.
23        A.   (Shakes head).
24        Q.   Roberto Gonzalez, he's an inmate at the Cameron
25   County jail here in Brownsville?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    270

```
1          A.    No.

2          Q.    Tino Ortiz?

3          A.    No.

4          Q.    Escolastica Harrison, also known as Escolastica

5    Cuellar?

6          A.    No.

7          Q.    Okay.  If it happens that you know one of them

8    once they come over to testify and now maybe they might

9    have a different last name or something, would that

10   affect you in any way?

11         A.    No.

12         Q.    Okay.  You would not automatically believe

13   their testimony just because you know them?

14         A.    No.  It's just -- well, I don't recall now, but

15   if they -- if there's something that I recognize that I

16   know, well --

17         Q.    You would not automatically just believe their

18   testimony just because you know them?

19         A.    Believe their testimony?

20         Q.    You would --

21         A.    No, not because -- just because I know them,

22   no.

23         Q.    Okay.  That's what I was trying to go ahead and

24   get out.

25                    Okay.  Here in Texas we have -- well, let
```

1   me go back a little bit.  When a person is arrested, what

2   is your feeling as to that?  Is that person already

3   guilty or not guilty of the offense?

4       A.   If I don't know anything about that person, I

5   cannot --

6       Q.   Okay.

7       A.   -- judge anybody.

8       Q.   So at that point, he's still not guilty of the

9   offense; is that correct?

10      A.   That's right.

11      Q.   Just because he was arrested, that does not

12  mean that he's already guilty?

13      A.   Right.

14      Q.   Okay.  And usually what happens is once a

15  person is arrested, then after that they go -- the law

16  enforcement agency tries to go ahead and collect all the

17  statements, all the -- from all the witnesses, take

18  pictures, and anything else they need to go ahead and

19  complete their file.

20           Once their file is complete, then after

21  that, they submit it over to the District Attorney's

22  Office.  Once the District Attorney's Office receives it,

23  then if they feel that they're sufficient, they'll go

24  ahead and present it to the grand jury.

25           The grand jury are 12 jurors that usually

STATE OF TEXAS VS. RUBEN GUTIERREZ                          272

1    meet like once a month.  And once the case is presented

2    to you, they're the ones that say yes, there's sufficient

3    to proceed with the case or no, there's not sufficient.

4                  Okay.  At that point -- if they're

5    sufficient, then at that point they'll sign what we call

6    an indictment, okay?  The foreman goes ahead and signs an

7    indictment; and then that indictment is filed in one of

8    the district courts, okay?  Like in this example, this

9    indictment fell here in the 107th District Court.

10                  At that point do you feel the person is

11   already guilty or not guilty of the offense?

12       A.   No, not yet --

13       Q.   Okay.

14       A.   -- because he hasn't been judged.

15       Q.   Okay.  He hasn't been judged by his peers?

16       A.   Right.

17       Q.   Okay.  By a jury.  They haven't heard the

18   evidence or anything else; is that correct?

19       A.   Right.

20       Q.   So would you agree with me that at that point a

21   person is still presumed innocent of the offense?

22       A.   Right.

23       Q.   In order for you to find a person guilty, the

24   State must prove their guilt beyond a reasonable doubt.

25   If you look on the left-hand side on those two posters

1   that are up there, "A reasonable doubt --" let me read it
2   to you.  "A reasonable doubt is a doubt based on reason
3   and common sense after a careful and impartial
4   consideration of all the evidence in the case.  It is the
5   kind of doubt that would make a reasonable person
6   hesitate to act in the most important of his own
7   affairs."
8               The second paragraph reads, "Reasonable
9   doubt, therefore, must be proof of such a convincing
10  character that you would be willing to rely and act upon
11  it without hesitation in the most important of your own
12  affairs."
13              What they're asking you to do at this
14  point is to go ahead and use your reasoning, everyday
15  reasoning, your everyday common sense to listen to the
16  testimony.  And you're the one that determines who you
17  believe is telling the truth and who's lying, okay?
18              You look at their demeanor to see if
19  they're lying or not.  And if two people are saying
20  completely the opposite, you're the one that uses your
21  common sense and your reasoning to see what you're going
22  to believe to see who's telling the truth, okay?
23       A.   Yes.
24       Q.   Like an example, have you ever purchased a
25  home?  Have you ever bought a home?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                274

1       A.   Yes.

2       Q.   Okay.  And let me give you an example.  If when

3   you went to purchase, if the sale price of the home was

4   50,000, and once you saw the home and it had a lot of

5   damage and once you saw it, to you it was only worth like

6   30,000, would you purchase the home at that point?

