STATE OF TEXAS VS. RUBEN GUTIERREZ   *73462*   1

REPORTER'S RECORD

VOLUME 17 OF 32 VOLUMES

TRIAL COURT CAUSE NO. 98-CR-1391-A

- - - - - - - - - - - - - - - x
                   :
THE STATE OF TEXAS          : IN THE DISTRICT COURT
                   :
VS.                     : 107TH JUDICIAL DISTRICT
                   :
RUBEN GUTIERREZ           : CAMERON COUNTY, TEXAS
                   :
- - - - - - - - - - - - - - - x

JURY TRIAL

On the 9th day of April, 1999, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Benjamin Euresti, Jr., Judge Presiding, held in Brownsville, Cameron County, Texas.

Proceedings reported by machine shorthand.

A P P E A R A N C E S

APPEARING FOR THE STATE OF TEXAS:

    HON. JOHN T. BLAYLOCK
    State Bar No. 00784302
    HON. KAREN L. FISCHER
    State Bar No. 00790685
    Assistant District Attorneys
    Cameron County Courthouse
    974 East Harrison
    Brownsville, Texas  78520
    (956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS

DEC 8 1999

Troy C. Bennett, Jr., Clerk

ORIGINAL

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    2

1    **APPEARANCES CONTINUED:**

2    APPEARING FOR THE DEFENDANT:

3         HON. SANTIAGO GALARZA
          State Bar No. 00787508
4         Law Offices of Santiago Galarza
          3100 East 14th Street
5         Brownsville, Texas   78521
          (956) 541-4157
6
          AND
7
          HON. DANIEL R. REYES
8         State Bar No. 16794290
          Perez & Reyes
9         316 Nolana Loop
          McAllen, Texas   78504
10        (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    i

VOLUME 17

TRIAL ON THE MERITS

APRIL 9, 1999                                              PAGE    VOL

Court's instructions to the jury...................4       17

Indictment read.................................13         17

Opening Statement by Mr. Blaylock...............14        17

STATE'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| David Garcia | 35 44 | 54 | 66 | 70 | 40 | 17 |
| Avel Cuellar | 74 | 145 | 197 | 217 | --- | 17 |
| Claudio Ortiz III | 224 | 231 | --- | --- | --- | 17 |
| Claudia Leyva | 240 248 | 250 | --- | --- | 244 | 17 |
| Ramiro Martinez | 254 | 279 | --- | --- | --- | 17 |

                                                          PAGE    VOL

Adjournment....................................298        17

Court Reporter's Certificate...................299        17

ALPHABETICAL WITNESS INDEX

TRIAL ON THE MERITS

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|-----|-----|-----------|-----|
| Cuellar, Avel | 74 | 145 | 197 | 217 | --- | 17 |
| Garcia, David | 35 44 | 54 | 66 | 70 | 40 | 17 |
| Leyva, Claudia | 240 248 | 250 | --- | --- | 244 | 17 |
| Martinez, Ramiro | 254 | 279 | --- | --- | --- | 17 |
| Ortiz, Claudio III | 224 | 231 | --- | --- | --- | 17 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    ii

### INDEX OF EXHIBITS

### TRIAL ON THE MERITS

**STATE'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | Photograph | 39 | 44 | 17 |
| 2 | Photograph | 39 | 44 | 17 |
| 3 | Photograph | 39 | 44 | 17 |
| 4 | Photograph | 48 | 49 | 17 |
| 5 | Photograph | 48 | 49 | 17 |
| 6 | Photograph | 48 | 49 | 17 |
| 7 | Photograph | 48 | 49 | 17 |
| 8 | Photograph | 48 | 49 | 17 |
| 9 | (Unidentified) | --- | --- | --- |
| 10 | Photograph | 48 | 49 | 17 |
| 11 | Photograph | 48 | 49 | 17 |
| 12 | Photograph | 48 | 49 | 17 |
| 13 | Photograph | 48 | 49 | 17 |
| 14 | Photograph | 48 | 49 | 17 |
| 15 | Photograph | 48 | 49 | 17 |
| 16 | Photograph | 48 | 49 | 17 |
| 17 | Photograph | 48 | 49 | 17 |
| 18 | Photograph | 48 | 49 | 17 |
| 19 | Photograph | 78 | 78 | 17 |
| 20 | Photograph | 78 | 78 | 17 |
| 21 | Index card with writing | 98 | 98 | 17 |
| 22 | Drawing | 104 | 105 | 17 |
| 23 | Cassette Tape | 121 | | |
| | | 244 | 248 | 17 |
| 24 | Green ledger | 124 | 125 | 17 |
| 25 | Phone numbers | 130 | 130 | 17 |
| 26 | Photograph | 130 | 130 | 17 |
| 27 | Photograph | 130 | 130 | 17 |
| 28 | Photograph | 130 | 130 | 17 |
| 29 | Photograph | 133 | 133 | 17 |
| 30 | Photograph | 138 | 138 | 17 |
| 31 | Photograph | 138 | 138 | 17 |
| 32 | Index card with writing | 145 | --- | 17 |
| 33 | Drawing | 204 | 204 | 17 |
| 34 | **911 Transcript | 253 | 253 | 17 |

**DEFENDANT'S EXHIBITS:**
N/A

**EXHIBIT ADMITTED FOR THE RECORD ONLY AND WAS NOT
SUBMITTED TO THE JURY

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    3

```
1                      P R O C E E D I N G S
2                 (Open court, defendant present, no jury)
3                 THE COURT:  Are you all ready for the
4    jury?
5                 MR. GALARZA:  Yes, Your Honor.
6                 THE COURT:  Bring them in.
7                 THE BAILIFF:  Yes, Your Honor.
8                 MR. REYES:  Your Honor, also we had
9    previously invoked the rule.  So, we're asking that
10   anybody that's here, that they be sworn and placed under
11   the rule.
12                THE COURT:  All right.
13                (Jury brought into the courtroom)
14                THE COURT:  Roy, I need the two alternates
15   to sit --
16                THE BAILIFF:  They're right behind, You
17   Honor.  We made some space behind the jury box.
18                THE COURT:  All right.  So, there will be
19   12 over here --
20                THE BAILIFF:  And two seats over here.
21                THE COURT:  You may be seated.
22            Good morning, ladies and gentlemen of the jury.
23                THE JURY:  Good morning.
24                THE COURT:  It's been a long process, but
25   we're getting ready to start.  And it took about three
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    4

1    weeks to get you all together to create this jury to hear
2    this case, but we're getting ready to start.
3              At this time, let me ask any witnesses that are
4    here to testify to please stand at this time.  Do you
5    have any witnesses?
6              MS. FISCHER:  No.  They're all waiting
7    outside the courtroom.
8              THE COURT:  Okay.  Well, just instruct
9    them that the rule has been invoked; and that -- any
10   witnesses that may walk in during testimony, I advise
11   both sides to -- if they're witnesses for either side, to
12   let them know that the rule has been invoked and to wait
13   outside.
14             MR. GALARZA:  We will, Judge.
15             MS. FISCHER:  Yes, sir.
16             THE COURT:  And another housekeeping,
17   ladies and gentlemen of the jury, when you walk in, feel
18   free to be seated and then I will instruct the rest of
19   the audience and the parties to be seated after you.
20   That is a courtesy that is extended to the jury.  So,
21   feel free to come in and take a seat as soon as you walk
22   in, all right?
23             Okay.  Just in case I missed -- I think I
24   gave everybody the oath.  Did I miss anyone?  I gave
25   everybody the oath after you were picked?  Yes?  Okay.  I

1    want to make sure I did that.

2              All right.  Now, let me give you some

3    further instructions.  Okay.  First of all, do not mingle

4    with nor talk to the lawyers, the witnesses, the parties,

5    or any other person who might be connected with or

6    interested in this case except for casual greetings.

7    They have to follow these same instructions and you will

8    understand it when they do.

9              Do not accept from nor give to any of

10   those persons any favors, however slight, such as rides,

11   food, or refreshments.

12             Do not discuss anything about this case or

13   even mention to anyone whomsoever, including your wife or

14   husband -- excuse me -- nor permit anyone to mention it

15   in hearing until you are discharged as jurors or excused

16   from the case.  If anyone attempts to discuss the case,

17   report it to me at once.

18             Do not even discuss the case among

19   yourselves until you have heard all of the evidence, the

20   Court's charge, and the attorneys' arguments, and until I

21   have sent you to the jury room to consider your verdict.

22             Do not take any -- do not make any

23   investigations about the facts of this case.

24   Occasionally we have a juror who privately seeks out

25   information about a case on trial.  This is improper.

1      All evidence must be presented in open

2   court so that each side may question the witnesses and

3   make proper objection.  This avoids a trial based upon

4   secret evidence.  These rules apply to jurors the same as

5   they apply to the parties and to myself.

6      If you know of or learn anything about

7   this case, except from the evidence admitted during the

8   course of this trial, you should tell me about it at

9   once.  You have just taken an oath that you will render a

10  verdict on the evidence submitted to you under my

11  rulings.

12      Do not make personal inspections,

13  observations, investigations or experiments, nor

14  personally view premises, things or articles not produced

15  in court.  Do not let anyone else do any of these things

16  for you.

17      Do not tell other jurors your own personal

18  experiences nor those of other jurors -- of other persons

19  nor relate any special information.  A juror may have

20  special knowledge of matters such as business, technical

21  or professional matters, or he or she may have expert

22  knowledge or opinions, or he or she may know of what

23  happened in this or some other lawsuit.  To tell other

24  jurors any of this information is a violation of these

25  instructions.

1         Do not seek information contained in law

2    books, dictionaries, public or private records or

3    elsewhere which is not admitted in evidence.

4         At the conclusion of the evidence, I may

5    submit to you a written charge.  Since you will need to

6    consider all of the evidence admitted by me, it is

7    important that you pay -- that you pay close attention to

8    the evidence as it is presented.

9         Texas law permits proof of any violation

10   of the rules of proper jury conduct.  By this I mean that

11   jurors and others may be called upon to testify in open

12   court about acts of jury misconduct.  I instruct you,

13   therefore, to follow carefully all instructions which I

14   have given you as well as others which you will later

15   receive while this case is on trial.

16        And there's another instruction I need --

17   in case any of you want to take any notes, let me give

18   you some instructions on note taking.

19        Note taking is permitted but is not

20   required.  Each of you may take notes; however, no one is

21   required to take notes.  Now, take notes sparingly.  Do

22   not try to summarize all of the evidence.  Notes are for

23   the purpose of refreshing your memory.  They are

24   particularly helpful when dealing with measurements,

25   times, distances, identity and relationships.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                   8

1          Do not take your notes away from the
2     court.  Hand them to the bailiff at the end of the day.
3     The bailiff will hand them back to you the next morning.
4     Your notes are for your own private use only.  It is
5     proper -- it is improper for you to share your notes with
6     any other juror during any phase of the trial other than
7     jury deliberation.  You may, however, discuss the
8     contents of your notes during deliberations.
9          Now, let me talk to you a little bit about
10    sequestration.  Now, some of you may recall that jurors
11    in criminal cases used to be sequestered.  Remember like
12    the O.J. trial they had the jury in the hotel all the
13    time?  That's sequestration; that is, they were kept
14    together housed in the courthouse or elsewhere and not
15    allowed to go home until after the case was over.  That
16    was done primarily to prevent jurors from receiving
17    information about the case from some place other than the
18    courtroom.
19          Although the Court can still sequester a
20    jury, I seldom do that because experience has shown that
21    most jurors take their oath seriously.  You swore to
22    decide the case according to the law I will give you and
23    the evidence you will hear in the courtroom; and I trust
24    that you will keep your word and honor your oath.
25          You're going to be asked to make some

1   decisions that will affect the lives of numerous people;
2   and those decisions must be based on the evidence you
3   hear in this courtroom and not on information received
4   elsewhere.
5             Therefore, I will ask you to do the
6   following things:  Do not discuss this case, again, with
7   anyone nor permit anyone to discuss it with you.  Your
8   spouse will probably want to know what you did today; and
9   when you answer that question, you have just violated
10  these instructions.  Just explain that you cannot talk
11  about the case now, but when it is over, you'll tell him
12  or her all about it.
13            Avoid all news media reports of the case.
14  Don't read about the case, don't watch televised reports
15  about the case, or listen to any radio broadcast about
16  this case.
17            Now, if you do not to do what I'm telling
18  to you do, several things, all of them bad, could happen.
19  First, I might to have declare a mistrial, thus wasting
20  all of our time here and a substantial sum of money.
21            Second, I might have to sequester the jury
22  for the rest of the trial.
23            Third, you might have to take the stand
24  and testify under oath about your observance or violation
25  of these instructions.  So, I think you can understand

1   the importance of obeying these instructions; and I trust

2   that you will do so.

3              Now, the case will proceed in the

4   following order.  First, the District Attorney will read

5   the indictment and the defendant will enter his plea.

6   The State will make an opening statement outlining their

7   case.  The opening statement is not evidence but is

8   merely to aid you in generally understanding the nature

9   of the case and the significance of evidence when it is

10  introduced.

11             After the opening statement, if any, the

12  State will introduce evidence.  At the conclusion of the

13  State's evidence, the defendant has a right to make an

14  opening statement and to also introduce evidence;

15  however, he need not do so.

16             Rebuttal evidence may also be introduced.

17  At the conclusion of all the evidence, the attorneys will

18  make their closing arguments to you at that time.

19             Faithful performance by you of your duties

20  is vital to the administration of justice.  The law

21  applicable to this case will be contained in the

22  instructions I give you during the course of the trial;

23  and it is your duty to follow all such instructions.

24             It is your duty to determine the facts and

25  to determine them from the evidence and the reasonable

1    inferences arising from such evidence.  And in so doing,

2    you must not indulge in guesswork or speculation.

3                 The evidence which you are to consider

4    consists of the testimony of witnesses and the exhibits

5    admitted in evidence.  The term "witness" means anyone

6    who testifies in person or by deposition.

7                 The admission of evidence in court is

8    governed by rules of law.  From time to time it may be

9    the duty of the attorneys to make objections and whether

10   you can consider certain evidence.  You must not concern

11   yourselves with the objections or the Court's reasons for

12   these rulings.  You must not consider testimony or

13   exhibits to which an objection was sustained or which has

14   been ordered stricken.

15                Opening statements and closing arguments

16   of the attorneys are intended to help you in

17   understanding the evidence and applying the law, but

18   they're not evidence.

19                You must not be influenced in any degree

20   by any personal feeling of, sympathy for, or prejudice

21   against the State or defendant, for each is entitled to

22   the same fair and impartial consideration.

23                No statement or ruling or remark which I

24   make during the presentation of testimony is intended to

25   indicate my opinion as to what the facts are.  You are to

1    determine the facts.

2              In this determination, you alone must

3    decide upon the believability of the evidence and its

4    weight and value.  In considering the weight and value of

5    the testimony of the witness, you may take into

6    consideration the appearance, attitude and behavior of

7    the witness, the interest of the witness in the outcome

8    of the case, the relation of the witness to the

9    complainant or the defendant, the inclination of a

10   witness to speak truthfully or not, the probability or

11   improbability of the witness' statements, and all other

12   facts and circumstances in evidence.

13             Thus, you may give the testimony of any

14   witness just such weight and value that you believe the

15   testimony of such witness is entitled to receive.

16             Until this case is submitted to you for

17   your deliberation, you must not discuss this case with

18   anyone or remain within hearing of anyone discussing it.

19   Neither should you read any newspaper article, listen to

20   any radio broadcast, nor view any television program

21   which discusses this case.

22             After this case has been submitted to you,

23   you must discuss the case only in the jury room when all

24   members of the jury are present.  You are to keep an open

25   mind and you must not decide any issue in this case until

1   the case is submitted to you for your deliberation under

2   the instructions of the Court as previously explained.

3                 You will be permitted to separate unless

4   instructed to the contrary following the instructions

5   I've previously given you concerning the discussion of

6   the case or forming or expressing opinions.

7                 Now, the schedule we'll try to keep during

8   this trial, we'll try to start at 9:00 in the morning,

9   have a break at about 10:30, break for lunch at 12,

10  reconvene at 1:30, have an afternoon break at about 3:30,

11  and then break for the day at about 5:00.  That is the

12  schedule I'll try to keep during this trial.

13                 Now I think we're ready to proceed.  Is

14  the State ready?

15                 MR. BLAYLOCK:  The State is ready, Judge.

16                 THE COURT:  Defense ready?

17                 MR. GALARZA:  Ready, Your Honor.

18                 THE COURT:  Okay.  Will the defendant

19  please rise?

20                 Do you have the indictment?

21                 MR. BLAYLOCK:  May I see the Court's copy?

22  "In the name and by authority of the State of Texas, the

23  grand jurors for the County of Cameron, the State

24  aforesaid, duly organized as such at the July term, 1998,

25  the 107th Judicial Court, in and for said county, upon

STATE OF TEXAS VS. RUBEN GUTIERREZ                          14

1    their oaths in this court present that Ruben Gutierrez,

2    hereinafter called the defendant, on or about the 5th day

3    of September, 1998, and anterior to the presentment of

4    this indictment, in the County of Cameron and the State

5    of Texas, did then and there intentionally cause the

6    death of an individual, namely Escolastica Harrison, by

7    stabbing Escolastica Harrison with a screwdriver or an

8    object unknown to the grand jury, or by striking

9    Escolastica Harrison with an object unknown to the grand

10   jury, or by causing Escolastica Harrison to impact with

11   an object unknown to the grand jury, and the defendant

12   was then and there in the course of committing or

13   attempting to commit the offense of robbery of

14   Escolastica Harrison, against the peace and dignity of

15   the State," signed the foreman of the grand jury.

16               THE COURT:  To which the defendant pleads?

17               THE DEFENDANT:  Not guilty.

18               THE COURT:  All right.  You may be seated.

19               MR. BLAYLOCK:  May it please the Court?

20               THE COURT:  You may proceed.

21               MR. BLAYLOCK:  Eighty-five, she was 85

22   years old.  She was born in 1913, in February.  She lived

23   a long life.  She died September 5, 1998.  She was

24   vulnerable, one of the most vulnerable members of our

25   society.

1      Over the next few days, today, most of
2  next week, we're going to tell you how she died.  We're
3  going to tell you how brutal she died, how much pain she
4  went through.  We're going to tell you how it was an
5  unnatural death.
6      And we're going to show you that Ruben
7  Gutierrez killed her along with his codefendant, Rene
8  Garcia.  They had a third codefendant, Pedro Gracia.  He
9  drove the get-away car.
10      Ms. Harrison was an 85-year-old woman, was
11  of course retired, and she was a widow.  She was a widow.
12  Her husband, Robert Harrison, died in 1991.  She had
13  worked at Cromack Elementary School for 26 years.  She
14  retired.
15      Her and her husband had bought a trailer
16  park, mobile home park, at the corner of Morningside and
17  Central, that whole corner there, that block.  They had
18  trailers there.  They had an office there, a little bitty
19  house that was an office and that's where she lived.  It
20  was a small place.  She lived very frugal.  She was a
21  woman who saved, didn't like to spend a lot of money.
22      Since her husband had died in '91, the
23  maintenance around the trailer park was taken care of by
24  one of her brothers.  Her brother was a good man, but he
25  was almost as old as she was.  Ms. Harrison needed

1   somebody, so Avel Cuellar came to live with her in 1992.

2   That's her nephew.

3            Avel -- you'll listen to him -- will come

4   and sit right here.  He's not the smartest fellow in the

5   world.  You're going to know that.  He's going to tell

6   you what he saw and what his relationship was with his

7   aunt.  He called her mom, lived with her for six years,

8   since 1992.

9            They got to be close.  They had their

10  fights.  She didn't like some things about Avel.  He

11  drank too much.  He was an alcoholic.  But he lived with

12  her, he took care of her, and he cared about her and she

13  cared about him.  And Avel's going to come in and tell

14  you how he found her dead September 5, 1998.

15            Avel took care of all the things around

16  the trailer park; the maintenance, the employment, the

17  mowing.  He decided -- if a trailer was too big to move

18  into the mobile home park, he decided where it should go.

19  He did a lot of things that were important to her.

20            You'll hear how Ms. Harrison saved her

21  money at home.  She didn't like banks.  You'll hear how

22  she didn't like the way the banks were.  So she kept all

23  of her money at home.  You'll hear, at the time of her

24  death in September, she had close to $600,000 in her

25  home.

1        Avel had seen the money.  She used to

2   count it.  She used to like to count some of the money,

3   almost every night.  Avel will tell you that.  He had

4   seen it.

5        She didn't tell many people about her

6   money.  She kept that a secret for most of her own life,

7   but there at the end that she was older, she did let a

8   few people in on the secret.  She told very few people.

9        And guess who was one of them?  She told

10  some people she trusted.  She told Crispin Villarreal.

11  She told Crispin -- he was her neighbor.  He lived in the

12  trailer park.  She was good friends with Crispin's mom.

13  Crispin helped out around the trailer park, did errands

14  for her.  Crispin stayed over from time to time and

15  helped her out.  He had won her trust.

16        She told Ruben Gutierrez about the money.

17  On a couple of occasions, she even loaned him money.  We

18  have her ledgers, "loaned Ruben money."  He knew about

19  the money.

20        Ms. Escolastica, her maiden name is

21  Cuellar, Harrison, she kept a list of names that were

22  important to her and their phone numbers.  I'll bring you

23  that list.  I'll show it to you.  At the top of the list

24  is Crispin Villarreal and his mom.

25        Next on the list is Ruben Gutierrez.  He

STATE OF TEXAS VS. RUBEN GUTIERREZ                          18

1   had worked his way into her heart.  She cared about him.

2   She worried about him.  He would come over and visit

3   Avel.  They would sit in the back of Ms. Harrison's house

4   and drink; and from time to time they would get drunk.

5                    From time to time Avel spat off his mouth.

6   He sort of bragged about how much money his aunt had.

7   Oh, Ruben listened to that.  He was over there drinking

8   with him.  He listened.  He knew how much money she had.

9   He began to want it.  He began to want more than her

10  friendship, more than her kindness.  He wanted that

11  money.  He wanted it bad.  The evidence will show that.

12                   You'll see on this list of names Crispin,

13  and then Ruben, and then the third on the list is the

14  police.  She had Ruben above the police for her important

15  numbers.  You'll see that.

16                   Once they were sitting in the back of the

17  house drinking, Ms. Harrison will come out there.  She

18  would get on Avel a little bit because he drank too much,

19  but she would come out there and talk to the guys because

20  Crispin and Avel and Ruben would drink back there.

21                   She noticed Ruben would blink a lot.  She

22  said, "You got a problem with your eyes, Ruben?"

23                   "Yeah, I got a problem."

24                   She offered to pay, she offered to pay his

25  medical expenses for his eyes.  That's how much she cared

1   about him.

2                They had a relationship.  In that

3   relationship, Ruben began to know what friends were

4   about.  He won her trust.  She would ask him to go to the

5   store and get some milk or food from time to time; and he

6   would do it.  He didn't live nearby.  He lived several

7   blocks over on Boca Chica, but he would do it.  She could

8   call him and she could count on him.

9                Ruben had a falling out with Crispin.

10  They had a conflict about a month before September 5,

11  1998.  So Ruben hadn't been over at the house that much,

12  hadn't been around.  He was making his plan to get the

13  money.

14                But September 5, 1998 was a payday for

15  Avel.  Avel got paid in cash 150 a week.  That's how much

16  she gave him.  She gave him a little bit extra that day;

17  and Avel was going to go to the VFW and drink with his

18  buddy, Ramiro.

19                Ramiro come over that afternoon on

20  September 5, 1998, and he picks up Avel in front of

21  Ms. Harrison's home.  And as they're about to pull out of

22  the trailer park on Morningside to go to the VFW, Avel

23  notices something behind Ms. Harrison's house.  He

24  notices something.  Somebody's back there.

25                So he said, "Ramiro, hold on."  Ramiro

1    pulls over; and he looks over there, and it's Ruben and

2    what turns out later to be Rene Garcia behind the house.

3    He sees them.  He looks at them.  Ruben sees him.  So

4    Ruben comes over to the truck.  Ruben says to Avel, "Hey,

5    how are you doing?"  He knows what he's going to do when

6    he talks to Avel.

7                 And Avel says, "What's up?"

8                 And he says, "Give me a ride to my house."

9    His house is the other way.

10                And Avel says, "It's not my truck.

11   Besides, we're going this way."

12                So Ruben goes on, him and Rene; and Avel

13   goes on to the bar.

14                Ruben is seen again that afternoon,

15   September 5, 1998.  Crispin is throwing caliche later in

16   the afternoon in the drive there and he could see the

17   back of Ms. Harrison's house from his driveway where he's

18   throwing caliche.  And what does he see?  He sees Ruben

19   going to the back of the house.

20                And Crispin says, "When Ruben saw me, he

21   kind of ducked down."  He thought it was because of that

22   conflict that he had, but he saw Ruben around

23   Ms. Harrison's house on that day.

24                Then later that afternoon, a person named

25   Julio Lopez -- doesn't know anybody in this case -- was

STATE OF TEXAS VS. RUBEN GUTIERREZ                     21

1    walking to the store with his sister; and he saw Ruben

2    Gutierrez and what turns out to be Rene Garcia walking on

3    the sidewalk down toward the office of the trailer park.

4              Julio notices it because they're walking

5    in the same direction.  They across the street; and Ruben

6    and his buddy cross the street.  He notices them.  He

7    goes on and he looks back because they're behind him now;

8    and he sees Ruben going around to the behind of

9    Ms. Harrison's house, behind her house.  And he sees Rene

10   go to the front door, right up to the front door.

11   Mr. Lopez goes on, doesn't think anything about it.

12             That's the last time somebody is seen

13   around the Harrison house that day until Avel Cuellar got

14   home.  Avel had been going out; and part of his habit was

15   when he would come home, he would bring a hamburger and

16   some fries home to Ms. Harrison.

17             Ms. Harrison couldn't sleep at night.  She

18   slept in the early morning.  She would stay up late at

19   night.  And he came home with his Jack-In-The-Box

20   hamburger and his French fries and comes to the front

21   door when he's dropped off.  He got a taxi because Ramiro

22   left early.

23             And he notices the door's unlocked.  He

24   doesn't really think too much of it, but he goes in and

25   he goes, "Mom, mom.  Where are you?"  In Spanish he says.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              22

1   She's not around.

2              So he walks through -- the first thing you

3   see when you walk into that house is the office.  There's

4   a desk right there.  He walks through the office on into

5   the kitchen, straight shot.

6              He puts the hamburger down and he looks

7   around the house and he can't find Ms. Harrison.  When

8   you walk through to the kitchen, you walk by

9   Ms. Harrison's bedroom.  And he does look in.  He looks

10  at the bed and she's not on the bed.  So he keeps going.

11  He's looking for her.

12             And he knows that sometimes she's out

13  about the lot.  It's about 1 a.m., 1:30.  He knows that

14  sometimes she's out on the lot and sometimes she's over

15  at a friend's house, Ms. Vento.

16             So Avel goes over there, "Have you seen

17  mom?  She's not home.  I haven't seen her."

18             Ms. Vento says, "I haven't seen her."

19             So Ruben goes home and they got a P.A.

20  system -- I mean, Avel goes home.  They've got a P.A.

21  system; and Avel calls on the P.A. system at the trailer

22  park, "Come home.  Mom, I'm home.  Come home."  No

23  answer.

24             He waits for awhile and then he begins to

25  look around the house again; and this is when he finds

1  her.  Avel goes into her bedroom -- which is a real small
2  house.  It's a small bedroom.  And laying on the floor
3  just inside her bedroom behind some boxes and a big pile
4  of clothes is Ms. Harrison, 85-year-old woman.  She's
5  laying on the ground with one hand underneath her, the
6  other hand's clenched up, and her head is down and
7  there's a big pool of blood around her.

8              Avel goes up to her and says, "Mom, are
9  you okay?"  He touches her and she's cold, very cold.  He
10 knows something's wrong.  Avel gets upset, very upset.
11 He goes to the phone.  He calls his Aunt Judy,
12 "Something's wrong with mom.  She's cold.  I don't think
13 she's alive."

14             Judy calls 911.  You'll hear the 911 tape.
15 She said, "We need somebody and an ambulance over at the
16 Harrison house.  Something's wrong."

17             The 911 operator says, "Is there anybody
18 home over there?"

19             Avel's home.  So the 911 operator calls
20 Avel.  You'll hear that conversation.  And he's upset.
21 He says, "She's cold.  She's not moving."

22             So the 911 operator sends the police out
23 and the ambulance.  It's too late for the ambulance.

24             You'll hear from the first officer that
25 got there.  He'll tell you how he found the body,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          24

1   Ms. Harrison in a pool of blood.  You'll see some
2   pictures how she was laying there.  You won't like to
3   look at them because I don't, but you'll see them.
4   You'll notice in the pictures that she's been beat in the
5   face.  She's been beat in the mouth.  There's something
6   wrong with the back of her neck and her head, like she's
7   been stabbed numerous times.
8                The police notice this, so they began a
9   murder investigation.  The body was taken for pathology.
10  And you'll hear from the pathologist.  He'll tell you how
11  he examined her.  He'll tell you that she had multiple
12  stab wounds on her head and her neck.  One of them
13  penetrated her skull and went into her brain.
14                The pathologist, Dr. Dahm, will tell you
15  that she was in pain.  He'll tell you that the blow to
16  the face and the forehead and the mouth were also enough
17  to kill an 85-year-old woman.  He'll tell you that the
18  impressions that he saw on the skull look like they could
19  have been made by a screwdriver.  That's why we alleged
20  it that way, stabbed by a screwdriver.
21                He'll tell you that those other blows
22  could have caused her death.  That's why we pled it that
23  way, that she was hit by an object unknown to the grand
24  jury; maybe a fist, maybe a shoe.  The pathologist will
25  tell you it's an unknown object.  Either way she died a

STATE OF TEXAS VS. RUBEN GUTIERREZ                              25

