STATE OF TEXAS VS. RUBEN GUTIERREZ                          148

1       A.   I have two brothers and three sisters -- four
2   sisters.
3       Q.   Five sisters?
4       A.   Four.
5       Q.   Four.  What are the names of your brothers?
6       A.   Ramon Israel Cuellar.
7       Q.   Okay.  Who else?
8       A.   Jorge Joel Cuellar.
9       Q.   Okay.  And as far as Ramon, do you get along
10  with him?
11      A.   Yes.  He's my brother.
12      Q.   Okay.  Is there any reason -- have you ever
13  gotten into an argument with him --
14      A.   Sure.  A lot of times.
15      Q.   Okay.  What --
16              THE COURT:  Just a minute.  Let him finish
17  asking the questions before you answer, okay?
18              THE WITNESS:  Yes, sir.
19              THE COURT:  You're running into each other
20  and it's hard to understand where the question stops and
21  where the answer begins.
22              THE WITNESS:  Yes, sir.
23              THE COURT:  Thank you.
24              Go ahead.
25      Q.   (BY MR. GALARZA)  This incident happened in

STATE OF TEXAS VS. RUBEN GUTIERREZ                    149

1   September 5, 1998; is that correct?
2        A.    That's correct.
3        Q.    Okay.  At that time period, were you and him
4   upset at that time?
5        A.    Not really.  We just -- he would come around.
6        Q.    So you were speaking at that time?
7        A.    Yes.
8        Q.    Okay.  I believe you stated that the lots are
9   rented for like around 170 to $180 per lot; is that
10  correct?
11       A.    That's correct.
12       Q.    Okay.  And right now you're still living there?
13       A.    Yes, I am.
14       Q.    Okay.  Are you the one that's collecting the
15  rent from it?
16       A.    My uncle is.
17       Q.    And your uncle, are you talking about Pablo
18  Cuellar?
19       A.    No.  Jose M. Cuellar.  He's the manager there.
20       Q.    Okay.  And you're allowed to live at the house
21  during this time?
22       A.    Yes, I am.
23       Q.    You stated that your aunt usually started
24  telling people about the money when she felt comfortable
25  with them; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    150

1        A.    That's true.

2        Q.    Okay.  How far -- or how much time did it take

3   for her to tell you about the money?

4        A.    To tell me?  I knew that from the beginning

5   when I first started living there.

6        Q.    So since 1992 she's always had money?

7        A.    Sure.

8        Q.    Okay.  How did you find out about that?  How

9   did you find out that she had money?

10       A.    She told me.

11       Q.    Okay.  She told you in 1992 or she told you

12  before then?

13       A.    Right after I moved in with her.

14       Q.    Okay.  Did she ever tell you where the money

15  was at?

16       A.    Only in her room.  That's all.

17       Q.    And you stated that you would see her counting

18  the money sometimes; is that correct?

19       A.    That's true.

20       Q.    Let me go back -- how old are you at this time?

21       A.    Forty-seven.

22       Q.    Forty-seven years old?

23       A.    Yes.

24       Q.    So when you moved in, you were around 40?

25       A.    Yes.

1    Q.   And during this seven year period, the only job
2  you've had is working with your aunt?
3    A.   That's true.
4    Q.   Okay.  Besides this money that she pays you --
5  I believe you said that she paid you $150 and she gave
6  you $50 extra that day, right?
7    A.   That's true.
8    Q.   Besides that, do you have any other source of
9  income?  Does your uncle or anybody else give you money?
10   A.   No.
11   Q.   So that day, mainly what you had was $200 I
12 believe; is that correct?
13   A.   That's true.
14   Q.   Do you usually spend your money as soon as you
15 get it?
16   A.   No.
17   Q.   Okay.  When -- on September 5th you stated you
18 woke up around 10:00?
19   A.   That's true.
20   Q.   And then you did some work around the trailer
21 park?
22   A.   Yes.
23   Q.   Then after that, around what time did you
24 call -- is it Ramon that you called?  Who did you call?
25   A.   No.  My daughter called.

1    Q.   Okay.  Your daughter called.  Okay.  Then after

2    that, I believe you stopped working around 2:00 and you

3    called a friends of yours.  Who was it?

4    A.   Ramiro Martinez.

5    Q.   And he picked you up at what time?

6    A.   Around 2:30, something like that.

7    Q.   And that's when you all went directly to VFW;

8    is that correct?

9    A.   Yes.

10   Q.   And VFW is the one that's located on Paredes?

11   A.   That's true.

12   Q.   You stated that before you left, at that point

13   is when you saw some -- somebody's legs?

14   A.   True.

15   Q.   Okay.  And then you all slowed down before you

16   left?

17   A.   We stopped.

18   Q.   Okay.  And that's when you say that Ruben

19   Martinez -- I'm sorry, Ruben Gutierrez and somebody else

20   approached your vehicle; is that correct?

21   A.   That's true.

22   Q.   Okay.  You also stated that it's not normal,

23   it's not unusual that people use that property around

24   there?

25   A.   I said that it's normal.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    153

```
 1        Q.   It's normal.
 2        A.   Yes.
 3        Q.   And so that happens sometimes?
 4        A.   Sometimes.
 5        Q.   Okay.  So you were not surprised as to Ruben
 6   and his friend walking through there?
 7        A.   No.
 8        Q.   Then you spoke to him; and after you spoke to
 9   him, then you all took off and they took off their own
10   way?
11        A.   That's true.
12        Q.   Okay.  You all took off towards --
13                  MR. GALARZA:  Can I approach, Your Honor?
14                  THE COURT:   You may.
15        Q.   (BY MR. GALARZA)  Using this map right here,
16   you all were here when you were talking to Ruben, is that
17   correct, around this area?
18        A.   Right there, over there in the front.  No.
19   Back -- no.  Come out to the road.
20        Q.   Okay.
21        A.   Just a little ways this way.  Like about there.
22        Q.   Okay.  And this is when you spoke to him?
23        A.   Yes.
24        Q.   Okay.  And you went this way?
25        A.   That's correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                      154

1        Q.    Okay.  And then he left this way?

2        A.    That's true.

3        Q.    Okay.  Did you see him turn back and come back

4   at any time?

5        A.    No.

6        Q.    Then you stated you stayed at the VFW until

7   what time?

8        A.    Around 10:00.

9        Q.    But hadn't you said that you left before that?

10       A.    Yeah, we left around -- after I called my aunt,

11  around seven I went to my uncle's -- aunt -- Uncle Augie

12  and Judy.

13       Q.    Okay.  Where do they live at?

14       A.    They live on Boca Chica going towards the

15  beach.

16       Q.    Okay.  And Ramiro is the one that took you over

17  there; is that correct?

18       A.    That's true.

19       Q.    After you all -- you stayed there for an hour?

20       A.    Approximately.

21       Q.    Okay.  And you stated Ramiro stayed in the

22  truck?

23       A.    Yes.

24       Q.    Why did he stay in the truck?

25       A.    Because he didn't want to come in the house.

1   He didn't know my family.

2       Q.   Okay.  So you knew that he was in the truck and

3   he was outside the house?

4       A.   Yes.

5       Q.   Did you all stop anywhere to buy beer, any more

6   beer or --

7       A.   No.

8       Q.   Then you left like around -- after you all

9   stayed there, where did you all go after that?

10      A.   Back to the VFW.

11      Q.   And then around ten, you stated you went to

12  Pescadores?

13      A.   Yes, that's correct.

14      Q.   Who was paying -- you all were buying drinks I

15  assume?

16      A.   Yes.

17      Q.   Okay.  Who was buying these drinks?

18      A.   I paid once and Ramiro would pay.

19      Q.   Do you know how many beers you had?

20      A.   No.  I was --

21      Q.   The first --

22      A.   I was having some beers from different people.

23      Q.   Okay.  So you wouldn't know how many you had?

24      A.   No.

25      Q.   Okay.  Would you assume six?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    156

1        A.    Six, seven.

2        Q.    Or more than that?

3        A.    Yeah.  It would be possible.

4        Q.    Twelve?

5        A.    Would be possible, yes.

6        Q.    Okay.  So we can be safe, can we say more than

7   12?

8        A.    Yes.

9        Q.    Okay.  At 2:00 when you were -- at two or three

10  that you saw -- that you all left your residence, that

11  Ramiro picked you up, had you already drank before that?

12       A.    No.

13       Q.    So you started drinking at VFW?

14       A.    Yes.

15       Q.    When you went to your aunt and uncle's house,

16  did you keep on drinking there?

17       A.    No.

18       Q.    Okay.  And then once you went back to VFW, you

19  started drinking again?

20       A.    Yes.

21       Q.    Did Ramiro start drinking again?

22       A.    Yes.

23       Q.    Once you all left VFW, at that point is when

24  Ramiro said, "I don't want to go to Pescadores," and he

25  dropped you off; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                      157

1        A.    That's true.

2        Q.    From where did you call your aunt?

3        A.    From VFW.

4        Q.    And you stated that she did not answer the

5    phone?

6        A.    That's true.

7        Q.    How many times did you call?

8        A.    Several, maybe four or five times.

9        Q.    You let it ring four or five times or you kept

10   on going to --

11       A.    No.  I kept on calling.

12       Q.    Okay.  Do you remember from what time period to

13   what time period?

14       A.    Well, just a little bit of time.  Maybe every

15   ten minutes or so.

16       Q.    So it would be safe that you called her -- it

17   would be safe to say that you called her between seven

18   and 7:30?

19       A.    Yes.

20       Q.    Were you concerned at that point?

21       A.    No, not really because she would -- like I say,

22   she usually walked out in the park and go chat with

23   people, you know.

24       Q.    Okay.  Once you got to Pescadores, what time

25   was it at?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              158

```
 1        A.    It must have been around a little bit after
 2   ten.
 3        Q.    And Ramiro left?
 4        A.    Yes.
 5        Q.    And you didn't see Ramiro anymore?
 6        A.    No.
 7        Q.    Where does Ramiro live at?
 8        A.    He lives on 409 Morningside on the rear, on a
 9   brick house, lot number 25.
10        Q.    And does that property also belong -- it's
11   together with the trailer park?
12        A.    Yes.
13        Q.    And who sent that house to be made?
14        A.    Pardon?
15        Q.    Who sent that house -- you say it's a brick
16   house?
17        A.    Yes, sir.
18        Q.    Who sent that house to be made?  Whose house is
19   it?
20        A.    Ms. Harrison's.
21        Q.    So he was renting that house from Ms. Harrison?
22        A.    Yes.
23        Q.    How long had Ramiro been living there?
24        A.    Maybe a month or two, something like that.
25   They just moved in recently at the time.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          159

1        Q.    Had you known Ramiro before that?

2        A.    Yes.

3        Q.    For how long?

4        A.    Not very long, maybe two months, three months.

5        Q.    Okay.  You stated that you had a prior

6   conviction; is that correct?

7        A.    That's correct.

8        Q.    And you went to the penitentiary for two and a

9   half years?

10       A.    That's true.

11       Q.    And that conviction was for possession --

12       A.    Felony possession of a firearm.

13       Q.    And it was because you already had a

14  conviction?

15       A.    That's true.

16       Q.    What was your prior conviction?

17       A.    Burglary of a vehicle.

18             MR. BLAYLOCK:  I object, Judge.  Just for

19  the record, he's not allowed to go that far back.  The

20  rule says ten years.

21             THE COURT:  It's overruled.  Go ahead.

22       Q.    (BY MR. GALARZA)  It was burglary of a

23  vehicle?

24       A.    Yes.

25       Q.    How long before that did that burglary occur?

```
 1        A.    About ten, eight years, ten years.
 2        Q.    Eight years before you were arrested for this
 3   felony --
 4        A.    Yes, sir, something like that.
 5        Q.    And do you remember what you got on this
 6   burglary of a vehicle?
 7        A.    I think two years.
 8              MR. BLAYLOCK:  Judge, I object.  This
 9   whole area is not permissible.  It's over ten years old.
10              THE COURT:  I'll sustain the objection.
11              MR. GALARZA:  Your Honor, can we approach?
12              (Off the record discussion at the bench)
13              THE COURT:  All right.  Let's proceed.
14        Q.    (BY MR. GALARZA)  Okay.  During this ten year
15   period, have you gotten arrested again?
16              MR. BLAYLOCK:  I object to that, Judge.
17   That violates --
18              THE COURT:  I'll sustain the objection.
19              MR. BLAYLOCK:  -- the rule.
20        Q.    (BY MR. GALARZA)  Okay.  So the only thing you
21   had at that time, you had served time for felony
22   possession of a firearm?
23        A.    That's correct.
24        Q.    Okay.  And that's during the time period you
25   served two and a half years in the penitentiary?
```

```
 1        A.    That's right.
 2        Q.    And you stated you got out in 1990; is that
 3   correct?
 4        A.    That's true.
 5        Q.    On September 5th, you stated you came back --
 6   got back around 1:00; is that correct?
 7        A.    Yes, sir.
 8        Q.    And do you remember which taxicab you used?
 9        A.    No, I don't remember.
10        Q.    Do you remember how much they charged you for
11   the taxicab?
12        A.    No, I don't.
13        Q.    Did you usually use the same taxicab?
14        A.    No.  I catch anybody I can.
15        Q.    Would you usually go out by yourself and stay
16   out and then come back in a taxicab?
17        A.    Always.
18        Q.    You stated you stopped at a -- to buy a
19   hamburger?
20        A.    That's true.
21        Q.    Do you remember where you stopped at?
22        A.    No, I don't.
23        Q.    Would you always stop at the same place to buy
24   your hamburger?
25        A.    No.  Wherever I could get a hamburger.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    162

```
 1         Q.    What else did you buy besides a hamburger?
 2         A.    A Coke and French fries.
 3         Q.    Was -- how often would you stop when you were
 4    coming home to buy her a hamburger?
 5         A.    Every time that I came home when I went out.
 6         Q.    Was she always awake when you came back?
 7         A.    Yes.
 8         Q.    Was she waiting for you or --
 9         A.    Always waiting for me.
10         Q.    What time was the time that you usually would
11    get home?
12         A.    It depends.  Sometimes I'd come in at 4:00 in
13    the morning.
14         Q.    And she would still be waiting for you?
15         A.    Yes.
16         Q.    You stated that you got home and you went into
17    the house; is that correct?
18         A.    That's true.
19         Q.    And at that point that the screen door was
20    unlocked?
21         A.    That's true.
22         Q.    And how about the other door, was it also
23    unlocked?
24         A.    Also unlocked, yes.
25         Q.    You stated that that's normal?
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                               163

```
1         A.   No, that's not normal, but -- because she
2    usually locked the door, but maybe she had forgotten to
3    lock it.
4         Q.   But that it's happened before?
5         A.   No, not really.
6         Q.   That never happened before?
7         A.   No.
8         Q.   So this is the first time that the doors were
9    unlocked?
10        A.   Yes.
11        Q.   And this was like around -- you said one, 1:30?
12        A.   Around one, 1:15, something like that.
13        Q.   Okay.  Once you went in, you went in to the
14   kitchen?
15        A.   That's true.
16        Q.   And you put the bag down; is that correct?
17        A.   That's true.
18        Q.   Okay.  And you looked into the bedroom, into
19   her bedroom and she was not there in bed?
20        A.   That's true.
21        Q.   At that point did you automatically get out?
22   Did you look for her anywhere else?
23        A.   No.  I went outside and I started looking
24   around the park from the porch.  Then I went to
25   Mrs. Vento's house because that's where she went the
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    164

1   most; and I asked her if she had been around or seen her

2   and she said, "No."

3       Q.   Did you walk into her bedroom at all?

4       A.   At the end, yes, I did.

5       Q.   The first time --

6       A.   No.

7       Q.   -- did you walk into the bedroom?

8       A.   No.

9       Q.   Okay.  Once you walked out -- Ms. Vento, how

10  old is she?

11      A.   I don't know.  I'd say 60, 70.  I don't know.

12  Just a rough guess.

13      Q.   And has she lived there in the trailer park for

14  a long time?

15      A.   Yes.  She's been living there for quite a few

16  years.

17      Q.   And you say that Ms. -- that your aunt would

18  stay awake until 4:00 sometimes in the morning?

19      A.   That's true.

20      Q.   And she would go over to Ms. Vento's house or

21  somebody else's house?

22      A.   She'd stay awake.  She'd be in the office or

23  she'd be over at Vento's, you know.  Once in awhile both

24  of them would stay up late.

25      Q.   So Mrs. Vento would also stay up until 4:00 in

STATE OF TEXAS VS. RUBEN GUTIERREZ                          165

1    the morning?

2         A.   No, not really.

3         Q.   She would usually go to sleep earlier?

4         A.   Oh, yes.

5         Q.   You went -- how far is Ms. Vento's trailer from

6    the house?

7         A.   About I'd say --

8         Q.   How many trailers down?

9         A.   I don't know.  About a hundred feet, something

10   like that.

11        Q.   Okay.

12             MR. GALARZA:  Can I approach, Judge?

13             THE COURT:  You may.

14        A.   Not that far.

15        Q.   (BY MR. GALARZA)  Let me show you this.  Where

16   does Ms. Vento live at?

17        A.   From the house, right there on 10B, right

18   there.

19        Q.   This is where she lives?

20        A.   Yeah.

21        Q.   And so you just went directly over to --

22        A.   Right.

23        Q.   -- Ms. Vento's house?  At that point, you

24   stated that the trailer park was full, is that correct,

25   almost full?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    166

