STATE OF TEXAS VS. RUBEN GUTIERREZ *73462*   1

REPORTER'S RECORD

VOLUME 18 OF 32 VOLUMES

TRIAL COURT CAUSE NO. 98-CR-1391-A

- - - - - - - - - - - - - - - x

| | |
|---|---|
| THE STATE OF TEXAS | : IN THE DISTRICT COURT |
| | : |
| VS. | : 107TH JUDICIAL DISTRICT |
| | : |
| RUBEN GUTIERREZ | : CAMERON COUNTY, TEXAS |
| | : |

- - - - - - - - - - - - - - - x

JURY TRIAL

On the 12th day of April, 1999, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Benjamin Euresti, Jr., Judge Presiding, held in Brownsville, Cameron County, Texas.

Proceedings reported by machine shorthand.

A P P E A R A N C E S

APPEARING FOR THE STATE OF TEXAS:

HON. JOHN T. BLAYLOCK
State Bar No. 00784302
HON. KAREN L. FISCHER
State Bar No. 00790685
Assistant District Attorneys
Cameron County Courthouse
974 East Harrison
Brownsville, Texas  78520
(956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS

DEC 8 1999

Troy C. Bennett, Jr., Clerk

ORIGINAL

STATE OF TEXAS VS. RUBEN GUTIERREZ                                2

1    APPEARANCES CONTINUED:

2    APPEARING FOR THE DEFENDANT:

3         HON. SANTIAGO GALARZA
          State Bar No. 00787508
4         Law Offices of Santiago Galarza
          3100 East 14th Street
5         Brownsville, Texas  78521
          (956) 541-4157
6
          AND
7
          HON. DANIEL R. REYES
8         State Bar No. 16794290
          Perez & Reyes
9         316 Nolana Loop
          McAllen, Texas  78504
10        (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ     i

**VOLUME 18**

**TRIAL ON THE MERITS**

APRIL 12, 1999          PAGE   VOL

Hearing to excuse alternate juror..................3    18

WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|----|----|----|----|
| Avel Cuellar | 3 | 6 | --- | --- | --- | 18 |

STATE'S WITNESSES: (Trial on the Merits)

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|----|----|----|----|
| Crispin Villarreal | 13 | 42 | 61 | 63 | --- | 18 |
| Julio Lopez | 66 | 84 | 94 | 97 | 77 | 18 |
|  | 79 |  | 98 |  |  |  |
| Antonio Flores | 100 | 222 | 271 | 288 | 123 | 18 |
|  | 128 |  | 294 | 298 | 154 |  |
|  | 158 |  | 299 | 301 | 201 |  |
|  | 203 |  | 301 |  |  |  |
| Rey Pineda | 303 | --- | --- | --- | --- | 18 |

| | PAGE | VOL |
|---|---|---|

Adjournment...................................333    18

Court Reporter's Certificate....................334    18

**ALPHABETICAL WITNESS INDEX**

**TRIAL ON THE MERITS**

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|----|----|----|----|
| Cuellar, Avel | 3 | 6 | --- | --- | --- | 18 |
| Flores, Antonio | 100 | 222 | 271 | 288 | 123 | 18 |
|  | 128 |  | 294 | 298 | 154 |  |
|  | 158 |  | 299 | 301 | 201 |  |
|  | 203 |  | 301 |  |  |  |
| Lopez, Julio | 66 | 84 | 94 | 97 | 77 | 18 |
|  | 79 |  | 98 |  |  |  |
| Pineda, Rey | 303 | --- | --- | --- | --- | 18 |
| Villarreal, Crispin | 13 | 42 | 61 | 63 | --- | 18 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                              ii

<div style="border:1px solid">

**INDEX OF EXHIBITS**

**TRIAL ON THE MERITS**

STATE'S EXHIBITS:

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 32 | Index card with writing | 197 | 197 | 18 |
| 35 | Photo lineup | 76 | 79 | 18 |
| 36 | Consent to Search | 118 | 118 | 18 |
| 37 | Waiver of Rights | 122 | 128 | 18 |
| 38 | Photograph | 143 | 144 | 18 |
| 39 | Photograph | 143 | 144 | 18 |
| 40 | Photograph | 147 314 | 314 | 18 |
| 41 | Photograph | 147 314 | 314 | 18 |
| 42 | Photograph | 150 | 150 | 18 |
| 43 | Waiver of Rights | --- | 157 | 18 |
| 44 | Confession | 164 | 164 | 18 |
| 45 | Confession | 174 | 174 | 18 |
| 46 | Photograph | --- | 182 | 18 |
| 47 | Photograph | --- | 182 | 18 |
| 48 | Photograph | --- | 182 | 18 |
| 49 | Photograph | 184 | 184 | 18 |
| 50 | Photograph | 184 | 184 | 18 |
| 51 | Photograph | 184 | 184 | 18 |
| 52 | Photograph | 191 | 192 | 18 |
| 53 | Photograph | 191 | 192 | 18 |
| 54 | Photograph | 191 | 192 | 18 |
| 55 | Toolbox | --- | 207 | 18 |
| 56 | Blue Suitcase | --- | 195 | 18 |
| 56A | Key | --- | 195 | 18 |
| 57 | Papers in plastic bag | --- | 203 | 18 |
| 58 | (Unidentified) | --- | --- | --- |
| 59 | Map | --- | 213 | 18 |
| 60 | Photograph | 275 | 276 | 18 |
| 61 | Photograph | 275 | 276 | 18 |

DEFENDANT'S EXHIBITS:

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | DPS Report | --- | --- | 18 |

</div>

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    3

```
 1                    P R O C E E D I N G S
 2              (Open court, defendant present, no jury)
 3              THE COURT:  Okay.  You may be seated.
 4              The juror is here.  Do you want to talk to
 5    her?
 6              MS. FISCHER:  Yes, Judge.  We'd like to
 7    talk to her.  Mr. -- do you want me to have Mr. Cuellar
 8    step out of the room?  He's here also.  I don't know if
 9    you want to put anything on the record with him.
10              THE COURT:  Okay.  Let's start with
11    Mr. Cuellar first.
12              MS. FISCHER:  Mr. Cuellar, come on up,
13    please.  `
14              THE COURT:  You can stand in front of the
15    court reporter here.
16              Go ahead, Ms. Fischer.
17                      AVEL CUELLAR,
18       having been first duly sworn, testified as follows:
19                     DIRECT EXAMINATION
20    BY MS. FISCHER:
21       Q.   Mr. Cuellar, Gilbert Garcia called me at 7:00
22    on Saturday night from the Brownsville Police Department
23    and told me that a juror had contacted you.
24       A.   That's correct.
25       Q.   And he had told me that you had gotten her name
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                4

```
 1    and her phone number.
 2         A.    Yes.
 3         Q.    After that, I called you at home at the
 4    Harrison Mobile Home Park.
 5         A.    That's correct.
 6         Q.    I need you to tell the Judge what it is that
 7    that juror told you.  Start with her name.
 8         A.    Okay.  I think her name is -- I wrote it down.
 9    Esperanza Trevino.  And I just got home from court and I
10    was laying down because I was kind of stressed out.  And
11    she -- the phone rang, and I answered it, and it was this
12    lady.
13               And she says, "You don't know me, but I
14    know you.  I saw you in court."  And I didn't ask her
15    what her name was right away.  And she said that she took
16    interest in me and that she'd like for me to go out with
17    her.
18               And when she said court, I said, "Well,
19    were you a visitor in the court or were you -- you know,
20    what were you doing in court?"
21               And she says, "No.  I'm a juror."
22               And I said, "Look, I can't talk to you."
23         Q.    Now, Mr. Cuellar, when is it that she called
24    you?  Did she call you Friday night --
25         A.    Friday night --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          5

```
 1        Q.   -- when you got home from court?
 2        A.   -- right after I got home, but I didn't know
 3   how to get in touch with you.  So I didn't call you right
 4   away.
 5        Q.   That's fine.  That's fine.  And did she say
 6   anything else to you?
 7        A.   No.  No.
 8        Q.   What did you tell her, Mr. Cuellar?
 9        A.   That I'd like to go out with her, it would be
10   fine, right?  And, you know, go out to a dance or maybe
11   meet her some other time.
12        Q.   Okay.  Did you see her over the weekend?
13        A.   No.
14        Q.   Not on Saturday?
15        A.   No.
16        Q.   Not on Sunday?
17        A.   No.
18        Q.   Did she give you her phone number?
19        A.   Yes.
20        Q.   What is the phone number she gave you?
21        A.   It's (956)412-7866.
22             MS. FISCHER:  I don't have any further
23   questions, Judge.
24             THE COURT:  Okay.  Go ahead and step
25   outside.  Thank you.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                6

```
 1                    THE WITNESS:  Thank you.
 2                    THE COURT:  Do you need to talk to the
 3   juror?
 4                    MR. REYES:  Yes, Your Honor.  If we can
 5   ask Mr. Cuellar some questions?
 6                    THE COURT:  Oh, I'm sorry.
 7                    MS. FISCHER:  I'm sorry.  They need to
 8   talk to you, Mr. Cuellar.
 9                    THE COURT:  I'm sorry.  I forgot.
10                    MS. FISCHER:  They're going to ask you
11   some questions, okay?
12                    THE COURT:  Go ahead.
13                    MR. REYES:  May I proceed, Your Honor?
14                    CROSS-EXAMINATION
15   BY MR. REYES:
16        Q.   Mr. Cuellar, you stated that she talked to you
17   or she called you at your home on April the 9th of 1998?
18        A.   Yes, sir.
19        Q.   That's after you --
20        A.   Right after I left from court here, yes.
21        Q.   Okay.  And have you ever spoken to Ms.
22   Esperanza Trevino before?
23        A.   No.  I don't even know who she is.
24        Q.   And do you know how it is that she got your
25   phone number?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                7

1       A.    She said she got it through the phone book.
2       Q.    And is your phone number listed?
3       A.    Yes.  It's the business phone.
4       Q.    Now, is this the only time that you talked to
5    her --
6       A.    Yes.
7       Q.    -- on Friday?
8       A.    Yes.
9       Q.    Have you ever talked to her since then?
10      A.    No.
11      Q.    And do you know whether or not she's talked to
12   any of the witnesses in this case?
13      A.    No, I have no idea, sir.
14      Q.    And do you know whether or not she's talked to
15   any other jurors?  Did she tell you anything about that?
16      A.    No.  No.  She never said anything as far as the
17   court was concerned.
18      Q.    And how long was your conversation with her on
19   Friday?
20      A.    Maybe about a minute, two.  Not very long.
21      Q.    And what you stated earlier, is that the only
22   thing that you all discussed --
23      A.    Yes, sir.
24      Q.    -- on Friday?
25      A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          8

```
 1        Q.   Nothing else?
 2        A.   Nothing else.
 3             MR. REYES:  I have nothing further, Your
 4   Honor.
 5             THE COURT:  Okay.  Thank you, sir.  We
 6   appreciate it.
 7             THE WITNESS:  Yes, sir.
 8             (Witness left the courtroom)
 9             THE COURT:  Okay.  Bring her in.
10             THE BAILIFF:  Yes, sir.
11             MS. FISCHER:  Judge, are you going to talk
12   to her or do you want us to talk to her?
13             THE COURT:  I need to put it on the
14   record.
15             Good morning, Ms. Trevino.
16             JUROR:  Good morning.
17             THE COURT:  How are you?
18             JUROR:  Just fine, sir.
19             THE COURT:  The reason we brought you in
20   is because we have a report that you called one of the
21   witnesses on Friday?  Did you call Mr. Cuellar?
22             JUROR:  No, I didn't.  No, sir, I didn't.
23             THE COURT:  Well, he reported that
24   Esperanza Trevino, one of the jurors, called him at his
25   house.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    9

```
 1                    JUROR:  No, sir, I didn't.  I didn't call
 2   nobody.  I didn't call nobody.  I'm surprised of this
 3   because I didn't call nobody.
 4                    THE COURT:  Well, that's what we were
 5   told.  That's why we're talking to you to ask you about
 6   that.
 7                    JUROR:  No, sir, I didn't call nobody.
 8   Why should I call anybody?
 9                    THE COURT:  Well, that's what we wanted to
10   find out.
11                    Do you have any questions?
12                    JUROR:  I sure didn't.
13                    MR. BLAYLOCK:  We don't have any
14   questions, Judge.
15                    MR. REYES:  Just a few.  Can I have her
16   phone number, Judge, or the number that was given --
17                    THE COURT:  What is your home number?
18                    JUROR:  412-2431.
19                    THE COURT:  That's a different number?
20                    MR. REYES:  Yes.  The last four digits are
21   7866.
22                    JUROR:  I didn't call nobody.
23                    THE COURT:  Okay.  That's the only
24   information we got, that an Esperanza Trevino --
25                    JUROR:  Uh-huh.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          10

```
 1                    THE COURT:  -- who is a juror in this
 2   case --
 3                    JUROR:  Uh-huh.
 4                    THE COURT:  -- called him at his house.
 5                    JUROR:  No, sir.  I sure --
 6                    THE COURT:  But they gave another number.
 7   They didn't give that number.
 8                    JUROR:  No, sir.  412-2431.  And I live in
 9   Harlingen and -- but I didn't call nobody.
10                    THE COURT:  Okay.  That's what we needed
11   to ask.
12                    JUROR:  Okay.
13                    THE COURT:  We wanted to find out what's
14   going on.
15                    JUROR:  Yes, sir.  No, I didn't call
16   nobody.  And I'm not lying.  I mean, why I should I call
17   a juror -- I mean, who did I call?
18                    THE COURT:  One of the witnesses,
19   Mr. Cuellar, the one that testified Friday.
20                    JUROR:  No.
21                    THE COURT:  Okay.  All right.  Thank you.
22                    JUROR:  Okay.
23                    (The juror left the courtroom)
24                    MS. FISCHER:  Judge, if you look at her
25   juror questionnaire, the phone number that she gave
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          11

```
 1    Mr. Cuellar is the exact same phone number she gives for
 2    her home phone, 412-7866.
 3                 That's the first thing I checked on
 4    Saturday.  When he told me what the phone number was, I
 5    came and looked at her juror questionnaire and said,
 6    "That's the right phone number."
 7                 I have not made this available to any of
 8    the family.  They don't know any of the jurors other than
 9    just casual conversation, "We have six.  We have seven,
10    you know.  We seven women, you know."  That's all the
11    conversation that I have had with the family about who
12    the jurors are.
13                 And so, when he gave me the name and the
14    phone number, he wouldn't have had access to it anyway,
15    not from our office.
16                 MR. BLAYLOCK:  For the record, that's
17    juror number 66; and her questionnaire on page 2, she has
18    the exact same phone number that Avel Cuellar gave in
19    this courtroom a few minutes ago.
20                 I'm not saying that anybody has -- that
21    this juror actually called somebody, but somebody who had
22    access to this information called Avel.  That's what I'm
23    saying.
24                 THE COURT:  Do you have a motion?
25                 MR. REYES:  We would ask that this juror
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          12

```
 1   be excused, Your Honor.  Obviously we have conflicting
 2   stories between the juror and the -- Mr. Cuellar; and we
 3   believe that it would be more prudent if she were excused
 4   as a juror.  I know she's only an alternate, but in case
 5   it does come to her being an actual juror in the case, I
 6   think that it would be prejudicial.
 7              MS. FISCHER:  Judge, we agree.  Out of an
 8   abundance of caution, the State agrees with defense
 9   counsel's motion.
10              THE COURT:  All right.  Tell her she's
11   excused.
12              THE BAILIFF:  Yes, Your Honor.
13              THE COURT:  Are you ready?
14              MR. BLAYLOCK:  We're just about ready.
15              We're ready, Judge.
16              THE COURT:  Bring them in.
17              THE BAILIFF:  Yes, Your Honor.
18              (Jury brought into the courtroom)
19              THE COURT:  All right.  You may be seated.
20              Good morning, ladies and gentlemen of the
21   jury.
22              THE JURY:  Good morning.
23              THE COURT:  I think we're ready to begin.
24              You may call your next witness.
25              MS. FISCHER:  Crispin Villarreal.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    13

```
 1                    THE COURT:  Would you raise your right
 2     hand, please?
 3                    (The witness was sworn in by the Court)
 4                    THE WITNESS:  Yes, sir.
 5                    THE COURT:  All right.  You may be seated.
 6                    You may proceed.
 7                    MS. FISCHER:  Thank you, Judge.
 8                         CRISPIN VILLARREAL,
 9      having been first duly sworn, testified as follows:
10                       DIRECT EXAMINATION
11     BY MS. FISCHER:
12          Q.   Mr. Villarreal, will you tell the jury your
13     full name, please?
14          A.   Crispin Villarreal.
15          Q.   And where do you live?
16          A.   Ms. Harrison's Trailer Park.
17          Q.   Okay.  And is that --
18          A.   I don't know the number.  409 Morningside.
19          Q.   Okay.  And how long have you been living there?
20          A.   Like seven months.
21          Q.   Okay.  And where do you work?
22          A.   PUB.
23          Q.   What do you do for PUB?
24          A.   I'm a tree surgeon.
25          Q.   Okay.  And how long have you lived here in
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    14

```
 1    Cameron County?
 2         A.    All my life.
 3         Q.    Now, who is your mother?
 4         A.    Maria Luisa Villarreal.
 5         Q.    Okay.  And she lives with a man, does she not?
 6         A.    Yes, ma'am.
 7         Q.    Her common-law spouse?
 8         A.    Yes.
 9         Q.    What is his name?
10         A.    Ramiro Martinez.
11         Q.    And do you have any brothers or sisters?
12         A.    One brother and three sisters.
13         Q.    Okay.  And where does your brother live?
14         A.    About two trailers across my house.
15         Q.    And is that at the Harrison Mobile Home Park?
16         A.    Yes, ma'am.
17         Q.    Okay.  Now, did you know the woman who owned
18    that mobile home park, Ms. Harrison?
19         A.    Yes, ma'am.
20         Q.    How did you know her?
21         A.    Well, one time that I was with my brother
22    visiting him, I met her there.
23         Q.    And is that the brother that lives there at the
24    trailer park you?  You only have one brother?
25         A.    Yeah.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           15

```
1        Q.   And he lives there?

2        A.   Yes, ma'am.

3        Q.   Okay.  How did you meet her?

4        A.   By Chacho.

5        Q.   Okay.  And Chacho is the one that his real name

6   is Avel Cuellar?

7        A.   Yes, ma'am.

8        Q.   Okay.  Did you know Chacho?

9        A.   No.  I met him there, too.

10       Q.   Okay.  After you met them, did you become

11  friends?

12       A.   Yeah.

13       Q.   Okay.  What kind of friends were you and

14  Ms. Harrison?

15       A.   I used to work for her, side jobs.

16       Q.   Okay.  What kind of things would you do for

17  her?

18       A.   Electricity, meters, poles.

19       Q.   Okay.  Would she pay you for that?

20       A.   Well, yes.  She tried to pay me, but I never

21  get money from her.

22       Q.   Okay.  Did she ever give you money?

23       A.   Yes.

24       Q.   How much money would she give you?

25       A.   Ten, $15.
```

1        Q.   Okay.  Now, when was this that you first met

2   Ms. Harrison?

3        A.   About a year ago, a year and a half.

4        Q.   Okay.  A year and a half.  You know that she

5   died in September of 1998.  How long before that had you

6   known her?

7        A.   About a year.

8        Q.   Okay.  And how would she get a hold of you if

9   she needed you to do things?

10        A.   I had a cellular phone.

11        Q.   Okay.

12        A.   She used to call me in the middle of the night

13   if no lights were in the trailer park.

14        Q.   Okay.  What would you do?

15        A.   Go and work.

16        Q.   Okay.

17                 MS. FISCHER:  Your Honor, may I approach?

18                 THE COURT:  You may.

19        Q.   (BY MS. FISCHER)  Did you ever go to her

20   house, like inside the office?

21        A.   Yes.

22        Q.   Okay.  Now, if you will look at State's Exhibit

23   Number 25, there's a phone number there at the top.  It

24   says Mrs. Villarreal and then it has Crispin and --

25        A.   My mother, yeah.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    17

```
 1        Q.   Okay.  Whose phone number is that there?
 2        A.   At the house.
 3        Q.   Okay.  At whose house?
 4        A.   Well, that number has been in our family since
 5   many years.
 6        Q.   When you call this number, though, where does
 7   it ring?
 8        A.   At the house.
 9        Q.   Is that the house you're living at now?
10        A.   Well, we used to live at J.J.'s Apartments; and
11   it's the same number since 30, 40 years.
12        Q.   Okay.  And now where does that number ring?
13        A.   At the house --
14        Q.   That you're living at over there at --
15        A.   -- where we're renting.
16        Q.   -- Harrison Mobile Home Park?
17        A.   Yes.
18        Q.   Now tell me about Chacho.  Did you get to know
19   him also?
20        A.   Yes.
21        Q.   Okay.  What would you do with him?
22        A.   We used to drink a lot.
23        Q.   Okay.  Where would you all drink?
24        A.   In the back of Ms. Harrison's house.
25        Q.   Who else would be around when you all were
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                            18

```
 1   drinking?
 2        A.   A lot of people, friends of Chacho.
 3        Q.   Okay.  Did Ramiro ever come over?
 4        A.   Ramiro?
 5        Q.   Yeah, your stepfather.
 6        A.   Yeah.
 7        Q.   Okay.  Who else would come over?
 8        A.   A lot of people.
 9        Q.   Okay.
10        A.   A lot of friends.
11        Q.   Okay.  How did you and Chacho get along?
12        A.   Pretty good, yeah.
13        Q.   Okay.  Now, did you know a man by the name of
14   Ruben Gutierrez?
15        A.   Yes, ma'am.
16        Q.   How did you know him?
17        A.   By Chacho.
18        Q.   Okay.  Where did you meet him?
19        A.   There in the -- where we used to hang out in
20   the back of Ms. Harrison's house.
21        Q.   Is this when you all would be drinking?
22        A.   Yeah.
23        Q.   Okay.  When did you first meet him?
24        A.   About a year.
25        Q.   Okay.  Is that a year from now or a year from
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    19

```
 1    when Ms. Harrison was killed?
 2         A.    No, a year from now.
 3         Q.    A year from now.
 4         A.    Yes, ma'am.
 5         Q.    Okay.  So at the time of her death, you had
 6    known her -- known him --
 7         A.    Six, seven months.
 8         Q.    -- about six or seven months.  Okay.  Do you
 9    see the person that you know as Ruben Gutierrez here in
10    the courtroom today?
11         A.    Yes, ma'am.
12         Q.    Can you please point him out and identify him
13    by telling me something he's wearing?
14         A.    White shirt with a tie.
15         Q.    You need to point to him so the jury knows who
16    you're talking about.
17         A.    Right there (pointing).
18              MS. FISCHER:  Your Honor, may the record
19    reflect that he's identified the defendant?
20              THE COURT:  It shall reflect.
21         Q.    (BY MS. FISCHER)  How many times did you see
22    the defendant over there drinking?
23         A.    Many times.
24         Q.    Okay.
25         A.    We used to drink every day.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        20

1        Q.    Okay.

2        A.    Yeah.

3        Q.    Now, Mr. Villarreal, did you know about

4   Ms. Harrison having a lot of money?

5        A.    Yeah.

6        Q.    How did you know that she had a lot of money?

7        A.    She told me.

8        Q.    Okay.  When did she tell you?

9        A.    She showed it to me.

10       Q.    Do you remember when it was that she showed it

11   to you?

