STATE OF TEXAS VS. RUBEN GUTIERREZ                              167

1   Brownsville Police Department went by my apartment; and
2   when I answered the door, he told me that I was under
3   arrest for murder.  A police officer then took me to
4   jail; and later on, Detective Pineda took me upstairs
5   where Detective Flores was waiting.
6              "Detective Flores proceeded to read me my
7   rights, which I have read, initialed, signed, dated and
8   timed them.  I would now like to give the following
9   statement to Detective Flores on a voluntarily basis.  I
10  have not been promised anything in return for what I am
11  about to tell him.
12             "Detective Flores stopped by my house on
13  9/8/98; and he told my wife that he needed to speak with
14  me.  My wife Angie told me later on that day when I saw
15  her that he, Detective Flores, had been looking for me.
16             "Angie told me that Detective Flores had
17  searched the house and had left his business card with
18  her in order for me to speak with him later.  I came into
19  the station to speak with Detective Flores that evening,
20  but he had already left for the day.
21             "On 9/9/98 I came in to the Brownsville
22  Police Department about 3 p.m. and I had met
23  Detective Flores at his office.  Detective Flores read me
24  my rights, which I had also signed; and then he asked me
25  some questions about my whereabouts of the past weekend,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    168

1   which was Friday, 9/4/98, through Sunday, 9/6/98.

2              "I began to tell Detective Flores who I

3   was with those days, but when -- but then I stopped and I

4   did not tell him anything else.  I read in my rights that

5   I could stop the interview at any time; and I did.

6              "I then left that day; and I did not see

7   or speak with him again until today when he went to my --

8   when he went to my apartment.  Today I would like to tell

9   Detective Flores what I did that weekend that he asked me

10  questions about.

11             "On Saturday, 9/5/98, around 12 in the

12  afternoon, Pedro Gracia stopped by my apartment and

13  picked me up in his Ford truck that he owns.  Pedro had

14  asked me about an old lady that I know by the name of

15  Ms. Harrison that has a lot of money.  I told Pedro that

16  I did know the lady; and he told me that he wanted to rip

17  her off, but he needed someone to help him.

18             "I told Pedro that I had a friend by the

19  name of Rene Garcia.  Pedro was driving his truck; and

20  then we decided to stop by Rene's house located on

21  Carolina Street.  When we got there, I talked to

22  Rene's --" I'm sorry.  "When we got there, I talked to

23  Rene, and I told him that Pedro wanted to break into a

24  house, and I asked Rene if he wanted to help Pedro out.

25  Rene told me, 'Yeah,' and he got into the truck.

1            "At this time I was now driving the truck.

2   I told Rene that it was an old lady's house on

3   Morningside Road.  I passed by the trailer home so they

4   could see how it was, location, house, and surrounding

5   areas.  I went to Morningside Park and I told Pedro and

6   Rene that for both of them to go in Pedro's truck, but

7   for Rene to be lying down in the bed of the truck.  I

8   told Pedro to get off and talk to the lady, that just

9   tell her that he, Pedro, wanted to rent a lot, for him to

10  ask her to show him a solar.

11           "After he would take Ms. Harrison out of

12  the office, for him to click the alarm to unarm it -- for

13  him to click the alarm to unarm it.  That would give Rene

14  the signal for him to get off of the truck.

15           "I then told Rene to go through the front

16  door and find her room, and somewhere in her closet was

17  going to be some money.  He had about ten to 15 minutes

18  to get the money and then get out; and once he had the

19  money, for him to go out through the back door.

20           "Once he was out the back door, Rene was

21  supposed to cut across the field and wait for me at Billy

22  Mitchell.  There is a concrete wall that has been knocked

23  down, and that is where Rene was supposed to wait for me.

24           "I was at the park waiting for Pedro to

25  pick me up so I could tell him where Rene was going to be

STATE OF TEXAS VS. RUBEN GUTIERREZ 170

1    and pick him up.  And then I waited there at the park for
2    20 to 25 minutes.  I then saw the truck drive into the
3    park, and they stopped next to where I was.
4                "I went around the passenger side of the
5    truck and Rene lowered the window.  I saw that Rene was
6    holding a screwdriver in his right hand.  The screwdriver
7    was covered with blood and his hand was splattered with
8    some blood.  I then saw a blue suitcase on Rene's lap and
9    a tackle box was between Pedro and Rene.
10               "The tackle/toolbox was open and Pedro was
11   looking through it.  I reached into the truck, and I
12   grabbed the handle to the blue suitcase and I thought
13   that it was going to open.  The suitcase was closed, so I
14   picked it up a little bit and I noticed that it was
15   closed.  I then let it go; and that is when I asked Rene
16   what had happened.
17               "Rene looked at me and he told me that he
18   had killed her.  I glanced towards Pedro and I saw that
19   one of his hands were on the steering wheel and the other
20   was going through the tackle/toolbox.  Pedro then looked
21   at me, and I could tell by the look on his face that he
22   was scared.
23               "After this, I stepped back from the
24   truck, and I told Pedro and Rene to leave me there and I
25   would go home walking.  Then they took off; and I stayed

STATE OF TEXAS VS. RUBEN GUTIERREZ                              171

1    at the park for about five minutes smoking a cigarette.

2    That is when I started walking towards my house.  I got

3    to about the Bad Boys Shop located on Central Avenue; and

4    that is when Pedro and Rene came up behind me in the

5    truck.

6                    "I opened the passenger door to the truck

7    and I got in.  Pedro then took me on the -- Pedro then

8    took me home; and on the way there, he told me that Rene

9    had thrown out the screwdriver out the window.  Pedro

10   said that the screwdriver landed somewhere between a

11   caliche driveway and a palm tree.  He also told me that

12   the blue suitcase was on California Road right next to

13   the resaca on the left side.

14                   "By then we were already at my house and I

15   got off.  I told them to act like they did not know me

16   because I did not want to -- I did not want any part of

17   this.  It was all supposed to be a ripoff, but then --

18   but they turned it into a murder.

19                   "While at Brownsville --" I'm sorry.

20   "While at Morningside Park before Pedro and Rene took off

21   towards the house to commit the ripoff, they both got off

22   the truck; and Pedro pushed the back rest of his seat

23   forward and took out two screwdrivers.  They had a

24   screwdriver each.  Rene put one of the screwdrivers in

25   one of his back pant pockets.  I saw Pedro place the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          172

1   screwdriver in his front left pocket.

2              "There was no doubt about the fact that I

3   planned the whole ripoff, but I never wanted for either

4   one of them to kill Ms. Harrison.  When I saw that Pedro

5   was grabbing the money from the tackle/toolbox and heard

6   some crumbling plastic inside, I decided that I did not

7   want any money that they had just ripped off.

8              "I have given this statement to

9   Detective Flores on my own free will.  And I would like

10  to say that I have not been threatened or promised

11  anything in return for what I have said.  I have given

12  this statement because I just want the truth to be told.

13             "I have read this statement and I find it

14  to be true and correct to the best of my knowledge,"

15  signed by Ruben Gutierrez.

16             MR. BLAYLOCK:  May I approach the witness

17  again, Judge?

18             THE COURT:  You may.

19       Q.   (BY MR. BLAYLOCK)  I'm going to show you

20  what's marked as State's Exhibit 45.  Do you recognize

21  this?

22       A.   Yes, sir.

23       Q.   Okay.  And again, did you read all of the

24  Miranda warnings this time?

25       A.   Yes, I did.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          173

1        Q.    And did he read all the Miranda warnings on
2    this date?
3        A.    Yes, he did.
4        Q.    Did he initial by each one?
5        A.    Yes, he did.
6        Q.    What did you tell him after he read each
7    paragraph?
8        A.    To go ahead and initial each paragraph at the
9    end with his initials on it.
10        Q.    Okay.  After he had read it?
11        A.    Yes, sir.
12        Q.    Okay.  And did he do that?
13        A.    Yes, he did.
14        Q.    His initials, do they appear on there?
15        A.    Yes, they do.
16        Q.    Okay.  Now, he had already given one statement.
17    When did the next statement come?
18        A.    He gave the following statement after the
19    statement was read and signed, initialed; and then
20    Sergeant Galvan had asked him some questions.  And during
21    that interview, she decided to go ahead and include that
22    information that she had gotten from the interview with
23    him to place it in the second statement, which is that
24    statement right there.
25        Q.    Okay.  So immediately after he gave one

```
 1    statement, he adds on to it?

 2         A.   Yes, sir.

 3         Q.   Okay.  Is the initial part of it exactly the

 4    same?

 5         A.   Yes, sir.

 6         Q.   Okay.  Just the add-on part?

 7         A.   Yes, sir.

 8         Q.   And were you there the whole time?

 9         A.   Yes, I was.

10              MR. BLAYLOCK:  I've already shown defense

11    State's Exhibit 45.  The State would move to admit

12    State's Exhibit 45.

13              MR. REYES:  We just reurge all the

14    objections we previously made, Your Honor.

15              THE COURT:  That'll be overruled.

16    Forty-five will be admitted.

17              (State's Exhibit Number 45 admitted)

18         Q.   (BY MR. BLAYLOCK)  Okay.  Again, while all

19    this is going on when Sergeant Galvan gets him to add a

20    few things on here, has he been threatened?

21         A.   Never.

22         Q.   Coerced?

23         A.   Never.

24         Q.   Did you withhold food or water?

25         A.   No, sir.
```

1    Q.   Did you do anything to make him give a
2    statement?
3    A.   No, I didn't.
4    Q.   Okay.  What is your attitude at this time?
5    A.   Well, he could give it if he wanted to; and we
6    already had the other statements to back up the warrant
7    that we already had obtained for him.
8    Q.   Okay.  All right.  Now, you say the second
9    statement, State's Exhibit 45, is exactly the same up to
10   what point?  Could you point it out in here?  I don't
11   want to have you read the whole thing again.
12   A.   Okay.  Right here.
13   Q.   Okay.  Can you start at this paragraph right
14   here, which is the last paragraph of the other statement,
15   and continue on and tell the jury what he added on to his
16   statement.
17   A.   Okay.  "There was no doubt about the fact that
18   I planned the whole ripoff, but I never wanted for either
19   one of them to kill Ms. Harrison.  When I saw that Pedro
20   was grabbing the money from the tackle box and heard some
21   crumbling plastic, I decided that I didn't want any money
22   and that they -- any money that they had just ripped off.
23              "About the last week of June or the first
24   of July, Chacho ripped off Ms. Harrison.  This was the
25   third or fourth time but the last time that I know that

STATE OF TEXAS VS. RUBEN GUTIERREZ                          176

1    Chacho, Avel Cuellar, ripped off Ms. Harrison.  Chacho
2    took between 30 and 40 grand this last time.  Chacho told
3    me to hold on -- to hold it -- Chacho told me to hold it
4    for him.  He gave me 10,000 for me.
5                   "This is the reason that I knew that
6    Ms. Harrison had a lot of money.  Chacho would get drunk
7    and talk a lot of shit.  Chacho, Crispin and myself would
8    hang around the back of Ms. Harrison's home and drink.
9                   "There was one time when I was in the back
10   drinking.  It was some time in April.  She came outside
11   and started arguing with Chacho because he was drinking.
12   He didn't do any work that day, so Ms. Harrison was
13   upset.  Ms. Harrison told Chacho she was going to kick
14   him out.
15                   "She went inside; and about two or three
16   minutes later he walked inside.  I could hear them
17   arguing with each other.  I'm pretty sure he hit her, but
18   I didn't see -- but I didn't see.  She came outside
19   holding one side of her face.  She went out the back door
20   and walked to the front.  I followed her to see what had
21   happened.  She was crying.  I talked with her.  She told
22   me how lonely she was and how mean Chacho was with her,
23   mistreating her all the time.
24                   "After I finished talking with her, I went
25   back to the -- went back to the back and Chacho was

STATE OF TEXAS VS. RUBEN GUTIERREZ                          177

1    already there drinking.  I went to my car to get some

2    cigarettes.  I noticed in the drinking --" I'm sorry.  "I

3    noticed in the passenger side of my car a little satchel;

4    and I asked Chacho what it was.  He told me to take it to

5    my house and hold it for him, he would pick it up later.

6              "I took off; and about three days later he

7    went to my house.  I gave him the satchel.  This is the

8    time that he gave me about $10,000.  I believe that

9    Chacho was ripping off Ms. Harrison because he was

10   shooting up heroin.  He also smoked marijuana.

11             "Crispin was always inside Ms. Harrison's

12   house also.  There was one time when I saw him with a

13   bag -- with a big stack of $100 bills.  Crispin was like

14   real close friends with her.

15             "Like yesterday he went over to my house

16   looking for me.  I don't know what he wanted.  My friends

17   were there.  I wasn't -- I wasn't -- my friends -- my

18   friends were there.  I wasn't.  My friends told me he was

19   in a brand new Dodge Ram truck with chrome rims.  He

20   would brag about how he and Chacho would stay up for two

21   or three days doing cocaine and stuff.  When Chacho would

22   get drunk, he would think he was high and mighty; and he

23   and Crispin would fight.  Crispin would beat him up.

24             "I have given this statement to

25   Detective Flores on my own free will; and I would like to

1    say that I have no -- not been threatened or promised

2    anything in return for what I have said.  I have given

3    this statement because I just want the truth to be told.

4              "I have read this statement and find it to

5    be true and correct to the best of my knowledge."

6         Q.   All right.  This statement was given on the

7    13th?

8         A.   Yes, sir.

9         Q.   Okay.  And by this time, has Crispin or has

10   Avel Cuellar been cleared as a suspect?

11        A.   Yes, sir.

12        Q.   Okay.  And was Crispin ever a suspect?

13        A.   At the beginning of the investigation he was.

14        Q.   Okay.  Had he been cleared by this time also?

15        A.   Yes, sir.

16        Q.   Okay.  But this defendant was trying to bring

17   them down in some way?

18        A.   That is correct.

19        Q.   All right.  After he gave this statement, did

20   you all go anywhere?

21        A.   Yes, we did.

22        Q.   And where did you go?

23        A.   After the statement was obtained, Ruben told me

24   that he wanted to show me --

25              MR. REYES:  I would object, Your Honor.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                  179

```
 1    It calls for hearsay.
 2                    THE COURT:  Overruled.
 3                    MR. REYES:  Can we have a running
 4    objection, Your Honor?
 5                    THE COURT:  You may.
 6         A.   He told me that he wanted to show us where the
 7    murder weapon was at.
 8         Q.   (BY MR. BLAYLOCK)  Okay.  And he described it
 9    in these statements where he thought they were?
10         A.   That is correct.
11         Q.   Okay.  And also the blue suitcase?
12         A.   Yes, sir.
13         Q.   All right.  So tell me what -- how did that
14    take place?
15         A.   Detective Pineda, myself and Ruben Gutierrez
16    got into my unit; and we proceeded to drive towards the
17    area that Ruben was telling us --
18         Q.   Tell the jury what you mean by your unit.
19         A.   Okay.  It's my detective car that I use while
20    working.
21         Q.   Okay.  Is this a marked car or an unmarked car?
22         A.   It's an unmarked car.
23         Q.   Okay.  Does it have any bars between the driver
24    and the passenger seats?
25         A.   No, it doesn't.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                     180

```
 1        Q.   It's just a regular car?

 2        A.   Yes, sir.

 3        Q.   Okay.  So you got in your car; and where did

 4   you go?

 5        A.   We started to drive towards the location that

 6   Ruben was advising us to go to.

 7        Q.   Okay.  And where did you go?  Tell the jury the

 8   route that you took.

 9        A.   We went down -- we made it down to Southmost

10   Road; and we made a left turn on Morningside by the

11   Castillo Elementary.  And we passed Ms. Harrison's

12   trailer park by; and then we made it all the way towards

13   Apollo and the Iowa intersection.  From there we

14   continued going straight; and then we came to an abrupt

15   stop where Ruben told us to stop.

16        Q.   Okay.  And where was that at?

17        A.   This was close to the intersection of Norton

18   Drive and Morningside Road.

19        Q.   All right.  And what -- is there some kind of

20   manufacturing plant near there?

21        A.   Yes, sir.

22        Q.   What plant is it?

23        A.   Norton.

24        Q.   All right.  Describe for the jury what the

25   place looked like when you got there.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          181

1      A.    It was an open field to our right.  The Norton
2   Company was -- the property was to the left.  As we were
3   driving, he told us to make a quick stop and turn into a
4   caliche driveway that was there in the opening of the
5   field.  And we parked in there; and that's where he
6   advised us that the screwdriver had been thrown out.
7      Q.    Okay.  And did he say that he had personal
8   knowledge at this time that the screwdriver had been
9   thrown out?
10     A.    No.
11     Q.    Okay.  In fact, what did he tell you about
12  that?
13     A.    As we were traveling, he was telling us that
14  Pedro Gracia had told him where the whereabouts of the
15  screwdriver was at, where they had dumped it.
16     Q.    All right.  So he's telling you, "Stop here
17  because somebody else told me that this is where it was
18  thrown"?
19     A.    That is correct.
20     Q.    All right.  I'm showing you what's been marked
21  State's Exhibit 48 and 46 and 47.  Look these over.  Do
22  all three of these depict the scene as you saw it that
23  day?
24     A.    Yes, sir.
25     Q.    Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                182

```
1              MR. BLAYLOCK:  I'm showing defense 46
2    through 48.
3        Q.   (BY MR. BLAYLOCK)  While they're looking at
4    those, can you look at Exhibit 49 through 51?
5              MR. REYES:  Your Honor, we would just
6    reiterate all our objections with respect to State's
7    Exhibits 46, 47 and 48.
8              THE COURT:  Okay.  That'll be overruled.
9    Forty-six, 47 and 48 will be admitted into evidence.
10             (State's Exhibit Numbers 46, 47 and 48
11             admitted)
12       Q.   (BY MR. BLAYLOCK)  Do these exhibits, 49
13   through 51, depict the scene as you saw it on that day?
14       A.   Yes, sir.
15             MR. BLAYLOCK:  I'm showing defense
16   Exhibits 49 through 51.
17       Q.   (BY MR. BLAYLOCK)  All right.  Now, hold up
18   State's Exhibit 48 and show the jury and tell them what
19   that is.
20       A.   This is the open field that was to the right of
21   Morningside Road that Ruben Gutierrez told us to stop at;
22   and it depicts the little caliche entrance there at
23   the -- on the side of the road.
24       Q.   Okay.  Whose car is that?
25       A.   That is the unit that I drive.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    183

```
 1        Q.   Okay.  It's your car?
 2        A.   Yes, sir.
 3        Q.   All right.  And this is an aerial shot?
 4        A.   Yes, sir.
 5        Q.   How did you get this?
 6        A.   There was a PUB electrical truck there with a
 7   basket; and I was allowed to go ahead and get on and take
 8   an aerial photograph of it.
 9        Q.   Okay.  And this is the field where Ruben told
10   you that somebody else told him that the murder weapon
11   was thrown?
12        A.   That is correct.
13        Q.   And did you find it there?
14        A.   No, we didn't.
15        Q.   All right.  So when you leave this scene, where
16   do you go?
17        A.   He tells us to drive off and to make a left on
18   Norton Drive and to head towards California Road.
19        Q.   Okay.
20        A.   Detective Pineda is driving.  He's following
21   his directions.
22        Q.   Ruben's giving directions?
23        A.   Yes, sir.
24        Q.   How many turns did you have to make?
25        A.   Three.
```

1      Q.   Okay.  And was Detective Pineda following his

2    directions on each turn?

3      A.   Yes, sir.

4      Q.   Okay.  And where did you end up?

5      A.   We ended up on California Road.

6      Q.   Is that out near the airport?

7      A.   Yes, sir.

8      Q.   Whereabouts in terms of the airport?

9      A.   I believe it borders -- the fence line borders

10   California Road.

11     Q.   Okay.  So is it behind the airport, then?

12     A.   Yes, sir.

13          MR. BLAYLOCK:  Move to admit State's

14   Exhibit 49 through 51.

15          MR. REYES:  We just reiterate the same

16   objections, Your Honor, we've previously made.

17          THE COURT:  Okay.  It'll be overruled.

18   Forty-nine through 51 will be admitted.

19          **(State's Exhibit Numbers 49, 50 and 51**

20          **admitted)**

21     Q.   (BY MR. BLAYLOCK)  All right.  So you're

22   driving on California Road on the back side of the

23   airport.

24     A.   That is correct.

25     Q.   Tell the jury what happens.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    185

1      A.   We're driving down the caliche road and we're

2   driving at a pace and we're asking Ruben if it was right

3   here.

4                  And he says, "No.  Keep on going.  Keep on

5   driving."

6                  And we keep slowing down, "Is it here?"

7                  He says, "Keep on driving.  It's a little

8   bit further.  It's a little bit further."

9      Q.   How fast is the vehicle going?

10      A.   Maybe -- it's a caliche road.  It's bumpy.

11   Maybe 20 miles an hour maybe.

12      Q.   Okay.

13      A.   And he would tell us to keep going, keep going;

14   and finally we make it to a grassy, wooden area on the

15   left hand side next to a resaca.

16      Q.   Okay.  And then how do you stop?

17      A.   Well, he told us to come to a stop right there

18   right in front of the wooded area and told us to stop.

19      Q.   Did he tell you abruptly or --

20      A.   No.  He told us, "A little bit further, a

21   little bit further."  And he said, "Right here."

22      Q.   Okay.  So you came to a stop next to a wooded

23   area?

24      A.   That is correct.

25      Q.   And what did he tell you was out there?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    186

1        A.    He told us that the blue suitcase in which the
2   money was located in was inside of the wooded area.
3        Q.    All right.  And who got out of the car to go
4   look for the blue suitcase?
5        A.    Detective Pineda.
6        Q.    Where is he seated?
7        A.    He's in the driver's side.  He's driving.
8        Q.    Okay.  And on which side of the road as you're
9   headed out California Road, what are you -- what road are
10  you headed towards?
11       A.    Towards South Indiana.
12       Q.    South Indiana.  So you're headed towards South
13  Indiana.  Which side of the road is this wooded area on?
14       A.    On the left hand side.
15       Q.    Okay.  So it's on the driver's side?
16       A.    Yes, sir.
17       Q.    Okay.  And Detective Pineda gets out of the
18  driver's side of the vehicle?
19       A.    Yes, sir.
20       Q.    And what does he do?
21       A.    He starts walking towards the direction that
22  Ruben had pointed at and saying where the suitcase would
23  be located at.
24       Q.    Okay.  Detective Pineda is out there walking
25  along in the woods?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                187

