STATE OF TEXAS VS. RUBEN GUTIERREZ  1

REPORTER'S RECORD

VOLUME 19 OF 32 VOLUMES

TRIAL COURT CAUSE NO. 98-CR-1391-A

- - - - - - - - - - - - - - - x
                                :
THE STATE OF TEXAS              : IN THE DISTRICT COURT
                                :
VS.                             : 107TH JUDICIAL DISTRICT
                                :
RUBEN GUTIERREZ                 : CAMERON COUNTY, TEXAS
                                :
- - - - - - - - - - - - - - - x

JURY TRIAL

     On the 13th day of April, 1999, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Benjamin Euresti,
Jr., Judge Presiding, held in Brownsville, Cameron
County, Texas.

     Proceedings reported by machine shorthand.

                    A P P E A R A N C E S

APPEARING FOR THE STATE OF TEXAS:

          HON. JOHN T. BLAYLOCK
          State Bar No. 00784302
          HON. KAREN L. FISCHER
          Assistant District Attorneys
          State Bar No. 00790685
          Cameron County Courthouse
          974 East Harrison
          Brownsville, Texas   78520
          (956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS

DEC 8  1999

Troy C. Bennett, Jr., Clerk

ORIGINAL

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    2

1   APPEARANCES CONTINUED:

2   APPEARING FOR THE DEFENDANT:

3        HON. SANTIAGO GALARZA
         State Bar No. 00787508
4        Law Offices of Santiago Galarza
         3100 East 14th Street
5        Brownsville, Texas  78521
         (956) 541-4157
6
         AND
7
         HON. DANIEL R. REYES
8        State Bar No. 16794290
         Perez & Reyes
9        316 Nolana Loop
         McAllen, Texas  78504
10       (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                    i

VOLUME 19

TRIAL ON THE MERITS

APRIL 13, 1999

STATE'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Rey Pineda | 3 7 | 10 | 18 | --- | 5 | 19 |
| Merlin Rasco | 20 | 29 | 31 | --- | --- | 19 |
| Gilbert Garcia Jr. | 34 | 76 | 97 107 | 105 | --- | 19 |
| Juan Hernandez Jr. | 109 | 125 | --- | --- | --- | 19 |
| Ben Neece | 137 | 144 | --- | --- | --- | 19 |
| Juan Pablo Campos | 149 | 166 | --- | --- | --- | 19 |
| Erika Martinez Rosales | 183 | 205 | --- | --- | --- | 19 |
| Lawrence J. Dahm | 215 224 253 | 258 | 276 | 282 | 221 249 | 19 |

| | PAGE | VOL |
|---|---|---|
| State rested.................................283 | | 19 |
| Adjournment.................................284 | | 19 |
| Court Reporter's Certificate....................285 | | 19 |

ALPHABETICAL WITNESS INDEX

TRIAL ON THE MERITS

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Campos, Juan Pablo | 149 | 166 | --- | --- | --- | 19 |
| Dahm, Lawrence J. | 215 224 253 | 258 | 276 | 282 | 221 249 | 19 |
| Garcia, Gilbert Jr. | 34 | 76 | 97 107 | 105 | --- | 19 |
| Hernandez, Juan Jr. | 109 | 125 | --- | --- | --- | 19 |
| Neece, Ben | 137 | 144 | --- | --- | --- | 19 |
| Pineda, Rey | 3 7 | 10 | 18 | --- | 5 | 19 |
| Rasco, Merlin | 20 | 29 | 31 | --- | --- | 19 |
| Rosales, Erika Martinez | 183 | 205 | --- | --- | --- | 19 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                    ii

# INDEX OF EXHIBITS

## TRIAL ON THE MERITS

**STATE'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 62 | $49,700 | 5 | | |
| | | 27 | 28 | 19 |
| 63 | $56,000 | 5 | | |
| | | 25 | 25 | 19 |
| 63A | Plastic bag and duct tape | 9 | | |
| | | 25 | 25 | 19 |
| 64 | Photocopy of lineup | 44 | 45 | 19 |
| 65 | Waiver of Rights | 56 | 56 | 19 |
| 66 | Confession | 65 | 65 | 19 |
| 67 | Robe | 113 | 114 | 19 |
| 68 | Nightgown | 113 | 114 | 19 |
| 69 | Slip | 113 | 114 | 19 |
| 70 | Photograph | 118 | 118 | 19 |
| 71 | **List of Items | 136 | 136 | 19 |
| 72 | Magistrate Warnings | 139 | 139 | 19 |
| 73 | Autopsy Report | 253 | 253 | 19 |
| 74 | Death Certificate | 221 | 223 | 19 |
| 75 | Photograph | 229 | 229 | 19 |
| 76 | Photograph | 229 | 229 | 19 |
| 77 | Photograph | 229 | 229 | 19 |
| 78 | Photograph | 229 | 229 | 19 |
| 79 | Photograph | 229 | 229 | 19 |
| 80 | Photograph | 229 | 229 | 19 |
| 81 | Photograph | 229 | 229 | 19 |
| 82 | Photograph | 229 | 229 | 19 |
| 83 | Photograph | 229 | 229 | 19 |
| 84 | Photograph | 229 | 229 | 19 |
| 85 | Photograph | 229 | 229 | 19 |
| 86 | Photograph | 229 | 229 | 19 |
| 87 | Photograph | 229 | 229 | 19 |
| 88 | Photograph | 229 | 229 | 19 |
| 89 | Photograph | 229 | 229 | 19 |
| 90 | Photograph | 229 | 229 | 19 |
| 91 | Photograph | 229 | 229 | 19 |
| 92 | Photograph | 229 | 229 | 19 |
| 93 | (Unidentified) | --- | --- | --- |
| 94 | (Unidentified) | --- | --- | --- |
| 95 | Photograph | 244 | 244 | 19 |
| 96 | Photograph | 240 | 240 | 19 |
| 97 | (Unidentified) | --- | --- | --- |
| 98 | Preliminary Autopsy Report | 278 | 278 | 19 |

STATE OF TEXAS VS. RUBEN GUTIERREZ                                iii

1                         **INDEX OF EXHIBITS**

2                      **TRIAL ON THE MERITS**

3      DEFENDANT'S EXHIBITS:

4      NO.   DESCRIPTION                OFFERED    RECEIVED    VOL

5      2     Magistrate Warnings          ---        ---       19
       3     Preliminary Autopsy Report   ---        ---       19
6

7

8

9

10        **EXHIBIT ADMITTED FOR THE RECORD ONLY AND WAS NOT
                  SUBMITTED TO THE JURY**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS VS. RUBEN GUTIERREZ                                3

```
 1                    P R O C E E D I N G S
 2              (Open court, defendant present, no jury)
 3              THE COURT:  Okay.  Are you all ready for
 4   the jury?
 5              MR. BLAYLOCK:  We're ready, Judge.
 6              THE COURT:  Bring them in.
 7              (Jury brought into the courtroom)
 8              THE COURT:  All right.  You may be seated.
 9              Good morning, ladies and gentlemen of the
10   jury.
11              THE JURY:  Good morning.
12              THE COURT:  I think we're ready to begin.
13              You had the questioning?
14              MR. BLAYLOCK:  I do, Judge.
15              THE COURT:  You may proceed.
16                        REY PINEDA,
17     having been first duly sworn, testified as follows:
18              DIRECT EXAMINATION CONTINUED
19   BY MR. BLAYLOCK:
20       Q.   Mr. Pineda, Detective, I want to show you a
21   couple of things I got marked as State's Exhibit 62 and
22   63.
23              MR. BLAYLOCK:  Can I approach the witness,
24   Judge?
25              THE COURT:  You may.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    4

1      Q.   (BY MR. BLAYLOCK)  Will you look these things

2  over --

3                  MR. REYES:  Judge, I'm going to object to

4  counsel showing the exhibits to the jury before they're

5  admitted into evidence.

6                  THE COURT:  Overruled.

7      Q.   (BY MR. BLAYLOCK)  Can you look these over and

8  see if you can identify what these are?  Look at the

9  evidence tags that you have there.

10     A.   Do I remove it?

11     Q.   Go ahead and remove it if you have to.

12     A.   This first bag here that's marked State's

13  Exhibit 62 is money that we seized --

14                  MR. REYES:  I'm going to object, Your

15  Honor, to counsel -- I mean, to the witness testifying to

16  something that's not been admitted into evidence.

17                  THE COURT:  All right.  Just if you can

18  identify that.

19                  THE WITNESS:  Okay.

20     Q.   (BY MR. BLAYLOCK)  Can you identify --

21     A.   Yes, I can.

22     Q.   -- State's Exhibit 62?  Okay.  And how can you

23  identify it?

24     A.   The evidence tag has my name on it.  This is

25  money that we seized.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              5

```
 1        Q.    Okay.  Now, look at State's Exhibit Number 63.
 2   I'm going to ask you the same question.  Can you identify
 3   it?
 4        A.    Yes, sir.
 5        Q.    Okay.  And how can you identify it?
 6        A.    The evidence tag has my name on it.
 7        Q.    Were you the one who -- because your name is on
 8   the evidence tag, were you the one who seized these
 9   items?
10        A.    That's correct.
11              MR. BLAYLOCK:  I'm showing 62 and 63 to
12   defense counsel.
13              MR. REYES:  May I take this witness on
14   voir dire, Your Honor?
15              THE COURT:  Go ahead.
16                    VOIR DIRE EXAMINATION
17   BY MR. REYES:
18        Q.    Officer Pineda, what has been marked as State's
19   Exhibit 62, that's the money that you allegedly found at
20   Rene Garcia's house; is that correct?
21        A.    I'd have to look at it again.  I'm sorry.
22        Q.    There's two exhibits here.  One of them you
23   found at Rene Garcia's house; the other one you found at
24   Pedro Gracia's house.  Is that correct?
25        A.    No.
```

1    Q.   Okay.  Where did you find these two exhibits?

2    A.   If you'd let me look at it again.

3              MR. REYES:  May I approach, Your Honor?

4              THE COURT:  You may.

5    A.   This is money that was seized from Juan Pablo

6  Campos.

7    Q.   (BY MR. REYES)  Okay.  And then what about

8  State's Exhibit Number 63?

9    A.   This one was seized from Rene Garcia.

10    Q.   Okay.

11              MR. REYES:  Judge, we would object to

12  State's Exhibit Number 62 as to relevance.  Also, the

13  proper chain of custody has not been established.  As to

14  State's Exhibit Number 63, we would also object as to

15  relevance and the proper chain of custody has not been

16  established.

17              We would also object to the wrappings

18  which have writing on them; and the writing has not been

19  identified.  It's hearsay.  We would object.

20              THE COURT:  Let me see.

21              MR. BLAYLOCK:  Judge, I'm not moving to

22  admit these at this time.  I just want him to identify

23  them as the initiator in the chain of custody.

24              THE COURT:  Okay.  Well, they're not

25  offering them at this time.  You can make your objection

1    at the proper time.

2              MR. BLAYLOCK:  My next witness is the end

3    of the chain of custody.

4              THE COURT:  Okay.  Go ahead.

5              **DIRECT EXAMINATION CONTINUED**

6    **BY MR. BLAYLOCK:**

7        Q.   Now, sir, I want you to look over State's

8    Exhibit 62 and 63 and ask -- and my question is, are

9    these in the same condition as when you seized these

10   items?

11       A.   Pretty much.

12       Q.   Okay.  Could you look it over closer?  Look at

13   the evidence tags and look at the totals.  Is that the

14   totals that you wrote down?

15       A.   That's correct.

16       Q.   Okay.  And were those rubber bands on there

17   when you seized them?

18       A.   I believe they had paper clips.

19       Q.   Okay.  This one, Number 63, has paper clips.

20   Were those paper clips on there when you seized it?

21       A.   Yes.

22       Q.   Was it seized in that condition?

23       A.   It was -- they were wrapped up.  They're pretty

24   much exactly the way --

25       Q.   Okay.  And this other item that's in this bag,

STATE OF TEXAS VS. RUBEN GUTIERREZ                              8

```
1    what is this?
2         A.    Okay.  This was where the money was in when we
3    first located it.
4         Q.    Don't get dirt everywhere.  Why is there dirt
5    on this?
6         A.    Because this is the one that was buried.
7         Q.    Okay.  Now, what I'm asking you is, this money
8    was inside that wrapping?
9         A.    That's correct.
10        Q.    In other words, this is part of the exhibit?
11   When you seized this, it was inside that?
12        A.    Yes, sir.
13        Q.    Okay.  And is that in the same condition it was
14   after you opened it?
15        A.    After we opened it, yes, sir.
16        Q.    Okay.  Look at your evidence tag.  Where did
17   this brown paper bag come from?
18        A.    From P.D.
19        Q.    So you supplied the bag?
20        A.    Yes, sir.
21        Q.    Who tapes these evidence slips to the bag?
22        A.    Detective Merlin Rasco.  He's in charge of
23   the -- he's one of the ones that is in charge of the
24   evidence.
25        Q.    Okay.  Who filled out this evidence slip?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                               9

1       A.    I filled out this one.

2       Q.    Okay.  So it's got your initials on it?

3       A.    Yes, sir.

4       Q.    Is it in the same condition it was when you

5    filled it out?

6       A.    Yes, sir.

7       Q.    Okay.  And look at the totals, and then look at

8    the money.  Is it in the same condition as it was when

9    you filled out that evidence tag?

10       A.    Yes, sir.

11       Q.    Okay.  Will you place 63, all of State's

12    Exhibit 63 back in this bag for me?

13       A.    (Witness complies).

14             MR. BLAYLOCK:  And again, just for the

15    record, I'm going to go ahead and -- Judge, for the

16    record, I'm going to mark these plastic bags and duct

17    tape as State's Exhibit 63A.

18       Q.    (BY MR. BLAYLOCK)  Can you identify what's now

19    been marked as State's Exhibit Number 63A?

20       A.    Yes, sir.

21       Q.    And what is 63A?

22       A.    This is the wrapping which we found the money

23    in.

24       Q.    Okay.  Can you put that in the bag, too?

25       A.    (Witness complies).

```
 1          Q.   Tell the jury one more time, how much money did
 2     you receive from Juan Pablo Campos?
 3                    MR. REYES:   I'm going to object, Your
 4     Honor.  It's been asked and answered.
 5                    THE COURT:   Overruled.
 6          Q.   (BY MR. BLAYLOCK)   Tell them one more time.
 7          A.   Close to 50,000.
 8          Q.   Okay.  And how much did you receive from Rene
 9     Garcia?
10          A.   Like over 50,000.
11                    MR. BLAYLOCK:   I'll pass the witness.
12                         CROSS-EXAMINATION
13     BY MR. REYES:
14          Q.   Officer Pineda, did you prepare a report for
15     this case?
16          A.   Yes, sir.
17                    MR. REYES:   Your Honor, we'd ask that we
18     be provided a copy of the report at this time.
19                    MS. FISCHER:   Let the record reflect that
20     I'm handing him a copy of Officer Pineda's report.
21                    THE COURT:   It shall reflect.
22                    MR. REYES:   May I have a few minutes, Your
23     Honor?
24                    THE COURT:   Go ahead.
25          Q.   (BY MR. REYES)   You assisted Officer Antonio
```

1   Flores on September the 9th of 1998 in interviewing or
2   interrogating Ruben Gutierrez; is that correct?
3        A.   Interviewing, yes, sir.
4        Q.   Okay.  And were you there present from start to
5   finish when he was being interviewed?
6        A.   That first one, yes, sir.
7        Q.   Okay.  And on 9/9 of '98, is that the only date
8   in which you assisted with this interrogation?
9        A.   With the interview of --
10       Q.   Of Ruben Gutierrez.
11       A.   As far as the interview, yes, sir.
12       Q.   And you didn't participate in his interrogation
13  on September the 13th of 1998?
14       A.   The only thing I did was go with them on the
15  route.
16       Q.   On -- okay.  But my question was, on
17  September 13th of 1998, did you participate in the
18  investigation -- in the interrogation of Ruben Gutierrez?
19       A.   I didn't interview him, no, sir.
20       Q.   And what about on September the 14th of 1998?
21       A.   No, sir.
22            MR. REYES:  May I approach the witness,
23  Your Honor?
24            THE COURT:  You may.
25       Q.   (BY MR. REYES)  I'm going to show you what has

STATE OF TEXAS VS. RUBEN GUTIERREZ                    12

1    been marked and admitted as evidence State's Exhibit

2    Number 37.  This is a -- what has been admitted as the

3    Miranda rights.  Do you agree?

4         A.    Uh-huh.

5         Q.    Okay.  Is -- where it says, "Witnessed by," is

6    that -- what does it state there?

7         A.    Santiago Manrique.

8         Q.    And then the second witness, who is it?

9         A.    Antonio Flores.

10        Q.    Does your name as a witness appear anywhere on

11   this form?

12        A.    No, sir.

13        Q.    But you were present when this was allegedly

14   read to Ruben Gutierrez?

15        A.    Yes, sir.

16        Q.    But your name does not appear on this form; is

17   that correct?

18        A.    That's correct.

19        Q.    You stated yesterday that you had received

20   information through your investigation that Escolastica

21   Harrison lived alone; is that correct?

22        A.    I believe so.  No, I didn't -- what I said,

23   what I knew of her is that she lived alone.

24        Q.    Okay.  But you stated that you had learned that

25   through your investigation; is that correct?  You had

STATE OF TEXAS VS. RUBEN GUTIERREZ                    13

1    learned through your investigation --

2         A.    What I said was what I knew of her --

3         Q.    Okay.

4         A.    -- is she lived alone.

5         Q.    But that information that you had was

6    incorrect; is that true?

7         A.    That's correct.

8         Q.    She actually lived with Avel Cuellar, her

9    nephew?

10        A.    Yes, sir.

11        Q.    You also stated that you spoke to a Joey

12   Maldonado; is that correct?

13        A.    Yes, sir.

14        Q.    Okay.  And isn't it correct that you -- the

15   Brownsville Police Department or officers from that

16   agency spoke to Joey Maldonado for the first time on

17   September the 9th of 1998 at almost 8:00 in the

18   afternoon -- in the evening?

19        A.    Yes, sir.

20        Q.    Okay.  And the second time that you spoke to

21   Joey Maldonado was on September the 11th of 1998 at about

22   11:50 in the morning; is that correct?

23        A.    That's correct.

24        Q.    The money that was shown to you and marked as

25   State's Exhibit Number 62 and 63, that was money that was

STATE OF TEXAS VS. RUBEN GUTIERREZ                          14

1    taken from Juan Campos; is that correct?  One of those --

2         A.   One of those exhibits was received from Juan

3    Campos.

4         Q.   Okay.  Another -- the other exhibit was from

5    Pedro Gracia; is that correct?

6         A.   No, sir.

7         Q.   Okay.  From Rene Garcia?

8         A.   Yes, sir.

9         Q.   And that was the money that you took from what

10   you call the chicken coop; is that correct?

11        A.   That's the money we recovered from the chicken

12   coop, yes, sir.

13        Q.   You also testified yesterday that you recovered

14   a Ford Bronco that was allegedly purchased by Ruben

15   Gutierrez; is that correct?

16        A.   That's what we were told, yes, sir.

17        Q.   But the Ford Bronco was actually recovered from

18   Juan Campos; is that true?

19        A.   No.  It was recovered from Mr. Gutierrez'

20   residence.

