STATE OF TEXAS VS. RUBEN GUTIERREZ    *73462*    1

REPORTER'S RECORD

VOLUME 23 OF 32 VOLUMES

TRIAL COURT CAUSE NO. 98-CR-1391-A

- - - - - - - - - - - - - - - x
                                :
THE STATE OF TEXAS              : IN THE DISTRICT COURT
                                :
VS.                             : 107TH JUDICIAL DISTRICT
                                :
RUBEN GUTIERREZ                 : CAMERON COUNTY, TEXAS
                                :
- - - - - - - - - - - - - - - x


PUNISHMENT PHASE


    On the 10th day of May, 1999, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Benjamin Euresti,

Jr., Judge Presiding, held in Brownsville, Cameron

County, Texas.

    Proceedings reported by machine shorthand.


        A P P E A R A N C E S

APPEARING FOR THE STATE OF TEXAS:

    HON. JOHN T. BLAYLOCK
    State Bar No. 00784302
    HON. KAREN L. FISCHER
    State Bar No. 00790685
    Assistant District Attorneys
    Cameron County Courthouse
    974 East Harrison
    Brownsville, Texas   78520
    (956) 544-0849

FILED IN
COURT OF CRIMINAL APPEALS

DEC 8 1999

Troy C. Bennett, Jr., Clerk

ORIGINAL

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                2

1    **APPEARANCES CONTINUED:**

2    APPEARING FOR THE DEFENDANT:

3        HON. SANTIAGO GALARZA
         State Bar No. 00787508
4        Law Offices of Santiago Galarza
         3100 East 14th Street
5        Brownsville, Texas   78521
         (956) 541-4157

6
         AND
7
         HON. DANIEL R. REYES
8        State Bar No. 16794290
         Perez & Reyes
9        316 Nolana Loop
         McAllen, Texas   78504
10       (956) 972-1414

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          i

1                         VOLUME 23

2                      PUNISHMENT PHASE

3    MAY 10, 1999                                 PAGE    VOL

4    Pretrial motions................................3      23

5    Opening Statement by Mr. Blaylock..............20      23

6    STATE'S WITNESSES:
                                                  VOIR
7    NAME                DX    CX    RDX   RCX    DIRE    VOL

8    Tina Hauff          31    ---   ---   ---    ---      23
     Ernestina Pizana    47    67    81    ---    ---      23
9    Lorenzo Hernandez   85    96    99    ---    ---      23
     Ricardo Leal       101   112   122    ---    ---      23
10   Michael Flores     123   128   ---    ---    ---      23
     Nelda Shull Garcia 132   138   146    ---    ---      23
11   Rita Alvarado      150   179   198    ---    ---      23
     Kip Van Johnson Hodge 200 205  ---    ---    ---      23
12   Alberto Gonzalez   208   218   227    ---    ---      23
     Rebecca RuBane     234   240   242    ---    ---      23
13   Isaac Cantu        243   248   251    ---    ---      23

14                                              PAGE    VOL

15   State rested...................................253     23

16   Adjournment....................................254     23

17   Court Reporter's Certificate...................255     23

18

19

20

21

22

23

24

25

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    ii

1                    **ALPHABETICAL WITNESS INDEX**

2                         **PUNISHMENT PHASE**

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|-----|-----|-----|-----|-----------|-----|
| Alvarado, Rita | 150 | 179 | 198 | --- | --- | 23 |
| Cantu, Isaac | 243 | 248 | 251 | --- | --- | 23 |
| Flores, Michael | 123 | 128 | --- | --- | --- | 23 |
| Garcia, Nelda Shull | 132 | 138 | 146 | --- | --- | 23 |
| Gonzalez, Alberto | 208 | 218 | 227 | --- | --- | 23 |
| Hauff, Tina | 31 | --- | --- | --- | --- | 23 |
| Hernandez, Lorenzo | 85 | 96 | 99 | --- | --- | 23 |
| Hodge, Kip Van Johnson | 200 | 205 | --- | --- | --- | 23 |
| Leal, Ricardo | 101 | 112 | 122 | --- | --- | 23 |
| Pizana, Ernestina | 47 | 67 | 81 | --- | --- | 23 |
| RuBane, Rebecca | 234 | 240 | 242 | --- | --- | 23 |

12                      **INDEX OF EXHIBITS**

13                        **PUNISHMENT PHASE**

14   **STATE'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| P1 | Judgment of Adjudication and Disposition Cause Number 7802-JE | 51 | 52 | 23 |
| P2 | (Unidentified) | --- | --- | --- |
| P3 | Judgment of Adjudication, Disposition and Commitment Cause Number 8300-JE | 52 | 53 | 23 |
| P4 | Judgment of Conviction Cause Number 94-CR-2011-A | 154 | 155 | 23 |
| P5 | Judgment Cause Number 95-CCR-6930-B | 161 | 161 | 23 |
| P6 | Judgment Cause Number 97-CCR-5356-B | 167 | 168 | 23 |

24   **DEFENDANT'S EXHIBITS:**

25   N/A

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    3

```
 1                    P R O C E E D I N G S
 2              (Open court, defendant present, no jury)
 3              THE COURT:  All right.  You may be seated.
 4    Let me recall 98-CR-1391-A, State of Texas versus Ruben
 5    Gutierrez.
 6              MR. BLAYLOCK:  The State's present and
 7    ready, Judge.
 8              THE COURT:  Somebody have a motion?
 9              MR. BLAYLOCK:  Yes, Judge.  I'd like to
10    bring to the Court's attention that over the last week or
11    so, the jail cell of the defendant was searched and found
12    a list of all the jurors' names and, in particular, the
13    jurors on this panel were circled with juror number 1,
14    juror number 2, and had the name and the address of each
15    juror.
16              What the State would like is to talk to
17    each juror individually and ask if they've been
18    contacted, intimidated, bribed in any way.
19              MR. REYES:  Judge, that list was served
20    upon my client by the District Attorney's Office
21    themselves.  So, if they're alleging that he obtained it
22    in some other way, form or fashion, I mean, they're the
23    ones that served it upon him.  And we'd object to --
24              MR. BLAYLOCK:  I just want to --
25              MR. REYES:  -- them being questioned --
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                4

```
 1                    THE COURT:  Just a minute, counsel, okay?
 2                    MR. BLAYLOCK:  Yes, sir.
 3                    THE COURT:  They gave you an opportunity
 4   to talk; you give them an opportunity to talk.
 5                    MR. BLAYLOCK:  Yes, sir.
 6                    THE COURT:  I'll listen to both sides and
 7   then I'll make a ruling, all right?
 8                    MR. BLAYLOCK:  I understand.
 9                    THE COURT:  I don't want any
10   interruptions.
11                    Now, what's your --
12                    MR. REYES:  And we would object, Judge.  I
13   mean, they are under instructions that if anybody
14   contacts them, for them to go ahead and advise the Court.
15   And for us to question them regarding that would
16   prejudice our client.
17                    THE COURT:  Okay.  I'll just sustain the
18   objection.  And let the record state that the list that
19   they're talking about is a master jury list --
20                    MR. REYES:  Yes.
21                    THE COURT:  -- that was typed up by the
22   District Clerk's Office.
23                    Anything further?
24                    MR. BLAYLOCK:  For the record, Judge, I'd
25   like to state that we did not serve anything on anybody
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                5

1    in this case.  That's not our function.  It's the
2    District Clerk's Office.
3                    THE COURT:  All right.  Anything else?
4                    MR. REYES:  Judge, we do have objections
5    to their response to our request to disclose their intent
6    to use extraneous offenses.  I don't know if the Court
7    wants me to go down each one of them right now --
8                    THE COURT:  The what now?
9                    MR. REYES:  We had filed a request for
10   them to give us notice of their intent to introduce
11   extraneous offenses.
12                    THE COURT:  In the punishment phase?
13                    MR. REYES:  Yes.  And they have served us
14   with a response.  I don't know if the Court wants me to
15   go down each one of them and list our objections at this
16   point or wait until they present evidence regarding
17   those -- what they listed.
18                    THE COURT:  How many objections are you
19   going to have?
20                    MR. REYES:  About 20.
21                    THE COURT:  Is it the same objection or --
22                    MR. REYES:  Some of them are similar; some
23   of them are different.
24                    THE COURT:  Okay.  Are you going to be
25   introducing these as a package, or one by one, or how are

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                                      6

1    you going to be --

2                     MR. BLAYLOCK:  Most of them will be in a

3    package through the juvenile and adult probation

4    department.  There are some incidents of one on one.

5    There are some witnesses that are going to testify to

6    their individual acts.

7                     MR. REYES:  The only thing, Judge, is that

8    we would have to make the same objections in front of the

9    jury.  So, if the Court just wants us to wait until that

10   point, maybe it'll save some time.

11                    THE COURT:  Well, the jury's already

12   seated.  They're already -- I mean, they're in the jury

13   room at this time waiting for us to begin.

14                    MR. REYES:  We would make the objection

15   right before they attempt to introduce any evidence

16   regarding that matter.

17                    THE COURT:  All right.  I'll let you do

18   that, then, at that point.

19                    MR. REYES:  The other thing, too, Judge, I

20   wanted to --

21                    MR. BLAYLOCK:  Just before we go on,

22   Mr. -- Danny, I'm sorry, Judge, but just to be fair, I

23   want to inform the Court and the defense counsel, I

24   intend to mention a good part of these extraneous

25   offenses in my opening statement of what we intend to

STATE OF TEXAS VS. RUBEN GUTIERREZ                              7

```
 1   show.
 2                   THE COURT:  All right.
 3                   MR. REYES:  Then we need to make a record
 4   at this time, Judge, just to see whether or not they're
 5   going to be admissible or not.
 6                   THE COURT:  Well, if you mention them, it
 7   doesn't mean they're admissible at this point.  I haven't
 8   made a ruling on any of those yet.  So I'll let you
 9   object to them when they offer them.
10                   MR. REYES:  Just for the record, we would
11   ask that we be allowed to make the objections before,
12   Judge.
13                   THE COURT:  On all of them or what?
14                   MR. REYES:  Yes.  There's 20 of them.
15   Some of them are juvenile adjudications which are
16   inadmissible; and if he mentions them, then he's going to
17   prejudice the jury.
18                   THE COURT:  All right.  Let's handle the
19   objections at this point so we can go through the hearing
20   smoothly without any interruptions.
21                   MR. REYES:  Just for purposes of the
22   record, I'm going to go based on the State's sixth
23   amended response, Judge, if the Court wants to follow
24   along.  They've given us six -- five amended responses,
25   and I'm going to go as to the last one.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                                    8

```
1              THE COURT:  Go ahead.
2              MR. REYES:  The first one, they're
3   attempting to introduce evidence of a criminal mischief
4   which occurred on or about October the 15th of 1995.
5              The first objection that we have as to all
6   these offenses that they've listed is that the response
7   is untimely.  It was given to us -- the sixth motion or
8   the sixth amended motion was given to us on April the
9   19th of 1998 -- rather, 1999.
10             We filed our request for notice on
11  February the 5th of 1999.  And as the Court knows, we had
12  already began -- or begun the trial on March 23rd of
13  1999.  So these responses are untimely.  We ask that they
14  not be introduced for that purpose.
15             We're also objecting to each and every one
16  of the 20 offenses that they've listed as to relevance.
17  We are alleging that they're attempting to introduce all
18  these offenses to prove character and that he acted in
19  conformity therewith, which is in violation of the Texas
20  Code of Criminal Procedure.  And we're also objecting
21  because it would create an unfair prejudice against
22  Mr. Gutierrez.
23             We're objecting because with respect to
24  the criminal mischief offense, which is listed on the
25  sixth amended motion, goes against special issue number
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              9

1    1, which the Court is very familiar with.  They have to

2    prove criminal acts of violence; and that has nothing to

3    do with any criminal act of violence; and, therefore, it

4    would be irrelevant.

5                MR. BLAYLOCK:  My response, Judge, is that

6    I'd ask you to take judicial notice of your file, first

7    of all.  There are six amended responses; and the ones

8    that he's talking about right now are on the very first

9    one filed way back on March the 4th.  And even if it was

10   April 19th, here we are at May the 10th.  That's plenty

11   of time that -- 37.07 says reasonable notice.  That's 20

12   some days, Judge.

13               In addition, the standard is not criminal

14   acts of violence.  It's anything the Court deems relevant

15   including, but not limited to, the defendant's criminal

16   history.  And the rule in capital cases is even more lax,

17   as the Court well knows.  We don't even have to prove

18   these incidents beyond a reasonable doubt.  We only have

19   to demonstrate them by clear and convincing evidence.

20               THE COURT:  That objection will be

21   overruled.

22               MR. REYES:  I would object to his

23   statement, Your Honor.  The law specifically requires

24   that they prove each and every one of the offenses which

25   they're going to bring during the punishment phase beyond

STATE OF TEXAS VS. RUBEN GUTIERREZ                    10

1   a reasonable doubt.  So I would object, first of all, to

2   him making a misstatement of law.

3                   And I would also ask the Court to instruct

4   him that if he is going to go ahead and have an opening

5   statement, that he state the proper burden of proof with

6   respect to those, the punishment phase.

7                   MR. BLAYLOCK:  My response to that, Judge,

8   is to hand the Court Powell versus State.  That's 821 --

9   correction, 898 S.W.2d 821.  I'm also handing a copy

10  to --

11                  MS. FISCHER:  No, no.  They're all three

12  different cases.

13                  MR. BLAYLOCK:  My mistake, Judge.  I can't

14  give the defense attorney a copy at this time.  My

15  co-counsel will.

16                  But in addition, I'll point the Court to

17  866 S.W.2d 210 Adanandus versus State, and, in addition,

18  the Powell versus State.

19                  And all of these cases, Judge, Court of

20  Criminal Appeal cases, say that the standard in a capital

21  case, in the interest of policy of giving the jury all

22  the information about the defendant that they need to

23  make an informed decision about life or death, is clear

24  and convincing.  These cases clearly state that.

25                  MR. REYES:  Judge, in support of our

1  argument, we would cite <u>Guerra versus State</u>, which is at

2  942 S.W.2d at 28, which specifically states that the

3  burden of proof on the State of Texas with respect to the

4  punishment phase is that of beyond a reasonable doubt.

5            THE COURT:  Okay.  Both of you are talking

6  about two different things, all right?  The burden of

7  proof on producing extraneous offenses is what his

8  argument is, not the burden of proof on proving the

9  punishment phase of a trial or the issues in the

10 punishment phase of a trial.  This is on offer of proving

11 up extraneous offenses.

12           MR. REYES:  Well, that's what I'm talking

13 about also.  It says, "Requirements of proof beyond a

14 reasonable doubt for extraneous offense evidence during

15 the punishment phase is beyond a reasonable doubt."

16           And if they're talking about the special

17 issues with respect to 1 and 2, the burden of proof is on

18 the State of Texas and that burden is also beyond a

19 reasonable doubt.

20           MR. BLAYLOCK:  I agree with the second

21 statement, not his first statement.

22           THE COURT:  Okay.  The objection will be

23 overruled.

24           MR. REYES:  With respect to --

25           THE COURT:  You just have to watch your

1   wording on that because as far as the burden on

2   extraneous offenses versus your burden on proving the

3   issues at the punishment phase --

4                    MR. BLAYLOCK:  Yes, sir.

5                    THE COURT:  -- are two different burdens.

6                    Okay.  Go ahead.

7                    MR. REYES:  So, with respect to the burden

8   as to extraneous offenses, the Court is overruling our

9   objections?

10                   THE COURT:  Yes.

11                   MR. REYES:  If I can just hand the Court

12  Guerra versus State.

13                   May I proceed, Your Honor?

14                   THE COURT:  You may.

15                   MR. REYES:  With respect to offense number

16  two, three and four that are listed, one being -- or the

17  second one being driving while intoxicated which happened

18  on or about August 27th of 1997, forgery which occurred

19  on or about October 1st of 1994, and forgery which

20  occurred on or about October 7th of 1994, we have three

21  objections as to each one; that the notice to us was not

22  given timely.  It was given to us at or the time that we

23  had already started jury selection in the trial and,

24  therefore, that the notice was not timely.

25                   We would also object because -- as to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    13

1   relevance.  It seeks to prove character and that the

2   defendant acted in conformity therewith, which is in

3   violation of the Code of Criminal Procedure.

4                    And we would also object because it would

5   create an unfair prejudice against Mr. Gutierrez.  And it

6   also goes as to special issue number 1, which requires

7   that they show only criminal acts of violence.  And that

8   would clearly create a prejudice against Mr. Gutierrez.

9                    THE COURT:  That'll be overruled.

10                   MR. REYES:  With respect to the second

11  page, Your Honor, the next offense is burglary of a

12  habitation which occurred on or about April 30th of 1993.

13                   The Code of Criminal Procedure

14  Article 609, Section (d), specifically provides that any

15  juvenile adjudications are not admissible at any adult

16  proceeding.  And this offense which they're attempting to

17  introduce as evidence is a juvenile adjudication with

18  respect to Mr. Gutierrez.