7       A.   No.

8       Q.   Okay.  You would try to go ahead and negotiate

9   the price down to be able to go ahead and have enough

10  money maybe to fix the damage.  And you wouldn't just

11  automatically go in and purchase the home at whatever

12  price it is; is that correct?

13      A.   Yes, sir.

14      Q.   You would use your common sense and your common

15  sense would tell you, "Don't purchase this home because

16  it's not worth 50,000;" is that correct?

17      A.   Right.

18      Q.   That's the same thing we're asking you to do in

19  this type of case, just use your common sense, your

20  everyday reasoning to determine who's telling the truth

21  and who's not telling the truth concerning the case,

22  okay?

23                In order for you to find a person guilty

24  of an offense or in this case of capital murder, they

25  need to prove every single element beyond a reasonable

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    275

1   doubt.  The elements are on the right-hand side right
2   there.
3               The elements are in this case, number one,
4   that the defendant; number two, on or about the 5th day
5   of September, 1998; number three in Cameron County,
6   Texas; number four, intentionally; number five, caused
7   the death of an individual by stabbing the individual
8   with a screwdriver or object unknown to the grand jury,
9   or by striking the individual with an object unknown to
10  the grand jury, or by causing the individual to impact
11  with an object unknown to the grand jury; and then number
12  six, and the said defendant was then and there in the
13  course of committing or attempting to commit the offense
14  of robbery of the individual.
15               Okay.  The State -- in order for you to
16  find the person guilty, they need to prove every single
17  element beyond a reasonable doubt, okay?
18               So what you end up doing, you go through
19  element number one, "Okay.  Did they prove this beyond a
20  reasonable doubt?"  If they did, then you check that one.
21  You go through element number two, "Did they prove this
22  beyond a reasonable doubt?"  "Yes," you check it.  You
23  just go through every single element.
24               Like an example, have you ever played the
25  lottery, Wednesdays and Saturdays, six numbers?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    276

1      A.   Yes.

2      Q.   Okay.  So in that situation, if you get five

3  out of the six numbers, do you automatically get the

4  whole jackpot?

5      A.   No.

6      Q.   Why not?

7      A.   Because I'm missing one.

8      Q.   Okay.  So you would agree with me that you need

9  to get all the six numbers in order for you to get the

10  whole jackpot?

11      A.   Yes, sir.

12      Q.   So it's the same thing as in this case.  In

13  order for to you find a person guilty, they need to prove

14  every single element beyond a reasonable doubt.

15      A.   Yes, sir.

16      Q.   If they do not prove one of the elements, after

17  you're going through it, beyond a reasonable doubt, then

18  as to that offense your verdict should be not guilty,

19  okay?

20           Let me give you -- like robbery, robbery

21  what that is is when a person goes -- like an example,

22  somebody comes up to me, they want to take my watch and

23  they put a gun in my face, like, "Give me the watch or

24  I'll kill you."  Okay?  That's robbery.

25           Or another example, if they try to go

1  ahead and take it away by force and they commit bodily
2  injury to me, then that's robbery.  Okay?
3       A.   Uh-huh.
4       Q.   Do you understand that?
5       A.   Yes, sir.
6       Q.   Burglary, what that is when somebody goes into
7  a residence or a building.  Like if somebody comes into
8  this courthouse and takes some chairs without permission,
9  okay, that's considered burglary of a building, okay?
10            Or if they go into my house and they take
11 the TV, that's considered burglary of a residence,
12 burglary of habitation, okay?  That's something that's
13 done to a habitation or a residence, okay?
14            They're both felonies, but they're both
15 different types of felonies, okay?  Do you understand
16 that so far?
17      A.   Yes, sir.
18      Q.   So let's look now at element number six where
19 it says, "And the said defendant was then and there in
20 the course of committing or attempting to commit the
21 offense of robbery," okay?  Would you agree with me that
22 right here they need to prove robbery beyond a reasonable
23 doubt?
24      A.   Yes.
25      Q.   If after all the evidence is presented to you,

STATE OF TEXAS VS. RUBEN GUTIERREZ                              278

1    after all the jurors, all 12 jurors go back to deliberate

2    to talk about the case, if after you go through element

3    number one all the way to element number five, and all

4    those ones you realize they did prove it beyond a

5    reasonable doubt, so you're okay with all the first five,

6    but then in element number six, once you go through it

7    and once you think about it, you think, "Well, in my mind

8    they proved burglary.  They did not prove robbery," okay,

9    and then you go through element number six, what they're

10   stating is that they need to prove robbery, at that point

11   what would your verdict be for capital murder?