```
 1   horrible unnatural death and it wasn't right.
 2                   So the police in their murder
 3   investigation, they come back the next day and the
 4   family's told them all that money she had is missing.
 5                   You'll hear from Teresa Cuellar.  She's a
 6   relative and she'll say, "Yeah, at one time I sat with
 7   Ms. Harrison and we counted the money that was in the
 8   blue suitcase and it was about 200,000; and that money is
 9   gone."
10                   You'll hear about a ledger they found.
11   The ledger shows and the last date -- look at the last
12   date.  It was way before September of '98.  It shows a
13   total of 560,000 some odd dollars that was in the house.
14                   So the police now have a murder and they
15   know they have a robbery, too, because she was obviously
16   hurt and killed in the course of committing that theft,
17   taking all that money.  So the police are looking and
18   looking hard.  They get lucky.  They get a Crime
19   Stopper's tip.
20                   The Crime Stopper tip says, "Rene Garcia
21   is spending a bunch of money.  I think it's tied to the
22   death of that old lady."
23                   So the police follow up on that and they
24   go over and talk to Rene Garcia.  He gives up his money.
25   They get a little over $60,000 off of him, what he had
```

1   left.  He had bought some cars, bracelets, TV sets.  He
2   bought a bunch of stuff.  He went on a spending spree
3   that day, that same day that he killed her, Rene Garcia.
4   The bulk of that money, 56,000, was found buried in a
5   chicken coop at one of the relatives of Rene.
6                During their investigation, the name Ruben
7   Gutierrez comes up.  So the police start looking at Ruben
8   Gutierrez.  And from a fellow by the name of Juan Pablo
9   Campos, Polo is what they call him, he's a relative by
10  marriage of Ruben.  From that guy, from that guy they get
11  $49,700, but he gives it up.  He tells the police, "Ruben
12  gave it to me to hold.  Ruben gave it to me to hold."
13                Now, that's funny, folks.  Ruben is seen
14  on the day of the murder at the back of the house.  Her
15  money is gone.  His codefendant and him have it.  The
16  codefendant is out spending it.  That's funny.
17                We're going to bring you some more.  The
18  police go and talk to Ruben before they arrest him.  They
19  just want to talk to him.  They say, "Ruben, where were
20  you that Friday and Saturday?"
21                He says, "Friday?  I was around the
22  neighborhood.  I saw Chacho," that's Avel Cuellar.  His
23  nickname is Chacho.  "I saw Ramiro in the truck and I
24  left.  On Saturday, well, Saturday I wasn't anywhere
25  around there.  I was riding around in a Corvette, Joey

STATE OF TEXAS VS. RUBEN GUTIERREZ                          27

1   Maldonado's Corvette.  Later that night I went to
2   Matamoros and partied Saturday night."  That's
3   September 5, 1998.  He said, "Later that night I went to
4   Matamoros and partied," and he did.  That's the night
5   that Ms. Harrison died; and he did go to Matamoros and he
6   partied.
7              But the police already had a lot of
8   information.  They say, "Ruben, are you sure that it
9   wasn't Saturday, September 5, 1998, that you saw Chacho
10  and Ramiro?"  Because they already talked to Chacho and
11  Ramiro.
12             And Ruben says, "Hey, you know, I ain't
13  talking to you no more.  I terminate the interview.  I'm
14  leaving."  And he leaves.  He leaves the police station.
15             The police continue their investigation.
16  Then they arrest Ruben.  They arrest him.  They take him
17  down to the police station and say, "We got you, Ruben.
18  Do you want to give a statement?"
19             He says, "Yeah, I'll give a statement."
20  He gives a self-serving statement.  He says, "Yeah, I
21  knew about the money.  I came up with the plan to get the
22  money.  That's all I wanted, though, was the money.  I
23  got Rene Garcia to help me.  I got Pedro Gracia to help
24  me, but it was Rene and Pedro that went in.  They must
25  have killed her.  I didn't have any part of that."

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    28

1    That's what he says in his first statement.  He says, "I
2    don't have any part of that."
3                        He says, "I even saw Rene and Pedro come
4    out of the house afterwards and they had the money.  They
5    offered me some of it.  I didn't really want any of it,
6    but I took a little bit.  I took a little bit of it, but
7    I didn't really want any."
8                        Okay.  Time goes by.  Ruben gives another
9    statement.  The police gather some more information.
10   They ask him, "Ruben, what about this?"
11                       Ruben has told them that Rene and Pedro
12   have told him that they dumped the blue suitcase.  They
13   had a blue suitcase and they dumped it up the road.  And
14   Ruben says, "And they told me where they threw the murder
15   weapon, the screwdriver.  They told me that."
16                       The police say, "Well, can you take us to
17   where they told you that they threw it?"
18                       Ruben says, "Yeah, I'll take you there."
19   So he takes them to a little caliche road on the side of
20   a field; and he says, "They told me they threw the murder
21   weapon in there."
22                       The police search, everybody searches, no
23   murder weapon.
24                       So they say, "Ruben, can you take us to
25   where they told you they threw the blue suitcase?"

1          Ruben says, "Yeah, I'll take you."  They
2  put him in a car and he takes them out by California Road
3  all the way on the back side of the airport out there,
4  dirt road by a resaca.  And Ruben says to the officer,
5  "They told me that they dumped it over here."
6          So Rey Pineda, a cop -- he'll come and
7  testify -- he gets out of the car and he's walking over
8  there.  He's looking around.  And Ruben, says, "No, not
9  over there.  They told me over here."
10          And Rey is walking around, "Where?"
11          They get him out of the car.  He walks up
12  to the fence and he says, "Over here.  Right here.  They
13  told me they dumped it right there."
14          Okay.  The police officers were a little
15  suspicious how he knows exactly where it is.  You can't
16  see it from the road, but there it is, the blue suitcase
17  and some papers that came from Ms. Harrison's home.  He
18  knows exactly where it is.
19          So the case continues.  Ruben wants to
20  give another statement.  He gives another statement; and
21  in this last statement he says, "Okay.  It was all my
22  plan.  It was all my idea.  I wanted that money.  I
23  didn't want Ms. Harrison to get hurt, though.  So the
24  plan was to do a burglary.  And I was going to go around
25  the back and Rene was going to go in the front and draw

1   her out under the ruse of wanting to rent a lot," because

2   that's what she did, rented lots.

3                  And just like the witnesses said, Ruben

4   went to the house, went around to the back; Rene went to

5   the front door and goes in.

6                  Ruben says in his statement, "I waited.  I

7   waited back there," and he wants that money.  He says, "I

8   waited back there for two minutes.  Two whole minutes I

9   waited.  Nothing ever happened.  They never left.  So I

10  go around to the front and I go in."  Ruben says he goes

11  in through the front door.

12                 So it's no longer a burglary.  And there's

13  one thing the evidence will show; and that's that

14  Ms. Harrison knew Ruben.  Ms. Harrison would finger Ruben

15  if her money was gone.  She knew him and she saw him.

16                 He says, "She saw me on September 5,

17  1998."  And when he waited those two minutes, then went

18  in, Ms. Harrison's fate was sealed.  She had to die

19  because she's a witness.

20                 Ruben went into the office.  Ms. Harrison

21  is sitting there.  And all this information comes from

22  Ruben's statement.  It's a self-serving statement.  You

23  will not hear from Rene Garcia, the codefendant.  He has

24  a Fifth Amendment right not to testify.  There's no deal.

25  You will not hear from him.  So we're going to go by his

1    statement.

2              He says he goes in; and as he is in there,

3    he sees Rene hit Ms. Harrison in the face.  And then he

4    says he sees Rene drag Ms. Harrison from the office into

5    the bedroom by the head and hair.  He says he sees Rene

6    stabbing Ms. Harrison with a screwdriver.  He says he

7    sees Rene with his foot on her head.  He says he looks

8    over and sees Ms. Harrison's eyes open.  He says he hears

9    Rene say, "Man, the old lady won't die."  This is all his

10   statement, self-serving statement.

11             He says while Rene is doing all this to

12   Ms. Harrison, the lady that offered medical help for his

13   eyes, the lady that loaned him money, the lady he knew

14   well, he did errands for her, he says while Rene is doing

15   all that to Ms. Harrison, he goes by and starts looking

16   for the money because he knows where the money is.

17             He says he gets the money.  He said

18   there's several containers of money.  He says while

19   Rene's got his foot on Ms. Harrison's head there, he

20   tosses Rene some of the money, according to him.  He says

21   Rene puts it on the bed and then keeps trying to kill

22   Ms. Harrison while he gathers up the rest of the money.

23             And then Rene says, "She won't die."  So

24   he says, "Blow it off on."  And they leave through the

25   front door.  He says, "I carry out the money."

STATE OF TEXAS VS. RUBEN GUTIERREZ                          32

1            One thing you'll note in his statement is
2    that before they went in to the Harrison house, him and
3    Rene, they got screwdrivers, both of them.  He says that
4    in his own statement.  Both of them get screwdrivers.
5    They arm themselves to go do what they're going to do.
6    They got them out of Rene -- or Pedro Gracia's pickup,
7    Pedro's pickup.  Pedro stays in the pickup according to
8    Ruben.  He's going to be the get-away car driver.  You
9    won't hear from Pedro, either.
10           What you'll hear is that they came out of
11   the house and they had the money; and Pedro comes and
12   picks them up and they drive away, according to his last
13   statement.  And they drive by that field where that
14   caliche road was that he had previously told the officers
15   that they had told him they dumped that weapon.
16           And he says, "Rene's still got his
17   screwdriver and it's bloody."  He says Rene wipes the
18   blood off; and then he takes it, he says, he takes the
19   screwdriver and flips it out the window as they're
20   driving by.  He tells you he got rid of the murder
21   weapon, according to his statement.
22           He says that they go on down the road,
23   California Road, on around to the back, down the back of
24   the airport to that resaca.  And this time in this
25   statement he says that him and Rene got out of the truck

STATE OF TEXAS VS. RUBEN GUTIERREZ                          33

1  and went in to that little wooded area and they left the
2  blue suitcase and took all the money.
3                    He says he got his share, Rene got his
4  share, Pedro got his share.  He said that Pedro turned
5  around in the truck, they got back in, and then they went
6  and dropped him off.
7                    He says a lot of things in his statements.
8  You look at these statements.  Look at them and read them
9  all.  Several times he's saying, "But it's not my fault.
10 It's not my fault."  He's not taking responsibility.
11                   The police get money from Pedro, too.  Of
12 course, Pedro's name comes up in the investigation.  They
13 go to Pedro and they get several thousand dollars out of
14 his couch.  He has it hidden in the couch.  You'll hear
15 about that.
16                   The evidence will show, folks, the
17 evidence will show by itself, without any statements,
18 that Ruben and Rene killed Ms. Harrison.  With these
19 statements, Ruben's statements, the evidence shows beyond
20 a reasonable doubt that he's involved in killing
21 Ms. Harrison and robbing Ms. Harrison, killed her in the
22 course of a theft.
23                   The evidence will also show at least one
24 other thing, another thing you need to watch for.  The
25 evidence will show that when he wants to, he will mislead

1   you.  The evidence will show he tells lies.

2              As I said, this kind of a crime, you can't

3   leave a witness like Ms. Harrison alive.  He had a lot of

4   money.  He knows that the police would come to his house

5   and ask him questions.  Even if his story is true and

6   Rene knocked her out and was killing her, he knows that

7   if she saw him and when she woke up, she'll say, "Ruben

8   was in my house and so was another man."  And he knows

9   that the police will come knocking at his door.

10  Ms. Harrison's fate was sealed when he decided to go into

11  her house to get the money.

12             Most of next week we'll be putting on all

13  this evidence.  I look forward to putting on the evidence

14  because that's my job to get justice, but I don't look

15  forward to showing you these pictures, but we will.

16             THE COURT:  All right.  You may call your

17  first witness.

18             MS. FISCHER:  The State calls

19  Officer David Garcia.

20             MR. REYES:  Judge, we're going to object

21  to the State not calling them in the order in which they

22  filed their subpoena list.

23             THE COURT:  It's overruled.

24             Could you raise your right hand, please?

25             **(The witness was sworn in by the Court)**

STATE OF TEXAS VS. RUBEN GUTIERREZ                          35

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  You may be seated.
 3              You may proceed.
 4              MS. FISCHER:  Thank you, Judge.
 5                      DAVID GARCIA,
 6      having been first duly sworn, testified as follows:
 7                   DIRECT EXAMINATION
 8    BY MS. FISCHER:
 9         Q.   Good morning, Officer Garcia.
10         A.   Good morning.
11         Q.   Will you please tell the jury who you are?
12         A.   I'm David Garcia.
13         Q.   What do you do for a living?
14         A.   I'm employed with the City of Brownsville
15    Police Department.
16         Q.   Okay.  Are you a certified peace officer in the
17    State of Texas?
18         A.   Yes, I am.
19         Q.   And how long have you been a certified peace
20    officer in the State of Texas?
21         A.   I've been employed since June of 1980.
22         Q.   Okay.  And has that whole time been with the
23    Brownsville Police Department?
24         A.   Yes.
25         Q.   Okay.  Tell me what you do for the Brownsville
```