```
 1        A.   Almost full, yes.
 2        Q.   I believe you stated that 40 of the lots were
 3   rented out of the 50?
 4        A.   Yes.
 5        Q.   How is the light in that area?
 6        A.   It's pretty well lit up.
 7        Q.   It is?
 8        A.   Yes.
 9        Q.   All the trailers and also the residence?
10        A.   Yes.  We have light poles.
11        Q.   Okay.  You went to Ms. Vento's house at around
12   1:15, 1:30; is that correct?
13        A.   Yes.
14        Q.   And then at that point was she awake?
15        A.   She had just gotten home from a dance she told
16   me.
17        Q.   Does Ms. Vento live alone?
18        A.   No.  She's got her husband.
19        Q.   Her husband?
20        A.   Yes.
21        Q.   What's his name?
22        A.   George.  I don't know his last name.
23        Q.   Has George lived there for a long time also?
24        A.   Ever since they moved there.
25        Q.   Once you went to Ms. Vento's house and you
```

1   spoke to her and she told you that she was not there; is
2   that correct?
3        A.   That's true.
4        Q.   And what did Ms. Vento tell you to do at that
5   point?
6        A.   To get her on the P.A. system and to call for
7   her.
8        Q.   What do you mean by the P.A. system?
9        A.   We have a public address system at the house
10  with speakers out on the light posts.
11       Q.   And that -- so everybody can hear it?
12       A.   Yes.
13       Q.   So you got on the P.A. system and you called
14  for your aunt?
15       A.   Yes.
16       Q.   What did you do after that?
17       A.   I waited for awhile to see if she'd come.
18       Q.   Around how much time did you wait?
19       A.   I'd say maybe ten minutes or so.
20       Q.   So this would take you to 1:45; is that
21  correct?
22       A.   That's true.
23       Q.   Where did you wait at?
24       A.   Inside the house.
25       Q.   So you waited for ten, 15 minutes --

1       A.   Yeah, by the door, yes, just looking out to the
2   front.
3       Q.   Were you outside the house or inside?
4       A.   I was inside for awhile, then I walked outside.
5       Q.   Okay.  And you were there for around ten, 15
6   minutes after you called on the P.A. system?
7       A.   Ten, yes.
8       Q.   Did at that point anybody call?  Did anybody
9   come by?
10      A.   No.
11      Q.   Once you waited after 15 minutes, what did you
12  do then?
13      A.   I turned back around, went inside the house,
14  and I went in her room.
15      Q.   Okay.  When you went into her room, at that
16  point is when you saw your aunt?
17      A.   That's true.
18      Q.   And you stated that you called your other aunt.
19  What's her name?
20      A.   Judy Cuellar.
21      Q.   And at that point you called her to let her
22  know what was going on?
23      A.   Yes.
24      Q.   Why didn't you call the 911 yourself?
25      A.   Because I was upset and I was very emotional,

STATE OF TEXAS VS. RUBEN GUTIERREZ                        169

1    and I wanted somebody from the family to know what
2    happened.
3         Q.   Wouldn't it be your first instinct to call 911
4    to try --
5         A.   I wasn't thinking --
6         Q.   -- to get help?
7         A.   -- and I was upset and I was emotional.  And I
8    just thought let them know and let them call so that
9    somebody would be at the house right away.
10        Q.   Did you ever think about calling EMS or the
11   ambulance?
12        A.   No.
13        Q.   Did you ever think about calling the police?
14        A.   No.
15        Q.   At that point, you stated that your aunt was
16   already cold?
17        A.   Yes.
18        Q.   Okay.  Did you at any time move her?
19        A.   Sir?
20        Q.   Did you move her?
21        A.   No.
22        Q.   Did you ever pick her up?
23        A.   No.  I tried to, but when I felt her, she was
24   cold and stiff.  I just let her go.
25        Q.   Okay.  When you tried to pick her up, where did

STATE OF TEXAS VS. RUBEN GUTIERREZ                          170

1    you try to pick her up from?

2        A.    From her elbow because her elbow was sticking

3    up like this and she was laying with this hand underneath

4    her body.  And I reached underneath her body like this

5    and grabbed her from the elbow.

6        Q.    Okay.  And at that point you were not able to

7    pick her up?

8        A.    No.  I just let go when I felt she was cold and

9    stiff.

10       Q.    Once you called your aunt, your aunt told you

11   that she didn't have a car or something like that?

12       A.    That my uncle wasn't there, that she didn't

13   have a car to come over.

14       Q.    Okay.  And at that point, who else did you call

15   or what else did you do?

16       A.    I -- she said she'd call 911; and then I hung

17   up the phone and I stayed there.  Then --

18       Q.    For how much time did you stay there?

19       A.    I stayed there until the phone rang again, and

20   it was the dispatcher from 911.

21       Q.    Okay.  At this point the dispatcher called and

22   then they -- what did -- what was your conversation?

23   What is it that you told them?

24       A.    Well, she told me in Spanish, but I'll

25   translate it in English, that where was the house, what

STATE OF TEXAS VS. RUBEN GUTIERREZ                              171

1    was the address, and if my aunt was breathing.  And I
2    told her no, that she was cold and stiff.
3         Q.   And how long did it take for -- who arrived
4    first?
5         A.   I don't know whether the police or the
6    ambulance arrived first.
7         Q.   How long were you there by yourself and then
8    somebody arrived?
9         A.   It was only minutes.
10        Q.   Okay.  What area of the house did you stay at?
11        A.   Right there in front, by the front entrance by
12   the door.
13        Q.   And once the police got there, what happened?
14        A.   They took me in for questioning.
15        Q.   So, at that point the police immediately picked
16   you up?
17        A.   That's true.
18        Q.   And they took you in for questioning?
19        A.   Pardon?
20        Q.   They took you right away for questioning?
21        A.   Yes, sir.
22        Q.   Did you ever check to see how she had died?
23        A.   No.
24        Q.   Did you ever check to see if she had fallen off
25   the bed or what had happened?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    172

```
 1        A.    No.
 2        Q.    Did you ever call any of the family members at
 3   that point?
 4        A.    No.
 5        Q.    The only one that knew at this point was your
 6   aunt; is that correct?
 7        A.    That's true.
 8        Q.    And this is Judy Cuellar?
 9        A.    That's true.
10        Q.    Did any family members ever come to the house
11   at that point?
12        A.    I don't recall.
13        Q.    During the time period that you were there by
14   yourself --
15        A.    No.
16        Q.    -- nobody went by?
17        A.    No.
18        Q.    So as far as when you were taken away by the
19   police officers, your aunt was there and there was just
20   police officers, but there was no other family members;
21   is that correct?
22        A.    Not at that time, I don't think so.
23        Q.    Okay.  Did anybody from the trailer park ever
24   come back during the time that you were looking for your
25   aunt or anything else?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          173

1       A.   No.

2       Q.   You stated that you wanted for your family to

3   know what had happened; is that correct?

4       A.   Yes, what I had found.

5       Q.   What you had found.

6       A.   Yes.

7       Q.   Once the police took you in for questioning,

8   how long were you in questioning?

9       A.   I don't know.  'Til about almost 6:00 in the

10  morning.

11      Q.   So they questioned you from, let's say, 2:00

12  that they picked you up all the way to 6:00 in the

13  morning?

14      A.   Almost, yes, sir.

15      Q.   Who else was there when they were questioning

16  you?

17      A.   Just me myself and the police officers.

18      Q.   And did they take you back?  Did you have to

19  get a ride back to your house?

20      A.   No.  They took me back and dropped me off at an

21  aunt of mine's house, another aunt.

22      Q.   And you stayed there or where did you go?

23      A.   No.  I just used the phone and I called my

24  Uncle Augie.  I called his house to have him come pick me

25  up.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          174

1      Q.   Okay.  And he picked you up?

2      A.   Yes, because I didn't have any -- I had just

3   those throw-away jumpsuits because they had took my

4   clothes off.

5      Q.   Okay.  So they had already put you in a jail

6   uniform?

7      A.   No, not a jail uniform.  Those disposal

8   jumpsuits.

9      Q.   The light blue ones?

10     A.   Yes.

11     Q.   So once they took you to your uncle's, you

12  stayed in that --

13     A.   Yes, until my uncle went and got me some

14  clothes from the house.

15     Q.   Where were your clothes at?

16     A.   In my room.

17     Q.   But once you changed into that jumpsuit --

18     A.   Oh, the police department kept it.

19     Q.   Once your uncle came back, did you take -- did

20  he take you back to your house?

21     A.   No.  He took me to his house.

22     Q.   Okay.  When did you get back to your house?

23     A.   I don't know.  About a week later.

24     Q.   You stated that they questioned you again on

25  the 6th; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                        175

1        A.   Yes.

2        Q.   Around what time did they question you?

3        A.   I don't know.  They questioned me about four or

4   five times.

5        Q.   On the 6th they questioned you --

6        A.   No.  In different times.  And it -- sometimes

7   they'd pick me up in the morning; sometimes they'd pick

8   me up at noon or in the afternoon.  There was no time.

9        Q.   Okay.  On the 6th, do you remember if it was in

10  the morning or the afternoon?

11       A.   I can't recall.

12       Q.   You stated that you were still intoxicated on

13  the 6th?

14       A.   Yes.

15       Q.   Okay.  What time did you start drinking again?

16       A.   When they left -- when my uncle picked me up

17  that I was waiting for him to come get me that I was in

18  the jumpsuit, I -- I bought -- I didn't buy some beer.

19  There was some beer there at my uncle's house and I

20  started drinking there.

21       Q.   Okay.  And that day you just kept on drinking?

22       A.   Yes.

23       Q.   And then when you -- when they picked you up

24  again to question you again or when you went to be

25  questioned again, you had kept on drinking until then?

1      A.    Yes.

2      Q.    When you came back that the police brought you

3  back or that your uncle brought you back, did you keep on

4  drinking again?

5      A.    No, because they wanted me sober so I could

6  give my statement.

7      Q.    So you stopped drinking at that point?

8      A.    Yes.

9      Q.    You went back the next day to the police?

10      A.    Yes.  I was there about four or five different

11  times, different occasions.

12      Q.    And in all these occasions, was there anybody

13  else there besides the police?

14      A.    No.

15      Q.    It was just mainly the police officers?

16      A.    Yes.

17      Q.    You stated that you gave the police a story

18  that night.

19      A.    Yes, I gave them a statement.

20      Q.    Which is September 5th; is that correct?

21  September 6th?

22      A.    Yeah, because they wouldn't take it because I

23  was still drunk.

24      Q.    Okay.  You were questioned you said four or

25  five times?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          177

```
 1        A.   Yes, over and over.
 2        Q.   Okay.  Did your statement change every single
 3   time?
 4        A.   No.
 5        Q.   It was always the same statement?
 6        A.   Yes.
 7        Q.   How many statements did you sign?
 8        A.   I only signed one.
 9        Q.   You only signed one?
10        A.   Yes.
11        Q.   When did you sign the statement?
12        A.   I don't recall.
13        Q.   Was it the first statement that they took from
14   you?
15        A.   No, until I was completely sober, that I went
16   sober.  It must have been around the third time.  It must
17   have been the 7th or the 8th of September.
18        Q.   So they would keep on questioning you?  They
19   would keep on letting you go and they would bring you
20   back?
21        A.   Yes.
22        Q.   And then you would gave them more information?
23        A.   Just what I knew.
24        Q.   And then finally, after the third or fourth
25   time they did the statement?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    178

1        A.    Yes.

2                    MR. GALARZA:   Your Honor, if I can get a

3    copy of the statement that he gave?

4                    MR. BLAYLOCK:   If the record will reflect

5    that defense counsel's request has been tendered.

6                    THE COURT:   It shall reflect.

7        Q.    (BY MR. GALARZA)   You stated in your statement

8    that she paid you $150 a week; is that correct?

9        A.    That's true.

10       Q.    Did you ever tell them that she had given you

11   $50 that day --

12       A.    No.

13       Q.    -- extra?   How many times did they read the

14   rights to you, the Miranda rights?

15       A.    I don't know.

16       Q.    Did they read them to you every single day that

17   you went there?

18       A.    I imagine that they did, yes.

19       Q.    You imagine, but you're not sure?

20       A.    I'm not sure.   As a matter of fact, I do

21   remember my rights were written -- were given to me every

22   time, yes.

23                    **(Brief pause in proceedings)**

24       Q.    (BY MR. GALARZA)   Okay.   When your aunt passed

25   away and then after that, there was all this questioning

STATE OF TEXAS VS. RUBEN GUTIERREZ                          179

```
 1   that was going on; is that correct?
 2        A.   That's correct.
 3        Q.   During -- they had -- do you know where they
 4   buried her?
 5        A.   At Roselawn Memorial -- I mean, not Roselawn.
 6   Buena Vista.
 7        Q.   Okay.  Cemetery?
 8        A.   Yes.
 9        Q.   Where did they have the funeral?
10        A.   At Darling-Mouser.
11        Q.   Okay.  During the time they were having the
12   funeral, I guess, procession or whatever they were having
13   there at Darling-Mouser, did you ever go by there?
14        A.   I was there all the time.
15        Q.   Okay.  Did you ever have a conflict with your
16   family?
17        A.   No.
18        Q.   Your family never called the police on you?
19        A.   No.
20        Q.   Did the police ever go --
21        A.   Yes, they went once to pick me up there because
22   they wanted to question me some more.
23        Q.   Okay.  And were you intoxicated at that time?
24        A.   No.
25        Q.   Do you know how many days it was after your
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          180

1    aunt had passed away?

2         A.    Actually she didn't pass away.  She was

3    murdered, but no, I don't remember.

4         Q.    Okay.  But they did go and pick you up there --

5         A.    At the funeral home, yes.

6         Q.    -- at the funeral home.  And as far as your

7    knowledge, did your family call the police to go pick you

8    up there?

9         A.    No.  The police knew where I was at every time.

10        Q.    Okay.  You stated that you've never been

11   interested in money; is that correct?

12        A.    That's true.

13        Q.    And that you're happy with the lifestyle that

14   you had?

15        A.    Yes.

16        Q.    You stated that your aunt gave you $50 extra?

17        A.    Yes.

18        Q.    And this was to buy clothes?  To buy clothes?

19        A.    Yes.

20        Q.    And did you actually buy these clothes?

21        A.    No.

22        Q.    Once you came back from going out at 1:00, 1:30

23   in the morning, how much money did you still have with

24   you; do you remember?

25        A.    I had money left.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    181

```
 1        Q.    Do you remember how much?

 2        A.    No, I don't.

 3        Q.    $100?

 4        A.    More or less.

 5        Q.    More than a hundred dollars?

 6        A.    More or less.

 7        Q.    And you had been partying since like 2:30,

 8   3:00; is that correct?

 9        A.    Yes.

10        Q.    How often would Ms. Harrison give you money?

11        A.    Well, whenever she felt like it or whenever I'd

12   ask her for some, she'd give me.

13        Q.    Okay.  What was the most money she ever gave

14   you?

15        A.    Whatever I wanted, I would get it.

16        Q.    Okay.  Do you remember how much the most was?

17        A.    I don't know.  Sometimes I'd -- sometimes I'd

18   ask for 300, $400, 500, a thousand.

19        Q.    Did you -- did you ever get arrested for

20   D.W.I.?

21        A.    Yes.

22        Q.    When was this?

23        A.    I don't recall.

24              MR. BLAYLOCK:  I object to that, Judge.

25   That's a clear violation of Rule 609 --
```

1              THE COURT:  Sustained.

2              MR. BLAYLOCK:  -- and we have a motion in

3   limine directly on point.  I'd ask that sanctions be

4   applied at this time.

5              THE COURT:  I'll sustain the objection.

6   Let's proceed.

7              MR. GALARZA:  Thank you, Judge.

8        Q.   (BY MR. GALARZA)  When they asked you a little

9   while ago, you stated, "One of the trailers that we own."

10  That was --

11       A.   That's true.

12       Q.   Okay.  Was that property actually owned by you

13  also?

14       A.   No, but it's just a custom that I have because

15  I was -- between my aunt and I, she used to tell me,

16  "What I own, you own."

17       Q.   So as to you, you also owned -- that property,

18  you also owned it?

19       A.   I just -- you know, just to say so.  I don't

20  actually own it or never did, actually did.

21       Q.   You stated that you met Ruben through his

22  father-in-law; is that correct?

23       A.   That's true.

24       Q.   Okay.  And his father-in-law is one of your

25  compadres?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    183

```
 1        A.   Yes, he is.
 2        Q.   How is he your compadre?
 3        A.   I am his son's godfather.
 4        Q.   Which ends up being Ruben's wife's brother?
 5        A.   Correct.
 6        Q.   Okay.  How old is this godson?
 7        A.   About 16 years old.
 8        Q.   Now, you stated that you lived with your
 9   compadre for some time period?
10        A.   At his mother's house.  I stayed there for
11   awhile once.
12        Q.   Okay.  How long ago was that?
13        A.   Oh, it's been about nine -- no, seven years
14   almost before -- right before I came to Brownsville --
15   right after I came to Brownsville.
16        Q.   Okay.  Do your brothers and sisters live here
17   in Brownsville?
18        A.   I have one brother and one sister here in
19   Brownsville.
20        Q.   Who is your brother that lives here?
21        A.   Ramon Israel Cuellar.
22        Q.   And who's your sister?
23        A.   Irma Cuellar.
24        Q.   You stated that you had to go to Waco --
25        A.   Yes, that's correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          184