12       A.    Not exactly.

13       Q.    Okay.

14       A.    About nine months.

15       Q.    Okay.  Nine months before her death?

16       A.    Nine months from right now.

17       Q.    Nine months from right now.  Okay.  She's

18   been -- she was killed in September.  So that would put

19   us September, October, November, December, January,

20   February, March --

21       A.    Like three months before.

22       Q.    -- it's April -- about three months before?

23       A.    Yes, ma'am.

24       Q.    How did that come about?  How did you find out?

25       A.    She was afraid of Chacho.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    21

1        Q.   Why was she afraid of Chacho, do you know?

2        A.   Because of violence, drinking too much, getting

3   after her a lot.

4        Q.   Okay.  So what did she do?

5        A.   She told me to stay there at the house.

6        Q.   And did you do that?

7        A.   Yeah.

8        Q.   Okay.  And I mean, when you stayed -- when you

9   say you stayed at the house, how long did you stay?

10       A.   No, I stayed one night there.

11       Q.   Okay.

12       A.   She told me to sleep in her bed and she would

13  sleep in the sofa.

14       Q.   Okay.

15       A.   Then the next day she told me about the money.

16       Q.   Okay.

17       A.   I didn't know about that until the next day.

18       Q.   Okay.  How did the money come about?  Did she

19  bring it up on her own?  Did you ask her about it?

20       A.   No.

21       Q.   How did the subject of the money come up?

22       A.   Well, that night, that she was afraid of

23  Chacho.

24       Q.   What did she tell you?

25       A.   She told me to stay there because she was

STATE OF TEXAS VS. RUBEN GUTIERREZ                         22

1    afraid of Chacho.

2         Q.   Okay.  But that doesn't answer my question,

3    Mr. Villarreal.  What about the money?  How did the money

4    come up?

5         A.   Well, I stayed there that night.

6         Q.   Uh-huh.

7         A.   Then the next day I went to work, and when --

8    she told me to come back after work, and then that's when

9    she showed me the money.

10        Q.   Okay.

11        A.   And that's why she told me to stay there,

12   because of the money.

13        Q.   Did she tell you that?

14        A.   Yeah.

15        Q.   So it wasn't that she was afraid of Chacho; she

16   was more concerned about somebody taking her money?

17        A.   Yes, ma'am.

18        Q.   Okay.  Now, let's talk about that.  Did you

19   look at the money?

20        A.   Well, she just showed me a blue briefcase --

21        Q.   Okay.

22        A.   -- one; and the other one's in the bed.  So I

23   said to close it up.  I didn't want to see the money.

24        Q.   Okay.  Well, let's talk about it, though.  You

25   did see the money, though, didn't you?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    23

```
 1        A.    Yes.
 2        Q.    What did -- how was it packaged?
 3        A.    Hundreds.
 4        Q.    Okay.  Were they just loose laying in the
 5   suitcase?
 6        A.    No.
 7        Q.    How were they done?
 8        A.    They were in thousands.
 9        Q.    Okay.  When you say thousands, were they
10   clipped together somehow?
11        A.    In thousands.  Hundreds, ten hundreds --
12        Q.    Right.
13        A.    -- in every clip --
14        Q.    What were they clipped with?
15        A.    That bank wraps, the one -- yeah.
16        Q.    Okay.  Were any of them clipped together with
17   rubber bands?
18        A.    Some, yes.
19        Q.    What about paper clips?
20        A.    Yes.
21        Q.    What about plastic baggies, did she have any
22   plastic baggies in there?
23        A.    Yes.
24        Q.    Okay.  Did she tell you how much money she
25   had --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              24

```
 1        A.    No.
 2        Q.    -- in that blue suitcase or the blue briefcase?
 3        A.    No.  I told her to close it up.  I didn't want
 4   to see the money.
 5        Q.    Well, now, when you say that you saw -- you saw
 6   the money packaged in ten sets of hundreds, that's a
 7   thousand each, about how many were in there?
 8        A.    It was full.
 9        Q.    Okay.  So it was more than ten?
10        A.    Stacks.
11        Q.    Stacks and stacks.  Probably more than 20?
12        A.    It's a briefcase this big (indicating).
13        Q.    Okay.
14        A.    They were stacked all over, hundreds.
15        Q.    Did you go and look and see if they were all
16   hundreds?
17        A.    She just showed me that way, and it was all
18   hundreds.
19        Q.    Did she tell you how much money was in there?
20        A.    No.  No.
21        Q.    Now, when she said that she had some more, did
22   she indicate where she had some other money?
23        A.    In another briefcase.  It was big.
24        Q.    It was a bigger one?
25        A.    Yeah.  And she couldn't bring it over to show
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              25

```
 1    it to me.
 2         Q.   She couldn't?
 3         A.   She couldn't 'cause it was -- she brought me
 4    the blue one; and I told her to -- and she said, "There's
 5    more over here."
 6              And I said, "No, no.  I don't want to see
 7    that."
 8         Q.   Did you go over there and look at it?
 9         A.   I just see -- I saw the -- the big one.
10         Q.   Okay.  You could tell what color it was?
11         A.   Yeah.  Kind of silver, old fashioned type.
12         Q.   Okay.  Did she say how much money was in that
13    one?
14         A.   No, ma'am.
15         Q.   Did she talk about having money anywhere else?
16         A.   I used to take her to the bank.
17         Q.   Okay.  When you took her to the bank, was it
18    for her to put money in the bank?
19         A.   Deposit.  No.  Deposit.
20         Q.   Did she like going to the bank?
21         A.   She didn't want to go.
22         Q.   Why didn't she want to go to the bank?
23         A.   'Cause she was afraid of driving.  I used to
24    use her Cadillac and take her to the bank.
25         Q.   Okay.  Did she ever talk about not liking
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          26

1   banks?

2        A.   Well, one time we went over there and it was a

3   lot of money; and the teller told us that -- she counted

4   all the money, right?  And it was a deposit.  And the

5   lady was there, and she said it was -- it wasn't 10,000;

6   it was 30,000.  She was mistaken.

7        Q.   She told Ms. Harrison she was mistaken?

8        A.   Yes.

9        Q.   Did that make Ms. Harrison mad?

10       A.   Yes.

11       Q.   She didn't like those bank people, did she?

12       A.   No.

13       Q.   But they told her she had more money than she

14   really did.  She still --

15       A.   Well, she was mad 'cause she -- she thought she

16   was correct, but it wasn't like that.

17       Q.   So she thought she had 10,000, and the bank

18   told her she had 30,000?

19       A.   Yes, ma'am.

20       Q.   But she was still mad?

21       A.   Yes.

22       Q.   Okay.

23       A.   'Cause she didn't like that.

24       Q.   Did she ever talk anything else about not

25   wanting to put the money in the bank; she didn't like

STATE OF TEXAS VS. RUBEN GUTIERREZ                              27

1    those folks?

2         A.   My way?

3         Q.   Yeah.

4         A.   Well, when we moved over there to the house,

5    she wanted me to take all the money in that house.

6    That's why we moved over there.

7         Q.   Why did she want you to take the money?

8         A.   I don't know.

9         Q.   Did she like you?

10        A.   As a friend, yes.

11        Q.   Okay.  Let's talk, then, about Ms. Harrison and

12   the day that she was killed, okay?  Do you remember that

13   day?  That was September the 5th of 1998.

14        A.   A Saturday.

15        Q.   A Saturday.  That's right.  Do you remember

16   what you were doing that day?

17        A.   Yeah.  I was going to go fix a gate.  She rents

18   auto parts; and I was going to go fix the gate.

19        Q.   When you say she rents auto parts, who are you

20   talking about?

21        A.   No.  She rents like a car lot.

22        Q.   She rents -- who is "she"?

23        A.   Ms. Harrison.

24        Q.   Okay.

25        A.   And I was going to go fix the gates.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          28

1        Q.   Okay.  Did you go over and fix the gates?

2        A.   No, 'cause it was raining.  I had to put some

3   cement, and it was not going to dry up.

4        Q.   So what did you do instead?

5        A.   I got some caliche --

6        Q.   Where did --

7        A.   -- so I can pour it in my driveway at her

8   house --

9        Q.   Okay.

10       A.   -- where I live.

11       Q.   Okay.  And when you say you got some caliche,

12  where did you get it from?

13       A.   Back of Ms. Harrison's house.

14       Q.   Okay.  Did she know you were taking the

15  caliche?

16       A.   I called her.

17       Q.   Okay.  Do you remember about what time it was

18  that you called her?

19       A.   It was early, about 10:30, 11 in the morning.

20       Q.   Okay.  And did she let you go get some caliche?

21       A.   Yeah.  She told me to get it and to get

22  anything I needed that day.

23       Q.   Okay.  And so, tell me what you did, then.  You

24  went and got the caliche.  What did you do?

25       A.   I went and got some caliche, around three loads

STATE OF TEXAS VS. RUBEN GUTIERREZ                              29

```
 1    or four loads in my truck.
 2         Q.   How did Ms. Harrison sound when you were
 3    talking to her on the phone?
 4         A.   She was sick.
 5         Q.   How did you know she was sick?
 6         A.   She told me.
 7         Q.   Okay.  Did she say what she was sick with?
 8         A.   Yeah.  Fever.
 9                   MR. GALARZA:  Objection, Your Honor, to
10    hearsay.
11                   THE COURT:  Sustained.
12         Q.   (BY MS. FISCHER)  After you got off the phone
13    and she told you that she was sick and you got three
14    loads of caliche, did you ever see Ms. Harrison again?
15         A.   Yes.  I saw her with two ladies outside, and --
16         Q.   Do you remember about what time it was that you
17    saw her with the two ladies outside?
18         A.   Like 12, 12:30.
19         Q.   Okay.  What was she doing?
20         A.   She was showing her backyard, the flowers and
21    the plants to the ladies.
22         Q.   Okay.  How long did the ladies stay?
23         A.   About an hour.
24         Q.   Okay.  Did you see Ms. Harrison again after
25    that?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    30

1       A.   No.  No, I never saw her again.

2       Q.   Okay.  Did you ever talk to her again?

3       A.   No, 'cause when I phoned her about the caliche,

4  she told me she was sick.  So I sent my mom like at 1:30

5  or 2:00.  She never answered.

6       Q.   Okay.  Are you sure about that time?  Could it

7  have been later?

8       A.   Three, 3:30.

9       Q.   Let me ask you this.  When you say that she

10  didn't answer, how do you know that she didn't answer?

11      A.   'Cause my mom went over there walking.

12      Q.   Okay.  Why did your mom go over there?

13      A.   'Cause I sent her 'cause Ms. Harrison was

14  sick --

15      Q.   And what --

16      A.   -- and she had taken some aspirins.

17      Q.   Okay.  And she didn't answer the door?

18      A.   No.  And I told her call over if she's there or

19  not.

20      Q.   Did you do that?

21      A.   My mom called.  She never answered.

22      Q.   Mr. Villarreal, do you remember giving a

23  statement to the police?

24      A.   In -- when they brought me in?

25      Q.   Uh-huh.  They wanted to talk to you about

STATE OF TEXAS VS. RUBEN GUTIERREZ                           31

1    Ms. Harrison being killed, didn't they?
2         A.    They were accusing me of a lot of things.
3         Q.    Okay.  Were they accusing you of killing her?
4         A.    They were suspicious of me.
5         Q.    Okay.  Did you give them a statement?
6         A.    Not that day.
7         Q.    Okay.  When did you give them a statement?
8         A.    Until Monday.
9         Q.    Okay.  And in that statement, did you tell them
10   about what time all this happened?
11        A.    Yes.
12        Q.    Okay.  If you got your statement and had a
13   chance to look at it, would that kind of refresh you
14   about your timing if the words in your statement are a
15   little bit different from the stuff you're telling the
16   jury here today?
17        A.    It might be kind of different, yes.
18              MS. FISCHER:  Your Honor, may I approach
19   the witness?
20              THE COURT:  You may.
21        Q.    (BY MS. FISCHER)  Mr. Villarreal, I want you
22   to take a look at your statement, especially the times,
23   because if you'll notice in that statement that you gave
24   to the Brownsville Police Department, you say here --
25        A.    3:30, four.

1      Q.   Okay.  But why don't you go ahead and read that

2  so you can refresh your memory?

3      A.   "I called Ms. Harrison about 3:30 or four --"

4               MR. GALARZA:  Objection, Your Honor.  If

5  he can read it himself.

6      Q.   (BY MS. FISCHER)  I'm sorry, Mr. Villarreal.

7  You need to -- you go ahead and take a look at that and

8  see if that --

9      A.   "I called Ms. Harrison about 3:30 or four --"

10               THE COURT:  You need to read it to

11  yourself.

12      Q.   (BY MS. FISCHER)  You have to -- you can't --

13  the jury can't know what you're reading from this

14  statement, Mr. Villarreal, okay?  But you need to read it

15  so that you remember what you wrote in the statement.

16      A.   Oh, okay.

17      Q.   Okay.  So when I asked you the question a

18  minute ago about what time you called Ms. Harrison, you

19  said it was about 10:30.

20      A.   In the morning.

21      Q.   Okay.  But in your statement you say it was

22  about 3:30 or four that you asked her for some caliche.

23      A.   Oh, yeah.

24      Q.   Okay.  Which one's right?

25      A.   Well, I called her that I wasn't going to work

STATE OF TEXAS VS. RUBEN GUTIERREZ                    33

```
 1    in the car lot.
 2        Q.   At what time?
 3        A.   At 10:30.
 4        Q.   Okay.  When did you call her about the caliche?
 5        A.   3:30.
 6        Q.   Okay.  So you were mistaken a little bit ago?
 7        A.   Yeah.
 8        Q.   We're kind of running it together too much.
 9        A.   Okay.  Yes.
10        Q.   Okay.  Maybe we can put it up on the board and
11    we can get it more clear.  How does that sound to you?
12    Tell me if we have this right.
13                   Okay.  So about 10:30 -- or what did you
14    say?  Was it 11?
15        A.   10:30.
16        Q.   At 10:30 you called about the car lot?
17        A.   Uh-huh.
18        Q.   Okay.  And then about 3:30 you called about the
19    caliche?
20        A.   Yes, ma'am.
21        Q.   Okay.  Now let's talk about when you saw her
22    with the ladies, okay?
23        A.   Between --
24        Q.   Well, now, look at your statement, Mr.
25    Villarreal, because I think your statement may say
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          34

1    something different.

2         A.    At 4:30 I was spraying some caliche.

3         Q.    Okay.  Is that when you saw her with the

4    ladies?

5         A.    Yeah.

6         Q.    Okay.  So you know that Ms. Harrison was alive

7    at 4:30; that's when she was talking with those ladies?

8         A.    Uh-huh.

9         Q.    Now, Mr. Villarreal, that's different from what

10   you told me just a minute ago, okay?

11        A.    Uh-huh.

12        Q.    Is your memory better here when you were giving

13   the statement or is it better today?

14        A.    Well, reading it, it is true.

15        Q.    Okay.  So you're just mistaken about the times;

16   and what you gave in the statement is --

17        A.    Yes, ma'am.

18        Q.    -- a better memory?

19        A.    Yes, ma'am.

20        Q.    Okay.  And you gave that statement to the

21   police back on September the 8th?

22        A.    Uh-huh.

23        Q.    About three days after this had all happened?

24        A.    Yes.

25        Q.    Okay.  So, then, that would be more correct

STATE OF TEXAS VS. RUBEN GUTIERREZ                    35

1   what you said back on September the 8th?

2        A.   That's right.

3        Q.   Okay.  When you sent your mom over, was it

4   after the ladies had already left?

5        A.   Yes.

6        Q.   So, then, it would have been --

7             MS. FISCHER:  I'm sorry.  Your Honor, may

8   I approach one more time?

9             THE COURT:  You may.

10        Q.   (BY MS. FISCHER)  Do you remember how long it

11   was after the ladies had left?

12        A.   Like -- let's see.  Right after the ladies

13   left.

14        Q.   Okay.  So can we safely say about 5:00?

15        A.   Or 4:45.

16        Q.   4:45.  Okay.  I want to get it just like you

17   said it happened.

18        A.   Yes, ma'am.

19        Q.   That's when your mom goes over.

20        A.   Uh-huh.

21        Q.   And that's when there's no answer?

22        A.   Yes, ma'am.

23        Q.   Okay.  Now, Mr. Villarreal, let's talk about

24   Ruben Gutierrez.  At the time that Ms. Harrison was

25   killed, did you see him that day?

STATE OF TEXAS VS. RUBEN GUTIERREZ                           36

1       A.    Yes.

2       Q.    Tell me where you saw him.

3       A.    Where the garage door is beside the house.

4       Q.    Beside whose house?

5       A.    Ms. Harrison.

6       Q.    Okay.  Do you remember when it was that you saw

7    him?

8       A.    About four.

9       Q.    Think about it.  Okay.  I mean, you've given us

10   a lot of different times and a lot of stuff happened that

11   day.

12      A.    Yes, a lot.

13      Q.    So can you remember about when in between all

14   that it was that you saw him?

15      A.    Like --

16      Q.    What were you doing when you saw him?

17      A.    I was pouring caliche in my truck.

18      Q.    Okay.  So you got the caliche at 3:30.

19      A.    I was up and down all day --

20      Q.    Okay.

21      A.    -- pouring caliche.

22      Q.    Okay.  But you called Ms. Harrison at 3:30 to

23   get permission for the caliche.  You saw him after 3:30?

24      A.    Yeah.

25      Q.    Do you remember how long it was after you

1    talked to her on the phone about the caliche?

2         A.    It was about two loads.

3         Q.    About two loads.

4         A.    It was about 20 each load, 20 minutes.

5         Q.    About 20 minutes for each load.  So that would

6    put us at a little after 4:00?

7         A.    Yes, ma'am.

8         Q.    Okay.  What was he doing?

9         A.    I just saw him beside the house, that's all,

10   when I was putting caliche in the truck.

11        Q.    Did you go over and talk to him?

12        A.    No.

13        Q.    Okay.  Did you -- how was he acting?

14        A.    Well, he didn't look at me right there and

15   then.

16        Q.    Okay.  But did he --

17        A.    Suspicious.

18        Q.    Did he look suspicious?

19        A.    Yes.

20        Q.    Did he -- did you think that he saw you?

21                   MR. GALARZA:  Objection, Your Honor.

22   Speculation.

23                   THE COURT:  It's overruled.  Go ahead.

24        A.    Yes.

25        Q.    (BY MS. FISCHER)  Why do you think that he saw

STATE OF TEXAS VS. RUBEN GUTIERREZ                    38