```
 1        A.    Yes, sir.
 2        Q.    Okay.  Tell us what happened next.
 3        A.    After Detective Pineda went into the little
 4   fenced area that was there, he went into the woods and he
 5   was walking about looking for the blue suitcase.
 6        Q.    And then what happened?
 7        A.    Ruben Gutierrez advises me that it's not --
 8   that's not where the suitcase is located at, that he'll
 9   show me exactly where the suitcase is located at.
10        Q.    Okay.  So Detective Pineda is in the wrong
11   area?
12        A.    Yes, sir.
13        Q.    And Ruben sets him straight, "He's in the wrong
14   area.  Come over here"?
15        A.    That is correct.
16        Q.    All right.  So do you get Ruben out of the car?
17        A.    Yes, sir.  I get off of the car and I get Ruben
18   off; and he walks to the wooded area.
19        Q.    He walks where?
20        A.    Towards the wooded area.
21        Q.    Okay.  And what does he do once he gets up
22   there?
23      . A.    He's walking towards the wooded area; and
24   there's like a barbed wire fence.  As soon as he --
25   before he gets to the barbed wire fence, he gets there,
```

1    and he's handcuffed in the front, and he goes with his

2    hand, he signals, "It's right there."  (Spanish spoken).

3    And he does the motion like this (indicating) pointing

4    into the wooded area.

5         Q.    Exactly where it is?

6         A.    Yes, sir.

7         Q.    And all the time he's telling you, "That's

8    where somebody else told me, where Pedro told me where it

9    would be"?

10        A.    Yes, sir.

11        Q.    But he showed you exactly where it was?

12        A.    Yes, sir.

13        Q.    State's Exhibit 51, is that what he could see

14   from where he was?

15        A.    Yes, sir.

16        Q.    Can you see the blue suitcase?

17        A.    Yes, sir.

18        Q.    Could you see it from the road?

19        A.    No, sir.

20        Q.    Detective Pineda missed it totally?

21        A.    Yes, sir.

22        Q.    He got off and he pointed exactly where it was?

23              MR. REYES:   Judge, I'm going to object to

24   counsel leading his witness.  Also he's repeating every

25   answer that this witness gives.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    189

1              MR. BLAYLOCK:  Recapping the testimony as

2   I'm showing the picture, Judge.

3              THE COURT:  He can recap.  Go ahead.

4        Q.   (BY MR. BLAYLOCK)  All right.  So what do you

5   do once he points out the suitcase?

6        A.   At this time I'm calling Detective Pineda back

7   because he's following -- he's inside the woods trying to

8   locate the suitcase.  So I tell him -- advise him to come

9   back, that, you know, Ruben had already pointed it out to

10  us.

11       Q.   Okay.  So you're saying, "Detective Pineda,

12  come back.  You're in the wrong place"?

13       A.   Yes, sir.

14       Q.   All right.  And once Detective Pineda came

15  back, what did he proceed to do?

16       A.   He took the camera kit that was in the trunk of

17  my car and he proceeded to photograph the location of

18  where the suitcase was located at.

19       Q.   Okay.  So before anybody touched the blue

20  suitcase, you took photos of it?

21              MR. REYES:  I'm going to object, Your

22  Honor, to counsel leading his own witness.

23              THE COURT:  Don't lead your witness,

24  counsel.

25       Q.   (BY MR. BLAYLOCK)  Did that happen?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    190

```
 1         A.   Yes, sir.
 2         Q.   Okay.  Did anybody touch it when these photos
 3  were taken?
 4         A.   Not until after the photos were taken.
 5         Q.   Okay.  Hold it up and point to the jury out
 6  what's what in that picture.
 7         A.   Here there's the blue suitcase, and it appears
 8  to be manila folders on the outside of it.
 9         Q.   Okay.  And in State's Exhibit 50, is that
10  another view of that picture?
11         A.   Yes, it is.
12         Q.   And State's Exhibit Number 49, describe for us
13  what that is.
14         A.   That appears to be a piece of paper with some
15  sort of writing on it.
16         Q.   Did you all pick that up?
17         A.   Yes, sir.
18         Q.   All right.  Once you got done taking the
19  pictures, did you walk up to the items?
20         A.   Yes, sir.
21              MR. BLAYLOCK:  I need to approach again,
22  Judge.
23              THE COURT:  Go ahead.
24         Q.   (BY MR. BLAYLOCK)  I show you State's
25  Exhibit 52 through 54.  Do these photos look like the way
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          191

1    you saw it that day?

2         A.    Yes, sir.

3         Q.    Look at each one and tell me --

4         A.    These photos were taken by Detective Pineda.

5         Q.    While you were there?

6         A.    I was outside of the wooded area by the side of

7    the car.

8         Q.    Okay.  And did you go up to the blue suitcase

9    eventually?

10        A.    Yes, I did.

11        Q.    And do these photos depict the way you saw it?

12        A.    Yes, sir.

13              MR. BLAYLOCK:  I'm showing defense 52

14   through 54.

15              Move to admit 52 through 54.

16              MR. REYES:  Judge, we'll make all the

17   previous objections we've made with respect to these --

18   this evidence.

19              In particular, we also object to State's

20   Exhibit 53 and also 54.  They have some writing in there

21   which is hearsay.  It has not been properly

22   authenticated.

23              THE COURT:  All right.

24              MR. BLAYLOCK:  They're photos of what they

25   found, Judge.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    192

```
1              THE COURT:  The writing is on the items
2    that were found there?
3                   MR. REYES:  That's correct, Judge.
4                   MR. BLAYLOCK:  Yes, sir.
5                   THE COURT:  The objections will be
6    overruled.  Fifty-two through 54 will be admitted.
7                   (State's Exhibit Numbers 52, 53 and 54
8                   admitted)
9         Q.   (BY MR. BLAYLOCK)  All right.  And just so the
10   jury will know, 52, 53 and 54, are these the items that
11   were found around the blue suitcase?
12        A.   Yes, sir.
13                  MR. REYES:  I'm going to object, Your
14   Honor, to counsel leading his witness.
15                  THE COURT:  Overruled.
16        Q.   (BY MR. BLAYLOCK)  Okay.  Now, sir, when you
17   got up to that suitcase, did you take possession of it?
18        A.   Detective Pineda secured it, sir.
19        Q.   Did the suitcase have any writing on it that
20   you saw?
21        A.   Yes, it did.
22        Q.   What did it say?
23        A.   "Mr. Harrison" on the back.
24        Q.   Okay.  I'm showing you what's marked State's
25   Exhibit 56.  Does this look familiar to you?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    193

```
1          A.    Yes, sir.

2          Q.    Is this the exact suitcase that you found that

3    day?

4          A.    Yes, it is.

5          Q.    And how do you know?

6          A.    It says Roberto A. Harrison and the telephone

7    number on the back.

8          Q.    And it's the exact one that you found?

9          A.    Yes, sir.

10         Q.    Okay.  Is it in the same condition as when you

11   found it?

12         A.    Yes, sir.

13              MR. BLAYLOCK:  I'm showing defense State's

14   Exhibit 56.

15              MR. REYES:  Judge, we would reurge all the

16   previous objections we've made.  And also in particular,

17   there's a plastic bag on the side which has writing on

18   it.  That's hearsay.  It has not been properly

19   authenticated or identified.  There's some documents

20   inside this State's Exhibit 56.  It has writing in it.

21   It's hearsay; and it has not been properly authenticated.

22   We would object.

23              MR. BLAYLOCK:  I'll take the exhibit

24   sticker and the evidence tag off the side, Judge.

25              THE COURT:  All right.  Take that off.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                194

1    What's inside of it?

2              MR. BLAYLOCK:  What's inside is just

3    what's in the picture, Judge.  It just says --

4              MR. REYES:  We would object to counsel

5    testifying before the jury.

6              MR. BLAYLOCK:  Well --

7              THE COURT:  This is what's in the

8    photograph?

9              MR. BLAYLOCK:  Yes, sir.  This is already

10   in the photograph.

11             THE COURT:  Okay.  You need to mark those

12   other items inside so the record will indicate what was

13   inside the suitcase.  The suitcase is just one item.

14             MR. BLAYLOCK:  I'll mark this as 56A.

15             MR. REYES:  There's some other documents,

16   Your Honor, in here that we would object to.

17             MR. BLAYLOCK:  We'll just take these out.

18             THE COURT:  What is that?

19             MR. BLAYLOCK:  They appear to be ripped up

20   pieces of paper, trash.  These appear to be maybe -- I

21   don't know what they are.

22             THE COURT:  If you're not going to offer

23   that, take it out.

24        Q.   (BY MR. BLAYLOCK)  All right.  When you found

25   this, was it dry or wet?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    195

1     A.    I don't recall whether it was dry or wet.

2     Q.    Do you want to look at your report?

3     A.    Detective Pineda was the one that went ahead

4   and seized it.

5               THE COURT:  Okay.  For the record, then,

6   56 will be admitted into evidence.

7               **(State's Exhibit Number 56 admitted)**

8               THE COURT:  And you marked something 56A?

9               MR. BLAYLOCK:  Yes, sir.  That's the key

10  on the inside with the note saying, "This is the key."

11              THE COURT:  Okay.  Is that what was found

12  in the suitcase, Detective?

13              THE WITNESS:  Yes, sir.

14              THE COURT:  56A will be admitted into

15  evidence.

16              **(State's Exhibit Number 56A admitted)**

17    Q.    (BY MR. BLAYLOCK)  Did you all have to take

18  this back and let it air dry in your detective area?

19    A.    Yes, sir.

20    Q.    Okay.  And what was the weather like around

21  that September?

22    A.    It was hot and humid.

23    Q.    Around the 13th, had it been raining or not?

24    A.    Yes, it had.

25    Q.    Okay.  And the items that were around there,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    196

1   when you got those items that were around there, what did

2   you do with them?

3        A.    They were seized and also placed into the lab

4   to air dry.

5        Q.    Okay.  Could you look at State's Exhibit 32?

6   Do you recognize that?

7        A.    Yes, sir.

8        Q.    Is that the exact item that you picked up on

9   that day?

10       A.    Yes, sir.

11       Q.    And how do you know?

12       A.    It's the photo that was taken that was pictured

13  in the photograph.

14       Q.    Okay.

15              MR. BLAYLOCK:   I show defense State's

16  Exhibit 32.

17       Q.    (BY MR. BLAYLOCK)   Look at State's Exhibit 57.

18  Do you do you recognize those items?

19       A.    Yes, sir.

20       Q.    Are those the exact items that were in that --

21  in the field that you picked up?

22       A.    Yes, sir.

23       Q.    And how do you know?

24       A.    They were also photographed and placed and --

25  seized and placed into the air lab to air -- the lab to

1    air dry.

2         Q.   Do you recognize them?

3         A.   Yes, sir.

4         Q.   Are they easily identifiable by looking at

5    them?

6         A.   Yes, sir.

7              MR. BLAYLOCK:  I show defense State's

8    Exhibit 57 also.

9              Move to admit State's Exhibit 32, Judge.

10             MR. REYES:  Judge, as to that one, we're

11   going to object.  There's some writing that they're

12   attempting to introduce.  They haven't authenticated

13   whose writing that is.  It's hearsay.

14             MR. BLAYLOCK:  Actually we have, Judge.

15   Avel Cuellar identified it as Ms. Harrison's writing.

16             THE COURT:  Now, these papers were found

17   outside of the suitcase?

18             THE WITNESS:  Yes, sir, in the immediate

19   area right outside the suitcase.

20             THE COURT:  Laying on the ground?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Thirty-two -- the objection

23   will be overruled, and it'll be admitted.

24             **(State's Exhibit Number 32 admitted)**

25        Q.   (BY MR. BLAYLOCK)  State's Exhibit 32, can you

STATE OF TEXAS VS. RUBEN GUTIERREZ                    198

1    read to the jury what it says on there?

2         A.   It says, "Ruben owes me $50 plus $150 equals

3    200 total, first personal loan" or "total personal loan."

4         Q.   Okay.

5              MR. BLAYLOCK:  May I publish 32 to the

6    jury, Judge?

7              THE COURT:  You may.

8              MR. REYES:  Judge, as to State's Exhibit

9    57 we would object.  There's a property evidence report

10   that's attached to it with writing.  It's hearsay.  It

11   hasn't been identified.

12             We would also object to what is inside

13   what has been marked as State's Exhibit 57.  It has

14   documents which have writing on it and have not been

15   properly identified.  It would be hearsay.

16             MR. BLAYLOCK:  They're easily identified

17   items, Judge.  I can take them out of the bag, take the

18   evidence tag off.

19             THE COURT:  What's the relevance of this?

20             MR. BLAYLOCK:  It's just stuff found

21   laying around with the -- it shows some activity took

22   place is what I'm trying to show, moving things around.

23             MR. REYES:  We also object to the writing,

24   Your Honor, on the plastic bag.  It hasn't been properly

25   identified.

1          THE COURT:  The evidence card?

2          MR. REYES:  The evidence card has writing

3   on the front on the plastic bag.

4          THE COURT:  This?

5          MR. REYES:  Yes.

6          THE COURT:  Just tell him to identify the

7   writing that's on the back.

8       Q.   (BY MR. BLAYLOCK)  Now, sir, when you picked

9   these items up, what did you put them in?

10      A.   They were placed in the C.I.D. lab to air dry.

11   They were placed on the sink to dry out.

12      Q.   And after they're air dried, what are they put

13   into?

14      A.   They're placed into the property evidence room.

15      Q.   Inside what?

16      A.   A locker.

17      Q.   Inside a plastic bag?

18      A.   Yes, sir.

19      Q.   Okay.

20      A.   I'm sorry.

21      Q.   Look at the plastic bag.  What is an I number?

22      A.   The I number is a little abbreviation for

23   incident number.

24      Q.   Okay.  And what is the incident number on this

25   case?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    200

```
 1          A.   1998 --
 2                    MR. REYES:   I object to counsel, Your
 3     Honor, having him testify from something that's not
 4     admitted into evidence.
 5                    THE COURT:   It's overruled.
 6          Q.   (BY MR. BLAYLOCK)   Is that the same -- just
 7     tell me this.   Is that the same incident number as the
 8     incident for this case?
 9          A.   Yes, it is.
10          Q.   And who put those writings on there?
11          A.   I believe Merlin Rasco or Detective Juan
12     Hernandez.
13          Q.   Okay.  And what is Merlin Rasco's job?
14          A.   He's the one that secures the property evidence
15     that's been seized or recovered into the evidence room.
16          Q.   Okay.  Do you recognize these writings?
17          A.   Yes, sir.  Juan Hernandez' initials.
18          Q.   Okay.  So are these the writings that are
19     normally on evidence so you can keep track of evidence?
20          A.   Yes, sir.
21          Q.   All right.
22                    MR. BLAYLOCK:   I ask -- this slip, I can
23     take this off if it's objectionable.
24                    THE COURT:   It's just an evidence slip.
25                    MR. REYES:   May I take this witness on
```

1   voir dire, Your Honor?

2                    THE COURT:  Go ahead.

3                **VOIR DIRE EXAMINATION**

4   BY MR. REYES:

5        Q.   Officer, let me show you what has been marked

6   as State's Exhibit Number 57.  On the top left hand

7   corner where the square is right here, is that your

8   handwriting?

9        A.   No, it isn't.

10       Q.   Okay.  And you don't have any personal

11   knowledge as to who made those writings; is that correct?

12       A.   I believe it was --

13       Q.   I'm sorry.  Personal -- were you present --

14       A.   No.

15       Q.   -- when those markings --

16       A.   No.

17       Q.   -- were made?

18       A.   No.

19       Q.   Inside the red evidence tag, do you recognize

20   those?

21       A.   Yes, I do.

22       Q.   Okay.  Were you present when those markings

23   were made?

24       A.   No, I wasn't.

25       Q.   Are those markings yours?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    202

```
 1        A.    No, they're not.
 2        Q.    When you look down here where there are numbers
 3   in parenthesis and I number followed by a set of numbers,
 4   did you personally make those markings?
 5        A.    No, I didn't.
 6        Q.    Were you present when those markings were made?
 7        A.    No, I didn't.
 8        Q.    I show you in the back where it says, "Property
 9   Evidence Report."  Did you prepare this report yourself?
10        A.    Yes, I did.
11        Q.    This is all your handwriting?
12        A.    That is correct.
13        Q.    Everything from start to finish is what you
14   have personally prepared?
15        A.    That is correct.
16        Q.    Okay.  And when you look at the back, the same
17   thing with that?
18        A.    Yes, sir.
19        Q.    Okay.  When you look at the second part down
20   here where it says, "chain of custody," is that your
21   writing there?
22        A.    No, it isn't.
23        Q.    Okay.  Were you present when that writing was
24   made?
25        A.    No, I wasn't.
```

1            MR. REYES:  We would still object, Your
2   Honor.  There's writings that have not been identified.
3   It's hearsay and we would object.
4            THE COURT:  The objection will be
5   overruled.  Fifty-seven will be admitted into evidence.
6            **(State's Exhibit Number 57 admitted)**
7            **DIRECT EXAMINATION CONTINUED**
8   **BY MR. BLAYLOCK:**
9       Q.   All right.  This stuff that you found -- all
10  the things that you found around that suitcase, as an
11  investigator, what does that indicate to you?
12      A.   That's evidence.
13      Q.   That's evidence, but what does it indicate?
14  What happened at that site?
15      A.   That something must have been taken out,
16  particularly money, out of the blue suitcase.
17      Q.   Okay.  So there was some activity that took
18  place there?
19      A.   Yes, sir.
20      Q.   Okay.  Did it indicate to you, in your
21  experience, that they went there and took a short time or
22  a long time?
23      A.   There was a brief -- there was some brief time
24  there removing the contents and then leaving the area.
25      Q.   So they took the important stuff and scattered

STATE OF TEXAS VS. RUBEN GUTIERREZ                    204

1   around the unimportant stuff?

2                MR. REYES:  I'm going to object, Your

3   Honor, to counsel leading his own witness.

4                THE COURT:  I'll sustain the objection.

5        Q.   (BY MR. BLAYLOCK)  Well, how do you feel?  Do

6   you feel they took some important stuff and left some

7   unimportant stuff?

8        A.   Yes, sir.

9        Q.   Now, after Rene Garcia gave a statement, you

10  went out also, didn't you?

11       A.   Yes, sir.

12       Q.   And did he take you to any place?

13       A.   Yes, he did.

14       Q.   Where did he take you?

15                MR. REYES:  I'm going to object, Your

16  Honor, as to relevance.

17                THE COURT:  Overruled.

18       A.   He took us to the intersection of Norton Drive

19  and Morningside Road.

20       Q.   (BY MR. BLAYLOCK)  Okay.  And what did you

21  find there?

22       A.   He pointed out a -- what appears to be a

23  toolbox.

24                MR. REYES:  I would object, Your Honor.

25  It calls for hearsay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                205

```
1                    THE COURT:  Overruled.
2         Q.   (BY MR. BLAYLOCK)  Just tell me what you
3    found.
4         A.   We found a toolbox, plastic toolbox.
5         Q.   Let me show you what's marked as State's
6    Exhibit Number 55.  Do you recognize that?
7         A.   Yes, sir.
8         Q.   Is this the exact item that you found on that
9    day?
10        A.   Yes, sir.
11        Q.   How do you recognize this is the exact item?
12        A.   We took photographs of the item while it was
13   being recovered.
14        Q.   And State's Exhibit Number 47 is already in
15   evidence.  What does it describe?
16        A.   It describes this tackle box in the little
17   canal.
18        Q.   Okay.  So this is where you found that?
19        A.   That is correct.
20        Q.   All right.
21                   MR. BLAYLOCK:  I'm showing defense State's
22   Exhibit 55.
23                   MR. REYES:  Your Honor, we would just
24   reiterate all the objections we previously made with
25   respect to this exhibit.  We would also object to the
```

1    contents of State's Exhibit Number 55 in that it has bags

2    inside of it which have markings that have not been

3    properly identified.  We would object as to relevance and

4    also as hearsay.

5                    MR. BLAYLOCK:  The bags, Judge, at one

6    time had the contents of what was left in here.

7                    THE COURT:  Let me see it.  What are

8    these?

9                    THE WITNESS:  Those are the bags, sir,

10   that the box was placed into after it was taken down to

11   the property evidence room.

12                   THE COURT:  Oh, from the police

13   department?

14                   THE WITNESS:  Yes, sir.

15                   THE COURT:  And you used two of them to --

16                   THE WITNESS:  One went in; and then the

17   other one went over the top of it like --

18                   MR. BLAYLOCK:  We'll withdraw the bags.

19                   THE COURT:  All right.  Anything else in

20   there?

21                   MR. BLAYLOCK:  Some paper clips.

22                   THE COURT:  That's it?

23                   MR. BLAYLOCK:  Yes, sir.

24                   THE COURT:  Fifty-seven -- the objection

25   will be overruled and 57 will be admitted into evidence.

1        Q.   (BY MR. BLAYLOCK)  When you found it, did it

2   have the paper clips inside it?