21        Q.   Well, yesterday you testified that you went to

22   Juan Campos' residence and you actually picked up the

23   Bronco from his home.

24        A.   I don't believe I said that.

25        Q.   Were you mistaken then?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          15

1        A.    I don't believe I said that.

2        Q.    Well, if you said that, were you mistaken?

3        A.    If I said that, yes.

4        Q.    You testified that you went to the scene to

5   attempt to locate the suitcase and also the toolbox; is

6   that correct?

7        A.    Excuse me?

8        Q.    You said yesterday that you went to the scene

9   to attempt to look -- to locate a suitcase and a toolbox;

10  is that true?

11       A.    A suitcase.

12       Q.    Okay.  So you had no involvement in attempting

13  to locate a toolbox?

14       A.    No, sir.

15       Q.    Now, isn't it correct that you stated that it

16  had been raining?

17       A.    Yes, sir.

18       Q.    And did you make any attempts when you found or

19  located that suitcase to try and see if there were any

20  footprints around that suitcase?

21       A.    No, sir.  It was a grassy area.  No, sir.

22       Q.    Did you attempt to locate any footprints around

23  that suitcase?

24       A.    No, sir.

25       Q.    That -- those exhibits, State's Exhibits 62 and

STATE OF TEXAS VS. RUBEN GUTIERREZ                          16

```
 1    63, did you yourself personally count that money?
 2         A.    I assisted.
 3         Q.    Okay.  Did you count everything that's in
 4    State's Exhibit Number 62?
 5         A.    Yes, sir.
 6         Q.    You yourself sat down and counted every single
 7    bill and determined how much was in that bag?
 8         A.    Counted, yes, sir.
 9         Q.    You yourself personally counted every single
10    bill in that bag?
11         A.    Yes, sir.
12         Q.    What about State's Exhibit Number 63?
13         A.    No, sir.
14         Q.    You didn't count that?
15         A.    No, sir.
16         Q.    Okay.  Was it Merlin Rasco that counted that
17    money?
18         A.    No, sir.
19         Q.    Did you --
20         A.    I don't know if Merlin Rasco counted it after
21    he received it.
22         Q.    Okay.  With respect to 63, you did not count
23    that money; is that correct?
24         A.    I was there when they counted it.  I did not
25    actually count it.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    17

```
1              MR. REYES:  May I have State's Exhibits 62
2   and 63?
3              May I approach the witness, Your Honor?
4              THE COURT:  You may.
5       Q.   (BY MR. REYES)  I'm going to show you the
6   contents of State's Exhibit Number 62.  This is what --
7   this white bag, which has the markings on it, was what
8   was inside State's Exhibit Number 62; is that correct?
9       A.   That's correct.
10      Q.   And was this white bag, was this provided by
11  the Brownsville Police Department?
12      A.   That's correct.
13      Q.   Okay.  And isn't it correct that approximately
14  $1,700 from State's Exhibit Number 62 was collected from
15  Juan Pablo Campos?
16      A.   That's correct.
17      Q.   And isn't it correct that 2,500 was collected
18  from Bertha Mejia?
19      A.   That's correct.
20      Q.   Are these your notes, Officer Pineda?
21      A.   No.
22      Q.   And do you have any -- were -- do you have any
23  personal knowledge as to who it is that made those
24  markings?
25      A.   Merlin Rasco.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        18

```
1        Q.   Were you present when he made those markings?

2        A.   No, I wasn't.

3              MR. REYES:  We'll pass the witness, Your

4   Honor.

5                    REDIRECT EXAMINATION

6   BY MR. BLAYLOCK:

7        Q.   I just want to clear up one thing.  We talked

8   about Pedro Gracia.  He has -- how much money did you get

9   out of Pedro's house?

10       A.   Like $11,000.

11       Q.   Okay.  And tell them again where that was

12  found.

13              MR. REYES:  Objection, Your Honor.  It's

14  been asked and answered.

15              THE COURT:  I'll permit him to answer.  Go

16  ahead.

17       Q.   (BY MR. BLAYLOCK)  Go ahead and recap where

18  you found it.

19       A.   That was located at his new residence inside a

20  sofa cushion.

21       Q.   Okay.  And we haven't -- I haven't brought and

22  showed you all the money that you've recovered in this

23  case, have you -- have I?

24       A.   No, sir.

25       Q.   Okay.  In fact, I've only shown you two samples
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           19

```
 1    of money?
 2         A.    That's correct.
 3         Q.    And together, those two add up to over a
 4    hundred thousand dollars?
 5         A.    Yes, sir.
 6                   MR. BLAYLOCK:  I pass the witness, Judge.
 7                   MR. REYES:  We have nothing further, Your
 8    Honor.
 9                   THE COURT:  All right.  You may step down.
10                   THE WITNESS:  Judge, may I be excused?
11                   THE COURT:  Any objection?
12                   MR. REYES:  Subject to him being recalled,
13    Your Honor, we have no objection.
14                   THE COURT:  All right.  You're excused to
15    go.
16                   THE WITNESS:  Thank you.
17                   THE COURT:  You may call your next
18    witness.
19                   MR. BLAYLOCK:  The State would call Merlin
20    Rasco.
21                   THE COURT:  Raise your right hand, please.
22                   (The witness was sworn in by the Court)
23                   THE WITNESS:  I do.
24                   THE COURT:  You may be seated.
25                   You may proceed.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          20

```
 1                        MERLIN RASCO,
 2        having been first duly sworn, testified as follows:
 3                      DIRECT EXAMINATION
 4    BY MS. FISCHER:
 5        Q.    Good morning, Officer.  Will you please tell
 6    the jury your full name?
 7        A.    Merlin Rasco.
 8        Q.    What do you do for a living?
 9        A.    I'm a police officer for the City of
10    Brownsville.
11        Q.    Are you a certified police officer in the State
12    of Texas?
13        A.    Yes, ma'am.
14        Q.    How long have you been a police officer with
15    the City of Brownsville?
16        A.    Twenty-four years, 11 months, 27 days.
17              THE COURT:  And still counting.
18              THE WITNESS:  And still counting.
19        Q.    (BY MS. FISCHER)  Now, what is your current
20    assignment there at the Brownsville Police Department?
21        A.    I take care of all the property in evidence
22    that is booked into the Brownsville Police Department.
23        Q.    Okay.  How long have you been doing that?
24        A.    Since November of 1994.
25        Q.    Now, will you please explain to the jury what
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        21

1    it means -- you're basically what we call the evidence

2    custodian; is that right?

3         A.    Yes, ma'am.

4         Q.    Tell the jury what that means.

5         A.    When the officers pick up evidence in a case or

6    in a case involving an arrested person or any other deal

7    that the officer is working on and it needs to be booked

8    in, they book it in to my office.

9              We have a set of lockers in front of the

10   evidence room.  Any evidence that is picked up is placed

11   into the lockers along with an evidence report; and I

12   enter and take custody of it and book it into my lockers.

13        Q.    Is it your job to make sure everything stays

14   secure, no one tampers with the evidence?

15        A.    Yes, ma'am, it is.

16        Q.    Now, sometimes the evidence will come to you

17   and it's not what we call easily identifiable, you know,

18   something like drugs or money or something like that

19   that's not easily identifiable.

20              How do you make sure that you're able to

21   identify which piece of evidence goes with which case and

22   make sure that it's the same piece of evidence?

23        A.    Well, the officers book in the evidence.  It's

24   booked into one locker.  The evidence that is in that

25   locker is with an evidence report.  I, in turn, take out

STATE OF TEXAS VS. RUBEN GUTIERREZ                              22

1    the evidence, check the evidence report itself, and then
2    put my initials or my marking on the evidence itself.
3         Q.   Okay.  Now, when the officer puts that evidence
4    in the evidence locker, is it secured, that evidence
5    locker?
6         A.   Yes, ma'am.  It's locked in the place.
7         Q.   Okay.  Who is the only person that can get to
8    it?
9         A.   Myself.
10        Q.   And then after you take it, where does it go?
11        A.   It goes into the evidence lockers that I have
12   in my evidence room.
13        Q.   And who can get to those?
14        A.   I can.
15        Q.   Now, the -- in a particular case -- let's talk
16   about this particular case, the murder of Ms. Harrison.
17   Did you have the opportunity to gather some evidence --
18   or actually, you didn't do the gathering, but did you
19   have the opportunity to do some evidence collecting in
20   that particular case?
21        A.   Yes, ma'am.  Quite a bit.
22        Q.   And this is a homicide that occurred back on
23   September the 5th of 1998, right?
24        A.   That's correct.
25        Q.   And in fact, there's a number of pieces of

STATE OF TEXAS VS. RUBEN GUTIERREZ                          23

1    evidence in the room.  We've got a suitcase --
2                   MS. FISCHER:  Your Honor, may I approach?
3                   THE COURT:  You may.
4         Q.   (BY MS. FISCHER)  -- and a toolbox and a few
5    other things.  These were all in your evidence locker,
6    were they not, before they ever came into the courtroom?
7         A.   Yes, ma'am, they were.
8         Q.   Okay.  Now, let's talk specifically about some
9    money that you were given custody of.  Tell me how you
10   came into custody of some money involved in this case.
11        A.   It was booked in by the detectives that were
12   working on the case.
13        Q.   Okay.  Now, let's talk -- I'm going to show you
14   what has been marked here as State's Exhibit Number 63
15   and 63A.  Let's start with that.  Specifically, I want
16   you to take a look at this and see if you recognize this
17   bag.
18        A.   Yes, ma'am.  This is the bag that was booked in
19   with $56,000; and these are my initials right here.
20        Q.   Now, how do you know that this is the same
21   money that you were given by one of your officers?
22        A.   Because I've got the evidence report right
23   here.
24        Q.   Okay.  And who -- which officer booked this in
25   to evidence?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    24

1      A.   Okay.  This one was booked in by Tony Flores
2   and Rey Pineda, Sergeant Sandra Galvan.
3      Q.   Okay.  After Rey Pineda gave it to you, where
4   did it go?
5      A.   It went into my safe.
6      Q.   Anybody else have any other custody with it?
7      A.   No, ma'am.
8      Q.   And you -- and take a look at it now.  I want
9   to make sure that you can tell the jury that this
10  evidence has not been tampered with in any way, what has
11  been marked as State's Exhibit Number 63.
12     A.   No, ma'am, it has not been.
13     Q.   Okay.  But now, if you look at 63A, which --
14     A.   This is the wrapping.
15     Q.   Okay.  Is that the same wrapping that goes
16  along with State's Exhibit Number 63?
17     A.   Yes, ma'am, it is.
18     Q.   To your knowledge, has that been tampered with
19  in any way?
20     A.   No.
21     Q.   Anyone else have care, custody or control of 63
22  or --
23     A.   No.
24     Q.   -- 63A?  Okay.  Once again, how is it that you
25  know that that is the same money Rey Pineda gave you?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                              25

1          A.   These are my markings right there.

2                   MS. FISCHER:  Your Honor, at this time

3     we'd offer into evidence what has been marked as State's

4     Exhibits Number 63 and 63A; and I'll tender this to

5     opposing counsel.

6                   MR. REYES:  Judge, we would object.

7     There's some writings that have not been identified.  We

8     also object as to relevance.

9                   MS. FISCHER:  Judge, we've got the

10    evidence tag in there.  We have to use that for

11    identification purposes.  It's necessary for him to know

12    that this is the same --

13                  THE COURT:  The evidence tag?

14                  MS. FISCHER:  -- money.  It's chain of

15    custody.  Yes.  We've got the evidence tag right here.

16    That's my note, Judge, that says, "chicken coop."  We can

17    take that out.  I just did that for me.

18                  THE COURT:  All right.  That's taken out.

19    Okay.  Sixty-three and 63A will be admitted into

20    evidence; and the objection will be overruled.

21                  MS. FISCHER:  Thank you, Judge.

22                  **(State's Exhibit Numbers 63 and 63A**

23                  **admitted)**

24         Q.   (BY MS. FISCHER)  All right.  Now, there's

25    another set of money, a rather substantial sum, and that

STATE OF TEXAS VS. RUBEN GUTIERREZ                          26

1   is what has been marked as State's Exhibit Number 62
2   here.  And I'm going to ask you if you can take a look at
3   this, what has been marked as State's Exhibit Number 62,
4   and I'm going to ask you the same question.  Have you
5   ever seen this money before?
6        A.   Yes, ma'am.
7        Q.   Okay.  And when and where did you first see
8   this money?
9        A.   It was booked in on --
10            MR. REYES:   I'm going to object, Your
11   Honor, to the witness testifying from something that has
12   not been admitted into evidence.
13            THE COURT:   It's overruled.
14       A.   -- 10/23 of '98.
15       Q.   (BY MS. FISCHER)  By who?
16       A.   By Detective Rey Pineda.
17       Q.   And how is it that you know that this is the
18   same money that Detective Rey Pineda brought you?
19       A.   There's my markings.
20       Q.   Okay.  And take a look at State's Exhibit
21   Number 62, what has been marked as State's Exhibit
22   Number 62.  Has it been tampered with in any way?
23       A.   No, ma'am.
24       Q.   Now, when we say tampered with in any way, now,
25   you and I did sit down before this trial started; and we

1    went ahead and we took the money out of this bag that you

2    put it in; and I put it in this zip lock bag while you

3    watched me do that?

4         A.    That is correct.

5         Q.    We got it ready for trial.  Okay.  But other

6    than that, has this been tampered with in any way?

7         A.    No, ma'am.

8         Q.    Now, are you sure this is the same money that

9    Rey Pineda gave you?

10        A.    It's $49,700.

11        Q.    Okay.  And how are you sure that this is the

12   same money that Rey Pineda gave you?

13        A.    It's got my markings.

14             MS. FISCHER:  Your Honor, at this time

15   we'd offer into evidence what's been marked as State's

16   Exhibit Number 62.  It contains the evidence tags and the

17   markings of Merlin Rasco that are necessary for

18   identification purposes for chain of custody.

19             MR. REYES:  Judge, we would object.

20   There's some writings that have not been identified.  We

21   would object that it's hearsay; also as to relevance.

22             MS. FISCHER:  That's the evidence tag

23   here, Judge, and his markings on his -- the Merlin Rasco

24   that he puts.

25             THE COURT:  All right.  The objection will

1    be overruled.  Sixty-two will be admitted into evidence.
2                  **(State's Exhibit Number 62 admitted)**
3         Q.    (BY MS. FISCHER)  Now, let's talk about
4    State's Exhibit Number 62 here.  You said this was
5    $49,700.  How do you know how much money is in there?
6         A.    I counted it.
7         Q.    Okay.  Every last penny?
8         A.    Every penny.
9         Q.    All right.  Let's talk the same about State's
10   Exhibit Number 63 and 60 -- well, State's Exhibit
11   Number 63.
12        A.    Yes, ma'am.
13        Q.    $56,000 in there.  How do you know it's
14   $56,000?
15        A.    Because I counted every bit of it.
16        Q.    Now, where was 63A before it got into this --
17        A.    It was in the bag --
18        Q.    Okay.
19        A.    -- with the money.
20        Q.    Okay.  And did that come to you together?
21        A.    Yes, ma'am.
22        Q.    Okay.  Now, Officer Rasco, as part of your job
23   as evidence custodian, you keep track of the money
24   through your evidence or property log; is that right?
25        A.    That is correct.

1       Q.   You don't write any official report; you just
2   keep the property logs with you and that tells you where
3   all the evidence is in the evidence room?
4       A.   Yes, ma'am.
5               MS. FISCHER:   I have nothing further, Your
6   Honor.  I pass the witness.
7               THE COURT:   Just for the record, when you
8   say every last penny, you don't mean it literally because
9   there's no pennies involved, right?
10              MS. FISCHER:   We can just clear that up.
11      Q.   (BY MS. FISCHER)  The money in there, tell me
12  what denominations are mainly in there.
13      A.   Hundreds.
14      Q.   Okay.  And it's all paper currency?
15      A.   Yes, ma'am.
16      Q.   There's no change?
17      A.   There is no change.
18      Q.   All right.
19              THE COURT:   Okay.  The record's clear on
20  that.
21              MR. REYES:   May I proceed, Your Honor?
22              THE COURT:   You may.
23                  **CROSS-EXAMINATION**
24  **BY MR. REYES:**
25      Q.   Officer Merlin, Mr. Rasco, are you the only

STATE OF TEXAS VS. RUBEN GUTIERREZ                          30

1    evidence custodian with the Brownsville Police
2    Department?
3         A.   Yes, sir.
4         Q.   So you handle all the property that is turned
5    into by the Brownsville Police Department officers?
6         A.   That is correct.
7         Q.   How many police officers are with the
8    Brownsville Police Department?
9         A.   Right around 200.
10        Q.   And you testified earlier that you're the only
11   person that has access to the evidence lockers; is that
12   correct?
13        A.   Yes, sir.
14        Q.   Nobody else has a key other than you?
15        A.   My sergeant does, yes.
16        Q.   Okay.  So earlier you stated that you're the
17   only one that has access, but your sergeant also has
18   access to that property; is that right?
19        A.   That's because he does not do the job of the
20   evidence.
21        Q.   But he also has a key to the lockers?
22        A.   That is correct.
23        Q.   So he's able to go ahead and go into those
24   lockers and also take out that evidence; is that correct?
25        A.   If he had a need to, yes.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          31

1        Q.   You don't know where -- what has been admitted
2   into evidence as State's Exhibit Number 62 and 63, where
3   that money came from; is that correct?
4        A.   I do not know.
5        Q.   You have no personal knowledge?
6        A.   No personal knowledge.
7        Q.   And by the time that evidence gets to your
8   office, you have no idea who has handled that property;
9   is that correct?
10       A.   Just the person that is on the evidence report
11  itself as having turned it in.
12       Q.   Okay.  But you don't know whether or not they
13  didn't write names of people who might have handled that
14  money; is that correct?
15       A.   I have no idea.
16            MR. REYES:  We have nothing further, Your
17  Honor.
18            MS. FISCHER:  Briefly, Judge.
19                  **REDIRECT EXAMINATION**
20  **BY MS. FISCHER:**
21       Q.   Now, that's not all the money -- State's
22  Exhibit Number 62 and State's Exhibit Number 63, that's
23  not all the money that was recovered in this case, is it?
24            MR. REYES:  I'm going to object, Your
25  Honor, to counsel leading her own witness.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                32

```
 1                    THE COURT:  I'll permit him to answer.
 2           Q.   (BY MS. FISCHER)  Was there other money
 3     recovered in this particular murder case?
 4           A.   Yes, ma'am, there was.
 5           Q.   Okay.  And was there some $11,700 collected in
 6     this particular case?
 7           A.   Yes, ma'am, 11,700.
 8           Q.   Okay.  Do you have custody of that?
 9           A.   I have custody of that right here.
10           Q.   As well as all the other money?
11           A.   Yes, ma'am.
12           Q.   Okay.  And just so that the record is clear,
13     like the Judge has said, I kind of got the jury a
14     little -- I got the record a little confused when I said
15     every last penny.
16                    MS. FISCHER:  Your Honor, may I approach?
17                    THE COURT:  You may.
18           Q.   (BY MS. FISCHER)  Let's just -- what you have
19     here in front of you, State's Exhibits Number 62 and
20     State's Exhibit Number 63, in State's Exhibit Number 62
21     we have $49,700 in U.S. cash currency?
22           A.   That's correct.
23           Q.   And it's bundled in -- it looks like one, two,
24     three, four, five, six bundles; and they each have rubber
25     bands around them.  Okay.  And was it like that when you
```

1   got it?

2        A.   Yes.

3        Q.   And then in State's Exhibit Number 63, we have

4   $56,000 in U.S. currency, and it's all cash paper bills;

5   is that correct?

6        A.   That is correct.

7        Q.   And it's bundled together with a large rubber

8   band, but inside of that, there is money paper clipped

9   together.  Is that how it came to you?

10       A.   It came to me with the paper clips, not with

11  the rubber band.

12       Q.   Okay.  So if we add that together, what we have

13  sitting here in State's Exhibit Number 62 and 63 is

14  $105,000?

15       A.   That's correct.

16       Q.   And that's not all the money?

17       A.   No, ma'am.  I have still approximately 25,000.

18                 MS. FISCHER:  Pass the witness.

19                 MR. REYES:  I have nothing further, Your

20  Honor.

21                 THE COURT:  All right.  You may step down.

22                 MS. FISCHER:  Your Honor, may he be

23  excused?

24                 THE COURT:  Any objection?

25                 MR. REYES:  Subject to him being recalled,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          34

```
 1    Your Honor, we don't have an objection.
 2                    THE COURT:  All right.  You're excused to
 3    go.
 4                    THE WITNESS:  Thank you.
 5                    THE COURT:  You may call your next
 6    witness.
 7                    MS. FISCHER:  Detective Gilbert Garcia.
 8                    MR. BLAYLOCK:  May I approach the stand,
 9    Judge?
10                    THE COURT:  You may.
11                    MR. BLAYLOCK:  I'd like to move this over
12    here if I could.
13                    THE COURT:  Go ahead.
14                    Would you raise your right hand, please?
15                    (The witness was sworn in by the Court)
16                    THE WITNESS:  I do.
17                    THE COURT:  All right.  You may be seated.
18                    You may proceed.
19                    MS. FISCHER:  Thank you, Judge.
20                        GILBERT GARCIA JR.,
21      having been first duly sworn, testified as follows:
22                     DIRECT EXAMINATION
23    BY MS. FISCHER:
24         Q.   Good morning, Detective Garcia.
25         A.   Good morning.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    35

1        Q.    Will you please tell the jury your full name?

2        A.    Detective Gilbert Garcia, Jr.

3        Q.    And what do you do for a living?

4        A.    I'm a criminal investigator.

5        Q.    With who?

6        A.    Brownsville Police Department.

7        Q.    And are you a certified peace officer in the

8    State of Texas?

9        A.    Yes, I am.

10       Q.    How long have you been a certified peace

11   officer?