19                   Again, we were not timely notified of this

20  offense.  We would object as to relevance because it goes

21  to proving character or that he acted in conformity

22  therewith.  It would create an unfair prejudice against

23  Mr. Gutierrez.  And it also goes against special issue

24  number 1, which requires that they only show criminal

25  acts of violence.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        14

```
 1              THE COURT:  That'll be overruled.
 2              MR. REYES:  With respect to special
 3   issue -- I'm sorry, aggravated perjury that happened on
 4   or about August 27th of 1997, we would object that it
 5   wasn't timely -- the notice was not timely filed.  It's
 6   irrelevant.  It would also create an unfair prejudice
 7   against Mr. Gutierrez; and it also goes against special
 8   issue number 1, Your Honor.
 9              THE COURT:  That'll be overruled.
10              MR. REYES:  Aggravated assault on a police
11   officer and resisting arrest which happened on or about
12   December the 5th of 1991, and criminal mischief which
13   happened on or about December the 5th of 1991, as well as
14   assault which happened on or about December the 5th of
15   1991, we have the same objections.
16              These are juvenile adjudications which by
17   their introduction would violate Code of Criminal
18   Procedure Rule 609(d) -- or, rather, Code of Criminal
19   Evidence Rule 609(d).
20              The notice was not timely given to us.
21   These are irrelevant.  They go as to proving character
22   and that he acted in conformity therewith, which is in
23   violation of the rules.  And it also would create an
24   unfair prejudice against Mr. Gutierrez.
25              THE COURT:  That'll be overruled.
```

PAM L.  ESQUIVEL,  CSR,  RPR

1              MR. REYES:  With respect to disorderly

2    conduct, assault, which happened, the first one, on or

3    about October 20th of 1998 and February the 2nd of 1998,

4    we would object that we were not timely notified as to

5    these two offenses.

6              They are irrelevant.  They go to prove

7    character or that he acted in conformity therewith.  It

8    would create an unfair prejudice against Mr. Gutierrez.

9    And with respect to the first offense, it goes against

10   special issue number 1, Your Honor.  It's not a criminal

11   act of violence.

12             THE COURT:  That'll be overruled.

13             MR. REYES:  With respect to burglary of a

14   habitation, we would object that, first of all, we were

15   not timely notified.  It goes also as to Criminal Rule of

16   Evidence 609(d).  It's a juvenile adjudication.  It is

17   inadmissible in this criminal proceeding.

18             We would object that it is irrelevant.  It

19   would create an unfair prejudice against Mr. Gutierrez;

20   and it also violates special issue number 1, Your Honor.

21             THE COURT:  That'll be overruled.

22             MR. REYES:  And we have exactly the same

23   objections to the next offense which is terroristic

24   threat which occurred on or about October the 9th of

25   1992.

STATE OF TEXAS VS. RUBEN GUTIERREZ                                      16

```
 1                THE COURT:  That'll be overruled.
 2                MR. REYES:  And the same objection for
 3    terroristic threat which occurred on or about November
 4    the 25th of 1992.
 5                THE COURT:  That'll be overruled.
 6                MR. REYES:  They also are alleging an
 7    attempted escape, Your Honor, which occurred on or about
 8    March 1st of 1998.  We would object that we were not
 9    timely notified.  It goes -- we also object as to
10    relevance.  And also, it goes against special issue
11    number 1 in that it is not a criminal act of violence.
12    And it would create an unfair prejudice against
13    Mr. Gutierrez.
14                THE COURT:  It'll be overruled.
15                MR. REYES:  With respect to the next few
16    offenses, disorderly conduct which occurred on or about
17    June 19th of 1995, disorderly conduct on or about June
18    4th of 1959, and run away which happened on or about
19    March 1st of 1993, we would object that these were not
20    timely -- that notice was not timely given to us.  We
21    would object as to relevance, and that it would create an
22    unfair prejudice.
23                And with respect to the last one, run
24    away, that it is a juvenile adjudication and that it is
25    not admissible under rule -- Criminal Rules of Evidence
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          17

```
1    Rule 609(d).
2                    THE COURT:   That'll be overruled.
3                    MR. REYES:   The last two objections that
4    we have are for terroristic threat which happened on or
5    about April the 15th of 1999, and attempted escape which
6    happened on or about April the 18th of 1999.  We would
7    object that these are irrelevant.  They go to proving
8    character or that he acted in conformity therewith, which
9    is in violation of the rules, that it creates an unfair
10   prejudice against Mr. Gutierrez.  And we were not timely
11   notified of these two offenses, Your Honor.
12                   THE COURT:   It'll be overruled.
13                   MR. REYES:   We also would object -- we
14   believe that with respect to the terroristic threat which
15   happened on or about April the 15th of 1999, that
16   Mr. Blaylock, who is one of the assistant district
17   attorneys in this case, in essence provoked Mr. Gutierrez
18   which led to that offense, actually to that terroristic
19   threat.
20                   With respect to that, we have filed a
21   subpoena.  We are intending to subpoena him as a witness
22   because we believe that he is the person that provoked
23   Mr. Gutierrez; and we are asking that the rule be invoked
24   and that Mr. Blaylock also be excluded as any other
25   witness would be in this case because we do intend to
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        18

1   call him as a witness.

2                  THE COURT:   You're talking about the

3   incident in the hallway?

4                  MR. REYES:   Well, the incident here in the

5   courtroom which led to that incident out in the hallway.

6                  THE COURT:   That'll be overruled.

7                  MR. REYES:   Those are the objections that

8   we have, Your Honor.

9                  THE COURT:   Okay.   Anything further?

10                  MR. REYES:   Nothing further.

11                  MR. BLAYLOCK:   I have a motion, Judge.   I

12  move to quash this subpoena that I was just handed

13  about -- the subpoena says 9:00, but I'm representing to

14  the Court I was handed the subpoena about less than ten

15  minutes ago.

16                  And I -- whatever happened in the

17  courtroom is on the record.   If we want to read back the

18  record, I certainly encourage defense counsel to read

19  that back, but I move to quash the subpoena to call me as

20  a witness.

21                  THE COURT:   Okay.   I'll go ahead and order

22  the subpoena quashed at this time.

23                  MR. REYES:   So we're being denied the

24  opportunity to call Mr. Blaylock as a witness, Your

25  Honor?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    19

```
 1                    THE COURT:  That's correct.  What happened
 2    in the courtroom is on the record.
 3                    Anything further?
 4                    MR. REYES:  Nothing further.
 5                    MR. BLAYLOCK:  Nothing from the State,
 6    Judge.
 7                    THE COURT:  All right.  Bring in the jury.
 8                    THE BAILIFF:  Yes, Your Honor.
 9                    MR. REYES:  Judge, at this time we would
10    also invoke the rule.
11                    MS. FISCHER:  Judge, I think all our
12    witnesses are outside.  No one sitting in here is going
13    to be a punishment witness in the punishment phase of the
14    trial.
15                    THE COURT:  All right.
16                    (Jury brought into the courtroom)
17                    THE COURT:  All right.  You may be seated.
18                    Good morning, ladies and gentlemen of the
19    jury.
20                    THE JURY:  Good morning.
21                    THE COURT:  First of all, excuse the
22    delay.  I had to take care of some legal matters before
23    we could proceed.
24                    Secondly, I appreciate your patience in
25    this trial.  I know that it's been several weeks and days
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    20

1    since we were last here, but because of things beyond our
2    control we were unable to continue this trial until
3    today; and the Court appreciates your patience in this
4    matter.  I think we're ready to begin.
5                   Mr. Blaylock?
6                   MR. BLAYLOCK:  Thank you, Judge.
7                   Good morning.
8                   THE JURY:  Good morning.
9                   MR. BLAYLOCK:  I know that some of you --
10   I know for a fact that some of you want this to be over.
11   I expect and I believe that all of us, all of us want
12   this to finally be over.  It's gone on a long time.  We
13   met first in March, we met in April, and here we are on
14   May 10th.
15                   Well, your duty as a United States citizen
16   is nearly over.  You know, I don't have to remind you,
17   that this system cannot work without you.  We cannot have
18   a judicial system and get justice, and there would be no
19   accounting without you.  So we do appreciate you being
20   here.
21                   In this, the punishment phase of the
22   trial, the rules are a little bit different.  The rules
23   allow us to bring you a little bit more information about
24   what we had over here.  We'll be able to bring you a lot
25   more information to show you what we're dealing with to

STATE OF TEXAS VS. RUBEN GUTIERREZ                    21

1    help you make a more informed decision.

2                    And while we're doing that, I'm going to

3    ask for your continued concentration and your focus on

4    what happened here, on what happened in Cameron County on

5    September of 1998 what happened.

6                    I'm going to ask for three more things.

7    I'm going to ask for your memory of everything that we

8    put in before that came in through the witness stand.

9    You must remember those things.  I know we've had quite a

10   break, but you must remember that heinous crime that was

11   described by every witness.

12                   I'm going to ask for your continued use of

13   your reason and your common sense because that's the

14   standard that was set out over 200 years ago, and that's

15   what makes us function.  That's what this is all about.

16                   I'm going to ask for one more thing.  We

17   all talked about this on the individual voir dire part

18   when we talked to you individually.  I'm going to ask for

19   your honesty in answering those three questions because

20   the evidence is going to be overwhelming.  And if you

21   answer with your honesty and integrity based on your

22   reason and common sense, there's only one answer to these

23   three questions.

24                   What we're going to show is what

25   you've already seen mainly.  And when I talked to each

1    and every one of you and Ms. Fischer talked to you, you

2    remember that we talked about the kinds of things that

3    show future dangerousness.

4              And those kinds of things were show me a

5    brutal crime for one thing.  That's what you all said you

6    wanted.  Well, you remember the pathologist came in here

7    and he said that 5-foot 4-inch 105-pound Ms. Harrison put

8    up a little struggle.  She had defensive wounds on her

9    right hand, remember?  She put up a little fight.

10             She battled them, but they killed her.

11   And how did they do it?  Well, they stabbed her 13 times

12   in the head and the neck with two different screwdrivers.

13   So that's pretty gruesome.  And they hit her in the face.

14   They kicked her, kicked her so hard that I believe her

15   head impacted back against something and that's

16   ultimately what killed her.

17             She was 85.  She's one of the most

18   vulnerable members of our whole society.  We talked about

19   that.  Protect the kids, protect the old people because a

20   society is ultimately judged how we take care of our very

21   young and our very old.

22             And this is about as heinous as it gets,

23   folks.  You wanted to see some brutal facts before you

24   could consider answering those questions in such a way

25   that the ultimate penalty is imposed.  Well, this is as

STATE OF TEXAS VS. RUBEN GUTIERREZ                    23

```
 1    brutal as it gets.
 2                    That's not all.  That's not all we're
 3    going to bring you.  We're going to bring you more.  The
 4    point I'm trying to make is you have enough right now
 5    with what you've already heard --
 6                    MR. REYES:  I'm going to object, Your
 7    Honor, to counsel's statement.  He's stating his own
 8    personal belief.
 9                    THE COURT:  All right.  I'll sustain the
10    objection.  Show them what you're going to prove,
11    counsel.
12                    MR. REYES:  We would ask the Court to
13    instruct the jury to disregard, Your Honor.
14                    THE COURT:  All right.  Let's move on.
15                    MR. BLAYLOCK:  I intend to ask this Judge
16    in a few minutes to reintroduce every single piece of
17    evidence that's over there and that you've already heard
18    from the witness stand.
19                    This is a whole different phase of the
20    trial.  We talked about the two phases, the innocence and
21    punishment.  And on that evidence, that evidence I'm just
22    going to ask him to re-admit what you've already heard is
23    enough.  It's enough, folks.
24                    MR. REYES:  I'm going to object to
25    counsel's personal opinion regarding the proof.
```

PAM L. ESQUIVEL, CSR, RPR

```
 1                     MR. BLAYLOCK:  Judge, I'm trying to
 2    summarize what the evidence has already been, remind
 3    them.
 4                     THE COURT:  Just summarize it and go ahead
 5    and show them what you're going to prove in this phase.
 6                     MR. REYES:  Can we have a ruling on the
 7    objection, Your Honor?
 8                     THE COURT:  It'll be overruled.
 9                     MR. BLAYLOCK:  What he doesn't want you to
10    remember is the brutal facts of this crime.  And what I
11    request or I demand, folks, that you remember is what
12    happened in this courtroom already.  You've got to have
13    your memory because we're not going to bring you every
14    witness that we've already had.  It would take too long.
15    We're not going to start over.
16                     And you can answer question 1, future
17    dangerousness, just on the brutal nature of this death,
18    the brutal nature of this murder.
19                     And you know from those facts that you've
20    already heard that he took part in the killing.  If he
21    didn't, he intended for her to die because she's the only
22    witness.  She's the one who can I.D. him.  And he's the
23    only one, he's the only one that she can I.D. because she
24    knew him.
25                     And at least he anticipated that she would
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          25

1   die when he walked into the house and he wanted her

2   $600,000.  He knew she wasn't going to part with it.  He

3   knew that she would have to die; and he knew that he was

4   going to leave no witnesses.  So at least he anticipated

5   it.

6                You can answer those questions right now

7   with what you've already heard, but we are going to bring

8   you some more.  We're going to bring you much more.

9   We're going to take you back to his juvenile probation.

10               His juvenile probation officer is going to

11  come here.  He's going to tell you when he was in school,

12  he would tear up property, kick teachers, threaten to

13  kill teachers.

14               He's going to tell you that an officer on

15  one occasion came out to the school to take him into

16  custody.  He punched the officer in the face.  He punched

17  a cop when he was in school.  The officer is going to

18  come himself and tell you how he felt about that.

19               We're going to go on and tell you how he

20  got probation for that.  The juvenile probation officer

21  tried everything she could.  While he was on that

22  probation, he picked up a burglary.  So they brought him

23  back; and they modified his probation and sent him to La

24  Esperanza Home for Young Men, to try to help him, put him

25  in a structured environment.

1          He ran away.  He escaped from there, ran
2    away, and committed another burglary, picked up again.
3    The Court showed mercy once more, sent him back to La
4    Esperanza Home for Young Men.  In three days he was gone
5    again, ran away again.
6          He was caught with another burglary,
7    prosecuted this time and was sent to TYC.  That's the
8    Texas Youth Commission.  That's the equivalent juvenile
9    jail prison.  And when you go to the juvenile jail, we'll
10   have a witness tell you, that you just don't go do hard
11   time in the juvenile system.  They try to rehabilitate
12   you.
13         In this case, they sent him to the Rio
14   Grande Military Institute.  That's like a boot camp, a
15   juvenile boot camp, to try to give him some structure,
16   some discipline, some self-respect, respect for
17   authority.  He got there to the Rio Grande Military
18   Institute and the next day he escaped.  He ran away
19   again.
20         By this time he's about 17.  The next time
21   he gets caught, he had stole some checks from a law
22   office.  He had stole some checks and forged them.  He
23   got caught and was convicted of forgery.
24         He was brought to this courthouse.
25   Considering his record, he was shown mercy once more.

STATE OF TEXAS VS. RUBEN GUTIERREZ                     27

1   They put him on probation one more time.  They sent him
2   over to the adult boot camp, the Homer Salinas boot camp.
3   He went there; and at the boot camp he was a discipline
4   problem, wouldn't follow the orders, had no respect for
5   authority.
6                   Boot camp didn't want him.  So they
7   discharged him back to the county jail.  And when he got
8   back over here to our county jail, he started tearing up
9   property, caused a small riot.  They had to put him down.
10                  He got convicted of that, too, criminal
11  mischief, tearing up property.  And guess what?  He got
12  more probation.  He got probation again.  He stayed in
13  jail for awhile.  They put him on probation.
14                  When he got out on that probation, he
15  picked up a D.W.I. like that.  When they brought him to
16  court again for the D.W.I., he got more probation one
17  more time.  He's caught every break you can get in this
18  system.  He's caught every single one.
19                  Then about a year later he had this
20  terrible plan to go and get the money of Ms. Harrison and
21  commits capital murder.  That's what you're dealing with.
22                  None of this that you've heard so far is
23  going to indicate in any way that there is any excuse,
24  anything that makes him less morally culpable for killing
25  Ms. Harrison.

1        You're not going to hear that he came from
2   a bad home because he didn't.  His mother tried to help
3   him.  He wouldn't have it.  Nobody could help him.  They
4   all tried.  There's nothing that makes it less morally
5   culpable for what he did.
6        Don't lose your focus.  Don't lose your
7   focus because when we're done presenting you all of
8   this -- and that's not all we're going to present.  We've
9   got more.
10       While he was in jail on this case, him and
11  his codefendant, Rene Garcia, attempted an escape.  They
12  took a guard hostage.  They held a shank, a shank which
13  is a toothbrush with the brush part cut off, and they had
14  sharpened it.  They held it to the guard's throat, Rene
15  Garcia did.
16       And when that officer tried to struggle to
17  get away, Ruben told him, "You'd better not do that.
18  They'll kill you with the shank.  They've got a shank.
19  They'll kill you."  He was in the cell across the hall,
20  but he was directing, he was aiding, he was encouraging.
21       Not only that, folks, but remember we were
22  here on April 15th, we were all here, and then they were
23  leading him back to custody.  They were taking him out
24  this door and down this hall.  You've all seen this
25  hallway.

1              They had it cleared.  The bailiffs, the
2    two bailiffs, Roy and Frank, and there was two more
3    bailiffs that had the hallway cleared for safety.  They
4    had a bailiff stationed at the end for safety.  You've
5    all seen the hallway.  You've seen the back doors of the
6    courts that lead into the hallway.
7              While they were taking him back,
8    inadvertently a woman went into the hallway.  She comes
9    out about this far from him.  She looks at him, he looks
10   at her.  With two bailiffs right beside him, he says,
11   "You'd better get her out of my way or I'll kill her,
12   too.  You'd better get her out of my way or I'll kill
13   her, too."  You can't tell me that there's not a future
14   danger.
15             That's not even all.  There will be more.
16   There will be more evidence that you'll hear from this,
17   about an aggravated perjury.  You'll hear more.
18             But when we're done giving you all that
19   over the next few days, they're going to get up and
20   they're going to say -- they're going to say two things.
21   They're going to try to change your focus again.
22             They're going to try to divert your
23   attention off of him.  They're going to try to divert
24   your attention off of what he did so that you don't see
25   it for what it is; and they're going to say something

STATE OF TEXAS VS. RUBEN GUTIERREZ                    30

1   mitigating, some sufficient circumstance that makes him

2   less morally blameworthy.