12        A.   If they haven't prove all the way to six, then

13   it's not.

14        Q.   Okay.  And so, you understand that they need to

15   prove every single element?

16        A.   Yes, sir.

17        Q.   Because they proved burglary not robbery, then

18   your verdict at that point would be not guilty; is that

19   correct?

20        A.   Yes, sir.

21        Q.   Okay.  What we have here in Texas, we have what

22   we call a bifurcated trial.  What that is is a two-part

23   trial.  Ms. Fischer kind of spoke to you about it a

24   little while ago.

25                 The very first part is when you all listen

1   to all the evidence.  You all look at any pictures that

2   there is, you listen to the witnesses.  And once we

3   close, once we finish the case, then at that point the

4   jurors will go to the back and they determine is this

5   person guilty or not guilty.  That's when you go through

6   all the six elements, okay?

7                  If they did not prove the six elements

8   beyond a reasonable doubt, then you come back and it's

9   not guilty; is that correct?

10       A.    Yes.

11       Q.    At that point it stops right there, okay?

12                  But if you all go back there and you go

13  through all the six elements and they did prove every

14  single element beyond a reasonable doubt, then at that

15  point you all come back with a guilty.

16       A.    Yes.

17       Q.    Okay.  So if you all come back with a guilty,

18  then at that point if you all come back with a guilty

19  verdict for capital murder, then we go through all the

20  three questions that are up there, okay?  And for a

21  capital murder, it's -- the sentence, it's either life or

22  death, okay?  That's the sentence for a capital murder.

23                  So what that means is that you're going to

24  go through all those three questions, answer yes or no to

25  each question, okay?  You don't automatically go back

STATE OF TEXAS VS. RUBEN GUTIERREZ                    280

1   there and say, "Well, I vote for death," or "I vote for

2   life."  That's not what you all do.  That's something the

3   Judge does.  He's the one that imposes the death penalty.

4            But what you all do is you all just go

5   through every single question and you all just answer the

6   questions, okay?  And I'll get back to those in a minute.

7            In a capital murder case, you can find him

8   not guilty of capital murder.  But if you all come back

9   and you say, "Well, but we find him guilty of murder,"

10  like in that hypothetical, if you say, "Well, they did

11  not prove element number six.  So he's not guilty of

12  capital murder, but he's guilty of murder because he did

13  cause the death," okay, so for murder, the sentencing

14  range is from five to 99 or life.

15           What that means is you can give him five

16  years for punishment, or you can give him 99 or life, or

17  anything in between, okay?  Are you willing to go through

18  that sentencing range?

19       A.   Yes, sir.

20       Q.   Okay.  If you find him not guilty of capital

21  murder and then you believe he did not cause the death

22  either of this individual, you say, "Well, he did commit

23  the robbery," then you can find him guilty of robbery.

24  Do you understand that?

25       A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    281

1    Q.   Okay.  In that -- in robbery, the sentencing

2    range is from two to 20, which means you can give him two

3    years, or you can give him 20 years, or anything in

4    between.

5    A.   Yes, sir.

6    Q.   Would you follow that sentencing range?

7    A.   Yes.

8    Q.   Okay.  So then let's go back to capital murder.

9    The very first question, Special Issue Number 1 which is

10   the one that's up there, it says, "Is there a probability

11   that the defendant would commit criminal acts of violence

12   that would constitute a continuing threat to society?"

13        Okay.  Would you agree with me that that

14   one is telling you to look into the future?

15   A.   Yes.

16   Q.   Okay.  It's telling you, "Will this person

17   commit criminal acts of violence that would constitute a

18   continuing threat to society in the future?"  That's

19   mainly what it's telling you, okay?

20        Would you agree with me that criminal acts

21   of violence, it's mainly acts of violence against another

22   person?

23   A.   Yes.

24   Q.   Okay.  So it's narrowing the scope down, okay?

25   Like an example, if you believe he's going to commit

1    theft, that's not a criminal act of violence; would you

2    agree with me?