1    Police Department.

2         A.    Right now I'm currently on the patrol division.

3         Q.    Okay.  And back in September of this year, what

4    were your duties?  September, I'm sorry, of 1998, what

5    were your duties?

6         A.    At that time I was the night detective with the

7    Brownsville P.D.

8         Q.    Okay.  When -- September the 5th of 1998, on

9    that day were you working as the night detective for

10   Brownsville Police Department?

11        A.    Yes.

12        Q.    Okay.  And on that date, did you ever have the

13   opportunity to have to go out to a crime scene?

14        A.    Yes, I did.

15        Q.    Can you tell me how that came about?

16        A.    I was dispatched to a dead body call at the

17   Harrison Mobile Park or Mobile Home Park here in

18   Brownsville.

19        Q.    Okay.  Where is the Harrison Mobile Home Park?

20        A.    It's located on Morningside Road.

21        Q.    Okay.  And is that in Cameron County, Texas?

22        A.    Yes.

23        Q.    Okay.  And what did you do when you got there?

24        A.    When I got there, there was EMS attendants that

25   were treating a lady on the ground there in the offices

1   of the house there.

2       Q.    Okay.  And let's go a little bit slower.  I

3   want you to tell the jury, you pull up.  Where is it that

4   you have to go?

5       A.    The office is like a large older home.  It's

6   been converted to an office to the particular mobile home

7   park.

8       Q.    All right.  When you get in to the office,

9   what's the first thing you see?

10      A.    Like I said, the EMS attendants were attending

11  to an elderly lady that was face down on the floor of the

12  office there.

13      Q.    Okay.  What did you do at that point?

14      A.    When -- they told me she wasn't breathing or

15  not responding.  She was basically dead.  So I had those

16  guys clear the room and seal the entire building or

17  secure the entire building.

18      Q.    And why did you do that?

19      A.    She was laying face down in a pool of blood.

20  She had like a -- some kind of wound to the back of her

21  neck.  I suspected a homicide.  So it was a homicide

22  scene then.

23      Q.    When you did that, when you suspected a

24  homicide, this person who had been killed, what did you

25  do?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              38

1        A.   What I do is get a J.P. to go to the scene, you

2   know, if at all possible.

3        Q.   Okay.  And why are you calling the J.P.?

4        A.   The main reason would be to get an autopsy

5   ordered.

6        Q.   Okay.  The person who was laying there on the

7   floor, did you ever discover who that was?

8        A.   We did eventually, yes.

9        Q.   Okay.  Who was that person laying there on the

10  floor?

11             MR. REYES:  I'm going to object, Your

12  Honor.  That calls for hearsay.

13             THE COURT:  Overruled.

14        Q.   (BY MS. FISCHER)  Do you know who that was?

15  Who was the elderly lady, Officer Garcia?

16        A.   She was identified as Escolastica Harrison.

17        Q.   Okay.  Did you happen to know Ms. Harrison?

18        A.   Personally I did not.

19        Q.   Okay.  When -- what was the next thing that you

20  did then?  When you declared this a homicide crime scene,

21  what did you do next?

22        A.   What I did is naturally I started taking

23  photos.  I dusted for fingerprints at the door and on the

24  glass on the entry door.

25        Q.   Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          39

```
 1              MS. FISCHER:  Your Honor, may I approach
 2   the witness?
 3              THE COURT:  You may.
 4        Q.   (BY MS. FISCHER)  Officer Garcia, I'm going to
 5   show you what has been marked as State's Exhibits
 6   Numbers 1, 2 and 3.  I just want to ask you to take a
 7   look at these; and I'm going to ask you, are you familiar
 8   with what these pictures here represent?
 9        A.   They depict the --
10        Q.   Okay.  You can't tell the jury yet what they
11   depict.  I just want to ask you, are you familiar --
12        A.   Oh, I'm familiar --
13        Q.   -- with what's in these pictures?
14        A.   Yes, I am.
15        Q.   Okay.  And do these pictures fairly and
16   accurately depict what is in the picture there?
17        A.   Yes, they do.
18        Q.   Okay.  And basically, is this what you saw when
19   you walked into that house?
20        A.   Yes.
21        Q.   All right.
22              MS. FISCHER:  Your Honor, at this time
23   we'd offer into evidence what has been marked as State's
24   Exhibits Numbers 1, 2 and 3.  I'll publish them to
25   opposing counsel at this time.
```

1              MR. REYES:  May I take this witness on

2    voir dire, Your Honor?

3                    **VOIR DIRE EXAMINATION**

4    **BY MR. REYES:**

5        Q.   Officer Garcia, with respect to what has been

6    marked as State's Exhibits 1, 2 and 3, were you the

7    person that actually took those photographs?

8        A.   I took some of these photographs.  That's

9    correct.

10       Q.   My question was, with respect to State's

11   Exhibits 1, 2 and 3 --

12       A.   I really can't say because when we took all the

13   photographs, I turned over all the rolls of film.  I

14   didn't mark the ones that I took and the ones that the

15   crime scene unit took.

16             MR. REYES:  May I approach the witness,

17   Your Honor?

18             THE COURT:  You may.

19       Q.   (BY MR. REYES)  Let me show you what has been

20   marked as State's Exhibit Number 1.  Did you yourself --

21   after viewing this photograph, can you tell the ladies

22   and gentlemen of the jury whether or not you yourself

23   took that photograph?

24       A.   No, I can't say that.

25       Q.   State's Exhibit Number 2, after reviewing that

STATE OF TEXAS VS. RUBEN GUTIERREZ                        41

1    photograph, can you tell the ladies and gentlemen whether

2    or not you yourself reviewed that photograph?

3        A.   I can't say that either.

4        Q.   State's Exhibit Number 3, after viewing it, can

5    you tell the ladies and gentlemen of the jury whether you

6    yourself took that photograph?

7        A.   No, I cannot.

8        Q.   What time did you respond to the scene?

9        A.   It was some time after 1 a.m. that particular

10   evening.

11       Q.   And when you responded to the scene, had there

12   been officers from the Brownsville Police Department

13   already at that location?

14       A.   No.

15            MS. FISCHER:  Your Honor, I'm going to

16   object.  This is outside the scope of any voir dire.  The

17   predicate's been laid.  They're same or similar to what

18   they purport to depict.  He's identified the pictures;

19   and any other issue is moot until such time as

20   cross-examination.

21            MR. REYES:  It's not moot, Your Honor.  It

22   goes as to whether or not, you know, what is depicted in

23   there has been moved, whether changes have been made to

24   the scene.  He's testifying that --

25            THE COURT:  Well, get to the point.

1               MR. REYES:   Thank you, Your Honor.

2      Q.   (BY MR. REYES)   You don't know who had been at

3  that house before you arrived; is that correct?

4      A.   Again, Avel was there.   He discovered the body.

5      Q.   Okay.   Do you know who else might have been

6  inside that house before you arrived?

7      A.   The deceased.

8      Q.   Okay.   Other than that, there was people there

9  that were allegedly called into that home.   Do you know

10  who they were?

11      A.   I don't know anything about any calls.

12      Q.   So when you arrived and those pictures were

13  taken, you don't know whether or not that body was moved;

14  is that correct?

15      A.   Well, sir, if you look at the blood splatter

16  around the head area, you can tell where she laid and

17  where she fell.

18      Q.   That wasn't my question.

19      A.   Maybe I didn't understand --

20      Q.   My question was --

21      A.   -- your question.   I'm sorry.

22      Q.   -- you don't know whether or not somebody moved

23  that body before you arrived; is that correct?

24      A.   I don't think anybody moved the body before I

25  got there.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    43

1      Q.   That's not my question.  Did you see -- were

2  you there from the time that this alleged murder occurred

3  to the time that you arrived there?

4                 MS. FISCHER:  Your Honor, now I'm going to

5  have to object.  This is definitely outside the scope of

6  voir dire.  Those pictures are what he saw.  If someone

7  else moved her, that's a point that is not relevant to

8  the admissibility of these photos.

9                 MR. REYES:  It's relevant because he's

10  testifying that supposedly this is the way the body was

11  found, Judge.

12                 THE COURT:  I'll sustain the objection.

13  When he took the photographs, that's where the body was.

14      Q.   (BY MR. REYES)  So your testimony is that you

15  don't know who took those pictures; is that correct?

16      A.   Myself and Detective Hernandez took several

17  photographs; and we put them all in one bunch to get them

18  developed.  So I really can't say I took that one and he

19  took this one, you know.

20      Q.   Well, did you understand my question?

21      A.   Maybe I didn't.  If you'll repeat it.

22      Q.   Well, my question was, did you take those

23  photographs or not?

24      A.   I may have taken one of these photographs.  I

25  can't say --

STATE OF TEXAS VS. RUBEN GUTIERREZ                              44

```
 1          Q.   But you're not sure?
 2          A.   -- whether I did or did not.
 3               MR. REYES:  I would object to the
 4    introduction of these photographs, Your Honor.  First of
 5    all, there's no evidence as to whether or not this is the
 6    position where the body was found.
 7               Also, the prejudicial effect is not
 8    outweighed by the probative value.  And he can't testify
 9    as to whether or not that was the position in which the
10    body was found.
11               THE COURT:  That's overruled.  One through
12    3 will be admitted into evidence.
13               (State's Exhibit Numbers 1, 2 and 3
14               admitted)
15               MS. FISCHER:  Your Honor, may I approach?
16               THE COURT:  Go ahead.
17               DIRECT EXAMINATION CONTINUED
18    BY MS. FISCHER:
19          Q.   Mr. Garcia, now let's talk about these
20    photographs.  Let's start here with -- let's start with
21    State's Exhibit Number 2.  Can you please describe for
22    the jury what that is?
23          A.   Okay.  Number 2, that's the --
24          Q.   Officer Garcia, they can't see it.
25          A.   Oh.
```

1          MS. FISCHER:  May he step down, Judge, so

2    perhaps he can show the jury what the picture is?

3          THE COURT:  Go ahead.

4          THE WITNESS:  Do I step down over here?

5    Q.    (BY MS. FISCHER)  Yes, If you don't mind.

6    A.    (Witness complies).  Maybe you all can hear me.

7    This is a picture of the elderly -- Ms. Escolastica

8    Harrison as we found her at least when the photo was

9    taken at the time of the homicide call.

10   Q.    Okay.  And State's Exhibit Number 3, is that

11   also a photo of Ms. Harrison?

12   A.    Right.  This is a separate or different angle,

13   of course --

14   Q.    Okay.

15   A.    -- of the same body at the time we found the

16   deceased.  I don't know if they can see the picture from

17   here.

18   Q.    We'll show it to them in just a minute,

19   Officer.  Go ahead and explain to them what that is a

20   photograph of and then we'll let them look at it.

21   A.    Okay.  This will be a photograph of the same

22   deceased, Ms. Harrison, when we rolled her over, you

23   know, to see if she had any wounds to her face.  You can

24   see her face is badly bruised, the same deceased.

25         MS. FISCHER:  May I publish 1 through 3 to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    46

```
 1   the jury?
 2                    THE COURT:  You may.
 3        Q.    (BY MS. FISCHER)  Go ahead and have a seat,
 4   Officer.
 5        A.    (Witness complies).
 6        Q.    Now, Officer Garcia, after you did your
 7   observations of the body of Ms. Harrison, did you also go
 8   ahead and take a look around the crime scene, around the
 9   house?
10        A.    Yes, we did.
11        Q.    Okay.  And in doing that, did you take some
12   photographs of that area, too?
13        A.    Yes.
14        Q.    Okay.
15                    MS. FISCHER:  Your Honor, may I approach?
16                    THE COURT:  You may.
17        Q.    (BY MS. FISCHER)  Okay.  Detective Garcia, I'm
18   going to show you State's Exhibit Number 4, okay?  Are
19   you familiar with what that picture has in it?
20        A.    Yes.
21        Q.    Is that photograph fair and accurate and depict
22   what you saw?
23        A.    Yes.
24        Q.    Okay.  Let's take a look at State's Exhibit
25   Number 5.  I'm going to ask you the same question.  Are
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    47

1    you familiar with what is in that photograph?

2         A.   Yes.

3         Q.   Does that photograph fairly and accurately

4    depict what it is that you saw when you first saw what's

5    in the photograph?

6         A.   Yes, ma'am.

7         Q.   Okay.  Let's take a look at State's Exhibit

8    Number 6.  Maybe we can do these kind of in bunches,

9    Detective.  I don't want to get too far ahead, but let's

10   try to do it a little quicker.

11              Let's look at these.  This is 6 through

12   10.  Take a look at each one of these.  Are you familiar

13   with each of the items that are in the pictures in

14   State's exhibits -- or what has been marked as State's

15   Exhibits Numbers 6 through 10?

16        A.   Yes.

17        Q.   Okay.  And do State's exhibits -- or what has

18   been marked as State's Exhibits Numbers 6 through 10, do

19   they fairly and accurately depict what it is that -- when

20   you saw the items that you're familiar with there in the

21   pictures?

22        A.   Yes.

23        Q.   Okay.  Let's go ahead and look -- take a look

24   at State's exhibits numbers -- or what has been marked as

25   11, State's Exhibits Numbers 12, State's Exhibits

STATE OF TEXAS VS. RUBEN GUTIERREZ                          48