```
 1         Q.   -- at one point?
 2         A.   That's correct.
 3         Q.   And that you asked your compadre's son and he
 4    couldn't go; is that correct?
 5         A.   No.  I asked my compadre's -- let me see.  How
 6    do I say it?  He's married to my compadre's niece.
 7         Q.   And he couldn't go?
 8         A.   No, because he had back surgery.
 9         Q.   And at that point is when Ruben ended up going
10    with you; is that correct?
11         A.   That's true.
12         Q.   And once you all went over there, you stated
13    you ended up paying him --
14         A.   Yes.
15         Q.   -- for taking you over there?
16         A.   Yes.
17         Q.   Okay.  And then you all came back and you
18    dropped him off?
19         A.   That's true.
20         Q.   Okay.  And then you drove over back to your
21    house?
22         A.   That's true.
23         Q.   Why couldn't you drive over there?
24         A.   Because I don't have a driver's license.
25         Q.   So that's why you needed somebody to take you?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    185

```
 1         A.    That's true.

 2         Q.    And then after that, you stated that you

 3    invited Ruben to go over to your house?

 4         A.    Yes.

 5         Q.    And after awhile, he started going over there?

 6         A.    Yes.

 7         Q.    You stated that he started getting along with

 8    you, he started getting along with Ms. Harrison; is that

 9    correct?

10         A.    That's true.

11         Q.    You also stated that he would go over and you

12    all would drink --

13         A.    Yes.

14         Q.    -- in the back area?  The back of the house, is

15    that the area where you saw Ruben?

16         A.    Yes.

17         Q.    Okay.  That's where you all would get together

18    to drink?

19         A.    Yes.

20         Q.    How often would you all get together to drink?

21         A.    I would drink every day.  Ruben would come --

22    he wouldn't come every day, but like I say, maybe one day

23    he'd come; the next day he wouldn't.

24         Q.    And who else would drink there with you?

25         A.    Crispin Villarreal.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    186

1        Q.    And you stated that Crispin and Ruben, that

2    Mrs. Harrison started getting -- started talking to them

3    also?

4        A.    Yes.

5        Q.    And then she started trusting them?

6        A.    Pardon?

7        Q.    She started trusting them?

8        A.    Yes.

9        Q.    That Ruben started doing errands for her?

10       A.    That's true.

11       Q.    And did Crispin ever do errands for her?

12       A.    Yes, he would.

13       Q.    Who told -- as far as you know, who told

14   Crispin that Mrs. Harrison had money?

15       A.    She did.

16       Q.    Did she ever tell him how much?

17       A.    I don't know.

18       Q.    Did she ever tell him where the money was at?

19       A.    I think she did.

20       Q.    And Crispin is the one that lives in the brick

21   house kind of behind your house?

22       A.    Yes.

23       Q.    And besides Crispin and Ruben, as far as you

24   know, who else did she tell that she had money?

25       A.    Not that I know of -- from the rest of the

1    people who would go there, no one.  But some of the

2    tenants there, she'd talk to them and tell them.

3         Q.   Did she ever tell them how much she had?

4         A.   I don't think so.  I don't know.

5         Q.   Do you have any tattoos?

6         A.   Yes, I do.

7         Q.   What kind of tattoos do you have?

8         A.   I have various tattoos.

9              MR. BLAYLOCK:  I object, Judge, relevance

10   of this.

11             THE COURT:  What's the relevancy, counsel?

12             MR. GALARZA:  Well, if we can approach?

13             **(Off the record discussion at the bench)**

14             THE COURT:  I'll sustain the objection for

15   the record.

16             Go ahead.

17             MR. GALARZA:  Thank you, Judge.

18        Q.   (BY MR. GALARZA)  Do you belong to any gangs?

19             MR. BLAYLOCK:  I object to that question,

20   Judge.

21             THE COURT:  I'll permit him to answer.  Go

22   ahead.

23        Q.   (BY MR. GALARZA)  Have you ever been a gang

24   member?

25        A.   No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          188

1        Q.   Do you belong to a gang right now?

2        A.   No.

3                  MR. BLAYLOCK:  I object to this line of

4   questioning.  I'd like a running objection.  He's clearly

5   trying to go to some sort of inflammatory --

6                  THE COURT:  You'll have a running

7   objection.

8                  MR. BLAYLOCK:  Thank you, Judge.

9        Q.   (BY MR. GALARZA)  Let's go back when you got

10  back to the residence, to your house, and once you found

11  your aunt there and then you called your other aunt, Judy

12  Cuellar, during this time period did you ever go back to

13  Ms. Vento's house?

14       A.   No.

15       Q.   Did you ever go back to anybody else's house?

16       A.   No.

17       Q.   Why not?

18       A.   Because I just didn't go.

19       Q.   Did you ever go to anybody to try to get help

20  for your aunt?

21       A.   No.

22       Q.   You stated that there's like around 40 trailers

23  that are occupied, right?

24       A.   Yes.

25       Q.   So at least one or two people live in each

1    trailer?

2         A.    Of course, yes.

3         Q.    And you didn't go to anybody to try to get

4    help?

5         A.    No.

6         Q.    You stated that you picked up your aunt or

7    tried to pick her up and after that, you were not able

8    to.  So you just left her there.  Is that correct?

9         A.    That's true.

10                   MR. GALARZA:  Could I approach, Your

11   Honor --

12                   THE COURT:  Go ahead.

13                   MR. GALARZA:  -- to get the pictures?

14        Q.    (BY MR. GALARZA)  Okay.  Let me show you

15   what's been marked as State's Exhibit Number 3, okay?

16   Whose room is this?

17        A.    Hers.

18        Q.    And this is the doorway going into the room; is

19   that correct?

20        A.    From -- yes.  From the kitchen, yes.

21        Q.    Okay.  So you got into the kitchen --

22        A.    No.  I came from the other side, from the

23   office side.

24        Q.    From the office side?

25        A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    190

1       Q.   Okay.  You stated that you got there with the
2   hamburger, you put it in the kitchen?
3       A.   Yes.
4       Q.   Okay.  Can you see this door from the kitchen
5   area?
6       A.   No, not from where I put the hamburger.  You
7   can't -- the table is right real close to the wall.  So I
8   just reached in there and put it right there.
9       Q.   And you stated then you -- whose bedroom is
10  this?
11      A.   That's hers.
12      Q.   Okay.  Then you came back and noticed that she
13  was not in the bed?
14      A.   Yes.  I passed back and her door was always
15  open.  And I looked into her bed and she wasn't there.
16      Q.   Okay.  When you got there, were there any
17  lights on?
18      A.   All the lights were on.
19      Q.   Okay.  Did you turn on any lights?
20      A.   No.
21      Q.   Is there a window in her bedroom?
22      A.   Yes.  As a matter of fact, there's four
23  windows.
24      Q.   In her bedroom there's four windows?
25      A.   Yes.  Two and two, two on the east side and two

STATE OF TEXAS VS. RUBEN GUTIERREZ                            191

1    on the west side -- on the north side.

2         Q.   Okay.  So light comes inside?

3         A.   No, because she always kept her blinds down.

4         Q.   So when you got there, everything was dark?

5         A.   No.  All the lights were on.

6         Q.   All the lights were on?

7         A.   Yes.

8         Q.   Okay.  Even the one in her bedroom?

9         A.   Yes.

10        Q.   Okay.  And so you got there, put the hamburger

11   down, went back, checked her room --

12        A.   I didn't check her room.  I just glanced.  I

13   just glanced.

14        Q.   Okay.  And you glanced through that door that's

15   right there; is that correct?

16        A.   Not where -- the one you showed me, no.  The

17   one on the office side.

18        Q.   There's another door?

19        A.   Yes.

20        Q.   Okay.  And that's when you noticed that there

21   was nobody on the bed?

22        A.   Yes.

23        Q.   As far as you remember, was the bedroom to --

24   I'm sorry, the light to your bedroom on also?

25        A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          192

1      Q.   You stated that Ruben stopped coming after him
2   and Ramiro had a conflict; is that correct?
3      A.   That's true.
4      Q.   Do you remember how much time was it before
5   September 5th?
6      A.   No, I don't.
7      Q.   But it had been some time since he had come
8   over to the house?
9      A.   Yes.
10     Q.   Did you and Crispin ever get into an argument?
11     A.   Yes.
12     Q.   Did you all ever get into a fight?
13     A.   Once he slapped me.
14     Q.   Do you remember how long that was, how long
15  ago?
16     A.   No.  No, I don't.
17     Q.   Were the police called at that time?
18     A.   Not that I know of.
19     Q.   Did you keep on talking to Crispin after that?
20     A.   Yes.
21     Q.   Before you came to live with Mrs. Harrison, had
22  you ever lived with her before?
23     A.   No.
24     Q.   And I believe one of your uncles was the one
25  that was helping her maintain the property before you

1    came down?

2        A.    My dad helped her some.

3        Q.    Your dad?

4        A.    Yes.

5        Q.    What's your dad's name?

6        A.    Fermin Cuellar.

7        Q.    Okay.  But once you got down here, then you

8    took over?

9        A.    That's correct.

10       Q.    Okay.  And was your dad living there with her?

11       A.    No.

12       Q.    Okay.  And -- but once you came down, you

13   started living there with her?

14       A.    Yes.

15       Q.    That addition or the room that you would stay

16   in, was that done after you moved in or was it --

17       A.    No.  It was already there.

18       Q.    How many bedrooms did the house have?

19       A.    The house, before that addition, it was just a

20   one bedroom home.

21       Q.    And that would be the addition, it had --

22       A.    Two.

23       Q.    -- it has two bedrooms, right?

24       A.    Yes.  Well, three because actually I converted

25   another little space there and put a bed in there, which

STATE OF TEXAS VS. RUBEN GUTIERREZ                    194

```
1    I took out now, but --
2         Q.   And this is -- this has been ever since she
3    passed away?
4         A.   No.  No.  That's while I was living there.
5         Q.   While she was still alive, you converted
6    another one, another --
7         A.   Yeah, because I remodeled the whole house from
8    the inside.
9         Q.   Did your aunt ever give you any personal loans?
10        A.   She would.  She'd -- every time she'd give me
11   money it would be personal, but then at the end when I'd
12   pay her, she'd give it back to me.
13        Q.   Okay.  Before she passed away, how much did you
14   owe her?  How much was the loan?  Did you owe her
15   anything?
16        A.   I don't know.
17        Q.   That night, did you call anybody else while you
18   were out on September 5th?
19        A.   No.
20        Q.   You stated that you had been living there for
21   seven years; is that correct?
22        A.   That's true.
23        Q.   And that there was only one key to the house?
24        A.   That's correct.
25        Q.   And she never gave you a key to the house?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          195

```
 1        A.   No.
 2        Q.   So when you would get home at one, two, three,
 3   4:00 in the morning, that's why she would have to be
 4   awake to let you in or --
 5        A.   No, because she really -- she just waited for
 6   me all the time.
 7        Q.   How often would you go out?
 8        A.   Sometimes I'd go out every weekend and
 9   sometimes I wouldn't go out for two or three weeks.
10        Q.   And every weekend you would go out at least
11   once a week, twice a week, or how long?
12        A.   I would go out only on Saturday nights and then
13   Sunday I'd stay home.
14        Q.   But although you would stay home, you would
15   still drink there at home?
16        A.   Yes.
17        Q.   Was your aunt afraid of you?
18        A.   No, I don't think so.
19        Q.   Would it surprise you if somebody would say
20   that she was afraid of you?
21        A.   No.
22        Q.   Would it surprise you if somebody would have
23   said that they thought you had killed your aunt?
24        A.   No.
25        Q.   Why not?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    196

1        A.   Because I didn't kill her.

2        Q.   But would it surprise you if somebody would say

3    that?

4        A.   No.  I don't know.

5        Q.   As far as your knowledge, nobody thought that

6    you had killed her?

7        A.   Pardon?

8        Q.   As far as your knowledge, nobody would have

9    thought that you had killed her?

10       A.   I don't think so.

11       Q.   Are you the only person that's living at the

12   house right now?

13       A.   Yes.

14       Q.   And who's the one that's paying for the

15   expenses?

16       A.   My uncle.

17       Q.   And are you still getting paid?

18       A.   Yes, I am.

19       Q.   You stated you had room and board there at the

20   house; is that correct?

21       A.   Pardon?

22       Q.   You had room and board there at the house?  You

23   were able to live there; and did you have any expenses?

24       A.   No, no expenses.  Room and board.  Okay.

25       Q.   So whatever money you would get, that was your

1    money?

2         A.    Yes.

3         Q.    On the ledgers that you were shown a little

4    while ago --

5                   MR. GALARZA:   May I approach, Judge?

6                   THE COURT:   You may.

7         Q.    (BY MR. GALARZA)   -- you stated that this is

8    shorthand?

9         A.    I believe it's what it is, yes.

10        Q.    Okay.  So you don't know if it's shorthand or

11   not?

12        A.    Well, she used to write shorthand.  That's what

13   it looks like, shorthand, yes.

14        Q.    Did she used to write shorthand everywhere

15   or --

16        A.    Every now and then she would.  She was very

17   well educated.

18        Q.    Okay.

19                   MR. GALARZA:   That's all we have at this

20   time, Your Honor.

21                   **REDIRECT EXAMINATION**

22   **BY MR. BLAYLOCK:**

23        Q.    I need to clear a couple of things up,

24   Mr. Cuellar.  Now, you said it was normal to see people

25   behind that house.  Was that normal?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    198

1       A.   Sometimes people would come from the back when
2   I was sitting there.
3       Q.   Okay.  'Cause there's a resaca back there --
4       A.   Yes.
5       Q.   -- and a Pronto store on the other side of
6   that?
7       A.   Yes.  And people would cut across there from
8   the park to go to the store.
9       Q.   Okay.  But was it normal -- or was it normal to
10  see Ruben in your backyard in September?
11      A.   That's true.
12      Q.   Was it or wasn't it?
13      A.   No.
14      Q.   Because he hadn't been around for awhile,
15  right?
16      A.   Right.
17      Q.   Okay.  And why hadn't he been around for
18  awhile?
19      A.   Because that's when they had that
20  misunderstanding between him and Crispin Villarreal.  He
21  didn't come for a long time.
22      Q.   All right.  So that wasn't normal to see him?
23      A.   Right.
24      Q.   All right.  You and your brother -- what's his
25  name?  Ramon?

1      A.   Yes.

2      Q.   He's your half brother?

3      A.   No.   He's my true brother.

4      Q.   He's a full brother?

5      A.   Yes.

6      Q.   From your mom and your dad?

7      A.   Yes.

8      Q.   And he wasn't talking to you in September of

9   '98?

10     A.   Well, he's kind of there.   He talks to me when

11  he wants to.   And when he's in a good mood, he'll pick me

12  up there and we'll have a good time; and then he would

13  get mad and run me off.

14     Q.   What I want to know is on September the 5th,

15  1998, how was he?

16     A.   I don't know because I don't really see him

17  that much.   It's every now and then that I would see him.

18     Q.   Okay.   So you don't know if he's mad at you or

19  not?

20     A.   No.

21     Q.   Okay.   Now, let's talk about -- and when he

22  says, "Does it surprise you that somebody would say that

23  you might have killed Ms. Harrison," you said that -- you

24  said, "No."

25               Did you understand that question?   Do you

STATE OF TEXAS VS. RUBEN GUTIERREZ                          200

1    know what that means?

2         A.   No, not really.

3         Q.   Okay.  What he's saying is if somebody had --

4    and somebody in your own family, let's say Ramon had said

5    you killed Ms. Harrison, how does that make you feel?

6         A.   That would -- with him, it wouldn't surprise me

7    because that's the way he is.

8         Q.   Okay.  And so with him it wouldn't surprise

9    you, but how does it make you feel if anybody else said

10   it?

11        A.   Pardon?

12        Q.   How would it make you feel if anybody else said

13   it?

14        A.   It wouldn't make me feel too good.

15        Q.   Now, I want to ask you -- you said -- you

16   testified that you don't know what kind of burger place

17   you stopped at.  You still don't remember what kind of a

18   burger?

19        A.   No, sir, I do not.

20             MR. BLAYLOCK:  May I approach, Judge?

21             THE COURT:  You may.

22        Q.   (BY MR. BLAYLOCK)  If you read your statement,

23   would it help you remember what kind of a burger place

24   you stopped at if it says it in your statement?

25        A.   Yes.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    201

1      Q.   Okay.  Look it over and read that area in there
2   and see if you can find where the --
3      A.   (Witness complies).
4      Q.   Did you find it, sir?
5      A.   No.
6      Q.   You said you stopped at a -- and you've got a
7   Spanish --
8              MR. GALARZA:  Your Honor, we would object.
9   He's leading at this time.
10             THE COURT:  It's overruled.
11     Q.   (BY MR. BLAYLOCK)  Okay.  What I want to ask
12  you, your statement -- does it remind you in your
13  statement you stopped to get a hamburger and a Coke?
14     A.   Yes.
15     Q.   Okay.  Now, look at State's Exhibit Number 11.
16  Is that the hamburger and Coke that you reference in your
17  statement?
18     A.   Yes.
19     Q.   Okay.  Can you tell where you got that from?
20     A.   It looks like Jack-In-The-Box.
21     Q.   Jack-In-The-Box.  Okay.  And you set it on that
22  table?
23     A.   On the table, yes.
24             MR. BLAYLOCK:  I'd like to republish
25  Number 11, Judge.

PAM L. ESQUIVEL, CSR, RPR

1            THE COURT:  Go ahead.

2       Q.   (BY MR. BLAYLOCK)  Now, let's talk a bit about

3  why you didn't -- why didn't you see Ms. Harrison lying

4  on the floor.  I mean, it's not a big house, right?

5       A.   Yes.

6       Q.   Why didn't you see her lying on the floor there

7  when you walked in?

8       A.   Because in her entrance, you could barely go in

9  there because she had a recliner; and on that recliner

10 she had clothes and she had stuff that I couldn't see

11 down on the floor.

12      Q.   Okay.  And I'm showing you State's Exhibit 12.

13 What is this?

14      A.   That's the entrance there.

15      Q.   That's the entrance from the office?

16      A.   Yes.

17      Q.   So this is what you would have been looking

18 at --

19      A.   Yes.

20      Q.   -- as you're walking in the office?

21      A.   Yes.

22      Q.   Okay.  And this stuff here, these clothes, is

23 that what you're talking about --

24      A.   Yes.

25      Q.   -- that obscured your view inside the room?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    203

1        A.   Yes.

2        Q.   Okay.  As you walked on, you could see the bed?

3        A.   Yes.

4        Q.   You looked on the bed?

5        A.   Yes.

6        Q.   Okay.

7                  MR. BLAYLOCK:  I'd like to republish

8    Number 12.

9                  THE COURT:  Go ahead.

10       Q.   (BY MR. BLAYLOCK)  In fact, would it help

11   describe your house better if you had a schematic of your

12   house to reference?

13       A.   Yes.

14       Q.   If you would you step off?

15       A.   (Witness complies).

16       Q.   State's Exhibit Number 33 for reference.  Look

17   this over and tell me if you recognize it.

18       A.   That's my house.

19       Q.   That's the house?  And does this accurately

20   depict how your house is?

21       A.   Yes.

22       Q.   Okay.

23                  THE COURT:  You have to speak up a little

24   louder so we can hear you.

25       A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           204

```
1                    THE COURT:  Thank you.
2                    MR. GALARZA:  Your Honor, I would object
3      to him publishing this to the jury.  It's not been
4      admitted.
5                    MR. BLAYLOCK:  It's just an aid, Judge, to
6      help him describe the house.
7                    THE COURT:  Are you going to offer it
8      or --
9                    MR. BLAYLOCK:  I'm going to offer it, but
10     this is just for demonstrative purposes at this time.
11                   THE COURT:  Well, go ahead and offer it.
12                   MR. BLAYLOCK:  Okay.  State would offer
13     State's Exhibit 33.
14                   THE COURT:  Any objection?
15                   MR. GALARZA:  We would just object at this
16     time that it's not to scale and it was not done by this
17     individual.
18                   THE COURT:  Overruled.  Thirty-three will
19     be admitted.
20                   (State's Exhibit Number 33 admitted)
21                   MR. BLAYLOCK:  Thank you, Judge.
22        Q.   (BY MR. BLAYLOCK)  Okay.  Step back so all the
23     jurors can see.  Where is the front door of your house?
24     Go ahead and take this thing.
25        A.   (Pointing).
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    205

1      Q.   Is that the front door?  Is that the door you
2   came in that night?
3      A.   Yes.
4      Q.   Okay.  Point to it.
5      A.   (Pointing).
6      Q.   All right.  And you would have walked
7   straight -- what route would you have taken?
8      A.   Right here and here.
9      Q.   That's the table right there?
10     A.   Yes.
11     Q.   That's where you set -- that's where you set
12   the Jack-In-The-Box?
13     A.   Yes.
14     Q.   Okay.  Well, from standing right there, can you
15   see -- I mean, is this where you found Mrs. Harrison
16   right there where that little body thing is?
17     A.   Yes.
18     Q.   Well, can you see that from that table?
19     A.   No.
20     Q.   Okay.  And right here is the entrance to her
21   room, correct?  And that picture that's going around,
22   does that show -- where would the obstructions be?
23     A.   Right there.
24     Q.   Okay.  And in fact, on this diagram, what does
25   it say?