```
 1   you?
 2        A.    'Cause he knows me.
 3        Q.    But I mean, was there anything about his body
 4   language that told you that he saw you?
 5        A.    No.  I had about a month or so that we didn't
 6   talk to each other.
 7        Q.    But I'm talking about that day.  Did he do
 8   anything that made you think that he saw you over there
 9   pouring caliche?
10        A.    He throw his back like that.
11        Q.    Okay.  You're --
12        A.    He didn't face me.  That's what I'm saying.
13        Q.    Okay.  But did he look at you?
14        A.    Well, that's what I'm saying.  He didn't face
15   me.  I don't know if he looked at me or not.
16        Q.    Okay.
17        A.    I can't say that.
18        Q.    But did he know that you were there?
19        A.    Yes.
20        Q.    How did he know you were there?
21        A.    'Cause the first time he saw me when I was in
22   my house, he passed first.
23        Q.    Did he see you in the house?
24        A.    Yes.
25        Q.    Okay.  Did you see him as he passed in front of
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                39

```
 1    your house?
 2         A.    He didn't pass in front of my house.  He passed
 3    through the -- what do you call it?  The side of the
 4    Morningside Street --
 5         Q.    Okay.
 6         A.    -- going towards Ms. Harrison's house.
 7         Q.    And when was that?
 8         A.    That was about 1:30.
 9         Q.    About 1:30 before you ever started pouring
10    caliche?
11         A.    Uh-huh.
12         Q.    Okay.  So then --
13                   MS. FISCHER:  Your Honor, may I approach?
14                   THE COURT:  You may.
15         Q.    (BY MS. FISCHER)  And these are all just
16    approximations, right?
17         A.    Yeah, 'cause --
18         Q.    You could be a little bit off on the time?
19         A.    Yes, 'cause it was a busy day that day.
20         Q.    Okay.  So at 1:30 you saw the defendant on
21    Morningside?
22         A.    Yeah.
23         Q.    And then at 4:00 you saw him at Ms. Harrison's
24    house?
25         A.    By the house, yes, to the side.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                         40

1        Q.   Okay.  Did you see him again after this time?

2        A.   No, ma'am.

3        Q.   Let's talk about the defendant, then, for a

4    little bit.  When Avel would go out drinking and you

5    would be there, Ramiro -- excuse me -- would be there,

6    you all would be out in the back, did you ever hear Avel

7    Cuellar talk about Ms. Harrison's money?

8        A.   Yeah.

9        Q.   Do you know what kind of things he would say?

10       A.   That she had a lot of money.

11       Q.   Okay.  Was there ever a time when the defendant

12   was there and Avel was saying those things?

13       A.   Yes.

14       Q.   Okay.  About how many times was it that Avel

15   was -- would he kind of brag about the money?

16       A.   Yes.

17       Q.   Okay.  How many times would -- when Avel was

18   there bragging about the money was the defendant there?

19       A.   Three or four times.

20       Q.   Okay.  Did Avel say it pretty loud?

21       A.   Yes.

22       Q.   Okay.  Do you -- was everyone in the group able

23   to hear it?

24       A.   Yes.

25       Q.   Okay.  Was everyone in the group, including

STATE OF TEXAS VS. RUBEN GUTIERREZ                    41

1    Mr. Gutierrez, able to hear it if they were listening?
2         A.    Yes, ma'am.
3         Q.    Did Mr. Gutierrez say anything about the money
4    ever?
5         A.    No.
6         Q.    Did he ever have much to say at all when you
7    all were sitting around drinking?
8         A.    No.
9         Q.    What about you and the defendant, do you all
10   get along?
11        A.    I used to help him a lot.
12        Q.    Okay.  Did that ever stop?
13        A.    Yes.
14        Q.    Why did it stop?
15        A.    When he took my car and he said he was going to
16   give me another car, but the title wasn't in his name.
17        Q.    Okay.  Now, Mr. Villarreal, I don't want to
18   talk about specifically what happened, okay?  I just want
19   to know if there was ever a time when you all stopped
20   being friends.
21        A.    Yeah.  That's when I went and I got my car back
22   and --
23        Q.    It was a disagreement about a car?
24        A.    I just -- I went and got my car back.  That's
25   all.

STATE OF TEXAS VS. RUBEN GUTIERREZ                            42

1      Q.    Did you stop talking to him after that?

2      A.    Yeah.

3            MS. FISCHER:  I pass the witness.

4            MR. GALARZA:  Can I proceed, Your Honor?

5            THE COURT:  You may.

6            MR. GALARZA:  If I could get a copy of the

7  statement, Your Honor?

8            MS. FISCHER:  Yes, Your Honor.  I'm

9  handing a him a copy of Mr. Villarreal's statement.

10           MR. GALARZA:  Can I have a minute to

11  review it?

12           THE COURT:  Go ahead.

13           **(Brief pause in proceedings)**

14                    **CROSS-EXAMINATION**

15  **BY MR. GALARZA:**

16     Q.    Mr. Villarreal, do you -- what is your address

17  right now?

18     A.    Right now?

19     Q.    Yes.

20     A.    1300 Fresno, San Benito.

21     Q.    At the time that you gave this statement on or

22  about September 8th, what was your address at that time?

23     A.    It was 9 -- 409 Morningside, 25B.

24     Q.    And that's the trailer park --

25     A.    Yeah.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              43

1        Q.    -- that Ms. Harrison owns; is that correct?

2        A.    Yes, sir.

3        Q.    How long had you been living there?

4        A.    Three or four months.

5        Q.    You stated that you used to do side jobs for

6   Ms. Harrison; is that correct?

7        A.    Yes, sir.

8        Q.    How long had you been doing that?

9        A.    Well, since I met her.

10       Q.    Okay.  You stated you met her a year before she

11  passed away?

12       A.    Yes, sir.

13       Q.    So you had been doing that since September of

14  '97?

15       A.    Yes, sir.

16       Q.    And you stated that she would never pay you for

17  these jobs?

18       A.    I didn't get her money.

19       Q.    Okay.  But that she would give you ten or $15?

20       A.    Yes, sir.

21       Q.    Okay.  Would this be to reimburse you for the

22  jobs that you had done or how would you all work that

23  out?

24       A.    Well, I just tried to help her.

25       Q.    But the money -- whenever she would give you

STATE OF TEXAS VS. RUBEN GUTIERREZ                    44

```
 1    money, would she just give it to you after you did a job
 2    or --
 3         A.    Yes, sir.
 4         Q.    Okay.  So every time you did a job, she would
 5    give you some money?
 6         A.    Yeah.
 7         Q.    She had your cellular phone; is that correct?
 8         A.    Yes, sir.
 9         Q.    And she also had your home phone?
10         A.    Yes, sir.
11         Q.    How often would she call you?
12         A.    Whenever there was a problem at the trailer
13    park.
14         Q.    And you stated you met Chacho how long before
15    that?
16         A.    About a year.
17         Q.    Did you meet them both at the same time?
18         A.    Yes, sir.
19         Q.    Who did you meet Chacho through?
20         A.    Through my brother 'cause Chacho used to hang
21    around with my brother there.
22         Q.    What's your brother's name?
23         A.    Andres Villarreal.
24         Q.    And who did you meet Ms. Harrison through?
25         A.    Through Chacho.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        45

1          Q.   Okay.  How often would you hang out with Chacho
2     there at the --
3          A.   Every other day.
4          Q.   And when you moved over there, how often would
5     you hang out there?
6          A.   How often?
7          Q.   Yes.
8          A.   Like --
9          Q.   Every other day?
10         A.   -- every day, every other day, yeah.
11         Q.   Okay.  And he would drink how often?  Chacho.
12         A.   Every day we used to drink, yeah.
13         Q.   Who would pay for the beer whenever you all
14    would drink?
15         A.   Well, sometimes me, sometimes Chacho.  Whoever
16    got there brought some beer over.
17         Q.   You stated that there was always friends over?
18         A.   Yes, sir.
19         Q.   Can you give us an estimate as to how many
20    people would be there on a daily basis?
21         A.   Four or five people.
22         Q.   Would it always be different people?
23         A.   No.  It used to -- the same guys.
24         Q.   Okay.  How many people would you estimate would
25    hang out there?  Like -- if it's four or five, how many

STATE OF TEXAS VS. RUBEN GUTIERREZ                              46

1    total people did you meet?

2         A.   That I knew?

3         Q.   Yeah, that you knew.

4         A.   About ten.

5         Q.   Okay.  Out of this ten people, how many persons

6    knew that Ms. Harrison had money?

7         A.   I guess all ten.  Chacho used to talk about it,

8    yeah.

9         Q.   How often would Chacho talk about Ms. Harrison

10   having money?

11        A.   After four or five beers.

12        Q.   So would you agree with me that it was on a

13   daily basis?

14        A.   Yes, sir.

15        Q.   And he would tell everybody that was there?

16        A.   Yes, sir.

17        Q.   You stated that Ms. Harrison told you that she

18   had money; is that correct?

19        A.   Yes, sir.

20        Q.   Okay.  How far after you met her did she tell

21   you this?

22        A.   Like three months before she died.

23        Q.   You stated that three months before she died

24   that she told you that she was afraid of Chacho; is that

25   correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    47

1          A.   Yes, sir.

2          Q.   And that's the time that she told you for you

3    to stay there?

4          A.   Yes, sir.

5          Q.   Okay.  As far as your knowledge, why was she

6    afraid of Chacho?

7          A.   Chacho used to argue a lot with her.

8          Q.   Okay.  And she was afraid just because he would

9    argue or would he do anything else besides that?

10         A.   No.  That's all.  She used to argue -- he used

11   to argue a lot.

12         Q.   Do you know what he would argue about?

13         A.   I don't know, like money sometimes or he had

14   some beer.

15         Q.   You stated about money.  Because he wanted more

16   money or --

17         A.   No.  He wanted more beer.

18         Q.   Okay.  So he wanted more money for beer?

19         A.   Yes.

20         Q.   And he would argue with her about this?

21         A.   Yes, sir.

22         Q.   And did she -- as far as your knowledge, did

23   Ms. Harrison trust Chacho?

24         A.   Yes.

25         Q.   Okay.  You stated that she wanted for you to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    48

1    keep the money.  How did you know that?
2         A.   She told me.  That's the way she brought me
3    over to her house to live; and my mom was going to take
4    care of her.
5         Q.   Okay.  And --
6                   MR. GALARZA:  Can I approach, Your Honor?
7                   THE COURT:  You may.
8         Q.   (BY MR. GALARZA)  Let me show you this
9    diagram.  Do you recognize this diagram?  Is it of the
10   area where you used to live at?
11        A.   Yes, sir, in the corner.
12        Q.   Okay.  This is where you used to live at?
13        A.   Yes, sir.
14        Q.   Okay.  And you moved there, you said, three
15   months before she passed away?
16        A.   It was in July.  Yeah, about three months.
17        Q.   And this is where Ms. Harrison used to live at,
18   right?
19        A.   Yes, sir.
20        Q.   And where would you all drink at?
21        A.   About right there.  Right there.
22        Q.   Around this area?
23        A.   Yes, sir.
24        Q.   So this is where you used to live; this is
25   where she lived; and this is where you all would drink?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          49

```
 1        A.    Yes, sir.
 2        Q.    So this is 25A, then?
 3        A.    Huh?
 4        Q.    Is this -- what number is this?
 5        A.    25B.
 6        Q.    25B.
 7        A.    Yes, sir.
 8        Q.    So the main reason she brought you over was to
 9   help her and for your mother to help her and because she
10   was afraid of Chacho?
11        A.    No, I didn't say that.
12        Q.    Okay.  Why was the main reason she brought you
13   over?
14        A.    To help her out in the trailer park.
15        Q.    Okay.  And how many times did you stay there,
16   spend the night?
17        A.    Just one time, sir.
18        Q.    Just that one time.  And then the next day you
19   went to work; is that correct?
20        A.    Yes, sir.
21        Q.    And then you went directly back to her house?
22        A.    Huh?
23        Q.    Did you go back to her house that same day?
24        A.    She told me to come back; and that's when she
25   showed me the money, that I was sleeping underneath the
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    50

```
1    whole money.  And I didn't knew about that.  That's why
2    she told me to come back after work and showed me the
3    money.
4         Q.   Okay.  What did she mean, as far as your
5    knowledge, that you were sleeping underneath the money?
6         A.   What do you mean by that?
7         Q.   What did she mean that she told you you were
8    sleeping under the money?
9         A.   Well, she put it in a way to protect her that
10   night.  And then she told me to come back after work; and
11   that's when she told me that I was sleeping underneath
12   the whole money.  That's when she showed me the money.
13        Q.   So she kind of told you where the money was at?
14        A.   No.  She brought it up.  She didn't told me
15   where the money was.
16        Q.   Okay.  And then you saw it in a blue suitcase?
17        A.   Yes.
18        Q.   How many suitcases did she have?
19        A.   Two.
20        Q.   How long were you there talking to her at that
21   point in time?
22        A.   Ten, 15 minutes, and I left.
23        Q.   As far as your knowledge, do you know if she
24   ever showed the money to anybody else?
25        A.   In my knowledge, I don't think so.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          51

1      Q.   As far as your knowledge, do you know if Chacho
2  knew where the money was at?
3      A.   Chacho used to talk about it.  I don't know if
4  he knew about it.  I can't say that.
5      Q.   You stated that one of the suitcases was silver
6  and old; is that correct?
7      A.   Yes, sir.
8      Q.   And which one was this one, the big suitcase or
9  the small one?
10     A.   The big one.
11     Q.   And that's the one that was on the bed?
12     A.   Yes, sir.
13     Q.   The one that she carried over to where you were
14  at was the small one?
15     A.   The blue one.
16     Q.   Did she open the silver suitcase also?
17     A.   No, sir.
18     Q.   You stated that you used to take her to the
19  bank?
20     A.   Yes, sir.
21     Q.   Okay.  How often?
22     A.   I took her one time; and I didn't want to take
23  her no more 'cause she used to argue with the people that
24  she was robbing the money, counting the money, I guess.
25     Q.   Okay.  You stated that day as to her knowledge

STATE OF TEXAS VS. RUBEN GUTIERREZ                                52

1    she was going to deposit $10,000; is that correct?

2         A.    Yes, sir.

3         Q.    And that's when the tellers told her it was

4    30,000?

5         A.    Yes, sir.

6         Q.    Okay.  Did she still deposit the whole amount?

7         A.    No.  She wanted to go to the lobby to talk to

8    the president, but it was closed.

9         Q.    Did she deposit anything at all?

10        A.    Not that day.

11        Q.    Do you know how often, as far as your

12   knowledge, she would go to the bank?

13        A.    No.

14        Q.    Okay.  Let's go back to the times that you have

15   up there.

16             MR. GALARZA:  Can I approach, Your Honor?

17             THE COURT:  You may.

18        Q.    (BY MR. GALARZA)  You stated that at 10:30 you

19   called her on the phone; is that correct?

20        A.    Yes, sir.

21        Q.    And then at around 1:30 is when you saw

22   Mr. Gutierrez on Morningside or behind Ms. Harrison's?

23        A.    Going to -- going through the -- where we used

24   to rent.

25        Q.    Okay.  Was that normal for people to pass by

STATE OF TEXAS VS. RUBEN GUTIERREZ                    53

1   there?  Would people usually pass by there?

2        A.   Yes, looking for Chacho.  Yes, sir.

3        Q.   So that's mainly what you thought was

4   happening?

5        A.   Yes, sir.

6        Q.   Okay.  Then at 3:30 you called her over the

7   phone?

8        A.   Yes, sir.

9        Q.   Did she answer the phone at that time?

10       A.   Yes, sir.

11       Q.   You spoke to her for how much time?

12       A.   Three minutes.

13       Q.   Okay.  And then you stated you saw Ruben again

14  around 4:00?

15       A.   Yes, sir.

16       Q.   And then at 4:30 is when you saw Ms. Harrison

17  again?  Let me see.  Is that when you saw her with the

18  ladies?

19       A.   Yes, sir.

20       Q.   Okay.  You stated earlier that, I believe, that

21  the ladies were there for around an hour?

22       A.   Yes, sir.

23       Q.   Okay.  So, the last time you saw Ms. Harrison

24  with the ladies was around 5:00, 5:30; is that correct?

25       A.   4:30, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          54

1       Q.   Okay.  When was the first time you saw
2   Ms. Harrison at this time?
3       A.   4:30.
4       Q.   4:30?
5       A.   Yes, sir.
6       Q.   And you stated that she was there -- that the
7   ladies --
8       A.   They left.
9       Q.   They left.
10       A.   And she went inside the house; and I never saw
11   her again.
12       Q.   How long did the ladies stay there, as far as
13   your knowledge?
14       A.   I told you about an hour.  From four or 3:30 to
15   four they were there.
16       Q.   Okay.  So this is the time period that you saw
17   her?  So you saw the ladies leave around 4:30, then?
18       A.   Yes, sir.
19       Q.   Okay.  Let me go back.  You called her over the
20   phone to get some caliche?
21       A.   Yes, sir.
22       Q.   Right after, when did you see Ms. Harrison for
23   the first time?
24       A.   Between 3:30 and 4:30.
25       Q.   That's the first time that you saw

STATE OF TEXAS VS. RUBEN GUTIERREZ                          55

 1    Ms. Harrison?

 2         A.    (Nods head).

 3         Q.    Okay.  So you're not sure what time?

 4         A.    No, sir, but it was about 3:30 to 4:30.

 5         Q.    Okay.  Then you saw Ruben at around 4:00?

 6         A.    Yes, sir.

 7         Q.    Okay.  Then at 4:30 is when you say that the

 8    ladies left?

 9         A.    Yeah.

10         Q.    And so Ms. Harrison went inside at this time?

11         A.    4:30.

12         Q.    And then at 4:45 is when you spoke to your mom

13    to go over --

14         A.    No.  I sent my mom over there.

15         Q.    You sent your mom over.

16         A.    Yes, sir.

17         Q.    So as far as your knowledge, the last time you

18    saw Ms. Harrison was around 4:30; is that correct?

19         A.    Yes, sir.

20         Q.    And the last time you saw Ruben was around

21    4:00, as far as your knowledge?

22         A.    Yes, sir.  As far as my knowledge, yes, sir.

23         Q.    Does your brother live there or you used to

24    live there also?

25         A.    He's been living there for 15 years.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    56

1       Q.    Okay.  And then when you all moved, it was --
2   did you move in with your mom at the same time?
3       A.    Yes, sir.
4       Q.    And was Mr. Martinez living --
5       A.    Yes, sir.
6       Q.    -- married to your mom?  So at that point, it
7   was Mr. Martinez, your mom Maria Luisa --
8       A.    Maria Luisa Villarreal.
9       Q.    -- and yourself?
10      A.    And myself.
11      Q.    Who else was living there?
12      A.    Just three of us.
13      Q.    As far as your knowledge, did Ramiro know about
14  the money?
15      A.    Yeah, when Chacho talked about it.
16      Q.    And we're talking about your stepdad; is that
17  correct?
18      A.    Yes, sir.
19      Q.    Who else, as far as your knowledge, would help
20  out Ms. Harrison running errands, doing any type of work?
21      A.    Before me?
22      Q.    Uh-huh.
23      A.    Relatives of hers.
24      Q.    And what was Chacho's duties there?
25      A.    Cutting the yards, maintaining the pipes,

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    57

```
 1    plumbing.
 2         Q.   And as far as you know, how much would he get
 3    paid?
 4         A.   He used to told me that 150 a week.
 5         Q.   And you stated that you would drink every
 6    single day?
 7         A.   Yes, sir.
 8         Q.   Okay.  You stated the very first time that you
 9    saw Ruben is the time that he saw you?
10         A.   No.  That time, he didn't see me that time or I
11    guess he never looked at me --
12         Q.   At that --
13         A.   -- directly at me.
14         Q.   That time we're talking about the 1:30; is that
15    correct?
16         A.   Yes, sir.
17         Q.   And around 4:00, as far as you know, do you
18    know if he saw you or not?
19         A.   No, I don't think he saw me or -- I don't know.
20    Just like I say, he just moved his head to the side.
21         Q.   And you gave this statement -- Ms. Harrison
22    passed away on Sunday morning; is that correct?  Do you
23    remember that?
24         A.   I can't say that 'cause when I got there it was
25    12:30.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                     58

1          Q.   12:30 --

2          A.   Sunday morning.

3          Q.   Sunday morning.  Okay.  When did the police

4    officers get in contact with you?

5          A.   Nobody got in -- my mom called me.  That's when

6    I came back.

7          Q.   And why did your mom call you?

8          A.   'Cause she knew I was a real close friend of

9    her.

10         Q.   And you got to the trailer park around 12:30?

11         A.   12:30, one, 1:15.

12         Q.   And this is on Sunday?

13         A.   Yes, sir.

14         Q.   Okay.  Were you living in San Benito at that

15   time or were you living here in Brownsville?

16         A.   I was staying over there at the house.

17         Q.   In San Benito?

18         A.   Yeah.  I got a girlfriend over there in San

19   Benito.

20         Q.   Okay.  What time did the police get in contact

21   with you or what time did you talk to the police?

22         A.   Monday.

23         Q.   At around what time?

24         A.   4:30, five p.m.

25         Q.   Did you speak to them on Sunday at all?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    59

```
 1        A.    No.
 2        Q.    For how long did you speak to the police
 3   officers?
 4        A.    Huh?  That day?
 5        Q.    That Monday.
 6        A.    They were -- about 20 minutes they were at the
 7   house.
 8        Q.    They went over to your house?
 9        A.    Yes, sir.
10        Q.    And that's here in Brownsville at the trailer
11   park?
12        A.    At the trailer park.
13        Q.    How many police officers were there?
14        A.    Two and a woman, three.
15        Q.    Do you remember who they were?
16        A.    Garcia, Flores, and I don't know her name, a
17   woman.
18        Q.    Garcia, Flores, and a lady?
19        A.    And a lady, yeah.
20        Q.    Did you give a statement on that day?
21        A.    No, sir.
22        Q.    They just spoke to you for 20 minutes?
23        A.    (Nods head).
24        Q.    When did you go in to give a statement?
25        A.    On Tuesday morning.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           60

1       Q.   At around what time?

2       A.   9:00.

3       Q.   How long did you talk to the police officers at

4   that time?

5       A.   I was there for an hour and a half.

6       Q.   So you were there until like 10:30; is that

7   correct?

8       A.   Yes, sir.

9       Q.   Who were the officers at that time?

10      A.   It was Garcia.

11      Q.   Was he the only one?

12      A.   And after that Flores came in.

13      Q.   Did the lady go in at all?

14      A.   No.

15      Q.   So, on Tuesday it was only Garcia and Flores?

16      A.   Yes, sir.

17      Q.   Did you have to wait for them to type up a

18   statement or did they already have it ready?