3        A.   Yes, sir.

4                  THE COURT:  I'm sorry.  That was 55.

5   Fifty-five will be admitted.

6                  MR. BLAYLOCK:  Fifty-five, yes, sir.

7                  **(State's Exhibit Number 55 admitted)**

8        Q.   (BY MR. BLAYLOCK)  And it, too, was wet when

9   you found it?

10       A.   That is correct.

11       Q.   All right.  Did you take it back to the

12  station --

13       A.   Yes, sir.

14       Q.   -- to let it air dry?

15       A.   Yes, sir.

16       Q.   And did Rene Garcia take you anywhere else?

17       A.   He also led us to that open field and --

18       Q.   Same field?

19       A.   Yes, sir.

20       Q.   Okay.  The one that we have --

21       A.   The aerial photo.

22       Q.   State's Exhibit 51.  He took you to this field

23  also?

24       A.   Yes, sir.

25       Q.   All right.  And when he took you to this field,

1    did you search the field?

2         A.    Yes, we did.

3         Q.    How long did you spend searching that field?

4         A.    All day Monday, which was the 14th, and part of

5    Tuesday, the 15th.

6         Q.    Okay.  How many people were out there searching

7    the field?

8         A.    Approximately 15 people.

9         Q.    Did you have metal detectors?

10        A.    Yes, sir.  Canines.

11        Q.    You used canines?

12        A.    Yes, sir.

13        Q.    What was the theory behind the canines?

14        A.    The theory with our police dogs was it would be

15   able to pick up the human scent off any item that were

16   used to attempt to locate the item.

17        Q.    Okay.  Where did -- do you know where the

18   canines came from?

19        A.    The canines came from our department, as well

20   as the Drug Task Force canine, and also a canine from

21   McAllen Police Department.

22        Q.    And from your conversations with Ruben and

23   Rene, what exactly were you looking for in that field?

24        A.    We were looking for a screwdriver with -- like

25   clear and red stripes on it.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          209

1       Q.   Okay.  All right.  Now, what was -- what did
2   you do next in this investigation?
3       A.   After we weren't able to locate the
4   screwdriver, we were just basically putting the case
5   together.
6       Q.   Let me ask you, Detective Flores, when you
7   talked to Rene Garcia, did it lead you to any money?
8       A.   Yes, he did.
9       Q.   Okay.  And approximately how much?
10      A.   $56,000.
11      Q.   Okay.  And where was that again?
12      A.   It was --
13              MR. REYES:  I'm going to object, Your
14  Honor.  It's been asked and answered.
15              THE COURT:  Overruled.
16      A.   It was at a residence on California Road.
17      Q.   (BY MR. BLAYLOCK)  Okay.  And what part of the
18  residence?
19      A.   It was in the backyard like in what appeared to
20  be a chicken coop or some type of pen for an animal.
21      Q.   Okay.  Was it above ground or below ground?
22      A.   It was buried under ground.
23      Q.   Buried?
24      A.   Yes, sir.
25      Q.   On California Road?

STATE OF TEXAS VS. RUBEN GUTIERREZ                     210

```
 1        A.   Yes, sir.
 2        Q.   And how much total did you recover from Rene
 3   Garcia?  Approximately.
 4        A.   Approximately $80,000.
 5        Q.   Okay.  And how much total did you recover from
 6   Pedro Gracia?
 7        A.   Approximately 11,700.
 8        Q.   All right.  And did you talk to a man by the
 9   name of Juan Pablo Campos?
10        A.   I talked to him after some money had already
11   been recovered from him as well.
12        Q.   All right.  And whose money was recovered from
13   Juan Pablo Campos?
14        A.   Ruben Gutierrez' money.
15        Q.   Okay.  And how much money did Juan Pablo Campos
16   have?
17        A.   About 49,000 in one stash, and then 2,000 in
18   another, and I believe 1,700 in another.
19        Q.   Okay.  And that was Ruben's money?
20        A.   Yes, sir.
21        Q.   As a detective having investigated this case --
22   and you have many years experience, correct?
23        A.   Yes, sir.
24        Q.   Do you feel you recovered all the money that
25   Rene Garcia had?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          211

```
 1                    MR. REYES:  I'm going to object, Your
 2   Honor.  It calls for speculation.
 3                    THE COURT:  It's overruled.
 4        Q.   (BY MR. BLAYLOCK)  Based on your experience.
 5        A.   On Rene Garcia?
 6        Q.   Yes, sir.
 7        A.   Yes, sir.
 8        Q.   Do you feel that you recovered all the money
 9   that Pedro Gracia had?
10        A.   Yes, sir.
11        Q.   Do you feel that you recovered all the money
12   that Ruben Gutierrez had?
13                    MR. REYES:  I'm going to object, Your
14   Honor.  It calls for speculation.
15                    THE COURT:  It's overruled.
16        A.   No, sir.
17        Q.   (BY MR. BLAYLOCK)  And how much total money
18   has been recovered?
19        A.   Approximately $130,000 in cash.
20        Q.   Okay.  And there's some cars --
21        A.   Some vehicles, yes, sir.
22        Q.   Jewelry?
23        A.   Yes, sir.
24        Q.   All right.  And you already said TV sets, that
25   kind of thing.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           212

```
 1        A.   Yes, sir.
 2        Q.   Okay.  And do the math for me, Officer.  How
 3   much money are we talking about still out there?
 4        A.   I'd say approximately $500,000.
 5        Q.   More or less?
 6        A.   Give or take.
 7        Q.   A lot of money?
 8        A.   A lot of money.
 9        Q.   All right.  Were you able to determine the
10   route that these three gentlemen took when they left
11   Ms. Harrison's house?
12        A.   Yes, sir.
13        Q.   We drew a map, State's Exhibit Number 59.  Do
14   you recognize this?
15        A.   Yes, sir.
16        Q.   Okay.
17             MR. REYES:  I'm going to object to counsel
18   showing the diagram to the jury, Your Honor.  It hasn't
19   been admitted into evidence yet.
20             THE COURT:  Place it away from the jury,
21   Counsel.
22        Q.   (BY MR. BLAYLOCK)  Does this diagram
23   reasonably depict the actual route that was taken?
24        A.   Yes, sir.
25        Q.   And did you help create this?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           213

```
1        A.   No, sir.
2        Q.   Okay.  You gave information to help create
3   this, though, right?
4        A.   That is correct.
5        Q.   Okay.  But in fact, who created it?
6        A.   Sergeant Robert Jesse.
7        Q.   Okay.  And he used a computer?
8        A.   Yes, sir.
9        Q.   Okay.
10                  MR. BLAYLOCK:  I show the defense State's
11  Exhibit 59.
12                  MR. REYES:  I'm going to object, Your
13  Honor.  It's not to scale.  Also, it has writing that has
14  not been identified.  It's hearsay.
15                  THE COURT:  What writing?
16                  MR. BLAYLOCK:  It does have writing,
17  Judge.  I'll get him to describe each one as we go
18  through.  I mean, that's why I'm getting it in.
19                  MR. REYES:  He's not the one that made the
20  markings, Judge.  It would be hearsay.
21                  MR. BLAYLOCK:  He testified that he gave
22  this information to the guy who made the map.
23                  THE COURT:  All right.  The objection will
24  be overruled.  Fifty-nine will be admitted.
25                  **(State's Exhibit Number 59 admitted)**
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          214

1     Q.   (BY MR. BLAYLOCK)  Step off there, Detective.
2   In fact, you gave this information; you noted this
3   information for the guy that put it into the computer to
4   make the map, correct?
5     A.   Yes, sir.
6     Q.   All right.  Now, show the jury -- and let's
7   give them a point of reference.  Let's start with
8   Ms. Harrison's home.
9     A.   This street which appears here in writing is
10  Morningside Road.  This is the resaca that borders
11  Harrison Mobile Home Park.
12    Q.   Get a little bit closer.  Go through it a
13  little bit slower.
14              THE COURT:  Can you all see over here?
15              I think you need to move a little further
16  back so they can see at both ends.
17              JUROR:  Okay.
18    A.   This is the resaca that borders the property of
19  Ms. Harrison.  This is Central Avenue.  And you continue
20  going on Morningside Road until you hit Iowa, which is
21  now Apollo Drive.  I'm sorry.
22    Q.   (BY MR. BLAYLOCK)  All right.  Now, let's go
23  through it slowly.  The yellow, what does that signify?
24    A.   It's just the route that was taken that we were
25  led to after Ruben Gutierrez showed us exactly where the

1   evidence was located at.

2        Q.   Okay.  And Rene Garcia gave you the same route?

3        A.   That is correct.

4        Q.   Okay.  And so, this is the route that the

5   people who killed and robbed Ms. Harrison --

6        A.   That is correct.

7             MR. REYES:  Judge, I'm going to object to

8   counsel leading his own witness.

9             THE COURT:  Sustained.

10             MR. REYES:  I'd ask the Court to instruct

11  him, Judge.  He's been doing it throughout the testimony

12  of this witness.

13             THE COURT:  Go ahead.  Don't lead your

14  witness, counsel.  Go ahead.

15        A.   Okay.  So what we have here is the route being

16  taken, which is Morningside Road.  It's in the color of

17  yellow.  And it leads us all the way around toward Norton

18  Drive; and Norton Drive to South Minnesota or Minnesota

19  right here; and this is California Road.  And this is the

20  resaca that borders where we found the suitcase at.

21        Q.   (BY MR. BLAYLOCK)  Okay.  Let's take it point

22  by point.  Show us Ms. Harrison's house again.

23        A.   This is the location here on this map of

24  Ms. Harrison's property.

25        Q.   All right.  And take us to where the first

STATE OF TEXAS VS. RUBEN GUTIERREZ                    216

1   point that you all stopped.

2       A.   Okay.  We were driving on Morningside Road

3   passed Iowa; and we were driving here.  Before we got to

4   the intersection on Norton Drive and Morningside, we were

5   told to make a quick stop -- to stop on this location.

6   And right here in this general area is an open field

7   where we were looking for the screwdriver.

8       Q.   And that's the same area that has the aerial

9   photograph?

10      A.   That is correct.

11      Q.   Okay.  Hold this.  Put this up here on --

12               MR. REYES:  I would object, Your Honor.

13  It's already been admitted into evidence and he's

14  attempting to alter it.

15               THE COURT:  What's that?

16               MR. BLAYLOCK:  We're showing it on the

17  diagram, Judge.

18               MR. REYES:  That State's Exhibit Number 59

19  has already been admitted into evidence; and he's having

20  this witness mark and alter it.

21               THE COURT:  It's overruled.  You're going

22  to tack on a picture?

23               MR. BLAYLOCK:  Yes, sir.

24               THE COURT:  It's overruled.

25      Q.   (BY MR. BLAYLOCK)  Tack on the picture

1     above -- or put it up in the margin up there.
2          A.   Up here?
3          Q.   Right over here.
4          A.   Here?
5          Q.   That's good.  All right.  That's where you
6     searched for about two days?
7          A.   That is correct, an open field right here.
8          Q.   Okay.  Take us to the next point on the map.
9          A.   The next point on the map is on Norton Drive.
10    There's a canal that runs alongside of it.  In this canal
11    is where we found the black plastic tackle box, the
12    toolbox; and --
13         Q.   That's the picture we've already seen of the
14    toolbox.  This is the canal?
15         A.   Yes, sir.
16         Q.   All right.  And how long did you all spend at
17    that spot?
18         A.   Approximately 45 minutes.
19         Q.   Who did you have to call to help you get that
20    out of there?
21         A.   We had to call the Brownsville fire department
22    to come in here and go down into the canal to recover it
23    for us.
24         Q.   Okay.  Take us to the next point on the map.
25         A.   After -- this is the location where the tackle

STATE OF TEXAS VS. RUBEN GUTIERREZ                          218

1   box, the toolbox was located at.  You go down all the way

2   to Minnesota Road.  We made a right turn on to Minnesota;

3   and then we made a left turn on California Road.

4          Q.    Okay.  And what's the next point after that?

5          A.    We were coming -- well, California Road right

6   here is the 6900 block is the residence where money was

7   recovered also from Rene Garcia.

8          Q.    Buried in a chicken coop?

9          A.    Buried, yes, sir, in a pen.

10         Q.    Okay.  And then what's the next point on the

11  map?

12         A.    Further down the road is a resaca; and right

13  next to the resaca was that wooded area where we came to

14  a stop and we recovered the blue suitcase from.

15         Q.    Okay.  The blue suitcase that's over there?

16         A.    Yes, sir.

17         Q.    And that's in all these pictures?

18         A.    Yes, sir.

19         Q.    All right.  You can go ahead and sit back down.

20         A.    (Witness complies).

21         Q.    Now, when Ms. Harrison was found, do you know

22  if a sexual assault kit was taken?

23         A.    During the autopsy there was a sexual assault

24  kit performed on her at the autopsy.

25                     MR. REYES:  I'm going to object, Your

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    219

1    Honor.  It's irrelevant.  It also -- I mean, he's not
2    qualified to make that -- testify regarding that.
3                    THE COURT:  It's overruled.
4        Q.   (BY MR. BLAYLOCK)  Was she found with panties
5    on or with panties off?
6        A.   Without.
7        Q.   Okay.  And is that the reason for the sexual
8    assault kit?
9        A.   That is correct.
10       Q.   And do you know the results of that -- those
11   tests?
12                   MR. REYES:  I'm going to object, Your
13   Honor.  He's not qualified to make those determinations
14   or testify regarding that.
15                   THE COURT:  It's overruled.
16       A.   I don't know the results, but I believe they
17   came back to be negative.
18       Q.   (BY MR. BLAYLOCK)  Okay.  Negative.  Now, were
19   you able to gather clothes during this investigation?
20       A.   Yes, we were.
21       Q.   In fact, who brought you the clothes of Ruben
22   Gutierrez?
23       A.   Angie Gutierrez.
24       Q.   And what did she tell you in reference to those
25   clothes?

STATE OF TEXAS VS. RUBEN GUTIERREZ                         220

1      A.   She told us that those were the clothes that --
2                MR. REYES:  I'm going to object, Your
3    Honor.  It calls for hearsay.
4                THE COURT:  Sustained.
5      Q.   (BY MR. BLAYLOCK)  Okay.  But she brought in
6    some clothes, right?
7      A.   That is correct.
8      Q.   Were they a white T-shirt and --
9                MR. REYES:  I'm going to object, Your
10   Honor, to counsel leading his witness.
11               THE COURT:  Sustained.  Don't lead your
12   witness, counsel.
13               MR. BLAYLOCK:  Judge, a leading question
14   is one that suggests an answer.  I'm just asking if they
15   were.
16               THE COURT:  Ask him what clothes were
17   brought.
18     Q.   (BY MR. BLAYLOCK)  Okay.  Describe the clothes
19   that were brought.
20     A.   There were several shirts, several pants,
21   several pairs of tennis shoes also.
22     Q.   Okay.  Were any of them a white T-shirt?
23     A.   I don't recall if there was.
24     Q.   Were any of them Levi shorts?
25     A.   Yes, sir.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          221

1        Q.    And were tests done on those?

2        A.    Yes, sir.

3        Q.    And what are those results?

4        A.    Those results --

5                    MR. REYES:   I'm going to object, Your

6    Honor.  It calls for an answer for which he's not

7    qualified to make.

8                    THE COURT:   Overruled.

9        A.    Negative.

10       Q.    (BY MR. BLAYLOCK)   Okay.  And what was the

11   condition of the clothes when they were brought in?

12       A.    They were recently washed and they were still

13   humid.

14       Q.    Okay.  And did you get clothes from Rene

15   Garcia?

16       A.    Yes, we did.

17       Q.    And how did you get those clothes?

18       A.    They were seized during the search.

19       Q.    Okay.  And who pointed those to you?

20       A.    I believe his family members were the ones that

21   pointed those to us.

22       Q.    So, you don't -- in each case, do you know

23   whether those were the clothes that they wore or not?

24       A.    I don't know.

25       Q.    Okay.  In fact, you were given those clothes by

STATE OF TEXAS VS. RUBEN GUTIERREZ                      222

1   family members in each case?
2        A.   That is correct.
3        Q.   And there were tests done on those clothes as
4   well?
5        A.   Yes, there were.
6        Q.   And what were those results?
7        A.   Negative.
8                  MR. REYES:  I object, Your Honor.  He's
9   not qualified to make those determinations.
10                 THE COURT:  Overruled.
11       Q.   (BY MR. REYES)  You did get the results from
12  the lab and they were negative?
13       A.   That is correct.
14                 MR. BLAYLOCK:  Your Honor, I pass the
15  witness.
16                 MR. REYES:  May I proceed, Your Honor?
17                 THE COURT:  You may.
18                     **CROSS-EXAMINATION**
19  **BY MR. REYES:**
20       Q.   I'm going to go ahead and show you what has
21  been marked --
22                 MR. REYES:  May I approach, Your Honor?
23                 THE COURT:  You may.
24       Q.   (BY MR. REYES)  -- State's Exhibit Number 37.
25  This has already been admitted as evidence, Officer.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          223

```
 1    Now, you testified earlier -- and we're talking about the
 2    Miranda rights; is that correct?
 3         A.    That is correct.
 4         Q.    This is the document that you showed to the
 5    jury earlier; is that correct?
 6         A.    Yes, sir.
 7         Q.    And isn't it correct that you testified that
 8    when Ruben Gutierrez came to the department, that you
 9    read to him his Miranda rights; is that correct?
10         A.    That is correct.
11         Q.    And after you read those Miranda rights to him,
12    you had him read those; is that correct?
13         A.    After I had read the whole statement.
14         Q.    Okay.  Then you had him go back and read these?
15         A.    That is correct.
16         Q.    Okay.  And after he read them, he initialed
17    next to each right; is that correct?
18         A.    That is correct.
19         Q.    Okay.  And after you read this bottom portion,
20    you had him sign; is that correct?
21         A.    That is correct.
22         Q.    And you had him sign that he understood his
23    waiver; is that true?
24         A.    That is correct.
25         Q.    Okay.  And who is it that witnessed the State's
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    224

1   Exhibit Number 37?

2        A.   Santiago Manrique.

3        Q.   Okay.  And whose signature appears next?

4        A.   That is my signature.

5        Q.   With respect to that, was Officer Manrique the

6   only other person who witnessed the signing of this

7   document?

8        A.   That is correct.

9        Q.   And nobody else?

10       A.   That is correct.

11            MR. REYES:  I need another exhibit, Judge.

12   It's the other waiver.

13       Q.   (BY MR. REYES)  Let me show you what has been

14   marked as State's Exhibit Number 43.  You testified that

15   you read those to him; is that correct?

16       A.   That is correct.

17       Q.   And after you read them to him, then you had

18   him read it; is that correct?

19       A.   That is correct.

20       Q.   And you had him initial each right that he had

21   read those rights; is that correct?

22       A.   That is correct.

23       Q.   After you read this second part, you had him

24   read it; is that correct?

25       A.   I read the whole document and then I had him

STATE OF TEXAS VS. RUBEN GUTIERREZ                          225

1   read it.

2        Q.   And you had him initial that he --

3        A.   That is correct.

4        Q.   -- read those rights; is that correct?

5        A.   Yes, sir.

6        Q.   And then you had him sign that he read that

7   waiver; is that correct?

8        A.   Yes, sir.

9        Q.   And who is it that witnessed the reading of

10  this statement?

11       A.   This is Detective Pineda.

12       Q.   Okay.  Is there any other witness on that form?

13       A.   Yes, myself.

14       Q.   Other than Detective Pineda and yourself, was

15  there anybody else present during that -- of the reading

16  of this document?

17       A.   No, sir.

18       Q.   Let me show you what has been marked and

19  admitted into evidence as State's Exhibit Number 44 and

20  also State's Exhibit Number 45; and these are the two

21  statements that you read to the jury; is that correct?

22       A.   That is correct.

23       Q.   Okay.  Now, isn't it correct that you testified

24  that these two statements were given on the same day?

25       A.   That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        226

1        Q.   And they show exactly the same time; is that
2   correct?
3        A.   That is correct.
4        Q.   And you testified that after Detective Galvan
5   questioned Ruben Gutierrez some more, that she then came
6   and added some more information; is that correct?
7        A.   That is correct.
8        Q.   Did you finish talking to Ruben Gutierrez and
9   have him sign State's Exhibit 44 and then he was taken
10  back to the jail?
11       A.   No.  It was done right there and then.
12       Q.   Okay.  Do you know for a fact whether or not
13  Sandra Galvan read him his Miranda rights before she
14  questioned him?
15       A.   I had -- I was the only one that read him his
16  rights.
17       Q.   Okay.  You stated that Sandra Galvan continued
18  to question him; is that correct?
19       A.   That is correct.
20       Q.   My question is, did Sandra Galvan read him his
21  Miranda warnings?
22       A.   I don't -- I don't recall if she did.
23       Q.   Do you know whether or not one of these forms,
24  these Miranda Warnings and Waivers was signed by Ruben
25  Gutierrez?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          227

```
 1        A.    That form --
 2        Q.    When Sandra Galvan questioned him.
 3        A.    No, there wasn't.
 4        Q.    Okay.  So to your knowledge, then, she did not
 5   read those -- his rights; is that correct?
 6        A.    That is.
 7        Q.    Now, isn't it correct that here at the last
 8   paragraph where it states, "I, Ruben, having been warned
 9   by Detective Flores of my rights," at the bottom portion
10   before the statement actually starts, it reads, "I
11   understand all of my rights as stated above; and now that
12   I know all of my rights, it is my choice to voluntarily
13   give them up and freely, intelligently and voluntarily
14   make this statement;" is that correct?
15        A.    That is correct.
16        Q.    So this is where he's agreeing to waive his
17   rights; is that correct?
18        A.    Once again, yes.
19        Q.    Okay.  And this is where he says that he
20   understands his rights; is that correct?
21        A.    Yes, sir.
22        Q.    But it is not signed or initialed by him in
23   that space; is that correct?
24        A.    That is correct.
25        Q.    Okay.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    228

```
 1              MR. REYES:  May I publish State's
 2    Exhibit 44 to the jury, Your Honor?
 3              THE COURT:  You may.
 4        Q.  (BY MR. REYES)  And that's after the first
 5    paragraph; is that correct?
 6        A.   That is correct.
 7        Q.   So you don't have an actual waiver, a signature
 8    from Ruben Gutierrez stating that he's waiving his
 9    rights; is that correct?
10        A.   That is correct.  It's on the original sheet
11    itself.
12        Q.   But what I'm talking about is State's
13    Exhibit 44.
14        A.   No, sir.
15        Q.   You don't have one from him; is that correct?
16        A.   No, sir.
17        Q.   Do you have State's Exhibit 43 on there?
18        A.   Yes, sir.
19        Q.   Who was it that witnessed State's Exhibit
20    Number 43?
21        A.   Detective Pineda and myself.
22        Q.   Earlier you testified that it was
23    Detective Sandra Galvan who witnessed the signing of
24    State's Exhibit 43.
25        A.   Okay.
```

1       Q.   Is that a mistake?

2       A.   Yes, sir.  It's a mistake.

3       Q.   So it was actually Detective Pineda and

4   yourself that signed as witnesses to that exhibit; is

5   that correct?