12       A.    Seven and a half years.

13       Q.    And how long have you been at the Brownsville

14   Police Department?

15       A.    Seven and a half years.

16       Q.    What is your current assignment with the

17   Brownsville Police Department?

18       A.    I'm an investigator in the persons division,

19   crimes against persons division.

20       Q.    Will you please tell the jury what it means to

21   be an investigator there with the persons division?

22       A.    In the persons division, we investigate crimes

23   against persons, such as stabbings, shootings, beatings,

24   robberies, homicides.

25       Q.    Okay.  How long have you been doing that?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          36

1        A.    Over five years.

2        Q.    Now, let's talk about a particular crime

3    against a person, the murder of Ms. Harrison.  Were

4    you -- did you have an opportunity to work on that case?

5        A.    Yes, I did.

6        Q.    And tell me, in what capacity did you work on

7    that case?

8        A.    I was assigned to investigate the homicide.  I

9    was called out on -- I believe it was September 6th.

10       Q.    Okay.  Would that make you the case agent in

11   this case?

12       A.    I believe so.

13       Q.    Okay.  And what does it mean to be the case

14   agent?

15       A.    Just the lead investigator --

16       Q.    Okay.

17       A.    -- but there were several of us working on it.

18   It's a major case.  We all get together and work on it.

19       Q.    Now, let's talk, then, about the murder of

20   Ms. Harrison.  You said that you got involved, then, on

21   September the 6th.  Tell me what is the first thing that

22   you did in connection with this case.

23       A.    When they called me out on September 6th, I

24   believe it was -- I want to say it's a Sunday.  I'm not

25   sure.  But they called me out on September 6th; and I

STATE OF TEXAS VS. RUBEN GUTIERREZ                          37

1    went straight to the scene --
2         Q.    Okay.
3         A.    -- to familiarize myself with this scene.
4         Q.    Can you just tell the jury again where that
5    scene was?
6         A.    It's the office/residence at 409 Morningside
7    Road, the Harrison Mobile Home Park.
8         Q.    And is that in Brownsville, Texas?
9         A.    It's in Brownsville Texas.
10        Q.    And is that in Cameron County, Texas?
11        A.    Yes, it is.
12        Q.    Tell me what you saw when you got there.
13        A.    When I got there, I familiarized myself with
14   the house, the layout, the rooms.  As you go in there's
15   an office, a small office with a sofa on the right, a
16   copier on the left and, I believe, a metal chair.
17   There's a large desk; and there was an intercom box on
18   another shelf next to the desk.
19        Q.    Who was there when you got there?
20        A.    I believe Detective Juan Hernandez, crime scene
21   officer.
22        Q.    Okay.  Now, what about the body of
23   Ms. Harrison, was it still there?
24        A.    No.  It had already been removed.
25        Q.    Okay.  And what is it that you did at the crime

STATE OF TEXAS VS. RUBEN GUTIERREZ                    38

1    scene that day?

2         A.    I went ahead and familiarized myself with that.

3    Then I went to the room, the actual scene.  And there was

4    still some blood stains on the floor and splatter stains

5    on other items around where the body had been found.

6         Q.    Okay.  At this point in time, then, what is it

7    that it was your job to do?

8         A.    To work with what evidence there was and start

9    investigating, find out who did it and how.

10        Q.    Okay.  And tell me what you did in your

11   investigation to find out who had killed Ms. Harrison.

12        A.    I started canvassing -- well, first off, I went

13   to the office.  I took some photos, a few of them, not

14   very many because Detective Hernandez was doing most of

15   that.

16        Q.    We can stop right there for just a minute,

17   Detective Garcia.

18                   MS. FISCHER:  May I approach?

19                   THE COURT:  You may.

20        Q.    (BY MS. FISCHER)  We've had a number of photos

21   that have been offered into evidence; and you may have

22   taken some and I'm sure --

23        A.    I probably did.

24        Q.    -- Detective Hernandez and Rey Pineda took

25   some.  But just to familiarize yourself with this, let's

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          39

```
 1    have you take a look at State's Exhibit Number 4.  Do you
 2    recognize that?
 3         A.    That is the house scene, the crime scene --
 4         Q.    Okay.
 5         A.    -- at 409 Morningside Road.
 6         Q.    Okay.  Let's go ahead -- State's Exhibit
 7    Number 7, do you recognize what that is?
 8         A.    That's the desk and shelf where the intercom
 9    is.
10         Q.    That's inside the home of Ms. Harrison?
11         A.    Yes, it is, as you go in.
12         Q.    Okay.  Now, as you stated, you went ahead and
13    made yourself familiar with the crime scene.  Was there
14    anything there at the crime scene that clued you in to
15    who had done it?
16         A.    At that point at the scene itself, no.  The
17    only thing we could see is that there was no signs of
18    real forced entry; so, therefore, it had to be someone
19    that the victim knew, someone that she allowed to come in
20    willingly.
21         Q.    Okay.  And then I think you said a minute ago
22    that your next step was to start canvassing --
23         A.    Yes.  We started --
24         Q.    -- the area?
25         A.    -- canvassing --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                40

```
1                    THE COURT:  Just a minute.  Just a minute.
2    Let her finish asking the question because you're running
3    into each other; and it's hard to understand where
4    somebody stops and when somebody begins, okay?  All
5    right?
6                    THE WITNESS:  All right, sir.
7                    THE COURT:  Let her finish asking the
8    question.
9                    What was your question again?
10       Q.    (BY MS. FISCHER)  The next step that you took
11   in your investigation was that you started canvassing the
12   scene for witnesses.  Can you tell the jury what you did?
13       A.    I went through the trailer park trailer by
14   trailer knocking on different doors.  Whoever was there,
15   I spoke to them and asked if they had seen or heard
16   anything on that night that was out of the ordinary.
17       Q.    Were you able to find anyone that had seen or
18   heard anything?
19       A.    I found several people that remembered seeing
20   an individual there in the trailer park around the time
21   that the pathologist estimated the time of death was.
22       Q.    Okay.  And can you tell me who those people
23   were that you found out had seen someone -- well, first
24   of all, who had they seen in the neighborhood?
25       A.    Okay.  According to --
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    41

1           MR. REYES:  Objection, Your Honor.  It
2   calls for hearsay.
3           THE COURT:  Restate your question,
4   counsel.
5       Q.   (BY MS. FISCHER)  During your investigation,
6   you said that you had found a number of people who said
7   they had seen a particular individual in the
8   neighborhood.  Who were those people who said they had
9   seen a number of -- a particular individual in the
10  neighborhood?
11      A.   The ones I recall are Crispin Villarreal.  He
12  lives by the resaca.  And a gentleman that lives in the
13  same house with him, a Mr. Martinez.  I can't remember
14  his first name.
15      Q.   Okay.
16      A.   The victim's nephew, Mr. Avel Cuellar.  And a
17  young man that had been walking by.  I can't remember his
18  last name, but his first name I believe is Julio.  He was
19  walking with his sister from the store and he had seen
20  somebody there.  And by that time, I had already had a
21  name to compile a photo lineup and to show to Julio.
22      Q.   And what was the name?
23      A.   Ruben Gutierrez.
24      Q.   When you say that you had that name, you listed
25  four people.  Did all those people give you that same

1    name?

2         A.    The first three did.

3         Q.    Okay.  But Mr. Lopez did not?

4         A.    Julio, no, he didn't.

5         Q.    Okay.  So what did you do in order for him to

6    identify?

7         A.    Based on the name I had already received from

8    the other three people, I compiled a photo lineup from

9    our jail photo records.  And I went and spoke to

10   Mr. Lopez; and I showed him the lineup and he picked out

11   Ruben Gutierrez.

12        Q.    Okay.

13                  MS. FISCHER:  Your Honor, may I approach?

14                  THE COURT:  You may.

15        Q.    (BY MS. FISCHER)  We have into evidence a

16   photo lineup, Detective Garcia.  I'm going to show you

17   here State's Exhibit Number 35.  Do you recognize State's

18   Exhibit Number 35?

19        A.    Yes.

20        Q.    Okay.  And in State's Exhibit Number 35, which

21   is the photo of Ruben Gutierrez?

22        A.    Number five.

23        Q.    And which is the photo that Julio Lopez picked

24   out?

25        A.    Number five.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    43

1      Q.   Now, as part of that, you did not have
2   Mr. Lopez initial that on the original, did you?
3      A.   No.
4      Q.   Why didn't you have him initial that on the
5   original?
6      A.   We make photocopies and have him initial on the
7   photocopy --
8      Q.   Okay.
9      A.   -- but they're shown the original.
10      Q.   I'm going to show you what has been marked --
11   if I'm not -- State's Exhibit Number 64.   Detective
12   Garcia, I'm going to show you what has been marked as
13   State's Exhibit Number 64.   I'm going to ask you to go
14   ahead and take a look at that.   Do you recognize what
15   that is?
16      A.   That's a photocopy of the photo lineup I
17   compiled.
18      Q.   Okay.   Is it an identical photocopy?
19      A.   Identical photocopy.
20      Q.   Okay.   But, now, there are some markings and
21   some writings on that photocopy.   What are those markings
22   and writings?
23      A.   That's the date, the time, the location that it
24   was shown, and who it was shown to, and who showed it to
25   him, and the date of the offense.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          44

```
1          Q.    Okay.  And whose writing is that on there?
2          A.    That's Julio Lopez' writing.
3          Q.    Did you see him write that?
4          A.    Yes --
5          Q.    Okay.
6          A.    -- on number five.
7          Q.    I'm sorry.  You said that and I kind of covered
8   you up.  Tell the jury --
9          A.    On number five he initialed that and he wrote
10  that.
11         Q.    Once again, whose photo is number five?
12         A.    Ruben Gutierrez.
13               MS. FISCHER:  Your Honor, at this time I'd
14  offer State's Exhibit Number 64 into evidence.  I'll
15  tender this to opposing counsel.
16               MR. REYES:  We're going to object.
17  There's some writing that has not been identified.  It's
18  hearsay.  It's also -- State's Exhibit Number 64 is
19  repetitive of the previous exhibit that was already
20  admitted.
21               MS. FISCHER:  Your Honor, he's identified
22  all the writing.  And it is the copy that Mr. Lopez wrote
23  on identifying which one he pointed out live.
24               THE COURT:  All right.  The objection will
25  be overruled and 64 will be admitted into evidence.
```

1        **(State's Exhibit Number 64 admitted)**

2        Q.   (BY MS. FISCHER)  Now, Mr. Lopez --

3             MS. FISCHER:  Your Honor, at this time may

4   I publish State's Exhibit Number 64 along with State's

5   Exhibit Number 35 to the jury?

6             THE COURT:  You may.

7             MS. FISCHER:  Thank you, Judge.

8        Q.   (BY MS. FISCHER)  Now, let's talk for a minute

9   about doing a lineup or doing a photo spread as that's

10  called.  After you got the pictures together, how is it

11  that you went about showing that to Mr. Lopez?

12       A.   I showed it to him and to ask if he could

13  recognize -- initially, I asked him if he could recognize

14  who he had seen from a photograph.

15       Q.   Did he indicate to you that he could?

16       A.   He said he did.

17             MR. REYES:  Objection, Your Honor.  It

18  calls for hearsay.

19             THE COURT:  Overruled.  Go ahead.

20       Q.   (BY MS. FISCHER)  When you handed the photo

21  spread to him, did you say anything?

22       A.   I asked him to look at them and choose the one

23  he saw there that day.

24       Q.   Okay.  And did he do that?

25       A.   Yes, he did.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    46

1      Q.   Tell me how he did it.

2      A.   He said, "It's the one in number five."

3      Q.   Okay.  Did it take a long time for him to do

4  that?

5      A.   No, not at all.

6      Q.   Can you give me an estimate about how long it

7  took before he picked Ruben Gutierrez out of that lineup?

8      A.   I believe between five and ten seconds.

9      Q.   Okay.  Did he have any hesitation about picking

10  Ruben Gutierrez out of that lineup?

11      A.   None whatsoever.

12      Q.   Did he have any questions about, "Maybe this is

13  him, maybe it's not"?

14      A.   No, sir -- no, ma'am.

15      Q.   Did he appear to be sure that it was Ruben

16  Gutierrez he saw outside Ms. Harrison's house?

17      A.   He told me he was sure.

18      Q.   Okay.  Did you suggest to him in any way which

19  photo he needed to look at?

20      A.   No, I did not.

21      Q.   Okay.  Now, he was with his sister that day,

22  was he not?

23      A.   Yes, he was.

24      Q.   Did you show the photo lineup to the sister?

25      A.   I did, but she was unable to identify him.

1       Q.   Okay.  Now, Mr. Lopez, did he indicate to you

2   that he saw one or two people walking there on

3   Morningside?

4               MR. REYES:  Objection, Your Honor.  It

5   calls for hearsay.

6               THE COURT:  Overruled.

7       A.   He said that he saw two people.

8       Q.   (BY MS. FISCHER)  Okay.  Did you show him any

9   other lineups?

10      A.   I don't recall if I showed him another lineup

11  or not.

12      Q.   Okay.  Would it help you refresh your memory if

13  you saw your report?

14      A.   It might.

15              MS. FISCHER:  Your Honor, may I show him a

16  copy of his police report?

17              THE COURT:  You may.

18      A.   On the 11th I didn't have a name on the second

19  individual until after I had already spoken to Mr. Lopez.

20      Q.   (BY MS. FISCHER)  Okay.  Did you ever go back

21  and show him the other lineups?

22      A.   I don't believe so.

23      Q.   Okay.  Now, let's then go on with your

24  investigation.  You had a name, Ruben Gutierrez.  You had

25  been given it by now four different people after counting

STATE OF TEXAS VS. RUBEN GUTIERREZ                              48

```
 1    Mr. Lopez, Mr. Villarreal, Mr. Martinez and Avel.  What
 2    did you do after that?
 3        A.   Their statements were secured, and I passed
 4    this information on to Detective Flores.
 5        Q.   Okay.
 6        A.   I had not had any contact with Ruben Gutierrez
 7    as of yet.
 8        Q.   Okay.  Did you ever get any information from a
 9    Crime Stopper's tip that helped you in your
10    investigation?
11        A.   Yes, I did.
12        Q.   What information did you get from the Crime
13    Stopper's tip?
14                 MR. REYES:  Objection, Your Honor.  It
15    calls for hearsay.
16                 THE COURT:  It's overruled.
17        A.   The information I received, that a subject --
18    there was a subject that had just gotten out of jail
19    recently that was spending a large amount of money.
20        Q.   (BY MS. FISCHER)  Okay.  Did you get a name on
21    that person?
22        A.   Yes, I did.
23        Q.   And who -- what was the name?
24        A.   Rene Garcia.
25        Q.   What did you all do with that information?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          49

1    A.   I was at the station when I received it.  I
2  radioed it to other investigators in the field.  And
3  another investigator had a warrant already for him for a
4  minor theft.  So they went looking for him at his
5  residence.
6    Q.   Okay.  And did they arrest Mr. Garcia?
7    A.   Yes, they did.  They located him and arrested
8  him.
9    Q.   Okay.  And after arresting him -- did you have
10  any role in the arrest of Mr. Garcia?
11    A.   In the arrest, no, but I did go to his
12  residence shortly after his arrest and I was called out
13  there to do some photography.
14    Q.   Okay.  After taking pictures of Mr. Garcia's
15  residence, what did you do next in this investigation?
16    A.   I returned to the station to continue with
17  more -- to continue with my reports.  We seized the
18  vehicle right after that.
19    Q.   Who did you seize the vehicle from?
20    A.   Rene Garcia.  A blue Grand Marquis -- Grand
21  Prix.
22    Q.   Okay.
23    A.   I believe we found some money at his residence
24  as well --
25    Q.   Okay.

1      A.   -- several bundles of $20 bills.  I

2 photographed those.

3      Q.   Okay.

4      A.   I think that was it that I did for that day.

5      Q.   What is the next thing, then, that you did as

6 part of this investigation?

7      A.   I believe I secured a statement from a

8 Ms. Terry Cuellar --

9      Q.   Okay.

10      A.   -- in regards to her having been present when

11 Mrs. Harrison had counted a large amount of money there

12 in the office.

13      Q.   Okay.  During your investigation, did you get

14 an idea of just how much money Ms. Harrison had there at

15 her home?

16      A.   I had a -- I had gotten a rough idea that it

17 was at least over half a million dollars in cash.

18      Q.   Okay.  Now, after -- after talking to

19 Ms. Cuellar, what else did you do in this investigation?

20 What's the next thing that you did?

21      A.   We continued seizing vehicles.  Well, there was

22 several of us working at the same time.

23      Q.   Who else did you seize vehicles from?

24      A.   I know I personally seized or assisted in

25 seizing two; one from Rene Garcia's mom that we picked up

1    outside the city limits, a Blazer; and this blue car that

2    he was driving at the time.

3         Q.    Now, why were you seizing these vehicles?

4         A.    By that time, we had information that they were

5    bought with money that was stolen from Ms. Harrison's

6    house.

7         Q.    Okay.  Now, did Ruben Gutierrez' name ever come

8    up again in the investigation?

9         A.    It kept coming up in the investigation.

10        Q.    Okay.  After talking to Rene Garcia, did his

11   name come up?

12        A.    It did.

13        Q.    After talking to Rene Garcia and Ruben

14   Gutierrez' name came up, did you ever have the

15   opportunity to talk to Mr. Gutierrez yourself?

16        A.    I spoke to him on September the 14th.

17        Q.    Okay.  Now, do you happen to know through

18   personal knowledge if he had spoken to any other

19   detectives at the Brownsville Police Department before

20   speaking to you?

21        A.    Yes, he had.  I recall him speaking to

22   Detective Flores --

23        Q.    Okay.

24        A.    -- but I was busy doing another part of the

25   investigation.

STATE OF TEXAS VS. RUBEN GUTIERREZ                     52

1      Q.    Do you know when it was that he spoke to

2  Detective Flores?

3      A.    I don't recall the exact date.

4      Q.    Okay.  Did Detective Flores take a statement

5  from him?

6      A.    I believe he might have.

7      Q.    Okay.

8            MS. FISCHER:  Your Honor, may I approach?

9            THE COURT:  You may.

10     Q.    (BY MS. FISCHER)  I'm going to show you

11 State's Exhibits Numbers 44 and 45.  Have you ever seen

12 these before?

13     A.    Yes, when I photocopied the case file.

14     Q.    Okay.  And what are those?

15     A.    These are statements taken by Detective Flores

16 in confession form from Ruben Gutierrez.

17     Q.    And what is the date on State's Exhibit

18 Number 44 and 45?

19     A.    Both are September 13th.

20     Q.    Okay.  So you did not talk to Ruben Gutierrez

21 yourself until the 13th?

22     A.    On the 14th.

23     Q.    I'm sorry.  The 14th.  You're right.  I got

24 that wrong.

25            Now, why is it that you were speaking to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    53