3                    But we talked about that.  The standard is

4   not that you feel sorry for the sorry way that he turned

5   out.  This is the punishment phase of the trial.  This is

6   not the sympathy phase of the trial.  It's the punishment

7   phase.  And that's got to be taken into account.

8                    You'll have to set your emotion aside; and

9   you'll have to answer these questions on your reason and

10  your common sense and give an honest answer, not one

11  where you just want the result to be something so you

12  answer a certain way.  You all said you could do that.

13  I'm going to ask that you do that.

14                    I look forward to presenting you all this

15  evidence and at the end, I just ask for your honesty.

16                    MR. REYES:  We're going to reserve our

17  opening statement, Your Honor.

18                    THE COURT:  All right.  You may present

19  your first witness, then.

20                    MR. BLAYLOCK:  Judge, at this time I move

21  to reintroduce every exhibit that was admitted in this

22  trial and all of the testimony that came from the witness

23  stand.

24                    MR. REYES:  Subject to all the objections

25  that we've made, Your Honor.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              31

```
 1                  THE COURT:  They'll be readmitted.
 2                  MS. FISCHER:  The State would call Tina
 3     Hauff.
 4                  I'm sorry.  This is Tina Pizana.  Tina
 5     Hauff.
 6                  THE COURT:  Would you raise your right
 7     hand, please?
 8                  (The witness was sworn in by the Court)
 9                  THE WITNESS:  I do.
10                  THE COURT:  All right.  You may be seated.
11                  You may proceed.
12                  MS. FISCHER:  Thank you, Judge.
13                          TINA HAUFF,
14        having been first duly sworn, testified as follows:
15                      DIRECT EXAMINATION
16     BY MS. FISCHER:
17          Q.  Good morning, Ms. Hauff.
18          A.  Good morning.
19          Q.  I need you to tell the jury your full name,
20     please.
21          A.  My name is Tina Hauff and I'm Mrs. Harrison's
22     sister.
23          Q.  Now, Ms. Hauff, I know you're not feeling very
24     good this morning.  You woke up this morning and felt
25     like you had the flu, didn't you?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        32

```
 1        A.   That's right.
 2        Q.   If you get to a point this morning where you
 3   don't feel good or you feel like you need to take a
 4   couple of minutes break, would you please tell the Judge,
 5   okay?  I don't want you to get any sicker --
 6        A.   Okay.
 7        Q.   -- because you had to come up here today.
 8             Okay.  Now, you say that you were
 9   Ms. Harrison's sister.  Tell me, how many brothers and
10   sisters did Ms. Harrison have?
11        A.   We were 12, total of 12.
12        Q.   Okay.  And where did -- let's start with the
13   first one in the list.  How many -- where did Ms. --
14   actually, Harrison is her married name.  What was her
15   maiden name?
16        A.   Cuellar.
17        Q.   So you all are the Cuellar family?
18        A.   All of us are Cuellar.
19        Q.   Who was your mommy and your daddy?
20        A.   My mother was Maria Luisa Cavazos Cuellar, and
21   my father was Fermin Claudio Cuellar.
22        Q.   And where were they from?
23        A.   From Brownsville.
24        Q.   Okay.  So you all are Brownsville natives all
25   your life?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    33

```
 1        A.    Right.
 2        Q.    Okay.  And you had 12.  Where did Ms. Harrison
 3   or Ms. Cuellar when she was your sister, where did she
 4   fall in the list?
 5        A.    She was the second.
 6        Q.    Okay.  And what about you?
 7        A.    I'm next to the last.  I'm the eleventh one.
 8        Q.    You're almost the baby?
 9        A.    That's right.
10        Q.    Okay.  Who is the baby?
11        A.    Agusto.
12        Q.    Okay.  And just very briefly, if you don't
13   mind, kind of run through all 12 of you.
14        A.    It was Agatha, who is dead already.  She died,
15   she had a stroke and died.  And then Mrs. Harrison,
16   Escolastica.  And then Fermin, he passed away also.  And
17   then it's Luis; and then it's Pablo; and then it's
18   Encarnacion; and then it's Estela, Willie, Moises,
19   Agusto, Arabella, who is in a nursing home, and myself.
20        Q.    Okay.  Ms. Hauff, let's talk for a little bit
21   about Ms. Harrison.  Let's talk about, first of all, her
22   growing up.  Did she take care of you when you all were
23   growing up?
24        A.    Yes, she sure did.  She was like our second
25   mother --
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                             34

```
 1        Q.   Okay.

 2        A.   -- all her life.

 3        Q.   What kinds of things would she do for you?

 4        A.   Well, she always saw that we had, you know,

 5   what we needed at home and especially after my daddy

 6   died.

 7        Q.   Okay.  When did your daddy die?

 8        A.   My daddy died in 1952.

 9        Q.   Okay.  And when Ms. Cuellar was at home before

10   she got married, did she work?

11        A.   Yes.

12        Q.   What kind of things did she do?

13        A.   She had a loan business.

14        Q.   Okay.  And was that here in Brownsville?

15        A.   Yes, Cuellar Loan Company.

16        Q.   Okay.  And then somewhere along the way she met

17   a man and married?

18        A.   Right.  Then later on she worked for Judge

19   Dancy.  After that, she opened a restaurant and --

20        Q.   Do you know what the name of the restaurant

21   was?

22        A.   It was Casablanca Restaurant on 14th and Taft.

23   We all were born there and lived there all our lives.

24        Q.   Is that 14th and -- I'm sorry.

25        A.   And Taft.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                     35

1      Q.   Okay.  And she opened a restaurant there at the
2  house?
3      A.   Right.
4      Q.   Okay.  And how long did she have that
5  restaurant?
6      A.   She had that restaurant for maybe four or five
7  years.  She met Robert there and they got married.
8      Q.   Okay.  And that was Robert Harrison?
9      A.   Robert Harrison.
10     Q.   Okay.  And when Ms. Cuellar married
11 Mr. Harrison, where did they live in?
12     A.   At the time she was living on the upstairs of
13 our old house there where she had the restaurant.  That
14 used to be our residence.
15     Q.   Uh-huh.  And after she got married to Robert,
16 where did they move to?
17     A.   Afterwards they bought a piece of property on
18 Roosevelt right where Lopez Food Store is on Villa Verde
19 and Roosevelt, the parking lot that used to be their home
20 there.  They built a little home there.
21     Q.   Okay.  And what did they do while they were
22 living over there?  What kind of -- did they have any
23 businesses or anything?
24     A.   Yeah.  She was working for different
25 conditions.  She worked for Hygeia Milk Company; and then

1    she went to work for Hydrocol; and then she worked for

2    Mr. Ikeman which had built aluminum doors.

3         Q.    Okay.

4         A.    And after that, they started -- when they were

5    working for Hygeia, she started buying the property there

6    on Morningside.

7         Q.    Okay.  And that was where at the time of her

8    death she owned a mobile home park, and they called it

9    Harrison's Mobile Home Park.  Is that the piece of

10   property you're talking about?

11        A.    Correct.  Uh-huh.

12        Q.    Okay.  So her and her husband bought that

13   together.  Do you remember about when that was?

14        A.    It was in the '50's.  I think it was '52, '53,

15   around there.

16        Q.    Okay.  Now, all this time while she's married

17   to Robert, you're still at home with your mama and daddy,

18   right?

19        A.    Right.  Uh-huh.

20        Q.    Okay.  Would Ms. Cuellar come around, visit,

21   take care of you guys?

22        A.    All the time.  All the time.  Uh-huh.

23        Q.    Okay.  Now, after they bought the mobile home

24   park, did they start a business there?

25        A.    Well, she continued with the loan business on

STATE OF TEXAS VS. RUBEN GUTIERREZ                    37

```
 1   the side; and she was working for different -- like I
 2   think -- when she moved there, built the house, I think
 3   she went to work for Ikeman --
 4       Q.   Okay.
 5       A.   -- Mr. Ikeman who just passed away recently.
 6   And then -- let's see.  What else?  That's about all she
 7   was doing, working for Ikeman and --
 8       Q.   And doing loans?
 9       A.   -- and doing the loan business.  Uh-huh.
10       Q.   But now, that piece of property, it wasn't a
11   mobile home park --
12       A.   It wasn't --
13       Q.   -- when they --
14            COURT REPORTER:  Excuse me.  I need you
15   all to talk one at a time, please.
16            THE COURT:  Let her finish asking the
17   question before you answer.  Thank you.
18            THE WITNESS:  Yes, sir.
19       Q.   (BY MS. FISCHER)  We've got to go a little bit
20   slower, Ms. Hauff.
21            Okay.  And you said it was a field.  That
22   was farmland back out in the '50's when they bought it,
23   wasn't it?
24       A.   Yes, ma'am.  They used to farm there and plant
25   cotton.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    38

```
 1        Q.    Okay.  Who would plant the cotton?
 2        A.    Robert.
 3        Q.    Now, at some point in time, did you stay close
 4   to Ms. Harrison even though she had moved off and started
 5   her own life?
 6        A.    Oh, yes.
 7        Q.    Okay.
 8        A.    We saw each other -- she almost -- every night,
 9   almost every night she came to visit us at the home --
10        Q.    Okay.
11        A.    -- at the farm.
12        Q.    At the farm.  Where were you all living at the
13   time?
14        A.    At -- my daddy had bought 40 acres on Oklahoma
15   and Boca Chica.  And she would always bring us ice cream
16   or Cokes or something, all the time.
17        Q.    Now, did her and Mr. Harrison have any
18   children?
19        A.    No, they didn't.
20        Q.    Okay.  Now, what about yourself, do you have
21   any children?
22        A.    I have four children.
23        Q.    Okay.  What about grandchildren?
24        A.    I have three grandchildren.
25        Q.    Okay.  So I assume there's -- I think that you
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          39

1   told me there's nine of you all still living, right?

2          A.    Right.

3          Q.    And I assume most of them had children?

4          A.    Yes.

5          Q.    Okay.  So Ms. Harrison had a lot of nieces and

6   nephews?

7          A.    Exactly.

8          Q.    Did she spend a lot of time with them?

9          A.    A lot of time -- with my children she spent a

10  lot of time and the ones that lived here because most of

11  my brothers are out of town.

12         Q.    Okay.  Now, while she was there, they had the

13  land over on 409 Morningside.  At some point in time

14  Ms. Harrison decided that she was going to go to school,

15  didn't she?

16         A.    Yes.

17         Q.    Can you tell the jury why your sister decided

18  that she wanted to go to school?

19         A.    Well, she wanted to improve herself and she

20  wanted -- she was tired of being a secretary and not

21  making it.  And she wanted to -- she had the knowledge

22  and she wanted to go on and be a teacher.  She loved

23  being with children.  So --

24         Q.    Now, you were kind of an inspiration for all

25  that, weren't you, Ms. Hauff?

STATE OF TEXAS VS. RUBEN GUTIERREZ                40

```
 1      A.    Yes.  Well, when she voiced, you know, that she
 2  wanted to go to school, and I was already a nurse, and I
 3  said, "Okay."
 4               And she said, "But I need money."
 5               And I said, "Well, I'll help you."  So --
 6      Q.    Did you help her go to school?
 7      A.    Yes.  Uh-huh.
 8      Q.    Where did she go to college?
 9      A.    She went to Southmost here in Brownsville and
10  she started -- she was doing substitute teaching.
11      Q.    And where was she substitute teaching at?
12      A.    She would substitute wherever they called her,
13  but mostly it was at Victoria Heights, Cromack, and some
14  at Castaneda.
15      Q.    Okay.  And did she finally graduate from Texas
16  Southmost?
17      A.    Yes, she did.
18      Q.    Okay.  And did she graduate with a teaching
19  degree?
20      A.    Then she went on to Pan American; and they
21  would car pool, several of the principals that were going
22  back to school at the time.  And she started teaching
23  with a teacher's certificate.
24      Q.    Okay.  And do you remember about when that was
25  that she started teaching?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                           41

1      A.    It was about '61 I would say.

2      Q.    Okay.  And where did she start her career as a

3  teacher?

4      A.    At Cromack.

5      Q.    Okay.  And how long did she stay there at

6  Cromack as a teacher?

7      A.    All her life there until she retired.

8      Q.    And when did she retire?

9      A.    She retired -- I cannot remember, but it had to

10  be like in '89 or '88, around there.

11      Q.    Okay.  And was Mr. Harrison alive during all

12  this time?

13      A.    Yes.  Uh-huh.

14      Q.    And they never had any children?

15      A.    Never had any children.

16      Q.    But she had her kids at school.  She taught

17  young children at school?

18      A.    Oh, yes.  Uh-huh.

19      Q.    Okay.  Now, her husband, Mr. Harrison, is no

20  longer alive, is he?

21      A.    No.  He passed away with cancer in '92, I

22  believe, '91 or '92.

23      Q.    Okay.  How did Ms. Harrison take that?

24      A.    Very, very bad because they had been together

25  all their life just about, 40 some years.

1    Q.   Now, she had already retired when Mr. Harrison
2    passed away.  What did she do then?  After Mr. Harrison
3    was gone and she was retired from teaching, what kind of
4    work did she do then?
5    A.   Well, Robert by that time was not feeling too
6    good.  So she just about took over with the trailer park.
7    And she would do substitute teaching, a lot of substitute
8    teaching even though she was retired.
9    Q.   Okay.
10   A.   And she would do tutoring at home also.
11   Q.   And this is the same Harrison Mobile Home Park
12   where she was killed last September?
13   A.   Right.
14   Q.   Now, somewhere along the way she got somebody
15   to come in and help.  Somebody moved in and helped her;
16   that's one of your nephews, Avel, right?
17   A.   Right.
18   Q.   And he came in and helped her out right about
19   the same time that Mr. Harrison passed away?
20   A.   It was right after he passed away.  Uh-huh.
21   Q.   Okay.  Now, let's talk about her last few years
22   of her life.  Ms. Hauff, were you close --
23   A.   Yes.
24   Q.   -- to your oldest sister?
25   A.   No.  She --

STATE OF TEXAS VS. RUBEN GUTIERREZ                          43

1      Q.   The very oldest is a girl.  Is she still
2  living?
3      A.   No.  She's deceased.
4      Q.   So this is your very oldest, oldest sister?
5      A.   (Nods head).
6      Q.   Okay.  Would you consider yourself the one that
7  she was closest to?
8      A.   Probably so because I -- we called each other
9  on the phone almost every day.
10     Q.   Okay.  What kind of things would you all do?
11     A.   I would take her out at night, you know.
12  Towards the end I would pick her up at night and take her
13  over to my house to eat supper --
14     Q.   Okay.
15     A.   -- or I would take -- bring supper to her and
16  she wanted -- showed interest in wanting to go out
17  because she didn't like to leave her home.  And I would
18  take her out riding; and I would tell her, "Let's go
19  cruising, you know."  So I would just put her in the car
20  and just play some music for her; and she was relaxed and
21  was having a good time all the time she was with me.
22     Q.   What kind of music did she like to listen to?
23     A.   She liked to listen to the oldies, the old, old
24  music from the '30's and '40's.
25     Q.   And you and I talked about this.  This is even

STATE OF TEXAS VS. RUBEN GUTIERREZ                    44

1   way before my time.  She really enjoyed music from the
2   '30's.
3        A.   And I had some albums of Billy Vaughn and all
4   the oldies, and she loved that tape.  She wanted me to
5   play it all the time.
6        Q.   Would she do that when you all came over to the
7   house?
8        A.   Yes, ma'am.
9        Q.   Now, you and I, we've talked about
10  Ms. Harrison's life on several times; and you've told me
11  many wonderful things about her.  You would oftentimes
12  bring over another sister that you had, one that was in
13  the nursing home; and the three of you would spend time
14  together.
15       A.   Right.
16       Q.   Did you all do that in the last few months of
17  her life?
18       A.   Oh, yes.  Uh-huh.
19       Q.   Okay.  What would -- which sister would you
20  bring over?
21       A.   Arabella.
22       Q.   Okay.  What would you all do?
23       A.   I would bring them home and I'd fix her hair --
24  both of them, fix up their hair and dress them up.  And
25  sometimes she would put on some of my dresses even though

STATE OF TEXAS VS. RUBEN GUTIERREZ                    45

```
 1    they were kind of big on her, but she liked --
 2         Q.   Is that Ms. Harrison?
 3         A.   Uh-huh.
 4         Q.   Yeah.  She was a pretty skinny lady.
 5         A.   Yeah.  And anyway, she would just -- I would
 6    feed them and then -- or feed them -- if it was late in
 7    the evening, I'd give them watermelon or papaya, whatever
 8    I had in the home, or ice cream.  And then we'd play
 9    music and talk, you know.  I'd trim her toenails and soak
10    her feet, you know.  I just babied them all the time.
11    So --
12         Q.   Right before she was killed, how often did you
13    get to see her?
14         A.   Almost on a daily basis.
15         Q.   Okay.  Ms. Hauff, tell me, how has your life
16    been affected since she was murdered?
17         A.   Very bad (weeping).
18         Q.   Okay.  Do you miss her?
19         A.   Very much.
20         Q.   What do you miss the most about her?
21         A.   Calling her and talking to her on the phone.
22         Q.   How is your own personal life different since
23    she was murdered?
24         A.   Very bad.  I got very depressed.
25         Q.   Did you have some problems at work because of
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    46

1    that?