3             Like an example, if he's going to come

4    into this building, steal some chairs, that's not an act

5    of violence; would you agree with me as to that?

6    A.   Yes.

7    Q.   Okay.  So, criminal act of violence is, like an

8    example, if I go and assault somebody, I go and push

9    somebody, I go and rob somebody, something from them.

10   That's criminal acts of violence.

11            So that's what you're looking into, "Is he

12   going to commit criminal acts of violence into the

13   future?"  Okay?

14            Special Issue Number 2, it says, "Do you

15   finds from the evidence beyond a reasonable doubt that

16   the defendant actually caused the death of the deceased;

17   number two, if he did not actually cause the death, did

18   he intend to kill the deceased or another; or number

19   three, did he anticipate that a human life would be

20   taken?"  Okay?

21            So this one is broken down into three

22   subparts, okay?  Let me give you a hypothetical.

23   Mr. Reyes and I go into the Circle K.  We talk about

24   robbing the Circle K, taking the money from them.  We

25   both take a gun and we both say, "Well, if the clerk

STATE OF TEXAS VS. RUBEN GUTIERREZ                               283

1    gives us a hard time, we'll kill her."  Okay?

2              So we go in.  The clerk gives me a hard

3    time.  She does not give me the money voluntarily.  So I

4    kill her and I take the money.  We both flee.  In this

5    hypothetical, did I actually cause the death of the

6    clerk?  Myself.  I had the gun and I shot the clerk.  So

7    I actually caused the death.

8         A.   Right.

9         Q.   Did Mr. Reyes actually cause the death of the

10   clerk?

11        A.   I guess both, I mean, if both acted into it.

12        Q.   Okay.  Let's go through each subpart

13   individually.  Remember it has three parts.

14        A.   Right.

15        Q.   So first, did he actually cause the death?  Did

16   he actually shoot the clerk?

17        A.   No.

18        Q.   Okay.  Now let's go into the second part.  Did

19   he intend -- did I intend to kill somebody?

20        A.   I don't know if you intended or not, but if you

21   were shotting [sic] at the person, you took part --

22        Q.   Remember we spoke about it before and we said,

23   "Well, if they give us a hard time, go ahead and kill the

24   clerk"?

25        A.   Oh.  Well, then yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                284

1       Q.   Then I did intend?

2       A.   Yes.

3       Q.   Okay.  Did Mr. Reyes intend that somebody

4   might --

5       A.   I don't know about his intentions, just -- if

6   you state about his actions, I don't know about the

7   intention is inside of him.

8       Q.   Okay.  But since we spoke about it before, we

9   both spoke about it and we both agreed --

10      A.   Well --

11      Q.   -- we said, "If somebody gives us a hard time,

12  we'll shoot the clerk."

13      A.   Yes.

14      Q.   So he also intended --

15      A.   Right.

16      Q.   -- to shoot the clerk.  Number three, could I

17  have anticipated that somebody might be killed?

18      A.   Yes.

19      Q.   Because I took a gun.

20      A.   Right.

21      Q.   Because we spoke about it.

22      A.   Right.

23      Q.   Could he have anticipated that somebody might

24  be killed?

25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           285

1     Q.   Okay.  So that's what you do in this one.  You

2     go through each part.  And if you answer "yes" to one of

3     them, of course, your response is going to be "yes" to

4     the second part.

5                    Okay.  Let me change the hypothetical a

6     little bit.  If Mr. Reyes and I agree to go to the

7     Circle K just to take some cigarettes, okay?  We're just

8     going to take some cigarettes.  He's going to go ahead

9     and distract the clerk, and I'm going to take the

10    cigarettes, and then we're going to leave.  That's all

11    we're going to do.

12                    We go in -- we separate for like five, ten

13    minutes.  And then after that we get together there at

14    the Circle K.  I get the gun from my car and I put it

15    inside my coat.  He does not know anything about that.

16    And we never talk about taking a gun in there or about

17    killing somebody.  All we're going to get is the

18    cigarettes.

19                    We both go in.  I distract the clerk.  He

20    gets the cigarettes.  And I know he gets them, so we're

21    going out.  He gets out first.  And as soon as I approach

22    the door, I still turn around and I shoot the clerk,

23    okay?

24                    In this hypothetical that I'm giving you

25    right now, did I actually cause the death of the clerk?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    286

1   Myself.

2        A.    No.

3        Q.    I'm the one that turned around and shot the

4   clerk.