```
 1    Numbers 13 and 14.  Once again, are you familiar with
 2    what is in each of these pictures, what has been marked
 3    as State's Exhibits Numbers 11 through 14?
 4         A.    Yes.
 5         Q.    Okay.  And do State's exhibits -- or what has
 6    been marked as State's Exhibits Numbers 11 through 14, do
 7    they fairly and accurately depict what is in each of the
 8    photographs?
 9         A.    Yes.
10         Q.    Okay.  Now, let's look at 15, 16, 17 and 18,
11    what has been marked as State's Exhibits Numbers 15, 16,
12    17 and 18.  Are you familiar with what is in each of
13    these exhibits?
14         A.    Yes.
15         Q.    Okay.  And do each of these exhibits fairly and
16    accurately depict what it is that you are familiar with,
17    what you saw, what they purport to depict?
18         A.    Yes, ma'am.
19               MS. FISCHER:  Your Honor, at this time
20    we'd offer into evidence State's Exhibits Numbers 6
21    through 15 -- 18.  I'll show them to opposing counsel.
22               THE COURT:  Four through 18?
23               MS. FISCHER:  I'm sorry.  Four through 18.
24    That's my mistake.  Yes, sir.
25         Q.    (BY MS. FISCHER)  Now, before I let you go,
```

1    you did not actually take all these photographs, did you?

2         A.   No.

3         Q.   Okay.  But you saw what is in each of these

4    photographs?

5         A.   Yes.

6         Q.   And everything in these photographs is just

7    like you saw it at the time when you went to the house

8    that night?

9         A.   That's correct.

10                   **(Brief pause in proceedings)**

11                   MR. REYES:  Judge, we don't have any

12   objection except for State's Exhibits 14, 16 and 17.  We

13   would object to those photographs being admitted in that

14   the probative value clearly is not outweighed by the

15   prejudicial effect.

16                        THE COURT:  Let me see those three.  These

17   three?

18                        MR. REYES:  Yes, Your Honor.

19                        THE COURT:  The objection will be

20   overruled.  Four through 18 will be received and admitted

21   into evidence's.

22                   **(State's Exhibit Numbers 4 through 18**

23                        **admitted)**

24        Q.   (BY MS. FISCHER)  Okay.  Officer, let's go

25   through just a couple of these.

1              MS. FISCHER:  Your Honor, may he step down

2    again?

3              THE COURT:  He may.

4        Q.   (BY MS. FISCHER)  Officer, why don't you come

5    down here and present these to the jury.

6        A.   (Witness complies).

7        Q.   First of all, will you tell them what is

8    State's Exhibit Number 11?

9        A.   This is a -- this depicts a photo by a desk

10   with -- it looks like a bag with a hamburger in it and a

11   soft drink.

12       Q.   From Jack-In-The-Box?

13       A.   From Jack-In-The-Box and --

14             COURT REPORTER:  I'm sorry, sir.  I'm

15   having trouble hearing you.

16             THE COURT:  She can't hear you.

17       Q.   (BY MS. FISCHER)  Make sure she can hear you.

18             THE WITNESS:  I'm sorry.

19       Q.   (BY MS. FISCHER)  She's taking everything

20   down.

21             And this was in the Harrison home?

22       A.   Correct.

23       Q.   Okay.  And then State's Exhibit Number 8, what

24   is that a photograph of?

25       A.   Okay.  This is one that I took.  That's my boot

1    on the bottom there.  I definitely took this photograph.

2    This is a photograph of a slipper, a nighttime house

3    slipper found on the floor of the Harrison home.

4         Q.   Now, was it found close to the body?

5         A.   There was one that was found next to the body

6    and there was one found in an adjacent room where she was

7    found.

8         Q.   Okay.  Now, this, what is that a photograph of?

9         A.   Okay.  This is a photograph of apparently her

10   office, of Ms. Harrison, of the trailer park.  If you

11   look in the bottom, there's the other slipper there where

12   she was probably seated or standing there.  This is the

13   same Harrison Trailer Park office.

14        Q.   And then let's go ahead and what -- that

15   picture, does that show the Harrison office there, the

16   one that you keep talking about?

17        A.   Yes, it is.  This is obviously a daytime photo

18   of the office of Harrison Mobile Home Trailer Park.  As

19   you can see it's a home that's been converted to an

20   office.  This is obviously a daytime photo.  I was there

21   at nighttime.  So I obviously didn't take this particular

22   photo.

23        Q.   Now, this State's Exhibit Number 18, is that

24   just a -- kind of a further away shot of the same house?

25        A.   Right.  This is obviously another daytime photo

STATE OF TEXAS VS. RUBEN GUTIERREZ                          52

1    of the same office a block or two away from the house or
2    the office, how ever you want to call it.  She worked out
3    of the office.  She managed the trailer park.  That's a
4    more further away photograph of the same.
5         Q.   But now, Officer Garcia, you keep calling this
6    an office, but this was also her home, wasn't it?
7         A.   Right.  Exactly.
8         Q.   In fact, the room that you found her in --
9              MR. REYES:  Judge, I'm going to object to
10   counsel leading her own witness.
11             THE COURT:  All right.
12             MS. FISCHER:  I'm sorry, Judge.  I'll
13   rephrase that.
14        Q.   (BY MS. FISCHER)  What was the room that you
15   found her in?
16        A.   The room where I found her in was a bedroom.
17        Q.   And these last two photographs, 14 and 6,
18   Officer Garcia, if you'll just tell the jury, is that how
19   you saw Ms. Harrison on that night?
20        A.   Okay.  Six is a photograph of -- close-up photo
21   of her bruised face.  The background, she's already in
22   what we call a body bag provided by the funeral home.
23   You can see that's a close photo of Ms. Harrison.  You
24   can see the bruising, excessive bruising to the face.
25        Q.   And that last photograph, is that pretty much

PAM L. ESQUIVEL, CSR, RPR

1    the same, Officer?

2         A.    This is --

3                   THE COURT:    Identify it by number.

4         Q.    (BY MS. FISCHER)   I'm sorry.   State's

5    Exhibit --

6         A.    This is Number 14.

7         Q.    -- Number 14.   Can you explain it to the jury?

8         A.    This is another photograph of the deceased a

9    little further away also in the same -- the body bag

10   provided by the funeral home of Ms. Harrison the night

11   that we found her, the night of the homicide.

12        Q.    Thank you, Officer.   You can go ahead and have

13   a seat.

14                   MS. FISCHER:   Your Honor, may I publish

15   State's Exhibits Numbers 4 through 18 to the jury?

16                   THE COURT:   You may.

17                   MS. FISCHER:   Thank you, Judge.

18        Q.    (BY MS. FISCHER)   Officer Garcia, let's talk,

19   then, about any other role that you had in this

20   investigation as far as the Harrison murder.   What else

21   did you do?   After taking these photographs, making sure

22   the crime scene was secure, what is the next thing that

23   you did?

24        A.    What I did also is that her nephew who located

25   the body, he was there at the scene and we brought him in

1    for a quick little interview.

2         Q.    Do you know what his name is?

3         A.    His name is Avel, but I can't think of his last

4    name right now.  I just saw him in the hall right now.  I

5    can't think of his last name.

6         Q.    Okay.  Could it have been Cuellar?

7         A.    That's the one, Avel Cuellar.

8         Q.    And did you talk to him about the case?

9         A.    Yes, we did.

10        Q.    Okay.  After talking to him about the case, was

11   he considered a suspect in the case?

12        A.    Well, initially like in all homicides,

13   everybody is a suspect --

14        Q.    Okay.

15        A.    -- but we were able to clear him and he was no

16   longer a suspect.

17        Q.    Okay.

18                   MS. FISCHER:  I have no further questions,

19   Your Honor.  I pass the witness.

20                   MR. REYES:  May I proceed, Your Honor?

21                   THE COURT:  You may.

22                        **CROSS-EXAMINATION**

23   **BY MR. REYES:**

24        Q.    Officer Garcia, isn't it correct that Avel

25   Cuellar lived in the same house as Escolastica Harrison?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    55

1       A.   Yeah, he does live there.  That's correct.

2       Q.   He was living in the back portion of that home;

3    is that correct?

4       A.   Yes.

5       Q.   So he had access to Escolastica Harrison's

6    home; is that correct?

7       A.   Oh, yes.  That's true.

8       Q.   I'm sorry?  I can't hear you.

9       A.   That's true.  I think he had a key to the

10   house.

11      Q.   Okay.  So he was able to go in and out of that

12   house as he wanted; is that correct?

13      A.   Yes.

14      Q.   Now, isn't it correct that throughout your

15   investigation, you indeed found that there was some what

16   appeared to be blood in the toilet of Avel Cuellar's part

17   of the home; is that correct?

18      A.   Right.

19      Q.   And isn't it correct that you also found next

20   to the toilet what appeared to be watered down blood

21   stains; is that correct?

22      A.   Right.

23      Q.   Isn't it also correct that you found what

24   appeared to be blood drops on the couch; is that correct?

25      A.   I don't know about the blood part on the couch,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          56

1    but --
2        Q.   You don't remember that in particular, but you
3    remember the other two; is that correct?
4        A.   I don't remember the blood on the sofa.
5    Everything is else is correct.
6        Q.   You weren't the only officer that was involved
7    in this case; is that correct?
8        A.   I was the only officer involved that evening;
9    and then the assigned detectives, they took over during
10   the day.
11       Q.   So there might have been another police officer
12   that might have observed those blood stains on that
13   couch; is that correct?
14       A.   That's possible, yes.
15       Q.   Isn't it correct that you learned through your
16   investigation that Avel Cuellar had indeed made threats
17   against Escolastica Harrison --
18       A.   Right.
19       Q.   -- that he threatened to kill her; is that
20   correct?
21       A.   Yeah.  They had arguments and he made those
22   threats in the past.
23       Q.   And isn't it correct that you learned through
24   your investigation that his family, in particular Ramon
25   Cuellar, believed that Avel had killed Escolastica

1    Harrison --

2                    MS. FISCHER:  Your Honor --

3        Q.   (BY MR. REYES) -- isn't that correct?

4                    MS. FISCHER:  -- I object.  That's

5    hearsay.  Everything that somebody else told him is

6    hearsay, Judge.  That's not admissible.

7                    MR. REYES:  It's --

8                    THE COURT:  Overruled.

9                    MR. REYES:  Thank you, Your Honor.

10       Q.   (BY MR. REYES)  Isn't it correct that you

11   learned from your investigation that Ramon Cuellar

12   believed that Avel Cuellar had killed Escolastica

13   Harrison?

14       A.   Yes.

15       Q.   Now, you stated that you took fingerprints from

16   that home; is that correct?

17       A.   I dusted for prints.

18       Q.   Okay.  And you stated that you found some

19   partial latents; is that correct?

20       A.   In my opinion they were partial latent prints,

21   yes.

22       Q.   Can you explain to the ladies and gentlemen of

23   the jury what a latent print is?

24       A.   What it is is a -- say if you have almost a

25   perfect surface, like glass, and if somebody has handled

STATE OF TEXAS VS. RUBEN GUTIERREZ                    58

1    the glass, we'll dust the particular area with a -- like
2    a very fine volcanic powder.  If there are prints or
3    latent prints, the powder will bring up the prints.
4         Q.   Okay.  And you, in fact, found a partial latent
5    print; is that correct?
6         A.   Sir, I can't really -- how do you say?
7    Classify prints.  I did find a lot of smudges that could
8    have been latent prints.
9         Q.   Okay.
10                   MR. REYES:  Your Honor, at this time --
11        Q.   (BY MR. REYES)  Did you prepare a report,
12   Officer Garcia?
13        A.   Yes.
14                   MR. REYES:  May I have -- at this time,
15   Your Honor, we request that we be provided a copy of that
16   report.
17                   MS. FISCHER:  Your Honor, at this time I'm
18   handing him a copy of Officer Garcia's report.
19                   MR. REYES:  May I have a second, Your
20   Honor?
21                   THE COURT:  Yeah.  This is a good time to
22   take a break.
23                   Ladies and gentlemen of the jury, let's go
24   ahead and take our morning break at this time so you can
25   use the facilities, get a drink of water.  Remember the

1    instructions I've given you not to discuss this case

2    among yourselves or with anyone else, not to form or

3    express any opinions.  We'll take about a 15 minute

4    break.

5                    **(Recess from 10:24 a.m. to 10:33 a.m.)**

6                    THE COURT:  All right.  Bring in the jury.

7                    THE BAILIFF:  Yes, Your Honor.

8                    MR. REYES:  We have one objection before

9    we proceed.  I noticed that the State of Texas has behind

10   it some evidence that they intend to introduce.  We would

11   object to it being seen by the jury before it's

12   introduced into evidence.

13                   THE COURT:  All right.  Go ahead and --

14                   MS. FISCHER:  It wasn't intentional,

15   Judge.  I'm sorry.  I'll turn it around.

16                   THE COURT:  All right.  Go ahead.  Bring

17   in the jury.

18                   MR. REYES:  There's also some suitcases

19   and things like that, Your Honor.  We'd object to those

20   also being --

21                   MR. BLAYLOCK:  The jury can't see it.

22                   MS. FISCHER:  It's below the bar here.  I

23   can just put this like that.

24                   THE COURT:  It's all right.  Go ahead.

25                   **(Jury brought into the courtroom)**

STATE OF TEXAS VS. RUBEN GUTIERREZ                              60

1              THE COURT:  All right.  You may be seated.

2         You may proceed.

3              MR. REYES:  Thank you, Your Honor.

4              **CROSS-EXAMINATION CONTINUED**

5    BY MR. REYES:

6         Q.   Officer Garcia, can you please state your full

7    name for the record?

8         A.   David R. Garcia.

9         Q.   And are you the same Officer David R. Garcia

10   that was testifying before our break?

11        A.   Yes.

12        Q.   Now, we were talking about fingerprints or

13   latent prints that were found; is that correct?

14        A.   Yes.

15        Q.   And you testified that you found some smudges;

16   is that correct?

17        A.   Right.

18        Q.   Can you tell the ladies and gentlemen of the

19   jury where at the Harrison home did you locate these

20   smudges?

21        A.   I dusted only on the door, the glass on the

22   front door and that's where they were located.

23        Q.   Okay.  And did you at any time find any latent

24   prints or any partial latent prints?

25        A.   I might have found some partial latent prints

STATE OF TEXAS VS. RUBEN GUTIERREZ                         61

1    on there.
2         Q.   Okay.  And did you do anything to try and lift
3    those latent prints?
4         A.   I'm sorry?  What?
5         Q.   Did you do anything to try and lift those
6    latent prints?
7         A.   I dusted the prints and I lifted them with the
8    lifting tape.
9         Q.   Okay.  And what did you do with those prints?
10        A.   Those were turned into evidence.
11        Q.   Okay.  And do you know what was done with them,
12   if anything?
13        A.   I believe they were sent to A.F.I.S. there in
14   Harlingen for examination.
15        Q.   And when you talk about A.F.I.S., are you
16   talking about the Harlingen Police Department?
17        A.   Yes, sir.
18        Q.   And who in particular in that police department
19   runs any kind of tests, if any, on these prints?
20        A.   I think it's a Detective Moore who does that.
21        Q.   Do you have any personal knowledge as to
22   whether or not he ran any kind of tests on these prints
23   that you lifted?
24        A.   No, I do not.
25        Q.   Now, isn't it correct that you found that there

1   was no forced entry into the Harrison home?

2       A.   Yes.

3       Q.   And isn't it correct that you also learned from

4   your investigation that Escolastica Harrison was, in

5   fact, afraid of Avel Cuellar; is that correct?

6       A.   That I don't know.

7                   MR. REYES:  May I approach the witness,

8   Your Honor?

9                   THE COURT:  You may.

10      Q.   (BY MR. REYES)  You stated earlier that you

11  prepared a report; is that correct?

12      A.   I'm sorry?

13      Q.   You wrote a report?

14      A.   Yes.

15      Q.   Okay.  I'm going to go ahead and ask you to

16  look at the document that I'm handing you.  Is that the

17  report that you wrote with respect to this case?

18      A.   Yes, sir.

19      Q.   Okay.  I'm going to go ahead and ask you to

20  look at the second page of that document at the last

21  paragraph, and then answer my question whether or not you

22  learned through your investigation that Escolastica

23  Harrison was, in fact, scared or afraid of Avel Cuellar.

24      A.   Okay.  Based on what --

25                  MS. FISCHER:  Your Honor, I object.

1   That's hearsay.  He's asking not only to speculate as to

2   what the victim thought, but then also what someone else

3   told him.

4                    MR. REYES:  Yes, based on what he learned

5   through his investigation, Your Honor.

6                    MS. FISCHER:  The wording is hearsay, the

7   words, asking the words, "Did she ever tell anyone that

8   she was afraid" is hearsay.

9                    THE COURT:  Overruled.

10      Q.   (BY MR. REYES)  Isn't it correct that you

11  learned through your investigation that Escolastica

12  Harrison was, in fact, afraid of Avel Cuellar?

13      A.   I think she may have told Ramon Cuellar that,

14  but she didn't tell me that.

15      Q.   My question was, did you learn through your

16  investigation that Escolastica Harrison was afraid of

17  Avel Cuellar?  Yes or no.

18      A.   Yes.  Based on what Ramon said, yes.

19      Q.   Now, isn't it correct that you also were able

20  to find a footprint in a puddle of blood?

21      A.   I don't remember that.

22      Q.   You don't recall that at all?

23      A.   I don't recall, sir.

24      Q.   Now, isn't it correct also that you had the

25  opportunity to question or interview Avel Cuellar?

1       A.    Right.

2       Q.    And isn't it correct that when you were

3  interviewing him, that this individual was, in fact,

4  intoxicated?

5       A.    Yes.

6       Q.    And isn't it correct that when you were

7  interviewing him, that you took photographs of him?

8       A.    Right.

9       Q.    Now, was it you or another police officer that

10 determined or saw bruising on his hand?

11      A.    I never saw bruising on his hand.  I saw like a

12 little bit of blood on his hand.

13      Q.    Is that what you saw?

14      A.    Right.

15      Q.    And we're talking about Avel Cuellar's hand; is

16 that correct?

17      A.    Yes.

18      Q.    Now, isn't it correct that when you were

19 talking to Avel Cuellar, you also seized his clothing?

20      A.    That's correct.

21      Q.    And you seized his clothing to have it analyzed

22 for any blood; is that correct?

23      A.    Right.

24      Q.    Now, when you took his clothing, were you able

25 to see that there was, in fact, blood on that shirt?

1       A.    I think that I saw something that appeared to

2    be blood.

3       Q.    Okay.  And is that the reason why you took that

4    clothing, so you could have it analyzed?

5       A.    That's correct.

6       Q.    Other than those two things, going to the scene

7    and also interviewing Mr. Cuellar, did you have any other

8    involvement in this case, Officer Garcia?

9       A.    I think I reinterviewed Cuellar about a day,

10   the next day.  He was still intoxicated.  That's about

11   it.

12      Q.    Okay.  So over a period of two days he was

13   intoxicated?

14      A.    Well, he was intoxicated the next day again.

15   So --

16      Q.    Okay.  So based on the fact that he was

17   intoxicated, you were not able to interview him; is that

18   correct?

19      A.    We interviewed him both times.  We interviewed

20   him anyway; and the detective in charge interviewed him a

21   third time.

22      Q.    Other than that, did you have anything else or

23   any other involvement in this case?

24      A.    That's it.

25                MR. REYES:  I'll pass the witness, Your

1    Honor.

2                    MS. FISCHER:  May I, Your Honor?

3                    THE COURT:  Go ahead.

4                    **REDIRECT EXAMINATION**

5    **BY MS. FISCHER:**

6        Q.   Officer Garcia, let's talk about the beginning

7    of any homicide investigation.  How do you treat every

8    person you come across?

9        A.   Well, everybody's a suspect initially.

10       Q.   Okay.  Then what do you do to determine whether

11   or not they're the killer?

12       A.   What we do is we eliminate suspects.

13       Q.   Okay.  And in this case, was Avel Cuellar

14   eliminated as a suspect?

15       A.   Yes.

16       Q.   Now, let's talk for a minute about the blood

17   that was found in the house.  I think you said that you

18   didn't know anything about any blood on the couch, right?

19       A.   On the couch, no.

20       Q.   Okay.  But now, that couch that we're talking

21   about, is that the one --

22                   MS. FISCHER:  May I approach, Your Honor?

23   I'm sorry.

24       Q.   (BY MS. FISCHER)  Is that the one here in the

25   photograph that we've shown the jury -- let me see if we

1    can get a good picture.  There is a gold couch in the

2    Harrison Mobile Home Park; isn't there?  You can kind of

3    see the end of it there?

4         A.    Yes, there is.

5         Q.    Where is that couch located within the home?

6         A.    That is located I guess by the entrance, the

7    front door.

8         Q.    Is that the first thing you see when you walk

9    in the front door?

10        A.    It'll be one of the first things you see to

11   your right hand side when you walk in.

12        Q.    Okay.  And the door that you went in to, when

13   you open that door, what is the first thing that you see?

14        A.    Well, you see the desk of the office; and then

15   you can see almost through the little small kitchen where

16   the table is where the Jack-In-The-Box bag was; and, of

17   course, the couch.

18        Q.    Okay.  But the front door that Ms. Harrison --

19   or the front door that you went in to, the one that you

20   thought -- the one that you used to go in and out of the

21   house, that opens up directly into an office?

22        A.    Right.

23        Q.    Okay.  Now, let's talk a little bit about this

24   man that you talked to, Ramon Cuellar.  Did you get a

25   feel from him about his relationship with Avel?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          68

1        A.    Yes.

2        Q.    Okay.  What was your feeling that you got from

3   him about how he felt about Avel Cuellar?

4        A.    I don't think he liked Avel too much.

5        Q.    Okay.  Could you tell if they had a good -- I

6   mean, they were half brothers, weren't they?

7        A.    I understand they were half brothers.  That's

8   my understanding.

9        Q.    Okay.  Did you get the feeling they were close?

10       A.    No, they weren't close at all.

11       Q.    Did you get the feeling there was bad blood

12  between the two of them?

13       A.    Yes.

14              MR. REYES:  I'm going to object, Your

15  Honor.  That calls for speculation.

16              THE COURT:  Overruled.

17       Q.    (BY MS. FISCHER)  While you were talking to

18  Avel -- and I know that you said he was intoxicated on

19  two different occasions.  Did he pretty much have a

20  consistent story, pretty much tell you the same thing

21  every time you talked to him?

22       A.    Yes.

23       Q.    Did he ever change his story to you?

24       A.    No.

25       Q.    Okay.  The last thing I want to talk to you

1   about is Mr. Reyes pointed out a statement in your report

2   where --

3                   MS. FISCHER:  Your Honor, may I approach

4   the witness?

5                   THE COURT:  You may.

6        Q.   (BY MS. FISCHER)  I think he pointed out a

7   statement in your report where you note that -- and I

8   think you're referring to Ramon Cuellar here.  He says

9   his aunt had said to him that she was afraid of the

10  suspect.

11       A.   Right.

12       Q.   Okay.  So that's just something somebody else

13  told you?

14       A.   That's true.

15       Q.   Okay.  You had never actually talked to

16  Ms. Harrison?

17       A.   I never did.

18       Q.   Okay.  So this is all just somebody --

19  something that somebody with some bad blood is telling

20  you?

21       A.   That's right.

22       Q.   All right.

23                  MS. FISCHER:  I pass the witness, Your

24  Honor.

25                  MR. REYES:  May I proceed, Your Honor?

1           THE COURT:   You may.

2                **RECROSS-EXAMINATION**

3    BY MR. REYES:

4        Q.   Now, let me get this straight.  You state that

5    the first thing that you do when you come across a

6    homicide investigation is that everyone is a suspect; is

7    that correct?

8        A.   That's correct.

9        Q.   And that what you do is you eliminate suspects;

10   is that correct?

11       A.   Right.

12       Q.   And the information that you had was that Avel

13   Cuellar had blood on his hands; is that correct?

14       A.   Yes.

15       Q.   And the information that you had is that he had

16   free reign to the Escolastica Harrison home; is that

17   correct?

18       A.   Right.

19       Q.   The information that you had is that he --

20   there was blood on Avel's toilet as well as blood next to

21   his toilet and there was blood on his shirt; is that

22   correct?

23       A.   Right.

24       Q.   You also had information that Escolastica

25   Harrison was indeed afraid of Avel Cuellar; is that

STATE OF TEXAS VS. RUBEN GUTIERREZ                    71

```
 1    correct?
 2         A.    Based on what Ramon said, yes.
 3         Q.    Okay.  And you also had information that Ramon
 4    Cuellar, his own half brother, actually believed that
 5    Avel Cuellar had killed his own aunt; is that correct?
 6         A.    That's what he believed.
 7         Q.    This is the information that you had?
 8         A.    That was his belief.
 9         Q.    My question was, this is the information that
10    you had; is that correct?
11         A.    Right.
12         Q.    Do you know when you received the results from
13    the Department of Public Safety with respect to the blood
14    that was found on Avel's shirt?
15         A.    That I do not know.
16         Q.    And you would not be able to eliminate him as a
17    suspect, isn't that correct, until you knew for a fact
18    whether or not that blood belonged to Escolastica
19    Harrison?  Is that true?
20         A.    I don't know how to answer that because, like I
21    said, my involvement was only initially at the crime
22    scene.
23         Q.    But if you find blood on a person who is a
24    suspect, wouldn't you have to wait for the analysis to
25    come back to determine whether or not that blood, in
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          72

1    fact, belonged to that victim?