1       A.   Pardon?

2       Q.   What does it say on the diagram?

3       A.   Box.

4       Q.   Box -- two boxes, right?

5       A.   Yes.

6       Q.   And on top of those boxes there were some

7  clothes?

8       A.   Yes.

9       Q.   So could you see -- just from standing at the

10 entrance of the door, could you see Ms. Harrison's body

11 on the floor?

12      A.   No.

13      Q.   Okay.  But you could, as you walked by, see the

14 bed as you say?

15      A.   Yes.

16      Q.   Okay.  And where did she keep her head at?

17      A.   This way.

18      Q.   This way?

19      A.   And her feet this way.

20      Q.   Okay.  And you were looking for her feet?

21      A.   Yes.

22      Q.   All right.  And where is your bedroom at?

23      A.   (Pointing).

24      Q.   Back there?

25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    207

1       Q.   And where is your bathroom?

2       A.   Right here.

3            THE COURT:   Can you speak a little louder?

4       A.   Right in here.

5       Q.   (BY MR. BLAYLOCK)   Okay.  So you've got your

6  own bathroom?

7       A.   Yes.

8       Q.   Okay.  Was there any blood found in that

9  bathroom?

10           MR. GALARZA:   Objection, Your Honor.  He's

11  leading the witness.

12           MR. BLAYLOCK:   I'm asking him if there was

13  any, if you know.

14           THE COURT:   Go ahead.

15      A.   No.

16      Q.   (BY MR. BLAYLOCK)   Okay.  And in fact, there's

17  another bathroom.  Where is the other bathroom in this

18  house?  The other bathroom?

19      A.   Oh.  Right here.

20      Q.   Okay.  That's Ms. Harrison's bathroom, right?

21      A.   Yes.

22      Q.   Okay.  And that's where you know some blood was

23  found in there?

24      A.   It was in there.

25      Q.   And you don't know who put it there?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              208

```
 1        A.   I don't know.  It might have been whoever
 2   killed my aunt.
 3        Q.   Like they washed up?
 4        A.   Yes.
 5        Q.   All right.  You can go ahead and sit down.
 6        A.   (Witness complies).
 7        Q.   When you walked up, you said the door was
 8   unlocked and that was unusual; didn't happen, right?
 9        A.   That's correct.
10        Q.   But were you surprised at this?
11        A.   No, not really, sir.
12        Q.   Were you alarmed?
13        A.   No.
14        Q.   All right.  Now, the police took you down that
15   night, right?
16        A.   That's correct.
17        Q.   You had blood on you?
18        A.   Yes.
19        Q.   You had blood on your hands?
20        A.   On one hand, yes, on this hand.
21        Q.   Some on your clothes?
22        A.   Yes.
23        Q.   Okay.  And the police took your clothes from
24   you?
25        A.   That's correct.
```

1       Q.   And gave you something else to wear, right?

2       A.   That's true.

3       Q.   Now, let me ask you, in all that experience

4    with the police, did they treat you badly?

5       A.   Yes.

6       Q.   You feel like you were mistreated?

7       A.   Yes.

8       Q.   Okay.  At the beginning were you a suspect?

9       A.   Yes.

10      Q.   And you -- I mean, did the officers tell you

11   that everybody's a suspect at the beginning of a

12   homicide?

13      A.   Yes.

14      Q.   Did the officers ever lie to you?

15      A.   Yes, a lot of times.

16      Q.   Like what?  Tell me how.

17      A.   Like -- well, maybe not lie, but they would

18   tell me that I had killed her and all this.

19      Q.   Okay.  All right.  So, did they force you to

20   say something that wasn't true?

21      A.   No.

22      Q.   In fact, you told the same story you've told

23   today time and time again?

24      A.   Yes, sir.

25      Q.   They put a little pressure on you?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    210

```
1        A.    Yes.
2        Q.    And they asked, "Why did you kill her?"
3        A.    Yes.
4        Q.    You took that as being mean to you?
5        A.    No, because that's their duty, their job.
6        Q.    Oh, so -- I mean, do you think you were
7   mistreated or not?
8        A.    Well --
9              MR. GALARZA:  Objection, Your Honor.
10   Asked and answered already.
11             THE COURT:  Overruled.
12       Q.    (BY MR. BLAYLOCK)  You can answer.  Do you
13   think you were mistreated or not?
14       A.    In a way, yes.  Yes, I was.
15       Q.    Okay.  But you know the officers were doing
16   their duty?
17       A.    Yes.
18       Q.    All right.  Did they ever do anything bad to
19   you other than -- other than put some pressure on you?
20       A.    I got hit a couple of times.
21       Q.    What?
22       A.    I got hit a couple of times.
23       Q.    What do you mean?
24       A.    I got hit.
25       Q.    Like how?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        211

1         A.    Right here on my head.

2         Q.    Accidentally?

3         A.    No.  With his finger like this.

4         Q.    All right.  Your statement -- do you still have

5    your statement?

6         A.    Yes.

7         Q.    All right.  And when did you sign that

8    statement?

9         A.    I never paid attention.

10        Q.    Well, look at it.

11        A.    Oh, it's here.  It was on the -- on September

12   the 7th.

13        Q.    What time?

14        A.    2:06 p.m.

15        Q.    Okay.  2:00 in the afternoon?

16        A.    In the afternoon.

17        Q.    That's when you sobered up enough for them to

18   take that statement?

19        A.    That's true.

20        Q.    And that's your signature on it?

21        A.    Yes.

22        Q.    All right.  And is that what you told the

23   police?

24        A.    Yes.

25        Q.    They didn't try to make up something to make

STATE OF TEXAS VS. RUBEN GUTIERREZ                    212

```
1    you sign?
2         A.   No, never.
3         Q.   And you were intoxicated, right?
4         A.   Yes.
5         Q.   The police didn't like that, right?
6         A.   That's true.
7         Q.   Now, he asked you why you didn't go for help
8    after you discovered your aunt was dead and cold.
9         A.   Because I had already called my aunt.
10        Q.   Okay.  You --
11        A.   And she had called 911; and 911 called me and
12   reassured me that they were -- help was on the way.
13        Q.   Okay.  So it's all happening pretty fast?
14        A.   Yes.
15        Q.   Okay.  So you call your aunt; and then how long
16   does it take for the phone to ring?
17        A.   A few seconds.
18        Q.   And then you talked to 911?
19        A.   Yes.
20        Q.   And then how long does it take for EMS and the
21   police to arrive?
22        A.   It just took minutes, a matter of minutes.
23        Q.   All right.  And so did you have time to go for
24   help with any of the neighbors?
25        A.   No.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          213

1        Q.   Did you ever take any of your aunt's money
2   without her knowledge?
3        A.   No.
4        Q.   Why not?
5        A.   Because I didn't need to.
6        Q.   Why?
7        A.   Because whatever I wanted, all I had to do was
8   ask and I'd get it.
9        Q.   Okay.  And -- so you didn't need to?
10       A.   No.
11       Q.   Did you like your lifestyle, drinking every day
12  and working during the day?
13       A.   Yes.
14       Q.   Do you still do that?
15       A.   Not anymore.
16       Q.   Why did you quit?
17       A.   Because I was just doing wrong, just ruining
18  myself.
19       Q.   Okay.  And when did you quit?
20       A.   I quit awhile back.  Sometimes I drink, yes,
21  but not anymore, not like I used to, every day, every
22  day.
23       Q.   All right.  And the police did come pick you up
24  at the funeral home, right?
25       A.   Yes, that's true.

1      Q.  And were you causing a disturbance?

2      A.  No.  As a matter of fact, when the police came

3  to pick me up, there was nobody there.  I was there

4  alone.

5      Q.  What time of day was it?

6      A.  It must have been around two or 3:00 in the

7  afternoon I think it was.

8      Q.  And he asked you, "Would it surprise you if one

9  of your relatives had called the police to come get you?"

10  What if they did?

11      A.  Well, I wouldn't know because, like I say,

12  there was nobody there.  I was just -- I was by myself

13  standing next to my aunt there by her casket.

14      Q.  At that time when they get there?

15      A.  Yes.

16      Q.  But earlier had you done anything to cause a

17  disturbance?

18      A.  No.

19      Q.  Now, why had there been an add-on at the house?

20      A.  Because my -- I have another aunt that she's

21  ill and she's in a nursing home.  And at that time she

22  was in a school, private school where she was -- and my

23  aunt wanted to bring her home with her to care for her.

24  And that's how come she built that one other room.

25      Q.  Okay.  Did she ever move in?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                215

```
 1        A.    No, she never -- my aunt never got to bring her
 2   in.
 3        Q.    Why not?
 4        A.    Because she got very ill.  She's -- and also,
 5   my aunt, the one that's in the nursing home now, also got
 6   real ill and she just couldn't make it.
 7        Q.    Okay.  So she got too sick to move in to the
 8   added-on room?
 9        A.    Yes.
10        Q.    All right.  Now, why would your aunt be afraid
11   of you?
12        A.    I don't know.
13        Q.    Okay.  He asked you, "Would it surprise you if
14   somebody had said your aunt was afraid of you?"
15              And you said no, it wouldn't surprise you.
16              Why wouldn't that surprise you?  Did you
17   understand that question?
18        A.    No, not exactly.
19        Q.    I mean, was your aunt afraid of you?
20        A.    No.
21        Q.    She didn't like you when you drank?
22        A.    That's right.
23        Q.    Do you have a problem with that, people don't
24   like to be around you when you drink?
25        A.    Pardon?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                     216

1        Q.   Do you have a problem with that, people don't
2    like to be around you when you drink?
3        A.   No.
4        Q.   She didn't like it?
5        A.   No.
6        Q.   Occasionally you guys had fights?
7        A.   Yes.
8        Q.   But they were word fights?
9        A.   Yes.
10       Q.   Did you ever strike your aunt?
11       A.   No.
12       Q.   Did she ever strike you?
13       A.   No.
14       Q.   Do you know anything else about the death of
15   your aunt?
16       A.   No, I don't.
17       Q.   Did you ever, even while you were drunk, tell
18   Ruben that she had a lot of money and he ought to come
19   take it and split it with you?
20       A.   No, sir.
21       Q.   That never happened?
22       A.   No, sir.
23       Q.   Okay.  So if somebody says that did happen,
24   then they're telling a lie?
25       A.   Yes, they are.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        217

```
1                    MR. BLAYLOCK:  I'll pass the witness.
2                    MR. GALARZA:  May I proceed, Your Honor?
3                    THE COURT:  You may.
4                         RECROSS-EXAMINATION
5    BY MR. GALARZA:
6         Q.    Did you ever make threats that you were going
7    to kill your aunt?
8         A.    No.
9         Q.    You stated that the officers treated you badly;
10   is that correct?
11        A.    That's correct.
12        Q.    And that they even hit you a couple of times?
13        A.    That's true.
14        Q.    During the time that you were being questioned,
15   how many officers were around there?
16        A.    I'd say maybe seven.
17        Q.    So there was seven officers and they --
18        A.    I'd say around seven.
19        Q.    And you were the only one that was there?
20        A.    Sure.
21        Q.    And there was -- you didn't have an attorney?
22   You didn't have anybody else?
23        A.    No.
24        Q.    Every single time that you went back, were
25   there several officers also?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          218

```
 1        A.   Yes.
 2        Q.   And again you didn't have an attorney?
 3        A.   No.
 4        Q.   Did you ever do anything for them to hit you?
 5        A.   No.
 6        Q.   Did you ever do anything for them to treat you
 7   badly?
 8        A.   No.
 9        Q.   As far as your information, you were trying to
10   cooperate with them; is that correct?
11        A.   Yes.  I was just saying what I knew.
12        Q.   Okay.  And you would go over there voluntarily?
13        A.   Yes.
14        Q.   If they told you, "Come back tomorrow," you
15   would go there voluntarily?
16        A.   That's true.
17        Q.   And you went over there four or five times?
18        A.   Yes.
19        Q.   Even though they were treating you badly?
20        A.   Yes.
21        Q.   Did any officer ever say, "No, don't hit him"?
22        A.   The first night, that's when I got hit.  And
23   then when they took me home, I told the officer and I
24   told my uncle what had happened and that -- the sergeant
25   that took me home, my uncle told him that they'd better
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    219

1    not hit me anymore.  And I think he brought it to their
2    attention because they didn't hit me afterwards.
3         Q.    You stated that you spoke to the police
4    officers like around four or five times; is that correct?
5         A.    That's true.
6         Q.    Have you spoken to the D.A.'s Office before
7    today?
8         A.    This morning, yes.
9         Q.    This morning?
10        A.    Yes.
11        Q.    Okay.  Besides this morning, have you ever
12   talked to them?
13        A.    Yes.
14        Q.    How many times?
15        A.    Once.
16        Q.    Was it Ms. Fischer or Mr. Blaylock?
17        A.    Mr. Blaylock.
18        Q.    What did you all talk about?
19        A.    We -- he told me to tell the truth.
20        Q.    And you went through the statement; is that
21   correct?
22        A.    Yes.
23        Q.    And at that point, mainly as to what your
24   statement was going to be here today; is that correct?
25        A.    Pardon?

STATE OF TEXAS VS. RUBEN GUTIERREZ                        220

1      Q.   As to what your statement was going to be here
2  today, is that what you all talked about?
3      A.   Yes.
4      Q.   Did you ever talk to any of the investigators
5  from the D.A.'s Office?
6      A.   No.
7      Q.   Did any police officers ever go question you
8  again at your house?
9      A.   No.
10              MR. GALARZA:   Could I approach, Your
11  Honor?
12              THE COURT:   You may.
13     Q.   (BY MR. GALARZA)   Let me show you what -- you
14  stated that this is a picture of your house; is that
15  correct?
16     A.   Yes.
17     Q.   Okay.  And you stated that this is the entrance
18  where you came in through?
19     A.   I can't see.
20     Q.   This is the entrance where you came in
21  through --
22     A.   Yes.
23     Q.   -- that night --
24     A.   Yes.
25     Q.   -- or early in the morning?

1       A.    Yes.

2       Q.    Okay.  You went directly to the table?

3       A.    Yes.

4       Q.    Okay.  You stated that all the lights were on?

5       A.    Yes.

6       Q.    Okay.  There's a box right here?

7       A.    Yes.

8       Q.    Okay.  Do you all still -- where do you all go

9   into this bedroom through?  You can go in through both

10  sides?

11      A.    Yes.

12      Q.    Okay.

13      A.    Here, barely.  She was the only one that fits

14  through there because it was real narrow.

15      Q.    Okay.  But this light was on; is that correct?

16      A.    Yes.

17      Q.    Okay.  And it's narrow, but you can see inside?

18      A.    Yes.

19      Q.    Okay.  So as you walked in, you can see into

20  this bedroom?

21      A.    Yes.  You can see into the bed, but you can't

22  see to the floor because you can't because of all those

23  boxes and clothes that were there.

24      Q.    Okay.  There's boxes right here --

25      A.    Yeah, and clothes --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    222

```
 1        Q.    -- and right here?
 2        A.    -- clothes on top of them.
 3        Q.    Okay.  But is there any boxes in this area
 4   right here?
 5        A.    No.
 6        Q.    Not in the walking area --
 7        A.    No.
 8        Q.    -- is that correct?  And then you went in, you
 9   put the hamburger --
10        A.    Yes.
11        Q.    -- and the Coke right here on the table?
12        A.    Uh-huh.
13        Q.    Did you come back around --
14        A.    No.
15        Q.    -- through the kitchen or --
16        A.    No.
17        Q.    -- where did you go back to?
18        A.    Through the same way.  In through here.
19        Q.    And how were you able to see the bed from here?
20        A.    When I came right around here, you could see
21   the bed.  About right here you could see the bed this
22   way.
23        Q.    Okay.  And so as you saw the bed, you didn't
24   see anything there?
25        A.    Correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                223

1        Q.   And that's when you went out?
2        A.   That's true.
3        Q.   You stated that you never took any money from
4   your aunt; is that correct?
5        A.   That's true.
6        Q.   You never stole any money?
7        A.   That's true.
8        Q.   Okay.  But if you would ask her for loans, she
9   would give you loans?
10       A.   Yes.
11       Q.   And then when you would try to repay them, she
12   didn't want to take the money?
13       A.   That's true.
14       Q.   You stated that you had some blood on your
15   hands?
16       A.   That's correct.
17       Q.   And that blood, where did it come from?
18       A.   From when I reached under her.
19       Q.   When you tried to pick her up?
20       A.   Yes.
21       Q.   Did you ever step on the blood?
22       A.   I don't think so, no.
23       Q.   Did the police officers ever take away your
24   shoes?
25       A.   No.  I don't think my shoes, no.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              224

1      Q.   No?  As far as you know, did you have any blood
2  on your shoes?
3      A.   No.
4               MR. GALARZA:  That's all I have at this
5  time, Your Honor.
6               MR. BLAYLOCK:  No further questions.
7               THE COURT:  All right.  You may step down.
8  Thank you.
9               You may call your next witness.
10              MS. FISCHER:  Tino Ortiz.  Judge,
11 Mr. Ortiz was not sworn in earlier.  He was not here that
12 day that we all met.
13              THE COURT:  All right.  Would you raise
14 your right hand, please?
15              **(The witness was sworn in by the Court)**
16              THE WITNESS:  I do.
17              THE COURT:  All right.  Go ahead.
18                   **CLAUDIO ORTIZ III,**
19   having been first duly sworn, testified as follows:
20                   **DIRECT EXAMINATION**
21 **BY MS. FISCHER:**
22      Q.   Mr. Ortiz, will you please tell the jury your
23 full name?
24      A.   Claudio J. Ortiz III.
25      Q.   And what do you for a living?

1       A.    I'm a paramedic for the city.

2       Q.    Everybody calls you Tino?

3       A.    Yes.

4       Q.    Okay.  Now, how long have you been a paramedic

5    for the city?

6       A.    As a paramedic, working two years.

7       Q.    And what is it that you do as a paramedic?

8    Just kind of briefly tell the jury what your job is.

9       A.    The job of a paramedic is just to sustain life

10   if at all possible; in emergencies to provide life if

11   possible; and if there is no life, to, you know, notify

12   the proper authorities or the justice of the peace if

13   it's obvious.

14      Q.    And here in Brownsville, how do you all ride?

15   Do you all ride in two main units?  Do you ride by

16   yourself?  How does that work?

17      A.    It's one unit per area depending on what zone

18   you are in, zones in Brownsville.  And it's a paramedic

19   and an EMT.  The paramedic is the one, of course, that's

20   in charge of the unit.

21      Q.    And that's you?

22      A.    Yes.

23      Q.    Okay.  Now, back on September 5th of 1998, were

24   you working as a paramedic here for the City of

25   Brownsville EMS?

1        A.    Yes, I was.

2        Q.    Okay.  On that day, did you get called out to a

3    residence out on Morningside?