19      A.   No.  They -- I was doing it with them, talking

20   to them; and he was in the computer writing down.

21      Q.   As far as your knowledge, did you see Ruben any

22   other times before this on Sunday -- I'm sorry, on

23   Saturday?

24      A.   No, sir.

25              MR. GALARZA:  That's all I have at this

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                        61

```
 1   time, Your Honor.
 2                    MS. FISCHER:  May I, Your Honor?
 3                    THE COURT:  Go ahead.
 4                    MS. FISCHER:  May I approach?
 5                    THE COURT:  You may.
 6                      REDIRECT EXAMINATION
 7   BY MS. FISCHER:
 8        Q.   Mr. Villarreal, you don't live at Harrison
 9   Mobile Home Park anymore.  Why did you move?
10        A.   I got married.
11        Q.   And where do you live now?
12        A.   1300 Fresno, San Benito.
13        Q.   Okay.  Now, these are all just approximate
14   times, right?  Let's get rid of this for a minute here
15   and let's talk about where you saw the defendant twice
16   the day Ms. Harrison was killed.
17                    Now, I have a diagram here,
18   Mr. Villarreal, and you can take a look at it.  I don't
19   want you to mark on it, but take a look at this.  Does
20   this pretty much look like Harrison Mobile Home Park?
21        A.   Yes, ma'am.
22        Q.   That means your house would be up over here in
23   the top corner.
24        A.   Yes.
25        Q.   That's Ms. Harrison's house right there in the
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              62

1    middle.

2         A.    Yes, ma'am.

3         Q.    Okay.  Let's -- I'm not going to draw all this

4    up here, Mr. Villarreal, but let's kind of put -- this is

5    your house.  Let's put Ms. Harrison's house, and let's

6    put Morningside.

7               Okay.  You take the chalk; and I want you

8    to show the jury the first time you saw the defendant.

9    Where was he?

10        A.    He was coming right here.

11        Q.    Okay.  The second time -- okay.  How many --

12   could you tell how many -- was the defendant by himself

13   or was he with someone?

14        A.    No.  I just saw him.

15        Q.    Okay.  The second time you saw him, where did

16   you see him?

17        A.    Right here.

18        Q.    Okay.  Was he alone or was he with someone?

19        A.    Alone.

20        Q.    Okay.  So these are two different times.  This

21   is the first time he's walking toward Ms. Harrison's

22   house; and this was early in the afternoon about 1:30?

23        A.    Yes.

24        Q.    And the second time is this time right here?

25        A.    Yes, ma'am.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          63

1        Q.    And it's not the same time?

2        A.    No.

3        Q.    Like some time passed?  This was about four?

4        A.    4:30, something like that.

5        Q.    Four or 4:30 --

6        A.    Yes, ma'am.

7        Q.    -- approximately.

8              Okay.  Mr. Villarreal, do you want to step

9   down for just a minute so now we can show the jury on the

10  diagram so they can be real sure?  We can't draw on this,

11  but there's a pointer right over here.  Go ahead and show

12  the jury the first time you saw him, where was the

13  defendant?

14       A.    Coming this way.

15       Q.    Okay.  And the second time?

16       A.    Right here.

17             MS. FISCHER:  I pass the witness.

18       Q.    (BY MS. FISCHER)  You can go ahead and have a

19  seat, Mr. Villarreal.

20       A.    (Witness complies).

21                    **RECROSS-EXAMINATION**

22  BY MR. GALARZA:

23       Q.    You stated the first time he's the only one

24  that you saw; is that correct?

25       A.    Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                64

```
 1          Q.   And the second time?
 2          A.   Just him again.
 3          Q.   Did you speak to Chacho that day at all?
 4          A.   No, sir.
 5          Q.   Have you spoken to him since then?
 6          A.   Since when?
 7          Q.   Since that day.
 8          A.   No, I had about two months that I didn't speak
 9    to Chacho.
10          Q.   Can you actually see --
11                    MR. GALARZA:  Can I approach, Your Honor?
12                    THE COURT:   You may.
13          Q.   (BY MR. GALARZA)  When you were putting the
14    caliche that you saw Ruben the first time, where were you
15    at?
16          A.   The first time I saw him?
17          Q.   The first time.
18          A.   The first time?  I was here at the house.
19          Q.   Right here at the house?
20          A.   Yeah, and he was walking that way.
21          Q.   Okay.  Where is the caliche road?  Where does
22    it go through?
23          A.   Caliche?  Let me see.  Right there, about
24    right -- no, no, over here.  Right there in the black
25    spot, right there.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    65

1        Q.   Okay.  So the caliche road goes from here to
2   your house or does it stop right there?
3        A.   There was the caliche stacked.  I was getting
4   it from there and putting it in over here to the house.
5        Q.   Where does it go?  I'm trying to find the
6   driveway to your house.  That's what I'm trying to find.
7   There's no driveway?
8        A.   No.  It finished right there where --
9        Q.   So you have to stop here and then you walk to
10  the house?
11       A.   No.  I was putting the caliche in my truck --
12       Q.   Oh, okay.
13       A.   -- and I was pouring it all the way over there.
14       Q.   Okay.  You were here at around your house?
15       A.   Yes, sir.
16       Q.   Can you actually see Ms. Harrison's house from
17  your house?
18       A.   Yes, sir.
19       Q.   Okay.  Even if there's trees around here?
20       A.   Yes, sir.
21       Q.   Okay.
22            MR. GALARZA:  That's all we have, Your
23  Honor.
24            THE COURT:  Ms. Fischer?
25            MS. FISCHER:  I have nothing further, Your

STATE OF TEXAS VS. RUBEN GUTIERREZ                         66

1    Honor.  May this witness be excused?

2                    MR. GALARZA:  Subject to recall, Your

3    Honor, that's fine.

4                    THE COURT:  You're excused to go.

5                    THE WITNESS:  Thank you.

6                    THE COURT:  Call your next witness.

7                    MR. BLAYLOCK:  The State calls Julio

8    Lopez.

9                    THE COURT:  Would you raise your right

10   hand, please?

11                    **(The witness was sworn in by the Court)**

12                    THE WITNESS:  I do.

13                    THE COURT:  Okay.  You may be seated.

14                    You may proceed.

15                    MR. BLAYLOCK:  Thank you, Judge.

16                         **JULIO LOPEZ,**

17     having been first duly sworn, testified as follows:

18                    **DIRECT EXAMINATION**

19   BY MR. BLAYLOCK:

20        Q.   Good morning, Mr. Lopez.

21        A.   Good morning.

22        Q.   How are you today?

23        A.   Good.

24        Q.   Good.  I want to talk to you a little about

25   last September, 1998, okay?

1      A.    Okay.

2      Q.    Did you know Ms. Harrison?

3      A.    I didn't know her personally.  I just knew that

4  an old lady lived there.

5      Q.    Okay.  You knew that an old lady lived in a

6  house?

7      A.    Yeah.

8      Q.    Was that house in a mobile home park?

9      A.    Yes.

10      Q.    Okay.  And is it a big house or a small house?

11      A.    I'd say it's a small house.

12      Q.    Okay.  And is that the office of the mobile

13  home park or do you know?

14      A.    I believe it is.

15      Q.    Okay.  And can you get closer to the

16  microphone?

17      A.    Yes.  (Witness complies).

18      Q.    All right.  Now, so you didn't know the old

19  lady -- had you ever seen the old lady before?

20      A.    I've seen her watering her plants when we pass

21  by before.

22      Q.    Okay.  And you passed by there a lot, didn't

23  you?

24      A.    No, not a lot.

25      Q.    Well, you lived at -- where -- what was your

STATE OF TEXAS VS. RUBEN GUTIERREZ                              68

1    address?

2        A.   204 Morningside.

3        Q.   204 Morningside.  From time to time you would

4    walk to the little store that's east of there?

5        A.   Yes.

6        Q.   Okay.  What's the name of that little store?

7        A.   I don't know the name, but I know the name

8    before.  It used to be Vanessa's Bakery.

9        Q.   Okay.  So you would walk to what used to be

10   Vanessa's bakery?

11       A.   Yes.

12       Q.   Okay.  And is that when you would see

13   Ms. Harrison watering her plants?

14       A.   Yes.

15       Q.   Okay.  Was she a young lady or, as you said, an

16   old lady?

17       A.   An old lady.

18       Q.   All right.  Now, did you know a man named Ruben

19   Gutierrez?

20       A.   No.

21       Q.   Okay.  Did you know a man named Rene Garcia?

22       A.   No.

23       Q.   What about Pedro Gracia?

24       A.   No.

25       Q.   You didn't know any of these people, right?

```
1        A.    No.
2        Q.    Okay.  But on September 5, 1998, were you
3   walking to that store?
4        A.    Yes.
5        Q.    Okay.  What time in the afternoon was that?
6        A.    It was about six.
7        Q.    Okay.  It was later in the afternoon?
8        A.    Yeah, late.
9        Q.    Okay.  Was the sun still up or was it dark?
10       A.    I think it was a cloudy day.
11       Q.    A cloudy day?  In fact, it had rained a little
12  bit that day, right?
13       A.    Yes.
14       Q.    So it's later in the afternoon about six.  And
15  who went to that store with you?
16       A.    My sister, my sister Veronica.
17       Q.    Veronica.  And why were you and Veronica going
18  to the store?
19       A.    To buy candy.
20       Q.    Okay.  Going to get some candy to eat, right?
21       A.    Yes.
22       Q.    How old is Veronica?
23       A.    She's 14.
24       Q.    Okay.  So she's your younger sister?
25       A.    Uh-huh.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    70

```
1        Q.   How old are you?
2        A.   Twenty.
3        Q.   Okay.  And that September afternoon, did you
4   walk from your house to that little store?
5        A.   Yes.
6        Q.   And did that make you walk right by
7   Ms. Harrison's house?
8        A.   Yes.
9        Q.   Okay.  And when you walked from your house to
10  the store, did you see anybody around Ms. Harrison's
11  house?
12                  MR. GALARZA:  Your Honor, objection to the
13  leading, Your Honor.
14                  THE COURT:  Don't lead your witness.  Go
15  ahead.
16       Q.   (BY MR. BLAYLOCK)  Okay.  When you walked from
17  your house to the little store, did you see anybody
18  around Ms. Harrison's house?
19       A.   No, not on the way to the store.
20       Q.   Okay.  And when you got to the store, about how
21  long did you spend there?
22       A.   Probably like five minutes.
23       Q.   All right.  You got the candy, you and
24  Veronica, and then what?  Did you leave the store?
25       A.   Yes.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          71

1       Q.   All right.  And where were you headed when you
2   left the store?
3       A.   Home.
4       Q.   Okay.  And when you were heading home, which
5   way did you go?
6       A.   I don't understand.
7       Q.   Okay.  Is that back west on Morningside Street?
8       A.   Yeah.
9       Q.   Okay.  And when you're heading out of the
10  store, do you see anybody then?
11      A.   When we were walking back, we see two guys
12  walking ahead of us.
13      Q.   Two guys?  And what do these two guys look
14  like?
15      A.   They look young and dressed in T-shirts and
16  shorts.
17      Q.   Okay.  T-shirts and what kind of shorts?
18      A.   Those baggy shorts.
19      Q.   Baggy?  Okay.  Now, can you describe how tall
20  they were?
21      A.   One of them was like five six, five seven, I
22  guess, like my size.
23      Q.   Okay.
24      A.   And the other one was a littler shorter than
25  him.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          72

1       Q.   All right.
2       A.   And the other one was chubby; and the other one
3  was slim.
4       Q.   Okay.  And did you get a good look at these
5  guys?
6       A.   I got a good look at one, at one of them.
7       Q.   Okay.  Is that guy that you got a good look at,
8  is he in this courtroom right now?
9       A.   No.
10      Q.   Okay.  Look all around.  Look all around in the
11  inside of this circle.
12      A.   It would be the one over there (pointing).
13      Q.   Somebody in the back?
14      A.   In the back.
15      Q.   Okay.  He looks kind of like he's got short
16  hair, that kind of thing?  Okay.  But when you talked to
17  the police, you picked somebody out of a lineup, right?
18      A.   Yes.
19      Q.   And the person you picked out of that lineup,
20  are you sure that's the person that you saw that day?
21      A.   The person that I picked?
22      Q.   Yeah.
23      A.   If I was sure it was the guy that I saw?
24      Q.   Yeah.
25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          73

1       Q.   Okay.  Are you absolutely positive that the
2   picture that the police showed you is the one that you
3   saw that day walking on the road?
4       A.   Yes.
5       Q.   Okay.  And people change, right?  They clean
6   up, wear different clothes.  You may not recognize them
7   from time to time, right?
8       A.   Yes.
9       Q.   Okay.  But you're absolutely sure the guy you
10  picked out of that picture is the guy you saw on the
11  street?
12      A.   Uh-huh.
13      Q.   All right.  Now, what did -- what did the two
14  guys on the street do when you saw them?
15      A.   The slim guy, he ran towards the house on the
16  side of the street --
17      Q.   Okay.
18      A.   -- like if he was going to go through the back
19  or something.  And the other one was just in front --
20      Q.   Let's go back a little bit.  You're leaving the
21  store.  What side of the street is the store on?
22      A.   On the left side.
23      Q.   Okay.  It's on the other side of the street
24  from the trailer park, right?
25      A.   Uh-huh.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    74

1        Q.    Okay.  So when do you cross the street?
2        A.    I cross the street around -- a little bit
3   before the tire shop.  There's a tire shop there.
4        Q.    Okay.
5        A.    And they crossed ahead of us.
6        Q.    Okay.  So you saw them cross the street?
7        A.    Uh-huh.
8        Q.    And they were walking the same direction you
9   were going?
10       A.    Same direction.
11       Q.    Okay.  And when you got to -- near the
12  Harrison's house, what did you see?
13       A.    When I got -- when we were near, I saw the guy
14  running towards the house.
15       Q.    Okay.  The same guy that you saw a picture of
16  that the police showed you?
17       A.    Yes.
18       Q.    Okay.  That same guy ran towards Ms. Harrison's
19  house?
20       A.    Towards Ms. Harrison's house.
21       Q.    Was he going to the front door or the back?
22       A.    The one that ran, he looked like he was going
23  through the side like to the back.
24       Q.    Okay.  And what about the other guy, where did
25  he go?

1    A.   He was like in the front door like if he was
2    going to go in.  He just looked like normal.
3    Q.   Okay.  So he was walking up to the front door
4    like he was going to go in?
5    A.   Uh-huh.
6    Q.   Okay.  And that's the office area?
7    A.   Uh-huh.
8    Q.   Okay.  And after you saw that, what did you do?
9    A.   We just kept on walking by.
10   Q.   Okay.  You kept going home?
11   A.   Yeah.
12   Q.   All right.  And did the police later come and
13   talk to you?
14   A.   A few days later they came and talked to me.
15   Q.   All right.  And they asked you -- what did they
16   ask you?
17   A.   They asked me if I --
18            MR. GALARZA:  Objection, Your Honor, to
19   hearsay.
20            THE COURT:  Sustained.
21   Q.   (BY MR. BLAYLOCK)  Okay.  So did the police
22   ask -- did the police want to know what you saw that day?
23   A.   Yes.
24   Q.   And did you tell them what you just told me?
25   A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        76

```
1          Q.   In fact, you gave a statement on the 11th day
2     of September.  Do you remember giving that statement?
3          A.   Yeah.
4          Q.   All right.  And when -- did you go to the
5     police station or was it at your house?
6          A.   No.  I went to the detectives to the police
7     station.
8          Q.   So you went to the police station?
9          A.   Yes.
10                   MR. BLAYLOCK:  May I approach the witness,
11    Judge?
12                   THE COURT:  You may.
13         Q.   (BY MR. BLAYLOCK)  Do you remember when you
14    got to the police station that -- you already said the
15    police showed you a photo lineup.  Yes?
16         A.   Yes.
17         Q.   Okay.  Would you look at State's Exhibit
18    Number 35?  Is this exactly as the way you saw it that
19    day?
20         A.   Yes.
21         Q.   Okay.  This accurately depicts exactly what you
22    saw that day?
23         A.   Uh-huh.
24         Q.   All right.
25                   MR. BLAYLOCK:  I'll show 35 to the
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    77

1   defense.

2                    I move to admit State's Exhibit 35.

3                    MR. GALARZA:  Your Honor, if we can take

4   him on voir dire at this time?

5                    THE COURT:  Go ahead.

6                    MR. GALARZA:  If I can borrow the -- can I

7   approach, Your Honor?

8                    THE COURT:  You may.

9                    **VOIR DIRE EXAMINATION**

10  **BY MR. GALARZA:**

11       Q.    It's Mr. Lopez, right?

12       A.    Yeah.

13       Q.    Let me show you what's been marked as State's

14  Exhibit Number 35.  Do you remember which one you picked

15  as the one -- as the person you saw that day?

16       A.    Number five.

17       Q.    Number five?  Okay.  And how much -- you stated

18  the police officers got in contact with you; is that

19  correct?

20       A.    Yes.

21       Q.    Okay.  And what day did the police officers get

22  in contact with you?

23       A.    It was a few days later after I saw the guy.

24       Q.    Okay.  And do you remember what -- well, who

25  took you over to the police department?

1        A.    The detective that came to my house.

2        Q.    They came to pick you up and they took you over

3   to the police department?

4        A.    Yes.

5        Q.    Okay.  And how long were you there at the

6   police department?

7        A.    About an hour.

8        Q.    After you got there, how long did it take for

9   them to show you the lineup?

10        A.    He showed it to me when he got to my house.  He

11   showed it to me right there.

12        Q.    Okay.  Before he took you over to the police

13   department?

14        A.    Yes.

15        Q.    How long did it take you to identify the

16   person?

17        A.    A few seconds.

18        Q.    For how long had you seen the individual when

19   you saw him at the store?

20        A.    Just for a few seconds, too.

21        Q.    And that's the person that you identified, the

22   same person that's on the lineup; is that correct?

23        A.    Yes.

24        Q.    Okay.  And here the person that you are

25   identifying is the person you just identified right now

STATE OF TEXAS VS. RUBEN GUTIERREZ                    79

1    here in the courtroom; is that correct?

2        A.    Yes.

3        Q.    Okay.

4              MR. GALARZA:  That's all I have at this

5    time, Your Honor.

6              MR. BLAYLOCK:  I didn't hear an objection.

7    I'd like a ruling on my motion.

8              MR. GALARZA:  Your Honor, the only

9    objection we have at this time is to inappropriate format

10   for identification of a person.

11             THE COURT:  I'm sorry.  What?

12             MR. GALARZA:  Inappropriate format of an

13   identification of a person.

14             THE COURT:  Which person?  The one in the

15   courtroom or the one in the lineup?

16             MR. GALARZA:  No.  He was not able to

17   identify the same one.

18             THE COURT:  That's overruled.  Thirty-five

19   will be admitted.

20             **(State's Exhibit Number 35 admitted)**

21             MR. BLAYLOCK:  Thank you, Judge.

22             **DIRECT EXAMINATION CONTINUED**

23   **BY MR. BLAYLOCK:**

24       Q.    In fact, you just told this defense attorney

25   that you picked out number five on that day?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              80

```
 1        A.   Yes.
 2        Q.   Number five.  Can you take a real good look at
 3   number five?  Does it resemble that man in the white
 4   shirt --
 5                   MR. GALARZA:  Your Honor, I'm going to
 6   object, Your Honor.  At this time he's already asked and
 7   answered that question; and he's already stated --
 8                   THE COURT:  I'll sustain the objection.
 9                   MR. BLAYLOCK:  Judge, what -- I don't
10   understand the question.  I haven't asked him if this
11   picture resembles anybody.
12                   MR. GALARZA:  Your Honor --
13                   MR. BLAYLOCK:  I talked about --
14                   MR. GALARZA:  -- he's pointing at the same
15   time, Your Honor, when he was asking him that.
16                   THE COURT:  What's your question, counsel?
17                   MR. BLAYLOCK:  Does this picture look like
18   that guy?
19                   MR. GALARZA:  That's what I objected to.
20   He's already identified who he stated was -- that he saw
21   that day.
22                   THE COURT:  All right.  I'll permit him to
23   ask him.
24        Q.   (BY MR. BLAYLOCK)  All right, sir.  My
25   question is simple.  You were shown a photo -- or this
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           81

1    lineup that's got six different photos in it, right?
2         A.   Uh-huh.
3         Q.   And you were shown this on September 11,
4    1998 --
5         A.   Yes.
6         Q.   -- right?  Okay.  Did the police suggest in any
7    way to you which one to pick?
8         A.   No.
9         Q.   Okay.  They just asked you, "Pick out the guy
10   that you saw on the street that day --"
11        A.   Yes.
12        Q.   -- right?  "And the guy who you saw run around
13   to the back of Ms. Harrison's house," right?
14        A.   Yes.
15        Q.   And you picked out which one?
16        A.   Number five.
17        Q.   Okay.  And does this picture look like that
18   guy?
19        A.   Yes.
20        Q.   Okay.  He's changed his hair a bit, right?
21        A.   Uh-huh.
22        Q.   His moustache is not as dark, right?
23        A.   Uh-huh.
24        Q.   But does it look like him now?
25        A.   Yes.

1    Q.   Okay.

2              MR. BLAYLOCK:   I'd like to publish this to

3    the jury.