6       A.   That is correct.

7       Q.   Now, isn't it correct that in State's

8   Exhibit 43 in the bottom part where it says that, "I have

9   read the statement -- this statement of my rights," and

10  then in parenthesis it says, "This statements of my

11  rights have been read to me," neither of those are

12  signed; is that correct?

13      A.   That is correct.

14      Q.   So we don't know whether or not Ruben

15  Gutierrez, in fact, read that paragraph to himself; is

16  that correct?

17      A.   I don't know if he read them to -- he read them

18  to himself after I had already read them aloud to him.

19      Q.   When he was reading them, did he read them out

20  loud?

21      A.   No, sir.

22      Q.   So you don't know whether or not he was

23  actually reading that waiver; is that correct?

24      A.   Possibly be.

25      Q.   Okay.  And you don't know whether or not, in

STATE OF TEXAS VS. RUBEN GUTIERREZ                    230

1    fact, he understood what he was reading; is that correct?
2        A.    That's correct.
3        Q.    So when you're looking at State's Exhibit 43 as
4    well as State's Exhibit Number 37, you would agree with
5    me that the most important part is the second portion of
6    those documents; is that correct?
7        A.    I wouldn't see it as the most important part.
8        Q.    Well, you understand that it's one thing
9    whether or not an individual actually understands his
10   rights; would you agree with me?
11       A.    I agree.
12       Q.    Okay.  And it's another thing that that person
13   is agreeing to waive his rights and give you a statement;
14   is that correct?
15       A.    That is correct.
16       Q.    So if you don't know for sure whether or not an
17   individual is willing to waive his statement, then he's
18   not giving you that statement freely and voluntarily; is
19   that correct?
20       A.    It states on the bottom of the paragraph that
21   he understands them and that he's waiving them.
22       Q.    That wasn't my question.  My question was, if
23   an individual doesn't understand that by signing this
24   document he's waiving his rights, then that person is not
25   freely, intelligently and voluntarily waiving his rights;

1    would you agree with me?

2         A.    I could agree with you on that.

3         Q.    Okay.  And you stated earlier that with respect

4    to those two documents, State's Exhibit 37 and 43, Ruben

5    Gutierrez did not read those out loud; is that correct?

6         A.    That is correct.

7         Q.    So you don't know whether or not he understood

8    what he read; is that correct?

9         A.    I can understand that he did understand them by

10   signing the form.

11        Q.    Well, you stated the procedure that you

12   followed was that you read these documents to him; is

13   that correct?

14        A.    That is correct.

15        Q.    And then you had him read these to himself; is

16   that correct?

17        A.    That is correct.

18        Q.    And you never had him read these documents out

19   loud; is that true?

20        A.    That is correct.

21        Q.    And you stated that after he read these

22   statements, you had him sign that he read the statement;

23   is that correct?

24        A.    That is correct.

25        Q.    Okay.  So you don't know whether or not he

STATE OF TEXAS VS. RUBEN GUTIERREZ                     232

1    understood what he read; all you know is that he's

2    signing that he apparently read what you had him read; is

3    that correct?

4         A.    That is correct.

5         Q.    And you stated also that on September the 9th

6    of 1998 you had gone over to his house; is that correct?

7         A.    It had been on September the 8th.

8         Q.    The 8th.  Okay.  If you look at State's exhibit

9    number --

10                  MR. REYES:  May I approach again, Your

11   Honor?

12                  THE COURT:  You may.

13        Q.    (BY MR. REYES)  You stated that the first time

14   you had contact with Ruben Gutierrez was on September the

15   8th?

16        A.    No.  That I made contact at the residence was

17   on September the 8th.

18        Q.    Okay.  And when was the first time that you

19   spoke to Ruben Gutierrez?

20        A.    It was on the 9th.

21        Q.    And this is what's reflected on State's Exhibit

22   Number 45, which is the statement that he allegedly gave

23   you; is that correct?

24        A.    No, it's not correct.

25        Q.    This is not it?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          233

1        A.   No, sir.

2        Q.   And it's not stated on here that you went to

3   talk to him on September the 9th of 1998?

4        A.   That says that I went to his residence.

5        Q.   Okay.  And when is it that you actually spoke

6   to Ruben Gutierrez?

7        A.   On September the 9th at approximately 3:43 p.m.

8        Q.   Okay.  That was my question.  My question, did

9   you talk to him on September the 9th of 1998?

10       A.   Yes, I did.

11       Q.   That was the first time you spoke to him; is

12  that correct?

13       A.   Yes, I did.

14       Q.   And isn't it true that when you talked to him,

15  he told you that he did not want to talk to you?

16       A.   That is correct.

17       Q.   And isn't it correct that even after he told

18  you he did not want to talk to you, you went back to his

19  house, picked him up, and talked with him again; is that

20  correct?

21       A.   After I served the warrant, yes, I did.

22       Q.   Yes.  He didn't initiate any conversations with

23  you, did he?

24       A.   Yes, he did.

25       Q.   He wasn't the one that told you that, "Yes, I

STATE OF TEXAS VS. RUBEN GUTIERREZ                    234

1    want to go ahead and give you a statement;" isn't that

2    correct?

3         A.    After I read him his rights, he did say that he

4    wanted to give me a voluntary statement.

5         Q.    You're the one that initiated the

6    interrogation; is that correct?

7         A.    Yes, sir.

8         Q.    You brought him in from the jail and took him

9    to your office so that you would be able to get a

10   statement from him; is that true?

11        A.    That is correct.

12        Q.    So you're the one that initiated the

13   conversation or the interrogation of Ruben Gutierrez on

14   September the 13th of 1998 --

15        A.    Yes.

16        Q.    -- true?  So earlier when you said that he's

17   the one that initiated the conversation with you, you

18   were mistaken?

19        A.    That he initiated the voluntariness that he

20   wanted to give a statement.

21        Q.    That's not what I'm talking about.  What I'm

22   saying is that you're the one that went to the jail to

23   pick him up to give you a statement; is that correct?

24        A.    I didn't go to the jail to pick him up.

25   Someone else did.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          235

1      Q.   Okay.  You had somebody or somebody picked him

2   up so that he could give you a statement; is that

3   correct?

4      A.   That is correct.

5      Q.   That was the whole purpose of going to pick him

6   up --

7      A.   Yes, sir.

8      Q.   -- true?  So knowing that on September the 9th

9   of 1998 he told you that he did not want to talk to you,

10  you still had him brought over so that he would give you

11  a statement; is that correct?

12     A.   That is correct.

13     Q.   Isn't it true that with respect to that second

14  statement, which is marked State's Exhibit Number 45

15  which is what you have on there, that has one additional

16  page; is that correct?

17     A.   That is correct.

18     Q.   It's totally different from State's Exhibit

19  Number 44, the other statement?

20     A.   For the -- that paragraph it is.

21     Q.   Right?

22     A.   Yes, sir.

23     Q.   Isn't it correct that when you had Ruben

24  Gutierrez sign this document, all you told him was that

25  it was the other document, State's Exhibit Number 44, had

STATE OF TEXAS VS. RUBEN GUTIERREZ                    236

1    been lost and you just needed for him to re-sign State's

2    Exhibit Number 45?

3        A.   No.  I had him read it to make sure that

4    nothing had been put in but what exactly that he had

5    talked about during the second statement.

6        Q.   Well, you stated earlier that what you did is

7    you had him just initial each and every paragraph.  You

8    never stated anything about him having read the

9    statement.

10       A.   I advised Ruben to go ahead and read it for

11   him -- to ensure him that nothing else but what he had

12   told -- been interviewed by Ms. Galvan had been put in

13   there and nothing else.

14       Q.   Well, you stated earlier that it took you 45

15   minutes from start to finish to get these two statements;

16   is that correct?

17       A.   Approximately.

18       Q.   Okay.  So what you're saying is that you went

19   ahead, sat down with Ruben Gutierrez, you allegedly read

20   him his Miranda warnings, had him read them not only once

21   but twice, had him sign that he had read them, and then

22   you took two different statements from him --

23       A.   That is correct.

24       Q.   -- is that correct?

25       A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                237

1       Q.   And you're saying that you -- as he was
2   allegedly telling you these things, you were having --
3   you were typing them out yourself?
4       A.   That is correct.
5       Q.   And you're saying that all this process took
6   you just 45 minutes?
7       A.   I didn't have a -- I wasn't keeping track of
8   how long it was.  I can't tell you exactly it took an
9   hour and 33 minutes and so and so.  I just -- it's an
10  approximate guess during the interview and --
11      Q.   So when Mr. Blaylock asked you, "How long did
12  it take," then you should have said, "I don't know;" is
13  that correct?
14      A.   That's correct.
15      Q.   Not 45 minutes?
16      A.   Exactly.
17      Q.   Do you know whether or not Ruben Gutierrez
18  wears glasses or contact lenses?
19      A.   No, I don't.
20      Q.   You don't -- you have no idea; is that correct?
21      A.   I don't have any idea.
22      Q.   Okay.  And when you picked him up from his
23  house after you executed that arrest warrant, he did not
24  have any glasses; is that correct?
25      A.   I don't recall if he did or he didn't.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              238

1      Q.   Well, you took a picture of him, did you not?
2      A.   Yes, I did.
3      Q.   And that picture was introduced into evidence;
4  is that correct?
5      A.   That is correct.
6      Q.   Did he have any glasses on when you took that
7  picture?
8      A.   No.
9      Q.   And you don't know whether or not he was
10  wearing contact lenses on that day; is that correct?
11      A.   That is correct.
12      Q.   And you don't know whether or not he can see or
13  how far -- how close he needs to have a paper to be able
14  to see, do you?
15      A.   That is correct.
16      Q.   And isn't it correct that his wife, Angie
17  Gutierrez, had to bring him some contact lenses later on
18  after you had questioned him two times?
19      A.   I don't recall if she did.
20      Q.   Okay.  So you're not saying it didn't happen;
21  you're just saying you don't remember whether or not --
22      A.   I didn't deal with her on that occasion that
23  she brought in contact lenses.
24      Q.   But what you do know is that he didn't have any
25  glasses; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          239

1          A.    Eyeglasses, that is correct.

2          Q.    When you picked him up from his home on

3    September the 13th of 1998, isn't it correct that he was

4    taken just in his boxer shorts?

5          A.    I don't recall.

6          Q.    Well, what was the purpose of you having Angie

7    Gutierrez take clothing to the Brownsville Police

8    Department?

9          A.    I didn't have Angie Gutierrez take clothing to

10   the police department.

11         Q.    Do you know who it was that did?

12         A.    No, I don't, sir.

13         Q.    But someone --

14         A.    Probably Detective Carrejo or another one of

15   the investigators did.

16         Q.    You testified earlier that somebody -- that

17   Angie Gutierrez took clothing to Ruben Gutierrez to the

18   Brownsville Police Department; is that correct?

19         A.    Brought clothing to the investigators of the

20   Brownsville Police Department.

21         Q.    Okay.  That was your testimony?

22         A.    That is correct.

23         Q.    You testified that you also obtained on

24   September the 8th of 1998 a consent to search the

25   Gutierrez residence; is that correct?

1        A.    That is correct.

2        Q.    And that was a consent to search Ruben

3   Gutierrez' and Angie Gutierrez' home; is that correct?

4        A.    That is correct.

5        Q.    And that is marked as State's Exhibit

6   Number 36.

7        A.    That is correct.

8        Q.    And isn't it correct that after you searched

9   that residence, you found absolutely nothing?

10        A.    That is correct.

11        Q.    But when you searched the residences of Rene

12   Garcia and Pedro Gracia, you, in fact, found money at

13   their homes; is that correct?

14        A.    That is correct.

15        Q.    And you never found any money on Ruben

16   Gutierrez or at his residence; is that true?

17        A.    That is correct.

18        Q.    You also testified that you took some clothing

19   that belonged to Ruben Gutierrez; is that true?

20        A.    Took some clothing?

21        Q.    Some clothing.  You went and picked up some

22   clothing from his residence?

23        A.    No, I didn't.

24        Q.    Okay.  Did anybody from the Brownsville Police

25   Department pick up any clothing that belonged to Ruben

1   Gutierrez?

2        A.    I'm unaware if they did.

3        Q.    Okay.  Well, you testified earlier that some

4   property was picked up, that it was apparently tested by

5   the Department of Public Safety; is that correct?

6        A.    That is correct.

7        Q.    And the purpose of sending it to the Texas

8   Department of Public Safety is to determine whether or

9   not there was any blood stains on that clothing; is that

10  correct?

11       A.    That is correct.

12       Q.    And all the property that was given to you that

13  belonged to Ruben Gutierrez, all of it came back as

14  negative; is that correct?

15       A.    That is correct.

16       Q.    Meaning that there was absolutely no blood

17  located on that clothing?

18       A.    That is correct.

19       Q.    And isn't it correct that even though clothing

20  has been washed, even if it has been washed several

21  times, that blood stains cannot be removed?  Do you know

22  that?

23       A.    I didn't know that.

24       Q.    Now, let me go back to September the 9th of

25  1998.  That was the first time that you actually talked

1    to Ruben Gutierrez; is that correct?

2        A.    That is correct.

3        Q.    And that was the day that Angie Gutierrez and

4    Norma Gutierrez' mother went with him to the Brownsville

5    Police Department; is that true?

6        A.    I'm not sure if they did or didn't.

7        Q.    When was the first time that you talked to

8    Ruben Gutierrez?

9        A.    I'm sorry.  Yes, on the 9th it was.  I'm

10   getting it mistaken with the 8th.

11       Q.    We're talking about September the 9th of 1998.

12       A.    That is correct.

13       Q.    Angie Gutierrez went and so did Norma

14   Gutierrez, his mother; is that correct?

15       A.    That is correct.

16       Q.    They took him so he could talk to you; is that

17   true?

18       A.    That is correct.

19       Q.    And isn't it correct that you took Ruben

20   Gutierrez into your office?

21       A.    That is correct.

22       Q.    And isn't it correct that after you started

23   questioning him, that he decided not to talk to you

24   anymore?

25       A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              243

1          Q.    And isn't it correct that you did not allow
2     Ruben Gutierrez to leave until after you spoke to Angie
3     Gutierrez?
4          A.    He was allowed to remain seated in the lobby
5     while I spoke with Ms. Gutierrez.
6          Q.    So your testimony is that he was at the lobby
7     while you were --
8          A.    In the C.I.D. lobby upstairs, yes, he was.
9          Q.    Did you talk to Angie Gutierrez?
10         A.    Yes, I did.
11         Q.    So what you're saying is that you took Ruben
12    Gutierrez out to the lobby and then you brought her in?
13         A.    There's a lobby before you get to our bays
14    where the cubicles are located.  There's some seats
15    there; and he was allowed to sit there and remain there
16    while I spoke to Ms. Gutierrez.
17         Q.    So you're not talking about the front lobby --
18         A.    No, sir.
19         Q.    -- is that correct?
20         A.    The lobby upstairs.
21         Q.    You're not talking about the lobby that's
22    accessible just to anybody that goes into the Brownsville
23    Police Department; is that true?
24         A.    That is correct.
25         Q.    In other words, you had him sit there in the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          244

1   lobby inside of the Brownsville Police Department?

2       A.   Yes, sir.

3       Q.   And you had him sit there until you finished

4   talking to Angie Gutierrez; is that correct?

5       A.   No, it's not correct.

6       Q.   Isn't it true that you threatened Ruben

7   Gutierrez that if he didn't talk to you, you were going

8   to arrest his wife?

9       A.   No, that is not correct.

10      Q.   And isn't it correct that you also threatened

11  to get the child protective services department to take

12  away his kids if he did not give you a statement?

13      A.   No, sir.

14      Q.   Earlier you testified that you saw

15  Officer David Garcia hitting Avel Cuellar; is that

16  correct?

17      A.   That is correct.

18      Q.   Is it normal and standard procedure with the

19  Brownsville Police Department to be hitting people that

20  they're questioning?

21      A.   No, sir.

22      Q.   But on that day, on September the 7th when you

23  questioned -- when Detective Garcia was questioning Avel

24  Cuellar, he was, in fact, hitting him on the head; is

25  that correct?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    245

1      A.   Yes, he did.

2      Q.   And he was hitting him on his head when he was

3  attempting to get a statement from Avel Cuellar; is that

4  correct?

5      A.   It was a verbal conversation, yes, it was.

6      Q.   But the purpose of that verbal conversation was

7  to get a statement down in writing; is that correct?

8      A.   No. He was too intoxicated to be able to

9  provide a written statement.

10     Q.   But he was talking to him nonetheless; is that

11 correct?

12     A.   That is correct.

13     Q.   And he was talking to him about Escolastica

14 Harrison; is that correct?

15     A.   That is correct.

16     Q.   So he was attempting to get information from

17 Avel Cuellar even though Detective Garcia knew that he

18 was intoxicated --

19     A.   That is correct.

20     Q.   -- is that correct?

21     A.   Yes, sir.

22     Q.   And even though he knew he was intoxicated, he

23 was still hitting him on the head trying to get

24 information from him; is that true?

25     A.   Yes, sir.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    246

1      Q.   Were you the only officer that was present when
2  this was happening?
3      A.   I believe so.
4      Q.   Now, you testified that Escolastica Harrison
5  had about $571,000 in those suitcases; is that correct?
6      A.   That is correct.
7      Q.   And you testified that the money was kept in
8  $100 bills; is that correct?
9      A.   I never said $100 bills.
10     Q.   Okay.  Do you know in what denominations that
11 money was kept?
12     A.   Yes, sir.  They were $100 bills and I believe
13 $20 bills also.
14     Q.   And that was only the two, the toolbox and the
15 suitcase in which she kept that money; is that correct?
16     A.   The ones that we knew of that we recovered,
17 yes.
18     Q.   So you only recovered the suitcase and the
19 toolbox; is that correct?
20     A.   That is correct.
21     Q.   But you don't know for a fact that that is the
22 amount of money that she, in fact, had in that suitcase
23 or in that toolbox; is that correct?
24     A.   That is correct.
25     Q.   You don't know how well she kept that ledger

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    247

1    that you were testifying about earlier; is that correct?

2        A.    That is correct.

3        Q.    You don't know whether she maybe put some money

4    in a bank somewhere or whether she gave some money away;

5    is that correct?

6        A.    That is correct.

7        Q.    So when you're testifying about an amount of

8    571,000, you don't have any idea whether or not that is

9    the amount of money that she had in her home?

10       A.    That is correct.

11       Q.    You're just guessing?

12       A.    I'm not guessing.  I'm taking it from the

13   ledger itself where she has it dated and the dollar

14   amounts that she has.

15       Q.    But you wouldn't know whether or not, in fact,

16   she had that amount --

17       A.    That is correct.

18       Q.    -- in her home; is that correct?

19       A.    That is correct.

20       Q.    And isn't it correct that when Ruben Gutierrez

21   was arrested, he was charged with the murder of

22   Escolastica Harrison as well as a burglary of a

23   habitation; is that correct?

24       A.    No, sir.  He was just charged with capital

25   murder.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          248

1        Q.   Okay.  Well, in order to have capital murder,

2   you have to have a murder and something else; is that

3   correct?

4        A.   That is correct.

5        Q.   And the charge that you brought was that of

6   burglary of habitation; is that correct?

7        A.   No, sir.  It was a charge of robbery.

8        Q.   Are you sure?

9        A.   Yes, sir.

10       Q.   Okay.  In the warrant that you obtained, isn't

11  it correct that you put on there burglary of a

12  habitation?

13       A.   I don't recall what it was.

14       Q.   Did you obtain that warrant?

15       A.   I didn't get it.  I didn't --

16       Q.   Do you know who it was?

17            THE COURT:  Just a minute.  Just a minute.

18  Let him finish answering the question before you ask him

19  another question.

20       Q.   (BY MR. REYES)  Do you know who it was?

21       A.   No, I don't.

22       Q.   Now, you stated -- testified earlier that

23  apparently Escolastica Harrison -- Escolastica Harrison's

24  home had been ransacked; is that correct?