```
1    Mr. Gutierrez on this date?
2         A.    Let me see my supplement.
3         Q.    Let me ask you this.  Let's go in smaller
4    steps.  Where did you speak to Mr. Gutierrez at?
5         A.    I had spoken to him in the Cameron County jail.
6         Q.    Okay.  Did you take -- did you talk to him
7    there at the Cameron County jail or did you bring him
8    somewhere else?
9         A.    I asked him if he was willing to come back to
10   the station with me and talk to me about the case.
11        Q.    Okay.  And when you asked him, what did he say?
12        A.    He said he would go with me.  So I signed him
13   out of Cameron County jail and I took him to the station.
14        Q.    Now, let's go through this very slowly,
15   Detective Garcia.  Did he hesitate in any way about going
16   to come and talk to you?
17        A.    No, he didn't.
18        Q.    Did he say anything to you at all about not
19   wanting to talk to you?
20        A.    No, he didn't.
21        Q.    Did he say anything at all about wanting an
22   attorney present?
23        A.    No, he didn't.
24        Q.    Did he say anything at all about knowing that
25   he had rights and he didn't have to talk to you?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                54

1        A.    No.  He didn't say anything.

2        Q.    Did you happen to know if he had already been

3   taken before a magistrate and booked in officially on

4   these charges and a bond set?

5        A.    I believe he had already been booked under

6   capital murder because if he -- if I picked him up at

7   county, he had already been taken before a magistrate

8   because once they're arrested by us, they're magistrated

9   there by us, by our agency, municipal court judge.  Then

10  they're transferred to county after magistration.

11       Q.    Okay.  And so, you had to bring him back from

12  county.  After he said, "I'll willingly go with you,"

13  where did you take him?

14       A.    To the Brownsville police station.

15       Q.    Okay.  Where in the Brownsville police station

16  did you talk to him?

17       A.    There in bay one of C.I.D., criminal

18  investigation division.

19       Q.    Okay.  And what does that room look like?

20       A.    It's a good-sized room.  I'd say about maybe 20

21  by 40 feet.  There's eight cubicles in there --

22       Q.    Okay.

23       A.    -- and there's a large area in the center.

24       Q.    And where did you talk to him?

25       A.    In the -- in one of the corner cubicles.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          55

1     Q.   Okay.  And tell me how the conversation took
2  place.
3     A.   Well, first off, since he had already been
4  arrested for capital murder, I went ahead and advised him
5  of his rights.  I read him his rights.  I made him aware
6  of his rights and allowed him to read the sheet of his
7  rights.  And I asked him if he was in agreement, to go
8  ahead and initial and sign it.
9     Q.   Detective Garcia, then let me show you what has
10 been marked as State's Exhibit Number 65 and I'm going to
11 ask if you recognize this.
12    A.   This is the rights sheet I read to him.
13    Q.   Okay.  Now, I need you to explain what all this
14 writing is on here.  The rights that are typed on there,
15 what are those?
16    A.   Those are the Miranda warnings.
17    Q.   Okay.  And all of this signatures off to the
18 side, what is that?
19    A.   His initials on each of the numbers.  They
20 indicate that he understood his rights --
21    Q.   Okay.
22    A.   -- because I read them to him.  I read him his
23 rights; and I told him, "Go ahead and read them and
24 initial them besides each number if you understand them."
25    Q.   And whose initials are those next to each one

STATE OF TEXAS VS. RUBEN GUTIERREZ                          56

1   of those rights?

2       A.   Ruben Gutierrez.

3       Q.   And after reading this to him and having him

4   read it, did he sign it?

5       A.   Yes, he did.

6       Q.   And whose signature appears there on that piece

7   of paper?

8       A.   That's his signature.

9       Q.   Okay.  And is it dated?

10      A.   Yes, it is.  And it's timed 4:41 p.m. on

11  9/14/98.

12              MS. FISCHER:  Your Honor, at this time

13  we'd offer into evidence what has been marked as State's

14  Exhibit Number 65.  For the record I tender it to

15  opposing counsel.

16              MR. REYES:  Judge, at this time we would

17  just reiterate all the previous objections we've made

18  with respect to State's Exhibit 65.

19              THE COURT:  All right.  That'll be

20  overruled.  Sixty-five will be admitted into evidence.

21              **(State's Exhibit Number 65 admitted)**

22      Q.   (BY MS. FISCHER)  Now, let's go over State's

23  Exhibit Number 65.  When you said that you read it to

24  him, did you read it from beginning to end?

25      A.   Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          57

1     Q.    Okay.  And those five warnings up on the top,
2  are those what we call the Miranda warnings?
3     A.    Those are Miranda warnings.
4     Q.    And that tells him that he doesn't have to talk
5  to you?
6     A.    Exactly.
7     Q.    He can have a lawyer and he can stop any time
8  he wants?
9     A.    Exactly.
10    Q.    Okay.  And then did you read all of that aloud
11 to him from one through five?
12    A.    Yes, I did.
13    Q.    And then this next part where it says,
14 "Waiver," and where it says, "I have read these rights
15 and I am voluntarily waiving my rights," did you read
16 that aloud to him?
17    A.    I believe so.
18    Q.    Okay.  And when you told him to initial it
19 here, what did you tell him to do before you told him to
20 initial it?
21    A.    To read them, to read his rights and if -- and
22 to put his initials next to each one.
23    Q.    Did he do that?
24    A.    He read them.
25    Q.    Okay.  How do you know that he did that?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    58

1        A.    He -- when I gave him the paper, he read them
2   to himself --
3        Q.    Okay.
4        A.    -- and then he initialed them.  It took him a
5   few seconds, not very long.
6        Q.    Okay.  Is this handwriting right there?
7        A.    Those are his initials.
8        Q.    And you saw him do that?
9        A.    I did.
10       Q.    And this is his signature?
11       A.    That is his signature.
12       Q.    Okay.  After reading him his rights, knowing he
13   didn't have to talk to you, did he agree to talk to you?
14       A.    Yes, he did.
15       Q.    Did he agree to voluntarily waive each and
16   every one of those rights and agree to give you a
17   statement?
18       A.    Yes, he did.
19       Q.    How did you know that he was agreeing to give
20   you a statement?
21       A.    He did not say, "I don't want to say anything
22   to you.  I have nothing to say.  I want my attorney."  He
23   just said, "Okay.  Let's talk."  So I asked him questions
24   and he answered them.
25       Q.    Okay.  Now, how did he go about giving you a

STATE OF TEXAS VS. RUBEN GUTIERREZ                          59

1   statement?  You said that he was talking; you were
2   listening.  Did you take the statement down in written
3   form?
4        A.   Yes, I did.
5        Q.   How did the statement become taken down in
6   written form?
7        A.   On a computer.
8        Q.   Okay.  And how did it get into the computer?
9        A.    I was keying it into the computer.  As he
10  spoke, I tried to get it as verbatim as possible, as much
11  in his words as possible.
12       Q.   Okay.  And when you say that, explain the
13  process to me, then.  You're sitting at your computer
14  keyboard where's the -- well, I don't think we've done
15  this part yet, Officer -- or Detective.  The person that
16  you took the statement from, is he here in the courtroom?
17       A.   Yes, he is.
18       Q.   Can you please point to him and identify him by
19  telling me something that he's wearing?
20       A.   He's wearing a white shirt and he's sitting
21  right over there (pointing).
22                 MS. FISCHER:  Your Honor, may the record
23  reflect that he's identified Ruben Gutierrez, the
24  defendant?
25                 THE COURT:  It shall reflect.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    60

1      Q.   (BY MS. FISCHER)   Where was the defendant
2   sitting?
3      A.   I was facing the terminal.  I had the keyboard.
4   He was sitting to my right no more than 3 feet away.
5      Q.   Okay.  And as he spoke, what were you doing?
6      A.   I was typing in what he told me.
7      Q.   Okay.  And when he got through speaking to you,
8   what did you do?
9      A.   I went ahead and spell checked it; and then I
10  printed a copy and I gave it to him.  And I go -- I asked
11  him -- I told him, "If there's anything that needs
12  changing or if there's anything wrong or something you
13  want to put in or take out, let me know and I'll do it,
14  and then I will print another copy which you will sign."
15     Q.   Okay.  And when you handed him -- that to him,
16  did he ask to make any changes or deletions?
17     A.   None that I remember.
18     Q.   Did he tell you that any part of that statement
19  was wrong?
20     A.   Not that I recall.
21     Q.   Did he read that statement?
22     A.   Yes, he did.
23     Q.   How do you know he read it?
24     A.   It took him about five, five to seven minutes
25  to read it.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    61

1       Q.   Okay.  Did it appear to you as if he were
2   reading it?
3       A.   It did.
4       Q.   Now, let's talk about while you're taking that
5   statement from him.  Is anybody else in the room?
6       A.   Detective Carrejo was in a cubicle next to
7   me --
8       Q.   Okay.  Was anybody --
9       A.   -- or right in front of me.
10      Q.   Was anybody there in that cubicle with you?
11      A.   I believe Detective Flores would come every now
12   and then.
13      Q.   Okay.
14      A.   And I believe Sergeant Galvan also.
15      Q.   Okay.  And on the written confession that you
16   gave -- the statement that he gave, did you also advise
17   him in writing once you gave him that statement that he
18   had a right to have an attorney?
19      A.   Yes, he was advised.
20      Q.   Okay.  And on that written statement that he
21   gave, did you also advise him again that he had the right
22   to remain silent?
23      A.   Yes.
24      Q.   And on that written statement that he gave you,
25   did you also advise him again that anything he said could

STATE OF TEXAS VS. RUBEN GUTIERREZ                          62

1    be used against him?

2        A.    Yes.

3        Q.    Did you tell him he had the right to have an

4    attorney?

5        A.    Yes, I did.

6        Q.    Did you all ever talk about him having an

7    attorney?

8        A.    He never asked me for an attorney.

9        Q.    Okay.  Did he ever say, "I want a lawyer"?

10       A.    No, he didn't.

11       Q.    Did he ever say anything about having a lawyer?

12       A.    No, he didn't say he had a lawyer.  I think he

13   said his mom was looking for one, but he didn't say

14   anything about having one.

15       Q.    Okay.  Well, when he said that, did he tell

16   you, "Look, I don't want to talk to you until that lawyer

17   comes"?

18       A.    No, he didn't.

19       Q.    What did he say?

20       A.    He asked me just -- went ahead and answered

21   every question I asked him or he gave the story that I

22   put down on his statement which he agreed to.

23       Q.    Okay.  Did you tell him that he had the

24   right -- once again when you took that written statement,

25   did you tell him again that he had the right to stop the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          63

1    interview at any time?

2         A.    Yes, I did.  Yes, I did.

3         Q.    Okay.  At any time while you're talking to him

4    and you're typing in, did he ever say, "I want a lawyer"?

5         A.    No.

6         Q.    Did he ever say, "I want to stop"?

7         A.    No, he didn't.

8         Q.    Did you ever have to -- did you say anything

9    coercing or threatening --

10        A.    No.

11        Q.    -- to get him to give you that statement?

12        A.    No.  I used no force or coercion against him.

13        Q.    Did you make him any promises?

14        A.    No, ma'am.

15        Q.    Did you ever deny anything he asked for?  Did

16   he ever ask to go to the restroom?

17        A.    I don't believe he did.  I believe I offered

18   him before, though.  I told him, "It's going to take a

19   little bit.  If you need to go to the bathroom or drink

20   some water, let me know."

21        Q.    Okay.  What about cigarettes, did he ever ask

22   to go smoke a cigarette or anything like that?

23        A.    No.

24        Q.    Did you ever deny him anything he asked for?

25        A.    No.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          64

1        Q.   Okay.  While you were taking the statement, did
2    he appear to you to be under the influence of any
3    alcohol?
4        A.   No, ma'am.
5        Q.   Did he appear to be under the influence of any
6    drugs?
7        A.   No, ma'am.
8        Q.   Okay.  Now, let's talk, then, about that
9    statement that you took.  I'm going to show you what has
10   been marked as State's Exhibit Number 66.  Do you
11   recognize what has been marked as State's Exhibit
12   Number 66?
13       A.   That's the statement I took from Ruben
14   Gutierrez.
15       Q.   Okay.  Does it contain his signature?
16       A.   Yes, it does.
17       Q.   Where is his signature on State's Exhibit
18   Number 66?
19       A.   It's at the end of the statement.
20       Q.   Okay.  And how did State's Exhibit Number 66
21   come into that form?
22       A.   This is printed out of the computer after he
23   had already told me what's here.  I spell checked it and
24   I printed it out.
25       Q.   Okay.  Now, that's all the typewriting -- I see

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                         65

1    there's some handwriting here on each -- at the end of
2    each paragraph.  What is that handwriting?
3         A.    Those are his initials after each paragraph.
4         Q.    When you say his initials, who are you talking
5    about?
6         A.    Ruben Gutierrez.
7         Q.    Okay.  And what are the initials that he puts
8    there?
9         A.    RG.
10                   MS. FISCHER:  Your Honor, at this time
11   we'd offer into evidence what has been marked as State's
12   Exhibit Number 66.  I will tender it to opposing counsel.
13                   MR. REYES:  We just reiterate all the
14   objections we previously made with respect to State's
15   Exhibit 66, Your Honor.
16                   THE COURT:  Okay.  Those objections will
17   be overruled and 66 will be admitted into evidence.
18                   **(State's Exhibit Number 66 admitted)**
19        Q.    (BY MS. FISCHER)  Detective Garcia, let's take
20   a look at State's Exhibit Number 66.  Okay.  What I'd
21   like you to do at this point is read from beginning to
22   end --
23                   MS. FISCHER:  Your Honor, may we publish
24   it to the jury at this time by having the detective read
25   it?

STATE OF TEXAS VS. RUBEN GUTIERREZ                              66

1              THE COURT:  Yes, he may read it.

2              MS. FISCHER:  Okay.

3         Q.   (BY MS. FISCHER)  I want you to start at the

4    beginning where it says, "I, Ruben Gutierrez," and I want

5    you to read from beginning to end all the whole statement

6    that Mr. Gutierrez --

7         A.   The whole statement?

8         Q.   -- gave to you.

9         A.   The statement goes like this:  "I, Ruben --"

10             THE COURT:  Before you start, can you

11   lower the microphone a little bit more?  There you go.

12   Thank you.

13        A.   It says, "I, Ruben Gutierrez, having been

14   warned by Detective Gilbert Garcia, Jr., whose occupation

15   is a police officer, at 4:40 p.m. on the 14th day of

16   September, 1998, at Brownsville, Cameron County, Texas,

17   that I have the right to remain silent and not make any

18   statements at all, and that any statements that I may

19   make may be used against me at my trial or trials;

20             "Number two, that any statement I make may

21   be used as evidence against me in court;

22             "Three, that I have a right to have an

23   attorney present to advise me prior to and during any

24   questioning;

25             "Four, that if I'm unable to employ an

1   attorney, I have the right to have an attorney appointed

2   to advise me prior to and during any questioning;

3                   "And, five, that I have the right to

4   terminate the interview at any time.

5                   "I understand all of my rights as stated

6   above; and now that I know all my rights, it is my choice

7   to voluntarily give them up and to freely, intelligently

8   and knowingly make the following statement.

9                   "My name is Ruben Gutierrez and I live at

10  4200 Boca Chica Boulevard, apartment 360.  My telephone

11  number there is 550-9209.  I'm 21 years of age and I was

12  born on June 10, 1977 in Fort Myers, Florida.  I am

13  unemployed.

14                  "Detective Garcia has read me my rights;

15  and I signed a copy of those rights which I understand.

16  I have waived my rights and am willing to give the

17  following statement.

18                  "Yesterday I gave Detective Flores a

19  statement in which I did not tell him everything.  I lied

20  to him about being in the house.  I lied to him about

21  being dropped off in the park, about not being with Rene

22  while they were taking out the suitcases.  Rene took the

23  little box and I took the blue suitcase."

24                  THE COURT:  Can you slow down just a

25  little bit?  You're rushing through this and it's hard to

STATE OF TEXAS VS. RUBEN GUTIÉRREZ                    68

1   keep up with the reading.

2        A.    "Pedro was in the truck.  I was in the house

3   looking for the money while Rene was stabbing that lady.

4   While I was at the back, Rene was in the front.  He was

5   supposed to take the old lady outside to talk about a

6   lot; and I was supposed to run around the other side of

7   the house and get in and take the money.

8               "It was around three in the afternoon.

9   After I waited at the back about two minutes, I thought

10  that maybe they were in the lot talking.  So I went

11  around the front.

12              "When I got to the front door, I could see

13  Rene was talking to the old lady and that he was on the

14  sofa.  I went in and I heard Rene saying, 'Yes, ma'am.

15  Yes, ma'am.'  And he stood up next to her at the desk and

16  he hit her on the face with his left hand on the face.

17              "Then he dragged her to the room by one

18  hand on the hair and one hand on the blouse.  When I went

19  into the room, he had one foot on her head waiting for

20  her to open her eyes or something.  That lady was knocked

21  out.  That's when I was already looking for the money.  I

22  found the money and I said," (Spanish spoken), "and

23  that's when he started stabbing her."

24              THE COURT:  Okay.  Wait a minute.  There's

25  some Spanish there.  You have to for the record --

STATE OF TEXAS VS. RUBEN GUTIERREZ                    69

1              THE WITNESS:  I'm sorry.

2              THE COURT:  -- interpret it.

3       A.   (Spanish spoken) means, "I found it," I guess,

4    "dude."

5                   "That's when he started stabbing her.  He

6    stabbed her with a screwdriver.  It had a clear handle

7    with red.  It was a standard screwdriver.  We had got the

8    screwdriver from the back of the truck in a toolbox along

9    with another screwdriver, a star type.