2         A.    Yes.   I had to quit my job because I couldn't

3    function, you know.   And any time I'm outside, I come in

4    the house and the first thing I want to do is call her.

5         Q.    You can't do that anymore, can you?

6         A.    No.   Any time I had a problem, I would call

7    her, or anything good to tell her, I would call her; and

8    she was the only one that I shared my happiness and my

9    sadness with.   My children, you know, any time they

10   called me and she wanted to know what they were doing

11   because they're all out of town.

12        Q.    Was she close to your children?

13        A.    Very close.   And she wanted to go to my

14   daughter's wedding, but she couldn't go.   She married on

15   July the 19th in Houston.

16        Q.    That was one of the last things that she missed

17   in her lifetime was your daughter's wedding?

18        A.    That's right.

19             MS. FISCHER:   Your Honor, I pass the

20   witness.

21             MR. GALARZA:   I have no questions, Your

22   Honor.

23             THE COURT:   All right.   You may step down.

24   Thank you.

25             You may call your next witness.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    .              47

```
 1                    MS. FISCHER:  The State calls Tina Pizana.
 2                    THE COURT:  Would you raise your right
 3   hand, please?
 4                    (The witness was sworn in by the Court)
 5                    THE WITNESS:  I do.
 6                    THE COURT:  You may be seated.
 7                    ERNESTINA PIZANA,
 8      having been first duly sworn, testified as follows:
 9                    DIRECT EXAMINATION
10   BY MS. FISCHER:
11        Q.   Ms. Pizana, I need you to tell the jury your
12   full name, please.
13        A.   My name is Ernestina Pizana known as Tina
14   Pizana.
15        Q.   And what do you do for a living?
16        A.   I'm a juvenile probation officer.
17        Q.   And how long have you been a juvenile probation
18   officer?
19        A.   Twenty-five and a half years.
20        Q.   And those 25 and a half years, have you been
21   employed by the same place?
22        A.   Yes, ma'am.
23        Q.   And what is that?
24        A.   Cameron County juvenile probation.
25        Q.   Okay.  Now, can you please tell the jury what a
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          48

```
 1    juvenile probation officer does?
 2         A.   We work with children between the age of ten to
 3    17 -- or 16, 17 if they commit an offense before they
 4    turn 17; and we have jurisdiction until they're 18.
 5    These are children that get into trouble with the law or
 6    have home problems or run away or have truancy problems.
 7         Q.   And you know the reason why you're here today
 8    is because a woman by the name of Escolastica Harrison
 9    was murdered back on September the 5th of 1998.  Now, you
10    knew Ms. Harrison, didn't you?
11         A.   I remember -- I used to know her when I was a
12    child.  She used to live in the same area that we did.
13         Q.   And in fact, the Tina that was here just before
14    you, you're named after her, aren't you?
15         A.   Yes, ma'am.
16         Q.   How did that come about?
17         A.   My older sisters used to associate with -- they
18    were best friends with Tina.  So they liked her and they
19    liked her name, so I ended up getting her name.
20         Q.   When you -- I guess what I want to say is
21    little did you know when you were a child that some day
22    you'd to have come to this courtroom and face
23    Ms. Harrison's killer?
24         A.   Yes, ma'am.  I had no idea.
25         Q.   So let's talk about that.  During your job as a
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              49

1    juvenile probation officer, long before any of this ever
2    happened, did you have the opportunity to supervise a
3    juvenile by the name of Ruben Gutierrez?
4         A.   Yes, ma'am.
5         Q.   Okay.  Ms. Pizana, do you see Mr. Gutierrez
6    here in this courtroom today?
7         A.   No, ma'am.  He's being blocked by --
8         Q.   Do you know he's in the courtroom?
9         A.   Yes, ma'am.
10        Q.   But you just can't see him.  If you want to
11   step down, I need you to point him out to me.
12        A.   He's right there wearing a white shirt with a
13   black tie (pointing).
14        Q.   Thank you, ma'am.
15                  MS. FISCHER:  Your Honor, may the record
16   reflect that she has identified the defendant?
17                  THE COURT:  It shall reflect.
18                  MS. FISCHER:  Your Honor, may I approach
19   the witness?
20                  THE COURT:  You may.
21        Q.   (BY MS. FISCHER)  Ms. Pizana, I'm going to
22   show you what has been marked as State's Exhibit P1,
23   that's Punishment Number 1, which is a juvenile --
24   certified copy of a juvenile judgment.  I'm going to ask
25   you the name on there, it says, "In The Matter of Ruben

1   Gutierrez --"

2                    MR. REYES:  I'm going to object to counsel

3   reading from something that has not been admitted into

4   evidence, Your Honor.

5                    THE COURT:  Let her identify it first,

6   counsel, and then offer it.

7        Q.   (BY MS. FISCHER)  I want you to take a look at

8   this.  Do you recognize this judgment?

9        A.   Yes, ma'am.

10       Q.   Okay.  Is this judgment, which is entitled "In

11  The Matter of Ruben Gutierrez --"

12                   MR. REYES:  I'm going to object, Your

13  Honor, to counsel reading what has not been admitted into

14  evidence.

15                   THE COURT:  Just let her identify it.

16                   Can you identify that?

17                   THE WITNESS:  Yes, sir.

18                   THE COURT:  Go ahead.

19       Q.   (BY MS. FISCHER)  And is this judgment the

20  same judgment that you supervised Mr. Gutierrez on?

21       A.   Yes, ma'am.

22       Q.   Is that the same Mr. Gutierrez sitting here in

23  the courtroom that you just pointed out a few minutes

24  ago?

25       A.   Yes, ma'am.

1            MS. FISCHER:  Your Honor, we're going to

2    offer P1 into evidence.  It is a certified copy of a

3    juvenile court judgment.

4            **(Brief pause in proceedings)**

5            MR. REYES:  Judge, we're going to object,

6    first of all, that the notice was not timely given to us

7    after we filed a request that the State inform us of any

8    extraneous offenses that they intended to introduce.  We

9    would object as to relevance.

10            We would object also because it creates an

11    unfair prejudice.  We would object because it is not an

12    act involving criminal acts of violence.  And we would

13    object also because the Code of Criminal -- the Code

14    of -- the Criminal Rules of Evidence, specifically

15    Rule 609(d), specifically prohibits any juvenile

16    adjudications from being admissible in a criminal

17    proceeding.

18            THE COURT:  It'll be overruled.

19            MR. REYES:  And we would also object, Your

20    Honor, one further objection, that by the introduction of

21    the judgment or State's Exhibit P1 we are effectively

22    being denied the opportunity to cross-examine any of the

23    witnesses that would be called to prove up that offer.

24            THE COURT:  That'll be overruled.  It'll

25    be admitted.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    52

1              **(State's Exhibit Number P1 admitted)**

2      Q.   (BY MS. FISCHER)  Ms. Gutierrez, I'm going to

3    show you what has been marked as --

4      A.   Pizana.

5      Q.   Pizana.  I'm sorry.  That's my mistake.  What

6    has been marked as State's Exhibit Number P3.  I want you

7    to take a look at this document and tell me, do you

8    recognize what this document is?

9      A.   Yes, ma'am.

10     Q.   Okay.  Now, knowing what this document is, the

11   person who this document belongs to, is he here in the

12   courtroom today?

13     A.   Yes, ma'am.

14     Q.   Is that that same Ruben Gutierrez that you

15   previously pointed out?

16     A.   Yes, ma'am.

17     Q.   Okay.

18              MS. FISCHER:  Your Honor, at this time

19   we'd offer into evidence what has been marked as State's

20   Exhibit P3, which is also a certified copy of a juvenile

21   court judgment.

22              **(Brief pause in proceedings)**

23              MR. REYES:  We would have the same

24   objections, Your Honor, that we previously made to

25   State's Exhibit P1.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    53

1           THE COURT:  They'll be overruled.  Three
2    will be admitted.
3                (State's Exhibit Number P3 admitted)
4         Q.   (BY MS. FISCHER)  Now, Ms. Pizana, let's talk
5    about, then, the very first time that you came in contact
6    with the defendant.  Will you please tell the jury when
7    that was?
8         A.   It was back on December of '91.
9         Q.   Okay.  And why was he there to see you?
10        A.   Well, at first he had been -- he had already
11   been referred to us for felony 3 criminal mischief,
12   assaulting a police officer, and assaulting -- just an
13   assault, and criminal mischief.
14        Q.   Okay.  And what was his purpose in coming to
15   see you?
16        A.   He was pending going to court.  So we go
17   through -- with all juveniles we try to counsel with
18   them, get to know them before we go to court.
19        Q.   Okay.  And your goal in going to court, then,
20   is to try and help them out of this trouble?
21        A.   Yes, ma'am.
22        Q.   Okay.  So, then, did you go to court with
23   Mr. Gutierrez?
24        A.   Yes, ma'am.
25        Q.   Okay.  At some point in time was he placed on

STATE OF TEXAS VS. RUBEN GUTIERREZ                    54

1   probation for those offenses you talked about, the

2   criminal mischief, aggravated assault, resisting arrest

3   and assault?

4        A.    That's what he was charged with.  They filed a

5   criminal mischief B; and that's what he was placed on

6   probation for.

7        Q.    Okay.  Is that -- and if you don't mind --

8             MS. FISCHER:  Your Honor, may I approach?

9             THE COURT:  You may.

10       Q.    (BY MS. FISCHER)  Is that this juvenile

11   judgment right here, P1?  This was the first time that he

12   was placed on juvenile probation --

13       A.    Yes, ma'am.

14       Q.    -- here in Cameron County?

15       A.    Yes, ma'am.

16             MS. FISCHER:  Your Honor, may I publish

17   State's P1 to the jury?

18             THE COURT:  You may.

19       Q.    (BY MS. FISCHER)  So, now he's on juvenile

20   probation.  What are you doing to work with him at this

21   point in time?

22       A.    He had -- at this time he was allowed to remain

23   at home under the care and custody of his mother; and we

24   tried counseling with them.  He was ordered to go to

25   MHMR, but the mother opted to do home private counseling.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    55

1    So he was going to counseling with Dr. James Freeberg.

2         Q.    Okay.  Now, let's stop right there for a

3    minute.  You said that the mother opted to do her own

4    counseling.  How was Mr. Gutierrez' mother?  Was she

5    cooperative?

6         A.    Yes, very cooperative.

7         Q.    Okay.  Did she try to help you help Ruben?

8         A.    She was always coming in for hearings if she

9    could.  I know a couple of times she couldn't because she

10   was working, but the majority of the time she'd be there

11   willing to assist us, coming for appointments, taking him

12   wherever he needed to go.

13        Q.    Okay.  And you said that she would be working.

14   She was employed rather successfully as running an

15   apartment complex, was she not?

16        A.    Yes, ma'am.

17        Q.    Okay.  She was always there for Ruben and would

18   help you and, in fact, tried to get him counseling?

19        A.    Yes, ma'am.

20        Q.    Okay.  Did that work?  Were you able to help

21   him?

22        A.    For awhile --

23             MR. REYES:  Judge, I'm going to object as

24   to relevance.

25             THE COURT:  Overruled.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          56

1        A.    For awhile he did okay, but then he messed up

2    again.

3        Q.    (BY MS. FISCHER)   Okay.   When you say messed

4    up again, what happened next?

5        A.    During the summer -- he was adjudicated in May.

6    So during the summer he did --

7                    MR. REYES:   I'm going to object, Your

8    Honor, to any relevance.   She's going outside the scope

9    of State's Exhibit P1 and State's Exhibit P3.

10                   THE COURT:   Overruled.

11                   MR. REYES:   We would also object, Your

12   Honor.   It goes outside the scope of the criminal

13   mischief and the theft which are State's Exhibits P1 and

14   P3.

15                   THE COURT:   That'll be overruled.

16                   Go ahead.

17       Q.    (BY MS. FISCHER)   Okay.   You say he was

18   adjudicated in May.   During the summer did he do okay?

19       A.    For awhile.   Then he got into trouble again

20   by -- he was alleged to have committed another burglary

21   of habitation -- burglary of habitation.

22       Q.    Okay.   And when he was alleged to have

23   committed that burglary of habitation, what did you, as

24   his juvenile probation officer, do to try and help

25   Mr. Gutierrez again?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    57

1        A.   We continued working with him pending the
2    paperwork that had to be submitted from the law
3    enforcement agencies.
4        Q.   Okay.  And after that paperwork was submitted,
5    did you all change Mr. Gutierrez' rehabilitation plan
6    there at the probation department?
7        A.   The District Attorney filed a motion to modify
8    in January.  So that's when it was modified.
9        Q.   Okay.  What was he modified to?
10       A.   Well, in February he pled -- they filed
11   burglary of habitation and truancy.  So he pled to
12   truancy only.  So at the time his probation conditions
13   were modified; and he was placed in La Esperanza Home for
14   Boys.
15       Q.   Okay.  Now, what is the La Esperanza Home?
16   What is that?
17       A.   It's a home for boys that get into trouble with
18   the law.  They have counselors there.  They live there;
19   and they try to work with them, counseling with them,
20   taking them to school, and making sure that they do
21   everything at school or at home and stay out of trouble.
22       Q.   So it is a placement outside of the home.  At
23   this point in time, you were taking him away --
24       A.   Yes, ma'am.
25       Q.   -- from the mother?  Up to this point, had

PAM L. ESQUIVEL, CSR, RPR

1   Ms. Gutierrez been helpful in trying to help you help the

2   defendant?

3        A.   Yes, ma'am.  She was always there.

4        Q.   Okay.  He was placed in La Esperanza I think

5   you said in February.  Do you remember when in February?

6        A.   February 17th of '93.

7        Q.   Did he stay there?

8        A.   No.  He ran away in March 8th.

9        Q.   So, he went in February 17th; by March the 8th

10  he had already run away?

11       A.   Yes, ma'am.

12       Q.   After he ran away, what did you all do with

13  him?

14       A.   He was on run-away status until 5/19/93.  At

15  that time he was taken into custody from the directive

16  that had been issued; and he was charged with burglary of

17  habitation.

18       Q.   Okay.  After you take him into custody for

19  running away, what did you all do with him at that point?

20       A.   He was in detention for awhile.  Then the Judge

21  released him and allowed us to place him back at La

22  Esperanza Home for Boys pending another hearing on these

23  pending charges.

24       Q.   And you said it was burglary of a habitation.

25  Did he have any other charges besides burglary of

STATE OF TEXAS VS. RUBEN GUTIERREZ                              59

1   habitation at that point?

2       A.   Yes.  When the police officers arrested him, he

3   resisted arrest and they charged him with criminal

4   mischief.  He apparently kicked the windows to the --

5                   MR. REYES:   Judge, I'm going to object to

6   hearsay.

7                   THE COURT:  It's overruled.

8       A.   He was alleged to have kicked in the unit and

9   the patrol unit -- radio in the unit, and also the

10  windows of the patrol unit.  So they added a resisting

11  arrest and criminal mischief.

12      Q.   (BY MS. FISCHER)  Ms. Pizana, you have

13  reviewed the files of Ruben Gutierrez prior to coming to

14  court here today, haven't you?

15      A.   Yes, ma'am.

16      Q.   And all of this information, is that

17  information that you obtained while reviewing the

18  juvenile file of the defendant, Ruben Gutierrez?

19      A.   Yes, ma'am.

20      Q.   Okay.  So after you had him back in custody for

21  committing the new offense and the run aways that he had

22  done from La Esperanza, you put him back in La Esperanza.