5        A.    Oh.  Well, you did, but not him.

6        Q.    Okay.  But Mr. Reyes did not; is that correct?

7        A.    (Nods head).

8        Q.    Did I intend that somebody might be killed?

9   Did I intend to kill somebody?  I had a gun with me.

10  So --

11       A.    Yeah.

12       Q.    Okay.  Did Mr. Reyes intend that somebody might

13  be killed?

14       A.    No.

15       Q.    Okay.  Did I anticipate that somebody might be

16  killed?  I had a gun with me.

17       A.    Yes.

18       Q.    Did Mr. Reyes anticipate?

19       A.    No.

20       Q.    Okay.  So this is what we call mainly like the

21  law of parties, okay?  Do you understand that not in

22  every situation that both people are there in some

23  situations -- like in this case, Mr. Reyes might be

24  guilty of robbery but not actually of murder or of

25  capital murder; is that correct?

1      A.    Yes, sir.

2      Q.    Then we go into Special Issue Number 3.    This

3    is what we call the mitigation issue.    What this mainly

4    talks about -- we'll go to the last paragraph first or

5    the very bottom paragraph.    "Do you find that there is a

6    sufficient mitigating circumstance or circumstances to

7    warrant a sentence of life imprisonment rather than a

8    sentence of death to be imposed?"

9              Okay.    What it's asking you, "Is there a

10    reason or set of reasons that this person should get life

11    rather than death?"    Okay?

12              And what you look at is you look at number

13    one, all the evidence, okay?    You look at the

14    circumstances of the offense.    You look at the

15    defendant's character and background.    And then you look

16    at the personal moral culpability of the defendant.

17              Like an example, in the hypothetical that

18    I gave you, let's take the first one where we both went

19    in with a gun.    We both talked about killing somebody.

20    In that hypothetical, if I'm in trial, okay, then you're

21    going to see that I was the one that was convicted.    You

22    already charged me with capital murder because I killed

23    the clerk and we intended to go over there and commit

24    robbery, okay?

25              So would you take that evidence into

1    consideration?

2        A.    Yes.

3        Q.    And Mr. Reyes, an example, would you take into

4    consideration the fact that he did not kill the clerk --

5        A.    Yes.

6        Q.    -- to determine whether he deserves life or

7    death?

8        A.    Right.

9        Q.    Another example, in -- like an example, if I

10   was 17 years old -- or let me go back.  Let me go to the

11   first two.  In the first one, in order for all 12 of you

12   to bring us a "yes" answer, all 12 of you have to answer

13   "yes."

14       A.    Yes.

15       Q.    Okay.  Do you understand that?  In order for

16   you all to bring us a "no" answer, then only ten of you

17   have to answer "no" and two of you can answer "yes."

18       A.    Yes.

19       Q.    You can still bring us a "no" answer.  If you

20   bring us a "no" answer to Question Number 1, then it

21   stops right there.  You all don't have to go any further,

22   okay?  And each time, evidence is going to be presented

23   to you so you can take it into consideration, okay?  So

24   if you answer "no," then it stops right there.  If you

25   answer "yes," then you go on to Number 2, okay?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    289

```
 1              Again in Question Number 2, if you answer
 2    "yes," all 12 of you have to agree to "yes" and you all
 3    have to bring us a "yes" answer, okay?  If you answer
 4    "no," then only ten of you have to agree to "no" and then
 5    you'll bring us a "no" answer.  If you bring us a "no"
 6    answer, it stops right there.  If you bring us a "yes"
 7    answer, then we go to Issue Number 3, okay?
 8              In Question Number 1 and Question
 9    Number 2, you all don't have to have the same response as
10    to "no."  Like you can have -- say, "Well I'm saying 'no'
11    because of A."  Another juror can say, "I'm saying 'no'
12    because of B," okay?  But just as long as you all say
13    "no," ten of you can say "no."  It does not have to be
14    exactly the same thing.  Do you understand that?
15         A.   Yes, sir.
16         Q.   Okay.  Then if you say "yes" to Number 1, "yes"
17    to Number 2, we go into Question Number 3.  It says, "Is
18    there any reason this person deserves life rather than
19    death?"
20              This is the opposite from Number 1 and
21    Number 2.  In order for you all to bring us a "no"
22    answer, all 12 of you have to say "no."  In order for you
23    all to bring us a "yes" answer, only ten of you have to
24    say "yes."  Do you understand that?
25         A.   Yes, sir.
```