2        A.    That's correct.

3        Q.    And then and only then would you be able to

4    eliminate that person as a victim; is that correct?

5        A.    Well, if you have other evidence, yes.  That's

6    true.

7        Q.    And are you aware of the fact that Avel and

8    Ramon Cuellar, in fact, drank together at Ramon Cuellar's

9    house?

10       A.    I'm not aware of that.

11       Q.    You weren't able to determine this at all

12   throughout your investigation, Officer?

13       A.    Nope.

14       Q.    Did you at all try to find out whether or not

15   they got along?

16       A.    Based on my conversation with Ramon, I'm pretty

17   sure they didn't get along.

18       Q.    Well, did you ask anybody whether or not, you

19   know, they drank together at Ramon Cuellar's house?

20       A.    No, I didn't do that.  That's correct.

21                 MR. REYES:  I'll pass the witness, Your

22   Honor.

23                 MS. FISCHER:  I don't have anything

24   further, Your Honor.  May this witness be excused?

25                 THE COURT:  Any objection?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          73

```
 1              MR. REYES:  We have no objection, Your
 2   Honor, subject to him being recalled.
 3              THE COURT:  All right.  You're excused to
 4   go.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  You may call your next
 7   witness.
 8              MS. FISCHER:  Tino Ortiz.
 9              THE BAILIFF:  No answer, Your Honor.
10              MS. FISCHER:  Judge, he may have stepped
11   out for a cup of coffee.  We had told him it was going to
12   be about 15 minutes.  I think he may be downstairs
13   getting a cup of coffee.
14              THE COURT:  Call another witness.
15              MR. BLAYLOCK:  The State would call Avel
16   Cuellar.
17              THE COURT:  Would you raise your right
18   hand, please?
19              (The witness was sworn in by the Court)
20              THE WITNESS:  Yes, sir.
21              THE COURT:  All right.  You may be seated.
22              You may proceed.
23              MR. BLAYLOCK:  Thank you, Judge.
24
25
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          74

```
 1                          AVEL CUELLAR,
 2        having been first duly sworn, testified as follows:
 3                       DIRECT EXAMINATION
 4    BY MR. BLAYLOCK:
 5        Q.   Mr. Cuellar, state your full name for the
 6    record, please.
 7        A.   Avel Ismael Cuellar.
 8        Q.   Okay.  And where --
 9                  THE COURT:  Let me ask you, could you
10    please get a little closer to the microphone so everybody
11    can hear you?  Thank you.
12                  Go ahead.
13        Q.   (BY MR. BLAYLOCK)  Say it again.
14        A.   Avel Ismael Cuellar.
15        Q.   What's your address?
16        A.   409 Morningside Road.
17        Q.   All right.  What is 409 Morningside Road?
18        A.   Harrison's Mobile Home Park.
19        Q.   Okay.  Is that the office?
20        A.   Yes.
21        Q.   And you live there?
22        A.   Yes.
23        Q.   You still live there?
24        A.   Yes.
25        Q.   Did you live there on September 5, 1998?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              75

```
 1        A.   Yes, sir.
 2        Q.   Who else lived there on September 5, 1998?
 3        A.   Just me and my aunt.
 4        Q.   What's your aunt's name?
 5        A.   Escolastica Cuellar -- Harrison.  I'm sorry.
 6        Q.   So it's Escolastica Cuellar Harrison?
 7        A.   Harrison.
 8        Q.   Okay.  Do you know when she got married to
 9   Mr. Harrison?
10        A.   No, I don't.
11        Q.   Do you know when Mr. Harrison died?
12        A.   1991.
13        Q.   Okay.  How long had Ms. Harrison been living at
14   that trailer park?
15        A.   Since 1950.
16        Q.   So she had lived there with Mr. Harrison?
17        A.   Yes, sir.
18        Q.   Okay.  Do you know what kind of job
19   Ms. Harrison had before she retired?
20        A.   She was a school teacher.
21        Q.   How long was she a school teacher?
22        A.   Twenty-six years.
23        Q.   Do you know what school she taught at?
24        A.   Cromack.
25        Q.   Did she retire?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           76

```
 1        A.   Yes.
 2        Q.   Now, describe your aunt.  This was your aunt,
 3   Ms. Harrison?
 4        A.   Yes, she was.
 5        Q.   Tell the jury what kind of lady your aunt was.
 6        A.   She was a real fine lady.
 7        Q.   Okay.
 8        A.   Very educated, very well kept, hard working
 9   lady.
10        Q.   When did you move in with her?
11        A.   In 1992.
12        Q.   Okay.  Where had you been living before that?
13        A.   San Antonio.
14        Q.   And you moved all the way down to Brownsville?
15        A.   Yes, sir.
16        Q.   Did she give you a job?
17        A.   Yes.
18        Q.   What kind of job did she give you?
19        A.   Doing maintenance, plumbing, mowing yards, the
20   empty lots, looking -- when people come and rent space,
21   make sure that the trailers would fit in there properly
22   and --
23        Q.   Okay.  Are these the kinds of things that
24   Mr. Harrison did while he was alive?
25        A.   Yes.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          77

1          Q.   And did you like your job?

2          A.   Yes.

3          Q.   Okay.  In fact, your aunt helped you out,

4     right?

5          A.   Yes.

6          Q.   All right.  Let me show you -- let me show you

7     a couple of photographs there.

8                    MR. BLAYLOCK:  If I may I approach, Judge?

9                    THE COURT:  You may.

10         Q.   (BY MR. BLAYLOCK)  Did Ms. Harrison like to

11    have her picture taken very much?

12         A.   No.

13         Q.   She didn't like it, did she?

14         A.   No.

15         Q.   Okay.  But occasionally she consented to have

16    her picture taken?

17         A.   Yes.

18         Q.   Were there a lot of photographs around the

19    house of her?

20         A.   No.

21         Q.   I'm going to show you what I've marked as

22    State's Exhibit Number 19.

23         A.   That's Ms. Harrison, my aunt.

24         Q.   Okay.  So this blown-up picture represents the

25    way she looked to you?

```
1        A.   Yes, sir.
2        Q.   Okay.  Let me show you what's marked as State's
3    Exhibit Number 20.  Does this picture look like --
4        A.   That's her house there.
5        Q.   And it looks like the way it looked to you?
6        A.   Yes.
7        Q.   Okay.
8                  MR. BLAYLOCK:  I'll show 19 and 20 to
9    defense counsel, Judge.  Move to admit Exhibits 19 and
10   20.
11                 MR. GALARZA:  There's no objection, Your
12   Honor.
13                 THE COURT:  They'll be admitted.
14                 (State's Exhibit Numbers 19 and 20
15                 admitted)
16       Q.   (BY MS. FISCHER)  Let's talk about State's
17   Exhibit Number 19.  You said this is a picture of your
18   aunt?
19       A.   Yes.
20       Q.   And this is Escolastica Harrison, right?
21       A.   Yes.
22       Q.   Do you know where this photo came from?  Do you
23   know if it came from the Brownsville Herald?
24       A.   It came from the Brownsville Herald, yes.  As a
25   matter of fact, it was mine 'cause I cut it off and I
```

1   saved it.

2       Q.   Okay.  And we got this from the Brownsville

3   Herald, right?

4       A.   Yes.

5       Q.   She didn't like to have her picture taken, but

6   she was in the newspaper for something?

7       A.   For getting her driver's license at that age.

8       Q.   Okay.  And how old was she at the time, do you

9   know?

10      A.   At the time about 84, I believe.

11      Q.   Okay.  She was over 80?

12      A.   Yes.

13      Q.   And she was driving?

14      A.   Yes.

15      Q.   All right.  And this is, as you already said,

16  your house?

17      A.   Yes.

18      Q.   And when you go in this part of the house, is

19  this the front door?

20      A.   Yes.

21      Q.   Okay.  When you go into the front door, tell

22  the jury what you see when you go into the front door.

23      A.   The office.

24      Q.   So you go right in and you see the office.

25  There's a desk there.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          80

```
1          A.   Yes.
2          Q.   And off to the right, the room off to the
3     right, what is that?
4          A.   That was my aunt's bedroom.
5          Q.   Okay.  So, this window?
6          A.   Yes.
7          Q.   That's where she looked out her window?
8          A.   Yes.
9          Q.   Okay.  And then if you go straight through the
10    office, through the passageway that's next to the desk,
11    where do you go?
12         A.   To the dining room table.
13         Q.   Okay.  You go into the kitchen area?
14         A.   Yes.
15         Q.   Where is your room in this house?
16         A.   Way in the back on the north side.
17         Q.   Okay.  Is that an add-on room?
18         A.   Yes.
19         Q.   Is this a big house or a small house?
20         A.   It's a small house, small frame house.
21         Q.   And how long had you been living in that
22    house --
23         A.   Almost seven years.
24         Q.   Okay.  Now, sir, do you -- do you know if
25    Ms. Harrison had a lot of business there at the mobile
```

1   home park or a little bit of business?

2       A.   We were up to the max for a few years there.

3   And then we came down because a lot of people were buying

4   land while they were renting and they started moving out

5   a little bit at a time, but we were always half -- above

6   half full.

7       Q.   Okay.  And how were you involved in the

8   business end of this trailer park?

9       A.   Because like I take care of the lots and make

10  sure that everything was properly done so when the

11  trailers came in, it would be hooked up properly and that

12  the services were in working order.

13      Q.   How many lots did she have there at the trailer

14  park?

15      A.   Fifty.

16      Q.   Okay.  Do you know about how many were full

17  when she died?

18      A.   We had about -- pretty close to 40.

19      Q.   Okay.  And how much income did each lot bring?

20      A.   Approximately -- well, it varied because it

21  depended on the size of the trailer.  Some were 170,

22  others were 180.

23      Q.   Okay.  So --

24      A.   And we had -- the majority were 180.

25      Q.   So if I wanted to get a lot there and I had a

1    small trailer, how much would I pay?

2        A.    170.

3        Q.    Okay.  If I had a large trailer, how much would

4    I pay?

5        A.    180.

6        Q.    Okay.  And so, Ms. Harrison got rent from these

7    lots?

8        A.    Yes, sir.

9        Q.    Okay.  Was that her only source of income?

10       A.    That and her retirement check.

11       Q.    Okay.  Retirement from school teaching?

12       A.    From school.

13       Q.    All right.  Did she have any other properties?

14       A.    Yes.  She had some like 12 acres out on Boca

15   Chica, and one acre out on Taft, 14th and Taft.

16       Q.    Okay.  Did you have to take care of some of

17   those properties?

18       A.    Only the one on 14th Street.

19       Q.    And one of them was a car -- the other one was

20   a car lot, right?

21       A.    Right.  The one on 14th Street.  It still is.

22       Q.    She had that property leased to the guy that

23   had the car lot, right?

24       A.    That's right.

25       Q.    So she had income.  Was it monthly income from

STATE OF TEXAS VS. RUBEN GUTIERREZ                               83

1    the trailer park?

2        A.    Yes.

3        Q.    170, 180 from each lot.  And then she had

4    income from other properties?

5        A.    From the lot on 14th Street, yes, sir.

6        Q.    Okay.  Now, tell the jury how Ms. Harrison kept

7    her money.  Did she like banks?

8        A.    She had some money in the bank, and -- but most

9    of it she kept it at home.

10       Q.    Okay.  Do you know if she liked banks or

11   disliked banks?

12       A.    She disliked banks.

13       Q.    Do you know why?

14       A.    I have no idea, no.

15       Q.    Okay.  What was -- tell the jury, if you know,

16   what her attitude was.

17       A.    Towards money, well, she wasn't satisfied with

18   the banks.  She was scared that the banks would go broke,

19   she would say sometimes, and that she would rather just

20   not put money in the bank.

21       Q.    Okay.  Do you know --

22       A.    Except for what she had to pay, the bills and

23   things like that.

24       Q.    Do you know what year she was born in?

25       A.    I know it was on February the 10th, but no, not

STATE OF TEXAS VS. RUBEN GUTIERREZ                    84

```
 1   the year.
 2        Q.   Okay.  Well, if she's 85 when she died, would
 3   it be about 1913?
 4        A.   Something -- yes.
 5        Q.   February 10th?
 6        A.   Yes.
 7        Q.   Okay.  And so she lived through the depression
 8   and a bunch of hard times?
 9        A.   Yes.
10        Q.   All right.  And you know she didn't like banks?
11        A.   Yes.
12        Q.   Well, what did she do with her money, then?
13        A.   She saved it.
14        Q.   How?
15        A.   Put it up.
16        Q.   Tell us how.
17        A.   She would put it up in her room.
18        Q.   Did she keep it in boxes or suitcases?
19        A.   In suitcases.
20        Q.   Did you ever see her counting her money?
21        A.   Yes.
22        Q.   How did she count it?
23        A.   She would go to her bedroom and count it on her
24   bed.
25        Q.   Did she ever tell you exactly how much money
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          85

```
 1   she had?
 2        A.   No, sir.
 3        Q.   But you knew she had a lot of money?
 4        A.   Yes, sir.
 5        Q.   And had you ever seen her count her money on
 6   her bed?
 7        A.   Yes.
 8        Q.   How would she do it, lay it out or --
 9        A.   Just lay it out on the bed.
10        Q.   So you knew she had a lot of money?
11        A.   Yes.
12        Q.   Did you know Ruben Gutierrez?
13        A.   Yes, I did.
14        Q.   How did you know him?
15        A.   I met him through my -- through his
16   father-in-law.
17        Q.   Okay.  And how did that occur?
18        A.   Well, I used -- as a matter of fact, I used to
19   live at one time at my father-in-law's mother's house.
20        Q.   Okay.
21        A.   And then he got married to his wife, which is
22   Angie; and I would see him there.  We weren't acquainted.
23   We would -- you know, we would just say hi and bye for
24   awhile there.
25        Q.   Okay.  Well, let's go back.  You saw Ruben get
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          86

1    married to his wife, Angie?

2          A.    Yes, sir.

3          Q.    Okay.  And so you were a casual acquaintance?

4          A.    Yes.

5          Q.    And how did you get to know him?

6          A.    Once I had to go to Waco because my brother was

7    sick, and they were going to operate on him.  And I

8    didn't have a driver's license.  And I had borrowed a car

9    and I needed a driver to go to take me over there.

10                   And I went there to my -- excuse me, by my

11   compadre's house; and I asked this other son --

12   son-in-law of my compadre if he could take me, but he

13   couldn't because he had an operation on his back.

14                   And then I asked Ruben, and Ruben asked

15   his wife, and it was fine.  He could take me.  And he

16   took me; and from then on we became pretty much friends.

17         Q.    Okay.  So, Ruben was acquainted to somebody

18   that your compadre knew?

19         A.    Yes.

20         Q.    Okay.  And they kind of hooked you up with

21   Ruben?

22         A.    No.  He just happened to be there at that time.

23         Q.    Okay.  And you asked him if he would drive you

24   up to Waco?

25         A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    87

```
 1        Q.   Did he want to be paid for that or no?
 2        A.   No.  I offered to pay him; and I did.
 3        Q.   Okay.  So he took the money?
 4        A.   Yes.
 5        Q.   Okay.  And do you know about when that was?
 6        A.   I can't recall, sir.  It was about maybe a
 7   little better than a year.
 8        Q.   Okay.  A year before Ms. Harrison died?
 9        A.   Oh, yes.
10        Q.   And you guys became friends on that trip?
11        A.   Sort of, not really, not actually, but until
12   after a while he started coming around.
13        Q.   Okay.  After you got back, how long was it
14   before --
15        A.   Oh, it was pretty much a good while.
16        Q.   Before he started coming over?
17        A.   Yes.
18        Q.   And at that time you lived with Ms. Harrison?
19        A.   Yes.
20        Q.   Okay.  And so, you needed to go see your
21   brother who was sick?
22        A.   Yes.
23        Q.   And he drove you?
24        A.   Yes.
25        Q.   Did you invite him over to Ms. Harrison's
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          88

1    house?

2         A.    No.   I left him -- as a matter of fact, when we

3    got back I left him at his house and I came home.   I

4    drove the car back to the house.

5         Q.    Okay.

6         A.    And then it was after that -- well, it was a

7    while after that that he came by the house, yes, on his

8    own.

9         Q.    Did you invite him to come by the house?

10        A.    I -- yes, I probably did.   Yes.

11        Q.    Okay.  So he started coming around

12   Ms. Harrison's house --

13        A.    Yes.

14        Q.    -- because of you?

15        A.    Yes.

16        Q.    Okay.  And how long after you got back from

17   your trip?  Was it a few weeks before he started coming

18   over or --

19        A.    I'd say, yes.

20        Q.    And then after he got to coming over, did he

21   get to know Ms. Harrison?

22        A.    Yes.

23        Q.    And how often would he come over?

24        A.    Sometimes he'd come like three or four times a

25   week.  Sometimes he wouldn't come for awhile; and then

1    sometimes he would just come.
2        Q.    Okay.  So he was pretty regular there?
3        A.    Yes.
4        Q.    And what did you all do when he came over?
5        A.    Well, we -- he would come after I got off of
6    work; and we sat down in the back and we drank beer.
7        Q.    Okay.  In fact, you had a habit of drinking
8    beer in the back of Ms. Harrison's house?
9        A.    Yes.
10       Q.    And who else would come over?
11       A.    Well, him, Crispin --
12       Q.    Crispin?
13       A.    -- Ramiro.
14       Q.    Crispin?
15       A.    Villarreal.
16       Q.    Villarreal.
17       A.    And Ramiro Martinez.
18       Q.    Ramiro.
19       A.    And sometimes Andres Villarreal, Crispin's
20    brother.
21       Q.    Okay.  So you all had a group that would come
22    to the back of the house?
23       A.    Yes.
24       Q.    It was a regular drinking group, right?
25       A.    Right.  Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          90