4        A.    Yes, I was called out.

5        Q.    Okay.  Now, was there anyone with you?

6        A.    Just the other -- the EMT in the unit with me

7    was Carlos Elizondo.

8        Q.    And when you get to this residence on

9    Morningside, tell me what it is that you saw.

10       A.    There was a man at the door, and he said that

11   there's something wrong and -- with the lady in the

12   house.  And I couldn't see the lady because the room was

13   completely dark.  And so, he -- I asked him, "Do you have

14   any lighting?"  And he opened -- he went into the room

15   and he turned on the light; and that's when I noticed

16   that there was a body on the floor face down.

17       Q.    Let's stop right there now, Mr. Ortiz.  When

18   you say there was a man at the door, there was a

19   gentleman that just left this courtroom.  Did you

20   recognize who that was?

21       A.    That was the man who was -- that answered the

22   door.

23       Q.    Okay.  And was anyone else around?

24       A.    No.

25       Q.    Were you and the EMT the first people there on

1   the scene?

2        A.   Yes, we were.

3        Q.   Okay.  Now, let's go, then, to the point where

4   you see the body laying on the floor.  Tell me what you

5   saw on the floor.

6        A.   Well, the body was face down in a pool of

7   blood.  And when we went to examine the body, rigidity

8   had already set in, meaning the hardness, stiffness of

9   the body.  So the body had been, you know, gone for quite

10  some time, at least several hours.

11            And I believe the call came in as a 1078,

12  which is a 10 code that the city uses which means man

13  down or somebody down.  That's how the call came in.  So

14  there was no police or anything on the scene, just the

15  ambulance.

16            And I -- also when I was examining the

17  body, I noticed that there had been -- appeared to be

18  some blood on the back of her neck.  And so, it just

19  didn't look right.  And also the appearance of the room

20  looked like it appeared to be ransacked, that somebody

21  had gone through personal belongings.  Things were thrown

22  on the bed and so forth.  So at that point I just

23  notified the authorities.

24        Q.   Why is that?

25        A.   It just didn't look right the way the body was

1   and the markings of blood on the back of her neck.

2        Q.   Okay.  I'm sorry.  When you say it didn't look

3   right, what are you trying to tell the jury?

4        A.   Due to the way the room was ransacked or like

5   somebody had gone through it and due to the blood on the

6   back of the neck from the patient falling, when you fall,

7   it's -- how are you going to get blood on the back of

8   your neck from falling?  So that's when I called the

9   authorities and --

10       Q.   Because you did not think this was a natural

11  death?

12       A.   No.

13       Q.   Okay.

14       A.   Not at all.

15       Q.   Now, when you say that you touched the body,

16  you felt that it was rigid.  That means it had been there

17  a while, several hours you said.  What about the

18  temperature of the body?

19       A.   Usually when a body has recently expired, it'll

20  be still warm.

21       Q.   What about this body?

22       A.   But this body was very cold due to the rigor

23  mortis that had set in.  Obviously, you know, there was

24  no -- nothing working, no functioning organs.

25       Q.   And that told you that she had been dead for

1   awhile?

2       A.   Yes.

3       Q.   Okay.  Now, one other question I want to ask

4   you, Mr. Ortiz, did you move the body?

5       A.   No, I did not.

6       Q.   Okay.  And why didn't you move the body?

7       A.   I requested C.I.D., which is the criminal

8   investigations division.  And I had worked with them

9   before and I know that they don't want anything touched.

10  They don't even want you to step around the body.  So I

11  basically stood back and waited for the proper

12  authorities to arrive.  And I didn't leave the room until

13  the authorities got there.

14      Q.   Okay.

15      A.   So there was no tampering with the body or

16  anything like that.

17      Q.   Okay.  And do you remember who the first

18  officer on the scene was?

19      A.   No.  I don't --

20      Q.   Once again, there was a gentleman out in the

21  hallway today, one of the Brownsville Police Department

22  officers.  Do you recognize any of those?

23      A.   I believe he was one of the officers on the

24  scene, but --

25      Q.   Okay.  The man --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    230

1      A.    -- I don't know.

2      Q.    The man in the sport coat?

3      A.    Yes.

4      Q.    Okay.  Now, what about the EMT that arrived

5  there with you?  You had said before you're the

6  paramedic, so you're in charge of the unit.  Did he go

7  into the crime scene?

8      A.    He was with me, but he did not examine the

9  body.

10     Q.    And so that was your job?

11     A.    Right.

12     Q.    And he kept away?

13     A.    Right.

14     Q.    Okay.

15            MS. FISCHER:  Your Honor, may I approach

16  the witness?

17            THE COURT:  You may.

18     Q.    (BY MS. FISCHER)  Mr. Ortiz, I want to show

19  you a couple of photos.  Mr. Ortiz, look at State's

20  Exhibit Number 16.  It's a picture of Ms. Harrison lying

21  there.  Is that familiar to you?

22     A.    Yes.

23     Q.    Okay.  Is that what you saw when you went in

24  the room that day?

25     A.    Yes, it was.

1    Q.   Okay.  Here's another one, State's Exhibit
2  Number 2.  Is that same or similar to what you saw when
3  you went into the Harrison home?
4    A.   Yes.
5    Q.   And the Harrison home is in Cameron County,
6  Texas; right?
7    A.   Yes, it is.
8    Q.   Okay.  And let's go ahead and look at State's
9  Exhibit Number 3.  Once again, is that what you saw when
10  you walked into the Harrison home?
11    A.   Yes.
12    Q.   Okay.
13            MS. FISCHER:  Your Honor, may I republish
14  these exhibits to the jury?
15            THE COURT:  You may.
16            MS. FISCHER:  I pass the witness, Your
17  Honor.
18            MR. GALARZA:  Can I proceed, Your Honor?
19            THE COURT:  You may.
20                    **CROSS-EXAMINATION**
21  **BY MR. GALARZA:**
22    Q.   Mr. Ortiz, good afternoon.
23    A.   Good afternoon.
24    Q.   You stated that you were the first ones to
25  arrive there?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    232

1        A.    Yes, sir.

2        Q.    Okay.  And you stated your EMT stayed -- did he

3   stay inside the vehicle or --

4        A.    He came off with me because we didn't know what

5   was going on, a possible fall.  And when we got there,

6   that's when I just told him, "Okay.  Let's -- it's my

7   call from here."  He didn't proceed with any --

8        Q.    Did he go into the residence at all?

9        A.    Yes, he was with me in the room.

10       Q.    You stated that the call came in as a 1078.

11  That means man down or something like that?

12       A.    Man down.

13       Q.    Okay.  Do you remember what time the call came

14  in?

15       A.    1:00 in the morning, 2:00 in the morning, early

16  in the morning.

17       Q.    Did you give a statement?

18       A.    A statement as --

19       Q.    To the police officers?

20       A.    Just as far as just the condition of the body

21  and the sight of the blood in this back of the head; and

22  that's the only thing.

23       Q.    And did you sign the statement?

24       A.    No.  There was no signing, just an EMS

25  statement.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    233

1           MS. FISCHER:  Your Honor, just to clarify

2    the record, he did not give a written statement to the

3    Brownsville Police Department.

4           Q.   (BY MR. GALARZA)  Okay.  Once you got there,

5    you stated you got there between one and two -- the call

6    came in between one and two.  And then how much time did

7    it take you to get there?

8           A.   About less than five minutes, five, no more

9    than five minutes.  We were real close by.

10          Q.   Okay.  How many individuals were there at the

11   residence at the time you got there?

12          A.   Just the man that answered the door --

13          Q.   Okay.

14          A.   -- when we first got there.

15          Q.   When you first got there, did you knock on the

16   door or was he already at the door?

17          A.   The door was open and the man came to the door

18   as we approached it.

19          Q.   So he was not standing there at the door when

20   you got there?

21          A.   I just remember the door being open.  And we

22   went up to the door and the man appeared, but I don't

23   remember him standing there.

24          Q.   Okay.  What -- did the man tell you at that

25   point where the lady was at?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          234

```
 1        A.    Yes.  In the room.  Where we were, it was an
 2   office building.  And her bedroom is -- one room, the
 3   office; and then her bedroom is right to the right
 4   inside, right in the -- after the office.
 5                   MR. GALARZA:  Can I approach, Your Honor?
 6                   THE COURT:  You may.
 7        Q.    (BY MR. GALARZA)  Let me show you what's been
 8   marked as State's Exhibit Number 33.  Okay.  This is the
 9   entrance; is that correct?
10        A.    Yes, sir.
11        Q.    Okay.  And this is the office that you're
12   talking about?
13        A.    Yes, sir.
14        Q.    Okay.  And then once you go in, this is the
15   bedroom you're talking about?
16        A.    Yes.
17        Q.    Okay.  And this is where you found the
18   individual?
19        A.    Yes, sir.
20        Q.    Okay.  Did he tell you where the individual was
21   at?
22        A.    No.
23        Q.    Did he tell you anything at that point?
24        A.    Just that there might be something wrong with
25   her, if I could check her out.  And that's when I told
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          235

1    him, "Where -- where is she?"  And then after I asked
2    him, he told me that she was in the next room.  And it
3    was completely dark.  I could not see into the room.
4         Q.   Okay.  And once he told you this, were you able
5    to understand everything he was telling you?
6         A.   Yes, sir.
7         Q.   What was his demeanor like at that point?
8         A.   I don't -- I don't recall other than just being
9    scared --
10        Q.   Okay.
11        A.   -- but I don't know how to describe that.
12        Q.   Was he crying?
13        A.   A little bit.  Emotional.
14        Q.   Was he intoxicated?
15             MS. FISCHER:  Your Honor, I would object
16   to that.  I mean, intoxication is a legal definition that
17   this paramedic is not equipped to make a call on.
18             THE COURT:  Rephrase your question.
19        Q.   (BY MR. GALARZA)  As far as your knowledge, as
20   far as you dealing with this individual, could you smell
21   any alcohol on him?
22        A.   No, I could not, sir.
23        Q.   How long were you there before any other
24   officers or anybody else showed up?
25        A.   That's hard to tell.  Maybe 15 minutes, 20

1   minutes between when the officers arrived and when I

2   requested them.

3       Q.   So from 15 to 20 minutes it was just you, the

4   EMT, and also this other individual?

5       A.   Yes, sir, but the individual was going outside,

6   coming back inside, going outside, back and forth, kind

7   of pacing himself.

8       Q.   Okay.  And you stated that you did not move

9   this individual at all, is that correct, the lady?

10      A.   I stayed with the body until the police got

11  there.

12      Q.   Do you remember which police officer showed up

13  first?

14      A.   No, sir.

15      Q.   What did you do once the police officer

16  arrived?

17      A.   I stepped back.  I just gave him, I believe, a

18  report of the situation; and I just let them handle it.

19              MR. GALARZA:  That's all I have at this

20  time, Your Honor.

21              MS. FISCHER:  I have nothing further, Your

22  Honor.  May this witness be excused?

23              THE COURT:  Any objection?

24              MR. GALARZA:  No objection, subject to

25  recall.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    237

1          THE COURT:  You're excused to go.

2          THE WITNESS:  Thank you, Judge.

3          THE COURT:  Thank you.

4          I tell you what, this is a good time to

5   take a break.  Ladies and gentlemen of the jury, remember

6   the instructions I've given you not to discuss this case

7   among yourselves or with anyone else, not to form or

8   express any opinions.  We'll take about a 15 minute

9   break.

10          **(Recess from 3:16 p.m. to 3:40 p.m.)**

11          **(Jury not present)**

12          THE COURT:  Are you all ready for the

13  jury?

14          MS. FISCHER:  Judge, the next thing we're

15  going to do is bring in the young lady to prove up the

16  911 tape.  And so we've got a tape recorder ready and set

17  up to go so that we can publish it to the jury, okay?

18          THE COURT:  That's fine.

19          MR. REYES:  The only thing we wanted to

20  bring up, Judge, before we start is that the Court had

21  overruled one our attempts to introduce evidence

22  regarding Avel Cuellar's tattoos.

23          The evidence that were going to introduce

24  with respect to that was that he had tattoos which

25  signified that he was member of the Mexican Mafia when he

STATE OF TEXAS VS. RUBEN GUTIERREZ                    238

1    was in prison; and that, in fact, he still is a member of

2    that gang; and that one month before this trial he did

3    have those tattoos covered up.

4              We were going to use this evidence for

5    purposes of impeachment and also going as to his

6    credibility.

7              THE COURT:  Okay.  It's on the record.

8              MS. FISCHER:  Judge, the last thing I

9    guess we can take up before we bring the jury in just so

10   that we have it clear, we had a 911 transcript made by

11   Ms. Reyes, one of the court reporters here.  She has left

12   on a trip to go away, but she has certified it as an

13   official transcript.  I gave a copy of it to Mr. Reyes.

14             I don't know what kind of objections there

15   are going to be about that, but we're prepared to enter

16   that into evidence also and if it's okay with the Court.

17   She certified it and she had told me that you've allowed

18   her to interpret before and that you were comfortable

19   with her; and so, that's why we chose her to prepare the

20   transcript.

21             Is that all right with the Court?  She

22   made a certified -- she certified that it was an

23   official --

24             THE COURT:  Because some of it was in

25   Spanish?

1              MS. FISCHER:  Yes.

2              THE COURT:  All right.

3              MR. REYES:  We're just going to object,

4    Your Honor, that before, you know, the Court does allow

5    that tape in, not all the voices have been identified.

6    One of the voices in that tape has not come to testify or

7    the person whose voice is on that tape has not come to

8    testify.  We're not able to cross-examine them before the

9    Court allowing that tape in as evidence.

10             Also, with respect to the transcript, I

11   don't know if they intend to offer it or not, but we

12   would object.  We would ask that we be allowed to

13   cross-examine Ms. Virginia Reyes before the transcript is

14   allowed as evidence.

15             THE COURT:  Okay.  I'll take that up at

16   the time that it's offered.

17             MS. FISCHER:  And, Judge, I'm not going to

18   offer the transcript.  I know I'm not allowed to do that.

19   It's merely a demonstrative purpose for the jury to use

20   while they are listening to the tape.  That's my

21   understanding of what the rule is.  I can't put the

22   transcript into evidence.

23             THE COURT:  To follow the tape?

24             MS. FISCHER:  Exactly.

25             THE COURT:  Okay.  Bring them in.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    240

```
1                    (Jury brought into the courtroom)
2                    THE COURT:  All right.  You may be seated.
3              You may call your next witness.
4                    MS. FISCHER:  Claudia Leyva.
5                    THE COURT:  All right.  Could you raise
6    your right hand, please?
7                    (The witness was sworn in by the Court)
8                    THE WITNESS:  I do.
9                    THE COURT:  You may be seated.
10                        CLAUDIA LEYVA,
11      having been first duly sworn, testified as follows:
12                      DIRECT EXAMINATION
13   BY MS. FISCHER:
14        Q.    Good afternoon, Ms. Leyva.
15        A.    Good afternoon.
16        Q.    Can you please tell the jury your full name?
17        A.    Claudia Leyva.
18        Q.    Ms. Leyva, what do you do for a living?
19        A.    I'm a 911 operator.
20        Q.    Okay.  Where do you work?
21        A.    At the Brownsville Police Department.
22        Q.    How long have you been a 911 operator?
23        A.    A year and seven months.
24        Q.    And is that full time there at the Brownsville
25   Police Department?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    241

1        A.    Uh-huh.

2        Q.    What kind of training do you have that allows

3   you to be a 911 operator?

4        A.    I have State training.  They send us out of

5   town for training for 911 operator for emergency, fire,

6   EMS, and police situations.

7        Q.    Okay.  And, Ms. Leyva --

8               MS. FISCHER:  Your Honor, may I approach

9   the witness?

10              THE COURT:  You may.

11       Q.    (BY MS. FISCHER)  Ms. Leyva, well, let's --

12  before I show you anything, let me talk a little bit more

13  about what we're talking about here in court.  I forgot.

14              September the 5th of 1998, were you

15  working for the Brownsville Police Department as a 911

16  operator back then?

17       A.    Yes, I was.

18       Q.    And were you working on that particular day?

19       A.    Yes I was.

20       Q.    And we're talking about -- September 5th would

21  have been a Saturday and going on into September 6th, the

22  late night hours, I guess what they call the night shift.