4              THE COURT:   You may.

5    Q.   (BY MR. BLAYLOCK)  Now, sir, did the police

6    show you any other photos or any other photo lineups at

7    that time?

8    A.   Yes, they did.

9    Q.   Okay.  And were you able to pick out anybody

10   else?

11   A.   No.

12   Q.   And why is it that you could pick that guy out

13   so well?

14   A.   What --

15   Q.   Number five, the one you picked -- and you did

16   pick number five, correct?

17   A.   Yes.

18   Q.   Why is it that you picked out number five so

19   easily; you didn't pick out anybody else?

20   A.   Because I saw him, I saw his face.

21   Q.   Okay.  And when did you see his face?

22   A.   When we were walking back home, he turned back

23   from across the street.  We crossed the street and they

24   crossed the street; and he turned back and I saw him.

25   Q.   Did you make eye contact with him?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          83

```
 1        A.    Yes.
 2        Q.    Did you make eye contact with the other guy?
 3        A.    No.
 4        Q.    Okay.  And did the other guy ever turn back and
 5   look at you?
 6        A.    No.
 7        Q.    Okay.  So you saw the other guy from behind
 8   mostly?
 9        A.    Uh-huh.
10        Q.    Okay.  And number five, the guy you did pick,
11   he turned around and you saw his whole face?
12        A.    Yes.
13        Q.    Okay.  How far were you away from him when you
14   saw his whole face?
15        A.    Like from where you are right now.
16        Q.    Okay.  So about, for the record, 23, 24 feet?
17        A.    Yeah.
18        Q.    More or less?  How far would you say this
19   distance is?
20        A.    Sixteen feet.
21        Q.    Okay.  Somewhere in that range, between 16 to
22   23.
23                    MR. BLAYLOCK:  I'll pass the witness.
24
25
```

PAM L. ESQUIVEL, CSR, RPR

```
 1                      CROSS-EXAMINATION
 2   BY MR. GALARZA:
 3       Q.   Mr. Lopez, you stated that it was around 6:00,
 4   is that correct, when you were going over to the store?
 5       A.   Yes.
 6       Q.   And that it was you and your sister Veronica?
 7       A.   Yes.
 8       Q.   And what's your address?
 9       A.   204 Morningside Road.
10       Q.   That's here in Brownsville?
11       A.   Yes.
12       Q.   Okay.  How far away do you live from the
13   Morningside Park?
14       A.   Like a block away.
15       Q.   But you live on the same Morningside Road?
16       A.   Yes.
17       Q.   Is it the apartments right beforehand?
18       A.   No.
19       Q.   Is it a house?
20       A.   It's a house next to this business that used to
21   be a clinic.  My house is right next to it.
22       Q.   Okay.
23            MR. GALARZA:  Can I approach, Your Honor?
24            THE COURT:  You may.
25       Q.   (BY MR. GALARZA)  Let me show you what's been
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          85

1    marked as State's Exhibit Number 22.  This is Morningside
2    Road; is that correct?
3         A.   Yes.
4         Q.   Okay.  And this is the trailer park?
5         A.   Uh-huh.
6         Q.   Okay.  What area do you live at?
7         A.   (No response).
8         Q.   This is the Harrison Trailer Park.  In what
9    direction do you live?
10        A.   Over here.
11        Q.   Okay.  Where is the store that you went to at?
12        A.   It's that way on Central Avenue and Morningside
13   on the corner.
14        Q.   It's this way on the corner?
15        A.   Yes.
16        Q.   How far away from the home is it?
17        A.   It's a few houses away.
18        Q.   Okay.  And I believe you stated it's on the
19   left hand side?
20        A.   Yeah.
21        Q.   When you got out of the store, is that when you
22   saw Mr. Gutierrez, the subject you identified?
23        A.   No.  I saw him --
24        Q.   You got out of the store.  You stayed there --
25   you got there.  You stayed there five minutes.  It was

STATE OF TEXAS VS. RUBEN GUTIERREZ                    86

```
 1    around 6:05, I guess.  And you started walking to your
 2    left hand side?
 3         A.   Yes.
 4         Q.   As you were walking, where did you first see
 5    Mr. Gutierrez, the subject you identified?
 6         A.   Around the tire shop.
 7         Q.   Okay.  Where is the tire shop?
 8         A.   Over here.
 9         Q.   Around here?
10         A.   Yes.
11         Q.   How far is the tire shop from the store?
12         A.   A few houses.
13         Q.   Okay.  You started walking -- you stated they
14    were walking in front of you; is that correct?
15         A.   Yes.
16         Q.   And it was two guys?
17         A.   Uh-huh.
18         Q.   Then you weren't seeing his face as you all
19    were walking?
20         A.   No.
21         Q.   You could just see his body structure?
22         A.   Uh-huh.
23         Q.   Where did you see him that he turned around you
24    stated?
25         A.   After we crossed the street.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                87

```
1        Q.   Where?  What area?
2        A.   We crossed the street, then they crossed the
3   street.  And then around here --
4        Q.   Okay.  So when he crossed the street, that's
5   when you saw him turn around?
6        A.   Yes.
7        Q.   Did he turn around to see if there was any cars
8   or do you know why he turned around?
9        A.   No.  He just already had -- he had already
10   crossed the street.  Then he just turned right to me.
11        Q.   Okay.  So when you -- he crossed the street.
12   Then after that is when you saw him turn around; and then
13   that's when you saw him go --
14        A.   Yes.
15        Q.   -- to the house?  How many seconds did you see
16   his face?
17        A.   I'd say like three or four seconds.
18        Q.   Three or four seconds?
19        A.   Yes.
20        Q.   For how many minutes was he walking or for how
21   many seconds was he walking in front of you before he
22   turned?
23        A.   Right after we crossed the street?
24        Q.   When you first saw him was when you got out of
25   the store; is that correct?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    88

1       A.    Yeah.

2       Q.    How many seconds did it take for him to walk

3  and then cross the street?

4       A.    I wouldn't know.  Like maybe 30.

5       Q.    Okay.  So you saw his body structure for like

6  30 seconds?

7       A.    Yeah.

8       Q.    Okay.  And you saw the other guy's body

9  structure for like 30 seconds?

10      A.    Yeah.

11      Q.    And then you saw him cross the street -- they

12 both crossed the street at the same time; is that

13 correct?

14      A.    Uh-huh.

15      Q.    And then you saw him turn around.  So you saw

16 his face for like around three seconds?

17      A.    Yes.

18      Q.    You stated that one of them was around five

19 six; is that correct?

20      A.    Yes.

21      Q.    And that was the slim one?

22      A.    Uh-huh.

23      Q.    And the other one was a little bit shorter?

24      A.    Yes.

25      Q.    You stated that you got a good look at him?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    89

1       A.   Yeah.

2       Q.   Okay.  For three seconds you got a good look at

3  him?

4       A.   Yes.

5       Q.   When Mr. Blaylock asked you if you see that

6  person that you saw that day here in the courtroom, you

7  stated it was the gentleman over there in the back; is

8  that correct?

9       A.   Yes.

10      Q.   Okay.  Do you believe that he looks like him

11  also?

12      A.   Yes.

13      Q.   Okay.  Is there anybody else that looks like

14  him here in the courtroom?

15      A.   The guy with the glasses.

16      Q.   Okay.  He also looks like him?

17      A.   No.  In the front, in the front row.

18      Q.   In the front?

19           JUROR:  Me?

20           THE WITNESS:  Yes.

21      Q.   (BY MR. GALARZA)  Okay.  He also looks like

22  him?

23      A.   Yes.

24      Q.   When the police officers went to talk to you,

25  first of all, how did the -- they find out that you had

1   seen this individual?  How did that come about?

2       A.   I was at my landlord's house, and she lives in

3   front of the trailer park.  And the detective was talking

4   to her about that.  And so, I had -- I had already told

5   him that I had seen some guys; and then he told me if I

6   could tell him what I saw.

7       Q.   Okay.  And what's your landlord's house name --

8   what's her name?

9       A.   Maria Zamora.

10      Q.   Maria --

11      A.   Maria Juana Zamora.

12      Q.   Maria Juana Samuel?

13      A.   Zamora.

14      Q.   Zamora.  And that's when the police officers

15  were talking to her?

16      A.   Yes.

17      Q.   And then after that when they started talking

18  to you?

19      A.   Uh-huh.

20      Q.   For how long did they talk to you?

21      A.   For like ten minutes.  Then he said he'll be

22  back another day.

23      Q.   And do you remember what day that was, the

24  first day that you -- they talked to you?

25      A.   No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              91

1      Q.   Was it Sunday, Monday, Tuesday?

2      A.   No, I don't remember.

3      Q.   You don't remember?  But they spoke to you ten

4  minutes?

5      A.   Yes.

6      Q.   And how many days after they spoke to you the

7  first time did they come back?

8      A.   Like two days.

9      Q.   Two days later?  For how long did they speak to

10  you two days later?

11      A.   Well, I went to the police station, and I made

12  a statement, and it took like an hour.

13      Q.   Okay.  What day was it that they showed you the

14  lineup?

15      A.   The day that I went to the police station.

16      Q.   So it was like three days after the incident

17  that they showed you the lineup?

18      A.   I'd say yes.

19      Q.   Was it like around Tuesday or Wednesday?

20      A.   Yes.

21      Q.   And that's the day that you went to the police

22  station?

23      A.   Uh-huh.

24      Q.   That's the day that they showed you the lineup?

25      A.   Yes.

PAM L. ESQUIVEL, CSR, RPR

1            MR. GALARZA:  Your Honor, can I approach?

2            THE COURT:  You may.

3       Q.   (BY MR. GALARZA)  When you saw the individual,

4   you stated that it was around 6:00; is that correct?

5       A.   Yes.

6       Q.   Is this the only lineup that they showed you

7   that day?

8       A.   Yes.  They showed me other pictures, but this

9   was the only lineup.

10      Q.   Okay.  What did they first show you, the lineup

11  or the pictures?

12      A.   The lineup.

13      Q.   And why did they show you the other pictures?

14      A.   I don't know.  Just to see them, I guess.

15      Q.   Okay.  How many other pictures did they show

16  you?

17      A.   Like six other pictures of other people.

18      Q.   When you first saw the lineup, the first time

19  you did not identify the person that you had seen before?

20  You stated they showed you the lineup, then they showed

21  you the pictures; is that correct?

22      A.   Yeah.

23      Q.   Were any of the other pictures the same way as

24  the lineup?

25      A.   No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    93

1        Q.   The first time that they showed you the lineup,
2   you did not tell them who the person was that first time?
3        A.   Yeah.
4        Q.   Do you know -- they showed you the lineup the
5   first time?
6        A.   Yeah.
7        Q.   You automatically told them who the person was?
8        A.   I told them who the person was.
9        Q.   And then --
10       A.   Then --
11       Q.   -- the other pictures, were they loose pictures
12   or were they also lineups?
13       A.   No.  They were loose pictures; and they showed
14   me at the police station, when I went to the police
15   station.
16       Q.   And you stated that they showed you six other
17   pictures?
18       A.   Yes.
19       Q.   Okay.  Did those other pictures look like these
20   ones also?
21       A.   No.  They were other chubby people.  They
22   wanted me to see if I could identify the other person.
23       Q.   Okay.  You stated there's at least two
24   individuals that look like the person there; is that
25   correct?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    94

```
 1        A.   Yes.
 2                  MR. GALARZA:   That's all I have at this
 3   time, Your Honor.
 4                  MR. BLAYLOCK:   Can I approach, Judge?
 5                  THE COURT:   You may.
 6                  REDIRECT EXAMINATION
 7   BY MR. BLAYLOCK:
 8        Q.   Just so there's no mistake, sir, I'm going to
 9   give you this little sticky thing and stick it by the one
10   you picked out that day.
11        A.   (Witness complies).
12        Q.   Okay.  Again, that's number five.  And when the
13   police showed you this, it didn't take you any time to
14   pick him out?
15        A.   No.
16        Q.   And were you a hundred percent sure that that's
17   the guy you picked out -- that you saw on the street that
18   day?
19        A.   Yes.
20        Q.   Okay.  Now, a lot of time has passed since
21   September -- and you gave your statement on
22   September 11th, right?
23        A.   Yes.
24        Q.   A lot of time has passed since then.  Is your
25   memory as clear today as it was back there on
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    95

```
1    September 11th?  Is it?
2         A.   I guess.
3         Q.   Okay.  So it's -- you still remember things
4    pretty clearly?
5         A.   I remember what I saw, yes.
6         Q.   Okay.  And are you a hundred percent sure,
7    then, that this is the guy you saw on the street?
8         A.   Yes.
9         Q.   Okay.  So he's the one.  And in fairness, you
10   weren't able to pick the other guy out of a lineup,
11   right?
12        A.   Uh-huh.
13        Q.   And the police didn't suggest anybody in that
14   lineup either, did they?
15        A.   No.
16        Q.   Now, let me draw your attention back here.  You
17   say this whole thing took place around six or
18   thereabouts, approximately, more or less, right?
19        A.   Uh-huh.
20        Q.   Okay.  Now, let's say this is Morningside
21   because it says it; and let's say that this is the
22   Harrison Mobile Home Park.  The road goes right in here,
23   okay?  Where did you see the man in that picture?  Where
24   did you see him run around to?
25        A.    Like around here; and then he went like if he
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                96

```
 1    was --
 2         Q.    Okay --
 3         A.    -- going to go through the back.
 4         Q.    All right.  And you're seeing this; you're
 5    still behind -- you're walking on the side of the road
 6    behind them?
 7         A.    I was walking from the road --
 8         Q.    Okay.  And the store's down here, right?
 9         A.    Yes.
10         Q.    Okay.
11         A.    And suddenly I noticed they weren't in front us
12    anymore.  So when they got to around here, to the road
13    that's here, that's when I saw him like running towards
14    the house.
15         Q.    Okay.  Going around that way?
16         A.    Yes.
17         Q.    And then the other guy, where did you say he
18    went?
19         A.    Like in the front door like he was going to go
20    in.
21         Q.    Okay.  Right up to the front door?
22         A.    Yes.
23         Q.    Did you see him reach for the door?
24         A.    No.
25         Q.    You just saw him standing in front of the door?
```

1       A.   In front of the door.

2       Q.   Okay.  And you just kept on walking?

3       A.   Yes.

4       Q.   All right.  And you said you don't know this

5  guy that's sitting over here.  You don't know that guy?

6       A.   No.

7       Q.   So you don't have anything against him?

8       A.   No.

9       Q.   And you didn't really know Ms. Harrison, right?

10      A.   No.

11      Q.   Okay.

12            MR. BLAYLOCK:  I'll pass the witness.

13                    **RECROSS-EXAMINATION**

14  **BY MR. GALARZA:**

15      Q.   Mr. Lopez, you stated that you spoke to the

16  police like around -- the first day was like around ten

17  minutes and the second day was like around an hour?

18      A.   Yes.

19      Q.   And you don't remember what days it was at all?

20      A.   No.

21      Q.   Okay.  But that day, you saw the individual for

22  three seconds and you remembered his face for two or

23  three days?

24      A.   Yes.

25      Q.   Do you wear glasses?

1        A.    No.

2        Q.    When was the last time you got your eyes

3   checked?

4        A.    Like five or six years.

5                  MR. GALARZA:  That's all I have at this

6   time, Your Honor.

7                  MR. BLAYLOCK:  Just one clarification.

8                  **REDIRECT EXAMINATION**

9   **BY MR. BLAYLOCK:**

10       Q.    You said you're a hundred percent sure the man

11  in that picture is the man you saw in the street, right?

12       A.    Yes.

13                 MR. GALARZA:  Your Honor --

14       Q.    (BY MR. BLAYLOCK)  Okay.  Now, the other

15  individuals that you picked out, one of them a juror

16  here, are you a hundred percent sure he's not the guy you

17  saw on the street or can you tell?

18       A.    Yeah, I know he's not the guy --

19       Q.    Okay.

20       A.    -- on the street.

21       Q.    And when he asked you and you identified him as

22  somebody who looked similar, were you just trying to

23  answer his question picking out the people who look

24  similar?

25       A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    99

1          Q.    Okay.

2                     MR. BLAYLOCK:  Nothing further.

3                     MR. GALARZA:  Nothing further, Your Honor.

4                     THE COURT:  All right.  You may step down.

5    Thank you.

6                     Let's take our break at this time.  Ladies

7    and gentlemen of the jury, remember the instructions I've

8    given you not to discuss this case among yourselves or

9    with anyone else, not to form or express any opinions.

10   We'll take about a 15 minute break.

11                     **(Recess from 10:41 a.m. to 11:01 a.m.)**

12                     THE COURT:  Okay.  Bring in the jury.

13                     **(Jury brought into the courtroom)**

14                     THE COURT:  All right.  You may be seated.

15                     You may call your next witness.

16                     MR. BLAYLOCK:  The State would call

17   Detective Antonio Flores.

18                     THE COURT:  Would you raise your right

19   hand, please?

20                     **(The witness was sworn in by the Court)**

21                     THE WITNESS:  Yes, sir.

22                     THE COURT:  All right.  You may be seated.

23                     You may proceed.

24                     MR. BLAYLOCK:  Thank you, Judge.

25

PAM L. ESQUIVEL, CSR, RPR

```
1                      ANTONIO FLORES,
2      having been first duly sworn, testified as follows:
3                    DIRECT EXAMINATION
4    BY MR. BLAYLOCK:
5         Q.   Good morning, Detective Flores.  State your
6    full name for the jury.
7         A.   Antonio Flores.
8         Q.   And how are you employed?
9         A.   I'm a detective with the Brownsville Police
10   Department.
11        Q.   Okay.  What does it mean to be a detective with
12   the Brownsville Police Department?
13        A.   I investigate various types of crimes that
14   occur within the city limits of Brownsville.
15        Q.   Okay.  How long have you been doing that?
16        A.   Approximately four and a half years.
17        Q.   Before that?
18        A.   I was a patrol officer for approximately two
19   and a half years.
20        Q.   Okay.  And how long have you been a police
21   officer altogether?
22        A.   A little over seven years.
23        Q.   All right.  Now, were you a police officer
24   September -- in September of 1998?
25        A.   Yes, sir.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    101

1        Q.    And were you a detective?

2        A.    Yes, sir.

3        Q.    All right.  I'm going to draw your attention to

4   September 5th, September 6, 1998.  Were you called out to

5   a certain case?

6        A.    Yes, sir.

7        Q.    What case was it?

8        A.    It's in reference to a homicide that occurred.

9        Q.    Where at?

10       A.    At the Morningside Trailer Park.

11       Q.    Okay.  Who was the victim?

12       A.    Ms. Escolastica Harrison.

13       Q.    All right.  And what day did you get involved

14  personally in this case?

15       A.    On the 6th of September of 1998.

16       Q.    Okay.  And in fact, that was the early -- or

17  she was found in the early morning hours of --

18                 MR. REYES:  I'm going to object to counsel

19  leading his own witness, Your Honor.

20                 THE COURT:  Okay.  Don't lead the witness,

21  counsel.