25       A.    It appeared to have been ransacked.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                        249

1        Q.    But you hadn't been inside that home before
2   September the 6th of 1998; is that true?
3        A.    That is correct.
4        Q.    So you don't know whether or not she kept her
5   home in that condition; is that true?
6        A.    It was in poor condition when we got there.  So
7   I wouldn't --
8        Q.    That wasn't my question.  My question was, you
9   don't know in what condition she kept that home before
10  September the 6th of 1998 --
11       A.    That is correct.
12       Q.    -- is that correct?
13       A.    Yes, sir.
14       Q.    You don't know whether or not she kept it in
15  the condition in which you found it; is that true?
16       A.    That is correct.
17       Q.    So when you talk about his home -- her home
18  having been ransacked, you don't know that for a fact; is
19  that correct?
20       A.    That is correct.
21       Q.    You're just guessing?
22       A.    I asked the family members.
23       Q.    You said that during your investigation you
24  talked to Edilia Vento; is that true?
25       A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    250

1       Q.   And isn't it correct that you found out through
2   your investigation that she, in fact, found that Avel
3   Cuellar was acting weird on that night of September the
4   5th of 1998?
5       A.   That is correct.
6       Q.   She was -- he was acting differently; is that
7   correct?
8       A.   That's correct.
9       Q.   And isn't it correct that the information that
10  you had up to that point when you started investigating
11  this case was that there was, in fact, some blood stains
12  that were found in Avel Cuellar's restroom?
13      A.   That is correct, what appeared to be.
14      Q.   What appeared to be blood on his toilet; is
15  that correct?
16      A.   On his toilet cover, the reservoir cover.
17      Q.   And that was in his restroom; is that correct?
18      A.   That is correct.
19      Q.   In his portion of the residence?
20      A.   That is correct.
21      Q.   And you also had information throughout your
22  investigation that Escolastica Harrison had -- was, in
23  fact, afraid of Avel Cuellar; is that true?
24      A.   I didn't have that information at all.
25      Q.   You never obtained that information from your

1    investigation?

2         A.    No, I didn't.

3         Q.    And isn't it also correct that the family

4    members, the Cuellar's or the Harrison's, actually called

5    the Brownsville Police Department to have Avel Cuellar

6    picked up from the funeral home because he was causing a

7    disturbance?

8         A.    That is correct.

9         Q.    And do you recall what date that was?

10        A.    I believe it was on the 7th or the 8th.  I'm

11   not sure which day it was.

12        Q.    One of those days?

13        A.    Yes, sir, when he was picked up and a statement

14   was obtained.

15        Q.    And isn't it correct that he was intoxicated on

16   that day?

17        A.    No, he wasn't.

18        Q.    He was not?

19        A.    No, he was not.

20        Q.    So he was sober, but yet he was causing

21   problems at the funeral home; is that correct?

22        A.    That's what the family members said.  That's

23   correct.

24        Q.    So you went and picked him up based on the

25   information that you had obtained from the family; is

STATE OF TEXAS VS. RUBEN GUTIERREZ                          252

1    that true?

2         A.   That is correct.

3         Q.   On September the 9th of 1998, how long was

4    Ruben Gutierrez at the Brownsville Police Department?

5         A.   I don't know.

6         Q.   What time did he arrive?

7         A.   At approximately 3:40.

8         Q.   And what time did he leave?

9         A.   I don't know.

10        Q.   So you have no idea whether you kept him there

11   one hour?  You don't have an idea as to whether maybe you

12   kept him there for three hours?

13        A.   No, sir.  It wasn't that long.

14        Q.   So it was anywhere between maybe one hour to

15   three hours?

16        A.   I would say it wasn't that long, sir.

17        Q.   Okay.  Well, earlier you stated that you don't

18   know how long he was there.

19        A.   That is correct.

20        Q.   Either you know or you don't.

21        A.   That is correct.

22        Q.   So he might have been there anywhere between

23   one hour to three hours; is that correct?

24        A.   No, it's not correct.

25        Q.   One hour to two hours?

1        A.    No, sir.

2        Q.    One hour?

3        A.    Maybe an hour, if that much.

4        Q.    But you don't know?

5        A.    That's correct.

6        Q.    What time did you start working on September

7   the 9th of 1998?

8        A.    8:00 in the morning, I think.  I'm not -- I

9   don't recall.

10        Q.    And what time does your shift end?

11        A.    It all depends what time I start.

12        Q.    My question was, what time does your shift end

13   if you knew what time you started on that day?

14        A.    Well, if I started at eight, the shift ends at

15   four.  If I started at nine, the shift ends at five.

16        Q.    Okay.  And you testified that you started at

17   8:00 that morning; is that correct?

18        A.    I don't recall exactly what my schedule was

19   that day, sir.

20        Q.    Okay.  Do you have it anywhere in your report?

21        A.    No, I don't.

22        Q.    And not necessarily because let's say, for

23   example, you go in at 8:00 in the morning are you going

24   to leave exactly at four; is that correct?

25        A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    254

1        Q.    If you're interviewing somebody or
2   interrogating somebody, you would stay longer; is that
3   true?
4        A.    That is correct.
5        Q.    Isn't it correct that Ruben Gutierrez was not
6   taken before a magistrate until September the 14th of
7   1998?
8        A.    I'm unaware, sir.
9        Q.    You don't know?
10       A.    I don't know.
11       Q.    You have no idea?  Were you the investigator in
12  charge of this investigation?
13       A.    No, I wasn't.
14       Q.    It was Detective Gilberto Garcia; is that true?
15       A.    That is correct.
16       Q.    Now you testified also that you had received
17  information from Ruben that he had been with his cousin,
18  Chuco; is that true?
19       A.    That is correct.
20       Q.    What is his true name?
21       A.    Jose Miguel Maldonado, of that sort.  I'm not
22  sure.
23       Q.    And isn't it correct that you had learned
24  through your investigation that he had been driving
25  around in a Corvette on that Saturday night; is that

1   true?

2        A.    That he had been?

3        Q.    Yes, that he had been.

4        A.    No, that he had not been.

5        Q.    Okay.  Is that the information that you had

6   obtained through --

7        A.    That's correct.

8        Q.    -- your investigation?

9             THE COURT:  Just a minute.  Let him finish

10  asking the question before you answer.

11            Go ahead.

12            MR. REYES:  Thank you, Your Honor.

13       Q.    (BY MR. REYES)  So, you have no information

14  that this Mr. Maldonado, in fact, gave a statement saying

15  that he was driving around in his Corvette?

16       A.    That is correct, but that Ruben was not with

17  him.

18       Q.    Well, earlier you testified that he was not

19  driving around in a Corvette, but he, in fact, was; is

20  that true?

21       A.    That's what he stated he had done.

22       Q.    So my question was, you learned from your

23  investigation that this person, Mr. Maldonado, Jose

24  Maldonado, was actually driving around in his Corvette --

25       A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              256

1        Q.    -- on that Saturday night; is that true?

2        A.    Yes, sir.

3        Q.    And you had learned from Ruben Gutierrez or he

4    told you on September the 9th that he, in fact, was with

5    his cousin, Chuco or Jose Maldonado, on Saturday night in

6    his Corvette; is that true?

7        A.    That's what he stated.

8        Q.    You testified earlier that you went and picked

9    up Rene Garcia on a warrant; is that true?

10        A.    That is correct.

11        Q.    And you had received information from Crime

12    Stopper's that he was spending large amounts of money?

13        A.    That is correct.

14        Q.    So this -- you having picked up Mr. Garcia on a

15    warrant was simply a pretext to question him; is that

16    correct?

17        A.    Not a pretext.  He had an outstanding warrant.

18    We serve warrants.

19        Q.    You could have gone to pick him up without

20    serving the warrant; is that correct?

21        A.    That's correct.

22        Q.    You could have gone to ask him to see if he

23    wanted to give you a statement; is that true?

24        A.    Not when he has an outstanding warrant for him.

25    He gets arrested.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          257

1      Q.   You could have gone to pick him up to question
2   him without serving a warrant; is that correct?
3      A.   That is correct.
4      Q.   Just like you could anybody else; is that true?
5      A.   That is correct.
6      Q.   But in this situation, what you did is you went
7   and served a warrant, and then you brought him to the
8   police station, and then you started questioning him; is
9   that correct?
10      A.   That is correct.
11      Q.   As a matter of fact, he not only refused to
12   talk to you once, but he refused to talk to you twice.
13   It was not until the third time after you, from the
14   Brownsville Police Department, continued to try and
15   question him that he actually gave you some information;
16   is that true?
17      A.   That's uncorrect -- incorrect.
18      Q.   You testified, when Mr. Blaylock was asking
19   you, you talked to him once; he refused to give you a
20   statement.  Is that true?
21      A.   We talked -- I interviewed him, all right?  And
22   then he was taken downstairs and booked in into the jail
23   where he remained overnight.
24      Q.   So you talked to him once; is that correct?
25      A.   That is correct.

1       Q.    And he didn't give you any information?

2       A.    That is correct.

3       Q.    And then he was booked in; is that true?

4       A.    That is correct.

5       Q.    And he was booked in on those warrants; is that

6  correct?

7       A.    That warrant, yes, he was.

8       Q.    And isn't it then after he spent the night in

9  the jail, then somebody from the Brownsville Police

10 Department went to question him again?  Is that true?

11      A.    That is correct.

12      Q.    And he did not give you any information?

13      A.    That's -- he did provide with a statement.

14      Q.    Was that the second time?

15      A.    Yes, sir.

16      Q.    To your knowledge, had anybody else questioned

17 him prior to that second time?

18      A.    Just Detective Pineda and myself.

19      Q.    And that was before he was booked in; is that

20 true?

21      A.    That is correct.

22      Q.    So the fact -- so he had, in fact, refused to

23 give you any information, but then you went back and you

24 questioned him a second time; is that true?

25      A.    That is correct.

1      Q.   You testified that you went to another

2   residence after you talked to Rene Garcia; is that true?

3      A.   That is correct.

4      Q.   Okay.  And whose residence did you go to?

5      A.   Pedro Gracia's residence.

6      Q.   And you testified that you found nothing at his

7   residence?

8      A.   That is correct.

9      Q.   Now, isn't it also correct that you, in fact,

10   did take some clothing that belonged to Avel Cuellar?

11      A.   I took some clothing?

12      Q.   Did anybody from the Brownsville Police

13   Department pick up any clothing that belonged to Avel

14   Cuellar?

15      A.   I believe so.

16      Q.   And isn't it correct that that clothing was

17   sent to the Department of Public Safety in McAllen for

18   testing?

19      A.   That is correct.

20      Q.   And isn't it correct that the laboratory, in

21   fact, found blood that belonged to Escolastica Harrison

22   on Avel Cuellar's clothing?

23      A.   I'm not sure what the results were on his

24   clothes.

25      Q.   Have you reviewed the report from the

1    Department of Public Safety?

2         A.   Not on Avel's clothes, no, sir.

3         Q.   You testified that you reviewed the report with

4    respect to Ruben Gutierrez's clothing; is that correct?

5         A.   Yes, I saw it, sir.

6         Q.   And that's how you know that, in fact, no blood

7    was found on his clothing; is that true?

8         A.   That is correct.

9         Q.   And isn't it correct that the information with

10   respect to Avel Cuellar is on that same document?

11        A.   I didn't see it, sir.

12        Q.   And who was the investigator in charge of

13   obtaining the results from the Department of Public

14   Safety?

15        A.   I believe those results were mailed to the

16   police department.  And when I saw them, I had brought

17   them over to, I believe, Ms. Fischer for her to have them

18   for the case file.

19        Q.   And isn't it a fact that this report was sent

20   directly to you?

21        A.   To me?

22        Q.   Yes.

23        A.   I don't know if it was.

24             MR. REYES:  May I approach the witness,

25   Your Honor?

1               THE COURT:  You may.

2      Q.   (BY MR. REYES)  I'm going to show you what

3  I've marked as Defendant's Exhibit Number 1 for

4  identification purposes only.  Do you recognize that?

5      A.   Yes, sir.

6      Q.   Okay.  Is that document what has been marked as

7  Defendant's Exhibit Number 1, is that a report from the

8  Department of Public Safety?

9      A.   Yes, sir.

10     Q.   And isn't it, in fact, addressed to you?

11     A.   Yes, sir.

12     Q.   And isn't it correct that the information with

13 respect to Avel Cuellar's clothing is also on that

14 document?

15     A.   Yes, it is.

16     Q.   And isn't it correct that they found some blood

17 on Avel Cuellar's clothing?

18     A.   That is correct.

19     Q.   And after you received this report, you

20 testified that you sent it over to the District

21 Attorney's Office; is that true?

22     A.    That report was placed on my desk and I brought

23 it over, yes, sir.

24     Q.   Did you on September the 9th of 1998 ever take

25 Ruben Gutierrez before a magistrate, before a judge?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              262

1       A.   No, I didn't.

2       Q.   And you are aware that you are required to take

3   a person before a judge so they can read that person

4   their rights?  You've heard of that?

5       A.   Not an adult.

6       Q.   What you're saying is that you're never

7   required to take somebody before a magistrate?

8       A.   That's correct.

9       Q.   That's your understanding of the law,

10  Officer Flores?

11      A.   That's my understanding from the Warning and

12  Waiver of Rights that we read to each person that we

13  interview.

14      Q.   Let me see if I understand you correctly.

15  You're saying that because somebody is an adult, you're

16  never required to take them before a magistrate?

17      A.   I'm not sure about never.  I didn't take him

18  that day.

19      Q.   Well, I mean, in other investigations, do you

20  ever take any adults before a magistrate?

21      A.   No, sir.

22           MR. BLAYLOCK:  I object, Judge.  This is

23  totally misleading.  I ask the Court to instruct the jury

24  on the law at this time.

25           THE COURT:  They'll be instructed later

1    on.  Let's move on.

2                    MR. REYES:  Thank you, Your Honor.

3         Q.   (BY MR. REYES)  So your testimony is that you

4    never took Ruben Gutierrez before a magistrate?

5         A.   That is correct.

6                    THE COURT:  All right.  Let's go ahead and

7    take a break at this time.  Ladies and gentlemen of the

8    jury, remember the instructions I've given you not to

9    discuss this case among yourselves or with anyone else,

10   not to form or express any opinions.  We'll take about a

11   15 minute break.

12                   **(Recess from 3:20 p.m. to 3:40 p.m.)**

13                   THE COURT:  All right.  Bring in the jury.

14                   **(Jury brought into the courtroom)**

15                   THE COURT:  All right.  You may be seated.

16                   Let's proceed.

17                   MR. REYES:  Thank you, Judge.

18                   **CROSS-EXAMINATION CONTINUED**

19   BY MR. REYES:

20        Q.   Detective Flores, when we left off before the

21   break I was talking to you about -- about Ms. Cuellar's

22   home.  Isn't it correct that before you arrived at the

23   scene, in fact the Cuellar family had already gone

24   through the house looking for the money?

25        A.   That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    264

1       Q.   And do you know how long they had been looking
2    for that money?
3       A.   I don't know.
4       Q.   Do you know how long they had been inside that
5    house?
6       A.   No, I don't.
7       Q.   And isn't it a fact that the Cuellar family, in
8    fact, knew some of the hiding places for that money?
9       A.   That is correct.
10      Q.   And isn't it a fact that they actually went
11   into those hiding places looking for that money?
12      A.   They located it.  I don't know if they went in.
13      Q.   They located those hiding places --
14      A.   That is correct.
15      Q.   -- is that correct?  So you don't know whether
16   or not the Cuellar family might have found some money and
17   not let you all know; is that correct?
18      A.   That is correct.
19      Q.   That is a possibility?
20      A.   Possibility.
21      Q.   We were talking to you about Ms. Edilia Vento.
22   She is one of the residents there at the trailer park; is
23   that correct?
24      A.   That is correct.
25      Q.   And the information that you had obtained

STATE OF TEXAS VS. RUBEN GUTIERREZ                              265

1    through your investigation was that she had -- was that

2    Avel Cuellar was, in fact, acting differently or weird

3    before Escolastica Harrison's body was found; is that

4    correct?

5         A.   I don't know if it was before or after that she

6    noticed it, the body was found.

7         Q.   Well, didn't you -- weren't you able to

8    determine that she's the one that instructed Avel Cuellar

9    to call for Escolastica's -- for Escolastica Harrison

10   over the P.A. system?

11        A.   If it's in her statement, yes, sir.

12        Q.   Right?  So if, in fact, Avel Cuellar was

13   calling Escolastica Harrison's name through the P.A.

14   system, then we can assume that he had not yet located

15   her body?

16        A.   That is correct.

17        Q.   You have the supplemental report that you gave;

18   is that correct?

19        A.   Yes, sir.

20        Q.   How many pages is it?

21        A.   How many pages what?

22        Q.   How many pages does your report consist of?

23        A.   Six and three/quarters pages.

24             MR. REYES:  May I approach the witness,

25   Your Honor?

PAM L. ESQUIVEL, CSR, RPR

```
 1                    THE COURT:  You may.
 2         Q.   (BY MR. REYES)  I'm going to ask you to look
 3    at page number 5 of your report.
 4         A.   What, sir?
 5         Q.   Number 5.  This is page 5, Officer.  I want you
 6    to read this paragraph to yourself.
 7         A.   Which one?
 8         Q.   It starts right there to right here.
 9         A.   (Witness complies).
10         Q.   Did you read it?
11         A.   Yes, sir.
12         Q.   Isn't it correct that you had obtained a
13    warrant for a burglary of a habitation for Ruben
14    Gutierrez?
15         A.   Yes, sir.
16         Q.   You also had obtained a warrant for burglary of
17    a habitation of Rene Garcia; is that correct?
18         A.   That is correct.
19         Q.   This morning when you testified, you said that
20    you did not find any money other than at Pedro Gracia's
21    home; is that correct?
22         A.   Pedro and Rene Garcia's home.
23         Q.   Well, my question was, this morning when you
24    testified, you said that the only place that you found
25    money was at Rene Garcia's home.  And then when we came
```

1    back this afternoon, then you added that you also found

2    some money at Pedro Gracia's home.

3                      Did you talk to the D.A. or Mr. Blaylock

4    or Ms. Fischer throughout lunch?

5         A.    No, sir.

6         Q.    Did you review your report?

7         A.    No, sir.

8         Q.    So how is it that then you remember later on

9    this -- in the afternoon that you had also found some

10   money at Pedro Gracia's home?

11        A.    In the morning we were talking about Rene

12   Garcia and the money that was found at his residence.  In

13   the afternoon the name of Pedro Gracia was brought up and

14   the money located at Pedro Gracia's residence was brought

15   up, sir.

16        Q.    So the only two places that you found money

17   were at Pedro Gracia's home and Rene Garcia's home; is

18   that correct?

19        A.    And also the Franco residence.

20        Q.    At the Franco residence.  And they're related

21   to whom?

22        A.    Rene Garcia.

23        Q.    But you never found money at Ruben Gutierrez'

24   home; is that correct?

25        A.    That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    268

1      Q.    You never found any money on his person; is
2   that correct?
3      A.    That is correct.
4      Q.    And isn't it correct that Mr. Rene Garcia's
5   family actually knew or had some money, but yet after you
6   talked to them, they didn't even return it to you; is
7   that correct?
8      A.    That is correct.
9      Q.    It wasn't until later you persisted on
10  questioning them that they returned that money; is that
11  correct?
12     A.    That is correct.
13     Q.    When you were attempting to obtain a statement
14  from Ruben Gutierrez, you told him that the other -- that
15  Pedro Gracia and Ruben -- Rene Garcia had already given
16  statements; is that correct?
17     A.    That is correct.
18     Q.    And this was before you started the
19  interrogation; is that correct?
20     A.    That was during the interrogation.
21     Q.    You also had information that Avel Cuellar had,
22  in fact, stole about 30 or $40,000 from Escolastica
23  Harrison; is that true?
24     A.    No, it's not.
25     Q.    You didn't have that information?

PAM L. ESQUIVEL, CSR, RPR

1       A.    Ruben provided it to us.

2       Q.    Okay.  Did you do anything with that

3  information, Officer?

4       A.    No, we didn't.

5       Q.    You stated that on September the 13th of 1998

6  Ruben Gutierrez took you to where some of this property

7  was found; is that correct?

8       A.    That is correct.

9       Q.    And you also testified that he was -- isn't it

10 a fact that he did not volunteer to take you there; that

11 you put him into that police car and you told him to take

12 you where that property was; is that correct?

13      A.    No, that's not correct.

14      Q.    And isn't it correct that he was leading you

15 just to places where Pedro Gracia had told him some of

16 this property had been thrown; is that correct?

17      A.    That's correct.

18      Q.    So the information that he was giving you was

19 what he was told by Pedro Gracia; is that true?

20      A.    That is correct.

21      Q.    Did you at all during your investigation locate

22 a silver suitcase?

23      A.    Silver?

24      Q.    A silver colored suitcase, did you locate one

25 during your investigation?

1     A.   No, I didn't.

2     Q.   You testified that the suitcases that you found

3  and the toolbox were photographed before anybody touched

4  them; is that true?

5     A.   That is correct.

6     Q.   You don't know whether or not any individuals

7  before --

8               MR. REYES:  I'll withdraw that question.

9     Q.   (BY MR. REYES)  Let me ask you this.  Did you

10  have that suitcase and that toolbox at all sent to the

11  Department of Public Safety for them to attempt to lift

12  fingerprints from?

13     A.   I don't know if they did or didn't.

14     Q.   Did you do it?

15     A.   No, I didn't.

16     Q.   Who would be in charge of sending those to the

17  Department of Public Safety?

18     A.   Crime scene investigator Detective Juan

19  Hernandez.

20     Q.   Before September the 6th of 1998 you had never

21  met Escolastica Harrison; is that true?

22     A.   No, I had -- yes, I had met her.

23     Q.   But were you familiar with her handwriting?

24     A.   No, I wasn't.

25     Q.   So when you're talking about that ledger which

STATE OF TEXAS VS. RUBEN GUTIERREZ                        271

1    is in front of you, you don't know whether or not that is

2    her handwriting; is that correct?

3         A.   That is correct.

4         Q.   You don't know whether or not anybody --

5    whether or not anybody made any additions --

6         A.   That is correct.

7         Q.   -- to that log; is that true?

8         A.   Yes, sir.

9         Q.   Those post cards or index cards that were

10   admitted as evidence, you don't know whether or not

11   whether somebody other than Escolastica Harrison prepared

12   those; is that correct?