10                  "When he started stabbing her, I pulled

11   out the blue suitcase from the closet and the black

12   toolbox fell.  It opened when it fell and I saw the

13   money.  It just opened but nothing fell out.  It just

14   opened.  You could see the bills in there.

15                  "I got it and I closed it and I tossed it

16   to Rene.  When he got it, he put it on the bed and he

17   kept stabbing the old lady.  He told me that she didn't

18   want to die; and he kept on stabbing her and stabbing

19   her.

20                  "I told him to blow it off when I was

21   walking out with the blue suitcase.  I knew who she was.

22   I had talked to her before.  When I was opening the door,

23   he comes behind me.  By the time I got to the fence at

24   the entrance, Pedro pulled up in the truck.  Rene got in

25   the middle and I got on the driver's side --" excuse me,

1   "on the passenger's side.

2              "That's when Rene started cleaning the

3   screwdriver with his shirt.  Pedro kept asking," (Spanish

4   spoken), which means "What happened?  What happened?"

5              "And Rene said," (Spanish spoken), which

6   means, "I killed her."

7              "Pedro said," (Spanish spoken), which

8   means, "It's better.  There's no witnesses."

9              "That's when we were driving and we were

10  going by Norton.  That's when Rene gave me the

11  screwdriver.  I grabbed it by the point and I threw it

12  out the window.

13             "That's when we turned down the road that

14  runs behind the airport, and then we went down to

15  California Road.  Pedro stopped next to the resaca.  I

16  got off with the suitcase, and Rene got off with the

17  toolbox.  That's where I took out all the paperwork that

18  was there and threw it out there.

19             "We left the suitcase there.  Pedro was

20  doing a U-turn.  It took him about five minutes to do the

21  U-turn.  While he was doing a U-turn, I was filling up

22  the little box -- the little toolbox with the money that

23  was in the suitcase; and Rene was filling up his shirt.

24  That's when the truck came back.

25             "As soon as I saw the truck, I told Rene,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          71

1   'Let's go.'  I got the toolbox and I got in the truck.

2   That's when Rene got in the passenger's side and he threw

3   the money on the floor.  That's when Pedro and Rene took

4   and dropped me off at my house.  I didn't get that much

5   money.  I just got a little stack of 50's.  I was

6   supposed to get more.

7                "About three days before, Chacho, the old

8   lady's nephew, had told me to go in and rip off his aunt.

9   Chacho's real name is Avel Cuellar.  He had been driving

10  around the yard in the tractor.  He was supposed to be

11  cutting the grass, but he wasn't.

12               "I was passing by in my mom's car right

13  there on Central.  I was going to turn from Central to

14  Morningside.  I had the windows down and Chacho whistled

15  to me.  I went around and into the trailer lot.  He gave

16  me four bucks for me to go buy some beer.  I went to go

17  buy a six pack.  I had gone walking to the store.  It's

18  Cardenas store next to some apartments.  It's a

19  tortilleria also.  It looks like a house.

20               "I walked back and he was already waiting

21  for me under a tree in the trailer park.  I drank two

22  beers; and he asked me if I would do him a favor.  I told

23  him it depends on what it was.  Then he told me,"

24  (Spanish spoken), which means, "I want you to rob my

25  aunt."

STATE OF TEXAS VS. RUBEN GUTIERREZ                    72

1           "I told him, no, that I wanted to stay out
2     of trouble.  Then he told me that if I wanted to, on this
3     day she wasn't going to be there.  She was going to be at
4     the bank.  She was supposed to go on Friday.  He told me
5     that the front door was going to be open and that he
6     would be working on the tractor.  She was supposed to go
7     to the bank after one.  I told him that I would think
8     about it.
9           "On Friday as I was driving by, I saw
10    Chacho was working outside and I signalled to him that --
11    signalled to him what was going to happen; and he
12    signalled back that no.
13          "After that, on Saturday when I passed by,
14    I passed by with these two guys.  Pedro dropped me off
15    with Rene at the apartments next to the resaca.  We went
16    walking towards the office and that's when I saw Chacho.
17          "Chacho saw me because he was at Crispin's
18    house in the back.  Crispin wasn't there.  Chacho saw us
19    and he drove over to us.  Chacho told me that the house
20    was empty and to go do it, then he would meet us at the
21    back in about ten minutes, that he was going to buy some
22    beers at Pronto.
23          "Chacho never came back.  I haven't spoken
24    to Chacho since.  He was supposed to meet Rene at the
25    park and split the money.  Chacho doesn't know Rene.  He

STATE OF TEXAS VS. RUBEN GUTIERREZ                    73

1   told us that we were supposed to meet up at Gonzalez

2   Park, but I told him that I wasn't going to be there,

3   that Rene was going to be there since Rene lives right by

4   there.  He said, 'All right,' and took off and that's

5   when everything else happened.

6                "I have given this statement of my own

7   free will.  I have not been forced or coerced into giving

8   this statement nor have I been promised anything in

9   return for my statement.  I have read the statement and I

10  find it to be true and correct to the best of my

11  knowledge," signed by Ruben Gutierrez, witnessed by

12  Sergeant Sandra Galvan and myself.

13       Q.   (BY MS. FISCHER)  Detective Garcia what was

14  the defendant's demeanor while he was telling you that he

15  had been a party to Ms. Harrison's death?

16       A.   He was very calm, very cool.

17       Q.   Did it look like he was showing any remorse?

18       A.   There was no remorse shown whatsoever.

19       Q.   Any tears?

20       A.   None.  No emotions, nothing.

21       Q.   Let's talk, then, about State's Exhibit

22  Number 66 one more time.  You said that you allowed Ruben

23  Gutierrez to read those typed words?

24       A.   Yes, I did.

25       Q.   Okay.  How is it that you can tell the jury you

STATE OF TEXAS VS. RUBEN GUTIERREZ                    74

1   know that he read what is in State's Exhibit Number 66?

2       A.   He initialed after every paragraph and he

3   signed it.

4       Q.   Okay.  Go ahead and take a look at State's

5   Exhibit Number 66.  Is there initials after each and

6   every paragraph?

7       A.   Yes, with the exception of the first one --

8   with the exception of the first one and the last one over

9   here, too.

10      Q.   Okay.

11      A.   And the first one, the reason is that his

12  Miranda rights are there again and he has initialed each

13  one again.

14      Q.   Okay.  Why did you have him initial each one of

15  his Miranda rights?

16      A.   I wanted him to be well aware of his rights.

17      Q.   Okay.  Do you know if the defendant read it?

18      A.   I could see that he was reading it.

19      Q.   Okay.  And did you watch him while he did that?

20      A.   Yes, I did.

21      Q.   Okay.  Now let's talk about the time of this

22  statement.  Do you remember about what time of day it was

23  that you took that confession from Mr. Gutierrez?

24      A.   It was in the afternoon.

25      Q.   Do you remember about what time in the

1    afternoon?

2         A.   The statement says 4:40.  It was between four

3    and five.  That's when I started -- I started at 4:40.

4    Unfortunately, the format we have in the computer doesn't

5    have a time for an ending time.  So I don't know how long

6    it took.  I'd say about an hour and a half.

7         Q.   Okay.  And those magistrate warnings that we

8    talked about before, State's Exhibit Number 65, when did

9    that happen, before or after you took the statement?

10        A.   Sixty-five.  Okay.  This was before I took the

11   statement.

12        Q.   Okay.  So before you ever get to taking the

13   confession, you do the magistrate warnings?

14        A.   Yes.

15        Q.   Okay.  Detective Garcia, was there anything

16   else that you did in connection with this investigation

17   after talking to Mr. Gutierrez?

18        A.   I believe I took some other statements from

19   some other people.

20        Q.   Okay.  What were you doing when you were taking

21   those statements from other people?

22        A.   I took some witness statements and also some --

23   another statement in a confession form.

24        Q.   And did you do any of the collecting of any of

25   the money in this case?

1      A.    No, I didn't.

2      Q.    Okay.  What about any of the evidence?

3      A.    Just two vehicles that I recall.

4      Q.    Okay.

5               MS. FISCHER:  I pass the witness.

6               MR. REYES:  May I proceed, Your Honor?

7               THE COURT:  You may.

8                    **CROSS-EXAMINATION**

9  BY MR. REYES:

10     Q.    You testified earlier, Detective Garcia, that

11 Ruben Garcia was not taken to a magistrate until

12 September the 14th of 1998; is that correct?

13     A.    No, I didn't.

14     Q.    You testified earlier that he was taken before

15 a magistrate; is that correct?

16     A.    The day before.

17     Q.    On the 13th?

18     A.    Correct.

19     Q.    And are you sure of that?

20     A.    I know he was arrested on the 13th.  Whether he

21 saw the judge that day or not, I don't know.  I'd have to

22 see the magistrate warning and I could tell you.

23               MR. REYES:  May I approach the witness,

24 Your Honor?

25               THE COURT:  You may.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          77

1     Q.   (BY MR. REYES)   Let me go ahead and show you
2   what I have marked as Defendant's Exhibit Number 2 for
3   identification purposes only.  Let me go ahead and ask
4   you to review that.
5     A.   I'm not good at Spanish, but that's the
6   magistrate's warning.
7     Q.   Okay.  And do you know what date he was taken
8   before a magistrate?
9     A.   It says here September 14th.
10    Q.   Okay.  So --
11    A.   It doesn't have a time, though.
12    Q.   But he was arrested on --
13    A.   The day before for capital murder.
14    Q.   And he wasn't taken to a magistrate until
15  September the 14th; is that correct?
16    A.   Correct.
17    Q.   And by this time, Detective Antonio Flores had
18  already talked to him or interrogated him about three or
19  four separate times; is that correct?
20    A.   I remember seeing Detective Flores speaking
21  with him on at least two different occasions.
22    Q.   So at least on two different occasions he had
23  already been interrogated before having been taken before
24  a magistrate; is that correct?
25    A.   Yes.  Detective Flores spoke to him.

1      Q.   The answer to my question, then, would be yes?

2      A.   Yes.

3      Q.   You stated that your first involvement in this

4  case was on September the 6th of 1998?

5      A.   Correct.

6      Q.   And you stated that you had gone to the

7  Harrison Trailer Home Park; is that correct?

8      A.   Yes.   The office, yes.

9      Q.   You testified also that you had talked to an

10  individual by the name of Julio Lopez; is that correct?

11      A.   Yes.

12      Q.   And this was the individual that you had shown

13  that photo lineup to; is that correct?

14      A.   Correct.

15      Q.   And isn't it also correct that you talked to

16  him on September the 11th of 1998?

17      A.   I believe so.

18      Q.   Okay.   He gave you that statement -- a

19  statement; is that correct?

20      A.   I secured a statement from him.

21      Q.   Okay.   And you spoke to him on September the

22  11th of 1998; is that correct?

23      A.   I believe so.

24      Q.   And you also testified that you interrogated

25  Ruben Cardenas on September the 14th of 1998; is that

STATE OF TEXAS VS. RUBEN GUTIERREZ                          79

```
1    correct?
2         A.    Who's Ruben Cardenas?
3         Q.    I'm sorry.  Ruben Gutierrez.
4         A.    I spoke to him on the 14th, correct.
5         Q.    Was that the first time that you had spoken
6    with Mr. Gutierrez?
7         A.    Yes.
8         Q.    I want you to go ahead and look at what has
9    been marked as State's Exhibit Number 65.  You have that
10   before you.
11        A.    Okay.
12        Q.    You testified that you read this exhibit to
13   Ruben Gutierrez on September the 14th of 1998; is that
14   correct?
15        A.    That's correct.
16        Q.    And after you read it to him, you had him read
17   it to himself and then you had him initial that he had
18   read it; is that correct?
19        A.    Yes.  I had him initial each right.  If he
20   understood it --
21        Q.    That --
22        A.    -- to go ahead and initial it.
23        Q.    And you also went ahead and had him sign after
24   he read what -- the section that's titled, "Waiver;" is
25   that correct?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           80

```
 1        A.    Correct.  I told him to go ahead and read it
 2   and --
 3        Q.    My question was, you had him sign it after he
 4   read it; is that correct?
 5        A.    Correct.
 6        Q.    You also testified that Officer Ruben Carrejo
 7   was present while you were interrogating Ruben Gutierrez?
 8        A.    Rene Carrejo.
 9        Q.    Rene Carrejo.  He was present --
10        A.    He was in the cubicle next to us.
11        Q.    And you also testified that Antonio Flores was
12   present when Ruben Gutierrez was being questioned; is
13   that correct?
14        A.    He would come in from time to time.
15        Q.    Okay.  And if you notice on State's Exhibit
16   Number 65, you also testified that Sandra Galvan was
17   present; is that correct?
18        A.    That would be on -- yeah, she was stepping in
19   and out also.
20        Q.    Okay.  Well, you can't tell the ladies and
21   gentlemen of the jury -- if you look at State's Exhibit
22   Number 65, do you see where it says at the bottom,
23   "Witnessed by," and then it says, "Rene I. Carrejo"?
24        A.    Uh-huh.
25        Q.    You can't tell the ladies and gentlemen of the
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    81

1   jury what exactly it is that he witnessed; is that

2   correct?

3        A.    He witnessed my reading of the rights.

4        Q.    Well, you stated he was walking in and out of

5   your cubicle.

6        A.    No.  That was Detective Flores.

7        Q.    Okay.  So if Detective Flores then signed this

8   as a second witness, then you don't know whether or not

9   he witnessed the reading and the signing of this State's

10  Exhibit 65; is that correct?

11       A.    Detective Carrejo did witness this.

12       Q.    I'm talking about Detective Flores.

13       A.    No, not Detective Flores.

14       Q.    Detective Flores also signed as a witness to

15  State's Exhibit Number 66, which is that alleged

16  statement that you took from Ruben Gutierrez on September

17  the 14th of 1998; is that correct?

18       A.    No, he didn't sign it.

19       Q.    Who is the second witness who's listed on

20  there?

21       A.    The bottom signature is mine, and the one above

22  mine is Sergeant Sandra Galvan.

23       Q.    Okay.  And since Sandra Galvan was walking in

24  and out of your cubicle, you can't tell the ladies and

25  gentlemen of the jury whether or not she was actually a

STATE OF TEXAS VS. RUBEN GUTIERREZ                          82

1   witness to everything that happened during the taking of
2   the statement; is that correct?
3        A.   Not to everything, no.
4        Q.   With respect to State's Exhibit Number 66, you
5   said it's important that you have the person initial
6   after they read their rights; is that correct?
7        A.   Correct.
8        Q.   And would you agree with me that it's important
9   also that a person voluntarily, intelligently and
10  knowingly give up their rights?
11       A.   Correct.
12       Q.   So would you agree with me that the last
13  sentence on the first paragraph where it says, "I
14  understand all of my rights as stated above; and now that
15  I know all my rights, it is my choice to voluntarily give
16  them up and to freely, intelligently and knowingly make
17  the following statement," that is the actual waiver of
18  his rights?  Would you agree with me?
19       A.   Yes.
20       Q.   And you have no initials after that statement;
21  is that correct?
22       A.   That's correct.
23       Q.   And you don't have a signature from Ruben
24  Gutierrez after that statement; is that correct?
25       A.   At the end of the paragraph, correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          83

1        Q.    I'm sorry?

2        A.    At the end of the paragraph, correct.

3        Q.    And when you look at the last page, the

4   paragraph above the signature, which covers half of the

5   second page and the last two sentences of the third page,

6   you don't have his initials; is that correct?

7        A.    Yeah.

8        Q.    So you don't know for a fact whether or not he

9   read that paragraph; is that correct?

10       A.    It appeared he was reading it to me.

11       Q.    No.   You stated earlier that the reason you had

12  him initial each one of these paragraphs was to make sure

13  that he read them; is that correct?

14       A.    That's correct.

15       Q.    So it's safe for us to assume that if he did

16  not initial a paragraph, then he did not read it; is that

17  correct?

18       A.    It was an oversight.   Since the two lines are

19  so close to the top --

20       Q.    Is there --

21       A.    -- they can be easily missed.

22       Q.    Is there a signature of Ruben Gutierrez on

23  page 3 on the second line?

24       A.    No.

25       Q.    Is there initials by Ruben Gutierrez after that

STATE OF TEXAS VS. RUBEN GUTIERREZ                    84

1   second line on page 3?

2        A.   No.

3        Q.   You stated that the procedure that you followed

4   with respect to taking State's Exhibit Number 66 was that

5   you typed it out, you spell checked it, and then you

6   printed out one copy; is that correct?

7        A.   Correct.

8        Q.   And then you had him read that one copy that

9   you printed out initially; is that correct?

10       A.   Uh-huh.

11       Q.   And then you went ahead and reprinted a second

12  copy, and that's the one that you had him sign; is that

13  correct?

14       A.   I don't recall if this is just the one copy, if

15  he had any errors or anything that he wanted me to

16  correct or not.

17       Q.   But the copy that you had him sign or the

18  printout that you had him sign was the second one that

19  you printed out; is that correct.

20       A.   This is -- I don't remember if I printed out a

21  second one.

22       Q.   Well, you stated that -- your testimony --

23       A.   The standard procedure is to print out a first

24  one if -- and let him read it.  If there's nothing to be

25  changed or nothing, we don't print it out again.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          85

1    Q.   But your testimony was that you printed out one

2    copy, you had him read it; and then you printed out a

3    second copy and that's the one you had him sign.  Is that

4    correct?

5        A.   That was my testimony, yes.

6        Q.   Okay.  So if that was your testimony, then,

7    that's what you did?

8        A.   Probably.

9        Q.   So you're telling us that you might be lying?

10       A.   No, I'm not lying.  It's just that it's been

11   some time.

12       Q.   I understand that, but if you said that you

13   printed out one copy, you had him read it, and then you

14   printed out a second copy and then you had him sign that

15   second copy, then that is what happened?

16       A.   It's quite possible what happened.  I don't

17   recall if I printed out a second copy or not.  Usually I

18   wind up doing it but usually with witness statements

19   because they have something to add or delete.

20       Q.   But you stated that that was your testimony

21   earlier; is that correct?

22       A.   That was my testimony earlier.

23       Q.   Now you also testified that it took you about

24   an hour and a half from start to finish with respect to

25   State's Exhibit Number 65 and State's Exhibit Number 66;

1    is that correct?

2         A.    An hour and a half, two hours.

3         Q.    And that's to go ahead and get this two and a

4    half page statement --

5         A.    Correct.

6         Q.    -- from Ruben Gutierrez; is that correct?

7         A.    Correct.

8              THE COURT:  All right.  Let's go ahead and

9    break for the morning.  Ladies and gentlemen of the jury,

10   remember the instructions I've given you not to discuss

11   this case among yourselves or with anyone else, not to

12   form or express any opinions.  We'll take about a 15

13   minute break.