23  How did he do this time?

24      A.   He ran away shortly thereafter.

25      Q.   Okay.  When you say shortly thereafter, how

STATE OF TEXAS VS. RUBEN GUTIERREZ                          60

```
 1    long did he stay?
 2         A.   He ran away on 6/10.
 3         Q.   When had he been placed there?
 4         A.   Pardon?
 5         Q.   What -- if he ran away on June the 10th, when
 6    had he gotten to La Esperanza?
 7         A.   June 7th.
 8         Q.   All right.  This is the second time he ran
 9    away.  Did you all ever catch up with him again?
10         A.   He was taken into custody back in September.
11         Q.   Okay.  And when you took him into custody this
12    time, why were you taking him into custody?
13         A.   He was charged -- he was taken into custody on
14    the order taking child into custody; and he was alleged
15    to have committed another burglary.
16         Q.   Okay.
17              MS. FISCHER:  Your Honor, may I approach
18    the witness?
19              THE COURT:  You may.
20         Q.   (BY MS. FISCHER)  Ms. Pizana, I'm going to ask
21    you to look at P3.  You said that he was charged with
22    another burglary.  Did he go to court about that other
23    burglary?
24         A.   Yes, ma'am.
25         Q.   And did he plead true and got on probation
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          61

```
 1   again?
 2                  MR. REYES:  I'm going to object, Your
 3   Honor, to hearsay.
 4                  THE COURT:  Overruled.
 5        Q.   (BY MS. FISCHER)  P3, is this the second time
 6   that he was on juvenile probation with the Cameron County
 7   juvenile probation department?
 8        A.   That's the second time he was adjudicated, but
 9   that time he was committed to the Texas Youth Commission.
10        Q.   Okay.
11                  MS. FISCHER:  Your Honor, may I publish P3
12   to the jury?
13                  THE COURT:  You may.
14                  MS. FISCHER:  Thank you, Your Honor.
15        Q.   (BY MS. FISCHER)  Okay.  I think we're now in
16   September of '93.  We have Mr. Gutierrez back in custody.
17   What happened this time?
18        A.   When they went to court?
19        Q.   Yes.
20        A.   Okay.  He was -- he pled true to burglary of
21   habitation.  He was found to be a delinquent child; and
22   he was committed to the Texas Youth Commission.
23        Q.   At this point in time, is your part of the job
24   in trying to help Mr. Gutierrez over?
25        A.   Yes, ma'am.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          62

1      Q.   Okay.  Now, let's talk a little bit about some
2    of the things that you did to help Mr. Gutierrez.  I know
3    that there are a lot of specific programs that we've
4    mentioned; La Esperanza, his mother giving him private
5    counseling.
6              Let's start with you as a juvenile
7    probation officer.  Tell the jury, what kind of things
8    did you try to do to help Mr. Gutierrez make something of
9    his life?
10     A.   There was counseling when he would come in.
11   Lots of times he wouldn't.  He'd fail to show up.  So I'd
12   have to call his mother.  The mother would bring him in.
13   And what we did, we would talk about how he had to comply
14   with the orders of the court, going to school, behaving.
15             We even got him -- at that time the
16   juvenile probation department had a program which was
17   called the H.O.P.E. program, Help One Student -- One
18   Person to Excel.  What we did is we got seniors that were
19   majoring in law enforcement to work with our juveniles
20   for ten hours a week in either recreation, education,
21   whatever they deemed necessary, to get them interested in
22   something else, something positive.
23             So, we also referred him to that program
24   hoping that he would create new interests and new
25   friends.

1      Q.   Did he succeed in the H.O.P.E. program?

2      A.   No, ma'am.

3      Q.   What happened then -- I mean, what happened

4  there?

5      A.   He wouldn't keep his appointments according to

6  the worker -- the student that was working with him.

7  Sometimes he would go to the home.  He wouldn't -- Ruben

8  wouldn't be home.  The mother would have to get on the

9  phone and call three or four places before finding him.

10 So finally they terminated him from that program as well.

11     Q.   Did you ever go out and pay a home visit to the

12 Gutierrez home?

13     A.   Yes, ma'am.

14     Q.   What kind of family -- what kind of home life

15 did he have?  Was it a nice home?

16     A.   It was a very nice apartment, nicely furnished.

17 Ms. Gutierrez kept a nice apartment.

18     Q.   Seem to be plenty of food in the kitchen?

19     A.   It appeared so.

20     Q.   Okay.  Was it clean?

21     A.   Yes, ma'am.

22     Q.   Did he have his own room?

23     A.   Yes, ma'am.

24     Q.   Was there anything else that you specifically

25 did?  You placed him in the H.O.P.E. program.  When you

1   saw him when he bothered to show up for his appointments,

2   how often was he supposed to meet with you?

3        A.   He was supposed to come on a weekly basis.

4        Q.   Okay.  About how many times out of -- you know,

5   four times in a month he's supposed to come see you.  How

6   many times would he actually come?

7        A.   Sometimes he'd be very good; and then all of a

8   sudden he wouldn't come at all.  I would have to call him

9   in order for the mother to bring him in.

10       Q.   When you are trying all these various avenues,

11  counseling with him, trying to get him in special

12  programs to get new interests, how is the defendant

13  responding?  Can you describe to the jury how he acted

14  towards you?

15       A.   With me, he was always very polite and very

16  well mannered.  As far as when he came into the office,

17  never had any problems.

18       Q.   Okay.  But then would you encourage him to go

19  out and do good with his life?

20       A.   Yes.

21       Q.   What would he do then?

22       A.   At school was his major problem.  He wouldn't

23  submit to the supervision of the teachers.

24            MR. REYES:  I'm going to object, Your

25  Honor, as to hearsay.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          65

```
 1                    THE COURT:  Overruled.
 2                    MR. REYES:  Can we have a running
 3   objection, Your Honor?
 4                    THE COURT:  You may.
 5       A.   The complaints from the principals was that --
 6                    MR. REYES:  Objection, Your Honor.
 7   Hearsay.
 8                    THE COURT:  Overruled.
 9       A.   -- that he would misbehave in class.  He was
10   disrespectful.  He would go to the classroom and sleep.
11   He wouldn't do his work.
12       Q.   (BY MS. FISCHER)  Is that part of your job as
13   his juvenile probation officer is to check up and make
14   sure he's doing okay in school?
15       A.   Yes, ma'am.
16       Q.   Okay.  Now, family help, you said time and time
17   again Ms. Gutierrez tried to work with you every way that
18   she possibly could.  How did she act towards you?  Did
19   she act like she was trying to help her son --
20       A.   Yes, ma'am.
21       Q.   -- stay out of trouble?
22       A.   Yes, ma'am.
23       Q.   Okay.  Is there any other type of help that you
24   tried to give Mr. Gutierrez?
25       A.   At one time before placing him at La Esperanza,
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    66

1   they advised that they had a family in Florida that might

2   be willing -- that would be willing to take him in.  We

3   went through the Interstate Compact --

4                     MR. REYES:  I'm going to object as to

5   hearsay, Your Honor.

6                     THE COURT:  Overruled.

7       A.    -- which is our procedures.  We can't just send

8   a child off without knowing what kind of a home it is.

9   So, Interstate Compact, which is an agency in Austin,

10  contacts Florida, juvenile probation authorities; and

11  they do an investigation and talk to the family.

12                    We waited for the response.  And we

13  finally got a response that the family --

14                    MR. REYES:  Objection, Your Honor.

15  Hearsay.

16                    THE COURT:  Overruled.

17      A.    -- the family had not been aware that Ruben was

18  in trouble and, apparently, they didn't think they would

19  be good role models because they had children of their

20  own that were in trouble.  So they refused to keep Ruben.

21      Q.    (BY MS. FISCHER)  Ms. Pizana, how did Ruben

22  Gutierrez act when you would tell him, "Look, you're

23  messing up, you know.  You need to do better"?

24      A.    In the office with me, he'd agree, and he was

25  polite and all that and say he'd go to school or he was

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          67

1   going to go and do whatever he was told to do.

2       Q.   Did he then -- would he go and turn and do

3   that?

4       A.   No, ma'am.

5       Q.   He tried to put on a good show for you and then

6   the minute he walked out of juvenile probation, didn't do

7   anything?

8       A.   He -- he continued to misbehave at school, not

9   attend, would skip, would be rude to the teachers, not do

10  his work.

11              MS. FISCHER:   Your Honor, I pass the

12  witness.

13              MR. REYES:   May I proceed, Your Honor?

14              THE COURT:   You may.

15                      **CROSS-EXAMINATION**

16  **BY MR. REYES:**

17      Q.   Ms. Pizana; is that correct?

18      A.   Yes, sir.

19      Q.   What is your degree in?

20      A.   My degree is in social work.

21      Q.   And when did you receive that degree?

22      A.   Pardon me?

23      Q.   When did you receive that degree?

24      A.   In 1973.

25      Q.   Now, you were asked to look at what was marked

1    as State's Exhibit P1 and P3; is that correct?

2         A.    Yes, sir.

3         Q.    And State's Exhibit P1, it alleges a criminal

4    mischief; is that true?

5         A.    Yes, sir.

6         Q.    You were not present when that offense

7    occurred; is that correct?

8         A.    No, sir, I wasn't.

9         Q.    So you don't know at all what Ruben's

10   involvement in that case, if anything, was; is that

11   correct?

12        A.    No, sir.

13        Q.    And you have no personal knowledge as to what

14   happened during that criminal mischief; is that correct?

15        A.    Not personally.

16        Q.    So you cannot sit here and tell the ladies and

17   gentlemen of the jury exactly what happened or did not

18   happen on that date of offense; is that true?

19        A.    No, sir.  I said he was alleged to have

20   committed those offenses.

21        Q.    So, my question was, you have no personal

22   knowledge as to what did or did not happen; is that

23   correct?

24        A.    No, sir.

25        Q.    You were not -- you were not his attorney; is

STATE OF TEXAS VS. RUBEN GUTIERREZ                    69

1    that correct?

2         A.    No, sir.

3         Q.    And you don't know what happened between him

4    and his attorney; is that correct?

5         A.    No, sir.

6         Q.    You don't know whether or not the attorney

7    might have forced him to enter a plea to that case; is

8    that correct?

9         A.    No, sir.

10        Q.    You also talked about State's Exhibit P3.

11   Again, you were not present when that alleged offense

12   occurred; is that correct?

13        A.    No, sir.

14        Q.    And you have absolutely no personal knowledge

15   as to what happened or what did not happen during that

16   offense; is that correct?

17        A.    No, sir.

18        Q.    So you cannot tell the ladies and gentlemen of

19   the jury what Ruben's involvement was, if any, during

20   that theft; is that correct?

21        A.    No.   Only what he was alleged to do.

22        Q.    Again, you were not his attorney; is that

23   correct?

24        A.    No.

25        Q.    You stated that the District Attorney's Office

STATE OF TEXAS VS. RUBEN GUTIERREZ                    70

1    is the one that made the recommendations; is that

2    correct?

3        A.    We make recommendations to the District

4    Attorney's Office.   Sometimes they agree with us;

5    sometimes they disagree.

6        Q.    And they, in turn, come to court and they make

7    a recommendation to the Judge; is that correct?

8        A.    Yes, sir.

9        Q.    And they make a recommendation to the Judge

10   after they discuss the case with you; is that correct?

11       A.    Usually with the director of the department.

12       Q.    Okay.   Isn't it correct that you provide a

13   statement to the District Attorney that's in charge of

14   the case regarding what's been happening with the case,

15   what's presented in court; is that correct?

16       A.    We provide a social history.

17       Q.    So the District Attorney is aware as to the

18   facts that you are alleging; is that correct?

19       A.    As to what he's been -- what the child has been

20   doing or not?

21       Q.    Exactly.

22       A.    Yes, sir.

23       Q.    And isn't it correct that you stated that that

24   offense which you're talking about, criminal mischief,

25   State's Exhibit P1, you stated that it was charged as a

STATE OF TEXAS VS. RUBEN GUTIERREZ                    71

1   felony 3 criminal mischief; is that correct?

2        A.    Yes, sir.

3        Q.    So that is a felony of the third degree; is

4   that correct?

5        A.    Yes, sir.

6        Q.    And the judgment that was introduced and that

7   is before the ladies and gentlemen of this jury is a

8   criminal mischief misdemeanor; is that correct?

9        A.    Yes, sir.  It's a class B.

10       Q.    I'm sorry?

11       A.    A class B.

12       Q.    A class B misdemeanor?

13       A.    Yes, sir.

14       Q.    So that's basically about one or two levels

15   lower than what he was charged with; is that correct?

16       A.    Yes, sir.

17       Q.    You also stated that with respect to State's

18   Exhibit P3, he was arrested and charged with a burglary

19   of a habitation; is that correct?

20       A.    Yes, sir.

21       Q.    And with respect to State's Exhibit P3, which

22   is what the ladies and gentlemen of the jury have before

23   them, that judgment shows a theft; is that correct?

24       A.    I thought he pled to a burglary of habitation.

25       Q.    I'm sorry?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    72

1         A.    Burglary of habitation.

2         Q.    Is that what the judgment on State's Exhibit P3

3    is?

4         A.    Yes, sir.

5         Q.    Are you sure?

6         A.    The judgment -- the petition alleged burglary

7    of habitation.

8         Q.    But I'm talking about the judgment which was

9    admitted as State's Exhibit P3.

10        A.    It would have been the result of the petition

11   which alleged burglary of habitation.

12        Q.    Well, the result of the petition on State's

13   Exhibit P1 was felony of the third degree criminal

14   mischief, is that correct, but the judgment itself --

15        A.    No, sir.  The petition alleged criminal

16   mischief B.  He was arrested -- at the time he was

17   arrested he was charged with felony third degree --

18        Q.    But in some situations --

19        A.    -- but the D.A. filed it as a misdemeanor.

20        Q.    In some situations and in some cases, even

21   though the petition alleges one crime, he can go ahead

22   and enter a plea or be tried on another crime; is that

23   correct?

24        A.    Yes, sir.

25        Q.    And you stated that while he was on probation

1   and in your custody as a probationer, his mother did

2   attempt to help him; is that correct?

3        A.   Yes, sir.

4        Q.   And she specifically also stated that she would

5   provide treatment for him on her own; is that correct?

6        A.   Yes, sir.

7        Q.   You stated that in the summer of 1992, he was

8   alleged to have committed a burglary of a habitation; is

9   that correct?

10        A.   Yes, sir.

11        Q.   And all that was done by the District Attorney

12   was to file a motion to modify; is that correct?

13        A.   Yes, sir.

14        Q.   So this is totally separate and different from

15   a petition; is that correct?

16        A.   Yes, sir.

17        Q.   All they were doing was seeking -- the District

18   Attorney was seeking to modify his probationary terms; is

19   that correct?

20        A.   Yes, sir.

21        Q.   And what they did is take him out of his

22   mother's home and place him at what's called La Esperanza

23   Home for Boys; is that true?

24        A.   Yes, sir.

25        Q.   You stated that the mother was -- his mother,

STATE OF TEXAS VS. RUBEN GUTIERREZ                          74

1    Norma Gutierrez, was present throughout the time that he
2    was on probation with you?
3         A.   Most of the time she showed.
4         Q.   Now, during that run away in which you
5    testified about that happened on or about March of 1993
6    and that burglary that happened on or about the summer of
7    1992, you again were not present; is that correct?
8         A.   No, sir.
9         Q.   So you cannot tell the ladies and gentlemen of
10   the jury what Ruben's involvement was, if any, during
11   these two crimes; is that correct?
12        A.   No, sir.
13        Q.   As a matter of fact, he pled to what is called
14   truancy as to that burglary of a habitation in 1992; is
15   that correct?
16        A.   In the modified disposition, yes, sir.
17        Q.   Would you agree with me that run away is not a
18   criminal act of violence?
19        A.   No, sir.  It's a CHINS, it's considered a CHINS
20   which means --
21        Q.   Would you agree with me that a burglary of a
22   habitation is not a criminal act of violence?
23             MS. FISCHER:  Your Honor, I'm going to
24   object to that.  That calls for a legal conclusion.  She
25   said that she knows it as a CHIN, Child In Need of

STATE OF TEXAS VS. RUBEN GUTIERREZ                    75

1   Supervision.

2            THE COURT:  I'll permit her to answer.

3        Q.   (BY MR. REYES)  Would you agree with me that a

4   burglary of habitation is not a criminal act of violence,

5   not an act of violence against a person; it's against

6   property?

7        A.   Against property.

8        Q.   And the criminal mischief, again, is not a

9   criminal act of violence; it's a criminal act against

10   property.  Is that correct?

11        A.   Yes, sir.

12        Q.   And with respect to theft which is with respect

13   to State's Exhibit P3, would you agree with me that that

14   is not a criminal act of violence against a person; it's

15   against property?

16        A.   Yes, sir.

17        Q.   You stated that he was taken into custody again

18   in September of 1993; is that correct?

19        A.   Yes, sir.

20        Q.   And he was alleged to have committed a burglary

21   of a habitation; is that true?

22        A.   Yes, sir.

23        Q.   You, again, were not present during that

24   alleged offense; is that correct?

25        A.   No, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    76

1       Q.   So you don't know whether or not Ruben had any
2   kind of involvement in this case?
3       A.   No, sir.
4       Q.   And again, burglary of a habitation is a
5   criminal act against property; is that correct?
6       A.   Yes, sir.
7       Q.   It is not a criminal -- a criminal act of
8   violence against a person; is that correct?
9       A.   Yes, sir.
10       Q.   Ms. Fischer asked you what it is that you did
11   to try and assist or help Ruben Gutierrez; and you stated
12   that you counseled him; is that correct?
13       A.   Yes, sir.
14       Q.   And the extent of you counseling -- of your
15   counseling was to talk to him about what it is that he
16   needed to do to comply with the court orders; is that
17   correct?
18       A.   Yes, sir.
19       Q.   And the extent of your counseling was to also
20   enroll him into what was called H.O.P.E.; is that
21   correct?
22       A.   Yes, sir.
23       Q.   Where he would talk to senior citizens; is that
24   correct?
25       A.   No, not senior citizens.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        77