1    Q.   Okay.  Like in this hypothetical, you can --
2    you might be able to say, well -- like an example, in
3    my -- if I'm the one that's in trial, "Well, he's 17
4    years old.  I believe that he deserves life rather than
5    death."  That can be your -- the reason, okay?
6              Another juror can say, well -- if I did
7    not kill the clerk, maybe he can say, "Well, he did not
8    kill the clerk.  So I believe he deserves life rather
9    than death," okay?
10             It can be one reason or it can be several
11   reasons, okay?  So -- for you all to bring us a "no"
12   answer.  I'm sorry.  A "yes" answer to Number 3.  This
13   person deserves life rather than death, okay?
14             If you all answer "yes" to Number 1, "yes"
15   to Number 2, and "no" to Number 3, then the Judge is the
16   one that imposes the death sentence at that point.  Do
17   you understand that?
18   A.   Yes, sir.
19   Q.   Are you willing to follow all this?
20   A.   Yes, sir.
21   Q.   Are you willing to answer truthfully as to all
22   this?
23   A.   Yes, sir.
24   Q.   Ms. Fischer kind of spoke to you that do you
25   understand that like if I'm in trial, that I have the

1   right to remain silent, that I don't have to talk to

2   police officers, I don't have to give a statement, I

3   don't have to take the stand and testify in court?

4        A.   Yes, sir.

5        Q.   Do you understand that I have that right?

6        A.   Yes, sir.

7        Q.   Okay.  Would you hold it against me if I did

8   not testify in court and, like an example, if I didn't

9   give a statement?

10       A.   No.

11       Q.   Okay.  You understand that like in a

12   hypothetical, if me and my wife are the ones that go into

13   the Circle K, if it's only the clerk, my wife and I, and

14   I shot the clerk, okay?  There was no other witnesses,

15   okay?  But you understand that my wife has the right not

16   to testify?

17       A.   Yes.

18       Q.   Okay.  Would you hold it against me if my wife

19   did not testify?

20       A.   No.

21       Q.   Even though it was only -- she's the only other

22   person that knows about what exactly happened?

23       A.   No.

24       Q.   Okay.  You understand that Mr. Reyes in that

25   hypothetical, that he would be a codefendant in my case?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          292

```
 1        A.    Yes.
 2        Q.    He would also be a defendant?   Okay.   In this
 3   hypothetical, you understand that sometimes -- like an
 4   example, if I'm the one that's in trial, if we're both
 5   facing capital murder charges, that there might be a plea
 6   bargain with the State.   He can enter into a plea bargain
 7   with the State.
 8        A.    Yes.
 9        Q.    Like an example, if he's facing life or death,
10   they might offer him 30 years to testify against me.   You
11   would agree with me that that can happen or that might
12   happen?
13        A.    Yeah.   Maybe.
14        Q.    If he gets less time, if he gets probation or
15   dismissal because of his testimony, would you agree with
16   me that he has a reason for testifying --
17        A.    Yes.
18        Q.    -- because he's getting something in return?
19        A.    Right.
20        Q.    Okay.   Would you agree with me that he might
21   have a reason for lying also because he has -- he's
22   getting something in return?
23        A.    It could be possible.
24        Q.    Okay.   Would you take that into consideration?
25        A.    Yes, sir.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    293

1       Q.   Okay.  Would you agree with me that doctors and
2   police officers are human?
3       A.   Are human?
4       Q.   Yeah.
5       A.   Yes.
6       Q.   Okay.  Would you agree with me that they can
7   also make mistakes?
8       A.   Yes.
9       Q.   Okay.  So, therefore, would you agree with me
10  that they could lie in order to cover their mistakes?
11      A.   Yes.
12      Q.   Would you take that into consideration?
13      A.   Yes.
14      Q.   Do you have any relatives in law enforcement?
15      A.   No, sir.
16      Q.   Okay.  Have you ever been a prior victim, like
17  an example a burglary or anything like that?
18      A.   No, sir.
19      Q.   I believe you stated that you've already heard
20  a little bit about this case?
21      A.   Yes, on the news and I think I read some in the
22  newspaper, Brownsville Herald.
23      Q.   Is there anything about that that would make
24  you be unfair and impartial in this case?
25      A.   No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          294

1      Q.    You would just listen to the testimony and be
2   fair and give it the weight that it deserves?
3      A.    Yes.
4      Q.    Have you already formed an opinion?
5      A.    Please?
6      Q.    Have you already formed an opinion?   Have you
7   already decided --
8      A.    No.
9      Q.    Have you ever served on a jury before?
10     A.    No.
11     Q.    That's all I have, but before I finish, is
12  there any questions you have?   This is the last time we
13  get to talk to you.
14     A.    No.
15     Q.    Okay.   Thank you.
16               MR. GALARZA:   That's all I have, Judge.
17               THE COURT:   All right.   Ms. Perez, let me
18  ask you to step down for just a minute.   Follow the
19  bailiff.   I need to take up a legal matter and then I'll
20  bring you back in.
21               MS. PEREZ:   Thank you.
22               THE COURT:   Thank you.
23               **(Prospective juror left the courtroom)**
24               THE COURT:   Is this venireperson
25  acceptable to the State?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                295