```
 1          Q.    You all would sit back there and party?
 2          A.    Yes, sir.
 3          Q.    Okay.  And did you drink with them?
 4          A.    Yes.
 5          Q.    In fact, you drank a lot, right?
 6          A.    Yes, sir.
 7          Q.    And you have a drinking problem; is that fair?
 8          A.    Yes.
 9          Q.    Okay.  Now -- and Ruben would come by
10    regularly; you say up to three times a week?
11          A.    Yes.
12          Q.    Did he get to know Ms. Harrison pretty good?
13          A.    Very well.
14          Q.    Did Ms. Harrison like you drinking in the back
15    of the house all the time?
16          A.    No.  Sometimes; sometimes no --
17          Q.    Okay.
18          A.    -- but the majority of the time, no.
19          Q.    In fact, she didn't like you drinking a lot,
20    did she?
21          A.    Right.
22          Q.    It used to make her a little mad?
23          A.    Yes, sir.
24          Q.    You guys would have fights from time to time?
25          A.    Yes, sir.
```

1      Q.    Okay.  But you continued to live there the

2   whole time and she let you live there?

3      A.    Yes.

4      Q.    Did she ever threaten to kick you out?

5      A.    No.

6      Q.    But she would yell at you when she was mad at

7   you?

8      A.    Yes.

9      Q.    And you would yell back?

10      A.    Yes.

11      Q.    Now, describe the relationship that Ruben and

12   Ms. Harrison had.

13      A.    They had a very, very nice relationship.

14      Q.    And how did that get started?

15      A.    Well, when Ruben used to go over there, my aunt

16   at times -- like I say, when she was -- when she wasn't

17   mad, she would go out there with us and, you know, sit

18   down and talk to us.  And she enjoyed Ruben.  She liked

19   Ruben and --

20      Q.    Who else did your aunt like?  Did she like any

21   of the other guys?

22      A.    Crispin.  Almost everybody that went there, she

23   got along real well with them.

24      Q.    But she really liked Crispin?

25      A.    Sure.  Yes.

1    Q.   And she trusted Crispin?

2    A.   Yes.

3    Q.   And she really liked Ruben?

4    A.   Yes.

5    Q.   She trusted Ruben?

6    A.   Yes.

7    Q.   Well, tell the jury why you think she trusted

8    Ruben.

9    A.   Well, because, number one, Ruben began -- he

10   was good to her and he was respectful.  And like my

11   aunt -- a lot of times I was working; and she liked half

12   and half cream on her coffee.  She wouldn't drink it with

13   milk.  And she wouldn't have any.  And Ruben would come

14   in, come by; and she'd send him and he'd go and get her

15   the milk.  And then she got a liking to him and --

16   Q.   Okay.  And did Ruben make errands for her on

17   other occasions?

18   A.   Yes.

19   Q.   Did Ms. Harrison ever call Ruben on the

20   telephone?

21   A.   Yes.

22   Q.   How do you know that?

23   A.   Because if -- she would ask me to call; and if

24   I wouldn't get him on the line, she would call.

25   Q.   Okay.  So you saw her on the phone talking to

1    Ruben?

2        A.    Yes.  She'd tell me, "I called Ruben and I

3    couldn't get him," or "Ruben's coming over," or "Ruben

4    called," or "He returned your call," or whatever.

5        Q.    Did your aunt -- and what did you call your

6    aunt?  How did you address her?

7        A.    Mom.

8        Q.    Okay.  And did you address her as mom from the

9    beginning from 1992 or did you grow into that?

10       A.    I grew into it gradually.

11       Q.    Okay.  But in 1998 you were calling her mom?

12       A.    No.  Tia.  '98?

13       Q.    Yes, sir.

14       A.    Yes.

15       Q.    First you were calling her Tia?

16       A.    Yeah.

17       Q.    And what does that mean?

18       A.    Aunt.

19       Q.    Okay.  Now, did your aunt, the one you called

20   mom, did she keep a list of numbers, important phone

21   numbers to her in the house?

22       A.    Yes, she did.

23       Q.    Where did she keep that list?

24       A.    Right in front of her desk on the wall.

25       Q.    Okay.  And could she see those numbers from her

STATE OF TEXAS VS. RUBEN GUTIERREZ                        94

1    desk?

2        A.   Yes.  She would write them real large where she

3    could see them.

4        Q.   All right.  And was Ruben's name on that list?

5        A.   Yes.  As a matter of fact, he was the second

6    one from the list.

7        Q.   All right.  Now, what else about their

8    relationship can you tell the jury?

9        A.   Well, like after Ruben would leave, she would

10   talk to me and say, "Well, look, he's a real nice kid.  I

11   really like him."

12              And as a matter of fact, once we were out

13   there in the back and Ruben used to blink his eyes a lot.

14   And she asked him, "Ruben, what's wrong with your eyes?"

15              And he answered, "I'm kind of going

16   blind."

17              And she felt real sorry for him and he

18   told her -- she told him --

19              MR. GALARZA:  Your Honor, we would object

20   to the hearsay.

21              THE COURT:  I'll sustain.

22       Q.   (BY MR. BLAYLOCK)  Okay.  So, you personally

23   observed your aunt interreacting with Ruben about some

24   medical problem he had?

25       A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              95

1        Q.   Okay.  Do you know if your aunt wanted to pay

2   for his medical expenses?

3        A.   Yes.

4        Q.   Okay.  And how did she present that to you?

5        A.   She told me when we went inside that particular

6   day and told me that she felt sorry for Ruben and that

7   she was going to try and help him, send him to an eye

8   doctor.

9        Q.   Okay.  And did you ever see Ruben blinking a

10  lot or --

11       A.   Yes.

12       Q.   Okay.  And your aunt just noticed that?

13       A.   Yes.

14       Q.   And what else about their relationship can you

15  tell us?  Did Ruben ever approach your aunt for some

16  money?

17       A.   Oh, yes.  Yes.

18       Q.   Okay.  Do you know if your aunt ever discussed

19  money with Ruben?

20       A.   Yes.

21       Q.   And how do you know if Ruben approached your

22  aunt for money?

23       A.   Because the first time that he went to ask for

24  money, he wanted me to ask her to borrow some money for

25  him.  And I said --

STATE OF TEXAS VS. RUBEN GUTIERREZ                              96

```
 1        Q.   And what --
 2        A.   -- "No, you go and ask her yourself."
 3        Q.   So Ruben knew about her money before that?
 4        A.   Yes.
 5        Q.   And in fact, when you all were drinking out
 6   there and getting a little drunk, occasionally it could
 7   slip that your aunt had a lot of money?
 8        A.   It's possible.
 9        Q.   And do you know if your aunt told very many
10   people about her money?
11        A.   A few people, yes.
12        Q.   Who did she tell?
13        A.   Crispin knew about it.  Ruben knew about it.
14        Q.   Okay.  So she -- just a few people she trusted?
15        A.   Yes.
16        Q.   And then when you first moved in with her, did
17   she -- was she free with that information or was she --
18        A.   No.  She was very secure.
19        Q.   So as she got older --
20        A.   Yes.
21        Q.   -- she got to 85, you're saying she was less
22   secure about her money?
23        A.   Yes.  Well, when she got to knowing these
24   people, like Crispin and Ruben, she felt a little bit
25   more confident to talk to them.  And, you know, she was
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              97

1    more free with them because really she was real secure.

2    With anybody else she wouldn't say a word.  And it amazed

3    me, you know, that after she got to know Ruben and

4    Crispin, that she was real free with them.

5         Q.   All right.  And how else do you know if your

6    aunt loaned Ruben some money on a couple of occasions?

7         A.   Well, because she would always tell me

8    everything.

9              MR. GALARZA:  I'm going to object to the

10   hearsay.

11             THE COURT:  Sustained.

12        Q.   (BY MR. BLAYLOCK)  Okay.  Is there any other

13   way you know?

14        A.   Just the only way I know is that she would tell

15   me about it.

16        Q.   Okay.  Did you ever go through her desk and see

17   some notes?

18        A.   Yes.

19        Q.   Did you find some -- something written down?

20        A.   Yes.

21        Q.   And what did it say?

22        A.   It says, "I lent Ruben --"

23             MR. GALARZA:  Objection, Your Honor, to

24   hearsay.

25             THE COURT:  Sustained.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          98

```
 1                    MR. BLAYLOCK:  May I approach, Judge?
 2        Q.   (BY MR. BLAYLOCK)  Would you recognize your
 3   aunt's writing if you saw it?
 4        A.   Yes, sir.
 5        Q.   Okay.  I'll show you State's Exhibit Number 21.
 6   Do you recognize State's Exhibit Number 21?
 7        A.   Yes.
 8        Q.   This is Ms. Harrison's writing?  All right.
 9   And where did State's Exhibit 21 come from?
10        A.   From her desk.
11        Q.   You got it?
12        A.   Yes.
13        Q.   And you brought it to me?
14        A.   Yes.
15                    MR. BLAYLOCK:  I'm showing defense State's
16   Exhibit Number 21.  Move to admit State's Exhibit
17   Number 21.
18                    MR. GALARZA:  Your Honor, we would object
19   at this time.  He doesn't really know.  It's hearsay.
20   And at this time he doesn't really --
21                    MR. BLAYLOCK:  He's identified her
22   writing, Judge.
23                    THE COURT:  It'll be overruled.
24   Twenty-one will be admitted.
25                    (State's Exhibit Number 21 admitted)
```

PAM L. ESQUIVEL, CSR, RPR

1    Q.   (BY MR. BLAYLOCK)   Again, whose writing is
2    this on State's Exhibit 21?
3    A.   Mrs. Harrison, Escolastica Harrison.
4    Q.   And you got it out of her desk?
5    A.   Yes.
6    Q.   Well, what's it say?
7    A.   "Personal loan, Ruben, $200."
8    Q.   It's got a date?
9    A.   7/21/98.
10   Q.   Okay.  A couple of months before she died?
11   A.   Yes.
12              MR. BLAYLOCK:  May I publish 21, Judge?
13              THE COURT:  You may.
14   Q.   (BY MR. BLAYLOCK)   So you do have personal
15   knowledge that she loaned Ruben some money?
16   A.   Yes.
17   Q.   Now, sir, let's go to September 5, 1998.  Is
18   that the day you remember?
19   A.   Yes.
20   Q.   Okay.  Who was home that day in the morning?
21   A.   Just her and myself, Ms. Harrison and myself.
22   Q.   Escolastica Harrison?
23   A.   Yes.
24   Q.   You were home in 409 -- or on the house there
25   at Morning -- on Morningside --

```
 1          A.    409 Morningside.

 2          Q.    Okay.  Just the two of you?

 3          A.    Just both -- yes, sir, that's all.

 4          Q.    Okay.  It was a Saturday?

 5          A.    Yes.

 6          Q.    What time of day did you all wake up?

 7          A.    She woke up very early in the morning.  I

 8     usually got up around ten.

 9          Q.    Did you do any work that day?

10          A.    Some, yes.

11          Q.    Okay.  Was this a special day for you?

12          A.    Yes, because I was out working and she called

13     me on the intercom and told me that my daughter had

14     called, to come in the office that she wanted to talk to

15     me; and that she was -- she wanted to come see me.  And I

16     hadn't seen my daughter for years.  And I was elated.

17     And so, she told me after -- because I didn't get to --

18               MR. GALARZA:  Objection, Your Honor.

19          A.    -- talk to my daughter.  She did.

20               THE COURT:  Just a minute.  Just a minute.

21     I'm sorry?

22               MR. GALARZA:  I'll object to the hearsay.

23               THE COURT:  I'll sustain.

24          Q.    (BY MR. BLAYLOCK)  All right, sir.  So it's a

25     special day for you?
```

1      A.   Yes.

2      Q.   And was it also your payday?

3      A.   Yes.

4      Q.   And how did you get paid by Ms. Harrison?

5      A.   Cash.

6      Q.   How much would she give you a week?

7      A.   150.

8      Q.   Did she give you any extra from time to time?

9      A.   Yes.

10     Q.   When?

11     A.   Most of the time she would.

12     Q.   Okay.  And on this day did she give you any

13   extra?

14     A.   She gave me $50 extra.

15     Q.   Okay.  What for?

16     A.   To buy me some clothes.

17     Q.   For a special occasion?

18     A.   Yeah, for my daughter when she was coming over.

19     Q.   Okay.  So you took the cash?

20     A.   Yeah.

21     Q.   And what did you have planned that afternoon?

22     A.   I had planned to go get some clothes, which I

23   didn't.

24     Q.   Okay.  In fact, you went out drinking, didn't

25   you?

1      A.    Yes.

2      Q.    And did you call Ramiro?

3      A.    Yes.

4      Q.    Okay.  And did you and Ramiro make a plan?

5      A.    Yes, to go out to the VFW and have a beer.

6      Q.    What time of day was this?

7      A.    Around two.

8      Q.    All right.  And did you get ready to go?

9      A.    Yes.  I got ready to go.  And she paid me my

10   money, and I called Ramiro.  And I told her to lock

11   the -- I locked the back door.  And I told her when I got

12   out to lock the front door and that I'd be right back.

13     Q.    Okay.  And did you shower and -- when you're

14   getting ready and everything?

15     A.    Yes.

16     Q.    And you showered in the front bathroom?

17     A.    No.  In my -- yes, because that's where I

18   shower because I didn't have a shower in my room.

19     Q.    Okay.  And that was Ms. Harrison's bathroom?

20     A.    Yes.

21     Q.    And did Ramiro come pick you up?

22     A.    Yes, he did.

23     Q.    Is that later in the afternoon?

24     A.    Around 2:30, somewhere around there.

25     Q.    Okay.  Where did he pick you up at?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              103

```
 1        A.    Right there in front of the office.
 2        Q.    All right.  And what kind of vehicle was he in?
 3        A.    He had a Chevrolet truck.
 4        Q.    Okay.  And we're talking about Ramiro Martinez?
 5        A.    Yes.
 6        Q.    Is he a friend of yours?
 7        A.    Yes.
 8        Q.    All right.  And you two were going to go to the
 9   VFW?
10        A.    Yes.
11        Q.    Did you see anything when you were pulling away
12   from your house?
13        A.    Yes.  As we were approaching the stop right in
14   the entrance of the park, I kind of glanced to my right
15   and I saw two people walking from the back of the yard
16   there coming towards the house.  And I told Ramiro,
17   "Stop, somebody's coming."
18              And when he stopped and then I could -- I
19   noticed that it was Ruben and --
20        Q.    Who --
21        A.    -- another young kid, which the kid I don't
22   know, but I know Ruben.
23        Q.    All right.  Slow down there.  Let me approach.
24   You're pulling away from the front of your house.
25        A.    Yes.
```

1      Q.   Is there a road in the front of your house?

2      A.   Yes, the entrance and the exit.

3      Q.   Okay.  And this road goes to what street?

4      A.   Morningside Road.

5      Q.   Okay.  And Morningside goes which direction, do

6   you know?

7      A.   It goes --

8      Q.   Do you know if it's north/south or east/west?

9      A.   East and west.

10      Q.   It goes east and west?

11      A.   Yes.

12      Q.   All right.  Now, look at this.  This is State's

13   Exhibit 22.  Do you recognize this?

14      A.   Yes.

15      Q.   Okay.  And does this reasonably depict the way

16   that the grounds looked there?

17      A.   Yes.

18      Q.   Okay.  And you've looked at this, right?

19      A.   Yes.

20      Q.   All right.

21            MR. BLAYLOCK:  I'm showing State's

22   Exhibit 22 to the defense.  I move to admit Exhibit 22.

23            MR. GALARZA:  Your Honor, at this time

24   we're going to object that it's not to scale and he's not

25   actually the one that prepared this.

1              THE COURT:  It'll be overruled.

2   Twenty-two will be admitted.

3              **(State's Exhibit Number 22 admitted)**

4        Q.   (BY MR. BLAYLOCK)  Can you step off, sir?

5        A.   (Witness complies).

6              THE COURT:  Get him the pointer, Roy.

7        Q.   (BY MR. BLAYLOCK)  Let's move this back.

8              MR. REYES:  May we approach, Your Honor?

9   May we approach?

10             THE COURT:  Go ahead.

11       Q.   (BY MR. BLAYLOCK)  Now, tell the jury what

12  State's Exhibit 22 is.  Step back a little bit.  Tell

13  them what it is.

14       A.   This is the -- my house, trailer park.  This is

15  the whole trailer park.  This is the back of the house.

16  This is the brick house on the back here; the resaca.

17  This is the trees in the back where I used to sit down

18  and drink.  And this is my room here.

19       Q.   Okay.  And what is further down this way that's

20  cut off?

21       A.   Right in here?

22       Q.   No.  Further down this way.

23       A.   This is another road going into the park.

24       Q.   Okay.  There's actually trailers down here; is

25  that right?

1        A.    Yes.  Right here and right here.

2        Q.    Morningside goes on down this way, right?

3        A.    Yes.

4        Q.    And that would be west?

5        A.    That would be east going that way.

6        Q.    Okay.  East.  My mistake.  And what road does

7    Morningside come to over here on the east?

8        A.    Central, Central Avenue.

9        Q.    Okay.  So it's the corner of Morningside and

10   Central?

11       A.    Yes.

12       Q.    All right.  And this part of the mobile home

13   park is the part where your house was?

14       A.    Yes.

15       Q.    All right.  And where did Crispin live?  Show

16   them where Crispin lived.

17       A.    (Witness complies).

18       Q.    Right there?

19       A.    Yes.

20       Q.    Okay.  And is this the front door?

21       A.    Yes.

22       Q.    Okay.  Where did Ramiro pick you up at?

23       A.    Right here.

24       Q.    In the front of the house?

25       A.    In front of the house.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          107

```
 1        Q.   You got in the pickup?
 2        A.   Yes, sir.
 3        Q.   Okay.  And where did you all go?
 4        A.   We went out this way.
 5        Q.   Okay.  And you've already told us you saw
 6   something when you were going out this way.  What did you
 7   see?
 8        A.   I saw two people coming back from the street
 9   towards the house.
10        Q.   Okay.  You saw them --
11        A.   Right here.
12        Q.   Into the road?  And -- all right.  So when you
13   saw them, did you tell Ramiro to do anything?
14        A.   I told Ramiro to pull over here and stop.
15        Q.   Okay.  And did he do that?
16        A.   Yes.
17        Q.   And you kept looking at these people?
18        A.   Yes.
19        Q.   Did it strike you odd that some people were
20   back there?
21        A.   Not really because sometimes people would come
22   through the back there.
23        Q.   Okay.  And did you recognize who it was?
24        A.   Yes, Ruben.
25        Q.   The same Ruben that's sitting right there?
```

1      A.    Yes, sir.

2      Q.    And for the record, point out to the jury and

3  tell us where Ruben Gutierrez is right now.

4      A.    Right there (pointing).

5      Q.    What color of shirt does he got on?

6      A.    White.

7                  MR. BLAYLOCK:   Judge, the record should

8  reflect that he's pointing to the defendant in this case.

9                  THE COURT:   It shall reflect.

10     Q.    (BY MR. BLAYLOCK)   So you see this man behind

11 your house that afternoon?

12     A.    Yes, sir.

13     Q.    Okay.   Is he alone?

14     A.    No.   He's with someone else.

15     Q.    Okay.   And where are they approximately when

16 you see them?

17     A.    Around right here.

18     Q.    Okay.   And did he see you?

19                 MR. GALARZA:   Your Honor, we would object

20 to speculation.   He's leading his witness.

21                 THE COURT:   It's overruled.   Go ahead.

22     Q.    (BY MR. BLAYLOCK)   You can answer.

23     A.    Yes, I saw him right here and he saw me.

24 That's when we stopped right there.

25     Q.    Okay.

1        A.    And he walked to the truck.

2        Q.    He walked over to the truck?

3        A.    Yes.

4        Q.    Did he say anything?

5        A.    He said,"Hi" --

6              MR. GALARZA:  Objection, Your Honor.

7        A.    -- and I said, "Hi, Ruben."

8              THE COURT:  Just a minute.  Just a minute.

9   I'm sorry?

10             MR. GALARZA:  Objection.  Hearsay.

11             THE COURT:  It's overruled.

12       Q.    (BY MR. BLAYLOCK)  Okay.  So he says hi --

13       A.    Right.

14       Q.    -- and you say hi?

15       A.    Right.  And he asked me where was I going.  I

16  said, "Well, I'm going up the road."  I said, "Where are

17  you going?"