23       A.    Yes, graveyard.

24       Q.    Okay.  You were working on that day?

25       A.    Uh-huh.

1      Q.   On that day, did you ever have the opportunity
2   to get a call regarding an elderly woman that was hurt in
3   her home off of Morningside?
4      A.   Yes, I did.
5      Q.   Now I'm going to show you what's been marked as
6   State's Exhibit Number 23; and I'm going to ask if you've
7   had an opportunity to listen to the contents of State's
8   Exhibit Number 23?
9      A.   Yes, I have.
10      Q.   And in listening to the contents of State's
11   Exhibit Number 23, were you familiar or did you recognize
12   all of the voices that were on the tape?
13      A.   I recognized my voice.
14      Q.   You recognized your voice.  And then there are
15   two other voices on the tape; and you don't know who
16   those people are, do you?
17      A.   I don't.
18      Q.   Okay.  But in listening to the tape, is this
19   tape an exactly -- an exact copy of what you actually
20   heard over the phone?
21      A.   Yes.
22      Q.   Okay.  So has this in any way been altered
23   with?
24      A.   No.
25      Q.   In any way has it been tampered with?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    243

```
1      A.   No.
2      Q.   Is this an exact rendition of what happened on
3   that 911 call that you got that morning?
4      A.   Yes, it is.
5      Q.   Okay.  Now, in listening to this tape, State's
6   Exhibit Number 23, how are the 911 tapes created over at
7   the police department?
8      A.   We have a machine that records every single
9   phone call that comes in or goes out of the building.
10      Q.   Okay.
11      A.   It includes the 911 calls, people just calling
12   the regular P.D. line which is a 7000 line, or just us
13   calling like to our residence or anywhere.  They are
14   recorded.
15      Q.   Okay.  Is there any actual person who has to
16   like push the record button every time or is it
17   automatically done?
18      A.   It's changed every 24 to 72 hours.
19      Q.   Okay.
20      A.   It's a tape that gets changed.
21      Q.   So it continually runs --
22      A.   Yes.
23      Q.   -- during that point in time?
24      A.   Yes.
25      Q.   Okay.  If the tape is copying, then it's
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          244

1    obviously working like it's supposed to?

2         A.   Yes.  Uh-huh.

3         Q.   Okay.  And you've listened to this and the 911

4    was recorded?

5         A.   Yes.

6         Q.   Okay.  And this was made back on September -- I

7    guess it would be the early morning hours of

8    September the 6th when you were working as a 911

9    operator?

10        A.   Yes.

11                  MS. FISCHER:  Your Honor, at this time we

12   would offer Exhibit Number 23 into evidence.

13                  MR. REYES:  May I take this witness on

14   voir dire, Your Honor?

15                  THE COURT:  Go ahead.

16                  **VOIR DIRE EXAMINATION**

17   **BY MR. REYES:**

18        Q.   You stated that the only voice that you

19   recognized on that tape is your own; is that correct?

20        A.   I heard my voice and I heard the female calling

21   in --

22        Q.   Okay.  My question, ma'am, was, the only voice

23   that you recognized on that tape is your own; is that

24   correct?

25        A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    245

1      Q.   You don't know who the lady that was calling in
2   is; is that correct?
3      A.   No.
4      Q.   You don't know her name?
5      A.   I don't recall the name.
6      Q.   Okay.  At this point do you recall her name?
7      A.   No, I don't.
8      Q.   The person -- the male subject that's on that
9   tape or on that recording, do you know who he is?
10      A.   No, I don't.
11      Q.   Do you know his name?
12      A.   No, I don't.
13      Q.   So you have no idea who's actually calling you;
14   is that correct?
15      A.   I don't --
16      Q.   I'm sorry.  You need to answer.
17      A.   No, I don't have an idea.
18      Q.   Now, do you know -- when is it that you
19   listened to this tape?
20      A.   When did I listen to this tape?
21      Q.   Yes.
22      A.   About a week ago.
23      Q.   So you don't know whether or not any changes
24   have been made from that last time that you listened to
25   this tape; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          246

1        A.    No.

2        Q.    I'm sorry?

3        A.    No.

4        Q.    And has that tape been in your care, custody,

5    and control since one week ago?

6        A.    No.

7        Q.    You don't know where it's been, do you?

8        A.    No, I don't.

9        Q.    And you stated that that is a copy; is that

10   correct?

11       A.    Yes, from the original.  We have an original

12   tape at the police department; and they usually make

13   copies --

14       Q.    Okay.  So --

15       A.    -- of the original tape.

16       Q.    So the original tape is, in fact, available; is

17   that correct?

18       A.    I believe so.  I don't know.  You would have to

19   check with my lieutenant.  He's the one in charge of

20   that.

21       Q.    So, you don't know whether or not we could get

22   the actual tape if we go out to --

23       A.    I don't know.  I'm not in charge of that.

24       Q.    And as far as you know, those other voices

25   that -- the female voice that's on that tape, you've

1    never heard it before; is that correct?

2         A.   No, I haven't.

3         Q.   The male voice that's on that tape, you've

4    never heard it before; is that correct?

5         A.   No, I haven't.

6         Q.   So you have no idea who they are?

7         A.   I have no idea.

8                   MR. REYES:  I have nothing further, Your

9    Honor.

10                  We would object.  First of all, there's a

11   female voice whose name they have not recognized.  That

12   person has not been made available for us to

13   cross-examine in court.  That would be hearsay.

14                  We would also object because this is a

15   copy of the original.  The proper predicate has not been

16   laid for the introduction of a copy as opposed to the

17   original.  And the names and voices of those three -- of

18   two individuals have not been properly authenticated.

19                  MS. FISCHER:  Your Honor, Mr. Cuellar said

20   that he listened to the tape and that he was able to

21   identify those other two voices --

22                  THE COURT:  I remember that testimony.

23   Just clear up the copy part; is that an exact duplicate

24   of the tape or not?

25

```
1                    DIRECT EXAMINATION CONTINUED
2    BY MS. FISCHER:
3         Q.   Ms. Leyva, is that an exact copy of the 911
4    call that happened on September the 6th?
5         A.   That's the exact call.  I remember every single
6    thing he told me.
7                    THE COURT:  The objection will be
8    overruled.
9                    (State's Exhibit Number 23 admitted)
10                   MS. FISCHER:  Your Honor, at this time
11   we'd like to publish it to the jury.
12                   THE COURT:  Go ahead.
13                   MS. FISCHER:  Oh, I'm sorry, Judge.
14   Before I do that, there's one matter I wanted to take up;
15   and that's the matter of the transcript that we have had
16   prepared.  The State has had the official court reporter
17   for the district courts, Ms. Virginia Reyes, prepare a
18   transcript as some of the tape does contain the Spanish
19   language.
20                   We'd like at this time to be able to allow
21   the jury to read along with this transcript that Ms.
22   Reyes has certified to.  We've provided a copy to defense
23   counsel in advance about the original signing by
24   Ms. Reyes for the Court.
25                   And Ms. Leyva has also had the opportunity
```

1    to go over this transcript with the tape.

2        Q.    (BY MS. FISCHER)   And, Ms. Leyva, you and I

3    sat down and went over this transcript, did we not?

4        A.    Yes.

5        Q.    And I asked you to read it word for word; and I

6    asked you to tell me if this was a correct transcript of

7    what's on that tape in there?

8        A.    Yes.

9        Q.    Is what's in this paper -- and you can take a

10   look at it, too.  When you and I went over this in my

11   office, is what's in that paper a correct transcript of

12   what's on this tape?

13       A.    Yes, it is.

14             MR. REYES:   Judge, we're going to object

15   to the jury being handed this transcript.  First of all,

16   they stated that Ms. Virginia Reyes has only translated

17   the Spanish portions of that tape into English.   There

18   has been no evidence presented as to who it is that

19   transcribed that tape into the -- this transcript.   And

20   we would object because we have not been provided an

21   opportunity to cross-examine that individual as well as

22   Ms. Reyes.

23             THE COURT:   Is this the complete

24   transcription of the whole tape or part of the tape or --

25             MS. FISCHER:   Judge, this is everything

1    from beginning to end.

2                    THE COURT:  Okay.  All right.  The

3    objection will be overruled.

4                    MS. FISCHER:  Your Honor, may I pass these

5    out to the jury, then, for their aid?

6                    THE COURT:  As an aid, you may pass them

7    out.

8                    **(State's Exhibit Number 23 was played)**

9        Q.   (BY MS. FISCHER)  Ms. Leyva, is that what

10   happened that early morning hour?

11       A.   Yes.

12                   MS. FISCHER:  I pass the witness, Your

13   Honor.

14                   MR. REYES:  May I proceed, Your Honor?

15                   THE COURT:  You may.

16                        **CROSS-EXAMINATION**

17   **BY MR. REYES:**

18       Q.   What time did you start your shift on September

19   the 5th of 1998?

20       A.   10:45.

21       Q.   Is that in the morning or in the afternoon?

22       A.   No.  That's at night, 10:45 p.m.

23       Q.   I can't hear you.  Can you please get closer to

24   the microphone?

25       A.   10:45 p.m.

STATE OF TEXAS VS. RUBEN GUTIERREZ                     251

1      Q.   And that was on September the 5th of 1998; is
2  that correct?
3      A.   Yes.
4      Q.   Now, do you recall what time you received that
5  phone call?  The first one.
6      A.   It was around after 12:30, 12:30, one.
7      Q.   So at the latest that you received it was maybe
8  1:00 in the morning; is that correct?
9      A.   12:30 to 1:30.  It was around that time.
10     Q.   I'm sorry?
11     A.   It was around 12:30 or 1:30.  At that time it
12  was really slow.
13     Q.   And did you yourself make this copy of the
14  recording?
15     A.   No.
16     Q.   Do you know who did?
17     A.   I don't know.
18     Q.   And do you know when that -- a copy of that
19  recording was made?
20     A.   No, I don't.
21     Q.   And do you know where it's been since that
22  week --
23     A.   No.
24     Q.   -- since a week ago that you saw that -- that
25  you heard that tape?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    252

1       A.   No.

2       Q.   You stated that that tape runs continuously for

3    72 hours; is that correct?

4       A.   Yes, around 24 to 72 hours.  It just keeps on

5    running.

6       Q.   And once it runs out, does it come back and

7    rewind and then retape everything?

8       A.   It has a back-up tape.  When the first one

9    finishes, the other one starts; and before it finishes,

10   they change the other one.

11      Q.   So the original is still available; is that

12   correct?

13      A.   Yes.

14      Q.   Other than you taking this 911 call, is there

15   anything else that you did with respect to this case?

16      A.   No.

17                MR. REYES:  I have nothing further, Your

18   Honor.

19                MS. FISCHER:  I have nothing further, Your

20   Honor.  May she be excused?

21                THE COURT:  Any objection?

22                MR. REYES:  Subject to being recalled,

23   Your Honor, we do not.

24                THE COURT:  You're excused to go.  Thank

25   you.

1                        THE WITNESS:  Thank you.

2                        MS. FISCHER:  Thank you, Ms. Leyva.

3                        THE COURT:  You may call your next

4     witness.

5                        MS. FISCHER:  Ramiro Martinez.

6                        Mr. Reyes, do you mind if we could

7     approach the bench for just a minute about something

8     else?

9                        **(Off the record discussion at the bench)**

10                       **(At the bench on the record)**

11                       MS. FISCHER:  Your Honor, at this time the

12    State is going to offer State's Exhibit Number 34 merely

13    for the record purposes.  It will not be published to the

14    jury.  The tape will be the evidence given to the jury,

15    but we'd like this to go up as what the jurors read as

16    the tape was being played.

17                       MR. REYES:  In other words, it won't be

18    admitted it as evidence.  We have no objection to that,

19    Your Honor.

20                       THE COURT:  Okay.  It'll be admitted for

21    purposes of the record.

22                       MR. REYES:  Thank you.

23                       **(State's Exhibit Number 34 admitted for**

24                       **the record only)**

25                       **(End of bench conference)**

1          THE COURT:  All right.  Mr. Martinez,
2   would you raise your right hand, please?
3          **(The witness was sworn in by the Court)**
4          THE WITNESS:  I do.
5          THE COURT:  Okay.  You may be seated.  And
6   if you'll do me a favor, sit up to the microphone and
7   speak into the microphone so we can all hear you, okay?
8          THE WITNESS:  Yes, sir.
9          THE COURT:  Make sure you speak out loud.
10         Go ahead.
11         THE WITNESS:  Yes, Your Honor.
12              **RAMIRO MARTINEZ,**
13   having been first duly sworn, testified as follows:
14              **DIRECT EXAMINATION**
15  BY MS. FISCHER:
16      Q.   Good afternoon, Mr. Martinez.
17      A.   Good afternoon.
18      Q.   Mr. Martinez, make sure that everybody here can
19  hear you, okay?
20      A.   Yes, ma'am.
21      Q.   Okay.  Tell me your full name.
22      A.   Ramiro Martinez.
23      Q.   Okay.  Mr. Martinez, where do you live?
24      A.   I live at 409 Morningside Road.
25      Q.   Is that here in Brownsville?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          255

```
1        A.    Yes, ma'am.

2        Q.    In Cameron County, Texas?

3        A.    Cameron County, Texas.

4        Q.    What's the name of that place over there?

5        A.    Ms. Harrison Mobile Park.

6        Q.    How long have you lived at Mrs. Harrison's

7   Mobile Home Park?

8        A.    Four months.

9        Q.    I'm sorry?  For four months?

10       A.    Yes, ma'am.

11       Q.    Okay.  That means that you would have lived

12  there -- moved in in November of 1998.

13       A.    Or September I think.

14       Q.    September?

15       A.    I don't remember.

16       Q.    Okay.

17       A.    More or less four or five months.

18       Q.    Okay.  Let me ask you this.  Did you know

19  Ms. Harrison?

20       A.    Yes, I did.

21       Q.    Okay.  How did you know Ms. Harrison?

22       A.    Because I used to go out there with Cuellar,

23  drink beer.  That's how I met her.

24       Q.    Okay.  And what about a woman named Maria

25  Villarreal, do you know her also?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    256

```
1        A.   Maria Villarreal?

2        Q.   Yes.

3        A.   She's my common-law wife.

4        Q.   Where does she live?

5        A.   The same address.

6        Q.   Okay.  And how long has she lived out there at

7   the mobile home Harrison -- at the --

8        A.   The same, about four or five months.

9        Q.   Okay.  Now, do you remember when Ms. Harrison

10  was killed?

11       A.   It was on Saturday.

12       Q.   Okay.  Do you remember about what month it was?

13       A.   Not really.

14       Q.   September of '98 sound about right?

15       A.   More or less.

16       Q.   Okay.  Were you living out there when

17  Ms. Harrison was killed?

18       A.   Yes, I was.

19       Q.   All right.  You said that you knew Avel

20  Cuellar.  How did you know Avel?

21       A.   Because my wife-in-law, she got a son that

22  lives over there about ten or 15 years.

23       Q.   When you say "live over there," is that at the

24  mobile home park?

25       A.   Yes, that's right.
```

1      Q.   Okay.  And would you and your wife go over to
2  visit?
3      A.   Yes.
4      Q.   Okay.
5      A.   That's how I get to met Cuellar.
6      Q.   Okay.  Is that how you got to know
7  Ms. Harrison, too?
8      A.   Yes.  Uh-huh.
9      Q.   Okay.  Well, how did -- what kind of friends
10  were you and Mr. Cuellar?  Good friends?
11     A.   Yeah, we become to be good friends.
12     Q.   Okay.  What kind of stuff would you all do
13  together?
14     A.   Just drink beer.
15     Q.   Okay.  Where would you all go to drink beer?
16     A.   Behind Ms. Harrison's home.
17     Q.   Okay.  Now, Mr. Martinez, I'm going to show you
18  a diagram that's in evidence.  This is State's exhibit
19  number --
20              MS. FISCHER:  Your Honor, may I approach?
21              THE COURT:  You may.
22     Q.   (BY MS. FISCHER)  -- State's Exhibit
23  Number 22.  I'm going to ask you to take a look at this.
24  Am I in your way?  Does this diagram look familiar to
25  you?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    258

```
 1        A.   Yeah.
 2        Q.   Okay.  Is this the Harrison Mobile Home Park?
 3        A.   That's right.
 4        Q.   Okay.  Tell me where it is that you actually --
 5                  MS. FISCHER:  May he step down, Judge?
 6                  THE COURT:  He may.
 7        Q.   (BY MS. FISCHER)  Mr. Martinez, why don't you
 8   come on down here?
 9        A.   (Witness complies).
10                  THE COURT:  You got the pointer?
11        Q.   (BY MS. FISCHER)  You hold on to this.  I want
12   to you tell the jury, where is it that you live?
13        A.   Right here.
14        Q.   Okay.  And when you said that you would go over
15   with Avel to drink beer, where would you all go to drink
16   beer?
17        A.   Right here.
18        Q.   Okay.  And that would be sitting outside over
19   by the trees?
20        A.   Yes, ma'am.
21        Q.   Okay.  Now, where does Ms. Villarreal's other
22   son, Andres, live?
23        A.   He lives right here.
24        Q.   Okay.  And then Ms. Villarreal has another son
25   named Crispin, too, doesn't she?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          259

```
 1        A.   Yes.
 2        Q.   And where does Crispin live?
 3        A.   He lives over here in the house.
 4        Q.   Okay.  So the three of you lived in the house
 5   together by the resaca?
 6        A.   Uh-huh.
 7        Q.   Why don't you go ahead and have a seat,
 8   Mr. Martinez?
 9        A.   (Witness complies).
10        Q.   Okay.  How often would you and Avel get
11   together and drink beer at the back of the house?
12        A.   Every -- two or three days a week.
13        Q.   Okay.  Avel liked to drink, didn't he?
14        A.   He did.
15        Q.   He did it almost every day?
16        A.   Every day, yes.
17        Q.   Okay.  And you said that you knew Ms. Harrison,
18   too?
19        A.   Uh-huh.
20        Q.   Would she ever come outside when you and Avel
21   were drinking?
22        A.   Yes, she did.
23        Q.   Okay.  Did she like the fact that Avel was
24   drinking?
25        A.   No, she didn't.
```

1    Q.   What would she -- how did you know that she

2  didn't like the fact that Avel was drinking?

3    A.   Well, because she would say that --

4            MR. GALARZA:  Objection, Your Honor.

5  Hearsay.

6            THE COURT:  I'll sustain.

7    Q.   (BY MS. FISCHER)  Mr. Martinez, you can't tell

8  us what Ms. Harrison said, okay?  But you can tell me how

9  she acted.  Did she act like she was happy Avel was

10  drinking or did she act like she was mad that Avel was

11  drinking?

12    A.   She acted like she was mad.

13    Q.   Okay.  Did she ever yell at Avel about his

14  drinking?

15    A.   No, not actually.

16    Q.   Okay.  Did you ever see them fight about it?

17    A.   No, I didn't.  I never see them.

18    Q.   Okay.  Did you ever see Ms. Harrison and Avel

19  fight about money?

20    A.   No, ma'am.

21    Q.   Okay.  Now --

22            MS. FISCHER:  Your Honor, may I approach

23  again?

24            THE COURT:  You may.

25    Q.   (BY MS. FISCHER)  Mr. Martinez, I'm going to

STATE OF TEXAS VS. RUBEN GUTIERREZ                          261

1    show you State's Exhibit Number 19.  That person in that

2    picture, who is that?

3        A.   Ms. Harrison.

4        Q.   Okay.  This is the one -- Avel's aunt?

5        A.   Yes.

6        Q.   Do you know what Avel used to call her?

7        A.   Well, sometimes she called her mother.

8        Q.   Okay.  Did you know anything about Ms. Harrison

9    having a lot of money?

10       A.   Well, I did.

11       Q.   Okay.  How did you know that she had a lot of

12   money?

13       A.   Because when Chacho would get drunk, he would

14   tell everybody, you know, that Ms. Harrison got money

15   inside the house.

16       Q.   Okay.  Did he ever say how much money she had

17   inside the house?

18       A.   He would say about 1 million or 2 million.

19       Q.   Okay.  Did he ever say anything about wanting

20   to steal that money?

21       A.   No.

22       Q.   Did he ever say anything about wanting to do

23   anything bad to Ms. Harrison?

24       A.   No, he never did.

25       Q.   Ms. Harrison take pretty good care of Avel?

1      A.   Well, sometimes.

2      Q.   Okay.  Did she give him money every week?

3      A.   Yes.

4      Q.   What about when he ran out of beer money, would

5  he give her more money for beer?

6      A.   No.  They were -- she would get mad when he

7  would ask him for, you know, more money.

8      Q.   Okay.  What about a man by the name of Ruben

9  Gutierrez, do you know him?

10     A.   Yes.  I saw him there about two or three times.

11     Q.   Okay.  And, Mr. Martinez, do you see that

12  person that you know as Ruben Gutierrez here in the

13  courtroom?

14     A.   Yes.

15     Q.   Okay.  I need you to point to him and tell me

16  something he's wearing so the jury knows which person

17  you're talking about.

18     A.   He's pointing a white shirt (pointing).

19          MS. FISCHER:  Your Honor, may the record

20  reflect he's identified the defendant?

21          THE COURT:  It shall reflect.

22     Q.   (BY MS. FISCHER)  Okay.  Now, how is it that

23  you know the defendant, Mr. Gutierrez?

24     A.   When me and Chacho we were out there, he would

25  drop by.

1     Q.    Okay.  When you say Chacho, is that Avel
2  Cuellar?
3     A.    Oh, yeah.
4     Q.    Is that the name that everybody calls him,
5  Chacho?
6     A.    Chacho.
7     Q.    Okay.  And when the defendant would drop by,
8  what would he do?
9     A.    He would just drink two or three beers and take
10 off.
11    Q.    Okay.  Did he ever say anything?
12    A.    No, he didn't talk much.
13    Q.    Okay.  Any of those times when you all were out
14 there drinking beer, were those any of the times that
15 Avel was bragging about the money?
16    A.    No.
17    Q.    Okay.  Can you ever remember Mr. Gutierrez
18 being there when Avel was bragging about the money?
19    A.    No, ma'am.
20    Q.    Okay.  Now, let's talk about September the 5th
21 of 1998, the day Ms. Harrison was killed, okay?
22    A.    Uh-huh.
23    Q.    Do you remember seeing Avel Cuellar on that
24 day?
25    A.    Yes.  I gave him a ride.