22       Q.    (BY MR. BLAYLOCK)  What time was

23  Ms. Escolastica Harrison found?

24       A.    I believe it was in the early hours of the 6th.

25       Q.    Okay.  Which was Sunday?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    102

```
 1        A.   Yes, sir.
 2        Q.   Now, tell us what you first did when you got
 3   involved in this case.
 4        A.   When I was called in by my supervisor, I went
 5   upstairs to our office; and I sat in on an interview with
 6   Detective David Garcia and Avel Cuellar.
 7        Q.   Okay.  So Detective Garcia is already in a
 8   room?
 9        A.   That's correct.
10        Q.   And Avel Cuellar is in the room also?
11        A.   Yes, he is.
12        Q.   And this is David Garcia.  Do you know if he's
13   testified in this trial already?
14        A.   I don't know if he has or hasn't.
15        Q.   Okay.  Do you know if he was the first officer
16   on the scene?
17        A.   I believe so.  He was.
18        Q.   All right.  And when you go into the room,
19   what's happening?
20        A.   Detective Garcia is interviewing Avel as to
21   what had occurred the night that he discovered his aunt.
22        Q.   Okay.  And is Avel intoxicated?
23        A.   He appeared to be.
24        Q.   Okay.  So he's drunk more or less?
25        A.   Yes, sir.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          103

1        Q.   Was he really falling down drunk or just --
2        A.   No.  He seemed to be intoxicated but not to a
3   point where he was falling down or --
4        Q.   All right.  Was he telling what happened?
5        A.   Yes, sir.
6        Q.   Okay.  And let me ask you this.  He sat on the
7   stand and said that Detective Garcia --
8                  MR. REYES:  I'm going to object, Your
9   Honor.  That's an inappropriate question telling this
10  juror -- this witness what it is that another witness
11  testified to.
12                 THE COURT:  It's overruled.
13       Q.   (BY MR. BLAYLOCK)  Did you hear what I said?
14       A.   I'm sorry.  Can you repeat the question?
15       Q.   Avel has testified that Detective Garcia had
16  hit him; and I want know if you were there when that
17  happened.
18       A.   I was present when he was being interviewed,
19  yes, sir.
20       Q.   Okay.  Well, tell the jury what happened.  What
21  kind of a hit was it?
22       A.   When Avel Cuellar was telling Detective Garcia
23  about what had occurred, Detective Garcia asked him a
24  question as to what exactly had happened, if he was clear
25  with it.  Avel said that he wasn't --

STATE OF TEXAS VS. RUBEN GUTIERREZ                          104

```
1                 MR. REYES:  I'm going to object, Your
2     Honor, as to hearsay.
3                 THE COURT:  Overruled.
4         Q.   (BY MR. BLAYLOCK)  Go ahead.
5         A.   And Avel said that he had -- hadn't found his
6     aunt during -- while he was looking for her; and
7     Detective Garcia said, "Come on, think," doing this
8     motion, "Think, think, think about what happened.  Think
9     about, you know, what you saw that night" or --
10        Q.   So he was tapping him on the head?
11        A.   Yes, sir.
12        Q.   Pretty hard or easy?
13        A.   More or less like what I was doing right now.
14        Q.   Okay.  And was Detective Garcia impatient with
15    this intoxicated man?
16        A.   He seemed to be a little impatient with him.
17        Q.   Okay.  And nothing was written down on that
18    statement, was it?
19        A.   No, there wasn't.
20        Q.   Because he was too intoxicated?
21        A.   That's correct.
22        Q.   What is the next thing that you got involved
23    with?
24        A.   The next statement?
25        Q.   Or what is the next thing that you did in this
```

1    case?

2        A.    Well, after sitting in on the interview with

3    Detective Garcia and Avel Cuellar, the following morning

4    Detective Juan Hernandez and Gilbert Garcia, myself, we

5    went out to the crime scene which was a home and the

6    office of the Harrison Mobile Home Park.

7        Q.    Okay.  And what did you do once you got there

8    to the crime scene?

9        A.    Once we were there -- I had sat in at the

10   interview; and I wanted to get a mental picture of

11   exactly what went on, what the scene was like.  And we

12   went through it, more or less what had been found in what

13   location.

14       Q.    Okay.

15       A.    And we were just getting a mental picture of

16   what could have happened.

17       Q.    Can you describe it for us when you went out

18   there?

19       A.    Sure.  We went in through the office; and there

20   was a desk which she used as her desk there at the very

21   front.  It was a home/office.  To the right of that there

22   was her bedroom.  In the bedroom there was some boxes

23   that were piled pretty high.  And as soon as you went

24   into the bedroom past the boxes, there was a large puddle

25   of blood on the floor, on the wooden floor.

1    Q.   Okay.  And tell me what happened, what you saw
2  next.
3    A.   So basically what we were doing, we were just
4  looking at the crime scene, seeing what could have
5  possibly happened, see if the home had been ransacked,
6  see if someone had gone in and burglarized the place, and
7  just trying to pick up clues from there.
8    Q.   Okay.  And did you find that the home had been
9  ransacked or not?
10   A.   Well, we -- we had found out through Avel --
11            MR. REYES:  Your Honor --
12   A.   -- from the interview --
13            MR. REYES:  -- I object as to hearsay.
14            THE COURT:  Just a minute.  Just a minute.
15            MR. REYES:  I'm going to object.  Hearsay.
16            THE COURT:  Okay.  Restate your question.
17   Q.   (BY MR. BLAYLOCK)  All right.  Do you know in
18  your investigation, not what somebody -- don't say what
19  somebody else said.
20   A.   Okay.  I'm sorry.
21   Q.   Do you know if the house had been ransacked or
22  not?
23   A.   Yes.
24   Q.   Okay.  And did you see the remnants of that?
25   A.   Yes, I did.

```
 1        Q.   Okay.  And did you find out if any money had
 2   been missing?
 3        A.   Yes, we did.
 4        Q.   Did you find out how much money there might
 5   have been?
 6                  MR. REYES:  I'm going to object, Your
 7   Honor.  It calls for hearsay.
 8                  THE COURT:  Overruled.
 9        Q.   (BY MR. BLAYLOCK)  You can answer.
10        A.   Yes, we found out that there was a
11   substantial -- a large, substantial amount of money that
12   had been taken from the residence.
13        Q.   Okay.  In fact, you found a ledger, right?
14        A.   That is correct.
15                  MR. REYES:  Your Honor, I'm going to
16   object, Your Honor, to counsel leading his own witness.
17                  THE COURT:  Don't lead your witness,
18   counsel.  Go ahead.
19        Q.   (BY MR. BLAYLOCK)  And what did -- did you
20   look in the ledger?
21        A.   Yes, I did.
22        Q.   About how much money are we talking about?
23        A.   Ms. --
24                  MR. REYES:  I'm going to object, Your
25   Honor.  It calls for a hearsay answer.
```

1           THE COURT:  Overruled.

2       A.    Ms. Harrison had a ledger book in which she had

3   written a large, substantial amount of money, like in the

4   $600,000 figure, and several different notes and like

5   IOU's.  And she was keeping track of all the money that

6   she had and what she had paid out, or that she had given

7   or bought or lent to her nephew Avel.

8       Q.    (BY MR. BLAYLOCK)  Okay.  Was all that in the

9   ledger?

10      A.    In the ledger and in separate receipts,

11  handwritten receipts.

12      Q.    Okay.  So her bookkeeping technique, was it

13  organized or unorganized?

14      A.    It was unorganized as to the IOU's that she

15  had, but as far as the money that she had saved up

16  through her -- in her ledger, it seemed to be very well

17  organized.

18      Q.    Okay.  And are you combining the separate

19  notes, IOU's and stuff with the stuff that was in the

20  ledger to get the 600,000 number?

21      A.    No.

22      Q.    Well, let me -- see that green book up there?

23      A.    Yes, sir.

24      Q.    Is that the ledger that you found that day?

25      A.    It appears to be, sir.

1          Q.   Okay.  Look in there to the marked page -- not

2    that page.  Has that got a total on it or --

3          A.   Yes, sir.

4          Q.   And a date, right?

5          A.   Yes, sir.

6          Q.   What's the date?

7          A.   As of March the 31st, 1998, $571,050.

8          Q.   Okay.  And you found -- or this was -- we're

9    talking about September?

10         A.   That's correct.

11         Q.   Okay.  Did you find any ledgers or anything to

12   show the money amounts between March and September?

13         A.   There was -- in the same ledger itself there

14   was different time periods that the money was counted.

15         Q.   Okay.  All right.  So, you don't have an exact

16   amount of the money, do you?

17         A.   No, I don't.

18         Q.   Tell the jury what your best approximation is.

19              MR. REYES:  I'm going to object, Your

20   Honor.  It calls for speculation.  It's also requiring

21   him to testify from something that has not been admitted

22   into evidence.

23              THE COURT:  I'll sustain.

24         Q.   (BY MR. BLAYLOCK)  Okay.  Well, without

25   testifying from something that's not in the record,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    110

1    you've already said, if I can recap your testimony, you
2    think that approximately $600,000 was in that house?
3         A.   That is correct.
4         Q.   All right.  Now, what is the next thing you did
5    after you left that house?
6         A.   Detective Garcia and I proceeded to a residence
7    there inside of the trailer park that is located behind
8    Mrs. Harrison's residence towards the resaca.
9         Q.   And that would be Gilbert Garcia?
10        A.   That is correct.
11        Q.   Okay.  Not David Garcia?
12        A.   No, sir.  Gilbert Garcia.
13        Q.   And did David Garcia have anything else to do
14   with this case?
15        A.   As far as with myself, no, sir.
16        Q.   Okay.  So you and Gilbert Garcia went where?
17        A.   To the Villarreal residence located towards the
18   rear of Mrs. Harrison's home.
19        Q.   Okay.  And who all lived at the Villarreal
20   residence?
21        A.   Ramiro Martinez, a Crispin Villarreal, and
22   Maria Luisa Villarreal, I believe.  They're the ones that
23   lived there.
24        Q.   Okay.  And how is Crispin related to Maria?
25        A.   I believe it was her son.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          111

```
 1        Q.   Okay.  And what did you find out there?
 2        A.   Well, we proceeded to interview Mr. Martinez;
 3   and from that, we learned that --
 4                  MR. REYES:  I'm going to object, Your
 5   Honor.  It calls for hearsay.
 6                  THE COURT:  It's overruled.
 7        A.   We proceeded to interview Mr. Martinez; and
 8   through the interview, we learned that the -- he was
 9   stating basically what Avel Cuellar was stating the night
10   before on his whereabouts.
11        Q.   (BY MR. BLAYLOCK)  Okay.  So he supported
12   Avel's story?
13        A.   That is correct.
14        Q.   And is that what helped clear Avel as a
15   suspect?
16        A.   It was mentioned, but we still needed a lot
17   further to go before that.
18        Q.   Okay.  Was he eventually cleared as a suspect?
19        A.   Yes, he was.
20        Q.   Just to be fair, he was initially a suspect in
21   this case?
22        A.   That is correct.
23        Q.   What is the next thing you did after you left
24   the Villarreal's residence?
25        A.   I also went to another mobile home that's
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        112

1   located there in the park, and I spoke with a Ms. Vento.
2        Q.   All right.  And do you know which mobile home
3   Ms. Vento lived in?
4        A.   I believe it's 10B.
5        Q.   Okay.  And when you got there, what did your
6   investigation uncover?
7        A.   I also interviewed her as to what had occurred
8   the night Ms. Harrison was discovered in her office; and
9   from that, we learned that, in fact --
10            MR. REYES:   I'm going to object, Your
11  Honor.  It calls for hearsay.
12            THE COURT:   Overruled.
13       A.   From the interview, we learned that Avel had,
14  in fact, gone over to her residence, which is Ms. Vento's
15  residence, to look for his aunt.
16       Q.   (BY MR. BLAYLOCK)  Okay.  Do you know what
17  time of day that would have been?
18       A.   It was in the early hours of Saturday night or
19  Sunday morning, I believe.
20       Q.   Okay.  So that corroborated Avel's story also?
21       A.   That is correct.
22       Q.   Okay.  Well, then, tell us what happened in
23  your investigation next.
24       A.   Which part?  With Ms. Vento?
25       Q.   Well, did you learn anything else --

1       A.   Well, basically, that what Avel had been
2   stating the night before and what Ms. Vento was saying,
3   it was more or less matching up to what Avel Cuellar had
4   been saying the night before.
5       Q.   Okay.  And so what did you learn next?
6       A.   I'm sorry.
7       Q.   Well, just tell me what happened next in your
8   investigation.
9       A.   May I refer to my notes, my supplement?
10      Q.   You bet.
11      A.   Okay.  Later on that day, I was working apart
12  from Detective Garcia; and he advised me via the radio
13  that --
14                 MR. REYES:  I'm going to object, Your
15  Honor.  It calls for hearsay.
16                 THE COURT:  I'll sustain that.
17      Q.   (BY MR. BLAYLOCK)  Okay.  You got a radio
18  call?
19      A.   That is correct.
20      Q.   And where did you go when you got that radio
21  call?
22      A.   We learned that there had been a --
23                 MR. REYES:  I'm going to object, Your
24  Honor.  It calls for hearsay.
25                 THE COURT:  The question is, "Where did

STATE OF TEXAS VS. RUBEN GUTIERREZ                    114

```
 1    you go?"
 2         Q.   (BY MR. BLAYLOCK)  Yeah.  Where did you go?
 3         A.   I went to the station.
 4         Q.   All right.  And who was there?
 5         A.   Avel Cuellar was at the station.
 6         Q.   Okay.  Do you know where they had picked him up
 7    at?
 8         A.   They had picked him up at the funeral home.
 9         Q.   Okay.  And do you know why?
10         A.   Because he had been causing some type of
11    disturbance at the funeral home and the family members
12    didn't want him there.
13         Q.   Okay.  And this is Detective Gilbert Garcia who
14    picked him up?
15         A.   No, sir.  It was Detective Danny Marks and Rey
16    Lopez.
17         Q.   Okay.  And did you all interview Avel again?
18         A.   Yes, sir, we did.
19         Q.   Was the statement consistent?
20         A.   Yes, it was, sir.
21         Q.   All right.  Did you have anything else -- did
22    you do anything else that day?
23         A.   While we were taking the statement, we learned
24    that the --
25                   MR. REYES:  I'm going to object, Your
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    115

1   Honor.  It calls for hearsay.

2                    THE COURT:  I'll sustain the objection.

3        Q.   (BY MR. BLAYLOCK)  All right.  Did your

4   investigation show a phone number?

5        A.   That is correct.

6                    MR. BLAYLOCK:  If I may approach the

7   witness?

8        Q.   (BY MR. BLAYLOCK)  Were you directed to this

9   phone number right here?

10       A.   That is correct.

11       Q.   All right.  And that's the phone number of

12  Ruben Gutierrez?

13                   MR. REYES:  And I'm going to object, Your

14  Honor, to counsel leading his own witness.

15                   THE COURT:  I'll sustain the objection.

16       Q.   (BY MR. BLAYLOCK)  Is that the phone number of

17  Ruben Gutierrez?

18       A.   Yes, it is, sir.

19       Q.   All right.  Now, what did you do when you got

20  that phone number?

21       A.   I contacted Southwestern Bell and advised them

22  that I was working on an investigation and I needed to

23  run the phone number to get an expect address of where

24  the phone number -- the listing of the phone number.

25       Q.   Okay.  Did you get the address?

```
1       A.   Yes, I did, sir.

2       Q.   What's the address?

3       A.   4200 --

4                 MR. REYES:   I'm going to object, Your

5    Honor.  It calls for hearsay.

6                 THE COURT:   Overruled.

7       A.   4200 Boca Chica, apartment 360.

8       Q.   (BY MR. BLAYLOCK)  And whose address is that?

9       A.   The address of Ruben Gutierrez.

10      Q.   Okay.  And tell me what happened next.

11      A.   Well, I found out that information on the

12   previous day.  Then on the 8th of September, myself and

13   Detective Ramon Ortiz went to 4200 Boca Chica,

14   apartment 360, and knocked on the door; and Ms. Angie

15   Gutierrez answered the door.

16      Q.   Okay.  Did you find out what relationship Angie

17   Gutierrez had with Ruben Gutierrez?

18      A.   Yes, I did.

19      Q.   And what is that relationship?

20                MR. REYES:   I'm going to object, Your

21   Honor.  It calls for a hearsay answer.

22                THE COURT:   Overruled.

23      Q.   (BY MR. BLAYLOCK)  What is the relationship?

24      A.   She was his wife.

25      Q.   Okay.  And did you go into that apartment?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    117

1        A.   Yes.  I advised Ms. Gutierrez that I was
2   conducting an investigation, and I requested a consent to
3   search the apartment.
4        Q.   Okay.  And did she give her consent?
5        A.   Yes, she did.
6        Q.   And did she give it to you in writing?
7        A.   Yes, she did.
8        Q.   Did she give you any problems at all about
9   going in there?
10       A.   No, she didn't.
11                MR. BLAYLOCK:  May I approach again?
12                THE COURT:  You may.
13       Q.   (BY MR. BLAYLOCK)  I'm going to show you
14  what's been marked as State's Exhibit Number 36.  Do you
15  recognize this?
16       A.   Yes, sir.
17       Q.   Okay.  Is that a true and correct -- that's
18  actually the original, right?
19       A.   Yes, sir.
20       Q.   And that's --
21                MR. REYES:  I'm going to object, Your
22  Honor, to counsel leading his own witness.
23                THE COURT:  Don't lead your witness,
24  counsel.
25       Q.   (BY MR. BLAYLOCK)  Is that the exact one that

STATE OF TEXAS VS. RUBEN GUTIERREZ                    118

1    Ms. Gutierrez signed in front of you that day?
2         A.    Yes, it is.
3                   MR. BLAYLOCK:   I'm showing 36 to defense
4    counsel.
5                   MR. REYES:   May we approach the bench,
6    Your Honor?
7                   **(Off the record discussion at the bench)**
8                   MR. REYES:   We have no objection, Your
9    Honor.
10                  MR. BLAYLOCK:   Move to admit 36.
11                  THE COURT:   It'll be admitted.
12                  **(State's Exhibit Number 36 admitted)**
13        Q.    (BY MR. BLAYLOCK)   All right.   Is this the
14   copy of the written consent that she signed?   Or that's
15   the original, correct?
16        A.    That's the original.
17        Q.    All right.   Was Ms. Gutierrez cooperative with
18   you?
19        A.    Yes, she was.
20        Q.    Okay.   And did you go in and search that
21   apartment?
22        A.    Yes, I did.
23        Q.    And what did you find?
24        A.    We didn't find anything at all.
25        Q.    All right.   So did you leave?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          119

1        A.    No.    While we were there, another female
2   arrived at the residence.
3        Q.    And who was that?
4        A.    The mother of Ruben Gutierrez.
5        Q.    What's her name?
6        A.    Norma Gutierrez.
7        Q.    Okay.   And what did -- did she lend anything to
8   your investigation?
9        A.    Yes.   We advised her that we were conducting an
10  investigation and that we needed to talk to Ruben.   And
11  she advised that he wasn't there, but that she would
12  personally take him in the following day.
13       Q.    All right.   Well, then, what did you do after
14  that?
15       A.    We left.
16       Q.    Okay.   Anything else -- did anything else
17  happen on the 8th in your investigation?
18       A.    No, sir.
19       Q.    What about the next day?   What happened the
20  next day?
21       A.    In the morning I received a phone call; and
22  Ms. Gutierrez, Angie, stated that --
23                   MR. REYES:   I'm going to object, Your
24  Honor.   It calls for hearsay.
25                   THE COURT:   Sustained.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    120

```
 1        Q.   (BY MR. BLAYLOCK)  All right.  Ms. Gutierrez
 2   called you the next day?
 3        A.   That is correct.
 4        Q.   Okay.  And did she tell you if Ruben was going
 5   to come in and talk to you?
 6             MR. REYES:  I'm going to object, Your
 7   Honor.  That calls for hearsay.
 8             THE COURT:  Sustained.
 9        Q.   (BY MR. BLAYLOCK)  From that conversation, did
10   you make an appointment for Ruben Gutierrez to come talk
11   to you again?
12        A.   Yes, sir.
13        Q.   Okay.  And did he show up?
14        A.   Yes, he did.
15        Q.   All right.  Voluntarily?
16        A.   That is correct.
17        Q.   Who was with him?
18        A.   Angie Gutierrez and Norma Gutierrez.
19        Q.   Okay.  Was he under arrest at this time?
20        A.   No, he wasn't.
21        Q.   Okay.  And, in fact, he's just a suspect?
22        A.   That is correct.
23        Q.   And did he go and talk to you?
24        A.   Yes, he did.
25        Q.   Where at?
```

1      A.   At the criminal investigation division's
2  office.
3      Q.   All right.  Did you take him into one of the
4  offices or did you talk to him in the lobby area?
5      A.   In the -- in my cubicle in our office.
6      Q.   All right.  And so the jury will know, describe
7  what your cubicle looks like.
8      A.   It's a room that goes in; and on the right,
9  there's four cubicles that are approximately about 4 feet
10 by 6 feet more or less.  And there's four cubicles on the
11 right, and four cubicles on the left.
12     Q.   And that's your office, isn't it?
13     A.   That's correct.  The second cubicle to the
14 right is my office.
15     Q.   And the middle area, that's the little lobby
16 area?
17     A.   There's a table, like a work table there.
18     Q.   Okay.  Is it like a waiting area for people to
19 go talk to you in your cubicle?
20     A.   Yes, there is.
21     Q.   Now, did Ruben go with you into your cubicle
22 voluntarily?
23     A.   Yes, he did.
24     Q.   Okay.  And did you read him his rights?
25     A.   Yes, I did.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    122

1        Q.    Did he sign off on his warnings?

2        A.    Yes, he did.

3        Q.    Did you read him all his Miranda rights?

4        A.    Yes, sir.

5              MR. BLAYLOCK:  May I approach, Judge?

6              THE COURT:  You may.

7        Q.    (BY MR. BLAYLOCK)  Again, what day is this

8  taking place on?

9        A.    On the 9th of September.

10       Q.    All right.  Do you recognize that?

11       A.    Yes, sir.

12       Q.    And how do you recognize it?

13       A.    I recognize this being the warning and waiver

14  of rights to Ruben Gutierrez.

15       Q.    All right.  Is your signature on there?

16       A.    Yes, it is.

17       Q.    And this is the original?

18       A.    That is correct.

19       Q.    Who else's signature is on there?

20       A.    Santiago Manrique.

21       Q.    And who else?

22       A.    And Ruben Gutierrez.

23       Q.    Okay.

24             MR. BLAYLOCK:  I'm showing defense

25  Exhibit 37.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        123

1                    I move to admit State's Exhibit 37.
2                    MR. REYES:  May I have a second, Your
3      Honor?
4                 **(Brief pause in proceedings)**
5                    MR. REYES:  May I take this witness on
6      voir dire, Your Honor?
7                    THE COURT:  You may.
8                 **VOIR DIRE EXAMINATION**
9      **BY MR. REYES:**
10         Q.    Officer, with respect to State's Exhibit
11     Number 37, you stated that you were the police officer
12     who read Ruben Gutierrez' Miranda warnings?
13         A.    That is correct.
14         Q.    And did you read those Miranda warnings exactly
15     the way they appear on the -- what has been marked as
16     State's Exhibit Number 37?
17         A.    That is correct.
18         Q.    When you read those warnings to him, did you
19     read them to him in Spanish or in English?
20         A.    I believe it was in English.
21         Q.    You believe?
22         A.    Yes, sir.  They're in English.
23         Q.    Okay.  Well, the word that you said you believe
24     it was in English.  Either you read them in English or
25     you read them in Spanish.

PAM L. ESQUIVEL, CSR, RPR

1        A.    They were in English.

2        Q.    And did you ascertain whether or not Ruben

3    Gutierrez knew how to speak English?

4        A.    Yes, I did.

5        Q.    And did you know for a fact that he -- when you

6    read those warnings that he understood them?

7        A.    Yes, I did.

8        Q.    And how is it that you were able to ascertain

9    that he understood them?