13        A.   That is correct.

14              MR. REYES:  I'll pass the witness, Your

15   Honor.

16              MR. BLAYLOCK:  I do have a few questions,

17   Judge.

18              THE COURT:  Go ahead.

19                   **REDIRECT EXAMINATION**

20   **BY MR. BLAYLOCK:**

21        Q.   Now, Detective Flores --

22              MR. BLAYLOCK:  May I approach the witness,

23   Judge?

24              THE COURT:  You may.

25        Q.   (BY MR. BLAYLOCK)  Detective, about his

STATE OF TEXAS VS. RUBEN GUTIERREZ                            272

1    eyesight, do you think he's got any problems with his

2    eyesight?

3                    MR. REYES:  I'm going to object, Your

4    Honor.  It calls for speculation.

5                    MR. BLAYLOCK:  He can comment on what his

6    observations were.

7                    THE COURT:  Rephrase the question.

8         Q.   (BY MR. BLAYLOCK)  In your observations, did

9    he appear to have any problem with his eyesight?

10        A.   No, sir.

11        Q.   Okay.  In fact, let's look at State's Exhibit

12   Number 43 and 37.  He put his initials right down there

13   each time, right?

14        A.   Yes, sir.

15        Q.   Did you have to guide his hand at all?

16        A.   No, sir.

17        Q.   He got every one of them right beside the

18   number, didn't he?

19        A.   Yes, sir.

20        Q.   Okay.  And that signature, did you guide his

21   hand when he was signing it?

22        A.   No, sir.

23        Q.   He got that signature right on the line, didn't

24   he?

25                    MR. REYES:  I'm going to object --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    273

```
 1        A.   Yes, sir.
 2                  MR. REYES:  -- to counsel leading his
 3   witness.
 4                  THE COURT:  Don't lead your witness,
 5   counsel.
 6        Q.   (BY MR. BLAYLOCK)  Let's look at State's
 7   Exhibit 43 now.  Same question, did you guide his hand
 8   when he put his initials on the paper?
 9        A.   No, sir.
10        Q.   Okay.  But where are they?
11        A.   They're -- his signature is right on the line.
12   The time and the date is also right on the line.
13        Q.   Okay.  He put the time and date up there?
14        A.   Yes, sir.
15        Q.   Let's look at State's Exhibit Number 44 and 45.
16   Is it easy for a person who can't see well to put their
17   initials right beside each one of those --
18                  MR. REYES:  I'm going to object, Your
19   Honor.  It calls for speculation.
20                  THE COURT:  I'll permit him to answer.
21        Q.   (BY MR. BLAYLOCK)  Is it easy to stick your
22   initials right beside every one of those numbers?
23        A.   Not really.
24        Q.   Okay.  But where did he put his initials?
25        A.   He put them next to each number that was
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    274

1    indicated to him as his rights were read to him.

2         Q.   He got it right by number one?

3         A.   Yes, sir.

4         Q.   And number two?

5         A.   Yes, sir.

6         Q.   And number three?

7         A.   Yes, sir.

8         Q.   And number four?

9         A.   Yes, sir.

10        Q.   And number five?

11        A.   Yes, sir.

12        Q.   And then he put them at the end of every

13   paragraph?

14        A.   That is correct.

15        Q.   Did you have to guide his hand to put it by any

16   of those?

17        A.   No, sir.

18        Q.   What about his signature on that exhibit?

19        A.   His signature is right on the line.

20        Q.   Got it right on the line.  Okay.  Does that

21   indicate to you that he had problems seeing?

22        A.   No, sir.

23        Q.   All right.  And --

24             MR. BLAYLOCK:  -- I'd like to republish 44

25   and 45, Judge.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    275

1              THE COURT:  You may.

2         Q.   (BY MR. BLAYLOCK)  He knew his rights anyway,

3    didn't he?

4              MR. REYES:  I'm going to object, Your

5    Honor.  It calls for speculation.

6              THE COURT:  What was the question?

7         Q.   (BY MR. BLAYLOCK)  He knew his rights from

8    before, didn't he?

9              THE COURT:  It's overruled.

10        A.   Yes, sir.

11        Q.   (BY MR. BLAYLOCK)  In fact, he had asserted

12   his rights to terminate the interview?

13        A.   That is correct.

14        Q.   So he knew how to terminate an interview?

15        A.   Yes, sir.

16        Q.   But he didn't terminate this one?

17        A.   No, sir.

18        Q.   In fact, he put all of his initials on there?

19        A.   Yes, sir.

20        Q.   I'm going to show you what's been marked as

21   State's Exhibit 61 and 60.  Do these look the same as you

22   saw it that day?

23        A.   Yes, sir.

24              MR. BLAYLOCK:  I'm showing defense 61 and

25   60.  I move to admit 61 and 60.

STATE OF TEXAS VS. RUBEN GUTIERREZ                           276

1           MR. REYES:  Judge, we would just reurge
2    all of our objections, but with respect to State's
3    Exhibit 60, we would object as to relevance.
4           MR. BLAYLOCK:  For the record, Judge, just
5    reurging previous objections, it doesn't put me on notice
6    what to respond to.
7           MR. REYES:  The objections would be that
8    this -- the search was illegal, he was taken by force
9    without his consent to the scene.  And State's Exhibit
10   Number 60 is irrelevant, Judge.
11          MR. BLAYLOCK:  We'll show the relevance.
12          THE COURT:  All right.  It'll be
13   overruled.  Sixty and 61 will be admitted into evidence.
14          **(State's Exhibit Numbers 60 and 61**
15          **admitted)**
16       Q.   (BY MR. BLAYLOCK)  Okay.  Before we go on,
17   let's clear up the eye problem.  Based on your experience
18   and observations, did he have any problem with his eyes?
19       A.   No, he didn't.
20       Q.   Okay.  Now let's look at State's Exhibit 60 and
21   61.  Tell the jury -- hold it up so they can see -- what
22   number 60 is.
23       A.   Sixty is the location inside of the pen, that
24   animal pen that we located behind the residence on
25   California Road.

1      Q.   Okay.  And tell them what 61 is.

2      A.   Sixty-one is a photo of the canal where the

3  toolbox was located at.

4      Q.   And on Number 60, is -- what is this hole?

5  There's a big hole there.  What did you get out of that

6  hole?

7      A.   We recovered a large sum of money from that

8  hole.

9      Q.   And that in fact -- is that the 50 -- how much

10 thousand?

11     A.   $56,000.

12     Q.   Okay.  Rene Garcia's?

13     A.   Yes, sir.

14     Q.   He told you where it was?

15     A.   Yes, sir.

16          MR. BLAYLOCK:  If I could finish off my

17 exhibit, Judge.

18     Q.   (BY MR. BLAYLOCK)  All right.  Can you see

19 this from where you are?

20     A.   No, sir.

21     Q.   Just for the record, on State's Exhibit 59,

22 have I placed the corresponding photos where they should

23 be?

24     A.   Yes, sir.

25     Q.   Okay.  Go ahead and sit down.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        278

1        A.    (Witness complies).

2        Q.    Now, you just told -- when he was telling you

3    where you all found the money, you told him that you

4    found some at Rene's and some at Pedro's house, right?

5        A.    Yes, sir.

6        Q.    And he left out the part about the Campos,

7    Campos' money, Juan Pablo Campos.  Did you determine how

8    Juan Pablo Campos is related to Ruben Gutierrez?

9        A.    Yes, sir.

10       Q.    How is he related?

11       A.    Ruben Gutierrez' wife is the cousin of Juan

12   Pablo Campos' wife.

13       Q.    Okay.  And you had mentioned in your report in

14   that same paragraph he had you read, did Ms. Gutierrez

15   tell you whose vehicle they were driving when he went out

16   that day?

17       A.    Yes, sir.

18             MR. REYES:  I'm going to object, Your

19   Honor, as to relevancy.

20             THE COURT:  Relevancy?  Overruled.

21       Q.    (BY MR. BLAYLOCK)  Tell the jury, whose

22   vehicle was it?

23       A.    It belonged to --

24             MR. REYES:  I'm going to object, Your

25   Honor, also as to -- may we approach, Your Honor?  May we

PAM L. ESQUIVEL, CSR, RPR

1  approach?

2              **(Off the record discussion at the bench)**

3              THE COURT:  I'll sustain to hearsay.

4      Q.   (BY MR. BLAYLOCK)  Did you determine if -- did

5  you determine if Ruben Gutierrez had paid Juan Pablo

6  Campos for the Bronco?

7              MR. REYES:  I'm going to object, Your

8  Honor.  It calls for hearsay.

9              THE COURT:  Overruled.

10     A.   Yes, sir.

11     Q.   (BY MR. BLAYLOCK)  Okay.  And about how much

12 had he paid him?

13     A.   $6,000 in cash.

14     Q.   Okay.  And then the money you got from

15 Mr. Campos, you've already testified that that money came

16 from Ruben Gutierrez?

17     A.   That is correct.

18     Q.   All right.  And how much was that?

19     A.   49,000 in one single lump sum; I believe 2,000

20 in another sum; and then 1,700, I believe they were all

21 in $100 bills, in another sum.

22     Q.   All right.  And these statements that you got

23 from Ruben, when you brought him again, did you tell him

24 that you didn't need a statement from him?

25     A.   That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    280

```
 1        Q.   And just so the jury will know, do you give
 2    everybody you arrest a chance to tell their side of the
 3    story?
 4        A.   Yes, sir.
 5        Q.   Is that standard?
 6        A.   Yes, sir.
 7        Q.   And why do you do that?
 8        A.   To allow for them to say what exactly what
 9    happened and their version of what happened.
10        Q.   As far as Miranda goes, the Miranda opinion
11    tells police officers to --
12             MR. REYES:  I'm going to object, Your
13    Honor.  It calls for a legal conclusion.
14             THE COURT:  Sustained.
15             MR. BLAYLOCK:  I'm just going to ask him
16    if he knows, Judge.
17             THE COURT:  Well, ask him.
18        Q.   (BY MR. BLAYLOCK)  Are you familiar with the
19    Miranda opinion?
20        A.   Yes, sir.
21        Q.   Every police officer is, right?
22        A.   Yes, sir.
23        Q.   Okay.  And it directs police officers to read
24    rights, right?
25        A.   Yes, sir.
```

1          MR. REYES:  I'm going to object, Your

2    Honor.  It calls for a legal conclusion.

3          THE COURT:  Overruled.

4       Q.   (BY MR. BLAYLOCK)  Does it say anywhere in

5    that whole opinion about judges, they can -- only judges

6    can read them their rights?

7       A.   No, sir.

8       Q.   In fact, that's not a requirement, is it?

9       A.   That is correct.

10         MR. REYES:  I'm going to object, Your

11   Honor.  That's a misstatement of the law.

12         THE COURT:  It's overruled.

13      Q.   (BY MR. BLAYLOCK)  And this attorney trying to

14   tell this jury that you have to take him before a judge

15   is incorrect, isn't it?

16      A.   Yes, sir.

17         MR. REYES:  I'm going to object, Your

18   Honor.  That's a misstatement of the law.  Article 15.17

19   of the Code of Criminal Procedure directly states that

20   they must be taken without -- with all -- unnecessary

21   delay before a magistrate.  So he's misstating the law.

22         MR. BLAYLOCK:  I'd like to read all of

23   15.17 --

24         THE COURT:  Well, at what time are you

25   referring your question to, counsel?

STATE OF TEXAS VS. RUBEN GUTIERREZ                282

1           MR. BLAYLOCK:  I'm talking about --

2      Q.   (BY MR. BLAYLOCK)  We're still talking about

3  the time the statements were taken, correct?

4           THE COURT:  Okay.  That's overruled then.

5      A.   Yes, sir.

6      Q.   (BY MR. BLAYLOCK)  Okay.  And 15.17 says

7  you've got to take them before a magistrate eventually to

8  have a bond set, right?

9      A.   Correct.

10      Q.   Okay.  And does it say anywhere in there about

11  reading them their rights before you can get a statement?

12      A.   Does it say in there?

13      Q.   It doesn't say in there, does it?

14      A.   No, sir.

15      Q.   Okay.  Now, these statements that Ruben did

16  give to you are self-serving, aren't they?

17      A.   Yes, sir.

18      Q.   In fact, he's saying that, "It wasn't me.

19  Somebody else did it"?

20      A.   That's correct.

21      Q.   Okay.  And does that -- does that conflict with

22  other information that you have?

23      A.   Yes, sir.

24      Q.   Okay.  In fact, if you were going to write a

25  statement for Ruben and try to dupe him into signing it

PAM L. ESQUIVEL, CSR, RPR

1   because he's blind, would you -- wouldn't you just say,

2   "I did it," and say -- and have him sign that?

3        A.   Yes, sir.

4        Q.   Okay.  But you're not that type of an officer,

5   are you?

6        A.   No, sir.

7        Q.   Tell the jury how you operate.

8        A.   When we have a suspect that's brought in, we go

9   ahead and read him his rights.  He understands what his

10  rights are; and we say that he can give a statement as to

11  what his version is.

12            His version is taken; and then he reads

13  his rights once again when he puts his initials at the

14  top of the page.  He initials each paragraph to ensure

15  that nothing has been added on to it.  And then he goes

16  ahead and signs it and it's witnessed by two officers or

17  two individuals.

18       Q.   Okay.  Do you try to limit in any way what his

19  version is?

20       A.   No, sir.

21       Q.   Do you just record what they tell you?

22       A.   Yes, sir.

23       Q.   And is that what you did in this case?

24       A.   Yes, sir.

25       Q.   Now, let me ask you this.  Is it -- how many

STATE OF TEXAS VS. RUBEN GUTIERREZ                284

1   officers were present at any given time while you were

2   talking to Ruben Gutierrez?

3        A.   Maybe two officers.

4        Q.   Okay.  In fact, the two that signed on to it?

5        A.   Yes, sir.

6        Q.   And did more come in --

7        A.   No, sir.

8        Q.   -- in and out of our cubicle?

9        A.   No, sir.

10       Q.   Are they in that area?

11       A.   In the office next door where Pedro Gracia was

12   being interviewed at the same time.

13       Q.   And where is that?  How far away is that?

14       A.   It's -- a wall separates both bays.

15       Q.   Let's talk about Pedro Gracia.  When he was

16   arrested, did you begin to ask him his version of the

17   events?

18       A.   He was -- yes, sir.

19       Q.   Okay.

20       A.   When he was arrested?

21       Q.   Yes.

22       A.   Yes, sir.

23       Q.   And when he was arrested he had a lot of money

24   on him?

25       A.   That is correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    285

1      Q.   And did you ask him where the money came from?

2      A.   Yes, sir.

3      Q.   What was he telling you?

4                MR. REYES:  I'm going to object, Your

5      Honor.  It calls for hearsay.

6                THE COURT:  Sustained.

7                MR. BLAYLOCK:  Judge, I'd ask for some

8      leeway to go into it.  The defense attorney opened this

9      door by trying to go into the voluntariness of another

10     individual's statements.

11               THE COURT:  It's overruled.

12     Q.   (BY MR. BLAYLOCK)  All right.  So, the first

13     time you talked to Rene Garcia, did you ask -- what did

14     you ask him?

15     A.   We wanted to know where exactly he had obtained

16     the money from.

17     Q.   Okay.  And did he give an answer?

18     A.   Yes.

19     Q.   Okay.  And was it -- what kind of answer was

20     it?

21     A.   He was saying --

22               MR. REYES:  I'm going to object, Your

23     Honor.  It calls for hearsay.

24               THE COURT:  Sustained.

25     Q.   (BY MR. BLAYLOCK)  Did he indicate it came

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    286

1    from some other source than the Harrison home?

2         A.   Yes, sir.

3              MR. REYES:  Objection, Your Honor.  It

4    calls for hearsay.

5              THE COURT:  Overruled.

6         Q.   (BY MR. BLAYLOCK)  Yes?

7         A.   Yes, sir.

8         Q.   All right.  And who terminated the interview

9    when he started talking like that?

10        A.   I did.

11        Q.   All right.  And you didn't take a written

12   statement then, huh?

13        A.   No, I didn't.

14        Q.   So the next day when -- or when you talked to

15   him again, who initiated that interview?

16        A.   Detective Marks and I.

17        Q.   Okay.  Well, did Rene Garcia talk to

18   Detective Clipper or Officer Clipper?

19        A.   I believe that was afterwards, sir.

20        Q.   Okay.  And --

21        A.   The following day he spoke to Detective Marks

22   and I.

23        Q.   Okay.  Did you get a statement that day?

24        A.   Yes, we did.

25        Q.   Did it turn out to be a truthful statement?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    287

```
 1        A.    No, sir.
 2        Q.    Okay.  So then he talked to Detective Clipper?
 3        A.    Yes, sir.
 4        Q.    And do you know what he indicated to
 5   Detective Clipper?
 6               MR. REYES:  Objection, Your Honor.  It
 7   calls for hearsay.
 8               THE COURT:  Sustained.
 9        Q.    (BY MR. BLAYLOCK)  Were you put on notice he
10   wanted to talk to you again?
11        A.    Yes, sir.
12        Q.    And this time did you -- well, did you talk to
13   him again?
14        A.    Yes, we did.
15        Q.    Did you initiate that conversation?
16        A.    No, sir.
17        Q.    He wanted to talk to you?
18        A.    He wanted to tell the truth, give a truthful
19   statement.
20        Q.    Okay.  And after that statement, is that when
21   you went and got the warrant for Ruben Gutierrez?
22        A.    Yes, sir.
23        Q.    Did you make him talk to you -- Rene Garcia
24   talk to you in any way?
25        A.    No, sir.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    288

1              MR. BLAYLOCK:  I'll pass the witness,

2    Judge.

3              MR. REYES:  May I proceed, Your Honor?

4              THE COURT:  You may.

5                    **RECROSS-EXAMINATION**

6    **BY MR. REYES:**

7         Q.    You stated that the procedure that you follow

8    in taking statements is as a person is speaking, you're

9    typing; is that correct?

10        A.    That is correct.

11        Q.    And is your typewriter located to the side of

12   your desk?

13        A.    It's in the center of my desk.

14        Q.    You testified with respect to State's Exhibit

15   Number 60, which is that photograph --

16        A.    Which one?

17        Q.    State's Exhibit Number 60.

18             MR. REYES:  May I approach, Your Honor?

19             THE COURT:  You may.

20             MR. REYES:  May the witness leave the

21   witness stand, Your Honor?