14             **(Recess from 10:29 a.m. to 10:50 a.m.)**

15             **(Jury not present)**

16             THE COURT:  Are you ready for the jury?

17             MR. BLAYLOCK:  Judge, I've got an issue

18   I'd like to approach.

19             THE COURT:  You may be seated.

20             MR. BLAYLOCK:  Judge --

21             THE COURT:  Do you want it on the record?

22             MR. BLAYLOCK:  Yes.

23             THE COURT:  Okay.  Well, speak up.

24             MR. BLAYLOCK:  Okay.  As another possible

25   witness, I've decided -- if we could add a witness who's

STATE OF TEXAS VS. RUBEN GUTIERREZ                    87

1   not on the witness list, Judge Neece is the one that
2   magistrated him that morning before he gave this
3   statement.
4                   Now, they've made it an issue about
5   magistrates.  I didn't anticipate that.  I would like to
6   call Judge Neece next unless they have an objection.
7                   MR. REYES:  We weren't put on notice,
8   Judge.  They never gave us --
9                   THE COURT:  Has he been subpoenaed?
10                  MR. BLAYLOCK:  He hasn't been subpoenaed.
11  He's not --
12                  THE COURT:  Well, subpoena him and then
13  you can bring him in.
14                  MR. REYES:  Just for the record, we would
15  object, Judge.  We were never put on notice that he would
16  be called as a witness.  And he wasn't subpoenaed and
17  they never gave us his name as a possible witness.
18                  THE COURT:  Well, you're put on notice now
19  that they're going to subpoena him.  I don't know if they
20  will or not, but I'm giving them permission to subpoena
21  him.  After he's been served with the subpoena he can
22  come in and testify.
23                  All right.  Bring in the jury.
24                  **(Jury brought into the courtroom)**
25                  THE COURT:  All right.  You may be seated.

STATE OF TEXAS VS. RUBEN GUTIERREZ                88

1    As you can tell we have some visitors from Faulk Middle

2    School here in Brownsville.  I gave them permission to

3    come in and observe the trial for a short period of time.

4                   **(The Court addressed the school children)**

5                   THE COURT:  All right.  You may be seated;

6    and you may proceed.

7                   MR. REYES:  May I proceed, Your Honor?

8                   THE COURT:  You may.

9                   **CROSS-EXAMINATION CONTINUED**

10   **BY MR. REYES:**

11        Q.    Detective Garcia, we were talking yesterday --

12   I'm sorry, before our break, you stated that you had

13   interrogated Ruben Gutierrez on September the 14th of

14   1998; is that correct?

15        A.    I spoke to him, correct.

16        Q.    And you stated that you had initiated the

17   taking of this statement; is that correct?

18        A.    What --

19        Q.    In other words, you went over to the county

20   jail to contact him about getting a statement from him;

21   is that correct?

22        A.    Correct.

23        Q.    Ruben Gutierrez never contacted you and he

24   never told you, "I want to give you a statement"?  You're

25   the one that went to the county jail to pick him up about

STATE OF TEXAS VS. RUBEN GUTIERREZ                                89

1   getting a statement; is that correct?
2        A.   I went to county and asked him if he wanted to
3   talk to me and he said, "Yes."
4        Q.   My question was, you went to the county jail to
5   see about taking a statement from him; is that correct?
6        A.   Correct.
7        Q.   So you're the one that initiated the taking of
8   any kind of statement on September the 14th of 1998; is
9   that correct?
10       A.   Correct.
11       Q.   And isn't it correct that when you had Ruben
12  Gutierrez sign what has been admitted into evidence as
13  State's Exhibit Number 66, you told him that you all, in
14  fact, had lost those other two statements and that these
15  were just -- this was just a copy and for him just to
16  re-sign it?
17       A.   No, I didn't tell him that.
18       Q.   And isn't it correct that you were making
19  threats against -- as to his wife?  You were telling him
20  that, in fact, you were going to arrest her if he did not
21  give you a statement on September 14th of 1998?
22       A.   That is incorrect.
23       Q.   And isn't it also correct that you threatened
24  to take away his kids and call child protective services
25  if he did not give you a statement?

1      A.   No, I didn't.

2      Q.   You testified earlier that his mother -- that

3  Ruben Gutierrez had advised you that his mother was

4  looking for an attorney; is that correct?

5      A.   Yes.

6      Q.   Okay.  And isn't it also correct that an

7  employee from Santiago Galarza's office was, in fact, at

8  the Brownsville Police Department advising the

9  Brownsville Police Department at 2:30 in the afternoon on

10  September the 14th of 1998 that Mr. Galarza had, in fact,

11  been hired and for you to stop questioning him?  Isn't

12  that correct?

13      A.   No, that's not correct.

14      Q.   You were never informed as to that fact?

15      A.   I was informed that there was a representative

16  from a law office downstairs.

17      Q.   So you knew that somebody was there from

18  Mr. Galarza's office or from a law office?

19      A.   Correct, from a law office.

20      Q.   And the information that you had also was the

21  fact -- was the fact that Ms. Gutierrez was looking for

22  an attorney for her son; is that correct?  This is the

23  information that --

24      A.   Yeah, that's what he told me.

25      Q.   And you were questioning Ruben Gutierrez at

STATE OF TEXAS VS. RUBEN GUTIERREZ                     91

1    4:40 in the afternoon on September the 14th of 1998; is

2    that correct?

3         A.    That is correct.

4         Q.    So you were questioning him for two full hours

5    after somebody from Mr. Galarza's office was there to

6    advise you not to question him; is that correct?

7         A.    I was never advised not to question him.

8         Q.    You were talking to him two full hours after

9    somebody from Mr. Galarza's law office was there at the

10   Brownsville Police Department; is that correct?

11        A.    I would have to see what time I signed him out

12   to give you a better time.

13        Q.    Well, you stated that these forms, State's

14   Exhibit 65 and 66, were signed at about 4:40 in the

15   afternoon on September the 14th of 1998; is that correct?

16        A.    That's correct.

17        Q.    And any information that you had received was

18   that somebody from a law office was there; is that

19   correct?

20        A.    Yes.

21        Q.    And do you recall what time that individual

22   from Mr. Galarza's office was there?

23        A.    It was in the afternoon.

24        Q.    But you don't recall what time?

25        A.    I don't remember the exact time, no.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    92

1      Q.   You learned through your investigation that

2  Avel Cuellar had, in fact, had several arguments with

3  Escolastica Harrison; is that correct?

4      A.   Yes.

5      Q.   And you learned through your investigation that

6  Escolastica Harrison and Avel Cuellar lived at the same

7  residence; is that correct?

8      A.   That's correct.

9      Q.   And you learned through your investigation that

10  Avel Cuellar lived in the back portion of Escolastica

11  Harrison's house; is that correct?

12      A.   Correct.

13      Q.   And you also learned through your investigation

14  that the back portion of Avel Cuellar's room was, in

15  fact, connected to Escolastica Harrison's portion of the

16  residence; is that correct?

17      A.   Correct.

18      Q.   In other words, you could walk in into each

19  part of the house?

20      A.   Where Mr. Cuellar stayed, is --

21      Q.   It's connected --

22      A.   -- two -- well, you have to go through the

23  garage.

24      Q.   Okay.  But you have access to the --

25      A.   If the back door to the garage from the main

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                93

1    house is not locked, yes, you have access.
2         Q.    Okay.  And isn't it correct that you also found
3    out through your investigation or you discovered that
4    there was some drops of blood which appeared to be in
5    Avel Cuellar's part of the residence; is that correct?
6         A.    I believe so.
7         Q.    Isn't it also correct that you found what
8    appeared to be watered down blood stains in Avel
9    Cuellar's toilet?
10        A.    In the bathroom area, correct.
11        Q.    And isn't it correct that you also found some
12   blood drops on the couch --
13        A.    Yes.
14        Q.    -- at that residence?
15        A.    Yes, I did.
16        Q.    And isn't it correct that you also found some
17   blood on Avel Cuellar's right hand?
18        A.    I didn't speak to him that initial night.
19        Q.    Okay.  Do you have any information from your
20   investigation that he, in fact, had some blood on his
21   right hand?
22        A.    I had been informed by one of the previous
23   detectives, but I never saw that on him.
24        Q.    But you had been informed that he had some
25   blood on his right hand; is that correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    94

1        A.    Correct.

2        Q.    You also had learned from your investigation

3   that there was -- someone had stepped in a puddle of

4   blood that was located at that residence of Escolastica

5   Harrison; is that correct?

6        A.    I wasn't there the initial night.  I came in

7   the next day.

8                    THE COURT:  No.  The question is, did you

9   learn that through the investigation?

10       A.    Yes.

11       Q.    (BY MR. REYES)  That somebody had left a

12  footprint in a puddle of blood at Escolastica Harrison's

13  home?

14       A.    I was told.

15       Q.    And to your knowledge as a case agent -- let me

16  back up here a little it.  You are the one that was in

17  charge of this investigation; is that correct?

18       A.    I was put in charge of it.

19       Q.    And were any photographs taken of that

20  footprint to your knowledge?

21       A.    To my knowledge, it's a good possibility, but I

22  don't -- I don't know.

23       Q.    Do you know for a fact whether or not any --

24       A.    For a fact, no, I don't know for a fact.

25       Q.    Did you direct anybody, any of your police

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    95

```
1    officers to take any photographs of that footprint in
2    that puddle of blood?
3         A.   Well, when I got there the next day --
4         Q.   My question --
5         A.   -- the blood had been cleaned up.
6         Q.   My question was, did you direct anybody to take
7    any photographs of that puddle of blood?
8         A.   No.
9         Q.   Did you direct anybody to make any kind of
10   castings of that footprint that was located in that
11   puddle of blood?
12        A.   Not castings, no.
13        Q.   And you would agree with me that if a casting
14   was made of that footprint, then, that could easily be
15   matched up to a certain individual?
16        A.   You can't cast on a hard surface.
17        Q.   Did you all even attempt to do that?
18        A.   You can't cast on it.  Casting is for ground,
19   soft ground.
20        Q.   Did you --
21        A.   We can only photograph what's there.
22        Q.   But no photographs were made; is that correct?
23        A.   Not to my knowledge.
24        Q.   Was the Department of Public Safety, to your
25   knowledge, called to see if they could, in fact, match up
```

1    that footprint that was found in that puddle of blood

2    with anybody else's?

3         A.   Not to my knowledge.

4         Q.   You also learned through your investigation

5    that Avel Cuellar had been at the VFW on September the

6    5th of 1998; is that correct?

7         A.   I believe so.

8         Q.   And you also learned through your investigation

9    that he, in fact, had left for a couple of hours; is that

10   correct?

11        A.   I believe so.

12        Q.   And you also learned through your investigation

13   that he, in fact, had given the waitress that night a

14   $100 bill as a tip; is that correct?

15        A.   That's correct.

16        Q.   And when we're talking about this individual,

17   we're talking about Avel Cuellar; is that correct?

18        A.   Correct.

19        Q.   And Avel Cuellar being Escolastica Harrison's

20   nephew?

21        A.   Correct.

22        Q.   Other than on September the 14th of 1998, did

23   you at all attempt to interrogate Ruben Gutierrez again?

24        A.   The only time I spoke to him was on that date.

25   I never spoken to him before or afterwards.

1          MR. REYES:  I'll pass the witness, Your
2    Honor.
3          MS. FISCHER:  May I, Judge?
4          THE COURT:  Go ahead.
5                **REDIRECT EXAMINATION**
6    BY MS. FISCHER:
7      Q.   Now, let's talk for a minute, Detective Garcia,
8    about this second copy of the statement.  Do you know for
9    a fact in this particular case when you were taking the
10   statement of Ruben Gutierrez on the 14th, did you print
11   out one copy of his statement or two?
12     A.   For a fact, I don't recall if I printed out one
13   or two.
14     Q.   Okay.  Why would you -- if you had already
15   printed out one copy, why would you have printed out a
16   second?
17     A.   Okay.  The second copy is usually printed out
18   after the first copy is given to whoever is giving the
19   statement; and they are allowed to proofread it and make
20   any additions or deletions or changes they might want to
21   make.
22          Once they -- I let them hold on to that
23   second copy -- of that first copy, excuse me, and then
24   I'll go back into the computer and I'll ask them, "Okay.
25   Where?  Tell me what line."  Then I'll get in and either

STATE OF TEXAS VS. RUBEN GUTIERREZ                98

1    add or delete or whatever they want to do.  And then once
2    that's done, I take the copy they have, tear it up and
3    print a new copy.
4         Q.   So there's really not ever two copies; there's
5    a rough draft and if they don't like that, it gets thrown
6    in the trash?
7         A.   Correct.
8         Q.   And then you print out not a second statement,
9    but you print out a corrected statement?
10        A.   Yes, ma'am, a revised statement.
11        Q.   Okay.  Mr. Galarza said you printed out two
12   copies of two different statements and had the defendant
13   sign whatever happened, sign whatever you put in front of
14   him.  Is that how it happened?
15        A.   No.  I allowed him to read it.
16        Q.   Then tell me what you did in this case.  You
17   printed out the first statement.  Then what did the
18   defendant do?
19        A.   He was allowed to read it.  He read his own
20   statement.
21        Q.   Did he ask to make any changes?
22        A.   I can't recall if he did or not.
23        Q.   Okay.  If he did, what would you have done?
24        A.   I would have made the changes wherever he
25   indicated and printed out a new copy and tore up the old

STATE OF TEXAS VS. RUBEN GUTIERREZ                          99

1   copy.

2        Q.    Okay.  Do you remember doing that in this case?

3        A.    No, I don't.

4        Q.    Okay.  But State's Exhibit Number 66 --

5              MS. FISCHER:  Your Honor, may I approach?

6              THE COURT:  You may.

7        Q.    (BY MS. FISCHER)  We keep saying first copy,

8   second copy.  Is this the original statement Ruben

9   Gutierrez read?

10       A.    Yes, it is.

11       Q.    And the original statement he signed?

12       A.    Correct.

13       Q.    And there is no other copy of this running

14  around?

15       A.    There is no other statement.

16       Q.    And this is the original one that came out of

17  the computer?

18       A.    Correct.

19             MS. FISCHER:  Your Honor, may I publish it

20  to the jury?

21             THE COURT:  You may.

22       Q.    (BY MS. FISCHER)  Let's talk about magistrate

23  warnings.  Are they required before you can talk to

24  somebody about giving a confession?

25             MR. REYES:  Objection, Your Honor.  It

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                         100

1   calls for a legal conclusion.

2                    THE COURT:   Overruled.

3        A.   No.

4        Q.   (BY MS. FISCHER)  Does the magistrate warnings

5   have anything to do with you taking a statement under

6   Article 38.22 of the Code of Criminal Procedure?

7        A.   No, they don't.

8        Q.   Okay.  And your guidelines in taking State's

9   Exhibit Number 66 right there come out of Section 38.22

10  of the Code of Criminal Procedure, don't they?

11       A.   Correct.

12       Q.   Okay.  State's Exhibit Number 66, those words

13  in there, where do they come from?

14       A.   They came from Ruben Gutierrez.

15       Q.   Okay.  Do you have any way of knowing whether

16  or not what he's telling you in that statement is true or

17  false?

18       A.   No.

19       Q.   You just write down what he tells you?

20       A.   Exactly.

21       Q.   Were you able to corroborate anything given in

22  that statement?

23       A.   No.

24       Q.   The representative of Mr. Galarza's office, you

25  had said when you were talking to Mr. Reyes that you did

STATE OF TEXAS VS. RUBEN GUTIERREZ                          101

1   not remember what time it was that they had come by.  If

2   you had a copy of your report, would that help you

3   refresh your memory?

4        A.   I have my report, but normally I don't put

5   times.

6        Q.   Detective, I'm going to ask you to go ahead and

7   take a look at it.  Look at the --

8        A.   It'll be on September 14th.

9        Q.   -- one, two, three, four, fifth page from the

10  back.  I think you talk there about someone coming.  Have

11  you found that, Detective?

12       A.   I found the page.

13       Q.   Okay.

14       A.   Okay.  Yeah.  I found it.

15       Q.   Go ahead and read that and refresh your memory,

16  and then I'll ask you a couple of questions.

17       A.   How much do you want me to read?  Okay.

18  "Detective --"

19                  MR. REYES:  I'm going to object to --

20       Q.   (BY MS. FISCHER)  No.  I just want to ask you

21  some questions about it.  I want you to read to

22  yourself --

23       A.   Oh, okay.

24       Q.   -- to refresh your memory.

25       A.   Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              102

1      Q.   Okay.  Did someone from the law offices of

2   Santiago Galarza come to the Brownsville Police

3   Department on September the 14th?

4      A.   A female claiming to be from that office went

5   there.

6      Q.   Okay.  Did that female who came from that

7   office say she was a lawyer?

8      A.   Not to my knowledge, no.

9      Q.   Did -- was she a lawyer?

10     A.   When I got down, she wasn't there.  I didn't

11  speak to her.

12     Q.   Okay.  But did she tell anyone that she was a

13  lawyer?

14              MR. REYES:  Objection, Your Honor.  It

15  calls for hearsay.

16              THE COURT:  That's overruled.

17     A.   Not to my knowledge.

18     Q.   (BY MS. FISCHER)  She said she was a

19  representative from the office?

20     A.   Correct.

21     Q.   And about what time was it that she came to the

22  police department?

23     A.   About 4:38 according to my report.

24     Q.   Okay.  And then did you go down and speak with

25  her?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          103

1        A.    I went downstairs, but she was gone.  There was
2    no business card or anything left to indicate who she was
3    representing or where she was from.
4        Q.    About how long was it after they told you at
5    4:38 that she was down there that you went to talk to
6    her?
7        A.    When they told me, I went downstairs.
8        Q.    Immediately?
9        A.    Yes.
10       Q.    And she was already gone?
11       A.    She was gone.
12       Q.    Now, let's talk about this puddle of blood.
13   And you may need to refresh your memory, but do you ever
14   remember the family coming up to you and saying, "It was
15   our mistake.  We're the ones that stepped in the blood"?
16              MR. REYES:  I'm going to object, Your
17   Honor, to leading and also calls for hearsay.
18              THE COURT:  Don't lead your witness,
19   counsel.  Rephrase your question.
20       Q.    (BY MS. FISCHER)  Did you ever have any
21   information in your investigation about where that puddle
22   of blood had come from?
23       A.    Where it came from?
24       Q.    I mean, where the footprint -- I'm sorry, where
25   the footprint in the puddle of blood came from.