```
 1        Q.    Okay.  Who was it that he would talk to --
 2        A.    Students from UTB that were seniors.
 3        Q.    To your knowledge, do you know if these seniors
 4   were supervised by anybody from the university in talking
 5   to these probationers?
 6        A.    When they taught, no.
 7        Q.    I'm sorry?
 8        A.    They're supervised as far as who they're going
 9   to send them to and what they're doing, but if they
10   actually sat in the counseling sessions?
11        Q.    Uh-huh.
12        A.    No, sir.
13        Q.    So you don't know --
14        A.    Not that I know of.
15        Q.    So when you send somebody over there, you don't
16   know what they're talking about; is that correct?
17        A.    No, sir.
18        Q.    And when they're talking to somebody at the
19   University of Texas-Brownsville, you don't know what kind
20   of problem that person that's counseling this probationer
21   had; is that correct?
22        A.    The role of the student wasn't to counsel with
23   him.  It was to take him to different activities, to the
24   library, to bowling, or whatever they came up with to try
25   to get him away from his -- what he was presently doing
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    78

```
 1   and --
 2        Q.   But --
 3        A.   -- the peers he was associating with.
 4        Q.   But he wasn't supervised, was he?  It was just
 5   a one-on-one session, the senior from the University of
 6   Texas at Brownsville and the juvenile probationer; is
 7   that correct?
 8        A.   Right.  They were mostly activities.
 9        Q.   So you had an adult with a juvenile --
10        A.   Yes, sir.
11        Q.   -- and there was no supervision; is that
12   correct?  Other than them being alone?
13        A.   Yes, sir.
14        Q.   And you don't know what happened during those
15   sessions; is that correct?
16        A.   No, sir.
17        Q.   Did you ever, as part of your counseling, send
18   Mr. Gutierrez to see any kind of psychiatrist?
19        A.   No.
20        Q.   Did you, as part of your counseling, ever send
21   Mr. Gutierrez to see any kind of psychologist?
22        A.   He was ordered by the court.
23        Q.   My question was, did you, as part of your
24   counseling of Mr. Gutierrez, send him -- or make
25   appointments for him to go see a psychologist?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    79

1      A.    I made appointments after I was ordered by the
2 court to set an appointment with Dr. Jay Martinez, the
3 psychologist.
4      Q.    And what about counselors, people who actually
5 have a counseling degree, did you ever allow him to go
6 talk to those individuals?
7      A.    I made appointments when the mother chose
8 Dr. Freeberg.  So I set up the first initial appointment
9 with him.
10      Q.    Now, you were stating that with respect to his
11 schooling, that he would not do his work and he would
12 sometimes fall asleep; is that correct?
13      A.    That's the reports I was getting, sir.
14      Q.    Those were reports that you were being -- that
15 you were receiving; is that correct?
16      A.    Yes, sir.
17      Q.    So you weren't present at school with him; is
18 that correct?
19      A.    No, sir.
20      Q.    You wouldn't sit in the classroom and observe
21 what he was or was not doing; is that correct?
22      A.    No, sir.
23      Q.    So you can't tell the ladies and gentlemen of
24 the jury whether or not these reports were, in fact,
25 accurate or not; is that correct?

1        A.    No, sir.

2        Q.    Now, how many cases do you handle as part of

3   your case load as a probation officer?

4        A.    They can range anywhere from 35 to 60.

5        Q.    Okay.  And back in 1991 and 1992 and 1993, was

6   that the approximate case load that you had?

7        A.    I would -- I don't remember, sir.  It would

8   have been somewhere in the 40's, 50's.

9        Q.    So, how many -- let's say of those 30 to 50

10  cases, are those cases that you handle monthly?

11       A.    It depends on the situation and the individual,

12  sir.

13       Q.    And in addition to you handling those cases,

14  you also have to come to court; is that correct?

15       A.    Yes, sir.

16       Q.    And you usually spend your mornings here in the

17  courtroom; is that correct?

18       A.    Sometimes.  When we've got court hearings we

19  would.

20       Q.    So that basically counts down your time that

21  you can spend in your office; is that true?

22       A.    We usually leave the afternoons free because

23  the students are -- the juveniles are in school in the

24  morning.  So they report to us in the afternoon.

25       Q.    So I guess what I'm trying to get at is the

STATE OF TEXAS VS. RUBEN GUTIERREZ                          81

 1    fact that you don't have a lot of time to spend with
 2    these individuals that are placed on probation; is that
 3    correct?
 4         A.   No.
 5         Q.   You probably see them maybe about an hour a
 6    week; is that correct?
 7         A.   Yes, sir.
 8         Q.   And that is the extent of the time that you're
 9    allowed to see them because of your case load and your
10    requirements to be in the courtroom, is that correct?
11         A.   To personally see the student?
12         Q.   Yes.
13         A.   Yes.
14              MR. REYES:   I'll pass the witness, Your
15    Honor.
16              THE COURT:   Anything further, counsel?
17                   **REDIRECT EXAMINATION**
18    **BY MS. FISCHER:**
19         Q.   Mrs. Pizana, is it your fault how Mr. Gutierrez
20    turned out?
21         A.   I don't think so, ma'am.  No.
22         Q.   Did you try everything that you possibly could
23    to help get Ruben Gutierrez on the right track?
24         A.   Yes, ma'am.
25         Q.   Is there any program out there that you can

1   think of that you didn't send Ruben Gutierrez to?

2        A.    Not that was available to us.  The fact is that

3   he was a run away most of the time.

4                    MS. FISCHER:  I pass the witness.

5                    THE COURT:  Anything further?

6                    MR. REYES:  Nothing further, Your Honor.

7                    THE COURT:  All right.  You may step down.

8                    Ladies and gentlemen of the jury, let's go

9   ahead and take our morning break at this time.  Remember

10  the instructions I've given you not to discuss this case

11  among yourselves or with anyone else, not to form or

12  express any opinions.  We'll take about a 15 minute

13  break.

14                    **(Recess from 10:21 a.m. 10:41 a.m.)**

15                    **(Jury not present)**

16                    THE COURT:  Are you all ready for the

17  jury?

18                    MR. BLAYLOCK:  Yes, sir.

19                    MR. REYES:  Judge, we just have one matter

20  to take care of real quick.

21                    THE COURT:  You may be seated.

22                    MR. REYES:  I noticed that Mr. Galarza had

23  faxed over a copy of a subpoena list that was filed by

24  the District Attorney's Office in which they subpoenaed

25  Roy Garcia who is the -- I believe the bailiff for this

STATE OF TEXAS VS. RUBEN GUTIERREZ                    83

```
 1   court.  And if he is going to be called as a witness,
 2   then we would ask that he also be subject to the rule.
 3                  THE COURT:  Well, I'm going to excuse him
 4   from the rule because we need him for security reasons
 5   here.
 6                  Anything else?
 7                  MR. BLAYLOCK:  Well, in addition, Judge, I
 8   don't anticipate using Roy in our case in chief on
 9   punishment.  I'll use him possibly as rebuttal only.
10                  One more thing, Judge, if I can just make
11   a quick record of something that happened awhile back,
12   just to clear the record up, if I could have the Court's
13   patience?
14                  THE COURT:  Go ahead.
15                  MR. BLAYLOCK:  When we came back on the
16   Monday after the weekend break on the first day of
17   testimony on Friday, a -- one of the witnesses -- I mean,
18   one of the jurors, number 14, that called one of the
19   witnesses, and when that juror came in, when all the
20   jurors came in in the morning, I would like the record to
21   be clear that juror number 14 was sequestered and kept
22   apart from the rest of the jury.
23                  And I would just ask the bailiff, Roy
24   Garcia, if that was the case.  Is that the case; she was
25   sequestered?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                        84

```
 1                    THE BAILIFF:  Yes, sir.
 2                    MR. BLAYLOCK:  Okay.  So I want the record
 3  to be clear that juror 14 had no contact with the rest of
 4  the jurors, and there's no way that she could have
 5  tainted it in any way.  Just trying to make the record
 6  clear.
 7                    THE COURT:  She was excused right after
 8  that.
 9                    MR. BLAYLOCK:  Yes, sir.
10                    MR. REYES:  Nothing further, Your Honor.
11                    THE COURT:  All right.  Bring in the jury.
12                    (Jury brought into the courtroom)
13                    THE COURT:  All right.  You may be seated.
14                    You may call your next witness.
15                    MR. BLAYLOCK:  State calls Lorenzo
16  Hernandez.
17                    THE COURT:  Would you raise your right
18  hand, please?
19                    (The witness was sworn in by the Court)
20                    THE WITNESS:  Yes, sir.
21                    THE COURT:  You may be seated.
22                    You may proceed.
23                    MR. BLAYLOCK:  Thank you, Judge.
24
25
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                          85

```
 1                     LORENZO HERNANDEZ,
 2      having been first duly sworn, testified as follows:
 3                     DIRECT EXAMINATION
 4    BY MR. BLAYLOCK:
 5         Q.   Officer Hernandez, state your full name for the
 6    jury.
 7         A.   Lorenzo Hernandez.
 8         Q.   Okay.  And how are you employed?
 9         A.   With the Brownsville Police Department as a
10    police officer.
11         Q.   Okay.  And what are your duties today?
12         A.   I'm an auto theft agent at this point.
13         Q.   And were you -- how long have you been employed
14    by the Brownsville Police Department?
15         A.   A little bit over nine years.
16         Q.   When was your date of hire?
17         A.   December of '89.
18         Q.   Okay.  Were you a police officer in December of
19    1991?
20         A.   Yes, sir.
21         Q.   Okay.  And were you still considered a rookie
22    officer?
23         A.   Yes, sir.
24         Q.   Okay.  What were your duties at that time?
25         A.   I was a patrolman at that time, sir, responding
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                          86

```
 1    to calls, took reports.
 2         Q.   All right.  And patrolmen are uniformed
 3    officers?
 4         A.   Yes, sir.
 5         Q.   What kind of uniform were you wearing in 1991?
 6         A.   A blue uniform.
 7         Q.   Did it have a badge on it?
 8         A.   Yes, sir.
 9         Q.   Just like similar to the uniforms they have
10    today?
11         A.   Yes, sir.
12         Q.   In December of 1991, were you called to what
13    was then Vela High School?
14         A.   Yes, sir.
15         Q.   Okay.  Would you tell me about that call?  How
16    were you dispatched out to that high school?
17         A.   I was advised to respond to go to Vela High
18    School in reference to a detained violent subject.
19         Q.   All right.  And were you in your unit, your
20    patrol unit at that time?
21         A.   Yes, sir.
22         Q.   And did you go over to the high school?
23         A.   Yes, sir.
24         Q.   Tell me what you saw when you got there.
25         A.   When I got there, I made contact with, I
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    87

1    believe, the assistant principal.  He escorted me to the

2    conference room.  At said location there was a subject by

3    the name of Ruben Gutierrez that was tearing up books,

4    was sitting down and tearing up books.

5        Q.   Okay.  Let me go back.  When you got there, you

6    were met by who?

7        A.   I believe the assistant principal.

8        Q.   Okay.  And he took you to a conference room?

9        A.   Yes, sir.

10       Q.   And in that conference room, who did they have

11   in there?

12       A.   A subject by the name of Ruben Gutierrez.

13       Q.   Okay.  And he was being detained in that

14   conference room?

15       A.   Yes, sir.

16       Q.   And when you went into that conference room,

17   what did you see and do?

18       A.   He was sitting down tearing up books.

19       Q.   Tearing them up?

20       A.   Yes, sir.

21       Q.   Just tearing them up?

22       A.   Yes, sir.

23       Q.   Okay.  And --

24       A.   He was making them into little pieces, making

25   sure that they were all torn up in little pieces.

STATE OF TEXAS VS. RUBEN GUTIERREZ                              88

1       Q.    Little bitty pieces?

2       A.    (Nods head).

3       Q.    Is that -- Ruben Gutierrez, do you see him in

4   the courtroom today?

5       A.    Yes, sir.

6       Q.    And point him out and tell me what color shirt

7   he's got.

8       A.    He's got a white shirt with a colored tie

9   (pointing).  He's got short hair.

10      Q.    Thank you, sir.

11            MR. BLAYLOCK:  Your Honor, may the record

12  reflect that he has pointed to and identified the

13  defendant in this case?

14            THE COURT:  It shall reflect.

15            MR. BLAYLOCK:  Thank you.

16      Q.    (BY MR. BLAYLOCK)  Now, Mr. -- or

17  Officer Hernandez, what did you do when you went into

18  that conference room and saw him tearing up the books?

19      A.    At that point I just stood by, and I was trying

20  to get the story as to what was going on.  When this was

21  going down, I believe that same assistant principal came

22  in and -- or was there and told him to stop tearing up

23  the books because they were expensive books.

24      Q.    Okay.  Was this assistant principal a man or a

25  woman?

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    89

```
 1        A.    A man.

 2        Q.    A man.

 3        A.    Uh-huh.

 4        Q.    All right.  And how did he respond when he told

 5   him to stop tearing up those books?

 6        A.    He got -- Mr. Gutierrez, the subject Gutierrez

 7   got up and continued tearing up the books intentionally,

 8   continued carrying out -- tearing up the books.

 9        Q.    What did you do?

10        A.    I asked him to stop.  He didn't stop.  I

11   grabbed him by the arm --

12        Q.    Okay.

13        A.    -- and I was going to arrest him at that

14   time --

15                  MR. REYES:  I'm going to object, Your

16   Honor.  We have several objections; first of all, that we

17   were not timely given notice of this alleged extraneous

18   offense.  We would object as to relevance.  We would

19   object also that it's unfair prejudice.  And we would

20   also object that under the Code of Criminal Evidence

21   Rule 609(d), juvenile adjudications are not admissible in

22   criminal proceedings.

23                  THE COURT:  It's overruled.

24                  MR. BLAYLOCK:  Thank you, Judge.

25        Q.    (BY MR. BLAYLOCK)  Okay, Officer Hernandez.
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                              90

```
 1   Tell -- let's start again.  You told him to stop and he
 2   refused to stop?
 3        A.   Correct, sir.
 4        Q.   Okay.  So you approached him?
 5        A.   Yes, sir.
 6        Q.   Okay.  And then tell us what happened.
 7        A.   I grabbed him by the arm and told him to stop.
 8   When I did this, he punched me on the mouth.
 9        Q.   Okay.  So you reached out and grabbed him.  Do
10   you remember if it was his left arm or right arm?
11        A.   I grabbed him by the left arm.
12        Q.   And he hit you with his right hand?
13        A.   Yes, sir.
14        Q.   Okay.  And how long have you been an officer?
15        A.   At that time I was an officer for approximately
16   about a year.
17        Q.   Okay.  And had you been hit by anybody up to
18   that point?
19        A.   No, sir.
20        Q.   Okay.  Now, tell me, how did it feel when you
21   got hit?
22        A.   It hurt.
23        Q.   It hurt?
24        A.   It hurt a lot.
25        Q.   Was he a big guy back then?
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    91

```
 1        A.   The same.

 2        Q.   About the same?

 3        A.   About the same, sir, but he's pretty strong or

 4   was at that day pretty strong.

 5        Q.   Okay.  So he was pretty fit and strong and

 6   capable of hitting a cop?

 7        A.   Yes.

 8        Q.   And in your nine years since then or -- well, I

 9   guess you've got a total of nine years.

10        A.   A little bit more than that.

11        Q.   Have you ever been hit that hard since?

12        A.   I've never been struck in my mouth or face by

13   anyone --

14        Q.   Is it --

15        A.   -- except for him.

16        Q.   -- usual for people to resist arrest?

17        A.   It's usual to resist arrest but not in the

18   manner in which he did it.

19        Q.   Okay.  And how would you describe that manner?

20        A.   He was being --

21             MR. REYES:  I'll object as to relevance,

22   Your Honor.

23             THE COURT:  Overruled.

24        Q.   (BY MR. BLAYLOCK)  Okay.  I'm sorry.  I didn't

25   hear you.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    92

1        A.   He was being real combative.

2        Q.   All right.  Tell the jury what happened after

3   he hit you on the face.

4        A.   I grabbed him by the arm, placed him against

5   the wall with a little bit of trouble.  And I was

6   assisted by three other males that were you there around

7   the area, including the assistant principal.

8        Q.   Okay.  And these other three guys are not

9   officers, right?

10       A.   No, sir.

11       Q.   School employees?

12       A.   School employees.

13       Q.   All right.  And tell me how he was treating

14  them.

15       A.   We struggled with him because I wanted to

16  handcuff him and I was having a real hard time.  We

17  struggled with him.  During the process, one of the

18  persons that was assisting me got kicked.

19       Q.   A teacher?

20       A.   Yes, sir.

21       Q.   And was it a light kick or a hard kick?

22       A.   He got kicked in the leg.  I really don't know

23  how hard or -- just after the fact that we had arrested

24  him was when the teacher complained about being kicked.

25  He had hurt because he made it known that it did hurt.

1      Q.   All right.  Now, how long did this whole
2  struggle take place?
3      A.   It seemed like forever, but approximately about
4  two, maybe three minutes.
5      Q.   Okay.  And we're talking minutes, right?
6      A.   Yes, sir.
7      Q.   Minutes when you're struggling with somebody,
8  is that a long time or a short time?
9      A.   It's -- to me, it's a long time.
10     Q.   All right.  And that -- I mean, that Rodney
11 King tape with the police officers, that only took
12 seconds, right?
13                MR. REYES:  I'm going to object, Your
14 Honor, as to relevance.
15                THE COURT:  Rephrase your question.
16     Q.   (BY MR. BLAYLOCK)  All right.  I'm trying to
17 put this in context.  Have you ever had a longer struggle
18 with a detainee since then?
19     A.   No, sir.  Usually just a matter of seconds.
20     Q.   Okay.  Usually the detainee struggles for
21 seconds --
22     A.   Yes, sir.
23     Q.   -- correct?  Like let's start right now.  Like
24 how long would the average -- I'm going to start right
25 now and tell me when to stop, the average person resists.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          94

1     A.    Probably that much, just --

2     Q.    Tell me when to stop.

3     A.    Right now.

4     Q.    Okay.  That's four seconds.  Four seconds.  And

5  this one lasted about a couple of minutes you said?

6     A.    Yes, sir.

7     Q.    And he not only hit you, he kicked some other

8  people?

9     A.    Yes, sir.

10    Q.    All right.  Did you finally get him under

11 control?