```
 1                    MS. FISCHER:  Yes, Your Honor.
 2               THE COURT:  To the defense?
 3                    MR. GALARZA:  Yes, Your Honor.
 4               THE COURT:  Bring her in.
 5                    Okay, Ms. Perez.  You have been selected
 6    as an alternate juror.
 7                    MS. PEREZ:  Okay.
 8               THE COURT:  I'll explain that in just a
 9    minute, but let me swear you in right now.  Would you
10    raise your right hand?  Do you swear that in the case of
11    the State of Texas against the defendant you will a true
12    verdict render according to the law and the evidence, so
13    help you God?
14                    MS. PEREZ:  Yes.  I do.
15               THE COURT:  Okay.  You've been selected as
16    an alternate juror.  We selected two alternates, okay, 12
17    jurors and two alternates, which means if one of the
18    jurors that we selected gets sick or is unable to
19    continue, then the first alternate, which is the lady
20    before you --
21                    MS. PEREZ:  Right.
22               THE COURT:  -- will take her place, all
23    right?
24                    MS. PEREZ:  Yes.
25               THE COURT:  If two jurors get sick, for
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    296

```
 1   example, and cannot continue, then you will replace the
 2   second juror that was unable to continue.
 3                   MS. PEREZ:  Yes, Your Honor.
 4                   THE COURT:  But you will sit with the jury
 5   throughout the whole trial like you were a juror, and you
 6   will wait until the end of the trial to see if anything
 7   happens to any of the jurors.
 8                   If nothing happens to the jurors at the
 9   end of the trial, at that time you'll be excused right
10   before the jury goes into deliberation.  At that time
11   you'll be excused, okay?
12                   MS. PEREZ:  Okay.
13                   THE COURT:  I'll ask you to be back Friday
14   morning --
15                   MS. PEREZ:  This Friday?
16                   THE COURT:  Yes.  Day after tomorrow.
17   Friday morning at nine a.m.  The bailiff will show you
18   the jury room where you will report to Friday morning,
19   okay?
20                   MS. PEREZ:  Yes, sir.
21                   THE COURT:  Thank you very much.  Follow
22   the bailiff.
23                   MR. GALARZA:  Thank you, Ms. Perez.
24                   MS. PEREZ:  Will I get a statement for
25   work?  Because I have to present it.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          297

1                    THE COURT:   Yes.   The bailiff will tell
2      you where --
3                    MS. PEREZ:   So I can be excused from work?
4                    THE COURT:   Right.   The bailiff will tell
5      you where to pick that up.
6                    MS. PEREZ:   Thank you.
7                    THE COURT:   Thank you.
8                    Be ready Friday morning.
9                    MR. REYES:   What time, Your Honor?
10                   THE COURT:   9:00.
11                   **(Proceedings recessed at 3:17 p.m.)**
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                298

THE STATE OF TEXAS:

COUNTY OF CAMERON:

### CERTIFICATE OF COURT REPORTER

I, PAM L. ESQUIVEL, Official Court Reporter in and for the 107th Judicial District Court of Cameron County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 6th day of December, 1999.

PAM L. ESQUIVEL, Texas CSR, RPR
Official Court Reporter
107th District Court
974 East Harrison Street
Brownsville, Texas 78520
(956) 544-0874
Certificate No. 2369
Expiration Date: 12/31/00

PAM L. ESQUIVEL, CSR, RPR