18             He says, "I'm going to my apartment."  He

19  said, "Will you give me a ride?"

20             I said, "It's not my truck."

21       Q.    Okay.

22       A.    And then he said, "Well, it's okay.  I'll walk

23  home."  So we took off.

24       Q.    And do you know where Ruben lives from here?

25       A.    Yes.  He lives off of Billy Mitchell.  You have

STATE OF TEXAS VS. RUBEN GUTIERREZ                    110

1    to go east and then turn left on Central Avenue.

2         Q.   Okay.  And then you go down Billy Mitchell?

3         A.   Yes.

4         Q.   And actually Boca Chica is right there?

5         A.   Right.

6         Q.   Way over here?

7         A.   Yes.

8         Q.   In reference to this diagram.

9              Okay.  So, he lives out that way and you

10   were going this way?

11        A.   Yes.

12        Q.   Did he seem to indicate he wanted to go this

13   way?

14        A.   Yes.

15        Q.   Okay.  And did Ramiro say anything to him?

16        A.   No.  Ramiro didn't offer him a ride or

17   anything.

18        Q.   Okay.  But Ramiro's right there with you?

19        A.   Yes.  He was driving the truck.

20        Q.   All right.  You can have a seat.

21        A.   (Witness complies).

22        Q.   Okay.  When was the last time that you saw

23   Ruben on that day?

24        A.   That's the last time I saw him.

25        Q.   Okay.  2:30, three, somewhere around there?

1       A.    About 2:30.

2       Q.    Okay.  And he was walking towards Central?

3       A.    Yes.

4       Q.    And you guys drove off toward the Pronto store?

5       A.    Yes.

6       Q.    And there is a Pronto store --

7       A.    Right on the corner.

8       Q.    -- on the other side of the resaca, right?

9       A.    Yes.

10      Q.    Now, tell us what you did that night.

11      A.    Okay.  From then we went to the VFW.  We got

12  off.  And we were -- we were having a beer.  We stayed

13  there for awhile.  Around 7:00 we left for a little bit.

14  I went to my aunt and uncle's house on Boca Chica.  And I

15  stayed there probably an hour.

16      Q.    With Ramiro?

17      A.    Ramiro was outside in the truck.  From 45

18  minutes to an hour.  And then we took off back again to

19  VFW and drank some more.  And finally I told Ramiro

20  about -- around 10:00, I said, "Let's go."  I wanted to

21  go to another bar.  I wanted to go to Pescadores

22  downtown.

23              And he said, "No, I don't want to go, but

24  I'll drop you off there if you wish."

25              I said, "Well, sure."

STATE OF TEXAS VS. RUBEN GUTIERREZ                    112

1        Q.    And did Ramiro drop you off at --

2        A.    Yes.

3        Q.    -- Pescadores?

4        A.    Yes.

5        Q.    Okay.  And did you drink some more?

6        A.    Yes.  He dropped me off and I drank some more.

7   I drank there until about, I'd say, 12, 12:30, you know,

8   a quarter to one, something like that.

9        Q.    All right.  Let me ask you this.  Did you ever

10  call home that night?

11       A.    Yes.  As a matter of fact, I did.  When I was

12  at the VFW, around 7:00 I had the bar lady dial the

13  number for me because it's dark in there and I didn't

14  have my glasses and I couldn't see the numbers.  And I

15  did call a few times, yes.

16       Q.    Okay.  How was your aunt feeling that day?

17       A.    She was -- she said she was feeling sick that

18  day.  She was going to lay down for a little bit.

19       Q.    Okay.  And that -- are you calling to check on

20  her or why are you calling?

21       A.    Yes.  Well, usually every time that I went out

22  I'd call home.

23       Q.    Okay.  And did you have another habit of when

24  you would go out that you would do something else for

25  your aunt?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          113

1      A.   Yes.  When I -- every time that I came in, even
2  though it was two, 3:00 in the morning, I always stopped
3  somewhere and made sure she had a hamburger, Coke and
4  French fries.
5      Q.   Okay.  So you're at -- back to the Pescadores
6  Bar.  How much have you had to drink up to this point?
7      A.   I had plenty.
8      Q.   Okay.  And how long do you stay there?
9      A.   Until around -- I think it was just maybe 20
10 minutes 'til one or something like that.
11     Q.   Close to one?
12     A.   Yes, close to one.
13     Q.   How do you get home?
14     A.   I had the barmaid call a cab for me.
15     Q.   And did a cab pick you up?
16     A.   Yes.
17     Q.   Did the cab take you home?
18     A.   I asked him to stop somewhere to get a
19 hamburger and Coke for my aunt.
20     Q.   Where did you stop?
21     A.   I don't recall where --
22     Q.   Okay.
23     A.   -- but he did; and I got the Coke, hamburger
24 and French fries.
25     Q.   A fast food place?

STATE OF TEXAS VS. RUBEN GUTIERREZ                           114

```
 1        A.   Yes.
 2        Q.   All right.  So you get home after one?
 3        A.   Yes.
 4        Q.   And what do you do?
 5        A.   I get off the cab.  I pay him his money and he
 6   goes.  I walk into the door and I go and I said, "Mom,
 7   I'm home."  (Spanish spoken).  And, "Mom."
 8        Q.   Is the front door unlocked?
 9        A.   Well, I reached and I opened -- it was usually
10   locked, but this time it was open.
11        Q.   Okay.
12        A.   And I tried the other door and it opened, too.
13        Q.   Did you have a key with you?
14        A.   No.  I never had a key with me.
15        Q.   Okay.
16        A.   There was only one key to the house and she had
17   it always.
18        Q.   Always?
19        A.   Yes.
20        Q.   And so are you surprised that the front door is
21   open?
22        A.   No, not really.
23        Q.   But it is unusual?
24        A.   Yeah.  It was very unusual, yes.
25        Q.   So what do you do?
```

1      A.   I go in and go in towards the kitchen to put

2   the hamburger, the Coke and the French fries on top of

3   the table.  And I turn around and I look into her bed to

4   see if she was in bed; and she wasn't in bed.

5      Q.   Okay.

6      A.   And then I went outside and --

7      Q.   Did you look around the house to see if she was

8   in there?

9      A.   No, because since the door was open and, you

10  know -- and she was always -- a lot of times, most of the

11  time she was outside.

12     Q.   Okay.

13     A.   And I figured that she was with her -- this

14  lady that she --

15     Q.   Even early in the morning she would be outside?

16     A.   Yes.  She would be outside sometimes at 4:00 in

17  the morning.

18     Q.   What were her sleep habits?

19     A.   She would sleep very little, maybe during the

20  day 30 minutes at the most or she probably just laid down

21  and go to sleep and then the doorbell would ring.

22  Somebody would come in for -- wanting space or trailer

23  rent or whatever and would wake her up and she'd be up

24  again.

25     Q.   So it -- was it usual for her to be up late at

1    night --
2         A.   Yes.
3         Q.   -- or early in the morning?
4         A.   Yes.
5         Q.   And where do you go to look for her?
6         A.   I went to this lady that her name is Edilia
7    Vento because she would go there a lot and they would
8    stay there for hours and hours talking.
9         Q.   They were good friends?
10        A.   Yes.  They would be real late.  They'd be out
11   there talking.  And I figured that maybe she was over
12   there.
13        Q.   Was she there?
14        A.   No.  The lady told me that she wasn't there.
15             MR. GALARZA:  Objection, Your Honor, to
16   hearsay.
17             THE COURT:  I'll sustain the objection.
18        Q.   (BY MR. BLAYLOCK)  Okay.  Just answer yes or
19   no.  Was she there when you got there?
20        A.   No.
21        Q.   Okay.  And what did you do?
22        A.   She told me to go back to the house and get on
23   the P.A. --
24        Q.   Okay.
25        A.   -- the lady did.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          117

```
 1        Q.   What did you do?
 2        A.   And I went back to the house and I got on the
 3   P.A. and I started calling her and looking out through
 4   the door to see if she would come in from up the road or
 5   something; and she wouldn't come.  And I kept on calling
 6   and calling; and she wouldn't come.  Until finally, I
 7   walked in her room --
 8        Q.   Okay.
 9        A.   -- and I found her there.  (Weeping).
10        Q.   All right.  Let's go back.  So time has passed
11   since you first got home, right?
12        A.   Yes.
13        Q.   You looked for her initially in the house and
14   you looked for her outside?
15        A.   Yes.
16        Q.   And you waited around for awhile for her to see
17   if she'd come back?
18        A.   Yes.
19        Q.   Okay.  And then you go and you check her room?
20        A.   Yes.
21        Q.   And you find her?
22        A.   Yes.  I found her laying on the floor.
23        Q.   She was on the floor?
24        A.   Yes.
25        Q.   Was she on the floor next to her bed or where?
```

1       A.   Yes, next to her bed with her feet towards the
2   desk; and she was face down with one elbow up and her
3   other arm was under the -- under her body.
4       Q.   Did you touch her?  Did you touch her?
5       A.   Yes.  I started crying and I told her, "Mom,
6   please, get up.  Please."
7       Q.   Was she warm or was she cold?
8       A.   No.  I reached with this hand and I put it on
9   her elbow, the one she had like this; and she was cold
10  and stiff.  And then I reached under there to get her,
11  and I couldn't.
12      Q.   Did you get blood all over you when did you
13  that?
14      A.   Yes, I did.  And I was very emotional and very
15  upset.  And I wanted somebody from the family to be there
16  to know about it.  So I called -- tried to call my Uncle
17  Augie; and he wasn't home, but my aunt answered and she
18  said, "Well, honey, I don't have a car."
19      Q.   Your aunt --
20      A.   "Your uncle --"
21      Q.   This is your Aunt Judy?
22      A.   Yeah, my Aunt Judy.  And she --
23           THE COURT:  Just a minute.  Just a minute.
24  Let him finish --
25      Q.   (BY MR. BLAYLOCK)  You're calling your Uncle

1    Augie?

2         A.   Yes.

3         Q.   Why?  Because you think he'll know what to do?

4         A.   At least for him to be -- you know, to know

5    what happened.

6         Q.   Okay.  And he's a smart man, right?

7         A.   Yes.

8         Q.   And he knows what to do?

9         A.   Yes.

10        Q.   Okay.  And are you drunk?

11        A.   Yes, I was drunk.

12        Q.   Okay.  But you know what you're doing?

13        A.   I knew what I was doing, yes.

14        Q.   So, you weren't too drunk; you're just --

15        A.   Right.

16        Q.   -- you were intoxicated?

17        A.   Yes.

18        Q.   So, you go to call your uncle and Aunt Judy

19   answers?

20        A.   Yes.

21        Q.   And do you tell her what you found?

22        A.   Yes.

23        Q.   Okay.  What's the next thing you remember?

24        A.   I told her to call 911.

25        Q.   Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    120

1        A.    And then --
2        Q.    Why didn't you call 911?
3        A.    I was upset.  I was very emotional.
4        Q.    Okay.  All right.  And then what happens at the
5   house?
6        A.    I stayed there; and my aunt said that she would
7   call 911.  And then the phone rang; and 911, this lady
8   called back and talked to me, talked to me in Spanish and
9   asked me what had happened and what was the address and
10  this and if my aunt was breathing.
11             And I said, "No, she's cold.  She's
12  stiff."
13             And then she said, "Well, okay.  Don't
14  worry.  An ambulance is on its way to your house."
15       Q.    All right.  And have you listened to that 911
16  tape?
17       A.    Yes.
18       Q.    And do you recognize all the voices on that
19  tape?
20       A.    Yes, I do.
21       Q.    Okay.  And whose voices are on there?
22       A.    Mine, my Aunt Judy's, and the dispatcher from
23  911.
24       Q.    Okay.  And her voice sounds the same on the
25  tape as it did that night?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    121

1        A.    Yes.

2        Q.    Do you know if that tape that you heard was

3    altered in any way?

4        A.    No, it was not.

5        Q.    When you heard it, it sounded the same as you

6    heard it that night?

7        A.    Yes.

8        Q.    I'm showing you what's been marked as State's

9    Exhibit 23.  Is this the tape that you listened to?

10       A.    Yes.

11                  MR. BLAYLOCK:   I'm showing defense Exhibit

12   Number 23.

13       Q.    (BY MR. BLAYLOCK)  All right.  So this is the

14   tape?

15       A.    Yes, sir.

16       Q.    And do you remember if you were talking in

17   English or Spanish?

18       A.    Spanish.

19       Q.    All right.  The 911 operator speaks Spanish?

20       A.    Very fluent.

21       Q.    What happened next?

22       A.    The -- I don't know whether the ambulance or

23   the police officers got there, which one got there first,

24   but I was taken to be investigated.

25       Q.    Okay.  So you're -- where do you wait at?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    122

```
 1       A.   Pardon?
 2       Q.   Where do you wait at?  Where are you waiting
 3  for the police to arrive?
 4       A.   Inside the office.
 5       Q.   Okay.  And do they arrive shortly after you're
 6  talking to the 911 operator?
 7       A.   Yes.
 8       Q.   Okay.  So it's a short time later?
 9       A.   Yes.
10       Q.   And when the police get there, what do they do?
11       A.   They -- they took me out right away.
12       Q.   Okay.  And where did they take you?
13       A.   To the police department.
14       Q.   Did you give a statement?
15       A.   Yes.
16       Q.   And the statement that you gave, that was on
17  the early morning hours of September 6th, the first time
18  they talked to you, right?
19       A.   Yes.
20       Q.   Okay.  And then you talked to them again?
21       A.   Yes.
22       Q.   And that was the next day on September 7th?
23       A.   Yes.
24       Q.   Okay.  And you were a little intoxicated that
25  night?
```

1      A.   Yes.

2      Q.   And the next day you were also a little bit

3  intoxicated?

4      A.   Yes.

5      Q.   Why did you keep drinking?

6      A.   I was upset; and not only that, because I have

7  an alcohol problem.

8      Q.   Okay.  Because you told them your story?

9      A.   Yes, sir.

10      Q.   That's the same story you told here today?

11      A.   Yes.

12      Q.   Now, I'm going to show you what's marked as

13  State's Exhibit 24.  Do you recognize this?

14      A.   Yes.

15      Q.   I'm going to show you the writing on the

16  inside.  Can you thumb through that?  Look at every page.

17      A.   (Witness complies).

18      Q.   Have you looked at every single page --

19      A.   Yes.

20      Q.   -- in State's Exhibit Number 24?

21      A.   Yes.

22      Q.   Do you recognize the handwriting?

23      A.   That's my aunt's, Escolastica Harrison's

24  writing.

25      Q.   The person who made the handwriting in this

STATE OF TEXAS VS. RUBEN GUTIERREZ                          124

1   book is Escolastica Harrison?

2        A.   Yes, sir.

3        Q.   Is this the journal that she kept?

4        A.   Yes.

5             MR. BLAYLOCK:   I'm showing defense State's

6   Exhibit 24.

7             Move to admit State's Exhibit 24,

8   specifically identifiable piece of evidence.

9             **(At the bench on the record)**

10            MR. GALARZA:   Your Honor, I would object

11  at this time that that's hearsay.  And also that he's not

12  a handwriting expert to be able to tell if that's

13  Ms. Harrison's handwriting or not.

14            THE COURT:   What's the purpose of

15  introducing this exhibit?

16            MR. BLAYLOCK:   The proof, Judge, it's a

17  journal with the amount of money that she had.  The

18  purpose is that it's a journal with the amount of money

19  that Ms. Harrison had; and I intend to show an amount and

20  a date.

21            THE COURT:   All right.  Now, there's a

22  loose sheet of paper.  Is this part of the exhibit?

23            MR. BLAYLOCK:   When it was found, that was

24  in there.  That yellow sheet I stuck in there to put a --

25  signify that sheet.  And the other loose piece of paper

STATE OF TEXAS VS. RUBEN GUTIERREZ                          125

1    has a paper clip on it and that was also in there when it
2    was found.
3                    THE COURT:  Did he identify this loose
4    piece of paper?
5                    **(End of bench discussion)**
6        Q.   (BY MR. BLAYLOCK)  Did you look at every
7    single sheet of --
8        A.   Yes, I did.
9                    THE COURT:  This one here?
10       Q.   (BY MR. BLAYLOCK)  Including the loose sheet
11   of paper?
12       A.   Yes.
13                   THE COURT:  Whose writing this?
14                   THE WITNESS:  My aunt's.
15                   THE COURT:  All right.  The objection will
16   be overruled.  Number 24 will be admitted into evidence.
17                   **(State's Exhibit Number 24 admitted)**
18       Q.   (BY MR. BLAYLOCK)  Okay.  I'm going to show
19   you this State's Exhibit 24.  It's got some components to
20   it.  Does State's Exhibit 24 have a paper clip in it?
21       A.   Yes.
22       Q.   Okay.  And under this paper clip there's a
23   piece of paper, correct?
24       A.   Yes.
25       Q.   Okay.  And on this piece of paper, whose

1    writing is this?

2         A.   My aunt's.

3         Q.   And does it say anything?

4         A.   "Good for $200 for Ruben, 7/15/98."

5         Q.   And in fact, on the first page of the ledger it

6    says -- what does it say also?

7         A.   "Ruben, 7/15/98," and shorthand, I can't read

8    that.

9         Q.   Shorthand?  Your aunt wrote shorthand?

10        A.   Yes, she did.

11        Q.   Okay.  And over the six years that you lived

12   with her, you got familiar with her handwriting?

13        A.   Sure.

14        Q.   Okay.  I'm going to direct you to a page that

15   I've marked with a stick-on about halfway through the

16   journal.  What's the top date on this page?

17        A.   1/31/98.

18        Q.   1/31/98?

19        A.   Yes.

20        Q.   It's got some writing and some numbers?

21        A.   Yes.

22        Q.   Okay.  And what's the next date that you see?

23        A.   March 31, '98.

24        Q.   March 31, 1998.  That's got an equal sign?

25        A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    127

```
1          Q.    Okay.  And out beside that equal sign it's got
2     a number.  What number is it?  Can you read that?
3          A.    571 -- $571,000.50.
4          Q.    Just read the numbers in order.
5          A.    57105000.
6          Q.    Okay.  In fact, it's 571 comma 050 --
7          A.    Dot 00.
8          Q.    -- dot 00.  And it indicates 571,050 --
9          A.    50.
10         Q.    -- on March 31, 1998.
11                    MR. BLAYLOCK:  May I publish 24?
12                    THE COURT:  You may.
13         Q.    (BY MR. BLAYLOCK)  Did your aunt continue to
14    get revenue from her income after March 31, 1998?
15         A.    Yes.
16         Q.    All right.  You say Crispin Villarreal also
17    came over to the house from time to time?
18         A.    Yes.
19         Q.    Okay.  And how often would Crispin come over?
20         A.    Pardon?
21         Q.    How often would Crispin come over?
22         A.    Almost every day.
23         Q.    Okay.  Crispin was a regular?
24         A.    Yes.
25         Q.    And you've already said that your aunt liked
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    128

1    Crispin quite a bit?

2         A.    Yes, a lot.

3         Q.    Okay.  And she trusted Crispin?

4         A.    Yes.

5         Q.    Okay.  When Ruben first started coming over,

6    did he get to know Crispin?

7         A.    Yes, a little bit.

8         Q.    Okay.  And were they friends?

9         A.    Yes.  Eventually they became friends.

10        Q.    And did they have a conflict?

11        A.    Yes, they did.  They had a misunderstanding.

12        Q.    Okay.  And did that leave them to be friends

13   anymore?

14        A.    No.  They kind of shy away from each other.

15        Q.    Okay.  And in fact, after they had their

16   conflict, you've already testified that Ruben stopped

17   coming around so much?

18        A.    That is true.

19        Q.    All right.  But Crispin kept coming around?

20        A.    Yes, Crispin did.

21        Q.    All right.  And in your house, your aunt had --

22   she had some important numbers on the wall, correct?

23        A.    Yes.

24              MR. BLAYLOCK:  May I approach again,

25   Judge?