```
 1        Q.    Okay.  You gave him a ride to where?
 2        A.    To -- we did stop at the pawn shop first.
 3        Q.    Okay.  Now, how -- where were you all going?
 4        A.    To the VFW.
 5        Q.    Okay.  How did that all come about?  Who
 6   decided you all were going to go to the VFW?
 7        A.    Chacho.
 8        Q.    And when is it that he decided that you all
 9   were going to go to the VFW?
10        A.    Well, he called me that -- it was Saturday,
11   yeah, Saturday he called me at 2:00 and told me if I
12   would give him a ride to over there to the VFW.
13        Q.    Okay.
14        A.    So I told him yes.  Then he said, "I'll call
15   you back -- I'm not ready right now.  I'll call you back
16   as soon as I'm ready."  So, 30 minutes more he called me;
17   and I went and picked him up.
18        Q.    So that would be about 2:30?
19        A.    2:30, yeah.
20        Q.    Okay.  And where did you go to pick him up?
21        A.    Behind Ms. Harrison's home.
22        Q.    Okay.  And when he got in the truck, what did
23   you all do?
24        A.    We went around the block.  That's when we saw
25   Ruben and another man behind the house walking towards
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    265

```
 1    the front, front of the house.
 2         Q.   Walking towards the front of where?
 3         A.   Ms. Harrison's home.
 4         Q.   Okay.  What did you do when you saw Ruben?
 5         A.   Chacho told me to stop to see what they want.
 6    So I stopped.
 7         Q.   Okay.  Had you seen Ruben around there in
 8    awhile?
 9         A.   What do you mean?
10         Q.   Was that -- was it unusual for Ruben to be
11    around there?
12         A.   Oh, yeah.  Uh-huh.
13         Q.   You hadn't seen him in awhile?
14         A.   Yeah.
15         Q.   Okay.  When Chacho said, "Stop, let's see what
16    Ruben wants," what did you all do?
17         A.   Well, we just stop; and Ruben and the other man
18    went over to the -- to my truck.
19         Q.   Okay.
20         A.   And then Cuellar told him what he wants; and he
21    say he wanted a ride home --
22              MR. GALARZA:  Objection, Your Honor.
23    Hearsay.
24              MS. FISCHER:  Your Honor, it's an
25    admission by a party opponent.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    266

1               THE COURT:  Overruled.  Go ahead.

2        Q.    (BY MS. FISCHER)  What Did Mr. Gutierrez say?

3        A.    That he wanted -- they wanted a ride home.

4        Q.    Okay.

5        A.    And Chacho told them, "No.  We're going that

6   way towards Southmost Street, you know."

7        Q.    Okay.  And when he said "home," do you know

8   where Mr. Gutierrez lives?

9        A.    Mr. Gutierrez?

10       Q.    The defendant, Ruben.

11       A.    Oh.  No, I don't know.

12       Q.    Okay.  But was it in a different direction --

13       A.    Yeah.

14       Q.    -- from where you all are going?

15       A.    They went towards Central Avenue.

16       Q.    Okay.  And you all went towards the VFW?

17       A.    Yeah.  We did stop at the pawn shop.  Then we

18   went to the VFW.

19       Q.    Okay.  Now, did you know the person who was

20   with Ruben?

21       A.    No, I didn't see him.  He was behind Ruben.

22       Q.    Okay.  After you all left toward the VFW, did

23   you see what direction the defendant went in?

24       A.    Yeah.  They went -- Southmost is on -- to the

25   west; and Central Avenue is to the east.  So I saw them

STATE OF TEXAS VS. RUBEN GUTIERREZ                          267

```
1    going to the east.
2         Q.   Okay.  And you were going to the west?
3         A.   Yes.
4         Q.   Okay.  After you left, you went to the pawn
5    shop.  Where did you go after the pawn shop?
6         A.   Yes.  We went -- well, Cuellar was going to
7    pick one of those DC players.
8         Q.   Okay.  A CD player?
9         A.   CD player.
10        Q.   Okay.  And after you went to the pawn shop,
11   where did you go next?
12        A.   To VFW.
13        Q.   Okay.  And what did you do at the VFW?
14        A.   We drink beer.
15        Q.   Okay.  About how many beers did you have?
16        A.   I would say about from six to eight.
17        Q.   Okay.  About how many beers did Chacho have?
18        A.   More or less the same.
19        Q.   Okay.  Maybe a little bit more?
20        A.   Yeah.
21        Q.   Okay.  And how long did you all stay there at
22   the VFW?
23        A.   We just stay until 10:00 I think or 10:30.
24        Q.   Okay.  And at 10:30 where did you go?
25        A.   I gave Chacho a ride -- he wants to go into
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           268

```
 1   town; and I told him that I was going to take him into
 2   town, but I wasn't going to stay with him there.
 3        Q.   Okay.
 4        A.   I was just going to drop him down on there.
 5        Q.   What about going to his uncle's house?  Did you
 6   all ever go to his uncle's house?
 7        A.   Oh, yeah.  We did go over there.
 8        Q.   When did you all go to his uncle's house?
 9        A.   I guess it was around seven.
10        Q.   Okay.
11        A.   We went over there.  We stayed over there about
12   30 or 45 minutes.
13        Q.   So you left the VFW at seven.  You went to his
14   uncle's house.  What did you all do at his uncle's house?
15        A.   We just -- I just drink one beer there --
16        Q.   Uh-huh.
17        A.   -- because they were inside the house; and I
18   didn't know those people.  So I got out of the house to
19   drink my beer outside.
20        Q.   Okay.  Did Chacho drink some beer over at his
21   uncle's house, too?
22        A.   I guess he did have one in his hand.
23        Q.   Okay.  Where is his uncle's house?
24        A.   He's there on Boca Chica and -- by the airport.
25        Q.   Okay.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    269