10       A.    I advised him when I was going to read him his

11   rights -- before we do, we have two forms.  One's in

12   Spanish and one's in English.  I advised him which is the

13   one that he understands better.  He chose to say the ones

14   in English.

15       Q.    And you stated that the witnesses to the

16   reading of those warnings were Santiago Manrique?

17       A.    That is correct.

18       Q.    He's an employee also of the Brownsville Police

19   Department; is that correct?

20       A.    That is correct.

21       Q.    And when these persons signed as witnesses,

22   what is it exactly that they're witnessing?

23       A.    That the rights have been read to him, to the

24   person that's being interviewed; and that the witness --

25   that the person that was being interviewed signed, and

STATE OF TEXAS VS. RUBEN GUTIERREZ                            125

1   then they turn around and they witness it.

2        Q.   Well, you stated that your cubicle is about

3   4 feet by 4 feet; is that correct?

4        A.   It's an approximate guess.

5        Q.   So it could be smaller, it could be bigger; is

6   that correct?

7        A.   That is correct.

8        Q.   And there was another witness; is that correct?

9        A.   That is correct.

10       Q.   And who is that person?

11       A.   The other person --

12       Q.   Who was that second witness?

13       A.   Santiago Manrique.

14       Q.   Okay.  So you signed as a witness and you were

15   the person that allegedly read these rights to him; is

16   that correct?

17       A.   That is correct.

18       Q.   Now, what you're saying is that actually there

19   were three individuals in your small cubicle when this

20   was being done?

21       A.   That is correct.

22       Q.   And you have a desk in there?

23       A.   That is correct.

24       Q.   And you have a chair for yourself?

25       A.   That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              126

1      Q.   And how many chairs do you have for people that
2  are in your cubicle?
3      A.   One.
4      Q.   So there was three people, there's a desk
5  there, and two chairs; is that correct?
6      A.   That is correct.
7      Q.   Do you have any filing cabinets in that space?
8      A.   No.
9      Q.   When you were talking to Ruben Gutierrez on
10 September the 9th of 1998, he was inside your station; is
11 that correct?
12     A.   That is correct.
13     Q.   So he was not free to leave; is that true?
14     A.   He was free to leave if he wanted to do so.
15     Q.   Okay.  Well, can you explain to the ladies and
16 gentlemen of the jury why it is that when he asked you to
17 leave, that you did not allow him to?
18     A.   He never asked me to leave.
19     Q.   Well, isn't it true that you questioned Angie
20 Gutierrez on that day also?
21     A.   That is correct.
22     Q.   And isn't it true that you did not allow Ruben
23 Gutierrez to leave your cubicle until you spoke to Angie
24 Gutierrez; is that correct?
25     A.   No, it's not.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          127

```
1        Q.   You spoke to Angie Gutierrez before Ruben
2   Gutierrez left; is that true?
3        A.   No.  Before Ruben Gutierrez left?
4        Q.   Yes.
5        A.   Yes.
6        Q.   So, you talked to Ruben Gutierrez first?
7        A.   That's correct.
8        Q.   And he stayed in your cubicle until you talked
9   to Angie Gutierrez; is that correct?
10       A.   No, it's not.
11       Q.   Okay.  What time did you speak to Angie
12  Gutierrez?
13       A.   It was after I terminated the interview with
14  Ruben Gutierrez.
15       Q.   Okay.  So after you terminated the interview
16  with Ruben Gutierrez, then you spoke to Angie Gutierrez;
17  is that correct?
18       A.   That is correct.
19       Q.   And Ruben Gutierrez was still inside the
20  Brownsville Police Department; is that true?
21       A.   Yes, he was.
22       Q.   Okay.  And it was not until you spoke to Angie
23  Gutierrez that you allowed Ruben Gutierrez to leave; is
24  that true?
25       A.   That is correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    128

1      Q.    How long of a period of time was Ruben
2  Gutierrez there at the Brownsville Police Department?
3      A.    I'd say less than an hour.
4      Q.    So what time did he wind up leaving on
5  September the 9th?
6      A.    I don't recall exactly what time it was.
7      Q.    Do you recall what time he got there?
8      A.    Approximately 3:40 p.m.
9      Q.    So he was there close to 5:00, would that be
10 safe for us to say?
11     A.    Yes.
12               MR. REYES:   Judge, we have no further
13 questions; and we would just make the same objections
14 that we previously made with respect to State's Exhibit
15 Number 37.
16               THE COURT:   Okay.  They'll be overruled.
17 Thirty-seven will be admitted.
18               (State's Exhibit Number 37 admitted)
19               DIRECT EXAMINATION CONTINUED
20 BY MR. BLAYLOCK:
21     Q.    All right.  State's Exhibit Number 37, what
22 does it say at the top?
23     A.    "Warning and Waiver of Rights."
24     Q.    All right.  And does it got a date and a time?
25     A.    Yes, sir.

1      Q.    And is this the date and time that you gave

2   these warnings?

3      A.    That is correct.

4      Q.    And what date and time is it?

5      A.    It has a date of September the 9th, 1998 at

6   3:43 p.m.

7      Q.    Okay.  So at 3:43 you're reading him these

8   rights?

9      A.    That is correct.

10     Q.    And go ahead and just briefly tell us what the

11  Miranda rights are.

12     A.    It says, "Warning.  Before you are asked any

13  questions, you must understand your rights.

14              "You have the right to remain silent and

15  not make any statement at all, and that any statement you

16  make may be used against you at your trial.

17              "Any statement you make may be used as

18  evidence against you in court.

19              "You have the right to have a lawyer

20  present to advise you prior to and during any

21  questioning.

22              "If you are unable to employ a lawyer, you

23  have the right to have a lawyer appointed to advise you

24  prior to and during any questioning.

25              "And you have the right to terminate the

1    interview at any time."

2         Q.   All right.  Now, there's essentially five

3    rights?

4         A.   That is correct.

5         Q.   Did he initial besides each one?

6         A.   Yes, he did.

7         Q.   And when did he put those initials there?

8         A.   As he was reading them.

9         Q.   Okay.  So he would initial each one after he

10   got done reading it?

11        A.   That is correct.

12        Q.   And he put five sets of initials?

13        A.   That is correct.

14        Q.   What are his initials?

15        A.   RG.

16        Q.   Okay.  And then he signed it at the bottom?

17        A.   Yes, sir.

18        Q.   Okay.  What does this say -- before he signed

19   it, did he read this second part?

20        A.   I read it to him also.  It says, "Waiver."

21        Q.   Okay.

22        A.   I have --

23        Q.   Did you read it to him or did he read it?

24        A.   Yes, I read it.

25        Q.   Okay.  And what does it say?  What did you read

1    to him?

2        A.    "I have read this statement of my rights.  This

3    statement of my rights has been read to me.  I understand

4    what my rights are.  I am willing to discuss subjects

5    presented and answer questions.  I do not want a lawyer

6    at this time.  I understand and know what I am doing.  No

7    promise or threats have been made to me and no pressure

8    of coercion of any kind has been used against me."

9        Q.    Okay.  So you just invite him into your cubicle

10   and read him these rights?

11       A.    That is correct.

12       Q.    And then what questions did you ask him?

13       A.    I proceeded to ask him about his whereabouts on

14   September the 5th, the weekend of September the 4th and

15   the 5th.

16       Q.    All right.  And that would be a Friday and

17   Saturday?

18       A.    That is correct.

19       Q.    So you would ask him, "Where were you on Friday

20   and Saturday?"

21       A.    That's correct.

22       Q.    And what did he say in response to that?

23             MR. REYES:  I'm going to object, Your

24   Honor.  It calls for hearsay.

25             THE COURT:  It'll be overruled.

1      A.    We learned through Mr. Gutierrez -- what he
2   advised me was that on Friday he had been with a friend
3   of his by the name of Miguel by the intersection of
4   Central Avenue and Morningside Road.
5      Q.    (BY MR. BLAYLOCK)  Okay.  And he said that
6   happened on Friday?
7      A.    That is correct.
8      Q.    Did he say anything else happened while he was
9   there?
10     A.    Yes.  He said that he had seen a Mr. Ramiro
11  Martinez and Avel Cuellar at that intersection.
12     Q.    Okay.  On Friday?
13     A.    That is correct.
14     Q.    And then what did he tell you he had did on
15  Saturday?
16     A.    On Saturday, he stated that he had been driving
17  around with a friend of his or a cousin of his by the
18  name of Chuco all day in a Corvette.
19     Q.    Did he say he was anywhere around the Harrison
20  place on Saturday?
21     A.    No, he didn't.
22     Q.    Okay.  Did he tell you that he had gone to
23  Matamoros that night?
24     A.    Yes, he did.
25     Q.    And what did he tell you he did there?

1     A.    That he was out there partying with his cousin.

2     Q.    On Saturday?

3     A.    That is correct.

4     Q.    Okay.  Now, he told you this, that on Friday he

5  saw Ramiro and Chacho, Avel, right?

6     A.    Yes.

7     Q.    And on Saturday, he wasn't around there; he was

8  driving around somewhere else, right?

9     A.    That is correct.

10    Q.    And then what did you say in response to that?

11    A.    I asked him if he was sure that he had his days

12  correct, that it wasn't on Saturday that he had seen

13  Mr. Martinez and Avel Cuellar instead of Friday.

14    Q.    All right.  And why did you ask him that?

15    A.    Because we had already obtained statements; and

16  I learned through interviews that --

17              MR. REYES:  I'm going to object, Your

18  Honor.  It calls for hearsay.

19              THE COURT:  Overruled.

20    A.    We had already obtained statements and learned

21  through interviews that Mr. Gutierrez had been seen on

22  Saturday outside the mobile home park.

23    Q.    (BY MR. BLAYLOCK)  And how did he respond when

24  you told him, "Are you sure it was Friday and not

25  Saturday?"

STATE OF TEXAS VS. RUBEN GUTIERREZ                    134

1       A.   He stood --

2       Q.   Did you --

3       A.   Yes.

4              COURT REPORTER:  Excuse me.  One at a

5  time, please.

6              THE COURT:  Let him finish asking the

7  question before you answer.

8              THE WITNESS:  I'm sorry.

9       Q.   (BY MR. BLAYLOCK)  Just tell me, how did he

10 respond when you told him that it wasn't Friday, it was

11 Saturday?

12      A.   He stood up and he said that he had --

13             MR. REYES:  I'm going to object, Your

14 Honor.  It calls for hearsay.

15             THE COURT:  Overruled.

16             MR. REYES:  Can we have a running

17 objection, Your Honor?

18             THE COURT:  You may.

19             MR. REYES:  Thank you.

20      Q.   (BY MR. BLAYLOCK)  Okay.  And he's not under

21 arrest at this point, right?

22      A.   No, he's not.

23      Q.   So he stood up and did what?

24      A.   He said that he had read in his warnings that

25 he could terminate the interview at any time.

1    Q.   And did he terminate it?

2    A.   Yes, he did.

3    Q.   Okay.  And did he stay in your cubicle?

4    A.   No, he didn't.

5    Q.   Okay.  Where did you put him?

6    A.   I walked him to the front of the C.I.D. lobby

7  and he had a seat there.

8    Q.   Okay.  And the reason he had a seat there is

9  because?

10    A.   Ms. Gutierrez was also there.

11    Q.   And did she give a voluntary statement?

12    A.   Yes, she did.

13    Q.   Okay.  And so, while you're talking to her,

14  he's just waiting on his wife?

15    A.   That is correct.

16    Q.   All right.  And then when you're done talking

17  to Ms. Gutierrez, what do they do?

18    A.   I walked her downstairs; and Ruben Gutierrez

19  was already downstairs with his mother; and Ms. Gutierrez

20  joined both of them and they all left.

21    Q.   They just left?

22    A.   Yes, sir.

23    Q.   Okay.  They weren't under arrest?

24    A.   No, they weren't.

25    Q.   Did you -- were you mean to him that day at

1   all?  Did you coerce him in any way?

2        A.    No, I didn't.

3        Q.    Did anybody?

4        A.    No, sir.

5        Q.    And when he terminated the interview, you just

6   stopped it?

7        A.    That is correct.

8        Q.    And they left?

9        A.    That is correct.

10       Q.    Well, tell me what happened in your

11  investigation.  What is the next thing?

12       A.    We had learned through the interview with

13  Ms. Gutierrez --

14            MR. REYES:  I'm going to object, Your

15  Honor.  It's also calling for hearsay.

16       Q.    (BY MR. BLAYLOCK)  All right.  Don't tell me

17  where you -- don't tell me what you learned.  Just tell

18  me what you did next.

19       A.    Okay.  We found out what the location where one

20  of the persons that Ruben Gutierrez had mentioned, where

21  he resided at.

22       Q.    Okay.

23       A.    I relayed that information to Detective Rey

24  Pineda; and Rey Pineda headed out to that location.

25       Q.    All right.  And what's the next thing that you

STATE OF TEXAS VS. RUBEN GUTIERREZ                          137

1   did?

2        A.    Later on that evening I accompanied

3   Detective Pineda back to that residence; and it was the

4   residence of -- the Maldonado residence.

5        Q.    Okay.  Joey Maldonado?

6        A.    That is correct.

7        Q.    Has he got a nickname?

8        A.    Yes, sir.

9        Q.    What is it?

10       A.    Chuco.

11       Q.    Chuco.  Okay.  So you went out to Chuco's

12  place.  And what did your investigation reveal there?

13       A.    Well, we proceeded to interview Mr. Maldonado

14  there; and then we asked him to go back to the station to

15  provide us with a statement.

16       Q.    Okay.  Did he confirm or conflict with what

17  Ruben said happened on the 6th?

18            MR. REYES:  I'm going to object, Your

19  Honor.  It calls for hearsay.

20            THE COURT:  Overruled.

21       A.    He conflicted.

22       Q.    (BY MR. BLAYLOCK)  Okay.  And what do you mean

23  by that?  Tell the jury.

24       A.    During the interview, Mr. Maldonado stated that

25  he was with two cousins --

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    138

1           MR. REYES:  I'm going to object, Your

2    Honor.  It calls for hearsay.

3           THE COURT:  Sustained.

4      Q.  (BY MR. BLAYLOCK)  All right.  So

5    Mr. Maldonado said that he was not with Ruben on the 6th?

6           MR. REYES:  I'm going to object, Your

7    Honor.  Counsel -- it's a leading question.  It's also

8    going as to hearsay, Judge.

9           THE COURT:  Sustained.

10     Q.  (BY MR. BLAYLOCK)  Let me re-ask it this way.

11   Mr. Maldonado's statement, did it conflict with

12   Mr. Gutierrez' statement?

13          MR. REYES:  I'm going to object, Your

14   Honor.  It calls for hearsay.

15          THE COURT:  Overruled.

16     A.   Yes, it did.

17     Q.  (BY MR. BLAYLOCK)  Okay.  All right.  Now,

18   when you were done talking with Mr. Maldonado, what

19   happened?

20     A.   He was -- I believe his father picked him up,

21   and he was taken back to his house.

22     Q.  All right.  What did you do next?

23     A.   That was it for that day.

24     Q.  All right.  What happened the next day?

25     A.   On the 10th of September I went back to trailer

PAM L. ESQUIVEL, CSR, RPR

```
1    10B, and I spoke with Ms. Vento.

2         Q.   Okay.

3         A.   And I asked her to come to the station with me

4    to provide me with a written statement as to what I

5    had -- the interview I had done with her previously.

6         Q.   Okay.  Did she give a consistent statement with

7    the previous statement?

8         A.   Yes, she did.

9         Q.   All right.  Did you do anything else on the

10   10th?

11        A.   No.  No, I didn't.

12        Q.   What happened on the 11th?

13        A.   On the 11th, Detective Pineda and myself, we

14   went out to 3113 Rene Avenue; and we made contact with

15   another person by the name of Alex Angeles.  And we just

16   told him that we needed to speak with him concerning the

17   investigation that we were working on.

18        Q.   All right.  And what is the next thing that

19   happened after that?

20        A.   We asked him to go to the Southmost substation

21   with us for an interview to interview him there.

22        Q.   Okay.

23        A.   And he went with us to the Southmost station.

24        Q.   He gave a statement?

25        A.   Yes, he was.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                      140

1        Q.   All right.  And what -- after he gave that
2   statement, tell me what happened.
3        A.   We then obtained a second statement from Miguel
4   Maldonado.
5        Q.   All right.  And did that second statement
6   conflict with what Mr. Gutierrez had told you?
7                 MR. REYES:  I'm going to object, Your
8   Honor.  It calls for hearsay.
9                 THE COURT:  Overruled.
10       A.   Yes, it did.
11       Q.   (BY MR. BLAYLOCK)  Now, what happened later on
12   that day on the 11th?
13       A.   On the 11th, we found out about some
14   information coming through Crime Stopper's.
15                 MR. REYES:  I'm going to object, Your
16   Honor.  It calls for hearsay.
17                 MR. BLAYLOCK:  Crime Stopper's reports are
18   not hearsay, Judge.
19                 THE COURT:  It's overruled.
20       Q.   (BY MR. BLAYLOCK)  Now, tell me what the Crime
21   Stopper's called in to provide to you.
22       A.   The caller had stated that a person by the name
23   of Rene Garcia --
24                 MR. REYES:  Can we have a running
25   objection, Your Honor?

1             THE COURT:  You may.

2             MR. REYES:  Thank you.

3        Q.   (BY MR. BLAYLOCK)  Go ahead.  You can answer.

4        A.   Okay.  That a person by the name of Rene Garcia

5   was spending large quantities of cash, and that it was

6   possibly related to the money that was taken during the

7   robbery.

8        Q.   Okay.  And did it say the death of the old

9   lady, related to the death --

10       A.   Yes, it did.

11       Q.   -- of the old lady?

12            MR. REYES:  I'm going to object, Your

13  Honor, to counsel leading his own witness.

14            THE COURT:  Sustained.  Don't lead your

15  witness, counsel.

16       Q.   (BY MR. BLAYLOCK)  All right.  And so, what

17  did you do with that information?

18       A.   Well, we met up at the police department; and

19  we found that Rene Garcia of 2813 Carolina Street had an

20  active warrant for him.

21       Q.   All right.  And did -- was he arrested?

22       A.   Yes.

23       Q.   And was he questioned?

24       A.   Yes, he was.

25       Q.   Did he give a statement?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    142

1      A.   Not the initial night, no, he didn't.

2      Q.   Okay.  Did he have any money on him?

3      A.   Yes, he did.

4      Q.   Okay.  What other kind of things did he have on

5  him?

6      A.   When we went to the residence, we found several

7  items; brand new tennis shoes, a lot of merchandise that

8  seemed to be recently purchased.

9      Q.   Okay.  And from your investigation, did you

10 confirm the Crime Stopper's tip?

11     A.   Yes, we did.

12     Q.   Okay.  And so, what had Rene Garcia been doing?

13     A.   Been spending a lot of --

14          MR. REYES:  I'm going to object, Your

15 Honor, as to relevance.

16          THE COURT:  Overruled.

17     A.   He had been spending a large sum of money on

18 the merchandise.

19     Q.   (BY MR. BLAYLOCK)  Okay.  Now, was there

20 anything else inside Rene Garcia's place, his house?

21     A.   Yes, there was.

22     Q.   What was it?

23     A.   There was a large amount of currency found

24 inside of the residence.

25          MR. REYES:  Can we have a running

PAM L. ESQUIVEL, CSR, RPR

1    objection, Your Honor, as to relevance?

2                    THE COURT:  You may.

3                    MR. REYES:  Thank you.

4        Q.   (BY MR. BLAYLOCK)  Do you know how much money

5    was found?

6        A.   I believe it was $5,600.

7                    MR. BLAYLOCK:  May I approach, Judge?

8                    THE COURT:  You may.

9        Q.   (BY MR. BLAYLOCK)  Where did you find that

10   money?

11       A.   The money was found in the bedroom inside of a

12   suitcase.

13       Q.   Okay.  I'm going to show you 38 and 39.  Do

14   these pictures accurately depict the way you saw it on

15   that day?

16       A.   Yes, sir.

17       Q.   Okay.

18                   MR. BLAYLOCK:  I'm showing defense 38 and

19   39.