22             THE COURT:  Yeah, he may step down.

23        Q.    (BY MR. REYES)  This is what was marked as

24   State's Exhibit Number 60, Officer.  Can you scoot over

25   so the jury members can see?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    289

```
1        A.    I'm sorry.

2        Q.    Is that correct?

3        A.    That is correct.

4        Q.    And you testified that that was the hole that

5    was dug and you found some money in it; is that correct?

6        A.    That's correct.

7        Q.    What residence did you find that money in?

8        A.    The Franco residence.

9        Q.    And who are they related to?

10        A.    To Rene Garcia.

11        Q.    And how much money was found in that hole?

12        A.    $56,000.

13        Q.    You talked about a chicken coop earlier; is

14    that correct?

15        A.    That's correct.

16        Q.    Is that the same location that you're talking

17    about?

18        A.    Yes, sir.

19        Q.    Go ahead and take a seat.

20        A.    (Witness complies).

21        Q.    Before you talked to Ruben Gutierrez, you had

22    already talked to Rene Garcia and Pedro Gracia; is that

23    correct?

24        A.    That is correct.

25        Q.    So they had told you -- they had given you some
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    290

1    information; is that correct?

2        A.    That is correct.

3                MR. REYES:  May I approach again, Your

4    Honor?

5                THE COURT:  You may.

6        Q.    (BY MR. REYES)  I'm going to show you what has

7    been marked and admitted into evidence as State's Exhibit

8    Number 45.

9                MR. BLAYLOCK:  It's over here.

10       Q.    (BY MR. REYES)  This is the statement in which

11   you testified earlier.  You told us that Sandra Galvan

12   had continued questioning Ruben Gutierrez; is that

13   correct?

14       A.    That is correct.

15       Q.    And this is the statement that has different

16   information from the statement that's dated the same

17   time; is that correct?

18       A.    That is correct.

19       Q.    And the same date?

20       A.    Yes, sir.

21       Q.    Now, isn't it true that up here where it says,

22   "I, Ruben Gutierrez, having been warned by

23   Detective Antonio Flores," that has your name on it; is

24   that true?

25       A.    That's true.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    291

1       Q.   But the office -- but never on there does it

2   state that Sandra Galvan ever read him his Miranda

3   rights; is that correct?

4       A.   That is correct.

5       Q.   I want you to look at that last page on State's

6   Exhibit Number 45, Officer.   You had him initial every

7   single paragraph; is that true?

8       A.   Yes.

9       Q.   But when you look at that last sentence, it

10  says, "I have read this statement and I find it to be

11  true and correct to the best of my knowledge."   It

12  doesn't have his initials on there; is that true?

13      A.   That is correct.

14      Q.   You talked about being familiar with the

15  Miranda warnings; is that correct?

16      A.   Yes, sir.

17      Q.   And what you're telling the ladies and the

18  gentlemen of this jury is that you don't know that you're

19  required to take a person before a magistrate to have him

20  what's called arraigned?   You're telling us that you

21  don't know that?

22      A.   That he has to be taken to be arraigned?

23      Q.   Before a magistrate to get arraigned.

24      A.   Yes, sir.

25      Q.   You're telling us that you're not -- that you

1    don't know that you're required to do that?

2        A.   I do know about it.

3        Q.   Okay.  And what's the answer?  Are you required

4    to take somebody before a magistrate or not?

5        A.   He's taken before a magistrate, you know, after

6    he gets arrested, maybe the following day when the

7    magistrate's there.  Yes, sir.

8        Q.   Okay.  And the purpose of taking that person

9    before a magistrate is that that Judge can read that

10    person his Miranda rights; is that correct?

11        A.   That is correct.

12        Q.   So earlier when you testified that you're not

13    required to do that, you were mistaken?

14        A.   Not when it says on the waiver of rights that

15    we were talking about at that time.

16        Q.   But isn't it correct that the code, a police

17    officer's required to take a person before a magistrate?

18        A.   That is correct.

19        Q.   And the purpose of taking that person before a

20    magistrate is that that Judge can give that person their

21    Miranda rights; is that correct?

22        A.   It tells them what they're arrested for, yes,

23    sir.

24        Q.   Okay.  And isn't it --

25                MR. BLAYLOCK:  I object to this.  This is

STATE OF TEXAS VS. RUBEN GUTIERREZ                    293

1    totally misleading.  I again ask the Court to instruct

2    the jury on the law and the sequencing that's required.

3              THE COURT:  That one of the purposes,

4    counsel.  You can handle that on redirect.

5         Q.   (BY MR. REYES)  Now --

6              THE COURT:  That's one of the purposes,

7    counsel, not the purpose.

8              MR. REYES:  May I proceed, Your Honor?

9              THE COURT:  You may.

10        Q.   (BY MR. REYES)  You testified that you talked

11   to Ruben Gutierrez on September the 9th of 1998; is that

12   correct?

13        A.   That is correct.

14        Q.   And you never took him before a magistrate; is

15   that correct?

16        A.   That is correct.

17        Q.   You testified that you talked to him on

18   September the 13th of 1998; is that true?

19        A.   That is correct.

20        Q.   And you never at all on that day took him

21   before a magistrate; is that correct?

22        A.   That is correct.

23        Q.   Did you take him to a magistrate any day

24   between September the 9th and September the 13th of 1998?

25        A.   I personally didn't.

1              MR. REYES:  I'll pass the witness, Your

2    Honor.

3                    **REDIRECT EXAMINATION**

4    **BY MR. BLAYLOCK:**

5         Q.   To clear up this magistrate thing, you take --

6    when do you in the normal course of business take a

7    prisoner before a magistrate?

8         A.   If the person is arrested during the day, the

9    normal course of it happening is the following day in the

10   morning when he's being arraigned by the Judge along with

11   every other prisoner that was picked up by the police

12   department.

13        Q.   Okay.  And what does the Judge do when you're

14   there?

15        A.   The Judge goes ahead and advises the prisoner

16   what he's being charged with.  He goes ahead and reads

17   him his rights; and then he sets a bond on him or --

18        Q.   Okay.  Is that required before you talk to

19   people about a crime?

20        A.   No, sir.

21        Q.   It's absolutely not, is it?

22        A.   No, sir.

23        Q.   And if it were required, would that come up the

24   system -- could you be able to work as a police officer?

25              MR. REYES:  I'm going to object, Your

1   Honor.  It calls for speculation, legal conclusion.

2                   THE COURT:  Overruled.

3        A.   No.

4        Q.   (BY MR. BLAYLOCK)  Wouldn't that -- if you had

5   to wait to talk to people, wouldn't that cause a problem?

6        A.   Yes, sir.

7        Q.   And you're familiar with Miranda.  It doesn't

8   envision only judges reading those rights, does it?

9        A.   That is correct.

10       Q.   It envisions police officers reading those

11  rights before they talk to people?

12       A.   That is correct.

13       Q.   And is that exactly what you did?

14       A.   Yes, sir.

15       Q.   You complied with that law?

16       A.   Yes, sir.

17       Q.   All right.  Now, let's go with State's

18  Exhibit 45.  He initialed every paragraph, right?

19       A.   That is correct.

20       Q.   Except that one at the very end where he

21  says -- he didn't initial it?

22       A.   That is correct.

23       Q.   But what did he do?

24       A.   He went ahead and signed it.

25       Q.   So he didn't initial every paragraph.  The last

1    one, he signed off after it.  Is that a big distinction?

2         A.   No, sir.

3         Q.   And when he took you out -- after he gave these

4    self-serving statements and took you out and showed you

5    where everything is, what was your impression?

6         A.   My impression was that he was stating that he

7    got this information from a third person, but yet he was

8    leading us exactly to the location where these items

9    could be found.

10        Q.   Did this indicate to you that he had some sort

11   of specialized knowledge of right where it was?

12        A.   Yes.

13        Q.   Is that consistent with what he was saying?

14        A.   Yes.

15        Q.   Is that consistent with what he was saying,

16   that he got --

17        A.   Oh, no.  No, it isn't.  About him getting it

18   from a third person, no, it isn't.

19        Q.   All right.  Now, as far as State's Exhibit 44

20   and 45, I didn't have you read verbatim from both of

21   them, but is this -- are both of these exactly the same

22   statement except for that extra part that you read?

23        A.   That is correct.

24        Q.   Okay.  And that extra part has got to do with

25   Avel Cuellar, right?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    297

```
 1        A.    That is correct.
 2        Q.    Did you force him to give that information on
 3   Avel?
 4        A.    No, sir.
 5        Q.    Was he doing it voluntarily?
 6        A.    Yes, sir.
 7        Q.    He wanted to talk some more about Avel?
 8        A.    Yes, sir.
 9        Q.    Okay.  What does robbery mean?
10              MR. REYES:  Objection, Your Honor.  It
11   calls for a legal conclusion.
12              THE COURT:  It's overruled.
13        Q.    (BY MR. BLAYLOCK)  You're a police officer,
14   right?
15        A.    Yes, sir.
16        Q.    What is a robbery?
17        A.    Robbery is when someone takes something from
18   another person, either by force, by threat or by
19   injury --
20        Q.    Okay.
21        A.    -- without the person's consent.
22        Q.    Do you have to take it right off their person
23   or can you get it out of a cash register, for example?
24        A.    Yes, sir.
25        Q.    So in the course of committing a theft, if you
```

1    hurt somebody, is that a robbery?

2         A.   Yes, sir.

3         Q.   Okay.  And was Ms. Harrison hurt?

4         A.   Yes, she was.

5         Q.   And was there a theft?

6         A.   Yes, sir.

7              MR. BLAYLOCK:  I'll pass the witness.

8                  **RECROSS-EXAMINATION**

9    BY MR. REYES:

10        Q.   So you're not familiar, Detective Flores, with

11   the fact that a magistrate -- the purpose of taking a

12   person before a magistrate, as is stated in

13   Article 15.14, is so that way he can read him his rights.

14   You're familiar with it?

15        A.   Correct.

16        Q.   And are you familiar with the fact that that

17   article also requires that magistrate to allow that

18   person that's before him sufficient time to consult with

19   an attorney?  Are you familiar with that?

20        A.   Yes, sir.

21        Q.   Okay.  So you would agree with me that if --

22   that it's important that a person be taken to a

23   magistrate so that the letter of the law will be

24   followed; is that correct?

25        A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          299

1     Q.   And if the law allows that magistrate -- or
2   requires a magistrate to let that person consult with an
3   attorney, you would agree with me that that is
4   important --
5     A.   That is correct.
6     Q.   -- right?  With respect to State's Exhibit
7   Number 44 and State's Exhibit Number 45, isn't it correct
8   that those two statements have the same exact date?
9     A.   Yes, sir.
10    Q.   They were given on the same date?
11    A.   Yes, sir.
12    Q.   And isn't it correct that those statements also
13  have the exact time on them?
14    A.   Yes, sir.
15         MR. REYES:  I'll pass the witness, Your
16  Honor.
17                 **REDIRECT EXAMINATION**
18  **BY MR. BLAYLOCK:**
19    Q.   Back to this magistrate thing, you're familiar
20  with Article 15, the whole article in the Code of
21  Criminal Procedure?
22    A.   Not the whole article verbatim, no, I'm not.
23    Q.   Okay.  It's got to do with magistrates and
24  setting bonds.  Did you violate the law in any way by
25  following Miranda and taking a statement?

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    300

```
 1               MR. REYES:  Objection.
 2      A.   No, sir.
 3               MR. REYES:  It calls for a legal
 4  conclusion.
 5               THE COURT:  Overruled.
 6      A.   No, I didn't, sir.
 7      Q.   (BY MR. BLAYLOCK)  All right.  And were you
 8  doing your job just like you always do?
 9      A.   Yes, sir.
10      Q.   Okay.  And as far as these statements, again,
11  they were taken one right after the other?
12      A.   That is correct.
13      Q.   And they're exactly the same except he wanted
14  to add on a little bit more about Avel in the second
15  statement?
16      A.   That is correct.
17      Q.   Is that why they have the same date and time on
18  them?
19      A.   Yes, sir, the time being the time that his
20  rights were read and which he signed on the waiver.
21      Q.   Okay.
22               MR. BLAYLOCK:  Nothing further.
23               MR. REYES:  May I proceed, Your Honor?
24               THE COURT:  Go ahead.
25
```

RECROSS-EXAMINATION

BY MR. REYES:

    Q.    Officer -- Detective Flores, if I were to go up to you right now and I were to hit you on your head several times, I would have violated the law; is that correct?

    A.    Yes, sir.

    Q.    I committed an assault upon you; is that correct?

    A.    Yes, sir.

    Q.    So when Detective David Garcia was hitting Avel Cuellar on the head, he was violating the law; is that correct?

    A.    Yes, sir.

         MR. REYES:  I'll pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MR.BLAYLOCK:

    Q.    Okay.  Let's go back to Avel.  Now, you said Avel was intoxicated, right?

    A.    Yes, sir.

    Q.    And did he actually hit him or what -- what was going on?  Tell them again.

    A.    He was --

         MR. REYES:  I would object, Your Honor.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    302

1   That question has already been asked and answered.

2                    THE COURT:  You brought it up again,

3   counsel.  Go ahead.

4        Q.   (BY MR. BLAYLOCK)  Go ahead.

5        A.   He was tapping him on his head saying, "Think,

6   think, think about what happened.  Think about what you

7   did."

8        Q.   Okay.  And --

9                    MR. BLAYLOCK:  I'll pass the witness.

10                   MR. REYES:  Nothing further, Your Honor.

11                   THE COURT:  All right.  You may step down.

12                   THE WITNESS:  Thank you, sir.

13                   THE COURT:  You may call your next

14  witness.

15                   MR. BLAYLOCK:  The State would call

16  Detective Rey Pineda.

17                   THE COURT:  Raise your right hand, please.

18                   **(The witness was sworn in by the Court)**

19                   THE WITNESS:  I do.

20                   THE COURT:  You may be seated.

21                   You may proceed.

22                   MR. BLAYLOCK:  Thank you.

23

24

25

1                          **REY PINEDA,**

2      having been first duly sworn, testified as follows:

3                      **DIRECT EXAMINATION**

4   **BY MR. BLAYLOCK:**

5          Q.    Good afternoon, Detective Pineda.  Would you

6   state your full name for the jury?

7          A.    Rey Pineda.

8          Q.    And how are you employed?

9          A.    I'm a police officer for the City of

10  Brownsville assigned to the criminal investigations

11  division.

12         Q.    How long have you been a police officer?

13         A.    Seventeen years.

14         Q.    And how long have you been assigned to criminal

15  investigations?

16         A.    Since '91, about eight years.

17         Q.    Okay.  You've been a detective a long time?

18         A.    Yes, sir, eight years.

19         Q.    And what were you doing before you were a

20  detective?

21         A.    I was assigned to the uniformed services.

22         Q.    Patrol?

23         A.    Yes, sir.

24         Q.    All right.  Let's go right to September 1998.

25  Were you a detective?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          304

```
 1        A.   Yes, sir.

 2        Q.   Were you assigned to work on a murder that

 3   occurred on Morningside?

 4        A.   I was asked to assist, yes, sir.

 5        Q.   Okay.  And who were you asked to assist?

 6        A.   Detective Tony Flores.

 7        Q.   Okay.  And what did you do the first time you

 8   got involved with that case?

 9        A.   On that occasion, I was asked to assist in the

10   interview of Mr. Ruben Gutierrez.

11        Q.   All right.  And that was on what date?

12        A.   September -- the beginning of September, about

13   the 9th, 10th.

14        Q.   Would it help if you reviewed your statement?

15        A.   Yes, sir.

16             MR. BLAYLOCK:  May I approach, Judge?

17             THE COURT:  You may.

18        Q.   (BY MR. BLAYLOCK)  Has it been a while since

19   you reviewed your statement?

20        A.   Yes, sir.

21             It was September the 9th, 1998.

22        Q.   All right.  Now, do you know anything about

23   Ms. Harrison?

24        A.   That she was an 85-year-old female living by

25   herself in the trailer park.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                      305

1      Q.   Okay.  Is that trailer park in Brownsville?

2      A.   Yes, sir.

3      Q.   Is that in Cameron County, Texas?

4      A.   Yes, sir.

5      Q.   All right.  Now, tell me what went on in that

6  interview on September 9th, the first thing you did in

7  this case.

8      A.   We had -- I guess the investigators had

9  received information that --

10           MR. REYES:  Objection, Your Honor.  It

11  calls for hearsay.

12           THE COURT:  Overruled.

13      A.   They had received information that

14  Mr. Gutierrez had been seen in the area.

15      Q.   (BY MR. BLAYLOCK)  Okay.  Is Mr. Gutierrez in

16  this courtroom?

17      A.   Yes, sir, he is.

18      Q.   Will you point him out and describe his clothes

19  for me?

20      A.   He's the young man sitting there with the white

21  shirt, red tie, little moustache.

22           MR. BLAYLOCK:  Judge, may the record

23  reflect he's identified the defendant?

24           THE COURT:  It shall reflect.

25      Q.   (BY MR. BLAYLOCK)  Okay.  Go ahead with what

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    306

1   you saw.

2        A.   Mr. Gutierrez was brought in that afternoon by

3   Detective Flores.

4        Q.   Okay.  Did you ask him what he had been doing

5   that weekend?

6        A.   We had asked him in reference to that weekend,

7   yes, sir.

8        Q.   Okay.  Did he give you an answer?

9        A.   He had started giving us a statement as to --

10  that he had been riding around with some friends.

11       Q.   On Saturday?

12       A.   Yes, sir.

13       Q.   Okay.  And did you say anything to him?

14       A.   Yes, sir.  We told him that we had information

15  that he had been --

16            MR. REYES:  Judge, I'm going to object.

17  It's hearsay and it's also cumulative.  It's repetitive.

18            THE COURT:  Overruled.

19       A.   That he had been seen in the area by witnesses.

20       Q.   (BY MR. BLAYLOCK)  Okay.  Did you ask him if

21  he had his days confused about what day he was riding

22  around on?

23       A.   He's the one that told us that it was the day

24  before.

25            MR. REYES:  Objection, Your Honor.  It

PAM L. ESQUIVEL, CSR, RPR

1    calls for hearsay.

2                    THE COURT:  Overruled, counsel.

3        A.   He's the one that said that the witnesses had

4    their days confused.

5        Q.   (BY MR. BLAYLOCK)  Okay.  And did he keep

6    talking to you after that?

7        A.   After he gave us a name or so of the people

8    that he was with, he decided to terminate the interview.

9        Q.   Okay.  And you guys had read him his rights,

10   right?

11       A.   That is correct.

12       Q.   And Miranda requires you to read somebody their

13   rights?

14       A.   That is correct.

15       Q.   All right.  And you're a police officer, right?

16       A.   That's correct, sir.

17       Q.   You're not a judge?

18       A.   No, sir.

19       Q.   Okay.  So it's okay for police officers to read

20   people their rights and then ask them questions?

21       A.   Yes, sir.

22       Q.   Is it done every day?

23       A.   Well, when he's a suspect --

24       Q.   I mean just in your normal course of your job,

25   is that done every day?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    308

1        A.    Just about, yes, sir.

2        Q.    Okay.  So you had read him his rights and he

3   signed off on them, right?

4        A.    That's correct sir.

5        Q.    And then he terminated the interview?

6        A.    Yes, sir.

7        Q.    All right.  So what did you do next?

8        A.    We went looking for the individuals that he had

9   mentioned.

10        Q.    All right.  And who were those individuals?

11        A.    I remember -- I recall one was named -- they

12   had called him El Chuco Maldonado --

13        Q.    Okay.

14        A.    -- Joey Maldonado.

15        Q.    Joey Maldonado?  Did you go out to Joey's

16   house?

17        A.    Yes, sir, we did.

18        Q.    What did you discover?

19        A.    We picked up Mr. Maldonado and he -- he gave a

20   statement.

21        Q.    And during your investigation with

22   Mr. Maldonado, what did you discover?  Was

23   Mr. Maldonado's statement to you consistent or

24   inconsistent with what Mr. Gutierrez had told you?