STATE OF TEXAS VS. RUBEN GUTIERREZ                      104

```
 1        A.   I was told that it was --
 2               MR. REYES:  Objection, Your Honor.  It
 3   calls for hearsay.
 4               THE COURT:  Did you have any information,
 5   is the question, about that footprint.
 6        Q.   (BY MS. FISCHER)  What information did you get
 7   about where that footprint came from?
 8        A.   I don't recall.
 9        Q.   Okay.  Would it help you to look at your report
10   to perhaps refresh your memory?
11        A.   Yes.  Let me see if I put it here.
12        Q.   If you look on the tenth page of your report,
13   Detective, perhaps that will help you refresh your
14   memory.
15        A.   What page is that?
16        Q.   September the 9th, if you'll read that page,
17   please.
18        A.   Okay.  Yes.  Okay.  Yeah.
19        Q.   Okay.  Now that you've refreshed your memory,
20   did it ever come -- as part of your investigation, did
21   you ever learn where that bloody footprint originated
22   from?
23               MR. REYES:  I'm going to object, Your
24   honor.  It calls for hearsay.
25               THE COURT:  Overruled.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              105

1     Q.   (BY MS. FISCHER)  Where did that bloody

2  footprint originate from?

3     A.   From one of the family members.

4     Q.   So it has nothing to do with the killer in this

5  case?

6     A.   No, it doesn't.

7          MS. FISCHER:  I pass the witness.

8          MR. REYES:  May I proceed, Your Honor?

9          THE COURT:  You may.

10                    **RECROSS-EXAMINATION**

11 **BY MR. REYES:**

12     Q.   You stated that you found out that an

13 individual from Mr. Galarza's office was at the

14 Brownsville Police Department at 4:38 in the afternoon on

15 September the 14th of 1998; is that correct?

16     A.   That's correct.

17     Q.   And you took -- you began taking this

18 statement, which is marked as State's Exhibit 65 and

19 State's Exhibit Number 66, at 4:40 in the afternoon; is

20 that correct?

21     A.   Correct.

22     Q.   So even though you knew that somebody from a

23 law office was there with respect to Ruben Gutierrez, you

24 continued with your questioning; is that correct?

25     A.   I went downstairs.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    106

1      Q.    My question was, even though you knew that --
2   you had been informed that somebody from a law office was
3   there regarding Ruben Gutierrez, you continued to
4   question him; is that correct?
5      A.    I hadn't begun questioning him yet.
6      Q.    You knew that somebody was there from
7   Mr. Galarza's office or from a law office at 4:38 in the
8   afternoon; is that correct?
9      A.    That's correct.
10     Q.    And you didn't begin your questioning until
11  4:40 in the afternoon --
12     A.    Correct.
13     Q.    -- two minutes afterwards; is that correct?
14     A.    Correct.
15     Q.    On September the 14th of 1998 when you were
16  talking to Ruben Gutierrez, was he under arrest?
17     A.    He had already been arrested.
18     Q.    My question was, was he under arrest?  Yes or
19  no.
20     A.    I believe so.
21     Q.    Was he free to leave?
22     A.    No.
23     Q.    You found out about that footprint on September
24  the 9th of 1998; is that correct?
25     A.    Correct.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    107

1       Q.    And you took the family's word at face value
2   that that footprint belonged to one of them?
3       A.    Correct.
4       Q.    Did you question anybody else regarding that
5   footprint?
6       A.    That was the -- at that time, that was the only
7   family member I had contacted at that point in time.
8       Q.    And what family member was that?
9       A.    Mr. Jose Cuellar.
10      Q.    And do you know what his relationship is to
11  Avel Cuellar?
12      A.    I believe it's his uncle.
13              MR. REYES:  Nothing further, Your Honor.
14                    **REDIRECT EXAMINATION**
15  **BY MS. FISCHER:**
16      Q.    Did the defendant, Ruben Gutierrez, ever ask
17  for an attorney?
18      A.    No, he didn't.
19      Q.    Those Miranda rights, it's the defendant's
20  right to ask for an attorney, isn't it?
21              MR. REYES:  Objection, Your Honor.  It
22  calls for a legal conclusion.
23              THE COURT:  That objection is overruled.
24      A.    Yes.
25      Q.    (BY MS. FISCHER)  You can't force a lawyer on

STATE OF TEXAS VS. RUBEN GUTIERREZ                    108

```
 1   them, can you?
 2        A.   No, I cannot.
 3        Q.   The most high powered, richest attorney in town
 4   could have come knocking on that door saying, "I'm going
 5   to be that man's lawyer," and it doesn't make a
 6   difference, does it?
 7             MR. REYES:  Objection, Your Honor.  It
 8   calls for speculation and a legal conclusion.
 9             THE COURT:  It's overruled.
10        A.   Yes.
11        Q.   (BY MS. FISCHER)  The defendant has to ask for
12   an attorney?
13        A.   Correct.
14        Q.   Did he?
15        A.   No, he didn't.
16             MS. FISCHER:  I pass the witness.
17             THE COURT:  Anything further?
18             MR. REYES:  Nothing further, Your Honor.
19             THE COURT:  All right.  You may step down.
20             You may call your next witness.
21             MS. FISCHER:  Detective Juan --
22             MR. BLAYLOCK:  Go ahead.  Juan Hernandez.
23             MS. FISCHER:  Detective Juan Hernandez.
24             THE COURT:  Could you raise your right
25   hand, please?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    109

```
1                      THE WITNESS:  Yes, sir.
2                      (The witness was sworn in by the Court)
3                      THE WITNESS:  Yes, sir, I do.
4                      THE COURT:  All right.  You may be seated.
5                 You may proceed.
6                      MS. FISCHER:  Thank you, Judge.
7                           JUAN HERNANDEZ JR.,
8            having been first duly sworn, testified as follows:
9                           DIRECT EXAMINATION
10      BY MS. FISCHER:
11           Q.    Detective Hernandez, will you please tell the
12      jury your full name?
13           A.    Yes, ma'am.  My name is Juan Hernandez, Jr.
14           Q.    And what do you do for a living?
15           A.    I'm a police officer for the City of
16      Brownsville.
17           Q.    Are you a certified police officer in the State
18      of Texas?
19           A.    Yes, ma'am.
20           Q.    How long have you been a certified police
21      officer in the State of Texas?
22           A.    Since 1991.
23           Q.    And how long have you been with the Brownsville
24      Police Department?
25           A.    Since 1987.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                         110

1      Q.   And what is it that you currently do at the
2    Brownsville Police Department?
3      A.   Currently assigned to the criminal
4    investigations division as a crime scene officer.
5      Q.   And what does it mean to be a crime scene
6    officer?
7      A.   The crime scene officer is responsible for
8    responding to any crime scene that comes about from a
9    burglary to a murder.  My job is to go and try and obtain
10   physical evidence, latent prints on a burglary,
11   photograph the scene, document it, diagram, videotape,
12   whatever the case might call for.
13     Q.   Okay.
14          THE COURT:   Detective, can I ask you to
15   please raise the microphone a little bit?  Thank you.  Go
16   ahead.
17     Q.   (BY MS. FISCHER)  Do you do any actual
18   investigation as to who committed a particular crime?
19     A.   No, ma'am.
20     Q.   Okay.  You just do the gathering of the
21   evidence?
22     A.   Yes.
23     Q.   Okay.
24          MS. FISCHER:   Your Honor, may I approach?
25          THE COURT:   You may.

1      Q.   (BY MS. FISCHER)  Detective Hernandez, we've

2   actually put in a number of exhibits; and I'm just going

3   to ask you, are you the person that did all these?  Let's

4   take a look at State's Exhibit Number 22.  Did you create

5   this drawing as part of your investigation?

6      A.   Yes, ma'am.

7      Q.   Okay.  State's Exhibit Number 33, did you

8   create this drawing as part of your investigation?

9      A.   Yes, I did.

10     Q.   Okay.  Did you also take a number of

11  photographs?  And we have quite a few of them in

12  evidence.  Let's just take a look at a few of these,

13  State's Exhibit Number 7, Number 4.  Were these all

14  photographs that you took as part of this investigation?

15  State's Exhibit Number 2.  If you'll just kind of look

16  through these.  Were these photographs that you took in

17  connection with this investigation along with a couple of

18  other officers?

19     A.   Yes, ma'am.

20     Q.   Okay.  One of your other jobs as part of being

21  the crime scene investigator also includes going to

22  autopsies, doesn't it?

23     A.   Yes, ma'am.

24     Q.   And why is it that you go to an autopsy?

25     A.   I go to attend on behalf -- and witness on

STATE OF TEXAS VS. RUBEN GUTIERREZ                    112

1   behalf of the department, and also just initiate the

2   chain of custody of evidence.

3        Q.   Okay.  In this particular case, did you go to

4   the autopsy?

5        A.   Yes, ma'am, I did.

6        Q.   And while at the autopsy, did you gather any

7   evidence?

8        A.   Yes, ma'am.  I went ahead and received from

9   Dr. Dahm the victim's clothing and also a sexual assault

10  kit.

11       Q.   Okay.  The victim's clothing that you collected

12  from Dr. Dahm, do you happen to know what it is?

13       A.   I remember it was a nightgown.

14       Q.   Okay.  Was there anything else that you

15  collected other than a nightgown?

16       A.   The scrapings and hair collection and all that

17  part of a sexual assault kit.

18       Q.   Okay.

19            MS. FISCHER:  Your Honor, may I approach?

20            THE COURT:  You may.

21       Q.   (BY MS. FISCHER)  Detective Hernandez, I'm

22  going to show you what has been marked as State's

23  Exhibits Numbers 69, State's Exhibit Number 68 and

24  State's Exhibit Number 67.  Do you recognize what those

25  items are?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          113

1        A.    Yes, ma'am.  These are the clothing.

2        Q.    Okay.  When and where did you first receive

3   these -- first see these items?

4        A.    I saw them at the crime scene, but I collected

5   them at the autopsy, the date of the autopsy, that same

6   day following afternoon.

7        Q.    And when you say you saw them at the crime

8   scene, I think there's a photograph of Ms. Harrison.  Are

9   those -- State's Exhibit Number 16, are those the same

10  items that are in State's Exhibit Number 16?

11       A.    Yes, ma'am.

12       Q.    And so, State's Exhibit Number 67, 68 and 69 is

13  what she was wearing the day she was killed?

14       A.    Yes, ma'am.

15       Q.    And who did you receive those from?

16       A.    Dr. Dahm.

17       Q.    Okay.  Are they in the -- are those the

18  identical items that Ms. Harrison was wearing when you

19  saw her laying there dead on the floor?

20       A.    Yes, ma'am.

21             MS. FISCHER:  Your Honor, at this time

22  we'd offer State's Exhibits Number 68, 69 and 67 into

23  evidence.  I'm going to remove at this time the bags that

24  they were placed in as I have repackaged them myself and

25  put them into plastic bags.  They were previously placed

STATE OF TEXAS VS. RUBEN GUTIERREZ                          114

1   in paper bags for drying purposes as they are bloody.

2              MR. REYES:  No objections, Your Honor.

3              THE COURT:  All right.  Sixty-seven, 68

4   and 69 will be admitted into evidence.

5              **(State's Exhibit Numbers 67, 68 and 69**

6              **admitted)**

7        Q.   (BY MS. FISCHER)  Now, you said that you also

8   collected some fingernail scrapings from Dr. Dahm and a

9   sexual assault kit; is that right?

10       A.   Yes, ma'am.

11       Q.   Okay.  And to your knowledge, was that stuff

12  sent off to the lab for testing?

13       A.   I don't know, ma'am.

14       Q.   Okay.  But would that be something that you

15  would do would be to send those items off to the lab for

16  testing?

17       A.   No.  Once I seize them and place them into

18  evidence, that decision is made by the case agent.

19       Q.   Okay.  Now, let's talk also about other things

20  that you did in connection with Ms. Harrison's murder.

21  You said that you went to the crime scene.  While at the

22  crime scene, did you collect any evidence there?

23       A.   We went ahead and photographed it.  As far as

24  the collection of evidence, no, I did not.

25       Q.   What about blood, was there any blood at the

1    crime scene?

2         A.    Yes, there was.

3         Q.    Did you collect any of that?

4         A.    I collected that the following afternoon or

5    that -- since we got called at around two in the morning,

6    I think we collected the blood around -- in the afternoon

7    of that day.

8         Q.    Okay.  Where did you collect blood from in that

9    house?

10        A.    I was instructed by Detective David Garcia --

11   correction, Gilbert Garcia, who is -- while I was

12   attending the autopsy, he was at the crime scene.  And he

13   noticed that there was some blood -- for example, there

14   was a raincoat in one of the bedrooms that had a drop of

15   blood.  There was also collection from the bathroom, the

16   lid of the water tank, also on the exterior side of the

17   window screen -- I mean, the screen door that leads into

18   the garage.  Those are the areas that we collected blood.

19        Q.    What about on the couch, was there any blood

20   collected off of the couch?

21        A.    There was two, I believe, blood drops that we

22   went ahead and we cut off the pieces where there was.

23        Q.    Do you remember what color the couch was?

24        A.    I believe it was yellow.

25                    MS. FISCHER:  Your Honor, may I approach

1    the witness?

2                   THE COURT:  You may.

3         Q.   (BY MS. FISCHER)  I'm going to show you here

4    State's Exhibit Number 29.  Does that look familiar to

5    you?

6         A.   Yes, ma'am.

7         Q.   Okay.  And why does it look familiar to you?

8         A.   That's the couch that was in the office space

9    of the crime scene.

10        Q.   Okay.  Is that the -- the couch that you're

11   referring to that you got the blood off of?

12        A.   Yes, ma'am.

13        Q.   Where -- if you don't mind --

14                  MS. FISCHER:  Your Honor, may he step

15   down?

16                  THE COURT:  He may.

17        Q.   (BY MS. FISCHER)  Can you show the jury where

18   the blood was on that couch?  Does that picture show

19   where the blood was?

20        A.   No.

21        Q.   Okay.  Can you kind of -- we may not have a

22   full picture of that, Detective Hernandez.  You may just

23   have to show them where it was.  If you put these two

24   kind of together, does that help?  I don't think it shows

25   the blood.  Can you get down and show the jury where the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    117

```
 1   blood was on that couch?
 2                    MR. REYES:  May I approach, Your Honor?
 3                    THE COURT:  You may.
 4        A.   This is the front door entrance of the crime
 5   scene, and the couch is right alongside of the wall.  I
 6   believe the blood drops Detective Garcia asked me to
 7   collect were on the side.
 8        Q.   (BY MS. FISCHER)  Okay.  Make sure all the
 9   jurors see that, Detective Hernandez.
10                    And when you said the side, where is it
11   that you're pointing to on that couch?
12        A.   Closer to the doorway.
13        Q.   Okay.  Detective Hernandez, let me show you
14   State's Exhibit Number 70 here.  Maybe this will help.
15   That was my fault.  I should have --
16                    THE COURT:  Number 70?
17                    MS. FISCHER:  Yes.
18        Q.   (BY MS. FISCHER)  Let me show you --
19   Detective, State's Exhibit Number 70, will you take a
20   look at that?  Are you familiar with -- are you familiar
21   with the object that's in that picture?
22        A.   Yes.
23        Q.   Okay.  Is that an accurate depiction of what is
24   in that picture?
25        A.   Yes.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                118

1        Q.    Is that how it -- you can't show it to the jury

2   yet.

3        A.    Okay.

4        Q.    Is that how it looked when you first saw that

5   object back on September the 5th or 6th?

6        A.    The 6th, yeah, September the 6th.  Yes, ma'am.

7        Q.    Okay.

8                  MS. FISCHER:  Your Honor, at this time we

9   would offer into evidence State's Exhibit Number 70.

10                 MR. REYES:  We have no objection, Your

11  Honor.

12                 THE COURT:  It'll be admitted.

13                 **(State's Exhibit Number 70 admitted)**

14       Q.    (BY MS. FISCHER)  Okay.  Detective, why don't

15  we use this one?  Can you tell the jury what State's

16  Exhibit Number 70 is?

17       A.    It's a close-up picture of the couch.

18       Q.    Does it contain the blood spots?

19       A.    Yes, ma'am.

20       Q.    Can you show the jury where the blood spots are

21  in State's Exhibit Number 70?

22       A.    (Witness complies).

23       Q.    You can go ahead and have a seat, Detective.

24  We can let the jury look at that picture at their

25  leisure.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          119

1        A.    (Witness complies).

2        Q.    Detective, as part of your investigation of the

3   Harrison murder, did you also do some collection of

4   fingerprints?

5        A.    Yes, ma'am.

6        Q.    Okay.  And where did you collect fingerprints?

7        A.    I collected a piece of wood off the screen door

8   that leads into the garage.  I had a visible latent print

9   on -- well, a visible print.

10       Q.    Okay.  Did you send that print off to see if it

11  could be matched?

12       A.    Yes, ma'am.

13       Q.    And did any match come of that print?

14       A.    No, ma'am.

15       Q.    And then were there any other fingerprints that

16  were sent for match?

17       A.    Yes, ma'am.

18       Q.    And what fingerprints were those?

19       A.    Those were collected by Detective David Garcia

20  from the glass door of the front -- the front entrance to

21  the office or the house.

22       Q.    Okay.  Did you send those in?

23       A.    Yes, ma'am.

24       Q.    Did any match come of those?

25       A.    No, ma'am.

1    Q.   Okay.  There was some -- I'm going to show you

2  State's exhibit here -- State's Exhibit Number 57.  Did

3  you have an opportunity to try and take some fingerprints

4  off of State's Exhibit Number 57?

5    A.   Yes, ma'am.

6    Q.   Were you able to get any fingerprints off of

7  that?

8    A.   No, ma'am.

9    Q.   Why not?

10   A.   Because the surface didn't help it.  There was

11  just no -- we went ahead and processed it and no evidence

12  came back, no development.

13   Q.   Okay.  You mentioned the surface.  Does the

14  surface type in State's Exhibit Number 57 there have

15  something to do with whether or not you can get

16  fingerprints off of it?

17   A.   It makes it difficult.

18   Q.   And why does it make it difficult?

19       MR. REYES:  I'm going to object, Your

20  Honor.  She hasn't qualified him to be able to make those

21  determinations.

22       THE COURT:  Lay the predicate.

23   Q.   (BY MS. FISCHER)  Detective Hernandez, do you

24  have any specialized training in the area of collecting

25  fingerprints?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    121

1       A.    Yes, ma'am.  We have worked on developing
2   latent prints from crime scenes, and also attended some
3   seminars and training outside the department itself.
4       Q.    Okay.  And how many different training seminars
5   have you gone on that are part of the development of
6   latent prints?
7       A.    I have attended two.
8       Q.    Okay.  When you say latent prints, is that the
9   lifting of fingerprints off of objects?
10      A.    Yes, ma'am, development.
11      Q.    Okay.  And how long have you been collecting
12  latent prints for the Brownsville Police Department?
13      A.    Since '95.
14      Q.    Okay.  And have you had the opportunity to
15  collect prints off of a number of items, number of
16  different surfaces?
17      A.    Yes, ma'am.
18      Q.    Okay.  Is that part of your daily job?
19      A.    Yes, ma'am.
20      Q.    Is that something you do almost every day?
21      A.    Basically.
22      Q.    Okay.  Can you take -- can you tell me from
23  looking at like this particular substance, is it the type
24  of surface that would be easy to get fingerprints off of
25  or hard to get fingerprints off of?

A. It would be hard.

Q. And why is that?

A. The surface itself doesn't lend itself to be processed. We might be able to get what I call -- for example, duct tape, a lot of times on contraband cases you're able to see that it has a positive effect. What I mean by positive, it means when we process with super glue fumes, you can see that it's been handled. You don't have a rich enough detail to say that's a suitable fingerprint that somebody would be able to match.

Q. And why is that?

A. That's just -- I would attribute it to the surface itself. It doesn't lend itself to retain enough of the oil or fluid in the hands to give me a chance to recover it later on.

Q. Okay. And then State's Exhibit Number 32, did you have an opportunity to try and get some fingerprints off of that?

A. Yes, ma'am.

Q. And were you able to get any fingerprints off of State's Exhibit Number 32?

A. No, ma'am.

Q. And then I think there were also some folders that were found next to a blue suitcase. We've got a picture of it somewhere here. Did you have an

STATE OF TEXAS VS. RUBEN GUTIERREZ                              123

1    opportunity to try and lift some fingerprints off of some

2    folders?

3         A.    Yes, ma'am.

4         Q.    Were you able to -- there we go.  State's

5    Exhibit Number 46 shows some folders here.  Did you have

6    an opportunity to take any fingerprints off of those

7    folders?

8         A.    Yeah.  We processed them, but we didn't get no

9    results, ma'am.

10        Q.    Okay.  No fingerprints were found?

11        A.    No.

12        Q.    Okay.  Now, let's talk, then, also about

13   State's Exhibit Number 55.  Did you ever have an

14   opportunity to try and take some fingerprints off of

15   this?

16        A.    We didn't process it.  That was dirty and had

17   been submerged under water.  The surface itself would not

18   lend.

19        Q.    Okay.  So you said a lot here.  Number one, you

20   did not take any fingerprints off of State's Exhibit

21   Number 55?

22        A.    No, ma'am.

23        Q.    And why is it that you did not take any off of

24   them?