12    A.    Yes, sir.

13    Q.    All right.  Tell me how that came about.

14    A.    The people that were assisting me finally

15 managed -- one of them managed to put his right hand

16 behind or grabbed a hold of his hand and place it behind.

17 I -- I don't know how I did it or how actually we did it,

18 but we handcuffed him.  And then we just -- they moved

19 away and I took control of him.

20    Q.    Okay.  And where did you take him?

21    A.    I escorted him to my unit outside the school.

22    Q.    Okay.  This is your car --

23    A.    Yes, sir.

24    Q.    -- patrol unit?  And did you put him inside

25 your car?

STATE OF TEXAS VS. RUBEN GUTIERREZ                        95

1       A.   Yes, sir, back seat of the patrol unit.

2       Q.   All right.  What happened when you got him in

3   the back seat?

4       A.   He became violent again and he started kicking

5   the back window of the unit, the door window.

6       Q.   With his feet?

7       A.   With his feet, yes, sir.

8       Q.   All right.  So what did you do when that

9   occurred?

10      A.   By this time my backup was arriving.  We got

11  him out of the unit.  We restrained him, placed him into

12  the other patrolman's unit, and he was escorted to

13  juvenile detention in a code -- 2 code 3 manner which was

14  lights and sirens to get to the location faster.

15      Q.   All right.  And what was he under arrest for at

16  that time?

17      A.   For criminal mischief, the assault on a police

18  officer, and the assault on the teacher, employee of the

19  school.

20      Q.   All right.  And he was taken with lights and

21  sirens down to the jail?

22      A.   To the juvenile detention at that time, sir.

23      Q.   The juvenile detention center.

24      A.   Yes, sir.

25      Q.   Okay.  All right.  Did you have any other

STATE OF TEXAS VS. RUBEN GUTIERREZ                          96

1    contact with him?

2         A.    That date, no, sir.

3         Q.    What other dates did you have contact with him?

4         A.    When I was a burglary detective, his name came

5    around as far as a burglary.

6         Q.    Okay.  And shortly after this, you did get

7    promoted from patrolman to --

8         A.    To detective, burglary detective.

9         Q.    Okay.  And do you know -- did you personally

10   make an arrest of Ruben Gutierrez while you were a

11   detective?

12        A.    As far as burglaries, no, sir.

13        Q.    Okay.  Did you have any other contact with him?

14        A.    No, sir.

15                   MR. BLAYLOCK:  I'll pass the witness.

16                   MR. REYES:  May I proceed, Your Honor?

17                   THE COURT:  You may.

18                        **CROSS-EXAMINATION**

19   **BY MR. REYES:**

20        Q.    Officer Hernandez, when you were originally

21   employed or initially employed by the Brownsville Police

22   Department back in 1989, were you assigned to the

23   juvenile section?

24        A.    I was a patrol officer, sir, started off as a

25   patrol officer.

PAM L. ESQUIVEL, CSR, RPR

1    Q.   Does the Brownsville Police Department have any

2  section within its department that handles only juvenile

3  individuals?

4    A.   I believe they do, yes, sir.

5    Q.   And on that day, on December the 5th of 1991,

6  did anybody from that division respond with you?

7    A.   No, sir.

8    Q.   You were the only individual; is that correct?

9    A.   Yes, sir.

10   Q.   And you stated that you responded to Vela High

11 School; is that correct?

12   A.   Yes, sir.

13   Q.   Now, you have no personal knowledge as to what

14 had occurred before you arrived there; is that correct?

15   A.   Correct, sir.

16   Q.   You don't know whether or not anybody provoked

17 Mr. Gutierrez or not; is that correct?

18   A.   Correct.

19   Q.   You stated that you grabbed Mr. Hernandez by

20 his arm; is that correct?

21   A.   Mr. Gutierrez?

22   Q.   I'm sorry.  Yes.  Mr. Gutierrez by his arm; is

23 that correct?

24   A.   Yes, sir.

25   Q.   And it was only after you grabbed him, that's

STATE OF TEXAS VS. RUBEN GUTIERREZ                              98

```
 1    when he hit you; is that correct?
 2         A.   Yes, sir.
 3         Q.   You stated that after you grabbed him, you also
 4    placed him up against a wall; is that correct?
 5         A.   To control him, yes, sir.
 6         Q.   Okay.  And also when you placed him up against
 7    a wall, there was three other individuals, three other
 8    males who were also assisting you; is that correct?
 9         A.   Yes, sir.
10         Q.   So at this time, Ruben Gutierrez had four
11    individuals, is that correct, upon him, grabbing him and
12    putting --
13         A.   Trying to --
14         Q.   -- him up against a wall?
15         A.   -- restrain him, yes, sir.
16         Q.   At this time, there was four individuals that
17    were grabbing him and trying to put him --
18         A.   They were --
19         Q.   -- up against a wall?
20         A.   -- trying to restrain him, yes, sir.
21         Q.   You stated that when one of the individuals who
22    worked for the school was also kicked; is that correct?
23         A.   Yes, sir.
24         Q.   But you have no personal knowledge as to
25    whether or not it was Mr. Gutierrez that kicked him; is
```

STATE OF TEXAS VS. RUBEN GUTIERREZ                    99

1    that correct?

2         A.   It was Mr. Gutierrez --

3         Q.   And --

4         A.   -- because that date, that time, the person

5    that got kicked advised me and told me that it was him

6    and --

7         Q.   Okay.

8         A.   -- and charges were also filed against him for

9    that assault.

10        Q.   Well, you only know this information because

11   you were told by him; is that correct?

12        A.   Yes, sir.

13        Q.   Okay.  And you don't know this information

14   other than that -- in that way; is that correct?

15        A.   Can you rephrase --

16        Q.   Other than you having been told by this

17   individual, you don't know; is that correct?

18        A.   Yes, sir.

19                  MR. REYES:  I have nothing further, Your

20   Honor.

21                  **REDIRECT EXAMINATION**

22   **BY MR. BLAYLOCK:**

23        Q.   Now, Officer Hernandez, did you know

24   Mr. Gutierrez before you went to the school on that day

25   in December?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    100

```
1        A.    No, sir, I never meet him before.
2        Q.    So you had no ax to grind with him?
3        A.    No, sir.
4        Q.    Well, is it your fault that he hit you in the
5   face?
6        A.    No, sir.  I was just trying to basically arrest
7   him and control him.
8        Q.    Were you four men picking on this boy?
9        A.    No, sir.
10       Q.    Were you --
11       A.    I was just lucky that they assisted me.
12       Q.    Okay.  I mean, were you all prodding him?  Is
13  it you all's fault that he acted like he was acting?
14       A.    No, sir.
15       Q.    Do you know if anybody made him tear that book
16  up?
17       A.    No, sir.
18                  MR. BLAYLOCK:  Pass the witness.
19                  MR. REYES:  We have nothing further, Your
20  Honor.
21                  THE COURT:  All right.  You may step down.
22  Thank you.
23                  THE WITNESS:  Thank you.
24                  THE COURT:  You may call your next
25  witness.
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    101

1            MR. BLAYLOCK:  Judge, the State would call
2   Mr. Ricardo Leal.
3            THE COURT:  All right.  Could you raise
4   your right hand, please?
5            THE WITNESS:  Yes, sir.
6            **(The witness was sworn in by the Court)**
7            THE WITNESS:  Yes, sir.
8            THE COURT:  All right.  You may be seated.
9            THE WITNESS:  Thank you.
10           THE COURT:  You may proceed.
11           MR. BLAYLOCK:  Thank you, Judge.
12                      **RICARDO LEAL,**
13     having been first duly sworn, testified as follows:
14                   **DIRECT EXAMINATION**
15   **BY MR. BLAYLOCK:**
16       Q.   Good morning, Mr. Leal.
17       A.   Good morning.
18       Q.   Can you state your full name for the jury,
19   please?
20       A.   Ricardo Leal.  Ricardo Leal.
21       Q.   Thank you.  And where do you work, Mr. Leal?
22       A.   I work for the Texas Youth Commission.
23       Q.   Well, what is the Texas Youth Commission?
24       A.   It's an agency, it's a State agency that when
25   the kids are at juvenile -- or at the probation

1   department, if for some reason the youth are not able to

2   work with that department, they are committed to the

3   Texas Youth Commission by the district judge.

4        Q.   Okay.  And the Texas Youth Commission, is that

5   just one thing?

6        A.   I'm sorry, sir?

7        Q.   Is that just one thing?  Is it just like a jail

8   that they send them to when they can't control them?

9        A.   The Texas Youth Commission, once they land at

10  the Texas Youth Commission, they are sent to the

11  assessment unit.  From the assessment unit, they

12  determine what placement that they're going to be placed

13  in.

14       Q.   All right.  And tell us -- I mean, tell us

15  generally how many different placement types there are.

16       A.   Right now, the Texas Youth Commission, we've

17  got about 11 State schools throughout the State of Texas.

18       Q.   Okay.  So there's a jail environment or State

19  schools.  Is there boot camp?

20       A.   There is a boot camp right now, sir.

21       Q.   What else?  Give us a run down.  What are some

22  other kinds of opportunities --

23       A.   We've got also halfway houses.  We've got

24  contract care programs that contract with the Texas Youth

25  Commission as well.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    103

1    Q.   All right.  So, what is the goal of the Texas
2    Youth Commission?
3    A.   The goal of the Texas Youth Commission is to
4    rehabilitate the youth.
5    Q.   All right.  And to do this, you have a
6    multifaceted system?
7    A.   Yes, sir.
8    Q.   Okay.  And you did mention that when they go to
9    the TYC, they're assessed and then assigned to
10   whatever -- or what is the goal of the assessment?  Tell
11   us that.
12   A.   When they do the assessment at the assessment
13   unit, they do the testings, psychological testing,
14   educational information, information that they acquire
15   from the probation department, and they do
16   psychologicals.  And once they get that information
17   together, then they determine -- the assessment unit
18   determines where the kid will be placed.
19   Q.   And are they trying to determine the needs of
20   the kid?
21   A.   Yes, sir.
22   Q.   Okay.  So based on whatever they determine the
23   needs to be, they send them to any one of these numerous
24   places?
25   A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    104

1      Q.   All right.  Now, did you -- what is your job at
2  TYC specifically?
3      A.   Currently in the Texas Youth Commission I'm a
4  parole officer.
5      Q.   Parole officer?
6      A.   Yes, sir.
7      Q.   Okay.  And what is a case manager?
8      A.   A case manager is a TYC counterpart from a
9  parole officer that works with contract care programs.
10     Q.   Okay.  And how were you employed by TYC in '93,
11 '94?
12     A.   In the year of 1993 and '94 I was a case
13 manager for the Texas Youth Commission.
14     Q.   Okay.  And tell us a little bit more about what
15 a case manager does.
16     A.   A case manager supervises and monitors and
17 makes sure that the program, whatever contract care
18 program the kid is placed in, they meet the kid's needs.
19     Q.   Okay.  And eventually, a kid can be paroled out
20 of TYC and they would have to report to you now --
21     A.   Yes, sir.
22     Q.   -- a parole officer --
23     A.   Yes, sir.
24     Q.   -- right?  Now, in 1993, did you take on a case
25 of an individual named Ruben Gutierrez?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    105

1      A.   In 1993, I was a case manager for the Rio

2  Grande Marine Institute which is a contract care program.

3      Q.   Okay.

4      A.   In 1993, Ruben was placed at the Rio Grande

5  Marine Institute, sir.

6      Q.   All right.  Well, give us the history.  You

7  were the case manager for Ruben Gutierrez, correct?

8      A.   I was the case manager for Ruben Gutierrez when

9  he was placed at the Rio Grande Marine Institute.

10     Q.   Okay.  And first, before he gets to there, he's

11  got to go to the assessment; and where is that located

12  at?

13     A.   The assessment at that time was located at the

14  Brownwood State School.

15     Q.   Okay.  And they start compiling records,

16  correct?

17     A.   Yes, sir.

18     Q.   And the records follow them around?

19     A.   Yes, sir.

20     Q.   And you have access to those records?

21     A.   I've got access to those records.  That is

22  correct.

23     Q.   And the records are kept in the usual course of

24  the business of TYC?

25     A.   The records are kept in what we call a master

STATE OF TEXAS VS. RUBEN GUTIERREZ                    106

1    file; and the master file follows wherever the kid is

2    placed in.

3         Q.   Okay.  And what I'm asking you is those records

4    are kept in the usual business of TYC; their business is

5    taking care of these individuals?

6         A.   Yes, sir.

7         Q.   All right.  And all the entries in the records

8    are made by people who have knowledge of those entries?

9         A.   Yes, sir.

10        Q.   All right.  Now -- and you eventually got the

11   records on Ruben Gutierrez?

12        A.   Yes, sir.

13        Q.   Okay.  So it goes to the assessment and then --

14   you've already told us how, but did they determine that

15   he needed to go to Rio Grande Military Institute?

16        A.   When he was at the assessment unit on --

17   according to my records, on 9/30/93 through 10/14/93,

18   Ruben Gutierrez after that assessment was placed at

19   Valley House --

20        Q.   And what --

21        A.   -- on 10/14/93.

22        Q.   What is Valley House?

23        A.   Valley House back then on 10/14/93, it was a

24   high -- it was considered a high restriction halfway

25   house.

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    107

1      Q.    Say that one more time.

2      A.    It was considered a high restriction halfway

3   house.

4      Q.    Okay.  So, it's a -- is that an effort to

5   rehabilitate?

6      A.    That's an effort to rehabilitate the youth,

7   yes, sir.

8      Q.    Okay.  And you know that Mr. Gutierrez went

9   there?

10     A.    According to my records, that's what they

11  indicate, sir.

12     Q.    And then was he transferred out of there for

13  some reason?

14     A.    From Valley House -- he was placed there on

15  10/14/93; and from Valley House, on 1/3/94 he was placed

16  T.A., temporary admission, to the Evins Regional Juvenile

17  Center in Edinburg, Texas.

18     Q.    Okay.  Do you know why he was placed from

19  Valley to Evins?

20     A.    According to my records, while he was at Valley

21  House, he was involved in 15 incident reports -- or 15

22  incidents.  I'm sorry.

23     Q.    And what -- I mean, tell me what -- just

24  generally, what is an incident?

25     A.    An incident is written on each youth when they

1   are involved in negative behavior.

2        Q.   Okay.  So he's at the halfway house; he's got

3   15 incidents?

4        A.   Yes, sir.

5        Q.   He goes to Evins --

6        A.   Yes, sir.

7        Q.   -- temporarily?

8        A.   Temporary admission, that's correct.

9        Q.   And then, when does he to go Rio Grande

10  Military Institute?

11       A.   On 1/3/94 through 1/5/94 he was placed at Evins

12  Regional Juvenile Center.  And then they did -- a level

13  II hearing was conducted; and Ruben Gutierrez was placed

14  at the Rio Grande Marine Institute on 1/5/94.

15       Q.   Okay.  You just said something we don't

16  understand.  What is a level II hearing?

17       A.   A level two hearing is -- within the Texas

18  Youth Commission is a -- it's called an administrative

19  hearing.  They do those hearings when the kid has been

20  involved in negative behavior that the current placement

21  that the kid is in is not able to -- determine that

22  they're not able to work with the kid at that point.

23       Q.   All right.  And what -- tell us what Rio Grande

24  Military Institute is.  What is that --

25       A.   The Rio Grande Marine Institute, it's a high

1   restriction contract care program that contracts with the
2   Texas Youth Commission.
3        Q.   Okay.  It's high restriction --
4        A.   Yes, sir.
5        Q.   -- contract care?
6        A.   Yes, sir.
7        Q.   And what type of environment is that?
8        A.    It's an environment where the -- they provide
9   close supervision and monitoring of the youth.  And the
10  program is located in the country, maybe -- I'd say maybe
11  8 miles or 10 miles northeast of Los Fresnos, if I'm
12  correct.
13       Q.   Okay.  I've been saying Military Institute, but
14  it's Marine Institute, right?
15       A.   Correct, sir.
16       Q.   Okay.  But is it a military style of an
17  institute?
18       A.   No, sir.  It's not military style, no, sir.
19       Q.   Okay.  What is it, then?
20       A.    The Rio Grande Marine Institute is a contract
21  care placement that provides educational, they provide
22  vocational training, they provide, like I mentioned
23  earlier, close supervision of the youth.
24       Q.   Okay.  They try to teach them discipline?
25       A.   Yes, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    110

1      Q.   Respect for authority?

2      A.   Yes, sir.

3      Q.   And self-respect?

4      A.   Yes, sir.

5      Q.   Okay.

6      A.   And try to teach them vocational skills plus

7    the education.

8      Q.   What kind of vocational skills?

9      A.   Back then in that year they had carpentry.

10   They had welding.  If I'm correct, they also had air

11   conditioning, if I'm correct.

12     Q.   Okay.  And do you know the date of birth of

13   Ruben Gutierrez?

14     A.   According to my records, the date of birth of

15   Ruben Gutierrez is 6/10/77.

16     Q.   Okay.  So he's 16 years old at that time?

17     A.   That is correct.

18     Q.   All right.  And when he got sent over to where

19   you are, the Rio Grande Marine Institute, how long did he

20   stay there?

21     A.   When Ruben Gutierrez was placed at Rio Grande

22   Marine Institute on 1/5/94, I, as a case manager, am

23   supposed to be called in at any time or before or after

24   the kid lands at the program.  I was called on 1/5/94 at

25   around 5 p.m. that I had a new resident or a new youth in

STATE OF TEXAS VS. RUBEN GUTIERREZ                    111

1    the program and his name was Ruben Gutierrez.

2                    On that same day, on 1/5/94, at

3    approximately -- on 1/5/94 at approximately 8:30 p.m.,

4    the Texas Youth Commission was informed that Ruben

5    Gutierrez had escaped from the program.

6         Q.    He gets there at five and he's gone by 8:30?

7         A.    Yes, sir.

8         Q.    So he stays there three and a half hours?

9         A.    My information, that's what it says here, yes,

10   sir.

11        Q.    Can you do any meaningful rehabilitation with

12   somebody in three and a half hours?

13        A.    No, sir.

14        Q.    And when they escape, what kind of -- what

15   happens?

16        A.    When the youth escapes from the contracting

17   program, such as RGMI, as a case manager, I'm responsible

18   to issue what we call a directive, Texas youth directive.

19        Q.    Is that like a warrant?

20        A.    It's like a warrant, yes, sir.

21        Q.    To take him into custody?

22        A.    Yes, sir.

23        Q.    And do you know when he was next caught?

24        A.    My information states that he was caught on

25   10/11/94.

1      Q.   Okay.  And by then he's 17; he's an adult?

2      A.   Correct, sir.

3      Q.   So, he's a native through the juvenile system;

4  he's in the adult system at that point?

5      A.   Correct, sir.

6           MR. BLAYLOCK:  I have no further

7  questions.

8                    **CROSS-EXAMINATION**

9  BY MR. GALARZA:

10     Q.   Mr. Leal, just a couple of questions.  How long

11  have you been working with the TYC again?

12     A.   I've been working with the Texas Youth

13  Commission for about -- close to 18 years, sir.  I'll be

14  18 years on June 25th or 26th of this year.

15     Q.   And you stated that before when you got this

16  incident, you were a case manager; is that correct?

17     A.   Correct, sir.

18     Q.   And what does a case manager cover again?

19     A.   A case manager is a person that is responsible

20  to monitor and make sure that the kid receives the

21  adequate treatment or the adequate supervision he needs,

22  that the youth is in need of at that time.

23     Q.   Okay.  And when was the first day that you got

24  in contact with Mr. Gutierrez?

25     A.   I never made contact with the youth when he was

STATE OF TEXAS VS. RUBEN GUTIERREZ                          113

1    at the program, sir.  I made contact -- according to my

2    chronos that I wrote at that time, I made contact with

3    Ruben on 10/11/94.

4         Q.   And that 10/11/94 is when he was caught again;

5    is that correct?

6         A.   Correct, sir.  That's when I was informed that

7    he had -- he was in county jail.

8         Q.   When were you first assigned this case?  When

9    were you the case manager --

10        A.   I was the case manager of the youth when he was

11   assigned or landed at the Rio Grande Marine Institute on

12   1/54/94.

13        Q.   And you stated that at that time he escaped

14   after three and a half hours; is that correct?

15        A.   That's what my information indicates, yes, sir.

16        Q.   Okay.  Before he was assigned over to the Texas

17   Youth -- actually, to the Rio Grande Institute, you

18   stated he was over at the Valley House?

19        A.   Before he was assigned to the Rio Grande Marine

20   Institute, he was admitted temporarily to the Evins

21   Regional Juvenile Center, sir.

22        Q.   Okay.  What does that consist of?

23        A.   The Evins Regional Center, when the youth are

24   temporarily assigned there, it's like -- more like a

25   security placement pending an administrative hearing.

STATE OF TEXAS VS. RUBEN GUTIERREZ                        114