```
 1                    THE COURT:  You may.
 2        Q.   (BY MR. BLAYLOCK)  I'm going to show you what
 3   I've marked as State's Exhibit 25, 26, 27, and 28.  Do
 4   you recognize State's Exhibit 25?
 5        A.   Yes, I do.
 6        Q.   Does this accurately -- is this what
 7   Ms. Harrison had on her wall?
 8        A.   That's exactly the one that she wrote down.
 9        Q.   How are you able to identify it?
10        A.   By her writing.
11        Q.   You recognize her writing?
12        A.   Yes.
13        Q.   State's Exhibit Number 26, does this picture
14   accurately depict what it's intended to depict?
15        A.   Yes.
16        Q.   Okay.  State's Exhibit 27, same question, does
17   this picture look the way it looked to you --
18        A.   Yes, sir.
19        Q.   -- on September 5, 1998?
20        A.   Yes.
21        Q.   State's Exhibit 28, does this picture look the
22   way it looked to you on September 5, 1998?
23        A.   Yes.
24                    MR. BLAYLOCK:  I'm showing 25 through 28
25   to the defense.
```

```
 1                    Move to admit 25 through 28.
 2                    MR. GALARZA:  Your Honor, the only
 3     objection we have is that it's cumulative and also as to
 4     hearsay.  They all end up being the same thing.
 5                    THE COURT:  Let me see.
 6                    The objection will be overruled.
 7     Twenty-five through 28 will be admitted.
 8                    (State's Exhibit Numbers 25 through 28
 9                    admitted)
10          Q.   (BY MR. BLAYLOCK)  Let's go one by one.
11     State's Exhibit Number 28 is -- tell us what this is.
12          A.   That's the phone numbers that my aunt had on
13     the wall.
14          Q.   Okay.  And is this her front door?
15          A.   This is the front door.  This is her office.
16          Q.   Okay.  And this is a window next to the front
17     door?
18          A.   Yes.
19          Q.   All right.  And where is her desk?
20          A.   Right in front of that -- on the door there.
21          Q.   Okay.  So the picture's taken from the desk?
22          A.   Yes.
23          Q.   If you were sitting at the desk, would this be
24     what you saw?
25          A.   Yes.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    131

```
1        Q.   Okay.  And this is where she kept her important
2   numbers, right?
3        A.   Yes.
4        Q.   Now, this, Number 25, is in that picture --
5        A.   Yes.
6        Q.   -- right?  Okay.  And it's the actual item that
7   was in the picture?
8        A.   Yes.
9        Q.   And this is your aunt's writing?
10       A.   Yes, it is.
11       Q.   Okay.  And the first name on here is who?
12       A.   Mrs. Villarreal, Crispin.
13       Q.   Okay.  It's Mrs. Villarreal.
14       A.   Crispin's mother.
15       Q.   That's Crispin's mother?
16       A.   Yes.
17       Q.   And it's Crispin's number, too?
18       A.   Yes.
19       Q.   In fact, Crispin is in parenthesis, right?
20       A.   Yes.
21       Q.   And she liked Crispin?
22       A.   Yes, she did.
23       Q.   And then under that whose name appears?
24       A.   Ruben Gutierrez.
25       Q.   550-9209?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    132

1       A.   Yes.

2       Q.   And it's got R-E-S.  Does that stand for

3  residence?  Do you know if that stands for residence?

4       A.   Yes.

5       Q.   Had you ever called 550-9209?

6       A.   Yes, I did.

7       Q.   Who would answer the phone when you would call

8  that?

9       A.   Sometimes his wife.

10      Q.   Angie?

11      A.   Yes.

12      Q.   And that would be --

13      A.   Ruben's wife, yes.

14      Q.   Would Ruben ever answer when you called?

15      A.   Very, very rare.

16      Q.   But did he?

17      A.   Yes.

18      Q.   Okay.  So you know 550-9209 is Ruben's phone?

19      A.   Yes.

20      Q.   And then who's under Ruben?

21      A.   I don't remember the whole list.

22      Q.   Okay.  Well, it speaks for itself.  The police.

23      A.   Okay.

24      Q.   Emergency 911 is underneath Ruben's name,

25  right?

1       A.   Yes.

2                 MR. GALARZA:   Your Honor, we would object

3    to his leading.

4                 THE COURT:   It's overruled.   Go ahead.

5       Q.   (BY MR. BLAYLOCK)   What else was in that front

6    room where the office was?

7       A.   We had a Xerox copier -- or we still do.

8       Q.   Okay.  A copier.  What else?

9       A.   The couch, the couch where people that would

10   come and pay their rent sit on.

11      Q.   Okay.  What color of a couch was it?

12      A.   Sort of brownish or faded gold, something like

13   that.

14      Q.   I'm showing you what's been marked as State's

15   Exhibit Number 29.  Does this look the way it looked to

16   you --

17      A.   Yes.

18      Q.   -- on the 5th of September, 1998?

19      A.   Yes, sir.

20                MR. BLAYLOCK:   I'm showing the defense 29.

21                Move to admit 29.

22                MR. GALARZA:   There's no objection, Your

23   Honor.

24                THE COURT:   It'll be admitted.

25                **(State's Exhibit Number 29 admitted)**

1        Q.    (BY MR. BLAYLOCK)   What is this a picture of?

2        A.    The sofa at our house in the office.

3        Q.    And you said that the people who would come in

4   the front door to do business would sit on this?

5        A.    Yes, sir.

6        Q.    And is this the front door right here?

7        A.    Yes.

8        Q.    Opened up?

9        A.    Yes.

10       Q.    You had blood on you that night after you

11   touched your aunt, right?

12       A.    Yes.

13       Q.    Do you know where all you went in the house?

14       A.    Just to her room.

15       Q.    Do you know if you may have gone anywhere else?

16       A.    No.

17             MR. BLAYLOCK:  Judge, this will be a good

18   stopping place if you want to take a lunch break.

19             THE COURT:  All right.  It's almost the

20   noon hour -- the clock's a little fast if you've noticed.

21   It's almost the noon hour.  At this time we'll break for

22   lunch.  I ask you to please follow the instructions I've

23   given you not to discuss this case among yourselves or

24   with anyone else, not to form or express any opinions.

25   And we'll resume with testimony at 1:30.  So, please

1    be -- try to be here before 1:30.
2                    **(Lunch recess taken from 11:56 a.m. to**
3                    **1:30 p.m.)**
4                    **(Jury not present)**
5                    THE COURT:  Are you all ready for the
6    jury?  Bring them in.
7                    THE BAILIFF:  Yes, Your Honor.
8                    MR. REYES:  Judge, one thing before we
9    start, this witness that they had on before on the lunch
10   break, he was out there talking to a member of the news
11   media.  And I thought we had agreed to have the --
12                   THE COURT:  Just a minute, Roy.
13                   MR. REYES:  -- you know, the State talk to
14   their witnesses not to be discussing anything with
15   respect to their testimony or what might be presented in
16   court.
17                   MR. BLAYLOCK:  We --
18                   THE COURT:  I haven't issued a gag order
19   or anything.
20                   MR. BLAYLOCK:  We told them not to talk,
21   Judge.  I think Mr. Cuellar was in the hall and a news
22   guy came up and asked him something about his name, how
23   to spell it or what his name was.
24                   What did he say to you exactly?
25                   THE WITNESS:  What was my name.

```
 1                    THE COURT:  That was it?
 2                    THE WITNESS:  That was it.
 3                    MR. BLAYLOCK:  And then he walked off.
 4   And then right after that, he pointed it out and I talked
 5   to him; and I don't think there's been any further
 6   contact.
 7                    THE COURT:  All right.  Well, you've
 8   already instructed your witnesses.
 9                    Bring them in.
10                    (Jury brought into the courtroom)
11                    THE COURT:  All right.  You may be seated.
12                    Good afternoon, ladies and gentlemen of
13   the jury.
14                    THE JURY:  Good afternoon.
15                    THE COURT:  Good afternoon.
16                    THE JURY:  Good afternoon.
17                    THE COURT:  Okay.  I thought you were
18   asleep there for a minute.  I think we're ready to get
19   started.
20                    Who had the witness?
21                    MR. BLAYLOCK:  I did, Judge.
22                    THE COURT:  Go ahead.
23                    DIRECT EXAMINATION CONTINUED
24   BY MR. BLAYLOCK:
25       Q.   Just to recap a couple of things, Avel, while
```

```
 1   you were out partying at the VFW and the Pescadores Bar,
 2   you called home and checked on your aunt?
 3        A.   Yes, I did.
 4        Q.   Around what time?
 5        A.   When I was at the VFW, around 7:00.
 6        Q.   Okay.  Did you get an answer or not?
 7        A.   No, never.
 8        Q.   All right.  And to recap where Ruben lives,
 9   this man here, in reference to where you live, how far of
10   a distance is it?
11        A.   It's better than a mile.
12        Q.   Okay.  It's walking distance?
13        A.   Oh, yes.
14        Q.   But it's not comfortable walking distance in
15   September?
16        A.   That's correct.
17        Q.   Now, let's go to -- let's go to what you were
18   telling the police.  You gave the police your story that
19   night?
20        A.   Yes.
21        Q.   Okay.  And then you talked to them the next
22   day?
23        A.   Yes.
24        Q.   Okay.  And has your story changed?
25        A.   No.
```

1           MR. BLAYLOCK:  Can I approach the witness

2     again, Judge?

3           THE COURT:  You may.

4     Q.   (BY MR. BLAYLOCK)  I'm showing you what's

5     marked as State's Exhibit 30 and 31.  Do you recognize

6     that?  Are you familiar with it?  Look at it closely.

7     A.   Yes, I do.

8     Q.   All right.  And does this reasonably depict the

9     way it looked on September 5, 1998?

10    A.   Yes.

11    Q.   Okay.

12          MR. BLAYLOCK:  I'm showing defense

13    Exhibits 30 and 31.

14          Move to admit 30 and 31.

15          MR. GALARZA:  No objections, Your Honor.

16          THE COURT:  They'll be admitted.

17          **(State's Exhibit Numbers 30 and 31**

18          **admitted)**

19    Q.   (BY MR. BLAYLOCK)  Look at State's Exhibit 30

20    and 31 and tell me what they are.

21    A.   This is a picture of Morningside Road and the

22    entrance to my house, Harrison Mobile Home Park.

23    Q.   All right.  And what -- what number is that

24    one?  Number 30?

25    A.   Thirty.

1          Q.    All right.

2          A.    And 31 is a picture of Morningside Road with

3    the entrance chance to Ms. -- Harrison Mobile Home Park;

4    and this is one of our trailers there that we own.

5          Q.    Okay.  Now, tell me again as I'm pointing, am I

6    pointing to the right direction where those pictures

7    look?  Okay.  You say one of them is the entrance to the

8    Harrison Mobile Home Park.

9          A.    Yes.

10         Q.    And am I pointing to the right area?

11         A.    To your left -- to my left.

12         Q.    This way?

13         A.    No.  The other way.

14         Q.    This way?

15         A.    Yes.

16         Q.    Okay.  This area right here?

17         A.    Right there.

18         Q.    This is the home?

19         A.    Yes.

20         Q.    This is one driveway that goes to the back of

21    the home?

22         A.    Yes.

23         Q.    And this is the main road --

24         A.    Yes.

25         Q.    -- into the mobile home park?

```
 1        A.    Yes.
 2        Q.    Okay.  So Number 30, where is the camera at?
 3        A.    Right there at the entrance over -- on the
 4   other side.
 5        Q.    Right here?
 6        A.    No.  Above.  Right there.
 7        Q.    Right here?
 8        A.    No.  Over here to your -- more this way.  More.
 9   Right there.
10        Q.    Okay.  So the camera's here looking towards the
11   house.
12        A.    Yes.
13        Q.    Okay.  Let me pass this one around.
14              The camera's actually across the street
15   from Morningside, right?
16        A.    Yes.
17        Q.    So the camera's actually right here?
18        A.    The camera.  Okay.  Yes.
19        Q.    That's the picture taken towards your house?
20        A.    Yes.
21        Q.    Okay.  And State's Exhibit 31, where is the
22   picture taker?
23        A.    The picture taker is across the street from my
24   house.
25        Q.    And which way is he?  Is he on the east side or
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        141

```
 1    the west side?
 2         A.    He's on the east side.
 3         Q.    Okay.  So he's down here --
 4         A.    Yes.
 5         Q.    -- looking back towards the mobile home park?
 6         A.    Yes.
 7         Q.    All right.  Now, what is over here?  What's
 8    over here at the corner of Central and Morningside?
 9         A.    There's a store.
10         Q.    What is the name of the store?
11         A.    I don't remember.
12         Q.    Okay.  Did it used to be Vanessa's Bakery?
13         A.    I believe so.
14               MR. GALARZA:  Objection, Your Honor, to
15    leading.
16               THE COURT:  Don't lead your witness,
17    counsel.  Go ahead.
18         Q.    (BY MR. BLAYLOCK)  But you don't know the name
19    of the store?
20         A.    No, I don't.
21         Q.    But it's right -- is it on the same side of the
22    street as the mobile home park or --
23         A.    No.  It's the opposite side.
24         Q.    Okay.  So there's a store across the street,
25    across Morningside and east of the mobile home park?
```

```
 1        A.   Yes.
 2        Q.   All right.  And where's the Pronto store at?
 3   There's another store nearby?
 4        A.   Towards the west.
 5        Q.   Okay.  Across the resaca?
 6        A.   Across the resaca and on the corner of
 7   Morningside and Southmost.
 8        Q.   Okay.  In fact, Morningside ends at Southmost,
 9   right?
10        A.   Right.
11        Q.   And there's a store there, a Pronto store?
12        A.   Yes.
13        Q.   Okay.  Let me publish this one.
14             And again, this one is at that -- this one
15   is east of the mobile home park looking back towards the
16   mobile home park.  Is that sidewalk there, is that on the
17   same side as the Harrison Mobile Home Park?
18        A.   No.
19        Q.   Okay.  If you're walking down the sidewalk,
20   what side of the street would you be on?
21        A.   It would be on the opposite side, opposite.
22        Q.   Okay.  Now, Avel, let me ask you, have you been
23   convicted of a felony or a crime of moral turpitude in
24   the last ten years?
25        A.   No.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                               143

```
1          Q.    Okay.  But in 1990, what happened?  You did get
2     out of prison, right?
3          A.    Yes, sir.
4          Q.    Okay.  And how long had you been in prison?
5          A.    Two and a half years.
6          Q.    For what?
7          A.    Felony possession of a firearm.
8          Q.    And so since 1990, have you been convicted of a
9     felony or a crime of moral turpitude?
10         A.    No.
11         Q.    In fact, Ms. Harrison -- you got out in '90.
12    Where did you work at in San Antonio?
13         A.    I worked for a contractor, painter.
14         Q.    All right.  And when did Ms. Harrison let you
15    come to work for her?
16         A.    '92.
17         Q.    She was helping you out, right?
18         A.    Yes, sir.
19         Q.    Could you have found a job that good if she
20    hadn't helped you out?
21         A.    No.
22         Q.    And how did you feel towards her?
23         A.    I loved her and I feel --
24               COURT REPORTER:  I'm sorry, sir?
25         A.    I said I loved her and I felt great honor for
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          144

```
 1   her.
 2        Q.    (BY MR. BLAYLOCK)   Did you ever know how much
 3   money she had?
 4        A.    Not exactly, no.
 5        Q.    You knew she had a lot of money?
 6        A.    Yes.
 7        Q.    Did you ever want to take that money from her?
 8        A.    No.
 9        Q.    Did you ever talk to Ruben about taking her
10   money?
11        A.    No.
12        Q.    Okay.  Now, if he says that somebody says that
13   you wanted to take her money, would that be truthful or
14   not?
15        A.    No.
16        Q.    Now, why didn't you take her money?
17        A.    Because I've never been interested in money.
18   And next, I worked for my money and I was happy with what
19   she gave me.  She gave me a roof over my head and paid
20   me.
21        Q.    Okay.  And you were happy with that lifestyle?
22        A.    Yes.
23        Q.    You had enough to drink; you had a lot of beer?
24        A.    Yes.
25        Q.    Go out and do what you wanted to do?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          145

```
 1        A.   Yes.

 2                   MR. BLAYLOCK:   I need to approach one more

 3   time, Judge.

 4                   THE COURT:   Go ahead.

 5        Q.   (BY MR. BLAYLOCK)  I show you State's

 6   Exhibit 32.  I just want you to look at State's

 7   Exhibit Number 32.  Can you see inside this piece of

 8   plastic?

 9        A.   Yes.

10        Q.   Okay.  And can you see the writing?

11        A.   Yes.

12        Q.   Okay.  Do you recognize this writing?

13        A.   That's Ms. Harrison's writing.

14        Q.   You're familiar with that writing?

15        A.   Yes.

16        Q.   And you recognize this to be her writing?

17        A.   Yes.

18        Q.   Okay.

19                   MR. BLAYLOCK:   I'll pass the witness,

20   Judge.

21                   MR. GALARZA:   Can I proceed, Judge?

22                   THE COURT:   You may.

23                      CROSS-EXAMINATION

24   BY MR. GALARZA:

25        Q.   Mr. Cuellar --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                146

```
 1        A.    Sir.
 2        Q.    -- good afternoon.  I'm going to be asking you
 3   some questions.  If you don't understand them, just ask
 4   me to repeat them and I'll go ahead and try to repeat
 5   them for you, okay?
 6        A.    Okay.
 7        Q.    You stated that you moved down here in 1992?
 8        A.    That's correct.
 9        Q.    Okay.  And you worked in San Antonio?
10        A.    Yes.
11        Q.    Where did you work at?
12        A.    I worked for a subcontractor painting.
13        Q.    Okay.  And besides this job in San Antonio,
14   what other jobs have you had?
15        A.    Well, I was in prison for awhile.
16        Q.    Okay.  And before the prison?
17        A.    I used to shrimp.
18        Q.    Down here in the Valley?
19        A.    Yes.
20        Q.    Have you lived in the Valley all this time --
21        A.    Yes.
22        Q.    -- besides 1992 that you lived in San Antonio?
23        A.    Yes.
24        Q.    You stated that there's some room way in the
25   back on the north side; is that correct?
```

1       A.    Yes, sir.

2       Q.    And that room has a bathroom for you?

3       A.    Yes.

4       Q.    Okay.  But the only shower is the one that

5   was --

6       A.    That's correct.

7       Q.    You had been living there for seven years?

8       A.    That's true.

9       Q.    Okay.  Besides working for Ms. Harrison or your

10  aunt, did -- were you working anywhere else?

11      A.    No.

12      Q.    And did you automatically move in with her when

13  you started working with her in 1992?

14      A.    No.

15      Q.    Okay.  Where --

16      A.    I used to live with my uncle.

17      Q.    Okay.  And your uncle's name?

18      A.    Pablo Cuellar.

19      Q.    Do your parents live down here?

20      A.    My parents are deceased.

21      Q.    Do you have any brothers or sisters that live

22  down here?

23      A.    Yes, I have.

24      Q.    Okay.  How many brothers and sisters do you

25  have?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          148

```
 1        A.    I have two brothers and three sisters -- four
 2   sisters.
 3        Q.    Five sisters?
 4        A.    Four.
 5        Q.    Four.  What are the names of your brothers?
 6        A.    Ramon Israel Cuellar.
 7        Q.    Okay.  Who else?
 8        A.    Jorge Joel Cuellar.
 9        Q.    Okay.  And as far as Ramon, do you get along
10   with him?
11        A.    Yes.  He's my brother.
12        Q.    Okay.  Is there any reason -- have you ever
13   gotten into an argument with him --
14        A.    Sure.  A lot of times.
15        Q.    Okay.  What --
16              THE COURT:  Just a minute.  Let him finish
17   asking the questions before you answer, okay?
18              THE WITNESS:  Yes, sir.
19              THE COURT:  You're running into each other
20   and it's hard to understand where the question stops and
21   where the answer begins.
22              THE WITNESS:  Yes, sir.
23              THE COURT:  Thank you.
24              Go ahead.
25        Q.    (BY MR. GALARZA)  This incident happened in
```