```
1        A.    I don't know the address.
2        Q.    Okay.  And so, you all stayed there for about
3   30 or 45 minutes.  So about 7:45 you left.  Where did you
4   go?
5        A.    Then he told me, "Take me over there.  I'm
6   going to buy a hamburger for my aunt."
7        Q.    Okay.  Did you go buy a hamburger for his aunt?
8        A.    We were going that way; and then he told me,
9   "No, let's go back to the VFW to drink one or two more
10  beers."
11       Q.    Okay.
12       A.    I told him, "Well, let's go.  Let's just drink
13  two beers and we'll go home."
14       Q.    Okay.  So did you all do that?  Did you all go
15  back to the VFW?
16       A.    We did go over there.
17       Q.    Okay.  So then you went back to the VFW.  Then
18  you said you left about 10:30.
19       A.    Yeah.
20       Q.    Where did you --
21       A.    Yeah, because he told me -- I told him, "Let's
22  go home."  I wanted to go home.
23                  And he said, "Okay.  Let's go and buy a
24  hamburger for my aunt."
25                  So we started going back again in the
```

1  road; and he told me, "No.  Take me over into town, to
2  that beer joint Pescadores or Pescada."
3      Q.   Okay.  And did you take him there?
4      A.   Yes, I just dropped him there.
5      Q.   Okay.  About what time did you drop him off?
6      A.   I would say around 10:30 more or less.
7      Q.   Okay.  And then where did you go after you
8  dropped him off?
9      A.   I went straight home.
10     Q.   Okay.  When you got home, what did you do?
11     A.   I went to bed --
12     Q.   Okay.
13     A.   -- because my wife was mad because I was late;
14  and I told her, "No, it's not late.  It's 11:00," but I
15  was drunk.
16     Q.   That's okay, Mr. Martinez.  So you know it was
17  11:00 when you got home because your wife was fussing at
18  you?
19     A.   Yeah.
20     Q.   Okay.  After you went to bed, did you ever get
21  woken up during the night?
22     A.   Yeah, I heard the phone ring.
23     Q.   Okay.
24     A.   And my wife got up and answer it; and I heard
25  her say, "No, she's not here."  And then --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    271

1        Q.   Did you know who she was referring to when she
2    said, "No, she's not here"?
3        A.   Yeah, Ms. Harrison.  He was looking for
4    Ms. Harrison.
5        Q.   Okay.  Do you know who was looking for
6    Ms. Harrison?
7        A.   Huh?
8        Q.   Do you know who was looking for Ms. Harrison?
9        A.   That Cuellar.
10       Q.   And when you say Cuellar, are you talking about
11   Chacho --
12       A.   Chacho.
13       Q.   -- Cuellar?
14       A.   Can I say Chacho?
15       Q.   If you call him Chacho, that's fine.
16       A.   Okay.  Chacho.
17       Q.   All right.  What happened after your wife
18   talked to Mr. Cuellar and was looking for Ms. Harrison?
19       A.   She answer the phone and she say, "No, she's
20   not here."  So she hang up and she went to bed; and she
21   told me that Chacho is looking for Ms. Harrison.
22            And then later on, I would say about 30
23   minutes, Chacho called again.  And she got up and she
24   said in the phone, "What?  Okay.  You want us to go over
25   there?"

STATE OF TEXAS VS. RUBEN GUTIERREZ                    272

1              And Chacho said, "Yes, come over here."
2              So she -- my wife hang the phone and told
3    me, "Hey, Ramiro, get up.  Chacho found Mrs. Harrison
4    dead."
5              So, we went over there; and the ambulance
6    and the police were already there.
7         Q.   Did you see Ms. Harrison dead?
8         A.   No, I didn't see her.
9         Q.   Did you go in the house?
10        A.   We stay outside.  They wouldn't let us in,
11   nobody in.
12        Q.   Did you have any idea who had killed her?
13        A.   No.
14        Q.   Okay.
15        A.   I didn't know she was -- somebody had killed
16   her.  I thought she had a heart attack or something.
17        Q.   Okay.  Now, after that, the police wanted to
18   talk to you about anything that you may have known about
19   Mrs. Harrison's death, didn't they?
20        A.   Yes.
21        Q.   Okay.  And you gave them a statement?
22        A.   Yes.
23        Q.   When you gave them a statement, you told them
24   about being with Avel pretty much --
25        A.   Uh-huh.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          273

1      Q.   -- the whole day from 2:30 'til about 10:30 at
2   night?
3      A.   Uh-huh.
4      Q.   Okay.  But you didn't tell them about seeing
5   Ruben right away, did you?
6      A.   No, I didn't --
7      Q.   Okay.
8      A.   -- because --
9      Q.   You gave them a second statement where you told
10  them about seeing Ruben?
11     A.   Yes.
12     Q.   Why didn't you tell them about Ruben the first
13  time you talked to them?
14     A.   Because -- well, sometimes Chacho would come
15  in, "Let me talk to this guy here," you know, afraid of
16  him or something like that.
17     Q.   Now, what --
18     A.   So --
19     Q.   I'm sorry.  I may have interrupted you.
20     A.   I forgot to tell them because the detective
21  told me, "Where was your first stop?"  So I told him at
22  the pawn shop.
23     Q.   Okay.  Had you just forgotten about seeing
24  Ruben?
25     A.   Yes.

1    Q.   Okay.  Do you remember when it was that you

2  talked to the police the first time?

3    A.   Yes.

4    Q.   Was that right after it had happened or the

5  same -- or actually the same day Ms. Harrison was found

6  killed?

7    A.   It was when they took me into the court or

8  what?

9    Q.   I'm sorry, Mr. Martinez.  I can't understand

10 you.  You're going to have to talk a little louder, okay?

11   A.   When the detective -- what do you say?

12 Interrogated me or what?

13   Q.   Okay.  Do you remember the first time that he

14 talked to you?

15   A.   Who?

16   Q.   The police officer.

17   A.   It was on Sunday.

18   Q.   The same Sunday that Ms. Harrison was killed?

19   A.   Yes.  No.  Ms. Harrison was killed on Saturday.

20   Q.   Saturday.  You're right.  That was my mistake.

21 Okay.  So then -- but she wasn't found until early Sunday

22 morning?

23   A.   It was around 1:00, no?

24   Q.   Okay.  All right.  And then you talked to the

25 police on that Sunday --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    275

1        A.    Yes.

2        Q.    -- and told them about being with Avel?

3        A.    Uh-huh.

4        Q.    Okay.  And then a little bit later on, a few

5   days later on the 9th, you talked to the police again,

6   didn't you?

7        A.    Yes, I did.

8        Q.    And it was on that day that you told them about

9   Ruben?

10       A.    Yes.

11       Q.    Okay.  And what was it that made you remember

12  about Ruben?

13       A.    We were making a cook-out over there at my

14  house and -- I don't know.  I think it was Crispin

15  mentioned something about Ruben.  Then I told him, "I

16  forgot to tell the detectives that we did make a first

17  stop, you know, with Ruben out there."

18       Q.    Okay.  At the time Ms. Harrison -- when you

19  talked to the police, like you said, you didn't even know

20  that she had been killed.  You thought that she had had a

21  heart attack, right?

22       A.    Uh-huh.

23       Q.    And you had no idea --

24       A.    No, I didn't.

25       Q.    -- that anybody was a suspect in her death?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    276

1        A.   No.  Nothing.

2        Q.   Okay.  And you had no idea that Ruben may have

3   been a suspect in her death?

4        A.   No, no.

5        Q.   Okay.  But then you got kind of suspicious when

6   you heard Crispin talking about seeing him, too?

7        A.   Yeah.

8        Q.   And that's when you thought, "I'd better tell

9   the police because I saw Ruben there"?

10        A.   Uh-huh.

11        Q.   Okay.  Mr. Martinez, let's talk a little bit

12   about where you saw Ruben so the jury can see it.

13             MS. FISCHER:  May he step down, Your

14   Honor, and may I approach?

15             THE COURT:  You may.

16        Q.   (BY MS. FISCHER)  Mr. Martinez, why don't you

17   come on down?  I want you to show the jury where you saw

18   the defendant.

19        A.   (Witness complies).

20        Q.   Use the pointier.  And, Mr. Martinez, this

21   woman sitting right over here and all the way to this one

22   right over here, they all need to see what you're doing,

23   okay?

24             All right.  Tell me where you went to pick

25   up Chacho.

1        A.    I went through here with my truck through here,

2   and I went to pick up Chacho right here.

3        Q.    Okay.  What did you do after picking him up?

4        A.    Then we --

5                   THE COURT:  You need to speak a little

6   louder, Mr. Martinez.

7        Q.    (BY MS. FISCHER)  I'm sorry, Mr. Martinez.

8   She has to listen to what you're saying.

9        A.    I came through this road with Chacho; and then

10  right around here, Chacho told me, "Hey, there's somebody

11  walking around behind Ms. Harrison's home."

12       Q.    Okay.

13       A.    He said, "Stop there."  I stopped right here;

14  and then those two guys were walking through here on the

15  side.

16       Q.    Okay.

17       A.    Then Chacho told me, "Hey, park over on

18  Morningside Road so Ms. Harrison won't see Ruben."  So I

19  stopped right here.  That's where we --

20       Q.    Why didn't Chacho want Ms. Harrison to see

21  Ruben?

22       A.    I don't know.  Because Chacho told me that

23  Ruben owed her some money and that she didn't want to see

24  him.

25                   THE COURT:  What?  I can't hear.

1       Q.   (BY MS. FISCHER)  You need to say it again
2   louder.
3       A.   Ms. Harrison say that Ruben was --
4               MR. GALARZA:  Objection to hearsay, Your
5   Honor.
6       A.   -- that Ruben owed her --
7               THE COURT:  Overruled.
8       A.   -- money and she didn't want to see him around
9   there.
10      Q.   (BY MS. FISCHER)  Because she was mad at
11  Ruben?
12      A.   Yeah.
13      Q.   Okay.  So you pulled up right over here.
14      A.   Right here.
15      Q.   Right over here.  Okay.  Now, when did you
16  first tell that it was the defendant?  When did you first
17  see him?
18      A.   Right when he was walking on the side of the
19  house towards my truck.
20      Q.   Okay.
21      A.   That's when I saw him.
22      Q.   Okay.  And where did you talk to him?
23      A.   Over here in the corner.
24      Q.   All right.  Thank you, Mr. Martinez.
25              MS. FISCHER:  I pass the witness.

1          MR. GALARZA:  Can I proceed, Your Honor?

2          THE COURT:  You may.

3          MR. GALARZA:  If I could get the

4    statement, Your Honor?

5          MS. FISCHER:  Judge, for the record, he

6    has given two statements.  I'm tendering both.

7                    **CROSS-EXAMINATION**

8    **BY MR. GALARZA:**

9      Q.   Mr. Martinez, you stated that you spoke to the

10   police officers on Sunday; is that correct?

11     A.   Yes.

12     Q.   And did the police officers come over to pick

13   you up or --

14     A.   Yes.

15     Q.   -- how did that come about?

16     A.   They went to pick me up.

17     Q.   Do you remember around what time it was?

18     A.   No.  I would say about four or 5:00 in the

19   afternoon.

20     Q.   And then you gave a statement to the police

21   officers; is that correct?

22     A.   Uh-huh.  Yes.

23     Q.   And then two days later you went back and spoke

24   to the police officers again?

25     A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    280

1      Q.   And that's when you added the information about
2  seeing Ruben?
3      A.   No.  It was on that Monday, I guess, when I
4  told -- no.  Yes, Monday.  And they went to question
5  Crispin; and that's when I told the detective that I
6  forgot to tell them about Ruben.
7      Q.   Okay.  And --
8      A.   And they went and picked me up again.
9      Q.   Did you change anything else besides that in
10 the statement?
11     A.   No.  No.
12     Q.   The only thing you added was that you had seen
13 Ruben --
14     A.   Yes.  Uh-huh.
15     Q.   Okay.  How long had you been living there at
16 the residence?
17     A.   I would say five months.
18     Q.   So if this happened in September, you moved in
19 like May or June?
20     A.   More or less, yes.
21     Q.   And before that, had you already known or had
22 you already met Avel Cuellar?
23     A.   Yes, I did.
24     Q.   How long had you known him before that?
25     A.   About two or three years.

STATE OF TEXAS VS. RUBEN GUTIERREZ                     281

1      Q.   How often do you all go out?  How often do you
2   go out with him?
3      A.   On Saturdays we used to go every week.
4      Q.   So you both would go out almost every week?
5      A.   Yeah.
6      Q.   Where -- would you always go to the VFW?
7      A.   Well, no.  Sometimes we go across the bridge.
8      Q.   And that day you stated he called you like
9   around 2:00; is that correct?  Avel, Chacho.
10     A.   Avel.
11     Q.   Chacho called you --
12     A.   He called around 12:00.
13     Q.   He called you around 12?
14     A.   Yes.  At night when she went looking for Ms.
15   Harrison?
16     Q.   No.  Let's start with that morning.
17     A.   Oh, okay.
18     Q.   That day on Saturday, what time did Chacho call
19   you?
20     A.   At 2:00.
21     Q.   Okay.  And that's when he told you, "I'll call
22   you back"?
23     A.   Uh-huh.
24     Q.   What time did he call you again?
25     A.   I would say around 2:30.

STATE OF TEXAS VS. RUBEN GUTIERREZ                         282

1       Q.   And what were your plans again on that day?

2       A.   What were my what?

3       Q.   The plans.  What were the plans that you and

4  Chacho had made?

5       A.   Chacho told me if I could give him a ride

6  because he didn't have nothing to move.  You know, he

7  don't have no car or nothing.  He was always telling me

8  if I can give him a ride or --

9       Q.   Okay.  And you stated that you were going to

10 give him a ride to the pawn shop?

11      A.   Well, he said if we can go to VFW to drink

12 beer.  I told him yes.  Then he told me to stop by at the

13 pawn shop.

14      Q.   Okay.  And why did he have to stop by at the

15 pawn shop?

16      A.   To pick up -- to pick up one of those CD

17 players.

18      Q.   Do you know how much he paid?

19      A.   No, I don't.  I didn't ask him.

20      Q.   Did he get the CD player?

21      A.   Yes, he did.

22      Q.   Do you know how much Chacho would get paid?

23 Chacho was working there; is that correct?

24      A.   Yes.

25      Q.   How much would he get paid per week?

1      A.    I would say -- he would say that he get paid

2  200, but Ms. Harrison was saving him $50 each payday.

3  That's what he told me.

4      Q.    Okay.  So, when did he first tell you this?

5      A.    Awhile ago.

6      Q.    Did he tell you this more than one time?

7      A.    No.

8      Q.    You knew that he was getting paid 200?

9      A.    Yes.  That's what he told me one time.  So from

10  there on, he would say he was getting paid 150.

11      Q.    Okay.  And Ms. Harrison would save $50 for him?

12      A.    That's what Chacho told me.  I don't know.

13      Q.    Okay.  As far as you know, did he get paid that

14  day?

15      A.    Yes, he did.

16      Q.    And you stated you showed up at the VFW at

17  2:45; is that correct?

18      A.    Yes.

19      Q.    Okay.  Once you all got to the VFW, you stated

20  you had like around six to eight beers?

21      A.    Uh-huh.

22      Q.    And Chacho had maybe a little bit more than you

23  did?

24      A.    Yes.

25      Q.    Okay.  Who paid for the beers?

1        A.    Chacho.

2        Q.    Okay.  And he also paid for your beers?

3        A.    Yes.  He got credit there; and he sometimes pay

4    for the beers or sometimes he would say just to write it

5    down.

6        Q.    Okay.  As far as you know, did he pay for the

7    beers that day?

8        A.    Yes.  Uh-huh.

9        Q.    And what you mean is credit there at the VFW;

10   is that correct?

11       A.    Yes.  That's right.  That's correct.

12       Q.    Then you all left like around 7:00, and you

13   went over to Chacho's uncle's house; is that correct?

14       A.    That's correct.

15       Q.    Okay.  Did you all stop anywhere --

16       A.    No.

17       Q.    -- from the VFW over to --

18       A.    No.  We went straight.

19       Q.    Straight to the uncle's?

20       A.    Uh-huh.

21       Q.    Okay.  You stated that you were drinking a

22   beer -- you stayed in the car; is that correct?

23       A.    What?

24       Q.    When you all got to Chacho's uncle's house --

25       A.    Uh-huh.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          285

1        Q.   Okay.   Chacho got down -- got out of the car;
2    is that correct?
3        A.   Yes.   That's correct.
4        Q.   Okay.   And you stayed there in the car?
5        A.   Yes, but then he waited too long.   So I got off
6    and went over to the house; and Chacho came out and
7    invite me.   So that's when they gave me one beer to drink
8    in there, you know, and --
9        Q.   So you went inside the house?
10       A.   Inside the house.
11       Q.   Okay.   How long were you all in there?
12       A.   Well, I just stayed two or three minutes and
13   then I got out to drink my beer outside.
14       Q.   So was Chacho drinking there inside the house?
15       A.   Yes.   He did have a beer in his hand.
16       Q.   Okay.   And they gave you a beer also?
17       A.   Yes.
18       Q.   So you didn't stay in the car all this time?
19       A.   No.
20       Q.   Then did anybody go outside with you?
21       A.   Yes.   There was his uncle.   His uncle came out
22   with me.
23       Q.   And around how much time did you all stay there
24   at the uncle's house?
25       A.   Around 45 minutes, 30, 45 minutes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    286

1     Q.   Had you already finished the beer by the time
2  you left?
3     A.   Yes, I did finish my beer; and then I told his
4  uncle, "Hey, call Chacho out so we can go."
5     Q.   Okay.  And did you all leave at that time?
6     A.   Uh-huh.  Yes.
7     Q.   Where did you all go from there?
8     A.   Chacho told me to go to the hamburger -- to buy
9  her a hamburger; and I was driving that way, but then he
10  told me, "No, let's go to the VFW again."
11     Q.   So you all went back to the VFW?
12     A.   Yeah, we went there.
13     Q.   Okay.  What time did Chacho call his aunt,
14  Ms. Harrison?
15     A.   About 6:30 or something like that.
16     Q.   Okay.  And by this time were you all at the VFW
17  already?
18     A.   Yes.  Uh-huh.
19     Q.   Okay.  And did he call anybody else besides --
20     A.   Yes.  He called -- I told him call -- because
21  he called Ms. Harrison and she won't answer.  And then I
22  told him, "Well call over to my house."  So she called --
23  he called over to my house; and my wife told him, no, she
24  wasn't there.
25     Q.   Okay.  And who's your wife again, your wife's

1   name?

2       A.   Maria Luisa Villarreal.

3       Q.   So he did call to your wife?

4       A.   Yes.

5       Q.   And at that point your wife told him, "No,

6   she's not here"?

7       A.   Uh-huh.  That's correct.

8       Q.   Do you know if he called again to Ms. Harrison?

9       A.   No.  I did call her, my wife.

10      Q.   Your wife called?

11      A.   No.  I called her from there from VFW.

12      Q.   Okay.  And how many times did Chacho call?

13      A.   He called -- I would say two times.  He got up

14  and called; and then later on he got up again and called.

15      Q.   Okay.  Until what time did you all stay at the

16  VFW?

17      A.   Ten, 10:15, 10:30.

18      Q.   And that's when you took Chacho over to the

19  Pescadores?

20      A.   Yes.

21      Q.   And then you went home?

22      A.   I went home, straight home.

23      Q.   Was Chacho drunk already?

24      A.   Yes, he was drunk.

25      Q.   Okay.  Was he drunk by the time you left the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    288

1  VFW at 7:00?

2       A.   Yes.

3       Q.   Okay.

4       A.   We were drunk.

5       Q.   Okay.  And then when you all came back to VFW,

6  do you know how many beers Chacho had?

7       A.   He had -- he -- well, I would say I did drink

8  three beers.  So he probably drank four.  He used to

9  drink real fast.

10      Q.   Okay.  And did he pay for the beer again?

11      A.   Yes, he did.

12      Q.   And he paid for your beers also?

13      A.   Yes.  Uh-huh.

14      Q.   You stated that you got to your house like

15 around 11:00; is that correct?

16      A.   Yes, that's correct.

17      Q.   And then did you see Chacho again?

18      A.   No, no.  Well, around what?  12:30 I did see

19 him again.

20      Q.   Okay.  And you stated that Chacho called over

21 to your house and he spoke to your wife; is that correct?

22      A.   That's correct.

23      Q.   And then your wife told him that he was not --

24      A.   She was not there.

25      Q.   -- not there; and then he called again at 1:30?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    289

1       A.   Yes.

2       Q.   Okay.  And he told you all to go over to where

3  he was at?

4       A.   Yes.   That's right.

5       Q.   Did you all go over to where he was at?

6       A.   Yeah, we did went over there.

7       Q.   Okay.  At around what time was it that you all

8  went over there?

9       A.   After 12.  At 12:30 or something, or 1:00.

10      Q.   And who was there at the time that you all went

11  over to the house?

12      A.   The paramedics and the police.

13      Q.   Okay.  And did you all talk to Chacho at that

14  time?

15      A.   No, we didn't.

16      Q.   Was Chacho there?

17      A.   Yes, he was there with the policemen on the

18  porch.

19      Q.   Okay.  And until what time did you all stay

20  there?

21      A.   2:00.

22      Q.   Okay.  Was Chacho still there when you all

23  left?

24      A.   No.   They took him in.

25      Q.   Okay.  You stated earlier that Chacho would

1   brag about the money that Ms. Harrison had; is that
2   correct?  He would talk that Ms. Harrison's had money?
3       A.   Oh, yes.  Uh-huh.
4       Q.   And you stated that he said that she had around
5   1 million or $2 million?
6       A.   That's right.
7       Q.   Okay.  When was the first time that he told you
8   this?
9       A.   I would say a year ago.
10      Q.   One year ago from today or one year ago from
11  the time that Ms. Harrison died?
12      A.   One year from today.
13      Q.   Okay.  So --
14      A.   And then he told me again after six or seven
15  months, I guess.
16      Q.   Okay.  When you moved in to the trailer park,
17  to the house that you live in right now --
18      A.   Uh-huh.
19      Q.   -- had Chacho already told you that
20  Ms. Harrison had money?
21      A.   Oh, yes.
22      Q.   He had already told you?
23      A.   Yes.
24      Q.   He had already bragged about it?
25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    291

1        Q.   Okay.  And then when you moved in, then he told
2   you again that she had money?
3        A.   Yes.
4        Q.   Okay.  Would he tell everybody or would he just
5   tell you?
6        A.   Well, Ms. Harrison, she would get mad because
7   when Chacho would get drunk, he would tell everybody.
8   That's what Mrs. Harrison told me, too.
9        Q.   Okay.  And you stated Ms. Harrison would get
10  mad.  Did Ms. Harrison and Chacho ever argue?
11       A.   Well, they did, but not in front of me.  I
12  never saw them argue.
13       Q.   Okay.  Did Ms. Harrison ever get upset with
14  him?
15       A.   Well, yes, she did.
16       Q.   Did she ever get upset with him because he did
17  not work fast enough?
18       A.   Yes.
19       Q.   Did Chacho ever steal any money, as far as your
20  knowledge, from Ms. Harrison?
21       A.   Not that I know.
22       Q.   Did he borrow money from Mrs. Harrison?
23       A.   Yes, he did.
24       Q.   Okay.  How many times, as far as you know, did
25  he borrow money?  How often?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    292

1      A.   Well, I wouldn't know.  Well, I would say once
2  a week, I guess.
3      Q.   Okay.  Do you know how much the most he ever
4  borrowed, the most amount?
5      A.   From Ms. Harrison?
6      Q.   Yes.
7      A.   200.
8      Q.   $200?
9      A.   Yes.
10     Q.   Would he ever repay her back?
11     A.    I don't know because Chacho told me that she
12  was taking $50 on savings for him; and she would, you
13  know, get paid from there.
14     Q.   Okay.  Did Chacho ever tell you where
15  Ms. Harrison had the money?
16     A.   No, he didn't.
17     Q.   Did Chacho ever tell you whether he had seen
18  the money?
19     A.   No.
20     Q.   As far as you know, who else knows that
21  Ms. Harrison had money?  Can you name -- did Crispin
22  know, Crispin Villarreal?
23     A.   Yes, he did know.
24     Q.   Did a lot of the people that lived there in the
25  trailer park know that she had money?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    293

1      A.   I don't think that the people that lives over
2  there.  The guys that know, the ones that were going
3  there to drink beer.
4      Q.   So it was mainly the guys that went out there
5  to drink beer that knew that she had money?
6      A.   Yes.
7      Q.   Okay.  You all would go out every Saturday you
8  said?
9      A.   Uh-huh.
10     Q.   You would go out with Chacho; is that correct?
11     A.   That's correct.
12     Q.   How often would Chacho drink beer there at the
13  house?
14     A.   Every day in the afternoons.
15     Q.   Okay.  How often would guys get together there?
16     A.   Two or three times a week.
17     Q.   And those were the guys who you're talking
18  about that knew that she had money?
19     A.   I would say that because Chacho would get drunk
20  and tell everybody.
21     Q.   When -- how many times had you seen Ruben
22  before that time that you saw him?
23     A.   Three or four times.  The last time was the
24  fourth time that I saw him.
25     Q.   Okay.  And that -- the three or four times that

STATE OF TEXAS VS. RUBEN GUTIERREZ                294

1   you're talking about is the times that you would see him

2   when you would go drink there with Chacho and maybe you

3   were there at that time?

4        A.   Yes.   That's right.

5        Q.   Besides these three or four times, you had

6   never seen him --

7        A.   No.

8        Q.   -- before?

9        A.   No.

10       Q.   You did not know the individual that was behind

11  Ruben you said?

12       A.   No.   I didn't see him.

13       Q.   Okay.   Are you sure that it was Ruben at that

14  point?

15       A.   Yes.

16       Q.   Okay.   Had you drank anything before you all

17  went to the VFW?

18       A.   No.   No.

19       Q.   Had Chacho drank anything at all?

20       A.   No.

21       Q.   Did Chacho ever threaten Ms. Harrison?

22       A.   No.

23       Q.   Did he ever say when he was drunk, "I'm going

24  to kill Ms. Harrison"?

25       A.   Oh, no.   He never did say that.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        295

```
 1          Q.   Did he ever say, "I want to keep the money that
 2     she has"?
 3          A.   No.  No, he didn't.
 4          Q.   Did he ever say whether he was going to inherit
 5     the money if Ms. Harrison passed away?
 6          A.   I don't know exactly the word.  Inherit?
 7          Q.   Did he ever say that if Ms. Harrison passed
 8     away, not that she was killed, but if she passed away --
 9          A.   Oh, no.
10          Q.   -- if she died, that he was the one that was
11     going to keep the money and the property there?
12          A.   No.
13          Q.   Do you know who's living there at the property
14     now?
15          A.   Who's living?
16          Q.   Yeah.  Who's living there at the house, the one
17     that Ms. Harrison used to live at?
18          A.   Only Chacho lives there.
19          Q.   Is there anybody else living there?
20          A.   No.
21          Q.   Are you still renting --
22          A.   Yes.
23          Q.   -- the house?
24          A.   Uh-huh.
25          Q.   So, do you pay the rent to Chacho?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    296

```
 1        A.    No, no.
 2        Q.    Who do you pay the rent to?
 3        A.    Right now?
 4        Q.    Yes.
 5        A.    To -- I guess his name is Joe Cuellar.
 6        Q.    And as far as you know, does Chacho pay rent?
 7        A.    No.   Chacho -- I don't think Chacho pays rent
 8   there.
 9        Q.    As far as you know, does he still get paid?
10        A.    Yes.
11        Q.    Okay.  That day on Sunday when the police came
12   to pick you up to interrogate you, when you came back,
13   did you drink with Chacho or did you see --
14        A.    No.
15        Q.    -- Chacho that day?
16        A.    No.
17        Q.    When did you see him again?
18        A.    Well, I did see him around there, but I haven't
19   talked to him no more.
20        Q.    Okay.  When was the last time you talked to
21   him?
22        A.    Saturday, I think.
23        Q.    When you all went out?
24        A.    Yes, when we went out.
25        Q.    You have not talked to him since Saturday,
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    297

1   September 5th?

2        A.    Yes.

3        Q.    Why not?

4        A.    Because I just don't want to talk to him.   I

5   don't drink with him no more.

6                    MR. GALARZA:   That's all I have at this

7   time, Your Honor.

8                    MS. FISCHER:   I don't have anything

9   further, Your Honor.  May he be excused?

10                   THE COURT:   Any objections?

11                   MR. GALARZA:   No objections, subject to

12  recall, Your Honor.

13                   THE COURT:   You may step down.  You're

14  excused to go.

15                   THE WITNESS:   Thank you.

16                   THE COURT:   Do you have another one?

17                   MS. FISCHER:   I do, Judge.  He'll probably

18  be about an hour.  I'm not sure what the Court wants to

19  do.  I can have him back here on Monday or we can do it

20  today.

21                   THE COURT:   All right.  Let's go ahead and

22  break for the day.  Ladies and gentlemen of the jury,

23  remember the instructions I've given you not to discuss

24  this case among yourselves or with anyone else, not to

25  form or express any opinions.  Again, stay away from all

STATE OF TEXAS VS. RUBEN GUTIERREZ                          298

1    news media coverage of the case.

2                    With those instructions, you're excused

3    until 9 a.m.  We'll start testimony at 9 a.m.  So be here

4    before 9 a.m. Monday morning in the jury room.

5                    **(Proceedings recessed at 4:42 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                                         299

1    THE STATE OF TEXAS:

2    COUNTY OF CAMERON:

3                    **CERTIFICATE OF COURT REPORTER**

4        I, PAM L. ESQUIVEL, Official Court Reporter in and

5    for the 107th Judicial District Court of Cameron County,

6    State of Texas, do hereby certify that the above and

7    foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings requested

9    in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-entitled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits, if

15   any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND on this the 6th day of

17   December, 1999.

18                    *Pam L. Esquivel*
                      PAM L. ESQUIVEL, Texas CSR, RPR
19                    Official Court Reporter
                      107th District Court
20                    974 East Harrison Street
                      Brownsville, Texas 78520
21                    (956) 544-0874
                      Certificate No. 2369
22                    Expiration Date: 12/31/00

23

24

25

PAM L. ESQUIVEL, CSR, RPR