20                   MR. REYES:  We would object as to State's

21   Exhibit Number 38 and 39, Your Honor, as to relevance.

22                   MR. BLAYLOCK:  I move to admit State's

23   Exhibit 38 and 39.

24                   THE COURT:  They're photos of where?

25                   MR. BLAYLOCK:  The inside of Rene Garcia's

STATE OF TEXAS VS. RUBEN GUTIERREZ                          144

```
1   house, a brown suitcase with a large amount of cash.
2                  THE COURT:  It'll be overruled.
3   Thirty-eight and 39 will be admitted.
4                  (State's Exhibit Numbers 38 and 39
5                  admitted)
6        Q.   (BY MR. BLAYLOCK)  Okay.  Now, hold up 38 and
7   39 and show the jury what they are.
8        A.    Thirty-eight is a close-up photograph of a
9   large amount of money in paper clips; and 39 is a
10  suitcase of where the money was found.
11       Q.   Okay.  This is inside Rene Garcia's house?
12       A.   That is correct.
13       Q.   Did you seize that money?
14       A.   Yes, we did.
15       Q.   And the TVs and everything else?
16       A.   All the merchandise that appeared to be
17  recently purchased.
18       Q.   Okay.  What about vehicles?
19       A.   We also seized a blue Pontiac Grand Prix in
20  which the -- Mr. Garcia had been arrested with during the
21  time the warrant was executed.
22       Q.   All right.  And what happened after you seized
23  all these items?
24       A.   They were all booked into evidence.
25       Q.   You took them back to the station?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    145

1       A.    Yes, sir, and they were booked into evidence.

2       Q.    Okay.  At that time did you talk to Rene

3  Garcia?

4       A.    Yes, I did, sir.

5       Q.    Did he give a statement?

6       A.    No, he didn't, sir.

7       Q.    All right.  When did he end up giving a

8  statement?

9       A.    The following morning.

10      Q.    Okay.  And was his statement voluntary?

11      A.    Yes, it was.

12      Q.    And without telling us what was in the

13  statement, what -- did you act on the information that he

14  gave you?

15      A.    Yes, we did, sir.

16      Q.    And what did you do?

17      A.    You want to ask me the question again?

18      Q.    And what did you do with that information that

19  you had gotten?

20      A.    We went out to another residence which he

21  advised us --

22            MR. REYES:  I'm going to object, Your

23  Honor.  It calls for hearsay.

24      Q.    (BY MR. BLAYLOCK)  Well, just tell us what you

25  did in response to the information.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    146

1       A.   Okay.  We went out and we found another
2   residence.
3       Q.   Okay.  And did you get consent to search the
4   other residence?
5       A.   Yes, sir.
6       Q.   And what did you find?
7            MR. REYES:   I'm going to object as to
8   relevance, Your Honor.
9            THE COURT:   Overruled.
10      A.   At the other residence, we made contact with
11  the homeowner or the person that was renting the place.
12      Q.   (BY MR. BLAYLOCK)  And what did you find?
13      A.   There was nothing found there at that location.
14      Q.   Okay.  Were you led to another location?
15      A.   Detective Marks and Pineda were, sir.
16      Q.   And do you know what they found?
17      A.   I believe they found another large, substantial
18  amount of money.
19      Q.   Do you know where they found it?
20      A.   Yes, sir.
21      Q.   Where?
22      A.   Inside of a sofa, the cushions of a sofa.
23      Q.   Okay.  And whose residence was that?
24      A.   Pedro Gracia's residence.
25      Q.   Pedro Gracia?

1      A.   Yes, sir.

2      Q.   Okay.

3                MR. BLAYLOCK:  May I approach, Judge?

4                THE COURT:  You may.

5      Q.   (BY MR. BLAYLOCK)  I'm showing you what's been

6  marked as State's Exhibit 40 and 41.

7                Now, did you go to Pedro Gracia's house?

8      A.   No, I didn't, sir.

9      Q.   But you've seen these before?

10     A.   Yes, sir.

11     Q.   And you can identify these?

12     A.   Yes, sir.

13     Q.   Okay.  Do you know how much cash was gotten?

14     A.   I believe $11,700 in cash.

15     Q.   Okay.  Do you know where that had been located?

16     A.   At the residence of -- the second residence of

17 Mr. Gracia.

18     Q.   I mean where specifically, do you know?  If you

19 know.

20     A.   I don't know the address.

21     Q.   I'm talking about where in the house.  Where

22 inside the house, do you know?

23     A.   I don't know where it was located at.

24     Q.   Okay.  So, where was that money taken, that

25 11,000?

1      A.   That money was taken to Brownsville Police
2  Department.
3      Q.   Okay.  And what did you do next?
4      A.   The money was counted there at the police
5  station, and it was booked into evidence.
6      Q.   Okay.  And based on that information, was
7  another arrest made?
8      A.   Yes, there was, sir.
9      Q.   For who?
10     A.   For Ruben Gutierrez.
11     Q.   And who else?
12     A.   And Pedro Gracia.
13     Q.   Pedro Gracia?
14     A.   Yes, sir.
15     Q.   And what is the next thing that you did?
16     A.   I met with Detective Rene Carrejo; and we went
17  to 4200 Boca Chica, apartment number 360.
18     Q.   Whose residence is that?
19     A.   Ruben Gutierrez' residence.
20     Q.   Okay.  So you went back to Ruben's residence?
21     A.   Yes, we did.
22     Q.   What for?
23     A.   To execute a capital murder warrant.
24     Q.   Okay.  Was he there?
25     A.   Yes, he was.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           149

1        Q.    Did you arrest him?

2        A.    Yes, I did.

3        Q.    What date was that?

4        A.    The 13th I believe.

5        Q.    That was on the 13th?

6        A.    Yes, sir.

7        Q.    How was he clothed when you got there?

8        A.    I don't recall seeing how he was clothed.

9        Q.    Did he have clothes on?

10       A.    I don't recall if he did.

11       Q.    Did you take him to the station?

12       A.    Yes, we did.

13       Q.    Did you photograph him at the station?

14       A.    Yes, I did, sir.

15             MR. BLAYLOCK:  May I approach the witness?

16             THE COURT:  You may.

17       Q.    (BY MR. BLAYLOCK)  I'm showing you what's been

18  marked as State's Exhibit Number 42.  Does that

19  accurately depict the way you saw him on that day?

20       A.    Yes.

21       Q.    And when was that taken?

22       A.    At 12:40 p.m. on 9/13/98.

23       Q.    Okay.  So it's on the 13th at 12:40 in the

24  afternoon?

25       A.    Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          150

1      Q.   And when did you execute that warrant?

2      A.   That same day earlier during the day.

3      Q.   About that same time?

4      A.   A little earlier, yes, sir.

5               MR. BLAYLOCK:  Move to admit State's

6  Exhibit 42.

7               MR. REYES:  We would object as to

8  relevance, Your Honor.  There's also some writing on the

9  back of State's Exhibit 42.  We would object that it's

10 hearsay.  It's not been properly authenticated or

11 identified.

12              THE COURT:  It'll be overruled.  Forty-two

13 will be admitted into evidence.

14              **(State's Exhibit Number 42 admitted)**

15     Q.   (BY MR. BLAYLOCK)  Can you hold up State's

16 Exhibit 42 and tell us what it is?

17     A.   It's a photograph of Ruben Gutierrez wearing a

18 striped shirt, T-shirt.

19     Q.   Okay.  Is that what he was wearing that day?

20     A.   Yes, sir.

21     Q.   Okay.  Now, at this point you've already talked

22 to Rene Garcia?

23     A.   That is correct.

24     Q.   You've already talked to Pedro?

25     A.   Yes, sir.

PAM L. ESQUIVEL, CSR, RPR

1      Q.   Okay.  And -- well, tell me what happened when
2  you got Ruben to the police station.
3      A.   Once --
4      Q.   Hold on.
5                     MR. BLAYLOCK:  Can we approach, Judge?
6                     **(Off the record discussion at the bench)**
7                     THE COURT:  All right.  Ladies and
8  gentlemen of the jury, let's go ahead and take our lunch
9  hour at this time.  Remember the instructions I've given
10 you not to discuss this case among yourselves or with
11 anyone else, not to form or express any opinions.  Be
12 back in the jury room at -- right before 1:30 because
13 we're going to start at 1:30 with the testimony.
14                     **(Lunch recess taken from 11:53 a.m. to**
15                     **1:30 p.m.)**
16                     THE COURT:  Are you all ready for the
17 jury?
18                     MS. FISCHER:  I think Mr. Galarza is right
19 outside.
20                     THE COURT:  Okay.  Bring in the jury.
21                     THE BAILIFF:  Yes, Your Honor.
22                     **(Jury brought into the courtroom)**
23                     THE COURT:  All right.  You may be seated.
24                     Good afternoon, ladies and gentlemen of
25 the jury.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              152

1              THE JURY:  Good afternoon.

2              THE COURT:  I think we're getting ready to

3  start.

4              Who had the witness?

5              MS. FISCHER:  Mr. Blaylock.

6              THE COURT:  Mr. Blaylock, you may proceed.

7              MR. BLAYLOCK:  Thank you, Judge.

8              **DIRECT EXAMINATION CONTINUED**

9  **BY MR. BLAYLOCK:**

10     Q.   Let's back up a little bit, Detective Flores.

11  Before we took the break, you were telling us that your

12  investigation had led to the point where you got a

13  warrant for Ruben Gutierrez.

14     A.   That is correct.

15     Q.   Okay.  And did you go and execute that warrant?

16     A.   Yes, I did, sir.

17     Q.   Okay.  And the person that you arrested on that

18  warrant, is he in this courtroom?

19     A.   Yes, he is.

20     Q.   Will you point him out and describe his

21  clothes?

22     A.   He's wearing a white T-shirt with a tie here in

23  the corner (pointing).

24     Q.   A white shirt?

25     A.   White long T-shirt with a tie.

PAM L. ESQUIVEL, CSR, RPR

1           MR. BLAYLOCK:  Judge, can the record
2  reflect that he's identified the defendant?
3           THE COURT:  It shall reflect.
4           MR. BLAYLOCK:  Thank you.
5      Q.   (BY MR. BLAYLOCK)  All right.  Now, once you
6  got back to the station, did you talk to Mr. Gutierrez?
7      A.   Yes, I did.
8      Q.   Okay.  And did you read him his rights before
9  you talked to him?
10     A.   Yes, I did.
11     Q.   Tell me what rights that you read to him.
12     A.   The rights that are on the Warning and Waiver
13  of Rights form.
14     Q.   Okay.  And what day are we talking about?
15     A.   The 13th of September.
16           MR. BLAYLOCK:  May I approach the witness,
17  Judge?
18           THE COURT:  You may.
19           MR. BLAYLOCK:  Thank you.
20     Q.   (BY MR. BLAYLOCK)  Let me show you -- I'm
21  going to show you what's been marked as State's Exhibit
22  Number 43.  Do you recognize that?
23     A.   Yes, sir.
24     Q.   Okay.  Is that the exact item that you saw that
25  day?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          154

1        A.    Yes, it is.

2        Q.    Has it been altered in any way?

3        A.    No, it hasn't.

4              MR. BLAYLOCK:  I'm showing Defendant's

5  Exhibit 43.

6              MR. REYES:  May I take this witness on

7  voir dire, Your Honor?

8              THE COURT:  As to the admissibility of the

9  warrant, yes.

10             MR. REYES:  Yes.  This is as to the

11 waiver.  This is as to the --

12             THE COURT:  Go ahead.

13             MR. REYES:  Yes.

14                   **VOIR DIRE EXAMINATION**

15 **BY MR. REYES:**

16       Q.    Who was it that signed as a witness to this

17 Exhibit Number 43?

18       A.    Myself.

19       Q.    And who else?

20       A.    I believe it was Sergeant Galvan.  It's listed

21 on the form itself.

22       Q.    What's Sergeant Galvan's first name?

23       A.    Sandra Galvan.

24       Q.    Now, in this -- do you recall what time you

25 read these rights to Mr. Gutierrez?

STATE OF TEXAS VS. RUBEN GUTIERREZ                         155

```
1        A.   I don't recall.  It's on the form.

2        Q.   And on this date when you were reading these

3   rights to him, was he under arrest?

4        A.   Yes, he was.

5        Q.   So he was not free to leave; is that correct?

6        A.   No, he wasn't.

7        Q.   Now, the second part of that form, State's

8   Exhibit 43, it states whether you read the rights to him

9   or whether the rights were read by him.  Which of the two

10  occurred?

11       A.   Both.

12       Q.   You allowed him time to read those rights?

13       A.   Yes, I did.

14       Q.   And you read those rights to him yourself?

15       A.   Yes, I did.

16       Q.   And how is it that you knew that he understood

17  those rights?

18       A.   I let him read the rights himself; and as I --

19  I advised him to initial each right as he understood it

20  to the left of every number.

21       Q.   How is it that you yourself ascertained that he

22  understood those rights, though?

23       A.   How did I ascertain?

24       Q.   Yes.

25       A.   By him writing his initials to the left of the
```

PAM L. ESQUIVEL, CSR, RPR

1    number.

2        Q.    So that was all he did?

3        A.    He read them and then he initialed it.

4        Q.    Okay.   So he never told you whether or not he

5    understood them; is that correct?

6        A.    That is correct.

7        Q.    All he did was do what it is that you told him,

8    which is initial the rights; is that correct?

9        A.    To read them and then to initial them as he

10   understood them to the left of it.

11       Q.    That's not what you said earlier, Officer.   You

12   said that you read them to him; and then after he read

13   them, he initialed them.   That's what you instructed him

14   to do; is that correct?

15       A.    That's correct.

16       Q.    So, all he was doing was initialing after he

17   read those rights; is that correct?

18       A.    After he understood them.

19       Q.    That's not what you said earlier.   Did you

20   understand my question?   Earlier you said that what you

21   did is you read those rights to him; and then you had him

22   read them and then he initialed.   That's all you said --

23       A.    That is correct.

24       Q.    -- is that correct?

25       A.    That's correct.

1      Q.    So that was the procedure that you followed; is
2  that correct?
3      A.    I advised him to initial each right to the left
4  of it as he was reading them and as he understood them.
5      Q.    Did you understand my question?  Earlier you
6  said all you did was read the rights to him.  You had him
7  read the rights and then he initialed.  That's all that
8  happened.
9             MR. BLAYLOCK:  Objection.  Asked and
10 answered, and it's argumentative.
11            THE COURT:  Overruled.  Go ahead.
12     Q.    (BY MR. REYES)  Is that correct?  That's what
13 you said earlier?
14     A.    That's correct.
15     Q.    Now, isn't it correct that on this form you
16 don't mark or make any kind of marking as to which one
17 occurred, you reading his rights to him or whether he
18 read the rights to himself; is that correct?
19     A.    That is correct.
20            MR. REYES:  Judge, we would object to
21 State's Exhibit 43; and we would reurge all the previous
22 objections we've made with respect to this exhibit.
23            THE COURT:  That'll be overruled.
24 Forty-three will be admitted into evidence.
25            **(State's Exhibit Number 43 admitted)**

STATE OF TEXAS VS. RUBEN GUTIERREZ                              158

DIRECT EXAMINATION CONTINUED

BY MR. BLAYLOCK:

Q.   State's Exhibit 43 is identical to the other exhibit, isn't it?

A.   Yes, it is.

Q.   So you had already been through this once with him already, hadn't you?

A.   That's correct.

Q.   Okay.  And he said he understood his rights the first time?

A.   Yes, sir.

Q.   And did he initial next to the five rights every time after he read them?

A.   That is correct.

Q.   And again, what are his initials?

A.   RG.

Q.   Okay.  And he put that after each one of the five rights?

A.   That is correct.

Q.   And whose signature is this?

A.   That is Ruben Gutierrez' signature.

Q.   Okay.

            MR. BLAYLOCK:  May I publish this to the jury, Judge?

            THE COURT:  You may.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                        159

```
 1              MR. BLAYLOCK:  Thank you.
 2        Q.    (BY MR. BLAYLOCK)  After you read him his
 3   rights, his Miranda rights, did he agree to talk to you?
 4        A.    Yes, he did.
 5        Q.    Okay.  Did you threaten him?
 6        A.    No, I didn't.
 7        Q.    Did you coerce him in any way?
 8        A.    No, I didn't.
 9        Q.    Okay.  And what time of day was this?  Do you
10   need to see --
11        A.    Yes.  It's on the -- it's at 12:21 p.m.
12        Q.    Okay.  So this is in the afternoon?
13        A.    That's correct.
14        Q.    All right.  Did he -- did you -- how long was
15   he in there with you?
16        A.    I'd say about 45 minutes.
17        Q.    Forty-five minutes?  Okay.  And during that
18   time, did you threaten him in any way?
19        A.    No, I didn't.
20        Q.    Describe for the jury what the atmosphere is
21   like inside that area again.
22        A.    It's an open bay, and it has cubicles on each
23   side.  He was seated inside of my cubicle.  There's no
24   door to it.  And I was just talking to him about why he
25   was being placed under arrest.
```

```
1       Q.   Okay.  So you're sitting down?

2       A.   Yes, sir.

3       Q.   And he's sitting down?

4       A.   Yes, sir.

5       Q.   Is Sandra there the whole time or just when the

6   rights were read?

7       A.   Yes, she is, the whole time.

8       Q.   Where is she?

9       A.   She's sitting next to me to my right.

10      Q.   Okay.  So there's three chairs in there?

11      A.   Yes, sir.

12      Q.   And where is he sitting?

13      A.   He's sitting to my left.

14      Q.   All right.  And do you got a computer screen in

15  front of you?

16      A.   Yes, sir.

17      Q.   Are you -- can he see the computer screen?

18      A.   No, sir.

19      Q.   Okay.  Are you typing everything that he's

20  telling you?

21      A.   Yes, sir.

22      Q.   Just word for word whatever he's saying?

23      A.   Yes, sir.

24      Q.   You have no way to tell if it's true or not;

25  you're just typing whatever he's saying?
```

```
1         A.    That's correct.
2         Q.    All right.  And did you take down what he told
3    you?
4         A.    Yes, I did.
5         Q.    All right.  Did he ever ask to terminate the
6    interview?
7         A.    No, he didn't.
8         Q.    Did he ever ask for an attorney?
9         A.    No, he didn't.
10        Q.    Why was he talking?
11                   MR. REYES:  I'm going to object, Your
12   Honor.  It calls for speculation.
13                   THE COURT:  I'll sustain the objection.
14        Q.    (BY MR. BLAYLOCK)  Okay.  Do you know why he
15   was talking?
16                   MR. REYES:  It calls for speculation, Your
17   Honor.  We would object.
18                   THE COURT:  I'll permit him to answer.
19        Q.    (BY MR. BLAYLOCK)  Do you know why?
20        A.    Yes, sir.
21        Q.    Okay.  Tell us why.
22        A.    I advised Ruben Gutierrez that he was under
23   arrest for capital murder for the death of Ms. Harrison.
24   I advised him that two other people had already been
25   arrested and that they were also there at the police
```

1    department and that both had already given statements.

2         Q.   Okay.  And at that point, did you tell him if

3    he had to make a statement or not?

4         A.   Excuse me?

5         Q.   Did you tell him that he had to make a

6    statement or --

7         A.   No.

8         Q.   What did you tell him?

9         A.   He volunteered to give me a statement as to his

10   involvement in it.

11        Q.   Okay.  So you said, "We already have this

12   information and do you want to give a statement?"  Is

13   that what you said?

14        A.   That's correct.

15        Q.   And he said, "Yeah, I'll give a statement"?

16        A.   That is correct.

17        Q.   All right.  Let's look at State's Exhibit

18   Number 44.  Look that over.  You don't have to read the

19   whole thing.

20        A.   Okay.

21        Q.   Is -- look through it.  Is that the statement

22   that you took that day?

23        A.   Yes, it is.

24        Q.   All right.  And how do you know?

25        A.   It's Ruben Gutierrez' signature on it witnessed

1   by Sergeant Sandra Galvan and myself.

2        Q.   Okay.  And this at the top, does this again

3   have the five warnings as contained on State's

4   Exhibit 43?

5        A.   Yes, it does.

6        Q.   These are called the Miranda warnings, right?

7        A.   Yes, sir.

8        Q.   And did you read these to him again at this

9   point?

10       A.   Yes, sir.

11       Q.   All right.  And did he read them?

12       A.   Yes, sir.

13       Q.   Did you tell him to initial them again?

14       A.   Yes, sir.

15       Q.   Now, what exactly did you tell him about

16   initialing them on that time?

17       A.   The same -- I went through the same procedure,

18   once again, for him to go ahead and read his rights, to

19   go ahead and initial each one next to the number, and

20   which he did.

21       Q.   Okay.  And did you also tell him to read each

22   paragraph?

23       A.   Yes, sir.

24       Q.   What did you tell him after reading each

25   paragraph?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    164

```
 1        A.   After the statement had been obtained, I told
 2   him to go ahead and read it and to place his initials at
 3   the end of each paragraph just to ensure him that nothing
 4   had been added in at a later date.
 5        Q.   Okay.  And does each paragraph have some
 6   initials after it?
 7        A.   Yes, sir.
 8        Q.   And each Miranda warning has some initials,
 9   too?
10        A.   Yes, sir.
11                MR. BLAYLOCK:  I'm showing defense State's
12   Exhibit 44.
13                MR. REYES:  Judge, with respect to State's
14   Exhibit Number 44, we would just reurge at this time all
15   the objections that we have previously made.
16                THE COURT:  All right.  They'll be
17   overruled.
18                MR. BLAYLOCK:  Move to admit State's
19   Exhibit 44.
20                THE COURT:  Forty-four will be admitted.
21            (State's Exhibit Number 44 admitted)
22        Q.   (BY MR. BLAYLOCK)  All right, sir.  Now,
23   again, did you tell him if he had to make a statement or
24   not?
25        A.   No, I didn't.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          165

1        Q.    Okay.   In fact, you left it up to him whether

2    he wanted to?

3        A.    Yes, sir.

4        Q.    Did you need a statement from him at that

5    point?

6        A.    No, I didn't.

7        Q.    Okay.   The case was pretty solid in your

8    opinion?

9        A.    Yes, sir.

10              MR. REYES:   I'm going to object, Your

11   Honor.   That's an improper question.

12              THE COURT:   Let's move on.

13       Q.    (BY MR. BLAYLOCK)   All right.   Now, State's

14   Exhibit 44, is that what he told you that day?

15       A.    Yes, it is.

16       Q.    That was his version of the story?

17       A.    Yes, sir.

18       Q.    Go ahead and read to the jury the whole thing,

19   his version of the story --

20       A.    Do you want me to start at the top?

21       Q.    Start at the top.

22       A.    It says, "I, Ruben Gutierrez, having been

23   warned by Detective Antonio Flores, whose occupation is a

24   police officer, at 12:21 p.m. on the 13th day of

25   September, 1998, at Brownsville, Cameron County, Texas;"