25        A.    They were kind of different, yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    309

```
1        Q.   In fact, they were different on different days,
2    right?
3                   MR. REYES:  Objection, Your Honor.
4    Counsel is leading his own witness.
5                   THE COURT:  Don't lead the witness,
6    counsel.
7        A.   He gave different versions when we brought him
8    in on different occasions.
9        Q.   (BY MR. BLAYLOCK)  All right.  And where did
10   your investigation lead you next?
11       A.   Our investigation led us to pick up these other
12   individuals, which also statements were secured from.
13   From there, we received a Crime Stopper's tip.
14       Q.   Before we go to that, these other individuals,
15   do you remember their names?
16       A.   I believe one was Trevino.
17       Q.   Okay.  George Trevino?
18       A.   Yes, sir.
19       Q.   Okay.
20       A.   There was another individual that I can't
21   really recall his name.
22       Q.   Let me refer --
23       A.   Alex Angeles, now that I looked on my --
24       Q.   Yeah.  Let me refer you to the fifth paragraph
25   on your statement.  Do you see Alex Angeles in there?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    310

1        A.   Yes, sir.

2        Q.   All right.  Now, these individuals gave

3   statements, too?

4        A.   Yes, sir.

5        Q.   Did you discover whether or not they had been

6   to Matamoros?

7        A.   We had no way of verifying that, only that they

8   said that they had been.

9             MR. REYES:  Objection, Your Honor.

10  Hearsay.

11            THE COURT:  I'll sustain on hearsay.

12       Q.   (BY MR. BLAYLOCK)  All right.  But -- go ahead

13  and tell me about the Crime Stopper's call.

14       A.   We had received a Crime Stopper's call that --

15            MR. REYES:  Objection, Your Honor.  It

16  calls for hearsay.

17            THE COURT:  It's overruled.

18       A.   That an individual by -- had been spending a

19  large amount of money.

20       Q.   (BY MR. BLAYLOCK)  What was his name?

21       A.   Rene Garcia.

22       Q.   Okay.  And did that report tell you that it

23  could be tied to the death of the old lady?  Or do you

24  remember?

25       A.   The Crime Stopper's tip, I just recall that

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          311

1   this guy was spending large amounts of money.  I don't

2   know if they referred to it as actually coming from the

3   Harrison incident.

4       Q.   All right.  And what did you do to follow up on

5   that tip?

6       A.   On that tip, we already -- for this certain

7   individual, Mr. Rene Garcia, we had a warrant -- a

8   warrant out for him already for theft by possession.  We

9   went out to the area where he lived in Southmost; and one

10  of the patrol uniformed services officer located him in

11  an alley, at which time he was taken into custody.

12      Q.   All right.  And was he interviewed?

13      A.   Yes, sir.

14      Q.   Did he give a statement on that day?

15      A.   No.  He may have given a statement later that

16  night.

17      Q.   You weren't there?

18      A.   No, sir.

19      Q.   All right.  What -- what were you involved in

20  on that?

21      A.   When we picked him up, we picked up -- he had

22  like two -- maybe about $2,000 on his person.

23      Q.   Okay.  And what else?

24      A.   After that we went back to his residence and we

25  asked him for a consent to search his residence; and we

STATE OF TEXAS VS. RUBEN GUTIERREZ                          312

1    located another 8,000.

2         Q.   Who gave consent to search his residence?

3         A.   He did.

4         Q.   And what other properties were at his

5    residence?

6         A.   We picked up items that he had recently

7    purchased; clothing, TV, stereos.

8         Q.   And any vehicles?

9         A.   We picked up the vehicle that he was in.

10        Q.   And did your investigation indicate where that

11   had come from?

12        A.   Our investigation led us that he had purchased

13   that vehicle for close to $6,000 cash.

14        Q.   Recent?

15        A.   Yes, sir.

16        Q.   All right.  And from your investigation with

17   Mr. Garcia, did it lead to any other names?

18        A.   Yes, sir.

19        Q.   Who?

20        A.   After he decided to talk about the incident, he

21   gave the name of Pedro Gracia and Ruben Gutierrez.

22        Q.   And did you go to Pedro Gracia's?

23        A.   Yes, sir, we did.

24        Q.   What happened there?

25        A.   At that time he was brought in to the station.

1    He had also had just recently purchased new vehicles.
2    We --
3        Q.   Did you seize those vehicles?
4        A.   Yes, we did.  After he was read his rights and
5    everything, he also provided a statement to the
6    investigators and turned over a large amount of cash.
7        Q.   Okay.  And did you go out to get that cash?
8        A.   Yes, sir, I did.
9        Q.   Where was it located?
10       A.   It was on -- he was moving residence at the
11   time.  It was on Browne Road.  I can't recall the exact
12   address.
13       Q.   Okay.  And where was the money located inside
14   the residence?
15       A.   It was hidden inside a sofa.
16       Q.   Okay.
17            MR. BLAYLOCK:  May I approach, Judge?
18            THE COURT:  You may.
19       Q.   (BY MR. BLAYLOCK)  I'm showing you what's been
20   marked as Exhibits 40 and 41.  Do these depict the scene
21   as you saw it that day?
22       A.   Yes, sir.
23       Q.   Do you remember how much money you got from
24   Pedro?
25       A.   The cash alone was like 11,000, a little over

1    11,000.

2                    MR. BLAYLOCK:  I move to admit Exhibits 40

3    and 41.

4                    MR. REYES:  We have no objection, Your

5    Honor.

6                    THE COURT:  They'll be admitted into

7    evidence.

8                    **(State's Exhibit Numbers 40 and 41**

9                    **admitted)**

10        Q.   (BY MR. BLAYLOCK)  Okay.  Tell the jury what

11   40 and 41 depict.

12        A.   Number 40 would be the -- this is the front

13   door of the apartment that he's moving in; and this is

14   the sofa.  We got on this side of the sofa to take a

15   picture of it.

16        Q.   Okay.  The front door is in the far background,

17   right?

18        A.   Yes, sir.

19        Q.   And he was just moving into this place?

20        A.   Yes, sir.

21        Q.   Okay.  That's where the sofa was inside his new

22   apartment?

23        A.   Yes, sir.

24        Q.   Now, what does 41 show?

25        A.   As he opened up the pillow case -- one of the

1   pillow sofas, and he opened up and there was the money

2   that was hidden inside the sofa.

3        Q.   A cushion?

4        A.   A cushion.

5        Q.   All right.  And he gave you consent and showed

6   you where it was?

7        A.   That's correct.

8        Q.   Did your investigation indicate where this

9   money had come from?

10       A.   That was believed to have come from the

11  Harrison residence.

12       Q.   From your investigation with Mr. Pedro Gracia,

13  were any other names followed up on?

14            MR. REYES:  Objection, Your Honor.  It

15  calls for hearsay.

16            THE COURT:  Overruled.

17       A.   He implicated Ruben Gutierrez and Rene Garcia.

18       Q.   (BY MR. BLAYLOCK)  All right.  So you get the

19  money from Pedro Gracia.  What do you do after that?

20       A.   Well, after we seize the vehicles, then we

21  start looking for Mr. Gutierrez.

22       Q.   Did you find him or did you get a warrant

23  first?

24       A.   There was a warrant obtained, issued for him.

25       Q.   All right.  The warrant was after you had

1    talked to Rene Garcia?

2        A.    I think after we corroborated the evidence that

3    we had and then we obtained the warrant.

4        Q.    All right.  Okay.  So, did you find

5    Mr. Gutierrez?

6        A.    He was located, yes, sir.

7        Q.    Where at?

8        A.    I believe he was located at a washateria.  I

9    didn't locate him.  Some of the other uniformed officers

10   and Detective Flores located him.

11       Q.    Okay.  So you weren't there for the arrest?

12       A.    No, sir.

13       Q.    All right.  Well, then, tell me what your next

14   involvement is.

15       A.    Next involvement, my part was I was waiting in

16   my office; and they obtained information from

17   Mr. Gutierrez on his statement.

18       Q.    So you were a witness to a statement?

19       A.    Yes, sir.

20       Q.    Okay.  And --

21       A.    Well, no, sir.  I take that back.  I'm sorry.

22   I had nothing to do with the statement.  The information

23   that they obtained I assisted in going after.

24       Q.    Okay.  So, do you know which detective talked

25   to Mr. Gutierrez?

1        A.    Detective Flores.

2        Q.    Okay.  You weren't there?

3        A.    No, sir.

4        Q.    Well, how did Detective Flores come -- how did

5   he get to you?

6        A.    He came out after he took the statement.

7        Q.    And was Sergeant Galvan, Sandra Galvan a

8   witness to the statement?

9        A.    I believe so.

10       Q.    Okay.  And when they came out of taking that

11  statement, what did they want you to do?

12       A.    They wanted me to go with them and as --

13  because he was cooperating with the investigation.

14       Q.    Okay.  And tell the jury what happened.

15       A.    From that point, Mr. Gutierrez went with us and

16  he showed us the route that they had taken after Mrs. --

17  they left Mrs. Harrison's residence that afternoon.

18       Q.    Okay.  And describe for the jury in words what

19  route they took.

20       A.    They left the Harrison Trailer Park.  They got

21  into Pedro Gracia's truck.  They drove down Morningside.

22  At one point they threw out a screwdriver, which he said

23  was a screwdriver.  And then he took us to a wooded area

24  on California Road where he pointed out where a suitcase

25  was thrown and the money divided up.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          318

1      Q.    All right.  Now, did you get out of the car

2  when they stopped at the resaca where the wooded area

3  was?

4      A.    Yes, sir, I did.

5      Q.    Okay.  And did you go look for the suitcase?

6      A.    Yes, sir, I did.

7      Q.    Okay.  Did you find it?

8      A.    I didn't find it at first, no, sir.

9      Q.    Well, tell me how it all took place.

10     A.    Well, we pulled up to the area; and he pointed

11  out the area.  He said, "It's right here where we threw

12  out the suitcase."

13     Q.    Okay.  Was he saying, "We did it," or did he

14  say, "Somebody told me that they did it"?

15     A.    He might have said -- he might have said

16  something different than what I'm saying, but what I

17  recall is that he said, "Here's where they threw it" or

18  "We threw it."  I'm not sure.

19     Q.    All right.  And did you get out of the car?

20     A.    Yes, sir, I did.

21     Q.    And did you go look for it?

22     A.    Yes, sir, I did.

23     Q.    Tell the jury what happened.

24     A.    I went in looking through this wooded area.

25  And in about five minutes they were calling me back,

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    319

1   Detective Flores and Mr. Gutierrez; and they tell me that
2   I was searching in the wrong place.
3       Q.   Okay.  And where -- did they point out a new
4   place to you?
5       A.   Well, Mr. Gutierrez at that time was already
6   out of the vehicle, and he was standing next to the fence
7   pointing to the area where the suitcase -- where I
8   located the suitcase.
9       Q.   Okay.  Could you have seen that suitcase from
10  the road?
11      A.   No, sir.
12      Q.   And you couldn't see it when you got out of the
13  car and approached the area?
14      A.   No, sir.
15      Q.   All right.  But he pointed you right to it?
16      A.   That's correct.
17      Q.   And what did you do once you had the
18  information?
19      A.   Oh, after I saw the suitcase there, I was able
20  to -- I got the camera kit, took photographs of the
21  suitcase, the items that were around that suitcase, and
22  collected it.
23      Q.   All right.  Well, describe for us what the
24  suitcase looked like.
25      A.   It was a blue old suitcase.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    320

1        Q.   And what were the items that were around it?
2        A.   They were like -- there was some old bands of
3   money, some folders.
4        Q.   Old bands of money?  What do you mean?
5        A.   You know like the $20 or something like that,
6   little wrappings.
7        Q.   Oh, okay.  So there wasn't money; there was
8   just wrappings of money?
9        A.   Right.
10       Q.   Okay.  What else?
11       A.   I found a little piece of paper with a name of
12  "Ruben owes me --" with Ruben's name --
13       Q.   Okay.
14       A.   -- a Ruben's name.
15       Q.   A Ruben?
16       A.   Yeah.  "Owes me $50," something like that.
17       Q.   Anything else?
18       A.   No, sir, I can't recall.
19       Q.   Okay.  But you photographed it all?
20       A.   Yes, sir.
21       Q.   And did you all take possession of that blue
22  suitcase?
23       A.   That's correct.
24       Q.   All right.
25                 MR. BLAYLOCK:  If I may approach?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              321

1        Q.   (BY MR. BLAYLOCK)   I just want to show you
2    something.  Does this look familiar?
3        A.   Yes, sir.
4        Q.   What is it?
5        A.   That's the suitcase that was located on
6    California Road.
7        Q.   Does it have anybody's name on it?
8        A.   Well, that side says, "Roberto A. Harrison."
9        Q.   Okay.  Did you take possession of the other
10   things that were found?
11       A.   Yes, sir.
12       Q.   Were they wet or dry?
13       A.   They were wet.
14       Q.   What was the weather like at that time during
15   September?
16       A.   I believe it had rained.
17       Q.   All right.  In fact, let me refer you to your
18   statement.  The end of the fourth paragraph, what does
19   that mean there?
20       A.   That we weren't able to do a lot because there
21   was a storm watch that night.
22       Q.   Okay.  So it had rained?
23       A.   Yes, sir.
24       Q.   And what's the date of that?
25       A.   9/10.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    322

```
 1        Q.    September 10th?

 2        A.    '98.

 3        Q.    Okay.  And what was the weather like through

 4   this whole period of early September, do you remember?

 5        A.    No, sir, I can't recall.

 6        Q.    Did you search that field where Mr. Gutierrez

 7   had told you that the weapon had been thrown?

 8        A.    Yes, sir.

 9        Q.    You spent some time out there?

10        A.    Yes, sir.

11        Q.    About how long?

12        A.    We sure did.  Like a day and a half.

13        Q.    A long time?

14        A.    Yes, sir.

15        Q.    Okay.  What all -- how many people had searched

16   that area?

17        A.    We brought in officers from another agency to

18   assist us.  And I'd say there was like 20, 20 guys out

19   there searching for that screwdriver.  We even brought in

20   the dogs.

21        Q.    Dogs?  Were there metal detectors?

22        A.    And metal detectors.

23        Q.    Okay.  This was some time after the murder,

24   right?

25        A.    That's correct.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    323

```
 1        Q.    Do you know what date the murder took place?
 2        A.    No, sir.
 3        Q.    Do you know what date the body was found?
 4        A.    I would say it was -- I was off that weekend.
 5   So I would say it was probably on the 8th.  I'm not sure.
 6        Q.    Okay.  If Sunday was the 6th, would that ring a
 7   bell with you?
 8        A.    Well, if you told me Sunday the 6th, I guess
 9   it's that day.
10        Q.    Okay.  But you got involved in this
11   investigation on what day?
12        A.    On the 9th.
13        Q.    And what day was that?
14        A.    If Sunday was the 6th, 7th, 8th.  Wednesday,
15   Tuesday.
16        Q.    All right.  Well, tell me what you did next
17   after you found the blue suitcase.
18        A.    After that, Mr. Gutierrez was taken back.
19   After, it seized and I booked it in.  We had to air dry
20   it -- I mean, let it dry out in the room because it stunk
21   so bad.
22        Q.    All right.  Tell me what happened next.
23        A.    Let me see.  After that, I believe we
24   received -- we had information that this Juan Pablo
25   Campos had some money from the homicide.
```

1        Q.    And do you know how Juan Pablo Campos is
2    related to Ruben Gutierrez?
3        A.    I think his wife's cousin.  They're cousins
4    somehow, his wife and his wife or something like that.
5        Q.    Did you seize a vehicle from Ruben Gutierrez?
6        A.    Yes, sir.
7        Q.    And who was the owner of the vehicle that you
8    seized?
9        A.    Juan Pablo Campos.
10       Q.    Did you receive any information about how Ruben
11   came to be in possession of that vehicle?
12              MR. REYES:  Objection, Your Honor.  It
13   calls for hearsay.
14              THE COURT:  Overruled.
15       Q.    (BY MR. BLAYLOCK)  You can answer.
16       A.    He came -- he purchased that vehicle from Juan
17   Pablo.
18       Q.    Okay.  What kind of a vehicle was it?
19       A.    It was a Ford Bronco.
20       Q.    Okay.  And do you know how much he paid for it?
21       A.    6,000 cash.
22       Q.    And when you followed up on the information
23   with Juan Pablo Campos, did you discover if he had any
24   money?
25       A.    Yes.  He later was brought in on a -- he was

STATE OF TEXAS VS. RUBEN GUTIERREZ                    325

1    found to have some outstanding traffic tickets that he

2    hadn't paid.  And he was brought in, and he was found to

3    be in possession of like a thousand something dollars

4    worth of money, money cash on him, which he then stated

5    that he --

6                    MR. REYES:  Objection, Your Honor.  It

7    calls for hearsay.

8                    THE COURT:  Sustained.

9         Q.   (BY MR. BLAYLOCK)  Did you discover where that

10   money had come from?

11                   MR. REYES:  It calls for hearsay, Your

12   Honor.

13                   THE COURT:  Overruled.

14        Q.   (BY MR. BLAYLOCK)  Did you discover that --

15        A.   From the Harrison's.

16        Q.   Okay.  And did -- was there any more money that

17   you were led to?

18        A.   Juan Pablo took us to an aunt's house by the

19   name of Bennett on Acapulco Street --

20        Q.   Okay.

21        A.   -- where she turned over a substantial amount

22   of money.

23        Q.   Why did Juan Pablo take you to his aunt's

24   house?

25        A.   To hide it.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    326

```
1          Q.   Okay.  He had hidden some money there?
2          A.   Yes, sir.
3          Q.   Okay.  And how much money are we talking about?
4          A.   That was close to $50,000.
5          Q.   Okay.  And did Juan Pablo -- did your
6     investigation show where Juan Pablo Campos had gotten
7     that money?
8          A.   Yes, sir.
9          Q.   From who?
10              MR. REYES:  Objection, Your Honor.  It
11    calls for hearsay.
12              THE COURT:  Overruled.
13         A.   From Mr. Gutierrez.
14         Q.   (BY MR. BLAYLOCK)  Now, what -- let's back up
15    a little bit.  Before you go to Juan Pablo Campos, did
16    you receive any other evidence from anybody else?
17         A.   Yes, sir, we did.  Before the Juan Pablo
18    Campos -- I'm sorry.  We had received information from
19    Mrs. Garcia, Rene's mother, that she wanted to turn over
20    some money.
21              MR. REYES:  I'm going to object, Your
22    Honor.  It calls for hearsay.
23              THE COURT:  It's overruled.
24         Q.   (BY MR. BLAYLOCK)  Okay.  So the mother of
25    Rene Garcia indicated she would like to give you some
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    327

1    money?

2         A.    Exactly.

3         Q.    Okay.  And did she -- did she indicate where

4    that money had come from?

5         A.    Yes, that she had received it from Rene.

6         Q.    Rene Garcia?

7         A.    Yes, sir.

8         Q.    Okay.  And where did you go to collect that

9    money?

10        A.    We went to a house on California Road where the

11   brother-in-law lived, Franco.

12        Q.    Okay.  And Franco is a relative to Rene Garcia?

13        A.    They're brother-in-laws, I think.

14        Q.    Okay.  And where was the money located on that

15   property?

16        A.    It was in the back in one of the livestock pens

17   back in the back, like a chicken coop or something like

18   that.  He had buried it.

19        Q.    Did you have to dig it up?

20        A.    Yes.

21        Q.    How much did that turn out to be?

22        A.    It came out -- that was over $50,000.

23        Q.    And did Mr. Garcia confirm where that money had

24   come from?

25        A.    Yes.  That was part of Harrison, from the

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              328

1    Harrison incident.
2         Q.   All right.  Now, do you know if any other
3    evidence was brought in by Angie Gutierrez?
4                   MR. REYES:  Objection, Your Honor.
5    Relevance.  It calls for hearsay.
6                   THE COURT:  Overruled.
7         Q.   (BY MR. BLAYLOCK)  I'm asking if you know if
8    Angie Gutierrez brought in any other evidence.
9         A.   Angie Gutierrez?
10        Q.   Yeah.  If you know.
11        A.   No, I don't.
12        Q.   Did -- do you know who Erika Martinez is?
13        A.   Yes.
14        Q.   And who is she?
15        A.   Rene Garcia's girlfriend.
16        Q.   Okay.  And do you know if Erika brought in any
17   evidence?
18        A.   Yes.
19        Q.   Okay.  What did she bring in?
20        A.   She brought in another vehicle that had been
21   purchased with money that was given to her by Rene, and
22   also jewelry.
23        Q.   What else?
24        A.   I don't know if she brought in some cash, a
25   little bit of cash.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              329

1       Q.   Did she -- did she bring anything else?

2       A.   I don't recall.

3            MR. BLAYLOCK:   May I approach the witness,

4  Judge?

5            THE COURT:   You may.

6       Q.   (BY MS. FISCHER)   Okay.  Now, when you were

7  riding around with -- is this the same Ruben Gutierrez

8  you're riding around with?

9       A.   Yes, sir.

10      Q.   Okay.  And you went on the route that was taken

11 when they left the Harrison residence.  Is that what you

12 said?

13      A.   Yes.

14      Q.   Okay.  Could you get off and get that pointer

15 right there?

16      A.   (Witness complies).

17      Q.   I'll refer you to State's Exhibit Number 59.

18           MR. REYES:   May I approach, Your Honor?

19           THE COURT:   You may.

20      Q.   (BY MR. BLAYLOCK)   What happened, Detective?

21      A.   I looked like Andy Griffith.

22      Q.   All right.  Step back so the jurors over there

23 can see.  And tell me, when you got involved in that

24 riding around with Ruben -- and who else was in the car?

25      A.   Detective Flores and Mr. Gutierrez.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          330

1        Q.   Tony Flores?

2        A.   Yes, sir.

3        Q.   All right.  And show me the route that you all

4   took.

5        A.   We started out here.  He showed us this way.

6   And right here he said that they threw out the

7   screwdriver.

8        Q.   All right.  I'll refer you to that photograph

9   down there.  Is that part of the field you searched?

10        A.   Yes.

11        Q.   The field is bigger than that, though, right?

12        A.   Yes, sir.

13        Q.   Okay.  And you looked all over that field?

14        A.   That's correct.

15        Q.   And then did you stop there?

16        A.   We stopped briefly; and he said, "It's around

17   here," and tried -- you know, like, "Right here."

18                  "Are you sure it's right here?"  And back

19   and forth.

20                  And he said, "Yes, I'm sure it's right

21   here, this piece of whatever."

22        Q.   Okay.  Did he indicate at all how it had gotten

23   into the field?

24        A.   He threw -- while they were driving by they

25   threw it out, threw it out of the truck.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          331

```
 1        Q.    Who threw it?
 2        A.    Well, he says Rene.
 3        Q.    All right.  And did you park about where -- do
 4   you see that vehicle in that picture?
 5        A.    That's correct.
 6        Q.    Whose car is it?
 7        A.    It looks like Detective Flores.
 8        Q.    So you parked right there?
 9        A.    Yes, sir.
10        Q.    Okay.  And then how long did you stay there?
11        A.    A few minutes, just, "Okay.  Are you sure it's
12   here?  Are you sure it's here?"
13              He said, "Yes," kept on saying, "Yes.  We
14   flung it out," or "Rene flung it out.  You're going to
15   find his prints on it."  Okay.  And then we --
16        Q.    All right.  Where did you go next?
17        A.    He took us down this road to this point right
18   here where they -- where the suitcase was located at.
19        Q.    All right.  Would you look at this photo?
20        A.    (Witness complies).
21        Q.    Were you able to see it like that?
22        A.    This is very, very, very hard.  You have to
23   look super close.
24        Q.    Okay.  So you weren't able to see it when you
25   first got out?
```

PAM L. ESQUIVEL, CSR, RPR

```
 1        A.    That's correct.
 2        Q.    And you were able to see it like this only
 3   after he pointed it to you?
 4        A.    Yes, sir.
 5              MR. REYES:  I'm going to object to counsel
 6   leading his own witness, Your Honor.
 7              THE COURT:  Don't lead your witness,
 8   counsel.  Let's proceed.
 9        Q.    (BY MR. BLAYLOCK)  All right.  From right
10   there after you found all these things, how long did you
11   spend at that spot?
12        A.    At that place, we stayed about a good 15, 20
13   minutes, maybe longer, because I had to collect
14   everything, take photographs.
15        Q.    All right.  And then where did you go from
16   there?
17        A.    From there, we went back to the station.
18        Q.    Okay.  What day -- what day was that?  Do you
19   need to look at your notes?
20        A.    That was the day that he was -- I'd better --
21   that was the same day that -- the same day.
22        Q.    That he had given his statement?
23        A.    Yes, sir.
24        Q.    And what's the date is what I'm asking.
25        A.    The 13th.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                333

1        Q.    13th, September 13th?

2        A.    Yes, sir.

3        Q.    Okay.  And what date did you go and dig up the

4   money at the California Road, 6900 California Road?

5        A.    14th.

6        Q.    The 14th, the next day?

7        A.    Yes, sir.

8        Q.    You can have your seat back.

9        A.    (Witness complies).

10             THE COURT:  All right.  Let's go ahead and

11   break for the day.  Ladies and gentlemen of the jury,

12   remember the instructions I've given you not to discuss

13   this case among yourselves or with anyone else, not to

14   form or express any opinions.  Stay away from all news

15   media coverage of the case, if any.  With those

16   instructions be back in the jury room tomorrow morning

17   before 9:00 so we can start at 9:00 with the testimony.

18             **(Proceedings recessed at 4:53 p.m.)**

19

20

21

22

23

24

25

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    334

1    THE STATE OF TEXAS:

2    COUNTY OF CAMERON:

3                **CERTIFICATE OF COURT REPORTER**

4

5        I, PAM L. ESQUIVEL, Official Court Reporter in and

6    for the 107th Judicial District Court of Cameron County,

7    State of Texas, do hereby certify that the above and

8    foregoing contains a true and correct transcription of

9    all portions of evidence and other proceedings requested

10   in writing by counsel for the parties to be included in

11   this volume of the Reporter's Record, in the

12   above-entitled and numbered cause, all of which occurred

13   in open court or in chambers and were reported by me.

14       I further certify that this Reporter's Record of the

15   proceedings truly and correctly reflects the exhibits, if

16   any, admitted by the respective parties.

17       WITNESS MY OFFICIAL HAND on this the 6th day of

18   December, 1999.

19                    *Pam L. Esquivel*
                    PAM L. ESQUIVEL, Texas CSR, RPR
20                   Official Court Reporter
                    107th District Court
21                   974 East Harrison Street
                    Brownsville, Texas 78520
22                   (956) 544-0874
                    Certificate No. 2369
23                   Expiration Date: 12/31/00

24

25

PAM L. ESQUIVEL, CSR, RPR