25        A.    As you can see, it was dirty.  It had been

STATE OF TEXAS VS. RUBEN GUTIERREZ                    124

1   submerged in water.  There was mud on it.  It's a little
2   bit cleaner now.
3        Q.   Okay.  And then you also said something about
4   the surface.  Why can't you get fingerprints off of
5   State's Exhibit Number 55 off of this surface?
6        A.   That surface itself won't lend itself to be
7   processed for latent prints.
8        Q.   And why --
9        A.   It's rough.  You can go ahead and show it
10  around.
11       Q.   Okay.  It's not -- you need a smooth surface
12  for fingerprints?
13       A.   You're better off with it.
14       Q.   And this is not smooth.
15            Now, let's take a look also at State's
16  Exhibit Number 56.  Did you try and take any fingerprints
17  off of this?
18       A.   No, ma'am.
19       Q.   And why not?
20       A.   Same case.  It was dirty.  It was in the water.
21  The surface itself doesn't lend --
22       Q.   And take a look --
23       A.   -- itself to be processed.
24       Q.   Take a look at that surface.  What is it about
25  that surface that keeps you from getting fingerprints?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    125

1       A.    It's not smooth.  You can see it's grained.

2       Q.    It's got like a texture to it; is that right?

3       A.    Yes, ma'am.

4       Q.    Is there any other evidence that you collected

5  in connection with this case, Detective Hernandez?

6       A.    No, ma'am.

7       Q.    Okay.  So the only thing that you picked up

8  from Dr. Dahm's office that we have here in the courtroom

9  today is State's Exhibits Number 68, 69 and 67; and these

10 are the clothes that Ms. Harrison was wearing at the time

11 of her death?

12      A.    Yes, ma'am.

13            MS. FISCHER:  Your Honor, may I publish

14 these to the jury?

15            THE COURT:  You may.

16            MS. FISCHER:  I pass the witness.

17            MR. REYES:  May I proceed, Your Honor?

18            THE COURT:  You may.

19                    **CROSS-EXAMINATION**

20 **BY MR. REYES:**

21      Q.    Good morning, Officer Hernandez.

22      A.    Good morning, sir.

23      Q.    On what day did you attend the autopsy of

24 Escolastica Harrison?

25      A.    I believe it was on Sunday, the 6th, September

STATE OF TEXAS VS. RUBEN GUTIERREZ                          126

1    the 6th I believe it is.

2        Q.    Do you recall what time of day you attended

3    that autopsy?

4        A.    Yes, sir.  The autopsy took place between 2:30

5    and 5 p.m.

6        Q.    So you don't recall the exact time, then?

7        A.    Between 2:30 and 5 p.m.  That's when the

8    autopsy took place.

9        Q.    And you stated that when -- what was marked and

10   admitted into evidence as State's Exhibits 67, 68 and 69

11   were the clothing that you obtained from Dr. Dahm; is

12   that correct?

13       A.    Yes, sir.

14       Q.    And that was the clothing that was being worn

15   by Escolastica Harrison?

16       A.    Yes, sir.

17       Q.    State's Exhibit 68, you said it was a

18   nightgown; is that correct?

19       A.    That's what I classified it all as nightgowns;

20   nightgown and undergarments, I believe, a slip.

21       Q.    And you also testified that you had taken some

22   scrapings from Escolastica Harrison; is that correct?

23       A.    I didn't take the actual scrapings.  The

24   scrapings were handed over to me by Dr. Dahm.

25       Q.    You collected the scrapings from Dr. Dahm?

STATE OF TEXAS VS. RUBEN GUTIERREZ                          127

1       A.    Yes, sir.

2       Q.    And you're not aware as to whether or not those

3  scrapings were at all sent for any kind of testing or

4  analysis; is that correct?

5       A.    That is correct.

6       Q.    And the purpose of scrapings is to be able to

7  determine if that person maybe under their fingernails

8  has tissue from another individual; is that correct?

9       A.    Sometimes it -- in cases like there where

10 there's --

11      Q.    For example, if I was fighting with you and I

12 scratched your face, then I might have some scrapings

13 underneath my fingerneath; is that correct?

14      A.    That is correct, sir.

15      Q.    And that is the purpose of collecting those, to

16 match them up with somebody else; is that correct?

17      A.    Yes, sir.

18      Q.    And to your knowledge, there was no kind of

19 testing or analysis done from the scrapings that were

20 collected from Escolastica Harrison, true?

21      A.    True.

22      Q.    You also stated that you photographed the

23 residence of Escolastica Harrison; is that correct?

24      A.    Yes, sir, I did the crime scene photographs.

25      Q.    On what -- on what day did you arrive at that

STATE OF TEXAS VS. RUBEN GUTIERREZ                     128

1    residence?
2         A.   The 6th of September, I believe, the same --
3    early in that morning.  It was about 2:47 when I logged
4    out into the residence.
5         Q.   And do you have any knowledge as to who had
6    been at that residence before you arrived?
7         A.   As far as police officers?
8         Q.   Yes.
9         A.   In my report, I -- there was two patrolmen, and
10   I believe it was Detective Sergeant Jesse, and Lieutenant
11   Orlando Rodriguez, detective also, and Detective David
12   Garcia.
13        Q.   So there had been five police officers there at
14   the scene before you arrived; is that correct?
15        A.   Yes, sir.
16        Q.   Do you have any personal knowledge as to
17   whether or not there were any neighbors of Escolastica
18   Harrison inside that residence before you arrived?
19        A.   No, sir, I didn't.
20        Q.   And do you have any personal knowledge as to
21   whether or not there were any relatives of Escolastica
22   Harrison inside that residence before you arrived?
23        A.   No, sir.
24        Q.   So you have no personal knowledge as to whether
25   or not things had been moved around inside that house

1    before you arrived on September the 6th?

2        A.    That is correct.

3        Q.    You stated that you collected some blood from

4    inside that residence; is that correct?

5        A.    Yes, sir.

6        Q.    When we're talking about collecting blood,

7    we're talking about Escolastica Harrison's home; is that

8    true?

9        A.    No, sir.  I merely collected blood that had

10   been seen by Detective Gilbert Garcia at the scene.  I

11   don't know whose blood it is.

12       Q.    Okay.  So he told you where he had seen blood

13   and you went to collect it?

14       A.    That is correct, sir.

15       Q.    And some of the blood that you collected came

16   from a raincoat in one of the bedrooms; is that correct?

17       A.    Yes, sir.

18       Q.    Do you know whether this raincoat was in that

19   bedroom in the back portion of the house?

20       A.    It was, I believe, in the -- we have a house.

21   If you'll see the diagram, there's a garage area.  In the

22   garage area in front of it or attached to it, there's two

23   rooms that had been converted into bedrooms.  It was on

24   the first one on the bed.

25       Q.    So it was towards the back portion close to the

STATE OF TEXAS VS. RUBEN GUTIERREZ                    130

1   garage where you found that raincoat that had the blood

2   stain on it; is that correct?

3       A.   Yes, sir.

4       Q.   You also found -- collected some samples of

5   blood from the restroom; is that correct?

6       A.   Yes, sir.

7       Q.   And this was on the floor and also on the

8   toilet or commode portion of that restroom?

9       A.   Yes.

10      Q.   And that was also towards the back portion of

11  that home; is that correct?

12      A.   That's the adjacent bedroom right next to where

13  the raincoat was.  If you'll see on the diagram, there's

14  another bedroom that has a bathroom.  That's where we

15  collected that.

16      Q.   And this was the bedroom that was closest to

17  the garage; is that correct?

18      A.   Yes, sir.

19      Q.   You also stated that you collected some blood

20  samples from a screen door leading to the garage; is that

21  correct?

22      A.   Yes.

23      Q.   So when you're talking about the garage, you're

24  talking about the back portion of that residence; is that

25  correct?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    131

1        A.    Yes.

2        Q.    And you also collected some blood samples from

3    that couch that was shown to the ladies and gentlemen of

4    the jury; is that correct?

5        A.    Yes.

6        Q.    Which is marked as State's Exhibit Number 70?

7        A.    Yes.

8        Q.    You were shown those note cards which are

9    marked as State's Exhibit Number 57; is that correct?

10       A.    Yes, sir.

11       Q.    And you stated that that surface doesn't lend

12   itself to you being able to lift latent fingerprints --

13   latent prints from them; is that correct?

14       A.    Yes, sir, it makes it difficult.

15       Q.    It makes it difficult, but it's not necessarily

16   impossible; is that correct?

17       A.    Yes, sir.

18       Q.    So, you are able to take -- or lift prints

19   from -- latent prints from those kinds of surfaces; is

20   that correct?

21       A.    It's possible.

22       Q.    And with respect to State's Exhibit

23   Number 32 -- do you have that with you?

24       A.    Yes, sir.

25       Q.    Okay.  The same thing with that evidence, isn't

STATE OF TEXAS VS. RUBEN GUTIERREZ                    132

1   it correct that it might be hard to be able to lift

2   latent prints, but it's not necessarily impossible?

3        A.   We won't lift them.  We would develop them,

4   yes.  That is true.

5        Q.   And did you develop any kind of latent prints

6   from State's Exhibit 32?

7        A.   No, sir.

8        Q.   And what about State's Exhibit Number 57, those

9   other note cards, did you develop those?

10       A.   We processed them and no development was made.

11       Q.   But nothing with respect to State's Exhibit

12  Number 32; is that correct?

13       A.   That's correct.

14       Q.   Okay.  You were also shown what was marked as

15  State's Exhibit Number 55, which is the toolbox which is

16  in front of you.

17       A.   Right.

18       Q.   Do you recall that?

19       A.   Yes, sir.

20       Q.   And you were also shown that suitcase, the

21  light blue suitcase; do you recall that?

22       A.   Yes, sir.

23       Q.   You also testified that the surface doesn't

24  lend itself to the lifting or developing of latent

25  prints, but that doesn't mean that it's not impossible to

1    be able to lift them; is that correct?

2         A.    That is correct.

3         Q.    And you also testified that you did not process

4    these two exhibits to develop any type of latent prints;

5    is that correct?

6         A.    Yes, sir.

7         Q.    Let's go back to the home and when you were

8    lifting or dusting -- looking for blood.  Did you attempt

9    at all -- let me back up here a little bit.

10                    You stated that you had found a raincoat

11   with some blood stains on it; is that correct?

12        A.    Detective Garcia pointed it out, yes, sir.

13        Q.    And he instructed you to go ahead and take some

14   blood samples from that raincoat --

15        A.    Actually, we seized the whole raincoat itself,

16   sir.

17        Q.    Did you at all attempt to develop that item for

18   latent prints?

19        A.    No, sir.

20        Q.    Did you -- in that restroom where you found

21   those drops of blood in the back portion of that

22   residence, did you at all dust for any types of

23   fingerprints?

24        A.    No, sir.

25                    MR. REYES:  Pass the witness, Your Honor.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          134

1          MS. FISCHER:  I have nothing further, Your
2     Honor.  May this witness be excused?
3               THE COURT:  Any objection?
4               MR. REYES:  Subject to him being recalled,
5     no, Your Honor.
6               THE COURT:  You're excused to go.
7               Call your next witness.
8               MR. BLAYLOCK:  We would call Judge Ben
9     Neece.
10          I would like to make a record before he's
11    called, Judge.  I'd like to file at this time this return
12    of subpoena that was served at 11:10 this morning for the
13    Court's records.
14          Also, I'd like the record to reflect the
15    defense counsel has already shown one of the witnesses
16    the Judge's actual magistrate warning out of his own
17    file.  I don't think he'll argue with me when I indicate
18    to the Court that the magistrate warning that he showed
19    that witness was given to him on March 19, 1999.  And
20    that goes to the issue of surprise on this witness
21    because he's not on our witness list.
22               MR. REYES:  I'm going to object, Your
23    Honor, to the calling of this witness.  We had
24    specifically asked the prosecution to give us a list of
25    the State's -- of the witnesses they intended to call

STATE OF TEXAS VS. RUBEN GUTIERREZ                          135

 1   during the trial.  This person or this witness was not

 2   listed at all; and we have never been given any notice

 3   whatsoever that he had been -- or he was going to be

 4   called as a witness.  So we would object to him being

 5   called at this time as a possible witness.

 6                   MR. BLAYLOCK:  That's correct, Judge.

 7   He's not on our witness list; and we did not anticipate

 8   calling him, but the record shall reflect that the

 9   defense made the issue of the magistrate warnings.

10                   And I'd like to get counsel to agree or

11   disagree that he was given a copy of the actual

12   magistrate warning signed by the Judge on 3/19/99.

13                   THE COURT:  Do you stipulate to that?

14                   MR. REYES:  I can't stipulate to that,

15   Your Honor, because I don't have the actual date that I

16   was given -- tendered a copy of that document.

17                   And we would argue, Judge, that's beside

18   the point.  The fact is that we specifically requested

19   and the Court granted our motion requiring the State to

20   give us their list of witnesses; and this witness was not

21   listed on there.  So we would argue surprise and they

22   didn't comply with the Court's order.

23                   THE COURT:  That objection will be

24   overruled.

25                   MR. REYES:  For purposes of the record,

STATE OF TEXAS VS. RUBEN GUTIERREZ                    136

```
1   Judge, I did receive a fax on March 21st of 1998;
2   however, the copy was not signed and it's a copy in
3   Spanish.
4               THE COURT:  All right.  Let's proceed.
5               MR. BLAYLOCK:  I'll just ask one more
6   question.  Just for identification, is that your
7   signature there, Santiago?
8               MR. GALARZA:  That's correct.
9               MR. BLAYLOCK:  Okay.  I give this for --
10  mark it as an offer of proof.
11              THE COURT:  Mark it with the court
12  reporter.
13              Would you raise your right hand, please?
14              MR. BLAYLOCK:  I offer proof Number 71;
15  and Mr. Galarza's identified it as his signature.
16              (State's Exhibit Number 71 admitted for
17              the record only)
18              (The witness was sworn in by the Court)
19              THE WITNESS:  Yes, sir.
20              THE COURT:  All right.  You may be seated.
21              Let's proceed.
22              MR. BLAYLOCK:  Thank you, Judge.
23
24
25
```

1                          BEN NEECE,

2      having been first duly sworn, testified as follows:

3                      DIRECT EXAMINATION

4   BY MR. BLAYLOCK:

5        Q.    Good morning, Judge.

6        A.    Good morning.

7        Q.    State your full name for the record.

8        A.    My name is Ben Richard Neece.

9        Q.    Okay.  What job do you hold?

10       A.    I'm a municipal judge for the City of

11   Brownsville.

12       Q.    All right, Judge.  How long have you been a

13   municipal judge in the City of Brownsville?

14       A.    I'm in my fifteenth year.

15       Q.    Were you a judge on September 14, 1998?

16       A.    Yes, sir.

17       Q.    And as part of your duties as a municipal court

18   judge, do you do magistrate warnings?

19       A.    Yes, sir.

20       Q.    And how is that normally done?  Tell the jury.

21       A.    We in the mornings bring out everybody who's

22   been arrested the night before.  And we advise them of

23   what their charges are, and what their rights are; and

24   then we set a bond on their case.

25                    We also have a probable cause hearing at

STATE OF TEXAS VS. RUBEN GUTIERREZ                        138

1    the time.  It's kind of an informal hearing.  The D.A.

2    presents their probable cause; and then we either find

3    probable cause or not.  And we go through the

4    constitutional rights and set a bond usually.

5         Q.    All right, Judge.  Let me call your attention

6    specifically to September 14, 1998.  Was that standard

7    procedure followed?

8         A.    Yes.

9         Q.    Okay.  And that procedure is to talk to all

10   people who were arrested the day before?

11        A.    That's correct.

12        Q.    Okay.  Do you remember if you did a

13   magistrate's warning on an individual named Ruben

14   Gutierrez?

15        A.    After reviewing this, yes.

16        Q.    Okay.  And I'm showing you what's marked as

17   State's Exhibit Number 72.  Is your signature on there?

18        A.    That's my signature.

19        Q.    Is that the exact magistrate's warning that you

20   gave that day?

21        A.    It looks like it, yes.

22        Q.    Okay.

23        A.    It would have been at 8:16 in the morning.

24        Q.    Okay.  Early in the morning?

25        A.    Yes.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          139

1      Q.   All right.

2      A.   We do them at 8:00 in the morning.

3               MR. BLAYLOCK:   I'm showing defense counsel

4    State's 72.

5               Move to admit State's 72.

6               THE COURT:  Any objection?

7               MR. GALARZA:   No objection at this time,

8    Your Honor.

9               THE COURT:  All right.  Seventy-two will

10   be admitted.

11              **(State's Exhibit Number 72 admitted)**

12     Q.   (BY MR. BLAYLOCK)  All right, Judge.  Could

13   you read State's 72 to the jury?

14     A.   Okay.  It says, "Magistrate's Warning.

15   English."  We have English on one side and Spanish on the

16   other.

17     Q.   Before you go on, Judge, do you ask the

18   defendants how -- which they prefer, English or Spanish?

19     A.   Yes.  I go through the list.  We'll have the

20   paperwork for each individual that's charged with a Class

21   B or higher; and I had asked them if they want their

22   rights in English or in Spanish.  So then I'll do a group

23   of English or Spanish first, whichever, and then I'll do

24   the other group.

25     Q.   Okay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    140

1        A.   So this particular one was in English because I
2    did the English side; otherwise, I would do it on the
3    Spanish side.
4        Q.   And does that indicate to you that he preferred
5    it read in English?
6        A.   Yes.
7        Q.   All right.  Go ahead and read it.
8        A.   And I make sure that they -- how they want it,
9    in English or in Spanish.
10               It says, "Magistrate's Warning.  English.
11    The State of Texas, County of Cameron, Case 98-B-2942.
12    This is to certify that on September 14, 1998, at 8:16 in
13    the morning, a.m., Ruben Gutierrez appeared before me in
14    Brownsville, Cameron County, Texas, at which time I
15    placed -- and place I administered to him the warnings
16    required by the Texas Code of Criminal Procedure
17    Article 15.17 by informing him in clear language as
18    follows:"
19               Of the accusation that he had, which was
20    capital murder; of the affidavits that were filed
21    therewith; of the right to remain -- retain counsel; of
22    the right to remain silent; of the right to have an
23    attorney present before and during any interview with the
24    police officers or attorneys representing the State; the
25    right to terminate his interview at any time; the right

STATE OF TEXAS VS. RUBEN GUTIERREZ                           141

1    to request appointment of counsel if he was indigent and

2    could not afford counsel; of the right to an examining

3    trial; and that he is not -- was not required to make a

4    statement or take a polygraph examination; that any

5    statement made by him could be used against him.

6               I also further informed him that she --

7    that he would be granted reasonable time and opportunity

8    to consult with counsel if required.

9               A bond was not set in this particular

10   case; and I also -- it also states, "I further certify

11   that I am duly appointed judge of the municipal court of

12   Brownsville, Cameron County, Texas.  Witness my hand this

13   14th day of September, 1998."

14       Q.   And that's your signature on there?

15       A.   And that's my signature, yes, sir.

16       Q.   Okay.

17               MR. BLAYLOCK:  I'd like to publish this to

18   the jury, Judge.

19               THE COURT:  You may.

20       Q.   (BY MR. BLAYLOCK)  Judge, I'm going to ask you

21   what -- you mentioned these P.C. hearings where the D.A.

22   gives you some information.  How does that work?  Tell

23   the jury how that works.

24       A.   Okay.  What happens is each file -- each case

25   has a -- the case file and it has the incident reports