```
 1        Q.    Which is the assessment, he's going through an
 2   assessment, through an evaluation to see where --
 3        A.    Not when --
 4                THE COURT:  Just a minute.  Just a minute,
 5   Mr. Leal.
 6                THE WITNESS:  I'm sorry, sir.
 7                THE COURT:  Let him finish asking the
 8   question.
 9                THE WITNESS:  Oh, I'm sorry.
10                THE COURT:  You're running into each
11   other; and it's hard to see when one ends and the other
12   begins.
13                Finish your question, counsel.
14        Q.    (BY MR. GALARZA)  Okay.  You said it's not an
15   assessment.  Okay.  What is that?
16        A.    Evins, sir, or -- you're asking about Evins?
17        Q.    Yes.
18        A.    Evins at that point, with the information I
19   got, it was a temporary placement.  It was a secured
20   placement where the youth was placed there pending an
21   administrative hearing.
22        Q.    Is that where you stated that he got some
23   write-ups or --
24        A.    No, sir.  He -- the write-ups, the incident
25   reports that I show, he received those when he was at
```

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                         115

1    Valley House.

2         Q.    Okay.  From Evins, where was he placed at after

3    that?

4         A.    After Evins when he had the administrative

5    hearing, he was placed at the Rio Grande Marine

6    Institute.

7         Q.    So, at Evins, like you stated, it was just a

8    temporary placement?

9         A.    Yes, sir.

10        Q.    After Evins, he was placed at the Valley House

11   or is it the institute?

12        A.    After Evins, he was placed at the institute.

13        Q.    When was he placed at Valley House?

14        A.    Valley House he was placed on 10/14/93 through

15   1/3/94.

16        Q.    So he stayed there from October to January of

17   1994, is that correct, at Valley House?

18        A.    That is correct, sir.

19        Q.    Okay.  Is that where he got the 15 incident

20   reports?

21        A.    That is correct, sir.

22        Q.    Do you know what type of incident reports they

23   are?

24        A.    I could just read to you briefly what I have

25   from my reports, if that's okay with you.

STATE OF TEXAS VS. RUBEN GUTIERREZ                          116

1       Q.   Okay.  Let me ask you this.  What consists of

2  an incident report?  Is it answering back to a

3  supervisor?  What --

4       A.   Incident reports consist of not following

5  instructions, to escapes, anything that's negative, to

6  possession of controlled substance, to assaults, to

7  threatening people, anything that's negative, sir.

8       Q.   Okay.  So at this time, it could range from not

9  following the rules to all the way to assault like you

10  stated?

11       A.   Assaults and escape.  That is correct.

12       Q.   Okay.  And from the Valley House, that's when

13  he was placed over in the Marine Institute; is that

14  correct?  He was taken over to the Marine Institute?

15       A.   From Valley House, he was T.A. to Evins; and

16  then from Evins, he was placed at the institute, sir.

17       Q.   Okay.  And you were assigned to his case on

18  January 5th of 1994?

19       A.   That is correct.

20       Q.   And at that point, you say that there's a high

21  supervision; is that correct?

22       A.   That is correct, sir.

23       Q.   Okay.  What happened at that point?  If there's

24  a high supervision, how was he able to escape?  Don't you

25  automatically take him over and be with him at all times?

STATE OF TEXAS VS. RUBEN GUTIERREZ                     117

1       A.    Yes, sir.

2       Q.    And he was only there for three and a half

3    hours?

4       A.    Yes, sir.

5       Q.    He automatically escaped.  Where is the Marine

6    Institute located at?

7       A.    If I'm correct, I think it's maybe eight, maybe

8    10 miles northeast of Los Fresnos and I think it's close

9    to Bayview.  I think Bayview is around that distance from

10   Los Fresnos.  It's close to Bayview, Texas.

11      Q.    Is your office located there at the Marine

12   Institute at that time?

13      A.    At that time my office was located in

14   Brownsville, sir.

15      Q.    Okay.  How were you able to have control of

16   these individuals that you had to supervise?

17      A.    I'm a case manager.  So I really don't have

18   physical control or supervision of the kids.  The

19   contract care program is the one that is responsible for

20   them.

21      Q.    Okay.  At that point, who was the contract care

22   program person?

23      A.    I don't have that information with me, sir.

24      Q.    Okay.

25      A.    As far as -- you're talking about the person

STATE OF TEXAS VS. RUBEN GUTIERREZ                    118

1    that's in charge of the program?

2         Q.   The person that had direct contact with

3    Mr. Gutierrez.

4         A.   It could be any number of staff that worked

5    there at the program, sir.

6         Q.   Okay.  You don't assign one person to give him

7    counseling, one person to supervise him, one person to

8    have control over him?

9         A.   There's persons that -- at the program that

10   have control over the kids.  I don't have the names of

11   those persons.  And as far as the counseling and the

12   treatment, the time was too short.

13        Q.   Okay.  You stated earlier that part of your job

14   is to try to go ahead and rehabilitate him.  How can you

15   rehabilitate him if they don't have a supervisor or

16   somebody he has direct contact with?

17        A.   Like I said, the time that he was in the

18   program was too short to actually assign him to any

19   particular classroom or counselor or maybe even a

20   vocational trade, sir.

21        Q.   As a case manager, you're allowed to see all

22   his records before he goes into the Marine Institute; is

23   that correct?

24        A.   No.  No.  I don't have the authority to decide

25   who comes into that program or not.  So I really don't

STATE OF TEXAS VS. RUBEN GUTIERREZ                119

1    have -- as far as the master file, I don't have access to
2    the master file until he actually gets in placement.
3         Q.    Okay.  So, once he lands in placement, you
4    don't know what kind of kid you're receiving at that
5    point?
6         A.    I'm sorry, sir?
7         Q.    Once he lands in placement, once he landed at
8    the Marine Institute, you still don't know what kind of
9    individual you're receiving at that point?
10        A.    That is correct.
11        Q.    But you know that you're receiving somebody
12   that's had some problems before?
13        A.    Yes, sir.
14        Q.    Isn't it your priority to try to rehabilitate
15   them?
16        A.    That's the priority of the Texas Youth
17   Commission, yes, sir.
18        Q.    You stated that he escaped January 5, 1994, and
19   then he got caught in October of 1994; is that correct?
20        A.    That is correct.
21        Q.    Do you know where he was caught at?
22        A.    No, sir, I don't know where he was caught at.
23        Q.    Was he caught here in Brownsville?
24        A.    I don't have that information, sir.
25        Q.    As far as your information, did anybody go over

PAM L. ESQUIVEL, CSR, RPR

STATE OF TEXAS VS. RUBEN GUTIERREZ                    120

1    to his residence?

2         A.    What I have, sir, as far as my documentation

3    was that on 10/11/94 I was informed by the Cameron County

4    Sheriff that Ruben had been arrested for burglary and

5    forgery.

6         Q.    Okay.  So, at that point he had been arrested,

7    but he was not served with a warrant; is that correct?

8    Nobody went over to his house and tried to --

9         A.    I don't have that information with me, sir.

10        Q.    He was out for around nine months.  There was a

11   warrant pending or a warrant issued, and nobody went over

12   to try to serve that warrant?

13        A.    What we do is we issue out a directive; and we

14   place him with the -- we enter that information on the

15   NCIC system, the National Crime -- I don't recall what

16   the I and the C stand for, sir.  But it's entered there

17   and it's a federal agency system that is placed -- all

18   the warrants are placed there.

19               We also issue or fax or mail a copy of

20   that directive to the Brownsville Police Department and

21   the Sheriff Department, sir.

22        Q.    Let's go back to the Marine Institute.  How

23   many individuals, how many I guess children do they have

24   there at the Marine Institute where he was going to be

25   placed at?

STATE OF TEXAS VS. RUBEN GUTIERREZ                    121

1      A.    It can range anywhere from maybe 22 to maybe 28
2   at that time, sir.
3      Q.    Okay.  At that time, how many persons did you
4   have working there in an eight hour basis at one point?
5      A.    At one point on an eight hour basis, we had --
6   or the Rio Grande Marine Institute had about maybe six,
7   seven staff.
8      Q.    Do you have any type of counseling there at the
9   institute?
10      A.    I don't recall at that point, sir, at that
11   year.
12      Q.    You stated that I believe you also provide
13   vocational skills; is that correct?
14      A.    Yes, sir, vocational skills.
15      Q.    Who provides these skills?
16      A.    A staff there from RGMI.
17      Q.    These six to seven individuals that work there,
18   the staff, are supposed to supervise these individuals
19   and also provide vocational skills?
20      A.    Yes, sir.
21      Q.    That goes from carpentry to welding to air
22   condition?
23      A.    Yes, sir.
24      Q.    What type of education do these people have?
25      A.    I don't have that information with me, sir.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    122

1        Q.    Do they have a college degree?

2        A.    Some of them do, yes, sir.

3        Q.    Out of the six or seven, how many have a

4   college degree?

5        A.    I don't know.

6        Q.    One?

7        A.    I don't know, sir.

8              MR. GALARZA:  That's all I have at this

9   time.

10             MR. BLAYLOCK:  Just a couple of things.

11                  **REDIRECT EXAMINATION**

12   **BY MR. BLAYLOCK:**

13       Q.    Now, sir, from the information that you have,

14   do you think it was Rio Grande Marine Institute's fault

15   that he ran away, he escaped?

16       A.    No, sir.

17       Q.    Do you think that their degrees or lack of

18   degrees made him the way he is?

19       A.    No, sir.

20       Q.    And again, he was only there three and a half

21   hours?

22       A.    That is correct.

23             MR. BLAYLOCK:  Nothing further.

24             MR. GALARZA:  I have nothing further, Your

25   Honor.

STATE OF TEXAS VS. RUBEN GUTIERREZ                    123

```
 1                    THE COURT:  All right.  You may step down.
 2              You may call your next witness.
 3                    MS. FISCHER:  State calls Michael Flores.
 4                    THE COURT:  All right.  Could you raise
 5    your right hand, please?
 6                    (The witness was sworn in by the Court)
 7                    THE WITNESS:  Yes, sir.
 8                    THE COURT:  All right.  You may be seated.
 9              You may proceed.
10                    MS. FISCHER:  Thank you, Judge.
11                         MICHAEL FLORES,
12      having been first duly sworn, testified as follows:
13                       DIRECT EXAMINATION
14    BY MS. FISCHER:
15         Q.   Mr. Flores, will you please tell the jury your
16    full name?
17         A.   Michael Flores.
18         Q.   And what do you do for a living?
19         A.   I'm a supervisor for the Brownsville
20    Independent School District, security services,
21    communications, technical services division.
22         Q.   Okay.  Mr. Flores, you're going to have to tell
23    us what that is.
24         A.   I oversee the communications department, nine
25    dispatchers.  And I also oversee the installation and
```

1   maintenance of all technical equipment in our school

2   district; alarms, video surveillance cameras and so

3   forth.

4        Q.   Okay.  Now, how long have you been doing that

5   specific supervising jobs?

6        A.   The past four years.

7        Q.   Okay.  Now, back in 1992, were you working for

8   the Brownsville Independent School District?

9        A.   Yes, ma'am.

10        Q.   And what were your duties back in 1992?

11        A.   That was my rookie year in the security

12   services department.  I was a security officer stationed

13   at the Rivera High School.

14        Q.   And what do the security officers at Rivera

15   High School, what is it your job to do?

16        A.   Just to -- well, back then it wasn't very

17   clear, but we provide a safe learning environment for our

18   students and staff and faculty.

19        Q.   Okay.  But you're not a police officer?

20        A.   No, ma'am.

21        Q.   You are what they call a security officer?

22        A.   Yes, ma'am.

23        Q.   Now, if there was a problem with a particular

24   child at Rivera High School, what would you do in

25   response to that?

1       A.    It would depend on the problem.  We would take

2   the child to the administrator and he would deal with it.

3       Q.    Okay.  And let's talk about a particular

4   incident that you had back on October the 9th of 1992

5   dealing with an individual named Ruben Gutierrez.  Were

6   you asked at that time to escort someone?

7            MR. REYES:  I'm going to object, Your

8   Honor, as to we were not given timely notice of this

9   alleged offense.  It's irrelevant.  We'd also object that

10  it gives an unfair prejudice.  And also it violates

11  Rule 609(d) of the Code of -- the Rules of Criminal

12  Evidence.

13           THE COURT:  It's overruled.

14      Q.    (BY MS. FISCHER)  Okay, Mr. Flores.  I know I

15  asked you a question and we need to get to the answer.

16  Before we get there, let's talk a little bit more about

17  you being a security guard -- or security officer I think

18  is the technical term that you all had back then.

19      A.    Yes, ma'am.

20      Q.    Did you have to wear a specific uniform?

21      A.    Yes, ma'am.

22      Q.    And what was the uniform that you would wear

23  when you were a security officer for B.I.S.D.?

24      A.    Okay.  The first month we did not wear a

25  uniform, but after that it was a blue shirt, a sky blue

STATE OF TEXAS VS. RUBEN GUTIERREZ                          126

1    shirt with Navy blue epaulets, blue pants, badge, name
2    tag, so forth.
3         Q.   Did you carry a gun?
4         A.   No, ma'am.
5         Q.   Okay.  But you were dressed as someone who was
6    in a position of security?  The students knew --
7         A.   Yes, ma'am.
8         Q.   -- what your job was?
9         A.   Yes, ma'am.
10        Q.   Okay.  Then let's talk about a specific
11   incident back on October the 9th of 1992 where you were
12   asked to escort an individual named Ruben Gutierrez.  Can
13   you please tell the jury about that?
14        A.   We were called in to the office to escort
15   Mr. Gutierrez off campus due to he was being -- he was
16   suspended from school.  As we were walking out towards
17   the front gate --
18        Q.   Okay.  Let's stop right there.  When you said
19   you were asked to escort Ruben Gutierrez, do you see the
20   person that you were supposed to escort off the campus in
21   the courtroom?
22        A.   Yes, ma'am, the young man in the white shirt
23   right here (pointing).
24             MS. FISCHER:  Your Honor, may the record
25   reflect he has identified the defendant?

PAM L. ESQUIVEL, CSR, RPR